## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PERFORMANCE POWERSPORTS GROUP | ) Case No. 23-10047 (___) |
| INVESTOR, LLC, *et al.*,[1] | ) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR AND JUNIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) AUTHORIZING USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),[2] respectfully state the following in support of this motion (the "Motion").

## PRELIMINARY STATEMENT

1.    The Debtors are in the business of adventure, selling dirt bikes, go-karts, ATVs, golf carts, and the like to retailers throughout the United States. This business is seasonal in nature, and its products are primarily purchased by consumers around the holidays. To capitalize on this demand, the Debtors purchase vehicles that it schedules for delivery in advance of the holidays.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

[2]    Capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in the *Declaration of Ken Vanden Berg of Performance Powersports Group Holdings, Inc., in Support of the Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") or the Interim Order, as applicable.

2.      The Debtors did just that with Huansong, one of its then primary vendors, who was to deliver all-terrain and utility vehicles prior to the fourth quarter of 2021.  Those vehicles were not, however, delivered until the beginning of January 2022.  As a result, the Debtors could not capitalize on the 2021 holiday season and suffered losses from their inability to sell their vehicles when demand was high.

3.      The Debtors' financial distress was further compounded by delays and costs in shipping caused by supply chain disruption felt across the country, prior management's decision making, increased costs associated with freight, shipping, demurrage and warehousing of inventory deliveries, and a "post-pandemic" reduction in demand from customers.

4.      The Debtors engaged Portage Point Partners, LLC ("Portage Point") in October, 2022 to serve as both their restructuring advisor and investment banker.  Since commencing its engagement, Portage Point has provided assistance in numerous areas including in connection with the Debtors' evaluation of strategic alternatives.  Portage Point has worked closely with the Debtors' management and other restructuring professionals and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

5.      In connection with the review and analysis of the Debtors' strategic alternatives, Portage Point worked closely with the disinterested director of the boards (the "Disinterested Director") who was delegated the authority to review and act upon any matters pertaining to a potential restructuring or refinancing or sale transaction in which a conflict may exist between the Debtors on the one hand, and their equity holders, affiliates (or those entities' managers, directors, or officers) on the other hand.  This process also included the Debtors' then-existing lender and that lender's retained advisors to evaluate potential strategic alternatives.  After considering the reasonably available possible courses of action, the Debtors determined that a sale of their assets

was in the best interest of the Debtors, their creditors, and all parties in interest under the circumstances, particularly considering the Debtors' liquidity constraints, litigation, vendor threats, and the anticipated difficulties in raising additional debt or equity financing.

6.    As a result of these circumstances, the financial distress experienced by the Debtors has continued to worsen as the Debtors are suffering from an ongoing drain on cash flow and the lack of any source of long-term additional liquidity.  Worse still, the very vendor that failed to timely deliver the product has commenced litigation against the Debtors for purportedly outstanding amounts and has threatened to file an involuntary petition against at least one of the Debtor entities.  Recognizing this dire situation, the Debtors quickly took steps necessary to save the business and maximize value for all stakeholders.

7.    In an effort to avoid a bankruptcy filing altogether, the Debtors attempted to negotiate a commercial resolution with Huansong.  Following the Debtors unsuccessful attempts to negotiate a commercial resolution with Huansong, the Debtors' restructuring counsel, restructuring advisor and investment banker, and Disinterested Director conducted a thorough review and analysis of the Debtors' strategic alternatives.  After considering all reasonably available courses of action in light of the Debtors' circumstances and Huansong's unwillingness to agree to a commercial resolution, and having received no indications of interest by the January 13, 2023 deadline, it became apparent that the Debtors' liquidity position and other issues described above would require the continuation of the sale process in a voluntary chapter 11 process, which would also be in the best interests of the Debtors, their creditors, and all parties in interest.

8.    Faced with no actionable sale proposal,  CPS USA Acquisition, LLC, an affiliate of Kinderhook, agreed to serve as the stalking horse bidder (the "Stalking Horse Bidder") pursuant

10329004.v10

to the terms of that certain asset purchase agreement, dated January 16, 2023 (the "Stalking Horse Purchase Agreement")[3] to acquire the Debtors' assets as a going concern, to expose the Stalking Horse Purchase Agreement to higher and better offers through a chapter 11 process, and to support the process by agreeing, through one of its affiliates, to provide needed debtor-in-possession financing to the Debtors on a junior lien basis as set forth in this Motion.

9.      In so doing, the Debtors and the Stalking Horse Bidder have agreed on a sale process that not only represents a value-maximizing, going concern sale of substantially all of the Debtors' assets, but provides for a recovery to Twin Brook Capital Partners and the other Debtors' senior lenders and unsecured creditors whose contracts and/or claims will be assumed under the Stalking Horse Purchase Agreement.  The sale process also will provide a recovery of approximately $500,000 to unsecured creditors whose claims were not assumed or assigned, plus the amounts needed to wind down the Debtors' estates.  Moreover, Kinderhook's willingness to serve as the Stalking Horse Bidder will enhance the bidding process—which will continue post-petition—by providing a floor that prospective bidders must clear and may also provide further opportunity for a commercial resolution with Huansong.

10.      To facilitate a thorough marketing and sale process and consequently, the Debtors' ability to continue as a going concern, Kinderhook, via its affiliate, Tankas Funding VI, LLC (the "DIP Lender"), has agreed to provide the DIP Facility that will address the Debtors' immediate need for liquidity and prevent the liquidation that would otherwise occur absent such financing. Specifically, in the days leading up this filing, the Debtors and the DIP Lender were able to reach terms on a $10 million second lien junior financing facility.  As a result of the DIP Lenders'

---

[3]      To the extent there are any discrepancies between the Stalking Horse Purchase Agreement and the description or summary of the Stalking Horse Purchase Agreement or its terms herein, the terms of the Stalking Horse Purchase Agreement shall prevail.

willingness to provide the DIP Facility, the Debtors will have sufficient liquidity to stabilize their operations, pay vendors, and fund the administration of these Chapter 11 Cases (as defined below).

11.     The DIP Facility features several favorable terms.  Most notably, the DIP Facility is being provided on a ***junior basis*** with respect to the Prepetition Secured Parties, such that no secured lender will be primed by the DIP Facility.  As of the Petition Date, substantially all of the Debtors' cash is encumbered, and thus the Debtors require immediate access to the Prepetition Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral") to operate their enterprise and continue paying debts as they come due in addition to the funds available under the DIP Facility.  Under the DIP Facility, the Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral in exchange for the adequate protection described herein.

12.     On January 16, 2023, the Disinterested Director recommended approval of entry into the proposed DIP Facility.  *See* First Day. Declaration ¶ 9.  The DIP Facility and use of Cash Collateral provide the Debtors the necessary liquidity to, among other things, fund the administration of these Chapter 11 Cases, including the marketing and sale process, satisfy payroll, pay suppliers, meet overhead, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' businesses.  The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their businesses during the pendency of these Chapter 11 Cases and to maximize value in any sale transaction.

13.     The ability to use Cash Collateral and access the DIP Facility is critical to signal to the Debtors' customers, vendors, and employees that operations can and will continue in the ordinary course during the reorganization process, which the Debtors believe will only further aid facilitation of a successful sale in these Chapter 11 Cases.  *See* Lozynski Declaration ¶ 12; Bremer

Declaration ¶ 20 (each defined below). This is particularly important to the foreign vendor base who is less familiar with the chapter 11 process and will be particularly focused on ensuring the Debtors have sufficient liquidity and authority to continue payments in the ordinary course of business during the pendency of these Chapter 11 Cases. *See* Lozynski Declaration ¶¶ 12-13. In addition, vendors who are not paid may be able to assert additional mechanics liens or other priming claims, particularly in foreign jurisdictions. Without the DIP Facility and ability to use Cash Collateral, the Debtors will experience extensive disruptions and delays in obtaining product, irreparable damage to customer relationships, and permanent disruption to vendor relationships, increasing operating costs, and requiring additional liquidity to convince vendors to perform. In short, absent access to the DIP Facility and Cash Collateral, any hope for the Debtors to avoid a near-term liquidation will be jeopardized. Accordingly, for the reasons set forth herein, the Debtors request that the Court approve the Debtors' entry into the DIP Facility and use of Cash Collateral on the terms set forth herein.

## **RELIEF REQUESTED**

14. Through this Motion, the Debtors move for the entry of an order, pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 9014, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1, 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), providing the following relief on an interim basis substantially in the form attached hereto as **Exhibit 1** (the "Interim Order") and, after notice and hearing, on a final basis (the "Final Order"):

    (1)    authorizing, pursuant to sections 361(a) and 363(c) of the Bankruptcy Code, the Debtors' use of cash collateral on the terms and conditions set forth in the Interim Order;

6

(2)     authorizing the Debtors to grant continuing liens and adequate protection liens, claims, and security interests to the Prepetition Secured Parties (as defined herein) as provided in the Interim Order;

(3)     authorizing the Debtors to use the Cash Collateral for such uses as are approved under the Interim Order, subject to the terms set forth in the Interim Order and the budget attached as **Exhibit A** to the Interim Order (the "Budget");

(4)     immediately authorizing and approving the Debtors, as borrower and obligors under the DIP Facility (as defined herein), to obtain postpetition financing up to the aggregate principal amount of $10 million (the "DIP Facility"), from the DIP Lender from time to time;

(5)     authorizing the Debtors to execute, enter into, and borrower under the DIP Facility (as defined below) and to perform such other and further acts as may be required in connection with the DIP Facility;

(6)     approving, pursuant to sections 364(c) of the Bankruptcy Code, that the claim for repayment of the DIP Obligations (as defined below) shall:

a.     subject to the Carve Out (as defined below), have priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113 and/or 1114 of the Bankruptcy Code and all administrative claims granted pursuant to an order of the Bankruptcy Court, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in these Chapter 11 Cases or any successor case, which allowed super-priority claim of the DIP Lender shall be payable from and have recourse to all prepetition and postpetition property of the Debtors, to the extent provided for herein; and

b.     be and be deemed, subject to the terms of the Interim Order, immediately secured by valid, binding, continuing, enforceable, fully perfected, and unavoidable (i) first-priority senior priming security interests in and liens on all Unencumbered Collateral (as defined in the DIP Term Sheet (as defined below)) of the Debtors and (ii) subject to and junior to the Carve Out, junior second priority security interests in, and liens on all Collateral of the Debtors securing the Prepetition First Lien Facility (clauses (i) and (ii), collectively, the "DIP Facility Liens"), in each case, whether now existing or hereafter acquired, and to the extent not otherwise included, all proceeds, commercial tort claims, insurance claims (as to insurance claims, to the extent of the Debtors' interest therein) and other rights to payments not otherwise included in the foregoing assets and all products of the foregoing assets and all accessions to, substitutions and replacements for,

and rents and profits of, each of the foregoing assets, including, without limitation, and solely upon approval and entry of the Final Order, the proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code pursuant to sections 502(d), 544, 545, 547, 548, 550 and/or 553 of the Bankruptcy Code (collectively, the "DIP Collateral"), as provided for by sections 364(c) and (d) of the Bankruptcy Code, subject only to: (i) the Carve-Out; and (ii) the Prepetition Permitted Liens (as defined in the DIP Term Sheet.

(7)    scheduling an interim hearing on the Motion to consider entry of the Interim Order; and

(8)    scheduling a final hearing (the "Final Hearing") to consider, among other things, entry of a Final Order authorizing the continued use of Cash Collateral and borrowing under the DIP Facility, each on a final basis, and approving notice and the grant of adequate protection and other rights and protections to the Prepetition Secured Party and the DIP Lender as set forth in the Motion and the Final Order.

15.    The relief requested in the Motion is supported by the First Day Declaration and the *Declaration of Steven Bremer in Support of the Cash Collateral and DIP Financing Motion* (the "Bremer Declaration") and the *Declaration of Alyssa Lozynski in Support of the Cash Collateral and DIP Financing Motion* (the "Lozynski Declaration," and together with the Bremer Declaration, the "DIP Declarations"), which are contemporaneously filed herewith and are incorporated herein by reference.

## JURISDICTION, VENUE AND PREDICATES FOR RELIEF

16.    The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), to the entry of a final order by the Bankruptcy Court in connection with this motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

17.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has constitutional authority to enter final judgment in this proceeding.

18.     Venue of the cases is proper in this district pursuant to 28 U.S.C. § 1408, and venue over this proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

19.     The statutory predicates and applicable rules for the relief sought herein are §§ 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 9014, and 9019, and Local Rules 2002-1, 4001-1, 4001-2, and 9013-1.

### BACKGROUND AND FACTUAL PREDICATES FOR RELIEF

**A.      The Chapter 11 Cases**

20.     On January 16, 2023 (the "Petition Date"), the Debtors commenced their chapter 11 cases (together, the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.

21.     The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1007(a) and 1108 of the Bankruptcy Code.  To date, no trustee, examiner, or statutory committee has been appointed in the cases by the United States Trustee (the "U.S. Trustee").

22.     A description of the Debtors' capital and corporate structures, businesses, and the events leading to the commencement of these Chapter 11 Cases, as well the facts and circumstances supporting this Motion, are set forth in the First Day Declaration, which is fully incorporated herein by reference.

**B.      The Debtors' Prepetition Debt Structure**

   ***i.        The First Lien Debt***

23.     Pursuant to that certain Credit Agreement dated as of October 8, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit

Agreement"); together with the Loan Documents (as defined in the Prepetition Credit Agreement) and any other agreements or documents executed or delivered in connection therewith, each as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Loan Documents") by and among (a) Performance Powersports Group Purchaser, Inc. (the "Borrower"), (b) Performance Powersports Group Holdings, Inc., and Performance Powersports Group, Inc. (collectively, the "Guarantors"; together with the Borrower, the "Prepetition Obligors"), (c) Twin Brook Capital Partners, LLC (the "Prepetition Agent"), and (d) each of the Lenders (as defined in the Prepetition Credit Agreement) party thereto (in such capacity, the "Prepetition Lenders"; together with the Prepetition Agent, collectively, the "Prepetition Secured Parties"), the Prepetition Lenders agreed to provide certain credit facilities and other financial accommodations to the Borrower on the terms and conditions set forth more completely therein (the "Prepetition First Lien Facility").

24.     As more fully set forth in the Prepetition Loan Documents, the Prepetition Obligors granted to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, a first-priority security interest in and continuing lien (the "Prepetition Liens") on certain "Collateral" (as defined in the Prepetition Loan Documents), including all real and personal property, other than certain specified "Excluded Property" (as defined in the Prepetition Loan Documents) of the Prepetition Obligors, as perfected against by the filing of various UCC-1 financing statements naming the Prepetition Obligors as debtor and the Prepetition Agent as secured party filed with the appropriate state recording offices (collectively, as such, the "Prepetition Collateral").

25.     On March 2, 2022, based on the Debtors' financial condition, the depletion of the $7.5 million available revolver under the Prepetition Credit Agreement, and in an effort to obtain further capital to take an advantage of a prospective business opportunity, the parties entered into

10

the First Amendment to the Credit Agreement pursuant to which: (1) certain Prepetition Lenders agreed to provide additional term loans to the Borrower to repay the outstanding Revolving Loans in an aggregate principal amount equal to $4,826,500 and to pay related fees, costs and expenses incurred by the Prepetition Lenders; and (2) the Prepetition First Lien Facility's total amount was increased of term loans was increased from $45,000,000 to $50,000,000.

26.    Thereafter, the Debtors notified the Prepetition Agent and the Prepetition Lenders that certain Defaults and/or Events of Default (as defined in the Prepetition Credit Agreement) had arisen pursuant to various provisions of the Prepetition Credit Agreement for, *inter alia*, Borrower's failure to comply with the mandatory prepayment set forth in Section 2.10.2(c) of the Prepetition Credit Agreement and Borrower's failure to timely comply with requirements to deliver audited financial statements for 2021 and financial projections for 2022. As a result, on September 30, 2022, the parties entered into that certain Second Amendment to Credit Agreement and Limited Waiver pursuant to which: (1) certain Prepetition Lenders agreed to provide additional term loans to the Borrower to repay the outstanding Revolving Loans in an aggregate principal amount equal to $5,500,750 and to pay related fees, costs and expenses incurred by the Prepetition Obligors; and (2) the Term Loan total amount then outstanding was increased by $5,700,000 to $55,450,000.

27.    As of the Petition Date, the Prepetition Obligors were indebted to Prepetition Secured Parties on account of the obligations under the Prepetition Loan Documents in the aggregate principal amount of $52 million (plus accrued and accruing interest, fees, expenses and other charges, the "Prepetition Obligations").

28.    The Prepetition Secured Parties have consented to the use of the Cash Collateral and the borrowing under the DIP Facility (including liens to the benefit of the DIP Lender) upon the terms set forth in the Interim Order.

10329004.v10

C.    **The Debtors' Immediate Need for Debtor-in-Possession Financing to Maintain Operations and Satisfy Their Obligations as Debtors-in-Possession**

29.    The Debtors commenced these Chapter 11 Cases to maximize the value of their estates for the benefit of all parties in interest through a going-concern sale process.  As further described in the First Day Declaration, prior to the Petition Date, the Debtors explored a range of options to address their ongoing challenges related to maintaining sufficient cash flow to satisfy their debt and operational obligations.  Ultimately, due to the continued drain on cash flow, lack of a source of additional long-term liquidity, no written, actionable indications of interest having been received by the initial January 13, 2023 bid deadline, and facing litigation and mounting pressure from vendors, including the threatened filing of an involuntary bankruptcy proceeding the Debtors, together with their advisors, commenced negotiations with CPS USA Acquisition, LLC, an affiliate of Kinderhook and the DIP Lender, to potentially serve as a "stalking horse" purchaser for the proposed sale.

30.    These negotiations culminated with the Debtors' entry into the Stalking Horse Purchase Agreement, by and among the Debtors as sellers and CPS USA Acquisition as buyer for the sale of substantially all of the Debtors' assets, subject to a public bidding and auction process with the DIP Lender as the stalking horse bidder (all as subject to the Bankruptcy Court's approval).[4]

31.    The DIP Lender also agreed to provide postpetition financing to the Debtors upon the terms set forth in the Interim Order and in the *Junior Secured Superpriority Debtor-in-Possession Term Loan Facility Term Sheet*, which is attached to the Interim Order as **Exhibit B** (the "DIP Term Sheet," and together with all agreements, instruments, pledge agreements,

---

[4]    Contemporaneously herewith, the Debtors filed a motion seeking, inter alia, approval of bid procedures and certain bid protections relating to the asset sale.

10329004.v10

intercreditor agreements, guaranteed, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual property security agreements, or notes) that are intended from time to time to effectuate the terms of the DIP Term Sheet, including the Interim Order and the Final Order, the "DIP Loan Documents").

32.     Upon execution and delivery of the DIP Term Sheet and entry of the Interim Order, the Debtors seek immediate authority to borrow (on an interim basis) under the DIP Facility from the DIP Lender up to the principal amount of $3.5 million (together with interest, fees, charges, and expenses payable under the DIP Term Sheet), with the remaining amount being made available upon entry of the Final Order, *provided*, that the DIP Borrower (as defined in the DIP Term Sheet) may elect to draw a portion (not to exceed $4,800,000) of such DIP Facility on one additional business day after the borrowing in connection with the Final Order (on not less than five (5) business days' notice (or such shorter period as the DIP Lender may agree)), subject to the conditions set forth below, pursuant and subject to the terms and conditions of this Interim Order and the DIP Term Sheet (including the conditions to effectiveness thereof and the rights and grants to the DIP Lender therein).  The Debtors, moreover, seek authority to use the proceeds of the DIP Facility in accordance with the terms of the DIP Term Sheet and the Interim Order.

33.     The Debtors submit that entry into the DIP Term Sheet and the related postpetition borrowing will: (a) ensure the continued, uninterrupted operation of their businesses as the Debtors pursue a value-maximizing chapter 11 sale process; (b) assure the Debtors' customers, employees, counterparties, utilities, and business partners that the Debtors are sufficiently capitalized during the pendency of the Chapter 11 Cases and will continue to meet their postpetition obligations; and (c) make available sufficient funding for the Debtors to pay necessary expenses incurred in

10329004.v10

connection with administering the Chapter 11 Cases, including professional compensation and statutory fees.

**D.**     **Alternative Sources of Financing are Not Readily Available**

34.     The DIP Facility was thoroughly evaluated by the Debtors and their advisors and was the subject arm's-length and good faith negotiations before the Petition Date.  Further, as a result of the Debtors' debt structure and the challenges facing the Debtors' businesses, as further detailed in the First Day Declaration and DIP Declarations, the Debtors faced significant challenges leading to the commencement of these Chapter 11 Cases, including a looming threat of an involuntary petition.  The Debtors, with their advisors, ultimately determined to obtain a stalking horse bidder for their assets and continue to market the Debtors' assets for sale in a rational chapter 11 process.  The Debtors, upon determining that the best path forward to maximize the value of their assets was through a section 363 sale in chapter 11, commenced a process to secure the requisite debtor-in-possession financing to fund the Debtors' ongoing business operations and the contemplated costs of the Chapter 11 Cases until the section 363 sale could be completed on or before March 31, 2023.

35.     Understanding that the Debtors' situation presented certain difficulties to obtaining such financing—namely that: (a) all or substantially all of the Debtors' assets are encumbered and subject to senior prepetition liens, and (b) seeking debtor-in-possession financing could invoke costly and time consuming legal challenges, particularly if priming liens were required by a lender—the Debtors and their advisors began discussions with the DIP Lender regarding the possibility of obtaining debtor-in-possession financing from the DIP Lender.  The DIP Lender was the only viable avenue to provide the Debtors sufficient postpetition financing on reasonable, market and actionable terms on the condensed timeline necessary.

10329004.v10

36.     Pursuant to Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B), and Local Rule

4001-2, the following is a summary of the proposed material terms relating to the DIP Term Sheet

and Interim Order:[5]

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| **Borrowers** Bankruptcy Rule 4001(c)(1)(B) | Performance Powersports Group Purchaser, Inc. |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Performance Powersports Group Holdings, Inc. and Performance Powersports Group, Inc. |
| **DIP Lender** Bankruptcy Rule 4001(c)(1)(B) | Tankas Funding VI, LLC |
| **Administrative Agent** Bankruptcy Rule 4001(c)(1)(B) | None |
| **Term** Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B); Local 4001-2(a)(ii) | The maturity date ("Maturity Date") shall be the earliest to occur of: (i) March 31, 2023; (ii) the consummation of any sale of all or substantially all of the assets of the Debtors, (iii) 30 days after the Petition Date if the Final Order has not been entered, (iv) the acceleration of the DIP Credit Facility pursuant to the terms of the DIP Term Sheet, (v) upon the effective date of any plan of reorganization in these Chapter 11 Cases (the "Plan"), (vi) upon the filing of an Unapproved Plan (as defined in the DIP Term Sheet), (vii) upon the failure of the DIP Borrower or any Guarantor to timely satisfy any Milestone (as defined below), or (viii) with respect to Events of Default other than those expressly set forth in the DIP Term Sheet, two (2) business days after receipt by the DIP Borrower of a written notice from the DIP Lender of the occurrence of any such Event of Default; *provided, however*, that without the consent of a majority of the First Lien Lenders, the DIP Credit Facility cannot be repaid from proceeds of Prepetition Collateral until all "Obligations" (as such term is defined in the First Lien Credit Agreement) are paid in full, assumed in full, or otherwise treated in a manner satisfactory to the Prepetition Secured Parties. For the avoidance of doubt, in no event shall the DIP Lender be required to provide any consideration or recovery to the Prepetition First Lien Agent or Prepetition Secured Parties on account of the Prepetition Obligations or the Prepetition Collateral in the event that (y) it does not receive any recovery on account of the Prepetition Collateral or (y) the sale contemplated under the Stalking Horse Purchase Agreement closes and the Prepetition Obligations are assumed by the buyer as contemplated thereunder. |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | The DIP Lender shall provide a secured, multiple draw term loan credit facility of up to $10 million to fund the DIP Facility, on the terms and subject to the conditions set forth in the DIP Term Sheet and Interim Order, provided that $3.5 million shall be available upon entry of the Interim Order with the remainder to be available upon entry of the Final Order; *provided*, that the DIP Borrower may elect to draw a portion |

[5]     The summaries contained in this Motion are qualified in their entirety by the Interim Order and documents referred to herein.  To the extent anything in this Motion is inconsistent with such order or documents, the terms of the applicable order or documents shall control.  Capitalized terms used in this chart but not otherwise defined herein have the meanings ascribed to such term in the referenced documents.

10329004.v10

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | (not to exceed $4,800,000) of such DIP Facility on one additional business day after the borrowing in connection with the issuance of the Final Order (on not less than five (5) business days' notice (or such shorter period as the DIP Lender may agree)), subject to the conditions set forth below, pursuant and subject to the terms and conditions of this Interim Order and the DIP Term Sheet (including the conditions to effectiveness thereof and the rights and grants to the DIP Lender therein).<br><br>Concurrently with the initial funding of the DIP Facility, proceeds of the DIP Loans (as defined in the DIP Term Sheet) shall be maintained in a segregated bank account over which DIP Lender shall retain control (the "DIP Loan Account") that shall be subject to the DIP Liens in favor of the DIP Lender, which shall be granted and perfected pursuant to the DIP Orders. Funds on deposit in the DIP Loan Account shall be made available to the DIP Borrower from time to time to be applied directly to the payment of amounts permitted to be paid under the Approved Budget (as defined in the DIP Term Sheet) (after giving effect to the Permitted Variances). Amounts repaid under the DIP Credit Facility may not be re-borrowed. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | Conditions Precedent to the Distribution Under the DIP Facility After Entry of the Interim Order. Customary conditions precedent to borrowing set forth in the DIP Term Sheet, the satisfaction of which is a condition precedent to the DIP Lenders' obligation to provide the commitment made available as of the entry of the Interim Order.<br><br>Conditions Precedent to the Distribution Under the DIP Facility After Entry of the Final Order. Customary conditions precedent to borrowing set forth in the DIP Term Sheet, the satisfaction of which is a condition precedent to the DIP Lenders' obligation to provide the commitment made available as of the entry of the Final Order. |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | Interest shall accrue on the DIP Obligations at a rate of 15.0% per annum (the "Interest Rate"). Accrued interest with respect to any DIP Obligation shall be paid in cash on (i) the last day of each month, until any and all obligations under the DIP Facility (collectively, the "DIP Obligations") are paid in full and (ii) on the maturity of the DIP Loans. All interest and fees under this DIP Term Sheet shall be calculated on the basis of a 360-day year for the actual number of days elapsed. All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid. Following the occurrence and during the continuance of an Event of Default (as defined below) (after giving effect to any applicable grace periods), principal, interest and all other amounts due in respect of the DIP Obligations shall bear interest at a rate equal to 3.00% per annum in excess of the Interest Rate. |
| **Use of DIP Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii); Local Rule 4001-2(a)(ii) | The proceeds of the DIP Obligations will be used solely to: (i) fund the DIP Loan Account; (ii) pay fees, costs, administrative expenses and other expenses associated with the DIP Facility; and (iii) finance working capital and general corporate purposes, subject to the Approved Budget (as defined below) and the terms and conditions of the DIP Facility and the DIP Orders, including to (a) fund the costs of the administration of the Chapter 11 Cases and the consummation of a sale under section 363 of the Bankruptcy Code (as defined below) and (b) fund interest, fees, and other payments contemplated in respect of the DIP Facility; *provided* that during the Challenge Period (as defined below), an investigation budget in an aggregate amount of $50,000 of the DIP Obligations may be used by any official committee of unsecured creditors (the "Committee") to investigate, but not to prepare, initiate, |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | litigate, prosecute, object to, or otherwise challenge, (i) the claims and liens of the Prepetition Lenders, and (ii) potential claims, counterclaims, causes of action or defenses against the Prepetition Lenders. |
| **Repayment Features** Local Rule 4001-2(a)(i)(E) | <u>Voluntary Prepayment:</u> Voluntary repayment of the DIP Obligations, whether in whole or in part, shall not be permitted; provided, for the avoidance of doubt, that the foregoing restriction shall not apply to any application of DIP Obligations as consideration for a transaction in which the DIP Lender or one or more affiliates of the DIP Lender are the buyer(s) of all or substantially all of the assets of the assets of the Debtors (or equity interests of entities representing all or substantially all of the assets of the Debtors).<br><br>Mandatory Prepayment: The Debtors shall immediately pay or prepay the DIP Obligations (including the Exit Fee) (together with a cash reserve established by the DIP Lender to cover asserted contingent and indemnity obligations) until such obligations are paid in full as follows (subject to any prior application of the proceeds of Prepetition Collateral to the Prepetition First Lien Facility, to the extent required by the DIP Orders):<br><br>(i)    100% of the net cash proceeds of any DIP Collateral in any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code simultaneously with the consummation thereof, after funding the "Carve Out" (to the extent agreed upon by the DIP Lender and set forth in the DIP Orders, the "<u>Carve Out</u>"); provided, that the foregoing mandatory prepayment requirement (and the Exit Fee) shall not apply to any application of DIP Obligations as consideration for a transaction in which the DIP Lender or one or more affiliates of the DIP Lender are the buyer(s) of all or substantially all of the assets of the assets of the Debtors (or equity interests of entities representing all or substantially all of the assets of the Debtors);<br><br>(ii)    100% of the net cash proceeds of any other sale or other disposition by the DIP Borrower or any Guarantor of any DIP Collateral in excess of $50,000, in a single transaction or series of related transactions (except for asset sales in the ordinary course of business);<br><br>(iii)    100% of indemnity payments and insurance proceeds not included as proceeds of asset dispositions; and<br><br>(iv)    100% of the net cash proceeds received from the incurrence or issuance of indebtedness by Holdings, the DIP Borrower or any subsidiary not expressly permitted to be incurred or issued pursuant to clause (iii) of the section entitled "<u>Negative Covenants</u>" in the DIP Term Sheet.<br><br>Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any insurance proceeds, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lender.<br><br>Mandatory payments or prepayments and proceeds of DIP Collateral received by the DIP Borrower or any Guarantor outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the DIP |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | Lender), after giving effect to the Carve Out, and any other payments required pursuant to the DIP Orders:<br><br>1) <u>first</u>, to pay all documented out-of-pocket expenses of the DIP Lender (including, without limitation, fees and expenses of counsel and external advisors);<br><br>2) <u>second</u>, to pay the Exit Fee to DIP Lender;<br><br>3) <u>third</u>, to pay an amount equal to all accrued and unpaid interest and fees, if any, owing to the DIP Lender;<br><br>4) <u>fourth</u>, to repay any principal amounts outstanding in respect of the DIP Obligations (including any interest or other amounts that have been paid in kind and added to the principal balance thereof);<br><br>5) <u>fifth</u>, to pay all other amounts owing to the DIP Lender; and<br><br>6) <u>last</u>, the balance, if any, after all of the DIP Obligations have been paid in full, to the DIP Borrower subject in all respects to the rights, liens and claims of each of the Prepetition Agent and the Prepetition Lenders.<br><br>*provided*, *however*, that without the consent of a majority of the Prepetition Lenders, the DIP Facility cannot be repaid from proceeds of Prepetition Collateral until all "Obligations" (as such term is defined in the Prepetition Credit Agreement) are paid in full, assumed in full, or otherwise treated in a manner satisfactory to the Prepetition Secured Parties. For the avoidance of doubt, in no event shall the DIP Lender be required to provide any consideration or recovery to the Prepetition First Lien Agent or Prepetition Secured Parties on account of the Prepetition Obligations or the Prepetition Collateral in the event that (y) the sale contemplated under the Stalking Horse Purchase Agreement closes and the Prepetition Obligations are assumed by the buyer as contemplated in the DIP Term Sheet. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition Secured Parties. |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(ii) | The Debtors shall pay the following fees to the DIP Lender:<br><br><u>Commitment Fee</u>: A commitment fee of 6.0% on the full amount of the DIP Facility, payable in kind, 35% of which shall be earned on the Petition Date and paid in kind upon entry of the Interim Order and on the Closing Date and 65% of which shall be earned on the Petition Date and paid in kind upon entry of the Final DIP Order and on the Final Closing Date, and shall be payable in cash upon the Maturity Date.<br><br><u>Exit Fee</u>: An exit fee of 10.0% of the amount of the full DIP Obligations and commitments under the DIP Facility (the "<u>Exit Fee</u>"), earned upon entry of the Final Order and payable in cash upon the earlier of (i) the Maturity Date and (ii) any other payoff, refinancing or termination of the DIP Facility; provided, that such Exit Fee shall not be due and payable if the Maturity Date, or such payoff, refinancing or termination, results from a transaction in which the DIP Lender or one or more affiliates of the DIP Lender are the buyer(s) of all or substantially all of the assets of |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | the assets of the Debtors (or equity interests of entities representing all or substantially all of the assets of the Debtors). |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B); Local Rule 4001-2(a)(ii) | The use of proceeds of the DIP Facility and Cash Collateral is subject to the DIP Budget, attached to the Interim Order as **Exhibit A**. |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B); Local Rule 4001-2(a)(ii) | The Debtors shall deliver to the DIP Lender, no later than 5:00 p.m. Eastern time one (1) business day after each Specified Reference Date, a proposed revision to the Approved Budget covering the 13-week period beginning on the first business day to occur after such Specified Reference Date (as defined below), together with a variance report (certified by the Debtors) (each a "Variance Report") setting forth (i) actual results against the forecasted results from the most recent cash flow forecast for the prior period, on a line-item basis and in the aggregate as of the end of such period and as of the end of the Testing Period ended on such date, (ii) the variance in dollar amounts and percentages for the week ending with such Specified Reference Date and for the Testing Period ending on such date, and (iii) such other information with respect to cash flows as the DIP Lender may reasonably request. The Debtors represent and warrant that the projections and pro forma financial information, taken as a whole, contained in the Approved Budget and any such proposed revisions to the Approved Budget are based upon good faith estimates and assumptions believed by management of the Debtors to be reasonable at the time made, it being recognized by the DIP Lender that such financial information as it relates to future events is not to be viewed as fact, forecasts and projections are subject to uncertainties and contingencies, actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount and no assurance can be given that any forecast or projections will be realized. "Testing Period" means each four-week period (or in the case of the first, second and third Testing Periods following the Closing Date, the one-week, two-week and three-week period, respectively) period ending on (and including) Sunday of each calendar week occurring after the Closing Date, commencing (a) in the case of the first, second and third such Testing Periods, with the Monday most recently prior to the Closing Date, and ending on (and including) Sunday of the calendar week in which the Closing Date occurs, Sunday of the next calendar week, and Sunday of the calendar week after that, respectively, and (b) in the case of each Testing Period, with the fourth Monday preceding the end of such Testing Period.<br><br>The Debtors shall not permit, for any Testing Period (A) (x) the amount of actual Cumulative Expenditures (as defined below) for such Testing Period to exceed (y) the projected amount of Cumulative Expenditures set forth in the Approved Budget for such Testing Period, by more than 15.0% of the aggregate amount projected for Cumulative Expenditures in the Approved Budget for such Testing Period, or (B) (x) the projected amount of Cumulative Receipts (as defined below) set forth in the Approved Budget for such Testing Period to be less than (y) the amount of actual Cumulative Receipts for such Testing Period by more than 15.0% of the aggregate amount projected for Cumulative Receipts in the Approved Budget for such Testing Period (the applicable foregoing limitations being referred to herein as the "Permitted Variance"). For the avoidance of doubt, the parties hereto acknowledge and confirm that this covenant measures, at the end of each applicable Testing Period, variance against the Approved Budget for the period from the first day of each Testing Period through the last day of such Testing Period. "Cumulative Expenditures" shall mean, for any period of determination, the aggregate cash |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | expenditures of the Debtors during such period, expressed as a positive number (in each case, calculated on an actual and not a GAAP basis); and "<u>Cumulative Receipts</u>" shall mean, for any period of determination, the aggregate cash receipts of the Debtors during such period (excluding proceeds of the DIP Obligations that may be deemed a receipt), expressed as a positive number (in each case, calculated on an actual and not a GAAP basis). |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | The Debtors shall be required to to achieve the following milestones (the "<u>Milestones</u>"):<br><br>• the Interim Order shall be entered in the Chapter 11 Cases by no later than 5 (five) days after the Petition Date;<br><br>• a final order authorizing the borrowings under the DIP Facility on terms acceptable to the DIP Lender (the "<u>Final DIP Order</u>" and, together with the Interim Order, the "<u>DIP Orders</u>") shall be entered in the Chapter 11 Cases within 30 calendar days of the Petition Date;<br><br>• the Debtors shall file a motion requesting an order from the Bankruptcy Court approving bid procedures relating to the solicitation of qualified bids for the sale of substantially all of the Debtors' assets and businesses (the "<u>Bidding Procedures</u>"), which motion shall be in form and substance satisfactory to the DIP Lender, within 2 calendar days of the Petition Date, and the Bankruptcy Court shall have entered an order approving the Bidding Procedures within 30 calendar days after the Petition Date; and<br><br>• within 60 calendar days after the Petition Date, subject to extension solely on account of the availability of the Bankruptcy Court, the hearing to consider the approval of the sale transaction shall have occurred and the Bankruptcy Court shall have approved the transaction contemplated by the Bidding Procedures. |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(1)(B)(i); Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | The DIP Orders shall grant and approve, among other things, the liens, claims and security interests in the Collateral in the order of priority described below:<br><br>(i)      pursuant to section 364(c)(1) of the Bankruptcy Code, a joint and several superpriority administrative expense claim in the Chapter 11 Cases in respect of all DIP Obligations (the "<u>DIP Superpriority Claim</u>") with priority over all other administrative expenses and claims; provided, however, that the DIP Superpriority Claims shall be junior to (1) a customary "Carve-Out" (to the extent agreed upon by the DIP Lender and set forth in the DIP Orders) and (2) the Prepetition Superpriority Claims (each as defined below);<br><br>(ii)     pursuant to section 364(c)(2) of the Bankruptcy Code, but subject and junior to the Carve-Out and only upon entry of the Final DIP Order, all DIP Obligations shall be secured by automatically perfected and unavoidable first priority priming security interests in, and liens on, all cash borrowed under the DIP Facility (which shall constitute cash collateral of the DIP Lender) (the "<u>DIP Proceeds</u>"), which cash shall be held in the segregated DIP Loan Account and not otherwise co-mingled with any other Cash Collateral, and all unencumbered Collateral of the Debtors, whether now existing or |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | hereafter arising and wherever located, tangible and intangible (collectively, the "Unencumbered Collateral"), which, in both cases, shall be senior in priority to the "Adequate Protection Liens" granted under the DIP Orders on the DIP Proceeds or Unencumbered Collateral; and<br><br>(iii)    pursuant to section 364(c)(3) of the Bankruptcy Code, but subject and junior to the Carve-Out, all DIP Obligations shall be secured by automatically perfected and unavoidable junior second priority security interests in, and all liens on, all Prepetition Collateral (for the avoidance of doubt, expressly junior to the liens securing the Prepetition First Lien Facility), whether now existing or hereafter arising and wherever located, tangible and intangible.<br><br>The DIP Collateral shall not include actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the "Avoidance Actions") but, subject to and upon entry of the Final Order, shall include the proceeds of Avoidance Actions ("Avoidance Action Proceeds").<br><br>Subject to the priorities and conditions set forth in the DIP Term Sheet, the liens granted on the DIP Collateral in respect of the DIP Facility are referred to herein as the "DIP Liens". |
| **Carve-Out**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(f) | The Interim Order provides a "Carve Out" of certain statutory fees, allowed professional fees of the Debtors, and any official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code appointed in the Chapter 11 Cases pursuant to section 1103 of the Bankruptcy Code, all as detailed in the Interim Order. |
| **Section 506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x); Local Rule 4001-2(a)(i)(C) | Subject to entry of the Final Order, with the exception of the Carve Out, neither the Prepetition Collateral nor any Prepetition Secured Party, nor the DIP Collateral, nor the DIP Lender shall be subject to surcharge, pursuant to sections 105, 506(c) or 552 of the Bankruptcy Code or otherwise, by the Debtors or any other party in interest without the prior written consent of the Prepetition Secured Party or DIP Lender (as applicable), and no such consent shall be implied from any other action, inaction or acquiescence by such parties in this proceeding, including but not limited to funding of the Debtors' ongoing operation by the Prepetition Secured Party or the DIP Lender. |
| **Section 552(b) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B); Local Rule 4001-2(a)(i)(h) | Subject to entry of the Final Order, the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code shall be deemed waived as to the Prepetition Secured Party and the DIP Lender. The Prepetition Secured Party and the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral or the Collateral subject to the DIP Facility Liens. |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(b)(1)(B)(iii); | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition Secured Parties' claims and liens. |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(i)(Q)[6] | |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B); Local Rule 4001-2(a)(i)(B) | "<u>Challenge Deadline</u>" means with respect to the Prepetition Secured Parties the earlier of (1) the date of confirmation of a plan of reorganization, and (2) seventy-five (75) calendar days following the date of entry of this Interim Order; provided that, in each case, the Challenge Deadline with respect to the Debtors' stipulations, admissions agreements, and other releases contained in the Interim Order with respect to the DIP Lender and its affiliates, including the releases set for in paragraph 4.14 of the Interim Order as to the DIP Lender and its affiliates, shall be the earliest of (1) the date of confirmation of a plan of reorganization, (2) entry of an order approving the sale of the Debtors' assets to the DIP Lender or its affiliates, or (3) the date of entry of the Final Order.  The Challenge Deadline may be extended (x) in writing prior to the expiration of the Challenge Deadline (which writing may be in the form of email by counsel) from time to time in the sole discretion of (A) the First Lien Agent (with respect to the Prepetition Liens and Prepetition Obligations or the adequate protection afforded to the Prepetition Secured Parties), (B) the DIP Lender (with respect to the DIP Liens, DIP Obligations, and DIP Superpriority Claims or any adequate protection afforded to the DIP Lender), or (y) by the Bankruptcy Court for good cause shown pursuant to an application filed and served by a party in interest prior to the expiration of the Challenge Deadline. The Challenge Period with respect to the DIP Lender will expire upon, among other things, entry of the Final Order and approval of the Releases set forth therein.<br><br>*See* Interim Order ¶ 4.9. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B); Local Rule 4001-2(a)(ii) | The occurrence of any one or more of the following shall constitute an "Event of Default":<br><br>(i)    the entry of an Interim Order or Final Order in form or substance that is not acceptable to the DIP Lender in its sole discretion;<br><br>(ii)    failure to pay principal or Adequate Protection Obligations in full when due, including without limitation, on the Maturity Date;<br><br>(iii)    failure to pay interest, fees or other amounts in full within three (3) business days after the date due, including without limitation, on the Maturity Date;<br><br>(iv)    failure of any representation, warranty or certification to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change (as defined below), in all respects) when made;<br><br>(v)    failure by any Debtor to be in compliance in all material respects with provisions of the DIP Facility (subject to applicable grace periods as set forth in the DIP Orders, including a two (2) business day grace period for delivery of the Approved Budget, cash flow forecasts and Variance Reports), any other DIP Loan Document or any DIP Order; |

---

[6] In accordance with Local Rule 4001-2(a)(i), this was an essential part of the Prepetition Secured Parties' agreement to the use of its Cash Collateral.

10329004.v10

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | (vi)    dismissal of any of the Chapter 11 Cases; |
| | (vii)    the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code) (without the prior written consent of the DIP Lender); |
| | (viii)    failure of any Milestones to be satisfied by the specified deadline therefor; |
| | (ix)    the filing of any application by any Debtor for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases which is *pari passu* with or senior to the DIP Obligations, DIP Liens, excluding the Carve Out, the Prepetition Permitted Liens, liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the DIP Lender; |
| | (x)    the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral with an aggregate value of at least $50,000 without the prior written consent of the DIP Lender; |
| | (xi)    the filing of a plan of reorganization or liquidation by the DIP Borrower or any Guarantor without the written consent of the DIP Lender (any such plan, an "Unapproved Plan"); |
| | (xii)    actual invalidity of any liens or security interests securing the DIP Obligations; |
| | (xiii)    any Debtor (or any direct or indirect non-Debtor affiliate or subsidiary of a Debtor) commences (or supports) any action (other than an action permitted by the DIP Orders) against the DIP Lender or any of their agents or employees, to subordinate or avoid any liens granted hereunder, under any other DIP Loan Document or under any DIP Order in favor of the DIP Lender; |
| | (xiv)    (a) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify the DIP Term Sheet, any other DIP Loan Document or any DIP Order, or the disallow any DIP Obligations, in whole or in part, or (b) any material provision of the DIP Term Sheet, any other DIP Loan Document or any DIP Order, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | Lender); |
| | (xv)      failure by the DIP Borrower or any Guarantor to comply in any material respect with the Interim Order or Final Order, as applicable; |
| | (xvi)      conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; |
| | (xvii)      any request made by any Debtor for the reversal, modification, amendment, stay, reconsideration or vacatur of any DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Lender; |
| | (xviii)      the entry of an order amending, modifying, staying, revoking, reversing, vacating or terminating the Interim Order or Final Order, as applicable, without the express written consent of the DIP Lender; |
| | (xix)      the termination of any of the Debtors' exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code without the prior written consent of the DIP Lender; |
| | (xx)      without the prior written consent of the DIP Lender, the filing with the Bankruptcy Court of a motion seeking approval of a sale of all or substantially all assets of the Debtors under section 363 of the Bankruptcy Code that, in either case, does not provide for indefeasible payment in full in cash to the DIP Lender of all DIP Obligations upon closing of such sale or the effective date of a plan pursuant to which such sale is made, unless otherwise agreed to by the DIP Lender; |
| | (xxi)      the filing of any motion seeking approval of a sale of any DIP Collateral without the consent of the DIP Lender (other than any sale permitted by the Final Order or permitted under "Negative Covenants" below), or any sale or other disposition of all or a material portion of the collateral securing the DIP Obligations other than as permitted by the Final Order and any sale permitted under "Negative Covenants" below; and |
| | (xxii)      entry of any judgment for the payment of money by Debtors in an amount greater than $50,000 that would be enforceable on a post-Petition Date basis. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The Interim Order includes a customary waiver/modification of the automatic stay to permit the Debtors to grant the liens and security interests to the DIP Lenders, make payments on account of the Debtors' obligations with respect to adequate protection (the "Adequate Protection Obligations"), and perform other acts necessary in connection with the DIP Loan Documents. |
| **Waiver/Modification of Applicability of Non-bankruptcy Law Relating to Perfection** | Upon entry of the Final Order, the liens granted to the DIP Lender in accordance with the DIP Term Sheet and the Interim Order will at all times be fully perfected liens in and to the Collateral described therein, subject, as to priority, only to liens permitted to have such priority under the Interim Order. |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| or Enforceability of Liens<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | |
| Indemnification<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Upon entry of a Final Order, the Debtors shall be authorized to indemnify the DIP Lender and certain other parties against any liability arising in connection with the DIP Term Sheet to the extent set forth in and in accordance with the terms of the DIP Term Sheet, to the maximum extent permitted under the Bankruptcy Code and applicable law. All such unpaid fees, expenses and indemnities of the DIP Lender, to the extent permitted by law, shall constitute DIP Obligations, and the repayment thereof shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Term Sheet. |
| Liens on Avoidance Actions<br>Local Rule 4001-2(a)(i)(D) | The DIP Collateral, subject to the DIP Liens, shall include, subject to and entry of the Final Order, the proceeds of the Avoidance Actions.<br><br>Subject to the Carve Out and the priorities set forth in the Interim Order, the Adequate Protection Liens shall cover assets, interests and proceeds of the Debtors that are or would be collateral under the Prepetition Loan Documents if not for section 552(a) of the Bankruptcy Code, and all cash and cash equivalents, and all assets, interests and proceeds of the Debtors that constitute DIP Collateral, including (subject to entry of the Final Order) the proceeds of the Avoidance Actions. |

### E.      The Debtors' Immediate Need for Authority to Use Cash Collateral in Accordance with the Budget to Avoid Imminent and Irreparable Harm

37.      The Debtors have worked closely with their senior management and outside advisors to evaluate the Debtors' cash requirements for their businesses in chapter 11 until a sale process can be completed. As set forth in the Budget attached to the Interim Order as **Exhibit A**, the Debtors have an urgent need for additional liquidity to ensure business continuity and operational stability while they conduct the auction and sale process from the Petition Date pending a final hearing on the Motion. The Debtors have thoroughly reviewed and vetted the Budget with their advisors, and the Debtors believe that the Budget provides an accurate reflection of the Debtors' currently anticipated business revenues and expenses, including administrative costs in Chapter 11 Cases, over the covered period.

10329004.v10

38. As reflected in the Budget, immediate authority to access the DIP Facility and Cash Collateral is necessary to avoid immediate and irreparable harm that would otherwise result if the Debtors were denied incremental liquidity and unable to maintain operations necessary to execute their going-concern sale strategy.

39. The Debtors, therefore, believe that authority to use Cash Collateral and access the DIP Facility on an expedited basis is critical to ensuring that the Debtors are able to successfully pursue their goals in chapter 11 for the benefit of all parties in interest. Having committed funding for the Chapter 11 Cases also is vital to sending a clear and important signal to the Debtors' customers, employees, counterparties, utilities, and business partners that the Debtors' operations can and will continue on a business-as-usual basis until the Debtors are able to consummate a sale to the Prepetition Secured Party or another party, subject to this Court's approval. Accordingly, through this Motion, the Debtors also seek authority to use Cash Collateral and borrow under the DIP Facility in accordance with the terms set forth in the Interim Order and the Final Order.

40. Pursuant to Bankruptcy Rules 4001(b)(1)(B) and Local Rule 4001-2 the following are the principal terms of the Interim Order regarding the use of Cash Collateral:[7]

| Bankruptcy Code / Local Rule | Summary of Material Terms |
| --- | --- |
| **Entities with Interest in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition Secured Parties |
| **Use of Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(ii) | The Cash Collateral shall be used to fund the operational, employee, and other costs of the Debtors, and payments related to the working capital and other general corporate purposes of the Debtors, as well as to pursue the orderly sale of their assets through these Chapter 11 Cases, including the payment of professional fees and expenses, and, in each case, consistent with, subject to, and within the categories and limitations contained in, the Budget. |

---

[7] The summaries contained in this Motion are qualified in their entirety by the DIP Term Sheet. To the extent anything in this Motion is inconsistent with the DIP Term Sheet, the terms of the DIP Term Sheet shall control. Capitalized terms used in this chart but not otherwise defined herein have the meanings ascribed to such term in the Interim Order or DIP Term Sheet, as applicable.

26

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| **Duration of Use of Cash Collateral / Events of Default** Bankruptcy Rule 4001(b)(1)(B)(iii) | Authority to use Cash Collateral shall continue on an interim basis pursuant to the Interim Order, then on a Final Basis following a Final Order, until terminated in accordance with the Interim Order or Final Order (as applicable). |
| **Budget** Bankruptcy Rule 4001 (b)(1)(B)(iii), Local Rule 4001-2(a)(iii); Interim Order Ex. A | A copy of the Budget is attached as **Exhibit A** to the Interim Order. The Debtors believe that the Budget will be adequate, considering all available assets, to pay all currently anticipated administrative expenses due or accruing during the period covered by the Budget. |
| **Milestones** Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(i)(H) | The same Milestones set forth regarding the DIP Term Sheet and Interim Order shall apply to Cash Collateral. |
| **Carve-Out** Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(i)(F); Interim Order at ¶ 10 | The same Carve Out set forth regarding the DIP Term Sheet and Interim Order shall apply to Cash Collateral. |
| **Stipulations to Prepetition Liens and Claims** Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(i)(Q)[8] | The same Stipulations to Prepetition Liens and Claims set forth regarding the DIP Term Sheet and Interim Order shall apply to Cash Collateral. |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv); Interim Order at ¶ 13 | Prepetition Lenders shall receive, in each case subject to the Carve Out, (i) current payment of all reasonable and documented out-of-pocket fees, costs and expenses of the Prepetition Agent (including all fees and expenses of their outside counsel, Winston & Strawn LLP, and one firm of local counsel engaged in connection with the Chapter 11 Cases); (ii) replacement liens on the collateral securing the Prepetition Credit Agreement; (iii) superpriority administrative expense claims with respect to the foregoing and to the extent of any post-petition diminution in value of the Prepetition Lenders' interest in the collateral securing the Prepetition Credit Agreement (the "Prepetition Superpriority Claims"); and (iv) access to the Debtors' books and records and such financial reports as are provided to the DIP Lender. |
| **Termination Events** Bankruptcy Rule 4001(b)(l)(B)(iii); Local Rule 4001-2(a)(ii)(M) | The Termination Events for the Debtors' use of Cash Collateral shall be the same as the Events of Default described in the DIP Motion and Interim Order. |

---

[8]     In accordance with Local Rule 4001-2(a)(i), this was an essential part of the Prepetition Secured Parties' agreement to the use of its Cash Collateral.

41.     The Interim Order also includes certain terms that may constitute material provisions requiring explicit disclosure under the Local Rules.  The provisions described in Local Rule 4001-2(a)(i), to the extent applicable, are set forth at the following sections of the Interim Order:

(a)     <u>Local Rule 4001-2(a)(i)(A) – Cross Collateralization</u>.  No provision of the Interim Order grants cross-collateralization protection regarding Cash Collateral of the type contemplated by the Local Rules.

(b)     <u>Local Rule 4001-2(a)(i)(B) – Validity, Perfection, and Amount of Prepetition Liens</u>.  The Interim Order stipulates, subject to the Challenge Period, the validity and perfection of liens held by the Prepetition Secured Party and the DIP Lender.

(c)     <u>Local Rule 4001-2(a)(i)(C) – Section 506(c) Waiver</u>.  Subject to entry of the Final Order, in consideration of their agreement to permit the use of Cash Collateral and/or to permit priming liens to the DIP Lender, the Debtors have agreed to waive the provisions of section 506(c) of the Bankruptcy Code as to the Prepetition Secured Party and the DIP Lender.

(d)     <u>Local Rule 4001-2(a)(i)(D) – Liens on Avoidance Actions</u>.  Subject to entry of the Final Order and the priorities set forth in the Interim Order, the Interim Order grants liens on the proceeds of avoidance actions as a form of adequate protection to the Prepetition Secured Party, and as collateral and a form of adequate protection to the DIP Lender.

(e)     <u>Local Rule 4001-2(a)(i)(E) – Provisions Deeming Prepetition Debt to be Postpetition Debt</u>.  The Interim Order contains no provisions that deem prepetition debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt.

(f)     <u>Local Rule 4001-2(a)(i)(F) – Disparate Treatment of Professionals Retained by the Committee</u>.  In the event an official committee of unsecured creditors is appointed, the Final Order will address fees of professionals retained by the committee.

(g)     <u>Local Rule 4001-2(a)(i)(G) – Nonconsensual Priming</u>.  The Interim Order does not provide for nonconsensual priming of any existing lien.

(h)     <u>Local Rule 4001-2(a)(i)(H) – Provisions Affecting the Court's Power to Consider Equities of the Case</u>.  Subject to entry of the Final Order, the Debtors have agreed to waive any "equities of the case" claims under section 552(b) of the Bankruptcy Code as to the Prepetition Secured Party and the DIP Lender.

**BASIS FOR RELIEF**

A.      **This Court should Authorize the Debtors to Obtain Postpetition Financing and Grant Priming Liens and other Rights and Privileges to the DIP Lender**

42.     Bankruptcy courts have authority to permit debtors-in-possession to obtain postpetition financing pursuant to section 364 of the Bankruptcy Code. Specifically, section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c). In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider various factors, including whether:

(a)     unencumbered credit or alternative financing without superpriority status is available to the debtor;

(b)     the credit transactions are necessary to preserve assets of the estate;

(c)     the terms of the credit agreement are fair, reasonable, and adequate;

(d)     the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

(e)     the proposed financing agreement adequately protects prepetition secured creditors.

See, e.g., In re Los Angeles Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011); In re Aqua Assoc., 123 B.R. 192 (Bankr. E.D. Pa. 1991).

43.     For the reasons discussed herein, the Debtors submit that they satisfy the standards required to access postpetition financing on a superpriority claim and junior lien basis under section 364(c) of the Bankruptcy Code.

### (b)    The Debtors Cannot Obtain Financing on More Favorable Terms

44.    In demonstrating that credit is not available without the protections afforded by section 364(c) of the Bankruptcy Code, a debtor need only make a good faith effort.  See, e.g., In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (holding "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").  Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

45.    As set forth above and in the First Day Declaration and Bremer Declaration, given their current financial condition, financing arrangements, and debt and capital structure, the only source of financing reasonably available and actionable is that offered by the DIP Lender on the terms under the DIP Term Sheet, and the Debtors were not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  Accordingly, the Debtors submit that, despite their good faith efforts, similar credit is not available to the Debtors without the priming sought through the Interim Order.

46.    The releases to be provided to the DIP Lender (and its affiliates) as approved by the Disinterested Director, pursuant to the Final Order, were critical to the DIP Lender's willingness to provide the DIP Facility.  The releases are reasonable and appropriate, and represent a sound exercise of the Debtors' business judgment given the unique circumstances of these chapter 11 cases.  The Debtors' willingness to agree to such a release was informed by a pre-petition investigation conducted by the Debtors and the Disinterested Director.  Based on the work performed in this investigation to date, the Debtors do not believe that any viable claims exist against Kinderhook and, as a result, believe that a release of Kinderhook is appropriate.  The

10329004.v10

Debtors will provide additional evidence prior to the Final Hearing in support of the releases that are proposed to be effective upon entry of the Final Order in favor of the DIP Lender.  The Debtors submit that such evidence will demonstrate that such releases are reasonable and justified under the circumstances.

<b><i>(c)      The DIP Facility and DIP Term Sheet are Necessary to Preserve the Value of the Debtors' Estates</i></b>

47.     As debtors-in-possession, the Debtors have a fiduciary duty to protect and maximize the value of their estates.  See In re Mushroom Transp. Co., 382 F.3d 325, 339 (3d Cir. 2004).  The DIP Facility and DIP Term Sheet, if approved, will provide working capital critical to fund the Debtors' day-to-day operations and the Chapter 11 Cases, which will provide a path for the Debtors to sell their assets as a going-concern pursuant to section 363 of the Bankruptcy Code by year end.  Without access to the DIP Facility, the Debtors may be forced to cease operations after the Petition Date, which would result in immediate and irreparable harm to their businesses, deplete the going-concern value of such businesses, and upend the going-concern sale process that the Debtors believe is the best way to maximize value for creditors.  The Debtors also would be unable to administer their Chapter 11 Cases without the liquidity provided by the DIP Facility. The Debtors' ability to maintain business relationships with their vendors, suppliers, utilities, and customers, to satisfy other working capital and operational needs, and to otherwise finance their operations during the Chapter 11 Cases, is essential to the Debtors' continued viability and to ensure a value-maximizing sale process.

48.     Because the Debtors' available and projected cash from operations alone is insufficient to fund their operations, see Budget, the funds to be provided under the DIP Facility are necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.

31

**(d)     The Terms of the DIP Term Sheet are Fair, Reasonable, and Adequate under the Circumstances**

49.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the proposed lender.  See In re L.A. Dodgers, 457 B.R. at 312 (approval of debtor-in-possession financing requires terms that are "fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender"); see also In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (although many of the terms favored the lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

50.     As described in the First Day Declaration, the DIP Declarations and herein, given the urgent need of the Debtors to obtain financial stability for the benefit of all parties in interest and fund a sale process in these Chapter 11 Cases, the Debtors submit that the terms of the DIP Term Sheet are fair, appropriate, reasonable, and in the best interests of the Debtors, their estates, and their creditors.  The DIP Term Sheet, moreover, was negotiated extensively by the Debtors and the DIP Lender, in good faith and at arm's-length as required by section 364(e) of the Bankruptcy Code, with all parties represented by experienced counsel.  The Debtors, therefore, believe that this requirement is satisfied.

**(e)     Entry into the DIP Term Sheet Reflects the Debtors' Reasonable Business Judgment**

51.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable

32

facility, and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); Ames Dep't Stores, Inc., 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"). Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. See, e.g., In re L.A. Dodgers, 457 B.R. at 313 ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender.").

52.     For the reasons set forth above and in the First Day Declaration and DIP Declarations, the Debtors submit that entry into the DIP Term Sheet is consistent with the exercise of the Debtors' reasonable business judgment. The Debtors, therefore, request that this Court authorize the Debtors to enter into the DIP Term Sheet and access funds under the DIP Facility, subject to the terms of the Interim Order, and that this Court grant to the DIP Lender all of the rights, privileges, and protections, as set forth herein, in the DIP Term Sheet, and the Interim Order, that are necessary to protect the DIP Lender and secure the DIP Obligations.

### B.     The DIP Lender should be Deemed a Good-Faith Lender under Section 364(e) of the Bankruptcy Code

53.     The Debtors submit that the DIP Lender should be deemed a good-faith lender under the Bankruptcy Code. Specifically, section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith,

33

whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).  Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

54.     As explained herein and in the First Day Declaration and DIP Declarations, the DIP Term Sheet is the result of: (i) the Debtors' reasonable judgment that under the circumstances the DIP Lender provided a reasonable and actionable postpetition financing proposal; and (ii) extended arm's-length, good-faith negotiations between the Debtors and the DIP Lender. The Debtors submit that the terms and conditions of the DIP Term Sheet are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, as more particularly set forth in the DIP Term Sheet and Budget.  Accordingly, the Debtors request that this Court find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

**C.     This Court Should Approve the Proposed Adequate Protection for the Debtors' Use of Prepetition Collateral, including Cash Collateral**

55.     To the extent a secured creditor's interests in the collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor in possession financing facility. Similarly, section 363(c)(2) of the Bankruptcy Code provides that a debtor may use Cash Collateral as long as: (a) each entity that has an interest in such Cash Collateral consents; or (b) the

34

bankruptcy court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of the section.  See 11 U.S.C. § 363(c)(2).  The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use after commencement of the bankruptcy case.  See In re Carbone Cos., 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral"); In re Cont'l Airlines, Inc., 154 B.R. 176, 180-81 (Bankr. D. Del. 1993) (adequate protection for use of collateral under § 363 is limited to use-based decline in value).

56.    Although section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts must decide what constitutes sufficient adequate protection on a case-by-case basis.  See Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.), 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case-by-case basis."); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case . . . .") (citation and quotation omitted).  The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use.  See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

57.    As set forth above, the Prepetition Secured Parties have consented to the use of the Cash Collateral pursuant to section 363(c)(2)(A) of the Bankruptcy Code.  The proposed adequate protection provided to the Prepetition Secured Parties comprises of the following:

(a)     **Replacement Liens**.  The Prepetition Secured Party shall be granted, as adequate protection, continuing liens and replacement liens on the Prepetition Collateral and any and all assets of the Debtors as exist on or after the Petition Date (including, without limitation, proceeds of Prepetition Collateral) in the same priority and validity as existed on the Petition Date (the "Adequate Protection Liens") to secure its claims for any diminution in the value of such Prepetition Secured Party's interests in the Prepetition Collateral during the pendency of these Chapter 11 Cases, whether the reason for such diminution is as a result of, arises from, or is attributable to, the use of Cash Collateral, the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Collateral, the imposition of the automatic stay, or otherwise (including, without limitation, any diminution in value of such interests in the Prepetition Collateral prior to the Prepetition Secured Party seeking relief from the automatic stay or the Bankruptcy Court granting such relief).  The Adequate Protection Liens shall be junior only to the Carve-Out, Prepetition Permitted Liens, and the DIP Lender's liens on the Unencumbered Assets, and senior to any other liens.  The Adequate Protection Liens are valid, binding, enforceable, and fully perfected as of the Petition Date without the necessity of the execution, filing, or recording by the Debtors or the Prepetition Secured Party of security agreements, pledge agreements, financing statements, or other agreements.  The Adequate Protection Liens shall cover assets, interests, and proceeds of the Debtors that are or would be collateral under the Prepetition Loan Documents if not for section 552(a) of the Bankruptcy Code, and all cash and cash equivalents, including Cash Collateral; and

(b)     **Superpriority Administrative Claim**. The Prepetition Secured Parties shall be granted in each of the Debtors' Chapter 11 Cases an allowed administrative claim under section 507(b) of the Bankruptcy Code to the extent that the Adequate Protection Liens do not adequately protect against the diminution in the value of the Prepetition Secured Party's interests in the Prepetition Collateral from and after the Petition Date, subject to the terms of the Carve-Out and Prepetition Permitted Liens.

58.     The Debtors believe that the adequate protection proposed herein to protect any diminution in value of the Prepetition Secured Party's interest in the Prepetition Collateral and Cash Collateral is fair and reasonable.  Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide the adequate protection described above to such parties.

**D.      Modification of the Automatic Stay is Warranted and Necessary to Facilitate the Debtors' Postpetition Borrowing through the DIP Facility**

59.      The Debtors request that this Court modify the automatic stay provisions of section 362 of the Bankruptcy Code solely to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Term Sheet (all subject to the default and notice provisions set forth in the Interim Order), and to the extent necessary to grant the adequate protection to the Prepetition Secured Party as set forth herein and in the Interim Order.  The Debtors believe that these modifications to the automatic stay are fair and reasonable and are necessary conditions to effectuate the relief sought in this Motion.

**E.      Interim Relief is Warranted**

60.      Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2); (c)(2).

61.      As described herein and in the First Day Declaration and DIP Declaration, the Debtors have an urgent and immediate need to borrow funds and use Cash Collateral.  During the thirteen days after the Petition Date, the Debtors will incur ordinary course expenses and require cash to satisfy their working capital and operational needs, and to otherwise finance their Chapter 11 Cases.  Failure to pay those expenses as they come due will result in irreparable harm to the business relationships that the Debtors have worked hard to maintain, and which form the

10329004.v10

foundation of the going concern value which they plan to maximize by virtue of the proposed sale process.

62.    Given the immediate and irreparable harm to be suffered by the Debtors, their estates, and their creditors absent interim relief, the Debtors request that, pending a final hearing, this Court schedule an interim hearing as soon as practicable after the Petition Date to consider the interim relief requested in the Motion.

## REQUEST FOR FINAL HEARING

63.    Pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2), the Debtors also request that this Court set a date for a final hearing on the Motion that is as soon as practicable in accordance with the Bankruptcy Rules and fix the time and date for parties to file objections to the Motion.

## NOTICE

64.    The Debtors will provide notice of this Motion to Notice will provide notice of this motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the Debtors' twenty (20) largest unsecured creditors or their counsel, (c) counsel to the Stalking Horse Bidder and DIP Lender, (d) counsel to the Prepetition Secured Parties, (e) all known holders of filed liens on the Debtors' assets, and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service.  As this Motion is seeking "first day" relief, the Debtors will serve copies of this Motion and any order entered in respect of this Motion as required by Local Rule 9013-1(m).  The Debtors believe that no further notice is required.

10329004.v10

## CONCLUSION

WHEREFORE the Debtors respectfully request entry of the Interim Order and, following

adequate notice and hearing, the Final Order, granting the relief requested herein and such other

and further relief as this Court may deem just and appropriate.

Dated: January 16, 2023             */s/ Domenic E. Pacitti*
Wilmington, Delaware                Domenic E. Pacitti (DE Bar No. 3989)
                                    Michael W. Yurkewicz (DE Bar No. 4165)
                                    Sally E. Veghte (DE Bar No. 4762)
                                    **KLEHR HARRISON HARVEY BRANZBURG LLP**
                                    919 North Market Street, Suite 1000
                                    Wilmington, Delaware 19801
                                    Telephone:    (302) 426-1189
                                    Facsimile:    (302) 426-9193
                                    Email: dpacitti@klehr.com
                                           myurkewicz@klehr.com
                                           sveghte@klehr.com

                                    -and-

                                    Morton R. Branzburg (*pro hac vice* pending)
                                    **KLEHR HARRISON HARVEY BRANZBURG LLP**
                                    1835 Market Street, Suite 1400
                                    Philadelphia, Pennsylvania 19103
                                    Telephone:    (215) 569-3007
                                    Facsimile:    (215) 568-6603
                                    Email:        mbranzburg@klehr.com

                                    *Proposed Counsel to the Debtors and Debtors in Possession*

10329004.v10