## Exhibit 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| PERFORMANCE POWERSPORTS GROUP | ) Case No.23-10047 (____) |
| INVESTOR, LLC, *et al.*,[1] | ) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |
|  | ) **Re: Docket No. _____** |

**INTERIM ORDER PURSUANT
TO 11 U.S.C. §§ 105, 361, 362, 363,
364, 503, AND 507 (I) AUTHORIZING
THE DEBTORS TO OBTAIN SENIOR AND
JUNIOR SECURED SUPERPRIORITY POSTPETITION
FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS; (III) AUTHORIZING
USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY;
(V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors (the "Debtors") pursuant

to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2) and 364(c)(3), 364(e), and 507 of title 11 of

the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, 9014, and 9019 of the

Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1,

4001-1(b), 4002-1(i), and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure

(the "Local Rules") of the United States Bankruptcy Court for the District of Delaware

(this "Court"), seeking, *inter alia*:

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' respective federal
tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance
Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and
Performance Powersports Group, Inc. (3380).  The Debtors' headquarters and mailing address is: 1775 East
University Drive, Tempe, Arizona 85281.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Term Sheet
(as defined herein).

(1)    authorization    for    Performance    Powersports    Group    Purchaser,    Inc. (the "DIP Borrower") to obtain postpetition financing pursuant to the DIP Facility (as defined below), and for certain of the DIP Borrower's direct parent and direct and indirect subsidiaries as guarantors (the "DIP Guarantors," and, together with the DIP Borrower, the "DIP Obligors") to guarantee unconditionally on a joint and several basis, and subject to the terms and limitations set forth herein and in the executed term sheet attached hereto as **Exhibit A**[3] (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "DIP Term Sheet," and together with all agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual property security agreements, or notes) that are intended from time to time to effectuate the terms of the DIP Term Sheet, including the Interim Order and the Final Order, the "DIP Loan Documents") in all respects, the DIP Borrower's obligations under the DIP Facility, consisting of a junior secured "new money" term loan credit facility (the "DIP Facility"), on the terms and conditions set forth in the DIP Term Sheet, by and among the DIP Obligors and Tankas Funding VI, LLC (the "DIP Lender"), in an aggregate principal amount of $10 million in term loan commitments which shall be available as term loans (the "DIP Loans") to the DIP Borrower following entry of this interim order (the "Interim Order") and satisfaction of the other conditions set forth therein in an initial amount not to exceed $3.5 million (the "Initial DIP Loan"), with the remaining amount being made available upon entry of the final order approving entry into the DIP Facility (the "Final Order"); *provided*, that the DIP Borrower may elect to draw a portion (not to exceed $4.8 million) of such

---

[3]    The DIP Term Sheet may be superseded and replaced in all respects by one or more DIP Loan Documents to be executed by the DIP Borrower, the DIP Guarantors and the DIP Lender, in form and substance consistent with the DIP Term Sheet and otherwise acceptable only to the DIP Lender.

DIP Facility on one additional business day after the borrowing in connection with the Final Order (on not less than five (5) business days' notice (or such shorter period as the DIP Lender may agree));

(2)    authorization for the Debtors to execute, deliver, and enter into the DIP Term Sheet and any other DIP Loan Documents and to perform all of the Debtors' respective obligations thereunder, and such other and further acts as may be required in connection with the DIP Loan Documents;

(3)    authorization for the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Lender pursuant to the DIP Loan Documents, including any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges, and disbursements of the DIP Lender (including the reasonable and documented fees and expenses of the DIP Lender's attorneys, advisors, accountants, and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, in each case, to the extent constituting all Debtors', and/or DIP Guarantors', obligations of any kind under the DIP Loan Documents (such obligations collectively, the "DIP Obligations") subject to the terms of this Interim Order;

(4)    authorization for the Debtors, immediately upon entry of this Interim Order, to use proceeds of the DIP Facility as expressly provided in the DIP Loan Documents and solely in accordance with this Interim Order and the applicable Approved Budget (as defined below) (subject to permitted variances and other exclusions set forth in the DIP Term Sheet) to:  (A) pay costs, premiums, fees, and expenses related to the above-captioned chapter 11 cases (the "Chapter 11 Cases") and in connection with the DIP Facility and the Debtors' use of Cash Collateral and (B) provide financing for working capital and for other general corporate purposes of the Debtors

in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents);

(5)    the granting and approval of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1), and 507(b) of the Bankruptcy Code, to the DIP Lender, in respect of all DIP Obligations, subject only to the Carve Out (as defined below);

(6)    the granting to the DIP Lender of valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below), including any "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral"), to secure the DIP Obligations, which DIP Liens shall be subject to the relative rankings and priorities set forth herein and in the other DIP Loan Documents;

(7)    authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral of the Prepetition Secured Parties under the Prepetition Documents (as defined below), and providing adequate protection to the Prepetition Secured Parties for, among other things, any diminution in value of the Prepetition Collateral, including in respect of Cash Collateral, from and after the Petition Date to the extent such diminution in value occurs on account (without limitation) of the Debtors' sale, lease or use of the Prepetition Collateral, including Cash Collateral, the imposition, enforcement, and consequences of the automatic stay pursuant to section 362 of the Bankruptcy Code.

(8)    authorizing the Debtors to incur the DIP Obligations, including the incurrence of senior liens on the Unencumbered Collateral (as defined below), the incurrence of junior liens on the Prepetition Collateral, the subordination of Prepetition Liens to the extent set forth herein, the administration of these Chapter 11 Cases, and the priming of the Prepetition Secured Parties' respective interests in the Prepetition Collateral by the Carve Out (as defined below).

4

(9)     the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents to the extent hereinafter set forth;

(10)    upon entry of the Final Order, a waiver of the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and Prepetition Collateral and certain rights of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(11)    a waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order;

(12)    the scheduling of a final hearing on the Motion (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(13)    the Court to grant such other and further relief as is just and proper.

The initial hearing on the Motion having been held by this Court on January [•], 2023 (the "Interim Hearing"), and upon the record made by the Debtors at the Interim Hearing, including the Motion and the *Declaration of Ken Vanden Berg in Support of Chapter 11 Petitions and First Day Motions and Applications* (the "First Day Declaration") and the *Declaration of Steven Bremer in Support of Cash Collateral and DIP Motion* and the *Declaration of Alyssa Lozynski in Support of Cash Collateral and DIP Motion* (collectively, the "DIP Declarations"), any exhibits in connection with the foregoing, and the filings and pleadings in these Chapter 11 Cases, the Court having found that the interim relief requested in the Motion is fair and reasonable and is in the best interests of the Debtors, the Debtors' bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates"), their stakeholders and other parties in interest, and represents a

sound exercise of the Debtors' business judgment and is essential for the continued operation of the Debtors' businesses; it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Final Hearing; and appropriate and adequate notice of the Motion, the interim relief requested therein, and the Interim Hearing (the "Notice") having been given under the circumstances; and the Notice having been served by the Debtors in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules on:  (a) the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) the entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis) (the "30 Largest Unsecured Creditors"); (c) counsel to the DIP Lender; (d) counsel to the Prepetition Secured Parties; (e) counsel to the DIP Lender; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the Environmental Protection Agency and all similar state environmental agencies for states in which the Debtors conduct business; (j) counsel for the Committee (if appointed); (k) the attorneys general of Delaware and Arizona; (l) all parties which, to the best of the Debtors' knowledge, information, and belief, have asserted or may assert a lien on the Debtors' assets; (m) the Debtors' cash management banks; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"); and the opportunity for an interim hearing on the Motion was appropriate under the circumstances; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

A.    <u>Petition Date</u>.  On January 16, 2023 (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No chapter 11 trustee or examiner has been appointed in the Chapter 11 Cases.

B.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief granted hereby are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 9013, 9014, and 9019 and Local Rules 7007-1, 9013-1, 9013-4, and 9014-2.

C.    <u>Committee Formation</u>.  As of the date hereof, the United States Trustee for the District of Delaware has not yet appointed an official committee of unsecured creditors in the Chapter 11 Cases (the "<u>Committee</u>") pursuant to section 1102 of the Bankruptcy Code.

D.    <u>Notice</u>.  The Notice was given in the manner described in the Motion.  Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing, and the relief granted under this Interim Order, constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001 and the Local Rules.

---

[4]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

10330388.v7

E.    <u>Parties' Acknowledgments, Agreements, and Stipulations</u>.  In requesting the DIP Facility and use of Cash Collateral, and in exchange for and as a material inducement to the DIP Lender to agree to provide the DIP Facility, access to Cash Collateral, and subordination of the DIP Liens (as defined herein) to the Carve Out and as a condition to the DIP Lender providing financing under the DIP Facility and consenting to the use of Cash Collateral, subject to the limitations, provisions and rights afforded pursuant to paragraph 4.9 of this Interim Order, the Debtors permanently and irrevocably admit, stipulate, acknowledge, and agree, as follows:

(i)    *Existing First Lien Credit Agreement.*  Pursuant to that certain Credit Agreement, dated October 8, 2021, among Performance Powersports Group Purchaser, Inc., (in such capacity, the "First Lien Borrower"), the Loan Parties (as defined therein) party thereto (collectively, with the First Lien Borrower, the "First Lien Obligors"), the lenders party thereto (the "First Lien Lenders"), Twin Brook Capital Partners, LLC, as agent (the "First Lien Agent"; and together with the First Lien Lenders, the "Prepetition Secured Parties") (as amended, restated, supplemented or otherwise modified, the "Prepetition First Lien Credit Agreement" and collectively with any other agreements and documents executed or delivered in connection therewith, each as amended, restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Documents"), the First Lien Lenders provided secured loans to the First Lien Borrower.

(ii)    *Prepetition Obligations.*  As of the Petition Date, the First Lien Obligors were indebted to the Prepetition Secured Parties under the Prepetition First Lien Credit Agreement in respect of outstanding Loans (as defined in the Prepetition First Lien Credit Agreement) in an aggregate principal amount of not less than $52 million under the Prepetition First Lien Credit Agreement (the "First Lien Loans"), plus interest accrued and accruing thereon, together with all

8

costs, fees, termination fees, fees and expenses (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees, financial advisors' fees, and related expenses and disbursements of the First Lien Agent's or the First Lien Lender's attorneys, advisors, accountants, and other consultants, and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the First Lien Obligors' obligations pursuant to the Prepetition First Lien Credit Agreement, and any other "Obligations" as defined therein (collectively, the "Prepetition Obligations"), which Prepetition Obligations are legal, valid, and binding on the Debtors.

(iii)     *Prepetition Collateral.*     As more fully set forth in the Prepetition Documents, as of the Petition Date, the First Lien Obligors granted to the Prepetition Secured Parties, first priority security interests in and continuing liens to the Prepetition Secured Parties (the "Prepetition Liens") upon substantially all of their tangible and intangible assets and properties as Collateral (as defined in the Prepetition Documents) for the Prepetition Obligations (the "Prepetition Collateral")).

(iv)     Indemnity.  The DIP Lender has acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, the DIP Lender, subject to and upon entry of a Final Order, shall be and hereby is indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in

any way related thereto, *provided* that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct, in each case, as determined by final order in a court of competent jurisdiction.  No exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this paragraph (13)E(iv) or in the DIP Loan Documents, to the Debtors' obligation to indemnify and/or hold harmless the DIP Lender, as the case may be.

(v)    <u>Sale and Credit Bidding</u>.  The Debtors admit, stipulate, acknowledge, and agree that the DIP Lender shall have the right to credit bid the entirety of (or any portion of) the DIP Obligations; *provided* that any such credit bid shall require (i) assumption in full of the Prepetition Obligations, (ii) payment in full in cash of the Prepetition Obligations, or (iii) such other treatment satisfactory to the Prepetition Secured Parties.  The Debtors admit, stipulate, acknowledge, and agree that the Prepetition Secured Parties shall have the right to credit bid the entirety of (or any portion of) the Prepetition Obligations.

F.    <u>Findings Regarding the Postpetition Financing</u>.

(i)    <u>Postpetition Financing</u>.  The Debtors have requested from the DIP Lender, and the DIP Lender is willing, subject to the terms of this Interim Order and satisfaction of the conditions set forth in the DIP Loan Documents and obtaining the consent of the Prepetition Secured Parties, to extend the DIP Loans on the terms and conditions set forth in this Interim Order and the DIP Loan Documents, respectively.

(ii)    <u>Need for Postpetition Financing</u>.  The Debtors do not have sufficient liquidity, including Cash Collateral, to operate their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to maintain business

10

relationships with their vendors, suppliers, and customers, pay employees, taxes, and certain fees and expenses as set forth herein, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of the Estates for the benefit of all creditors of the Debtors.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Lender as set forth in this Interim Order and other DIP Loan Documents, as applicable, is vital to the preservation and maintenance of the going concern value of each Debtor.  Accordingly, the Debtors have an immediate need to obtain the postpetition financing to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' Estates to maximize the recovery to all creditors of the Estates.

(iii)    <u>No Credit Available on More Favorable Terms</u>.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) other than as set forth herein, credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. The Debtors assert in the Motion, the First Day Declaration, and in the DIP Declaration, and demonstrated at the Interim Hearing, that they have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by the DIP Lender pursuant to the DIP Loan Documents.  In light of the foregoing, and considering all alternatives, the Debtors have reasonably and properly concluded, in the exercise of their sound business judgment, that the

DIP Facility represents the best financing available to the Debtors at this time, and is in the best interests of the Debtors, their Estates, and all of their stakeholders.

(iv)    Budget.  The Debtors have prepared and delivered to the DIP Lender and First Lien Agent an initial budget (the "Initial Budget"), a copy of which is attached hereto as **Exhibit B**.  The Initial Budget reflects the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date (the Initial Budget and each subsequent budget approved by the DIP Lender then in effect, an "Approved Budget").  The Debtors believe that the Initial Budget is reasonable under the facts and circumstances.  The DIP Lender is relying upon the Debtors' agreement to comply on the terms set forth in the Approved Budget, the other DIP Loan Documents, and this Interim Order in determining to enter into the postpetition financing arrangements provided for herein.  The DIP Lender is relying upon the Debtors' agreement to comply on the terms set forth in the Approved Budget, the other DIP Loan Documents, and this Interim Order in determining to enter into the postpetition financing arrangements provided for herein.  The First Lien Agent and Prepetition Secured Parties are relying upon the Debtors' agreement to comply on the terms set forth in the Approved Budget and this Interim Order in determining to consent to the use of Cash Collateral and entering into the postpetition financing arrangements provided for herein.

(v)    Certain Conditions to DIP Facilities.  The DIP Lender's willingness to make the DIP Loans is conditioned upon, among other things:  (a) the Debtors obtaining Court approval to enter into the DIP Loan Documents and to incur all of the respective obligations thereunder, and to confer upon the DIP Lender all applicable rights, powers, and remedies thereunder in each case as modified by this Interim Order; (b) the DIP Lender being granted, as security for the prompt

12

payment of the DIP Facility and all other obligations of the Debtors under the DIP Loan Documents, subject and junior to the Carve Out, (x) automatically perfected and unavoidable first priority security interests in, and liens on, all cash borrowed under the DIP Facility (which shall constitute cash collateral of the DIP Lender) and which cash shall be held in a segregated account in accordance with the DIP Loan Documents (the "DIP Proceeds") and unencumbered real and personal property of the Debtors, whether now existing or hereafter arising and wherever located, tangible and intangible (collectively, the "Unencumbered Collateral"), which, in both cases, shall be senior in priority to the Adequate Protection Liens granted here under on the DIP Proceeds or Unencumbered Collateral; (y) subject to and upon entry of a Final Order, automatically perfected and unavoidable first priority security interests in, and liens on, the proceeds of any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "Avoidance Actions")); and (z) automatically perfected and unavoidable junior second priority priming security interests in, and all liens on, all real and personal property of the Debtors securing the Prepetition First Lien Credit Agreement (collectively hereinafter referred to as the "DIP Collateral,") and (c) the First Lien Agent and Prepetition Secured Parties' receipt of the adequate protection granted to them in this Interim Order. For the avoidance of doubt, DIP Collateral shall not include the DIP Obligors' leasehold interests, but instead shall include solely the proceeds of any such leasehold interests.

      (vi)    Business Judgment and Good Faith Pursuant to Section 364(e). Any credit extended, loans made, and other financial accommodations extended to the Debtors by the DIP Lender, including pursuant to this Interim Order, have been extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in

express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Facility, the DIP Liens, the Adequate Protection Liens, and the DIP Superpriority Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(vii)    <u>Credit Bid Rights</u>.  The Debtors hereby acknowledge and agree that they shall not object, or support any objection, to the DIP Lender's right to credit bid up to the full amount of its DIP Obligations, and the Prepetition Secured Parties' right to credit bid up to the full amount of its Prepetition Obligations including in each case, without limitation, any accrued interest and expenses, subject to the terms of the Bid Procedures, in any sale effectuated through section 363 of the Bankruptcy Code, whether in a chapter 11 or chapter 7 proceeding.

(viii)    <u>Sections 506(c) and 552(b)</u>.  The Debtors have agreed as a condition to obtaining financing under the DIP Facility and the use of Cash Collateral as set forth in the Interim Order that as a material inducement to the DIP Lender to agree to provide the DIP Facility and the Prepetition Secured Parties' consent to the Debtors' use of Cash Collateral, and in exchange for (a) the DIP Lender's willingness to provide the DIP Facility to the extent set forth herein, (b) the DIP Lender's agreement to subordinate its liens and superpriority claims to the Carve Out, and (c) the use of Cash Collateral consistent with the Approved Budget, the terms of the DIP Loan Documents, and the terms of this Interim Order, the Prepetition Secured Parties and the DIP Lender are entitled to receive (x) subject to and upon entry of a Final Order, a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code and a waiver of unjust enrichment and similar equitable relief as set forth below, and (y) subject to and upon entry of a Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

14

(ix)    <u>Good Cause</u>.  Good cause has been shown for the entry of this Interim Order.  The relief requested in the Motion is necessary, essential, and appropriate and is in the best interest of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (a) minimize disruption to the Debtors' businesses and on-going operations, (b) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (c) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.  The terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of their sound business judgment, and are supported by reasonably equivalent value and fair consideration.  The DIP Facility is the product of reasonable, arm's length, good faith negotiations between the Debtors, the DIP Lender, the First Lien Agent, and the Prepetition Secured Parties.

(x)    <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  Any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled on the merits.

Based upon the foregoing, and upon the record made before the Court at the Interim Hearing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

Section 1.    <u>Authorization and Conditions to Financing</u>.

1.1    <u>Motion Granted</u>.  The Motion is granted on an interim basis to the extent provided in this Interim Order.  Any objections to the entry of this Interim Order that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

15

1.2    <u>Authorization of DIP Financing</u>.

(a)    The Debtors are hereby authorized and empowered to immediately borrow, incur, and guarantee (as applicable), DIP Loans, pursuant to the terms and conditions of the DIP Term Sheet and any other DIP Loan Documents, in an aggregate principal amount not to exceed $10 million, with the Initial DIP Loan to be made following entry of this Interim Order and upon satisfaction of other conditions set forth in the DIP Loan Documents, with the remaining amount being made available upon entry of the Final Order and upon satisfaction of other conditions set forth in the DIP Loan Documents and consistent with the applicable Approved Budget and the DIP Loan Documents; *provided*, that the DIP Borrower may elect to draw a portion (not to exceed $4.8 million) of such DIP Facility on one additional business day after the borrowing in connection with the Final Order (on not less than five (5) business days' notice (or such shorter period as the DIP Lender may agree)).

(b)    The Debtors are hereby authorized to (i) borrow under the DIP Facility during the Interim Financing Period (as defined below) in accordance with, and for the purposes permitted by, the DIP Loan Documents (including the Interim Order), (ii) pay all interest, costs, fees, and other amounts and obligations accrued or accruing under the DIP Loan Documents, all pursuant to the terms and conditions of this Interim Order and the other DIP Loan Documents, in each case during the period commencing on the date of this Interim Order through and including the entry of the Final Order (the "<u>Interim Financing Period</u>"), and (iii) use the Cash Collateral for the purposes described in this Interim Order.  The Initial Budget is hereby approved as the "Approved Budget" in all respects.  The Debtors shall use the proceeds of the DIP Facility solely in a manner consistent with the Approved Budget and the terms and conditions of the DIP Loan Documents (including this Interim Order).

10330388.v7

1.3     <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, and in a manner consistent with the Approved Budget, the Debtors are authorized to use Cash Collateral.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order (including with respect to the Carve Out), the DIP Facility, or the DIP Loan Documents.

1.4     <u>Financing Documents</u>.

(a)     <u>Authorization</u>.  The Debtors are hereby authorized and directed to enter into, execute, deliver, and perform all obligations under the DIP Term Sheet and any other DIP Loan Documents, each of which are approved pursuant to this Interim Order.  No obligation, payment, transfer, or grant of security hereunder or under the other DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable state, federal, or foreign law (including under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any defense, reduction, setoff, counterclaim, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), cross-claims, or any other challenge under the Bankruptcy Code or any applicable law, rule, or regulation by any person or entity.

(b)     <u>Approval; Evidence of Borrowing Arrangements</u>.  All terms, conditions, and covenants set forth in the DIP Term Sheet and any other DIP Loan Documents are approved.  All such terms, conditions, and covenants shall be sufficient and conclusive evidence of (i) the borrowing arrangements by and among the Debtors, the DIP Obligors, and the DIP

17

Lender, and (ii) the Debtors' assumption and adoption of, and agreement to comply with, all the terms, conditions, and covenants of this Interim Order and the other DIP Loan Documents for all purposes, including to the extent applicable, the payment of all DIP Obligations arising thereunder, including all principal, interest, fees, and other expenses, including, without limitation, all of the DIP Lender's closing, commitment and exit fees, consultant fees, professional fees, attorney's fees and legal expenses, as more fully set forth in the DIP Loan Documents.  Upon effectiveness thereof, the DIP Loan Documents shall evidence the DIP Obligations, which DIP Loan Documents and DIP Obligations shall be valid, binding, and enforceable against the Debtors, their Estates, and any successors thereto, including, without limitation, any trustee appointed in the Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of these Chapter 11 Cases (collectively, the "Successor Cases"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Interim Order and the other DIP Loan Documents.

(c)    Payment of DIP Fees and Other Expenses.  Any and all fees and expenses payable pursuant to the DIP Term Sheet and any other DIP Loan Documents (collectively, any and all such fees and expenses, the "DIP Fees") are hereby approved and the Debtors are hereby authorized and directed to pay, in cash and on a current basis, all reasonable and documented out-of-pocket costs, disbursements, and expenses of the DIP Lender incurred at any time, as provided by the DIP Loan Documents (including this Interim Order) in accordance with Section 4.15 hereof.  The DIP Fees shall not be subject to any offset, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever.

(d)    Additional DIP Loan Documents; Amendments to DIP Loan Documents.  At the option of the DIP Lender, in its sole discretion, the Debtors and the DIP Lender shall execute additional definitive DIP Loan Documents with respect to the DIP Facility, including,

18

without limitation, guarantees and security documents, in each case, reasonably satisfactory in form and substance to the DIP Lender and the Debtors, which such DIP Loan Documents shall contain the terms and conditions set forth in the DIP Term Sheet and such other terms as the Debtors and the DIP Lender shall agree.  The provisions of the DIP Loan Documents shall, upon execution, amend, modify, supplement and (where applicable) supersede the provisions of the DIP Term Sheet; *provided* that if the DIP Lender determines not to require the Debtors to execute additional DIP Loan Documents, the provisions of the DIP Term Sheet, the Interim Order and the Final Order shall govern the DIP Facility.  The provisions of the DIP Loan Documents shall be consistent with the DIP Term Sheet, the Interim Order and, once entered, the Final Order.  The Debtors and the DIP Lender may make amendments, modifications, or supplements to the DIP Term Sheet and any other DIP Loan Document, and the DIP Lender may waive any provisions in the DIP Term Sheet and any other DIP Loan Documents, without further approval of the Court; *provided* that any amendments, modifications, or supplements to the DIP Term Sheet or any other DIP Loan Documents that operate to increase the aggregate commitments, the rate of interest payable thereunder, or existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee) other than as currently provided in the DIP Loan Documents ("Material DIP Amendment"), shall be subject to consent of the Prepetition Secured Parties (not to be unreasonably withheld) and filed with the Court, and the Debtors shall provide prior written notice of a Material DIP Amendment to (i) counsel to the DIP Lender, (ii) the 30 Largest Unsecured Creditors unless a Committee has been appointed, (iii) the U.S. Trustee, (iv) counsel to the First Lien Agent, and (v) counsel to the Committee (if appointed); *provided* that the consent of the foregoing parties will not be necessary to effectuate any such amendment, modification, or supplement, except that any Material DIP Amendment that is subject to a timely

19

and unresolved objection must be approved by the Court.  For the avoidance of doubt, the Debtors must receive written consent as to any Material DIP Amendment prior to filing notice thereof with the Court from the DIP Lender.

      1.5    <u>Indemnification</u>.  Subject to and upon entry of a Final Order, the Debtors are authorized to indemnify and hold harmless the DIP Lender, and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, in accordance with, and subject to, the DIP Loan Documents, which indemnification is hereby authorized and approved.

**Section 2.**    <u>Postpetition Lien; Superpriority Administrative Claim Status</u>.

      2.1    <u>Postpetition Lien</u>.

      (a)    <u>Postpetition DIP Lien Granting</u>.  To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtors to the DIP Lender of whatever kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, the DIP Lender shall have and is hereby granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (such security interests and liens, the "<u>DIP Liens</u>") in and upon all DIP Collateral, subject to the priorities set forth herein.

      (b)    <u>DIP Lien Priority in DIP Collateral</u>.  The DIP Liens on the DIP Collateral securing the DIP Obligations shall have and are hereby granted (i)  first priority security interests in, and liens on, the DIP Proceeds and the Unencumbered Collateral, which shall be senior in priority to the Adequate Protection Liens granted hereunder on the DIP Proceeds and

Unencumbered Collateral; (ii) subject to and upon entry of a Final Order, first priority security interests in, and liens on, the proceeds of any Avoidance Action; and (iii) junior second priority security interests in, and all liens on, all real and personal property of the Debtors securing the Prepetition First Lien Credit Agreement. At all times, the Debtors shall maintain the DIP Proceeds in a segregated account and not otherwise co-mingle cash constituting DIP Proceeds with any other Cash Collateral.  It shall be condition to closing that the Debtors have confirmed to the DIP Lender in writing that such an account exists and that the DIP Proceeds will be held in such account.

(c)    Postpetition Lien Perfection.  This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, the Adequate Protection Liens, and the other security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) party to a control agreement or other depository account consisting of DIP Collateral, or requirement to register liens on any certificates of title (a "Perfection Act"). Notwithstanding the foregoing, if the DIP Lender, in its sole discretion, elects for any reason to file, record, or otherwise effectuate any Perfection Act, then such DIP Lender is authorized to perform such act, and the Debtors and DIP Guarantors are authorized and directed to perform such act to the extent necessary or required by the DIP Loan Documents, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law.  The DIP Lender may choose to file, record, or present a certified

copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Interim Order in accordance with applicable law. Should the DIP Lender so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.

(d)    To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of any liens and security interests granted and created by this Interim Order or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby preempted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of this Court; *provided*, *however*, that nothing herein shall excuse the Debtors from payment of any local fees, if any, required in connection with such liens. By virtue of the terms of this Interim Order, to the extent that the DIP Lender has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the names of any of the Debtors (including all DIP Guarantors), such filings shall be deemed to properly perfect its liens and security interests granted and confirmed by this Interim Order without further action.

(e)    Except as provided in section 2.3 herein, the DIP Liens and the DIP Superpriority Claims (i) shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim heretofore or hereinafter granted in these Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their Estates, any trustee, or any other

estate representative appointed or elected in these Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of these Chapter 11 Cases or any Successor Cases; (B) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise; and (C) any intercompany or affiliate lien or claim and (ii) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code.

(f)     Adequate Protection for the Prepetition Secured Parties.    The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including any Cash Collateral, solely to the extent of any diminution in value of their interests in the Prepetition Collateral.  As adequate protection, the Prepetition Secured Parties are hereby granted the following, in each case subject to the Carve Out (the "Adequate Protection Obligations"):

(i)     Adequate Protection Liens.  As security for the payment of the Adequate Protection Obligations, each of the Prepetition Secured Parties, for the benefit of the applicable Prepetition Secured Party, is hereby granted (effective and perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements, or other agreements) a valid, perfected replacement security interest in and liens on the applicable Prepetition Collateral and the Unencumbered Collateral (the "Adequate Protection Liens"), which security interests and liens shall be subject to the Carve Out.  For the avoidance of doubt, the Prepetition Secured Parties' Adequate Protection Liens on the DIP Proceeds and the Unencumbered Assets shall be junior to the DIP Liens.  The Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Secured Parties and not in substitution therefor.

23

(ii)    Other Adequate Protection.  The Prepetition Secured Parties shall receive (i) postpetition payment of all reasonable and documented out-of-pocket fees, costs and expenses of the First Lien Agent (including all fees and expenses of their outside counsel, Winston & Strawn LLP and Young Conaway Stargatt & Taylor, LLP, and up to one financial advisor retained by the First Lien Agent with the reasonable consent of the DIP Lender) and; (ii) superpriority administrative expense claims with respect to the foregoing and the Adequate Protection Liens to the extent of any post-petition diminution in value of the Prepetition Secured Party's interest in the collateral securing the Prepetition First Lien Credit Agreement (the "Prepetition Superpriority Claims"); and (iii) access to the Debtors' books and records and such financial reports as are provided to the DIP Lender, including concurrent receipt of the weekly proposed updates to the Approved Budget and Variance Reports to be provided by the Debtor to the DIP Lender pursuant to the DIP Term Sheet and (iv) other protections set forth in this Interim Order.

2.2    Superpriority Administrative Expenses.

(a)    DIP Loans.  Subject to the Carve Out, all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the other DIP Loan Documents, or otherwise, the DIP Lender is granted an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 507(a), 507(b), 546(c), 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien,

24

levy, or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to and upon entry of a Final Order, proceeds of Avoidance Actions) (such superpriority administrative expense claim, the "DIP Superpriority Claims").

> 2.3    Carve Out Provisions.

> (a)    As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); plus (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000 incurred after the first business day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other

electronic means) by the DIP Lender to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the First Lien Agent, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is given by the DIP Lender to the Debtors with a copy to counsel to the Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Lender in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Lender in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger Notice Reserve, the "<u>Carve Out Reserves</u>") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "<u>Pre-Carve Out Amounts</u>"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the

extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the First Lien Agent for the benefit of the Prepetition Secured Parties unless the funds are identifiable proceeds of a DIP Loan, in which case such funds shall be paid to the DIP Lender.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the First Lien Agent for the benefit of the Prepetition Secured Parties unless the funds are identifiable DIP Proceeds, in which case such funds shall be paid to the DIP Lender.  Notwithstanding anything to the contrary in the DIP Loan Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph (b), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph (b), prior to making any payments to the DIP Lender or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Lender and the Prepetition Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Lender for application in accordance with the DIP Loan Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans (as defined in the DIP Term Sheet) or increase or reduce the DIP Obligations, (ii) the failure of the

Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in the First Lien Credit Agreement, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations.

(c)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the

DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

Section 3.    Default; Waivers; Rights and Remedies; Relief from Stay.

3.1    Events of Default.  The occurrence of (a) any "Event of Default" as that term is defined in the DIP Loan Documents, (b) any failure to meet or satisfy any Milestone as defined in, and in accordance with, the DIP Loan Documents, (c) the Maturity Date under the DIP Loan Documents, or (d) any material violation, breach, or default by the Debtors with respect to any of their obligations under this Interim Order or any other DIP Loan Document, shall constitute a "DIP Termination Event" hereunder unless waived in writing by the DIP Lender in accordance with the DIP Loan Documents.

3.2    Debtors' Waivers.

(a)    Prior to the indefeasible payment in full of all DIP Obligations, any request by the Debtors with respect to the following shall also constitute a DIP Termination Event: (i) to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code that does not provide for the repayment in full of the DIP Obligations, other than as provided in this Interim Order or as may be otherwise permitted pursuant to the DIP Loan Documents; (ii) to challenge the application of any payments authorized by this Interim Order pursuant to section 506(b) of the Bankruptcy Code; (iii) to file a plan of reorganization or liquidation without the written consent of the DIP Lender and First Lien Agent; (iv) to propose or support any challenge by any party in interest to seek to limit or prevent the DIP Lender or Prepetition Secured Parties from exercising its credit bid rights in connection with the sale of any assets of the Debtors; or (v) to seek relief under the Bankruptcy Code, including under section 105 of the Bankruptcy Code, to the extent any such relief would restrict or impair

29

(A) (x) the rights and remedies of the DIP Lender against the Debtors as provided in this Interim Order or any of the DIP Loan Documents or (y) the rights and remedies of the Prepetition Secured Parties against the Debtors as provided in this Interim Order or any of the Prepetition Documents or (B) (x) the exercise of such rights or remedies by the DIP Lender against the Debtors in accordance with the DIP Loan Documents (including this Interim Order) or (y) the exercise of such rights by the Prepetition Secured Parties against the Debtors in accordance with the Prepetition Documents or this Interim Order; *provided*, *however*, that (x) the DIP Lender may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender and (y) the Prepetition Secured Parties may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by any Prepetition Secured Party.

(b)    It shall also be a DIP Termination Event under the DIP Facility if, prior to the indefeasible payment in full of such DIP Facility, the Debtors propose or support any chapter 11 plan or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of the DIP Obligations (other than indemnities then due and payable) in full in cash and the payment of the Debtors' obligations with respect to the adequate protection hereunder, in full in cash, within a commercially reasonable period of time, and in any event no later than the effective date of such chapter 11 plan or sale, without the written consent of the DIP Lender.

3.3    <u>DIP Lender Rights and Remedies upon a DIP Termination Event</u>.  During the period covered by this Interim Order, after three (3) business days following the delivery of a written notice of the occurrence of and during the continuance of a DIP Termination Event to the DIP Lender and the Prepetition Secured Parties (the "<u>Remedies Notice Period</u>"), the DIP Lender

30

shall be entitled to independently take any act or exercise any right or remedy as provided in this Interim Order or any other DIP Loan Document, as applicable, including, without limitation, (a) declare all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (b) terminate, reduce, or restrict any commitment to extend additional credit to the Debtors to the extent any such commitment remains (including provision of any Letters of Credit), (c) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations, (d) terminate and/or revoke the Debtors' right, if any, under this Interim Order and the other DIP Loan Documents to use any Cash Collateral and all authority to use Cash Collateral shall cease, (e) invoke the right to charge interest at the default rate under the DIP Loan Documents, and/or (f) stop lending.  For the avoidance of doubt, notwithstanding the foregoing, during the Remedies Notice Period, the Debtors may use Cash Collateral in amounts that the Debtors have determined in good faith are necessary to the preservation of the Debtors and their Estates solely in accordance with the Approved Budget, or that have otherwise been approved in advance in writing by the DIP Lender.

       3.4    <u>Prepetition Secured Parties Rights and Remedies upon a DIP Termination Event</u>.  During the period covered by this Interim Order, after the Remedies Notice Period, the Prepetition Secured Parties shall be entitled to independently take any act or exercise any right or remedy as provided in this Interim Order or any of the Prepetition Documents, as applicable, including, without limitation, (a) declare all Obligations owing under the Prepetition Documents to be immediately due and payable, and (b) terminate and/or revoke the Debtors' right, if any, under this Interim Order, the other DIP Loan Documents, and any of the Prepetition Documents to use any Cash Collateral and all authority to use Cash Collateral shall cease.  For the avoidance

of doubt, notwithstanding the foregoing, during the Remedies Notice Period, (x) the Prepetition Secured Lenders shall have no ability to exercise rights with respect to the DIP Proceeds and (y) the Debtors may use Cash Collateral in amounts that the Debtors have determined in good faith are necessary to the preservation of the Debtors and their Estates solely in accordance with the Approved Budget, or that have otherwise been approved in advance in writing by the Prepetition Secured Parties.

3.5     Modification of Automatic Stay.    The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application, or order of the Court to the extent necessary to permit the DIP Lender to perform any act authorized or permitted under or by virtue of this Interim Order, the DIP Term Sheet, or the other DIP Loan Documents, as applicable, including, without limitation, (a) to implement the postpetition financing arrangements authorized by this Interim Order, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (c) to assess, charge, collect, advance, deduct and receive payments with respect to the DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs, and expenses permitted under any of the DIP Loan Documents, and (d) subject to the Remedies Notice Period, to take any action and exercise all rights and remedies provided to it by this Interim Order, the other DIP Loan Documents, or applicable law.

Section 4.     Other Rights and DIP Obligations.

4.1     No Modification or Stay of this Interim Order.    The DIP Lender has acted in good faith in connection with the DIP Facility and with this Interim Order, and their reliance on this Interim Order is in good faith, and the DIP Lender is entitled to the protections of section 364(e) of the Bankruptcy Code.

32

4.2    <u>Rights of Access and Information</u>.    The Debtors shall provide the DIP Lender reasonable access and information as requested by the DIP Lender.    The Debtors shall provide the First Lien Agent reasonable access and information as requested by the First Lien Agent.

4.3    <u>Power to Waive Rights; Duties to Third Parties</u>.

(a)    Subject to the terms of the DIP Loan Documents, the DIP Lender shall have the right to waive any of the terms, rights, and remedies provided or acknowledged in this Interim Order that are in favor of the DIP Lender (the "<u>DIP Lender Rights</u>"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Rights.    Any waiver by the DIP Lender of any DIP Lender Rights shall not be nor shall it constitute a continuing waiver unless otherwise expressly provided therein.    Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the DIP Lender.

4.4    <u>No Unauthorized Disposition of Collateral; Use of Cash Collateral</u>.    The Debtors shall not sell, transfer, lease, encumber, use, or otherwise dispose of any portion of the DIP Collateral (including inventory and Cash Collateral), other than pursuant to the terms of this Interim Order, and the Debtors are authorized to use Cash Collateral in a manner consistent with this Interim Order, the Approved Budget and the other DIP Loan Documents (including the permitted variances and exclusions to the Approved Budget permitted thereunder).

4.5    <u>No Waiver</u>.    The failure of the DIP Lender to seek relief or otherwise exercise their rights and remedies under the DIP Loan Documents, the DIP Facility, or the Interim

Order, as applicable, shall not constitute a waiver of any of the DIP Lender's rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Lender to: (a) request conversion of the Chapter 11 Cases to a case under chapter 7, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan; or (c) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lender.

4.6    <u>Maintenance of Collateral</u>. Unless the DIP Lender and First Lien Agent otherwise consents in writing, until the latest of (a) the indefeasible payment in full or otherwise acceptable satisfaction of all DIP Obligations and (b) the termination of the DIP Lender' obligations to extend credit under the DIP Facility, the Debtors shall comply with the covenants contained in the Prepetition Documents and the DIP Loan Documents regarding the maintenance and insurance of the DIP Collateral. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the First Lien Agent and DIP Lender (on behalf of the DIP Lender) shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

4.7    <u>Reservation of Rights</u>. The terms, conditions, and provisions of this Interim Order are in addition to and without prejudice to the rights of the First Lien Agent and DIP Lender to pursue any and all rights and remedies under the Bankruptcy Code with respect to the DIP Lender, the other DIP Loan Documents, with respect to the First Lien Agent the Prepetition

Documents or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of Cash Collateral or granting of any interest in the Prepetition Collateral or DIP Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Estates.

4.8    Binding Effect.

(a)    All of the provisions of this Interim Order and the other DIP Loan Documents, the DIP Obligations, all liens, and claims granted hereunder in favor of the DIP Lender or Prepetition Secured Parties, and any and all rights, remedies, privileges, immunities and benefits in favor of the Prepetition Secured Parties or DIP Lender set forth herein, including, without limitation, the parties' acknowledgements, stipulations, and agreements in Section E of this Interim Order (without each of which the DIP Lender would not have entered into or provided funds under the DIP Loan Documents and the Prepetition Secured Parties would not have consented to the use of Cash Collateral provided or acknowledged in this Interim Order), and any actions taken pursuant thereto, shall be effective and enforceable as of the Petition Date immediately upon entry of this Interim Order and not subject to any stay of execution or effectiveness (all of which are hereby waived), notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, shall continue in full force and effect, and shall survive entry of any other order or action, including, without limitation, any order which may be entered confirming any chapter 11 plan providing for the refinancing, repayment, or replacement of the DIP Obligations, converting the Chapter 11 Cases

35

to any other chapter under the Bankruptcy Code, dismissing the Chapter 11 Cases, approving any sale of any or all of the DIP Collateral, or vacating, terminating, reconsidering, revoking, or otherwise modifying this Interim Order or any provision hereof; *provided* that in the event a Final Order is entered, the terms and conditions of such Final Order shall control over this Interim Order; *provided*, *further*, that such Final Order must affirm each of the provisions, protections, grants, statements, stipulations, and agreements in this Interim Order in order for such provisions, protections, grants, statements, stipulations, and agreements to remain in effect after entry of the Final Order.

(b)    No order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise may impair the DIP Superpriority Claim, and the DIP Lender's liens on and security interests in the DIP Collateral, respectively, and all other claims, liens, adequate protections, and other rights granted pursuant to the terms of this Interim Order (including in favor of the Prepetition Secured Parties), which shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full or each of the DIP Lender has otherwise agreed to alternate treatment in writing and such alternate treatment has been consummated.  Notwithstanding any such dismissal, this Court shall retain jurisdiction for the purposes of enforcing all such claims, liens, protections, and rights referenced in this paragraph and otherwise in this Interim Order.

(c)    Except as set forth in this Interim Order, in the event the Court modifies, reverses, vacates, or stays any of the provisions of this Interim Order or any of the other DIP Loan Documents following a Final Hearing, such modifications, reversals, vacatur, or stay shall not affect the (i) validity, priority, or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Lender, of the effective date of such modification,

reversal, vacatur, or stay, (ii) validity, priority, or enforceability of the Adequate Protection Liens, DIP Liens or the DIP Superpriority Claims, or (iii) rights or priorities of any DIP Lender pursuant to this Interim Order with respect to the DIP Collateral or any portion of the DIP Obligations, or the Prepetition Secured Parties with respect to the Prepetition Collateral, Adequate Protection Liens, or any portion of the DIP Obligations.

(d)     Unless otherwise subject to entry of a Final Order, this Interim Order shall be binding upon the Debtors, all parties in interest in the Chapter 11 Cases, and their respective successors and assigns, including, without limitation, (i) any trustee or other fiduciary appointed in the Chapter 11 Cases or any subsequently converted bankruptcy case(s) of the Debtors and (ii) any liquidator, receiver, administrator, or similar such person or entity appointed in any jurisdiction or under any applicable law.  This Interim Order shall also inure to the benefit of the Debtors, the DIP Lender, Prepetition Secured Parties, and each of their respective successors and assigns.

4.9     Effect of Stipulations on Third Parties.

(a)     *Generally*.  The Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order, including the releases set forth in paragraph 4.14 (the "Releases"), shall be binding on the Debtors, any successor thereto (including any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors or any other estate representative appointed in the Chapter 11 Cases or any Successor Cases) in all circumstances and for all purposes as set forth in this Interim Order and the DIP Loan Documents.  The Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order, including the Releases set forth in paragraph 4.14, shall also be binding on all creditors and other parties in interest and all of their respective successors and assigns, including, without limitation, any statutory or non-

37

statutory committees appointed or formed in the Chapter 11 Cases, including the Committee (if appointed), and any other person or entity acting or seeking to act on behalf of the Debtors' estates in all circumstances and for all purposes, unless (i) the Committee or a party in interest with standing (in each case, to the extent standing is obtained pursuant to an order of this Court) has commenced a proceeding or contested matter as required under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this Interim Order, including this paragraph 4.9(a) by the Challenge Deadline challenging any of the Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order, including Releases set forth in paragraph 4.14, with respect to the Prepetition First Lien Credit Agreement (each such proceeding or contested matter, a "Challenge") and (ii) there is entered a final non-appealable order in favor of the plaintiff in any such Challenge sustaining such Challenge. The Court may fashion any appropriate remedy following a successful Challenge.

(b)     If no such Challenge is filed prior to the Challenge Deadline or the Court does not rule in favor of the plaintiff in any such proceeding, then (i) the Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order, including the Releases set forth in paragraph 4.14, shall nonetheless remain binding and preclusive (as provided in paragraph 4.9(a) hereof) on the Committee (if appointed) and on any other person or entity, the Debtors and any successor thereto (including any chapter 7 or chapter 11 trustee appointed or elected in the Chapter 11 Cases or any Successor Cases), (ii) the obligations of the Debtors under the Prepetition Documents, including the Prepetition First Lien Credit Agreement, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, recoupment, offset, or avoidance, for all purposes in the Chapter 11 Cases and any Successor

Cases, (iii) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance, or other defense, and (iv) the Prepetition First Lien Credit Agreement and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims, and offsets by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, (including without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties or their respective subsidiaries, parents, affiliates, controlling persons, officers, directors, members, shareholders, employees, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other advisors and professionals and the respective successors and assigns thereof, in each case past, present and future, and their respective heirs, predecessors, successors and assigns, in their respective capacity as such, arising out of or relating to any of the Prepetition Documents, the Prepetition First Lien Credit Agreement, the Prepetition Liens, or the Prepetition Collateral, as applicable, shall be deemed forever waived, released and barred, in each case except to the extent that such Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order, including the Releases set forth in

paragraph 4.14, were expressly and successfully challenged by such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.

(c)      If any such Challenge is filed prior to the Challenge Deadline by the Committee or any statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases or any other person or entity with requisite standing, (i) any claim or action that is not brought shall forever be barred, and (ii) the Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order, including the Releases set forth in paragraph 4.14, shall nonetheless remain binding and preclusive on the Committee and each other statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements, and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.

(d)      The "Challenge Deadline" shall mean the earlier of (1) the date of confirmation of a plan of reorganization, and (2) 75 days following the entry of this Interim Order; *provided* that, in each case, the Challenge Deadline with respect to the Debtors' stipulations, admissions, agreements, and other releases contained in this Interim Order with respect to the DIP Lender and its affiliates, including the Releases set forth in paragraph 4.14 as to the DIP Lender and its affiliates, shall be the earliest of (1) the date of confirmation of a plan of reorganization, (2) entry of an order approving the sale of the Debtors' assets to the DIP Lender or its affiliates; or (3) the date of entry of the Final Order.  The Challenge Deadline may be extended (x) in writing prior to the expiration of the Challenge Deadline (which writing may be in the form of email by counsel) from time to time in the sole discretion of (A) the First Lien Agent (with respect to the Prepetition Liens and Prepetition Obligations or the adequate protection afforded to the Prepetition

40

Secured Parties), (B) the DIP Lender (with respect to the DIP Liens, DIP Obligations, and DIP Superpriority Claims or any adequate protection afforded to the DIP Lender), or (y) by this Court for good cause shown pursuant to an application filed and served by a party in interest prior to the expiration of the Challenge Deadline.

(e)     Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee (if appointed) or any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including Challenges with respect the Debtors' stipulations, admissions, agreements, and other releases contained in this Interim Order with respect to the DIP Lender, including the Releases set forth in paragraph 4.14 and all rights to object to such standing are expressly reserved.

(f)     For the avoidance of doubt, notwithstanding anything to the contrary in this Interim Order, (i) upon the entry of the Final Order and the approval of the Releases set forth in paragraph 4.14, the Challenge Deadline shall automatically be deemed to have lapsed (unless such Challenge Deadline has already lapsed pursuant to the terms thereof) as to the Debtors' stipulations, admissions, agreements, and other releases contained in this Interim Order with respect to the DIP Lender and its affiliates, including the Stipulations set forth in the Releases set forth in paragraph 4.14 as to the DIP Lender and its affiliates, (ii) such stipulations, admissions, agreements, and other releases shall be binding upon the Debtors and all other parties in interest, including any Committee, and (iii) any Challenges with respect to the DIP Lender and its affiliates, including with respect to the Releases set forth in paragraph 4.14 as to the DIP Lender and its affiliates, shall be deemed forever, waived, released, and barred.

(g)      For the avoidance of doubt, any trustee appointed or elected in these Chapter 11 Cases shall, until the expiration of the period provided herein for asserting Challenges, and thereafter for the duration of any adversary proceeding or contested matter timely commenced pursuant to this Interim Order  (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations and stipulations of the Debtors in this Interim Order.

4.10    Discharge.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or the DIP Lender has otherwise agreed in writing.

4.11    Section 506(c) Waiver.  Subject to and upon entry of a Final Order, no costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of value by the DIP Lender upon the DIP Collateral) shall be charged against any of the Prepetition Secured Parties, the Prepetition Obligations, the Prepetition Collateral, the DIP Lender, the DIP Obligations, or the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the affected DIP Lender or Prepetition Secured Parties, as applicable, in each case in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other

action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve Out or the approval of any budget hereunder).

4.12    Section 552(b) Waiver.  Subject to and upon entry of a Final Order, the Debtors have agreed as a condition to obtaining financing under the DIP Facility and using Cash Collateral that the "equities of the case" exception under section 552(b) shall not apply to the DIP Lender and the DIP Obligations or the Prepetition Secured Parties and the Prepetition Obligations.

4.13    No Marshaling/Application of Proceeds.  Subject to and upon entry of a Final Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, and all proceeds shall be received and applied in accordance with the Prepetition Documents and the DIP Loan Documents.  Subject to and upon entry of a Final Order, in no event shall the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral, and all proceeds shall be received and applied in accordance with the Prepetition Documents.

4.14    Releases.  Subject to and upon entry of a Final Order, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Debtors, (in their own right, on behalf of their estates and their current and former direct and indirect subsidiaries, and each such entity's and its current and former direct and indirect subsidiaries' current and former directors, officers, managers, predecessors, and successors and assigns, and each of such entity's current and former officers, members, managers, directors, principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), and representatives, in each case to the extent

43

permitted by applicable law and solely in such parties capacity as such) (collectively, the "Releasing Parties") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the DIP Lender, and each such entity's current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "Released Parties") and their respective property and assets from any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of the Final Order, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature

whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement, recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the Prepetition First Lien Credit Agreement, but excluding obligations of the DIP Lender under the DIP Facility arising after the date of the Final Order (collectively, the "Released Claims"). This paragraph is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties. As of the entry of the Final Order, the releases granted in this paragraph 4.14 are final and binding and are not subject to a Challenge.

4.15    Payment of DIP Lender Fees and Expenses.

(a)    The Debtors shall pay (i) the reasonable and documented fees and expenses reimbursable under the DIP Facility, the DIP Term Sheet, or the other DIP Loan Documents, as applicable, whether incurred before or after the Petition Date and (ii) all reasonable and documented out-of-pocket costs and expenses of the DIP Lender including, without limitation, reasonable and documented fees and disbursements of counsel in connection with the enforcement or preservation of any rights under the DIP Facility, the DIP Term Sheet, or the other DIP Loan Documents (collectively, the "DIP Fees and Expenses"). Upon entry of this Interim Order, the Debtors shall immediately pay, and the DIP Lender are hereby authorized to immediately make an advance under the DIP Loan Documents to immediately pay, all accrued and unpaid DIP Fees and Expenses incurred prepetition.

10330388.v7

(b)      With respect to DIP Fees and Expenses incurred postpetition, professionals for the DIP Lender shall deliver an invoice in summary form (which shall not be required to include time entry detail and may be redacted for privileged information) to the U.S. Trustee, and the Committee (if appointed), with a copy of such invoices delivered simultaneously to the Debtors.  If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the date that is ten (10) business days after delivery of such invoice to the Debtors, the U.S. Trustee, and the Committee (if appointed), the Debtors shall promptly pay, and the DIP Lender is hereby authorized to make an advance under the DIP Loan Documents to timely pay, such DIP Fees and Expenses.  If an objection to a professional's invoice is timely received, the Debtors shall promptly pay, and the DIP Lender is authorized to make an advance under the DIP Loan Documents to timely pay, the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Under no circumstances shall professionals for any of the DIP Lender be required to comply with the U.S. Trustee fee guidelines or otherwise be required to file a fee or retention application with the Court.  Payments of any amounts set forth in this paragraph are not subject to recharacterization, avoidance, subordination, or disgorgement.

4.16    <u>Limits on Lender Liability</u>.

(a)      Nothing in this Interim Order, any of the DIP Loan Documents, any of the Prepetition Documents, or any other documents related thereto, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Prepetition Secured Parties of any liability for any claims arising from activities by the Debtors in the operation of their businesses or in connection with the administration of these Chapter 11 Cases or any Successor Cases.  The DIP Lender and the Prepetition Secured Parties shall not, solely by reason

46

of having made loans under the DIP Facility or authorizing the use of Cash Collateral, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute). Nothing in this Interim Order or the DIP Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

(b)    Nothing in this Interim Order or the other DIP Loan Documents shall permit the Debtors to violate 28 U.S.C. § 959(b).

(c)    As to the United States, its agencies, departments, or agents, nothing in this Interim Order or the other DIP Loan Documents shall discharge, release, or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

4.17    <u>Survival</u>.  The provisions of this Interim Order, the validity, priority, and enforceability of the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in these Chapter 11 Cases, (b) converting these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any of these Chapter 11 Cases, (d) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Loan Documents), or (e) pursuant to which the Court abstains from hearing these Chapter 11 Cases.  The terms and provisions of this Interim Order, including the claims, liens, security

interests, and other protections (as applicable) granted to the DIP Lender and Prepetition Secured Parties pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in these Chapter 11 Cases, following dismissal of any of these Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until (i) in respect of the DIP Facility, all of the DIP Obligations, pursuant to the DIP Loan Documents (including this Interim Order), have been indefeasibly paid in full in cash (such payment being without prejudice to any terms of provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility are terminated or the DIP Lender has otherwise agreed in writing and such alternate treatment has been consummated.

4.18    No Third Party Rights.    Except as specifically provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holders, or any direct, indirect, or incidental beneficiary.

4.19    No Avoidance.    No obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the DIP Facility shall be avoidable or recoverable from the DIP Lender under any section of the Bankruptcy Code or any other federal, state, or other applicable law.

4.20    Reliance on Order.    All postpetition advances under the DIP Loan Documents are made in reliance on this Interim Order.

4.21    Payments Free and Clear.    Any and all payments or proceeds remitted to the DIP Lender and First Lien Agent on behalf of the Prepetition Secured Parties shall, subject to the terms of this Section 4.21, be irrevocable, received free and clear of any claims, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of

the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, and in the case of payments made or proceeds remitted after the delivery of a Trigger Notice, subject to the Carve Out in all respects; *provided, however,* that to the extent the Prepetition Obligations are not treated as unimpaired or otherwise assumed upon (i) the consummation of a sale of all or substantially all of the Prepetition Collateral or (ii) the confirmation of a plan of reorganization in these cases, the DIP Lender shall turnover to the First Lien Agent any recovery the DIP Lender receives on account of the Prepetition Collateral until the Prepetition Obligations are paid in full. For purposes of clarity, in no event shall the DIP Lender be required to provide any consideration or recovery to the First Lien Agent on account of the Prepetition Obligations or the Prepetition Collateral in the event that (y) it does not receive any recovery on account of the Prepetition Collateral or (y) the sale contemplated under the Stalking Horse Purchase Agreement closes and the Prepetition Obligations are assumed by the buyer as contemplated thereunder.

4.22    <u>Limited Effect</u>.  In the event of a conflict between the terms and provisions of any of the DIP Loan Documents (including this Interim Order), the terms and provisions of this Interim Order shall govern.

4.23    <u>Headings</u>.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

4.24    <u>Bankruptcy Rules</u>.  The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

4.25    <u>General Authorization</u>.  The Debtors, the Prepetition Secured Parties, and the DIP Lender are authorized to take any and all actions necessary to effectuate the relief granted in this Interim Order.

4.26    <u>Retention of Exclusive Jurisdiction</u>.  This Court shall retain exclusive jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order, the DIP Term Sheet, and the other DIP Loan Documents.

4.27    <u>No Implied Modification of Approved Budget</u>.  For the avoidance of doubt, any order of this Court authorizing the Debtors to make certain payments shall not be construed as authorization to for the Debtors to make any payments inconsistent with the Approved Budget and the Approved Budget shall control in all respects.

4.28    <u>Proofs of Claim</u>.  The Prepetition Secured Parties (including the First Lien Agent) shall not be required to file proofs of claim in any of the Debtors' cases or any of the Successor Cases for any claim allowed herein or therein in respect of the Prepetition Obligations. Any order entered by the Court establishing a bar date in any of these Chapter 11 Cases or any Successor Cases shall not apply to the First Lien Agent or other Prepetition Secured Parties; provided that notwithstanding any order entered by the Court establishing a bar date in any of these Chapter 11 Cases or any Successor Cases to the contrary, the First Lien Agent on behalf of the Prepetition Secured Parties, may (but are not required) in their discretion file (and amend and/or supplement) a proof of claim and/or aggregate proofs of claim in each of these Chapter 11 Cases or any Successor Cases for any claim allowed herein, and any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor.  Any proof of claim filed by any Prepetition Secured Parties shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons.

4.29    <u>Final Hearing and Response Dates</u>.  The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) will be held on **[•], 2023, at [•]:00 [a/p].m., prevailing**

**Eastern Time.**  The Debtors shall promptly mail copies of this Interim Order to the Notice Parties, and to any other party that has filed a request for notices with this Court.  The Debtors may serve the Motion and the Interim Order without the exhibits attached thereto as such exhibits are voluminous and available, free of charge, at https://omniagentsolutions.com/PerformancePowersports, and such notice is deemed good and sufficient and no further notice need be given.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon Any objections or responses to entry of a final order on the Motion shall be filed on or before **4:00 p.m., prevailing Eastern Time, on [•], 2023**, and shall be served on: (a) the Debtors, Performance Powersports Group Investor, LLC, 1775 East University Drive, Tempe, Arizona 8528, Attn: Ken Vande Berg, CFO; (b) proposed counsel to the Debtors, Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic E. Pacitti (dpacitti@klehr.com) and Michael W. Yurkewicz (myurkewicz@klehr.com); (c) counsel to the DIP Lenders, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Brian Schartz, P.C. (brian.schartz@kirkland.com) and Allyson B. Smith (allyson.smith@kirkland.com); (d) counsel to the Prepetition Secured Parties, Winston and Strawn LLP, 200 Park Avenue, New York, NY 10017 Attn: Gregory M. Gartland (ggartland@winston.com) and Emma Fleming (efleming@winston.com) and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street Wilmington, DE 19801 Attn: Andrew Magaziner (amagaziner@ycst.com); and (e) Office of The United States Trustee, 844 King Street, Suite 2207, LockBox 35, Wilmington, Delaware 19801, Attn: Richard Schepacarter (Richard.Schepacarter@usdoj.gov).

# Exhibit A

*Performance Powersports Group*
*DIP Budget*

DRAFT - SUBJECT TO MATERIAL CHANGE

| Week Ending | Post-Petition Forecast Week 1 1/22/2023 | Week 2 1/29/2023 | Week 3 2/5/2023 | Week 4 2/12/2023 | Week 5 2/19/2023 | Week 6 2/26/2023 | Week 7 3/5/2023 | Week 8 3/12/2023 | Week 9 3/19/2023 | Week 10 3/26/2023 | Week 11 4/2/2023 | 11-week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | |
| Tractor Supply Company | 1,943,734 | 1,234,406 | 4,377,313 | | 3,582,456 | | 3,967,795 | | 1,122,739 | | 1,568,950 | 16,560,987 |
| Lowe's | 1,216,541 | | 1,208,745 | 1,212,154 | 1,793,548 | 1,805,503 | 1,798,794 | 2,034,685 | 1,852,028 | 1,852,028 | 1,852,028 | 17,860,461 |
| Walmart | 15,582 | 74,397 | 69,826 | 95,164 | 3,667 | | 917 | | | | 103,200 | 259,773 |
| Other | 189,992 | 248,865 | 340,412 | 51,889 | 320,662 | 83,720 | 134,876 | 174,173 | 119,339 | 108,014 | | 1,874,722 |
| **Net Cash Receipts** | 3,365,849 | 1,557,668 | 5,996,096 | 1,359,207 | 5,700,333 | 1,889,222 | 5,902,382 | 2,208,659 | 3,094,107 | 1,960,042 | 3,522,179 | 36,555,944 |
| **Disbursements** | | | | | | | | | | | | |
| *Methodology Disbursements* | | | | | | | | | | | | |
| Payroll | | 300,000 | | 300,000 | | 300,000 | | 300,000 | | 300,000 | | 1,500,000 |
| Employee Benefits | | | 60,000 | 8,141 | | 60,000 | | 8,141 | | | 60,000 | 196,282 |
| Insurance | | | 180,000 | | | 180,000 | | | | | 180,000 | 540,000 |
| Rent | | | 380,449 | | | 380,449 | | | | | 380,449 | 1,141,347 |
| **Total Methodology Disbursements** | | 300,000 | 620,449 | 308,141 | | 300,000 | 620,449 | 308,141 | | 300,000 | 620,449 | 3,377,629 |
| *Non-Methodology Disbursements* | | | | | | | | | | | | |
| 3PL Warehouse | | | | | | | | | | | | 637,650 |
| Freight/Tariff | | | | | | | | | | | | 295,000 |
| Factory Tao | 650,000 | | | | 656,000 | | | | | | | 3,096,893 |
| Factory Kandi | 2,276,438 | 1,746,563 | 1,746,563 | 1,746,563 | 1,746,563 | 2,731,250 | 1,811,250 | 1,811,250 | 1,811,250 | 2,731,250 | 1,811,250 | 21,972,188 |
| Factory Kaxa | | | | | | | | | | | | 451,300 |
| Factory Other | | | | | | | | | | | | 515,000 |
| Service Providers | | | | | | | | | | | | 56,636 |
| Professional Services | | | | | | | | | | | | 515,000 |
| Licensing Fees | | | | | | | | | | | | 1,300,000 |
| Other | | | | | | | | | | | | 384,170 |
| **Total Non-Methodology Disbursements** | 2,964,438 | 2,012,703 | 2,029,353 | 2,046,387 | 2,556,195 | 3,093,940 | 2,311,971 | 2,341,490 | 2,819,047 | 3,301,375 | 3,746,940 | 29,223,837 |
| **Operating Cash Flow** | 401,411 | (755,034) | 3,346,294 | (995,321) | 3,144,138 | (1,504,718) | 2,969,963 | (440,772) | 275,060 | (1,641,333) | (845,210) | 3,954,478 |
| **Cumulative Operating Cash Flow** | 401,411 | (353,623) | 2,992,671 | 1,997,350 | 5,141,488 | 3,636,770 | 6,606,733 | 6,165,961 | 6,441,021 | 4,799,688 | 3,954,478 | 3,954,478 |
| *Non-Operating Disbursements* | | | | | | | | | | | | |
| Secured Debt Service (Interest & Principal) | | | | | | | | | | | 1,401,718 | 1,401,718 |
| DIP Interest | | | 32,463 | | | | 56,058 | | | | 82,542 | 171,083 |
| Facility Closure & Move | | | | | | | 200,000 | | | | | 1,270,000 |
| Capex | | | 354,907 | | | | | | | | | 404,907 |
| **Total Non-Operating Disbursements** | | | 387,370 | | | 1,120,000 | 256,058 | | | | 1,484,259 | 3,247,688 |
| *Restructuring Costs* | | | | | | | | | | | | |
| Debtor Professionals | 320,000 | | 150,000 | | | | 160,000 | | | | 1,230,000 | 2,750,000 |
| Secured Lender Professionals | | 300,000 | | | | | | | | | | 300,000 |
| DIP Lender Professionals | 600,000 | | | | | | | | | | | 600,000 |
| UCC Professionals | | | | | | | | | | | 175,000 | 175,000 |
| Vendor Relief | 1,845,000 | | | | | 3,450,000 | | | | | | 5,395,000 |
| Wind-Down Budget Escrow | | | | | | | | | | | 600,000 | 600,000 |
| Other Restructuring Costs | | | | | | 100,000 | | | | | | 800,000 |
| **Total Restructuring Costs [1]** | 2,765,000 | 300,000 | 250,000 | 224,091 | 115,000 | 3,737,778 | 160,000 | 209,091 | 90,000 | 60,000 | 2,709,040 | 10,620,000 |
| **Total Disbursements** | 5,729,438 | 2,612,703 | 3,287,172 | 2,578,619 | 2,671,195 | 8,251,718 | 3,348,478 | 2,858,722 | 2,909,047 | 3,661,375 | 8,560,688 | 46,469,153 |
| **Debt Rollforward** | | | | | | | | | | | | |
| Beginning Cash (Book) | 978,481 | 2,114,892 | 1,059,858 | 3,768,782 | 2,549,370 | 5,578,508 | 1,016,013 | 3,569,917 | 2,920,054 | 3,105,114 | 1,403,781 | 978,481 |
| Net Cash Flow | (2,363,589) | (1,055,034) | 2,708,924 | (1,219,412) | 3,029,138 | (6,362,496) | 2,553,904 | (649,863) | 185,060 | (1,701,333) | (5,038,510) | (8,913,510) |
| DIP Draw (Repayment) | 3,500,000 | | | | | 1,800,000 | | | | | 4,700,000 | 10,000,000 |
| Ending Cash (Book) | 2,114,892 | 1,059,858 | 3,768,782 | 2,549,370 | 5,578,508 | 1,016,013 | 3,569,917 | 2,920,054 | 3,105,114 | 1,403,781 | 1,065,271 | 1,065,271 |
| Beginning DIP Balance | | 3,710,000 | 3,710,000 | 3,710,000 | 3,710,000 | 3,710,000 | 5,900,000 | 5,900,000 | 5,900,000 | 5,900,000 | 5,900,000 | |
| Draw (Repayment) | 3,500,000 | | | | | 1,800,000 | | | | | 4,700,000 | 10,000,000 |
| Commitment Fee (PIK) | 210,000 | | | | | 390,000 | | | | | 1,000,000 | 1,600,000 |
| Exit Fee | | | | | | | | | | | | |
| Ending DIP Balance | 3,710,000 | 3,710,000 | 3,710,000 | 3,710,000 | 3,710,000 | 5,900,000 | 5,900,000 | 5,900,000 | 5,900,000 | 5,900,000 | 11,600,000 | 11,600,000 |
| DIP Availability | 6,500,000 | 6,500,000 | 6,500,000 | 6,500,000 | 6,500,000 | 4,700,000 | 4,700,000 | 4,700,000 | 4,700,000 | 4,700,000 | | |
| DIP Commitment | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| **Total Liquidity** | 8,614,892 | 7,559,858 | 10,268,782 | 9,049,370 | 12,078,508 | 5,716,013 | 7,805,114 | 8,269,917 | 7,620,054 | 6,103,781 | 1,065,271 | 1,065,271 |

1. The professional fee accruals are attached and incorporated in the Budget for purposes of calculating and funding the Carve Out as provided in the Interim Order.

**Exhibit B**

*[Execution Version]*

### Junior Secured Superpriority Debtor in Possession Term Loan Facility Term Sheet

This Junior Secured Superpriority Debtor in Possession Term Loan Facility Term Sheet (including all annexes and exhibits hereto, as may be amended, amended and restated, supplemented or otherwise modified from time to time, this "DIP Term Sheet" or this "Agreement") describes the terms and conditions of the secured superpriority debtor in possession term loan facility (the "DIP Credit Facility") provided by the DIP Lenders (as defined below) to Performance Powersports Group Purchaser, Inc., a Delaware corporation (the "DIP Borrower"), in connection with cases (collectively, the "Bankruptcy Cases") filed or to be filed by Performance Powersports Group Holdings, Inc., a Delaware corporation ("Holdings"), the DIP Borrower and the other Guarantors (as defined below) (collectively, the "Debtors") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") on a date (such date, the "Petition Date") no later than January 16, 2023. Capitalized terms used but not defined herein have the meanings assigned to them in the Interim DIP Order (as defined below).

| | |
|---|---|
| **DIP Borrower**: | Performance Powersports Group Purchaser, Inc., as debtor and debtor-in-possession. |
| **Holdings**: | Performance Powersports Group Holdings, Inc., as debtor and debtor-in-possession. |
| **Guarantors**: | Holdings and Performance Powersports Group, Inc., a Delaware corporation, each as a debtor and debtor-in-possession, agrees (collectively, the "Guarantors" and each, individually, a "Guarantor") to the guaranty provisions set forth in Annex A attached hereto, incorporated herein by this reference. Such Guarantors, together with the DIP Borrower, are referred to herein each as a "Debtor" and collectively, as the "Debtors". |
| **DIP Lender:** | Tankas Funding VI, LLC (the "DIP Lender"). |
| **Prepetition Facilities:** | The senior secured first lien credit facility (the "Prepetition First Lien Facility") under that certain Credit Agreement, dated as of October 8, 2021 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition First Lien Credit Agreement"), among Performance Powersports Group Purchaser, Inc., as borrower, Twin Brook Capital Partners, LLC, as agent (the "Prepetition First Lien Agent"), and the financial institutions party thereto from time to time (the "Prepetition First Lien Lenders"). |
| **DIP Credit Facility:** | The DIP Lender agrees to make junior lien superpriority debtor-in-possession term loans (the "DIP Credit Facility") in an aggregate principal amount not to exceed $10,000,000 in "new money" loans (the "DIP Loans", and such commitment of the DIP Lender, the "DIP Commitment") to the DIP Borrower, subject to the terms and conditions in this DIP Term Sheet, as it may be replaced and/or supplemented as set forth herein (this DIP Term Sheet, as it may be so replaced and/or supplemented the "DIP Agreement"), which DIP Loans shall be made available in two separate borrowings: (1) $3,500,000 under the DIP Credit Facility to be drawn, subject to the conditions set forth below, following entry in the Bankruptcy Cases (as defined below) of the Interim DIP Order approving the DIP Credit Facility (the "Initial DIP Loan") on the Closing Date, and (2) the remainder of the DIP Credit Facility (the "Final DIP Loan") to be drawn, subject to the conditions set forth below, following entry of a Final DIP Order upon the Final Closing Date (as defined below); provided, that the DIP Borrower may elect to draw a portion (not to exceed $4,800,000) of such Final DIP Loan on one additional business day after the Final Closing Date that is specified by |

the DIP Borrower (on not less than five (5) business days' notice (or such shorter period as the DIP Lender may agree)), subject to the conditions set forth below.

Concurrently with the funding of the Initial DIP Loan, proceeds of the DIP Loans shall be maintained in a segregated bank account over which DIP Lender shall retain control (the "DIP Loan Account") that shall be subject to the DIP Liens in favor of the DIP Lender, which shall be granted and perfected pursuant to the DIP Orders. Funds on deposit in the DIP Loan Account shall be made available to the DIP Borrower from time to time to be applied directly to the payment of amounts permitted to be paid under the Approved Budget (after giving effect to the Permitted Variances). Amounts repaid under the DIP Credit Facility may not be re-borrowed.

**Closing Date:** The date of initial borrowing under the DIP Credit Facility, on or before January 23, 2023, on which the "Conditions Precedent to the Closing Date" as set forth below shall have been satisfied or waived by the DIP Lender in accordance with the DIP Agreement. Upon the Debtors' filing of the Bankruptcy Cases in the Bankruptcy Court, the DIP Borrower or its counsel shall notify the DIP Lender of the anticipated date of the first day hearing (the "First Day Hearing Date").

**Use of Proceeds:** The proceeds of the DIP Loans will be used solely to: (i) fund the DIP Loan Account; (ii) pay fees, costs, administrative expenses and other expenses associated with the DIP Credit Facility and the Debtors' use of cash collateral; and (iii) finance working capital and general corporate purposes, subject to the Approved Budget (as defined below) and the terms and conditions of the DIP Credit Facility and the DIP Orders, including to (a) fund the costs of the administration of the Bankruptcy Cases and the consummation of a sale under section 363 of the Bankruptcy Code (as defined below) and (b) fund interest, fees, and other payments contemplated in respect of the DIP Credit Facility; *provided* that during the Challenge Period (as defined below), an investigation budget in an aggregate amount of $50,000 of the DIP Loans may be used by any official committee of unsecured creditors (the "Committee") to investigate, but not to prepare, initiate, litigate, prosecute, object to, or otherwise challenge, (i) the claims and liens of the Prepetition First Lien Lenders, and (ii) potential claims, counterclaims, causes of action or defenses against the Prepetition First Lien Lenders.

**Cash Collateral:** Subject to entry of the Interim DIP Order, the Prepetition First Lien Agent and Prepetition First Lien Lenders and the DIP Lender hereby consent to the use of their "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**") on the terms and conditions set forth in the DIP Orders and the DIP Facility Documents.

**Interest Rates:** Interest shall accrue on the DIP Loans at a rate of 15.0% per annum (the "Interest Rate"). Accrued interest with respect to any DIP Loan shall be paid in cash on (i) the last day of each month, until any and all DIP Loans and other obligations under the DIP Credit Facility (collectively, the "DIP Obligations") are paid in full and (ii) on the maturity of the DIP Loans. All interest and fees under this DIP Term Sheet shall be calculated on the basis of a 360-day year for the actual number of days elapsed. All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid. Following the occurrence and during the continuance of an Event of Default (as defined below) (after giving effect to any applicable grace periods), principal, interest and all other

amounts due in respect of the DIP Obligations shall bear interest at a rate equal to 3.00% per annum in excess of the Interest Rate.

**Fees:**

The Debtors agree to pay the following fees to the DIP Lender:

Commitment Fee: A commitment fee of 6.0% on the full amount of the DIP Credit Facility, payable in kind, 35% of which shall be earned on the Petition Date and paid in kind upon entry of the Interim DIP Order and on the Closing Date and 65% of which shall be earned on the Petition Date and paid in kind upon entry of the Final DIP Order and on the Final Closing Date, and shall be payable in cash upon the Maturity Date.

Exit Fee: An exit fee of 10.0% of the amount of the full DIP Loans and commitments under the DIP Credit Facility (the "Exit Fee"), earned upon entry of the Final DIP Order and payable in cash upon the earlier of (i) the Maturity Date and (ii) any other payoff, refinancing or termination of the DIP Credit Facility; provided, that such Exit Fee shall not be due and payable if the Maturity Date, or such payoff, refinancing or termination, results from a transaction in which the DIP Lender or one or more affiliates of the DIP Lender are the buyer(s) of all or substantially all of the assets of the assets of the Debtors (or equity interests of entities representing all or substantially all of the assets of the Debtors).

**DIP Loan Documentation; DIP Term Sheet Controls:**

At the option of the DIP Lender, in its sole discretion, the Debtors shall execute definitive financing documentation with respect to the DIP Credit Facility, including, without limitation, guarantees and security documents, in each case, reasonably satisfactory in form and substance to the DIP Lender and the Debtors (the "DIP Facility Documents"), which such DIP Facility Documents shall contain the terms and conditions set forth in this DIP Term Sheet and such other terms as the DIP Borrower, the and the DIP Lender shall agree.  The provisions of the DIP Facility Documents shall, upon execution, amend, modify, supplement and (where applicable) supersede the provisions of this DIP Term Sheet; *provided* that if the DIP Lender determines not to require the Debtors to execute additional DIP Facility Documents, the provisions of this DIP Term Sheet, the Interim DIP Order and the Final DIP Order shall govern the DIP Credit Facility.  The provisions of the DIP Facility Documents shall be consistent with this DIP Term Sheet, the Interim DIP Order and, once entered, the Final DIP Order.

**Expenses and Indemnity:**

The DIP Borrower and each Guarantor shall jointly and severally pay promptly all reasonable and documented out-of-pocket costs and expenses of the DIP Lender (including reasonable and documented fees and expenses of counsel, which shall be Kirkland & Ellis, LLP and local counsel in each appropriate jurisdiction, including Delaware bankruptcy counsel), in connection with administering the DIP Credit Facility, preparing all documents and enforcing any and all right, remedies and obligations relating to the DIP Credit Facility.

The DIP Borrower and each Guarantor shall jointly and severally indemnify the DIP Lender in accordance with the indemnity provisions set forth in Annex B attached hereto.

**Voluntary Prepayments:**

Voluntary repayment of the DIP Obligations, whether in whole or in part, shall not be permitted; provided, for the avoidance of doubt, that the foregoing restriction shall not apply to any application of DIP Obligations as consideration for a transaction in which

the DIP Lender or one or more affiliates of the DIP Lender are the buyer(s) of all or substantially all of the assets of the assets of the Debtors (or equity interests of entities representing all or substantially all of the assets of the Debtors).

**Mandatory Prepayments:** The Debtors shall immediately pay or prepay the DIP Loans and all other DIP Obligations (including the Exit Fee) (together with a cash reserve established by the DIP Lender to cover asserted contingent and indemnity obligations) until such obligations are paid in full as follows (subject to any prior application of the proceeds of Prepetition Collateral (as defined below) to the Prepetition First Lien Facility, to the extent required by the DIP Orders):

(i) 100% of the net cash proceeds of any DIP Collateral in any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code simultaneously with the consummation thereof, after funding the "Carve Out" (to the extent agreed upon by the DIP Lender and set forth in the DIP Orders, the "Carve Out"); provided, that the foregoing mandatory prepayment requirement (and the Exit Fee) shall not apply to any application of DIP Obligations as consideration for a transaction in which the DIP Lender or one or more affiliates of the DIP Lender are the buyer(s) of all or substantially all of the assets of the assets of the Debtors (or equity interests of entities representing all or substantially all of the assets of the Debtors);

(ii) 100% of the net cash proceeds of any other sale or other disposition by the DIP Borrower or any Guarantor of any DIP Collateral in excess of $50,000, in a single transaction or series of related transactions (except for asset sales in the ordinary course of business);

(iii) 100% of indemnity payments and insurance proceeds not included as proceeds of asset dispositions; and

(iv) 100% of the net cash proceeds received from the incurrence or issuance of indebtedness by Holdings, the DIP Borrower or any subsidiary not expressly permitted to be incurred or issued pursuant to clause (iii) of the section entitled "Negative Covenants" below.

Any amounts so paid or prepaid may not be reborrowed.  No reinvestment of the proceeds of any insurance proceeds, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lender.

Mandatory payments or prepayments and proceeds of DIP Collateral received by the DIP Borrower or any Guarantor outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the DIP Lender), after giving effect to the Carve Out, and any other payments required pursuant to the DIP Orders:

(1) first, to pay all documented out-of-pocket expenses of the DIP Lender (including, without limitation, fees and expenses of counsel and external advisors);

(2) second, to pay the Exit Fee to DIP Lender;

4

(3) <u>third</u>, to pay an amount equal to all accrued and unpaid interest and fees, if any, owing to the DIP Lender;

(4) <u>fourth</u>, to repay any principal amounts outstanding in respect of the DIP Loans (including any interest or other amounts that have been paid in kind and added to the principal balance thereof);

(5) <u>fifth</u>, to pay all other amounts owing to the DIP Lender; and

(6) <u>last</u>, the balance, if any, after all of the DIP Obligations have been paid in full, to the DIP Borrower subject in all respects to the rights, liens and claims of each of the Prepetition First Lien Agent and the Prepetition First Lien Lenders.

*provided*, *however*, that without the consent of a majority of the First Lien Lenders, the DIP Credit Facility cannot be repaid from proceeds of Prepetition Collateral until all "Obligations" (as such term is defined in the First Lien Credit Agreement) are paid in full, assumed in full, or otherwise treated in a manner satisfactory to the Prepetition Secured Parties. For the avoidance of doubt, in no event shall the DIP Lender be required to provide any consideration or recovery to the Prepetition First Lien Agent or Prepetition Secured Parties on account of the Prepetition Obligations or the Prepetition Collateral in the event that (y) it does not receive any recovery on account of the Prepetition Collateral or (y) the sale contemplated under that certain Asset Purchase Agreement, dated as of January 16, 2023, by and between the Debtors and CPS USA Acquisition, LLC (the "<u>Stalking Horse Purchase Agreement</u>") closes and the Prepetition Obligations are assumed by the buyer as contemplated thereunder.

**DIP Milestones:**   The Debtors shall be required to achieve the following milestones (collectively, the "<u>Milestones</u>"):

(i)   the Interim DIP Order shall be entered in the Bankruptcy Cases by no later than 5 calendar days of the date of commencement of the Bankruptcy Cases (the "<u>Petition Date</u>");

(ii)   a final order authorizing the borrowings under the DIP Credit Facility on terms acceptable to the DIP Lender (the "<u>Final DIP Order</u>" and, together with the Interim DIP Order, the "<u>DIP Orders</u>")) shall be entered in the Bankruptcy Cases within 30 calendar days of the Petition Date;

(iii)   the Debtors shall file a motion requesting an order from the Bankruptcy Court approving bid procedures relating to the solicitation of qualified bids for the sale of substantially all of the Debtors' assets and businesses (the "<u>Bidding Procedures</u>"), which motion shall be in form and substance satisfactory to the DIP Lender, within 2 calendar days of the Petition Date, and the Bankruptcy Court shall have entered an order approving the Bidding Procedures within 30 calendar days after the Petition Date; and

(iv)   within 60 calendar days after the Petition Date, subject to extension solely on account of the availability of the Bankruptcy Court, the hearing to consider the approval of the sale transaction shall have occurred and the Bankruptcy Court shall have approved the transaction contemplated by the Bidding Procedures.

**Events of Default:** The occurrence of any of the following shall constitute an "<u>Event of Default</u>".  The DIP Lender shall be permitted to exercise remedies, in its sole discretion, upon an Event of Default, as set forth in the DIP Orders and under the heading "Maturity" below.

(i) the entry of an Interim DIP Order or Final DIP Order in form or substance that is not acceptable to the DIP Lender in its sole discretion;

(ii) failure to pay principal or Adequate Protection Obligations in full when due, including without limitation, on the Maturity Date;

(iii) failure to pay interest, fees or other amounts in full within three (3) business days after the date due, including without limitation, on the Maturity Date;

(iv) failure of any representation, warranty or certification to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change (as defined below), in all respects) when made;

(v) failure by any Debtor to be in compliance in all material respects with provisions of the DIP Agreement (subject to applicable grace periods as set forth in the DIP Orders, including a two (2) business day grace period for delivery of the Approved Budget, cash flow forecasts and Variance Reports), any other DIP Facility Document or any DIP Order;

(vi) dismissal of any of the Bankruptcy Cases;

(vii) the appointment in any of the Bankruptcy Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code) (without the prior written consent of the DIP Lender);

(viii) failure of any Milestones to be satisfied by the specified deadline therefor;

(ix) the filing of any application by any Debtor for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Bankruptcy Cases which is *pari passu* with or senior to the DIP Obligations, DIP Liens,  excluding the Carve Out, the Prepetition Permitted Liens, liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the DIP Lender;

(x) the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Bankruptcy Cases with respect to any portion of the DIP Collateral with an aggregate value of at least $50,000 without the prior written consent of the DIP Lender;

(xi) the filing of a plan of reorganization or liquidation by the DIP Borrower or any Guarantor without the written consent of the DIP Lender (any such plan,

an "<u>Unapproved Plan</u>");

(xii)     actual invalidity of any liens or security interests securing the DIP Obligations;

(xiii)     any Debtor (or any direct or indirect non-Debtor affiliate or subsidiary of a Debtor) commences (or supports) any action (other than an action permitted by the DIP Orders) against the DIP Lender or any of their agents or employees, to subordinate or avoid any liens granted hereunder, under any other DIP Facility Document or under any DIP Order in favor of the DIP Lender;

(xiv)     (a) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify this DIP Term Sheet, any other DIP Facility Document or any DIP Order, or the disallow any DIP Obligations, in whole or in part, or (b) any material provision of this DIP Term Sheet, any other DIP Facility Document or any DIP Order, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Lender);

(xv)     failure by the DIP Borrower or any Guarantor to comply in any material respect with the Interim DIP Order or Final DIP Order, as applicable;

(xvi)     conversion of any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code;

(xvii)     any request made by any Debtor for the reversal, modification, amendment, stay, reconsideration or vacatur of any DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Lender;

(xviii)     the entry of an order amending, modifying, staying, revoking, reversing, vacating or terminating the Interim DIP Order or Final DIP Order, as applicable, without the express written consent of the DIP Lender;

(xix)     the termination of any of the Debtors' exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code without the prior written consent of the DIP Lender;

(xx)     without the prior written consent of the DIP Lender, the filing with the Bankruptcy Court of a motion seeking approval of a sale of all or substantially all assets of the Debtors under section 363 of the Bankruptcy Code that, in either case, does not provide for indefeasible payment in full in cash to the DIP Lender of all DIP Obligations upon closing of such sale or the effective date of a plan pursuant to which such sale is made, unless otherwise agreed to by the DIP Lender;

(xxi)     the filing of any motion seeking approval of a sale of any DIP Collateral without the consent of the DIP Lender (other than any sale permitted by the Final DIP Order or permitted under "Negative Covenants" below), or any

sale or other disposition of all or a material portion of the collateral securing the DIP Obligations other than as permitted by the Final DIP Order and any sale permitted under "Negative Covenants" below; and

(xxii)  entry of any judgment for the payment of money by Debtors in an amount greater than $50,000 that would be enforceable on a post-Petition Date basis.

**Maturity:**  The DIP Credit Facility shall be repaid in full in cash (and, to the extent not already terminated, all commitments thereunder shall automatically and permanently terminate) on the earliest of the following dates (such earliest date, the "<u>Maturity Date</u>"):

(i)  March 31, 2023;

(ii)  the consummation of any sale of all or substantially all of the assets of the Debtors;

(iii)  30 days after the Petition Date if the Final DIP Order has not been entered;

(iv)  the acceleration of the DIP Credit Facility;

(v)  the effective date of any plan of reorganization;

(vi)  the filing of an Unapproved Plan;

(vii)  the failure of DIP Borrower or any Guarantor timely to satisfy any Milestone; and

(viii)  with respect to Events of Default other than those expressly set forth above, two (2) business days after receipt by the DIP Borrower of a written notice from the DIP Lender of the occurrence of any such Event of Default;

*provided*, *however*, that without the consent of a majority of the First Lien Lenders, the DIP Credit Facility cannot be repaid from proceeds of Prepetition Collateral until all "Obligations" (as such term is defined in the First Lien Credit Agreement) are paid in full, assumed in full, or otherwise treated in a manner satisfactory to the Prepetition Secured Parties. For the avoidance of doubt, in no event shall the DIP Lender be required to provide any consideration or recovery to the Prepetition First Lien Agent or Prepetition Secured Parties on account of the Prepetition Obligations or the Prepetition Collateral in the event that (y) it does not receive any recovery on account of the Prepetition Collateral or (y) the sale contemplated under the Stalking Horse Purchase Agreement closes and the Prepetition Obligations are assumed by the buyer as contemplated thereunder.

**Collateral:**  "<u>Collateral</u>" means, collectively, all assets of the DIP Borrower and each Guarantor (and, in the case of each Debtor, its bankruptcy estate) of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods (including fixtures), instruments, inventory, investment property, money, cash, cash equivalents, and all deposit accounts, securities accounts, commodities accounts and lockboxes

together with all money, cash, securities and other investment property on deposit from time to time therein, letters of credit, letter-of-credit rights and other supporting obligations, real property, books and records, and to the extent not otherwise included, all substitutions, replacements, accessions, products and other proceeds and products (whether tangible or intangible and including, without limitation, insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit) of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing (and subject to entry of the Final DIP Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code). All of the DIP Liens described herein with respect to the Collateral shall be effective and perfected by the Interim DIP Order and the Final DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the DIP Lender may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Lender in the DIP Collateral, or to enable the DIP Lender to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the DIP Collateral.

|  |  |
|---|---|
| **Priority and Security under DIP Credit Facility:** | The DIP Orders (as defined below) shall grant and approve, among other things, the liens, claims and security interests in the Collateral in the order of priority described below: |

(i)     pursuant to section 364(c)(1) of the Bankruptcy Code, a joint and several superpriority administrative expense claim in the Bankruptcy Cases in respect of all DIP Obligations (the "DIP Superpriority Claim") with priority over all other administrative expenses and claims; *provided, however,* that the DIP Superpriority Claims shall be junior to (1) a customary "Carve-Out" (to the extent agreed upon by the DIP Lender and set forth in the DIP Orders) and (2) the Prepetition Superpriority Claims (each as defined below);

(ii)    pursuant to section 364(c)(2) of the Bankruptcy Code, but subject and junior to the Carve-Out and only upon entry of the Final DIP Order, all DIP Obligations shall be secured by automatically perfected and unavoidable first priority priming security interests in, and liens on, all cash borrowed under the DIP Facility (which shall constitute cash collateral of the DIP Lender) (the "DIP Proceeds"), which cash shall be held in the segregated DIP Loan Account and not otherwise co-mingled with any other Cash Collateral, and all unencumbered Collateral of the Debtors, whether now existing or hereafter arising and wherever located, tangible and intangible (collectively, the "Unencumbered Collateral"), which, in both cases, shall be senior in priority to the "Adequate Protection Liens" granted under the DIP Orders on the DIP Proceeds or Unencumbered Collateral; and

(i)     pursuant to section 364(c)(3) of the Bankruptcy Code, but subject and junior to the Carve-Out, all DIP Obligations shall be secured by automatically perfected and unavoidable junior second priority security interests in, and all liens on, all Collateral of the Debtors securing the Prepetition First Lien Facility (for the avoidance of doubt, expressly junior to the liens securing the Prepetition First Lien Credit Agreement) (the "Prepetition Collateral"), whether now existing or hereafter arising and wherever located, tangible and intangible (clauses (ii) and

(iii), collectively, the "DIP Collateral").

The DIP Collateral shall not include actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the "Avoidance Actions"), but, subject to and upon entry of the Final DIP Order, shall include the proceeds of Avoidance Actions ("Avoidance Action Proceeds").

Subject to the priorities and conditions set forth herein, the liens granted on the DIP Collateral in respect of the DIP Credit Facility are referred to herein as the "DIP Liens".

**DIP Superpriority Claim:**

All of the DIP Obligations shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having a superpriority over any and all customary administrative expenses a DIP loan would have priority over, subject only to the Carve-Out.

**Conditions Precedent to the Closing Date:**

The obligations of the DIP Lender to make the Initial DIP Loan on the Closing Date will be subject to satisfaction, or written waiver by the DIP Lender, of each of the following conditions precedent:

(i)   Debtors shall have delivered to the DIP Lender a written request for borrowing the Initial DIP Loan no later than 5:00 p.m. Eastern time on the business day preceding the Closing Date;

(ii)  Debtors shall each have delivered to the DIP Lender an executed counterpart of this DIP Term Sheet;

(iii) the DIP Borrower shall have delivered to the DIP Lender a closing certificate duly executed, in form reasonably satisfactory to the DIP Lender, by the chief executive officer, president or chief financial officer of the DIP Borrower, delivered to the DIP Lender, appropriately completed, by which such officer shall certify to the DIP Lender that (x) the conditions precedent to the Initial DIP Loan set forth in clauses (v) and (vii) hereof have been satisfied and (y) that the Interim DIP Order has been entered by the Bankruptcy Court (which may be satisfied by providing the DIP Lender with a copy of the signed Interim DIP Order).

(iv)  subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this DIP Term Sheet and the Interim DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this DIP Term Sheet and the Interim DIP Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change;

(v)   all representations and warranties of the Debtors hereunder shall be true and correct in all material respects on the Closing Date (except those qualified by materiality or Material Adverse Change, which shall be true and correct in

all respects) and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date;

(vi) receipt by the DIP Lender of a certificate, in form and substance reasonably satisfactory to the DIP Lender, executed by the secretary, chief executive officer, president, chief financial officer, treasurer or controller of each Debtor on behalf of each such Debtor, certifying that attached to such certificate are true, correct and complete copies of (a) (x) the certificate of incorporation, certificate of limited partnership or articles of organization, as applicable, of such Debtor and (y) the by-laws, partnership agreement or an operating, limited liability company agreement, as applicable, of such Debtor, in each case, then in full force and effect, (b) the resolutions then in full force and effect adopted by the board of directors (or comparable governing body) of such Debtor authorizing and ratifying the execution, delivery and performance by such Debtor of this DIP Term Sheet and the transactions contemplated hereby, (c) a certificate of good standing, dated as of a recent date, from the secretary of state of the state under whose laws such Debtor was incorporated or formed and (d) an incumbency certificate evidencing the identity, authority and capacity of the chief executive officer, president, chief financial officer, treasurer or controller thereof authorized to execute the DIP Term Sheet and any other related document to which such Debtor is a party or is to be a party and specimen signatures thereof;

(vii) no default or Event of Default under the DIP Credit Facility or the under the Interim DIP Order shall have occurred and be continuing on the Closing Date or shall exist after giving effect to the Initial DIP Loan to be made on the Closing Date;

(viii) payment of all fees and expenses required to be paid by the Debtors on or prior to the date of funding of the Initial DIP Loan;

(ix) payment of fees and expenses of any professional advisors retained by the DIP Lender or its counsel;

(x) receipt of an Approved Budget in form and substance acceptable to the DIP Lender;

(xi) the DIP Lender shall be satisfied that the liens and security interests of the DIP Lender in the DIP Collateral have been perfected by the Interim DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements with the priority set forth in this Term Sheet; and Debtors shall have confirmed to the DIP Lender in writing that the DIP Loan Account exists and that the DIP Proceeds will be held in such account until applied as permitted by this DIP Term Sheet;

(xii) receipt of all first day motions and material other motions acceptable to the DIP Lender and the DIP Lender's counsel;

(xiii)    an interim financing order authorizing the DIP Credit Facility on the terms and conditions contemplated by this Term Sheet (the "Interim DIP Order") and otherwise on terms acceptable to DIP Lender, and, inter alia, modifying the automatic stay, authorizing and granting the security interests and liens described above, and granting a super-priority administrative expense claim to DIP Lender with respect to all obligations to DIP Lender, subject to no priority claim or administrative expenses of the Bankruptcy Cases or any other entity, and any future proceeding which may develop out of any such cases, including liquidation in bankruptcy, shall have been entered within 5 calendar days after the Petition Date and be in full force and effect and not have been vacated, reversed, modified amended or stayed and not be subject to a pending appeal or motion or motion for leave to appeal or other proceeding to set aside any such order or the challenge to the relief provided for in it;

(xiv)    no Material Adverse Change shall have occurred since [December 31], 2022 ("Material Adverse Change" means a material adverse change in (a) the business, assets, operations or financial condition of the DIP Borrower and its subsidiaries, taken as a whole, (b) the ability of DIP Borrower to pay the Loan or any of the other Obligations in accordance with the terms of the DIP Agreement and the other loan documents, (c) the DIP Collateral or the DIP Lender's liens on the DIP Collateral or the priority of such liens, or (d) the DIP Lender's rights and remedies under the Agreement and the other loan documents; provided that the effects and events that typically result from the commencement and administration of a chapter 11 case shall not be deemed to be a material adverse change; and

(xv)    the Debtors shall have filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") for Holdings, the DIP Borrower and its subsidiaries (collectively, the "Bankruptcy Cases") by no later than January 16, 2023. The Debtors shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner acceptable to DIP Lender, with respect to the Interim DIP Order, and DIP Lender shall have received such evidence thereof as it shall reasonably require. No trustee, or other disinterested person with expanded powers pursuant to section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Debtor or their respective businesses, properties or assets and no motion shall be pending seeking any such relief.

| | |
|---|---|
| **Conditions Precedent to the Final Closing Date:** | The obligations of the DIP Lender to make the Final DIP Loan on the business day following entry of the Final DIP Order (such day, the "Final Closing Date") will be subject to satisfaction, or written waiver by the DIP Lender, of each of the following conditions precedent (provided, that in the event the DIP Borrower elects to draw a portion of such Final DIP Loan after the final Closing Date as described under "DIP Credit Facility" above, the obligations of the DIP Lender to make such portion of the Final DIP Loan on the applicable drawing date will be subject to satisfaction, or written waiver by the DIP Lender, of each of the following conditions precedent): |

(i)     Debtors shall have timely delivered to the DIP Lender the Approved Budget or any update thereto required to be delivered in accordance with this DIP Term Sheet;

(ii)    Debtors shall have delivered to the DIP Lender a written request for borrowing the Final DIP Loan no later than 5:00 p.m. Eastern time on the business day preceding the Final Closing Date, which Final Closing Date shall occur no later than the business day following the entry by the Bankruptcy Court of the Final DIP Order (provided, that in the event the DIP Borrower elects to draw a portion of such Final DIP Loan after the Final Closing Date as described under "DIP Credit Facility" above, the Debtors shall have delivered to the DIP Lender a written request for borrowing such portion of the Final DIP Loan no later than 5:00 p.m. Eastern time five (5) business days (or such shorter period as the DIP Lender may agree) prior to such funding date);

(iii)   the DIP Borrower shall have delivered to the DIP Lender a closing certificate duly executed, in form reasonably satisfactory to the DIP Lender, by the chief executive officer, president or chief financial officer of the DIP Borrower, delivered to the DIP Lender, appropriately completed, by which such officer shall certify to the DIP Lender that (x) the conditions precedent to the Final DIP Loan set forth in clauses (v) and (v) hereof have been satisfied and (y) that the Final DIP Order has been entered by the Bankruptcy Court (which may be satisfied by providing the DIP Lender with a copy of the signed Final DIP Order).

(iv)    subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this DIP Term Sheet and the Final DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this DIP Term Sheet and the Final DIP Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change;

(v)     all representations and warranties of the Debtors hereunder shall be true and correct in all material respects on the Final Closing Date and date of funding (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects) and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date;

(vi)    no default or Event of Default under the DIP Credit Facility or the under the Final DIP Order shall have occurred and be continuing on the Final Closing Date and date of funding or shall exist after giving effect to the Final DIP Loan to be made on the Final Closing Date or other date of funding;

(vii)    payment of all fees and expenses required to be paid by the DIP Borrower on or prior to the date of funding of the Final DIP Loan;

(viii)    payment of fees and expenses of any professional advisors retained by the DIP Lender or its counsel;

(ix)    the DIP Lender shall be satisfied that the liens and security interests of the DIP Lender in the DIP Collateral have been perfected by the Final DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements with the priority set forth in this Term Sheet;

(x)    the Final DIP Order on terms acceptable to DIP Lender, and, inter alia, modifying the automatic stay, authorizing and granting the security interests and liens described above, and granting a super-priority administrative expense claim to DIP Lender with respect to all obligations to DIP Lender, subject to no priority claim or administrative expenses of the Bankruptcy Cases or any other entity, and any future proceeding which may develop out of any such cases, including liquidation in bankruptcy, shall have been entered within 30 calendar days after the Petition Date and be in full force and effect and not have been vacated, reversed, modified amended or stayed and not be subject to a pending appeal or motion or motion for leave to appeal or other proceeding to set aside any such order or the challenge to the relief provided for in it; and

(xi)    no Material Adverse Change shall have occurred since the Closing Date.

| | |
|---|---|
| **Representations and Warranties:** | The Debtors represent and warrant to the DIP Lender on the Closing Date and the Final Closing Date (and any other date of funding of the DIP Loans) as set forth on <u>Annex C</u> attached hereto. |
| **Affirmative Covenants:** | Until the date the DIP Obligations are paid in full, the Debtors hereby covenant and agree that the Debtors shall: |

(i)    timely deliver to the DIP Lender the weekly proposed updates to the Approved Budget and Variance Reports in accordance with the provisions set forth under the heading "Budget Covenant" below and in the DIP Orders;

(ii)    comply with the Approved Budget (after giving effect to the Permitted Variances) and with provisions of this DIP Term Sheet and the Interim DIP Order and/or the Final DIP Order (as applicable);

(iii)    maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of such person;

(iv)    cooperate, consult with, and provide to the DIP Lender, all such information as required under this DIP Term Sheet or the DIP Orders or as reasonably requested by the DIP Lender, and permit representatives and independent contractors of the DIP Lender to visit and inspect any of its properties, to

examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the reasonable expense of the DIP Borrower (provided that the DIP Borrower shall only be obligated to reimburse such expenses for two visits during the pendency of the Bankruptcy Cases) and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the DIP Borrower; *provided* that any and all information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or information where such disclosure would not be permitted by any applicable requirements of law shall be excluded from this "Affirmative Covenants" subparagraph (iv);

(v)     take, or cause to be taken, all reasonably appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the DIP Lender to carry out the provisions of this DIP Term Sheet, the other DIP Facility Documents and the DIP Orders;

(vi)    except to the extent contemplated by the Approved Budget or otherwise consented to by the DIP Lender in writing, continue, and cause to be continued, the business of the Debtors, maintain, and cause to be maintained, the Debtors' existence and material relationships, rights and privileges, and comply with all material contractual obligations of the Debtors;

(vii)   take, or cause to be taken, all appropriate action to remain the sole owner of the DIP Collateral, free of liens other than the Prepetition Permitted Liens, liens permitted to be incurred or exist pursuant to subparagraph (i) of the "Negative Covenant" section of this DIP Term Sheet, liens granted or incurred after the Petition Date in the ordinary course of business or other liens granted or imposed pursuant to an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the DIP Lender;

(viii)  take, or cause to be taken, all appropriate action to comply with all material applicable laws applicable to the Debtors or the DIP Collateral unless failure to comply could not reasonably be expected to result in a Material Adverse Change;

(ix)    subject to the Approved Budget, pay when due all taxes prior to the date on which penalties attach, except where such tax is being contested in good faith and adequate reserves have been established in accordance with GAAP or to the extent payment and/or enforcement thereof is stayed as a result of the Bankruptcy Cases;

(x)     provide copies of all material pleadings, motions, applications, judicial information, financial information and other documents intended to be filed by or on behalf of any Debtor with the Bankruptcy Court in the Bankruptcy Cases to counsel to the DIP Lender at least two (2) days in advance of such filing or as promptly as practicable; *provided, however,* that the following are not material: ministerial notices and similar ministerial documents; retention applications; fee applications; fee statements; any similar pleadings or

motions relating to the retention or fees of any professional; or statements of financial affairs and schedules of assets and liabilities;

(xi)    promptly provide such additional information concerning the Debtors, or the DIP Collateral as the DIP Lender may reasonably request; *provided* that any and all information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or information where such disclosure would not be permitted by any applicable requirements of law shall be excluded from this "Affirmative Covenants" subparagraph (xi);

(xii)    maintain its cash management system in a manner reasonably acceptable to the DIP Lender (which shall be deemed satisfied if the cash management system is substantially the same as the cash management system in existence on the Petition Date, with such modifications as permitted under the cash management order, as entered);

(xiii)    cause the Debtors' senior management and legal and financial advisors to be available to conduct a telephonic conference at least once every other calendar week at reasonable times during normal business hours and upon reasonable prior notice, if reasonably requested by the DIP Lender, to discuss the Approved Budget, the Bankruptcy Cases, and the financial condition, performance and business affairs of the Debtors;

(xiv)    upon and at all times after the Closing Date, maintain proceeds of the DIP Loans in the DIP Loan Account solely for the benefit of the DIP Lender until disbursed by the DIP Borrower as permitted by this DIP Term Sheet;

(xv)    comply with the affirmative covenants set forth in sections 6.1 (other than any covenant referenced in subparagraph (xvi) below or sections 6.1.4, 6.1.5, 6.1.6, 6.1.7, 6.1.8, 6.1.9, 6.1.10 and 6.1.11), 6.2, 6.3(b), 6.4 and 6.5 of the Prepetition First Lien Credit Agreement as in effect on the Petition Date, incorporated herein by this reference, (1) as if such affirmative covenants were set forth herein and references to "this Agreement" therein were references to this DIP Term Sheet and references to the "Administrative Agent" or the "Agent" therein were references to the DIP Lender, and (2) with such other definitional or non-substantive updates deemed made thereto as the context may require;

(xvi)    deliver to the DIP Lender (x) promptly upon the occurrence thereof, written notice of any default or Event of Default, and (y) the financial statements, compliance certificates and other financial reporting deliverables that would be required to be delivered to the Prepetition First Lien Agent under the Prepetition First Lien Credit Agreement pursuant to sections 6.1.1, 6.1.2 and 6.1.3 of the Prepetition First Lien Credit Agreement (as in effect on the Closing Date), incorporated herein by this reference, (1) as if such affirmative covenants were set forth herein and references to "this Agreement" therein were references to this DIP Term Sheet and references to the "Administrative Agent" or the "Agent" therein were references to the DIP Lender, and (2) with such other definitional or non-substantive updates deemed made thereto as the context may require; and

(xvii)   timely comply with the Milestones.

**Negative Covenants:**   Until the date the DIP Obligations are paid in full, the Debtors hereby covenant and agree that no Debtor shall, without the express, prior written consent of the DIP Lender, do, cause to be done, or agree to do or cause to be done, any of the following:

(i)   other than liens securing indebtedness required or permitted by this DIP Term Sheet and the DIP Orders, create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except (a) the Carve Out, (b) liens permitted by the Prepetition First Lien Credit Agreement which, other than prepetition liens securing the Prepetition First Lien Facility (the "Prepetition Permitted Liens"), or other liens that are permitted to be senior to the DIP Liens by the DIP Lender, are junior to the liens securing the DIP Credit Facility, (c) the "Adequate Protection Liens" set forth and as defined in the DIP Orders, (d) other liens securing obligations in an aggregate principal amount at any time outstanding not to exceed $50,000;

(ii)   convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or hereafter acquired, other than (a) asset sales approved by an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the DIP Lender, (b) asset sales in the ordinary course of business, (c) dispositions of obsolete, worn out, used or surplus property in the ordinary course of business and dispositions of property no longer used or useful in the conduct of the business of the Debtors and (d) dispositions of property not otherwise permitted so long as the aggregate fair market value of all assets so disposed shall not exceed $50,000;

(iii)   create, incur assume or permit to exist any indebtedness outside of the ordinary course of business, other than the DIP Obligations (it being agreed that trade payables in the ordinary course of business shall not be restricted);

(iv)   (a) amend, modify or compromise any material term or material amount owed under a real property lease or material contract without the prior written consent of the DIP Lender, or (b) assume or reject any executory contract or lease pursuant to section 365 of the Bankruptcy Code without the prior written consent of the DIP Lender;

(v)   incur or make any expenditure, Restricted Payment (as defined below), investment, loan or other payment without the prior written consent of the DIP Lender, other than in accordance with the Approved Budget, after giving effect to the Permitted Variances;

(vi)   create or acquire any ownership interest in any subsidiaries (whether direct or indirect) other than those existing on the Petition Date;

(vii)   modify or alter (a) in any material manner the nature and type of its business or the manner in which such business is conducted or (b) its organizational documents, except as required by the Bankruptcy Code or in a manner that is

not materially adverse to the interests of the DIP Lender (in its capacity as such) without the prior written consent of the DIP Lender;

(viii)  pay pre-petition indebtedness, except (a) payments contemplated by this DIP Term Sheet and the DIP Orders, (b) payments authorized by an order of the Bankruptcy Court and (c) adequate protection payments as set forth in the Interim DIP Order;

(ix)  not make, commit to make, or permit to be made any bonus payments to executive officers of the Debtors and their subsidiaries in excess of the amounts set forth in the Approved Budget; and

(x)  not permit the Debtors to seek authorization for, and not permit the existence of, any claims other than that of the DIP Lender entitled to a superpriority under section 364(c)(1) of the Bankruptcy Code that is senior or pari passu with the DIP Lender's section 364(c)(1) claim, except for the Carve-Out or as otherwise acceptable to the DIP Lender in writing.

"Restricted Payment" means, with respect to any person, (a) the declaration or payment of any dividend (whether in cash, securities or other property or assets) or distribution of cash or other property or assets in respect of equity interests of such person; (b) any payment (whether in cash, securities or other property or assets) on account of the purchase, redemption, defeasance, sinking fund or other retirement of the equity interests of such person or any other payment or distribution (whether in cash, securities or other property or assets) made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal or premium, if any, or interest, fees or other charges on or with respect to, or any redemption, purchase, retirement, defeasance, sinking fund or similar payment or any claim for rescission with respect to, any indebtedness (other than adequate protection payments in respect of the pre-petition indebtedness as expressly provided for herein, in the Interim DIP Order or in the Approved Budget); and (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire equity interests of such person now or hereafter outstanding, in each case of (a) through (d), other than any payment to any Debtor (other than Holdings).

**Budget Covenant:**  "Approved Budget" means the rolling 13-week cash flow forecast of the Debtors containing line items of sufficient detail to reflect the Debtors' projected receipts and disbursements for the applicable 13-week period, in form and substance satisfactory to the DIP Lender, delivered most recently prior to the Closing Date, and as modified following the Closing Date by any rolling 13-week cash flow forecast of the Debtors delivered no later than 5:00 p.m. Eastern time two (2) business days after each Friday of each calendar week following the Closing Date (each such Friday, a "Specified Reference Date"), covering the 13-week period beginning on the first business day to occur after each such Specified Reference Date, together with (following the first such forecast) a Variance Report (as defined below) setting forth (i) actual results against the forecasted results from the most recent cash flow forecast for the prior period, on a line-item basis and in the aggregate as of the end of such period and as of the end of the Testing Period (as defined below) ending on such date, (ii) the variance in dollar amounts and percentages for the week ending with such Specified Reference Date and for the Testing Period ending on such date, and (iii) such other information with respect to cash flows as the DIP Lender may reasonably request. Notwithstanding anything

18

herein to the contrary, any such 13-week cash flow forecast delivered to the Lender after the Closing Date shall only become the effective "Approved Budget" for purposes hereof following the DIP Lender's acknowledgement that the proposed budget is in substance satisfactory to the DIP Lender.

The Debtors shall deliver to the DIP Lender, no later than 5:00 p.m. Eastern time two (2) business days after each Specified Reference Date, a proposed revision to the Approved Budget covering the 13-week period beginning on the first business day to occur after such Specified Reference Date (as defined below), together with a variance report (certified by the Debtors) (each a "Variance Report") setting forth (i) actual results against the forecasted results from the most recent cash flow forecast for the prior period, on a line-item basis and in the aggregate as of the end of such period and as of the end of the Testing Period ended on such date, (ii) the variance in dollar amounts and percentages for the week ending with such Specified Reference Date and for the Testing Period ending on such date, and (iii) such other information with respect to cash flows as the DIP Lender may reasonably request. The Debtors represent and warrant that the projections and pro forma financial information, taken as a whole, contained in the Approved Budget and any such proposed revisions to the Approved Budget are based upon good faith estimates and assumptions believed by management of the Debtors to be reasonable at the time made, it being recognized by the DIP Lender that such financial information as it relates to future events is not to be viewed as fact, forecasts and projections are subject to uncertainties and contingencies, actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount and no assurance can be given that any forecast or projections will be realized. "Testing Period" means each four-week period (or in the case of the first, second and third Testing Periods following the Closing Date, the one-week, two-week and three-week period, respectively) period ending on (and including) Sunday of each calendar week occurring after the Closing Date, commencing (a) in the case of the first, second and third such Testing Periods, with the Monday most recently prior to the Closing Date, and ending on (and including) Sunday of the calendar week in which the Closing Date occurs, Sunday of the next calendar week, and Sunday of the calendar week after that, respectively, and (b) in the case of each Testing Period, with the fourth Monday preceding the end of such Testing Period.

The Debtors shall not permit, for any Testing Period (A) (x) the amount of actual Cumulative Expenditures (as defined below) for such Testing Period to exceed (y) the projected amount of Cumulative Expenditures set forth in the Approved Budget for such Testing Period, by more than 15.0% of the aggregate amount projected for Cumulative Expenditures in the Approved Budget for such Testing Period, or (B) (x) the projected amount of Cumulative Receipts (as defined below) set forth in the Approved Budget for such Testing Period to be less than (y) the amount of actual Cumulative Receipts for such Testing Period by more than 15.0% of the aggregate amount projected for Cumulative Receipts in the Approved Budget for such Testing Period (the applicable foregoing limitations being referred to herein as the "Permitted Variance").  For the avoidance of doubt, the parties hereto acknowledge and confirm that this covenant measures, at the end of each applicable Testing Period, variance against the Approved Budget for the period from the first day of each Testing Period through the last day of such Testing Period. "Cumulative Expenditures" shall mean, for any period of determination, the aggregate cash expenditures of the Debtors during such period, expressed as a positive number (in each case, calculated on an actual and

not a GAAP basis); and "<u>Cumulative Receipts</u>" shall mean, for any period of determination, the aggregate cash receipts of the Debtors during such period (excluding proceeds of the DIP Loans that may be deemed a receipt), expressed as a positive number (in each case, calculated on an actual and not a GAAP basis).

**Other Bankruptcy Matters:**

The DIP Orders shall be in form and substance satisfactory to the DIP Lender and shall include the following provisions:

(i) modifying the automatic stay to permit the creation and perfection of the DIP Lender's liens on the DIP Collateral and the Prepetition Adequate Protection Liens, in each case, subject to the Carve Out;

(ii) authorizing and approving the DIP Credit Facility and the transactions contemplated thereby, including the granting of the superpriority status, security interests and liens and the payment of all premiums, payments and fees referred to herein;

(iii) without limiting the scope of the releases described herein, subject to a customary challenge period for parties in interest, including, but not limited to, any official committee appointed in these cases, of 75 days from the entry of the Interim DIP Order (the "<u>Challenge Period</u>"), acknowledging the validity and enforceability of the Prepetition First Lien Facility, the debt outstanding thereunder and the liens granted in connection therewith; *provided*, that the Challenge Period with respect to the DIP Lender and its affiliates, including the releases set forth in the Interim DIP Order, shall be the earliest of (A) the date of confirmation of the plan of reorganization, (B) entry of an order approving the sale of the Debtors' assets to the DIP Lender or its affiliates; or (C) the date of entry of the Final Order;

(iv) providing that the DIP Lender and its counsel, advisors, and consultants shall be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code;

(v) subject to and upon entry of (A) the Interim DIP Order, providing that the DIP Lenders shall have the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the full amount of the DIP Loans approved pursuant to the Interim DIP Order, and (B) subject to and upon entry of the Final DIP Order, the DIP Lender shall have the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the full amount of the DIP Loans, as applicable, in each case, in whole or in part, in connection with any sale or disposition of assets in the Bankruptcy Cases and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code; provided that any such credit bid shall require assumption in full of the Prepetition Obligations (or other treatment satisfactory to the Prepetition Secured Parties);

(vi) subject to and upon entry of the Final DIP Order, prohibiting the assertion of claims arising under section 506(c) of the Bankruptcy Code against any of the Prepetition First Lien Lenders;

(vii) subject to and upon entry of the Final DIP Order, providing that the Prepetition Secured Parties are entitled to all of the benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception thereunder shall not apply to any of the Prepetition First Lien Lender with respect to proceeds,

product, offspring, or profits of any of the Prepetition Collateral;

    (viii)    subject to and upon entry of the Final DIP Order, providing that in no event shall any of the Prepetition Secured Parties or Existing Secured Facility Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral; and

    (ix)    provide for the release attached hereto as <u>Annex D</u>**.**

| | |
|---|---|
| **DIP Orders Govern:** | To the extent of any conflict or inconsistency between this DIP Term Sheet, the DIP Agreement and any DIP Order, such DIP Order shall govern. |
| **Adequate Protection:** | Prepetition First Lien Lenders shall receive, in each case subject to the Carve-Out, (i) current payment of all reasonable and documented out-of-pocket fees, costs and expenses of the Prepetition First Lien Agent (including all fees and expenses of their outside counsel, Winston & Strawn LLP, and one firm of local counsel engaged in connection with the Bankruptcy Cases); (ii) replacement liens on the collateral securing the Prepetition First Lien Credit Agreement (the "<u>Prepetition Adequate Protection Liens</u>"); (iii) superpriority administrative expense claims with respect to the foregoing and to the extent of any post-petition diminution in value of the Prepetition First Lien Lenders' interest in the collateral securing the Prepetition First Lien Credit Agreement (the "<u>Prepetition Superpriority Claims</u>"); and (iv) access to the Debtors' books and records and such financial reports as are provided to the DIP Lender. |
| **Amendments:** | No provision of this DIP Term Sheet, any other DIP Facility Document or any DIP Order may be amended or waived other than by an instrument in writing signed by (i) the DIP Lender and (ii) the Debtors. |
| **Assignments** | The DIP Lender may assign all or any part of the DIP Loans or its commitments hereunder from time to time with the consent of the DIP Borrower; *provided* that no consent of the DIP Borrower shall be required (i) so long as an Event of Default has occurred and is continuing after giving effect to any applicable grace period or (ii) for any assignment to any of its affiliates. |
| **Governing Law**: | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this DIP Term Sheet. The Debtors will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then [in any state or federal court of competent jurisdiction in the State, County and City of New York, borough of Manhattan]. |
| **Counterparts and Electronic Transmission:** | This DIP Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument.   The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this DIP Term Sheet shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually |

21

executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be.

As used herein, "Electronic Signature" shall mean an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

**Notices:**

Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

if to the DIP Borrower or any Guarantor, to
Performance Powersports Group Purchaser, Inc.
1775 E. University Drive
Tempe, AZ 85281
Attention: Ken Vanden Berg
Email: kenv@colepow.com

with a copy (which shall not constitute notice) to:
Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801
Attention:  Domenic Pacitti, Esq.
Email:  dpacitti@klehr.com

if to the DIP Lender:
c/o Kinderhook Industries, LLC
505 Fifth Avenue
25th  Floor
New York, NY 10017
Attn: Christian P. Michalik, Managing Director
Email: cmichalik@kinderhook.com

with a copy (which shall not constitute notice) to:
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY  10022
Attention:  Brian Schartz and Yongjin Im
Email: brian.schartz@kirkland.com; yim@kirkland.com
Telecopy:  (212) 446 6460

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopy shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).

**Counsel to the
DIP Lender:**

Kirkland & Ellis LLP

**IN WITNESS WHEREOF**, each of the undersigned has caused this DIP Term Sheet to be duly executed and duly delivered by its duly authorized officer as of the day and year first above written.

**PERFORMANCE POWERSPORTS GROUP PURCHASER, INC.**

By:

Name: Ken Vanden Berg

Title: Chief Financial Officer

**PERFORMANCE POWERSPORTS GROUP HOLDINGS, INC.**

By:

Name: Ken Vanden Berg

Title: Chief Financial Officer

**PERFORMANCE POWERSPORTS GROUP, INC.**

By:

Name: Ken Vanden Berg

Title: Chief Financial Officer

**TANKAS FUNDING VI, LLC**

By: _____
DocuSigned by:
*Christian Michalik*
2FD60AB546CC427...
Name: Christian Michalik
Title: Managing Director

[Signature Page to DIP Term Sheet]

**Annex A**

**Guaranty**

(A)    The Guarantors jointly and severally hereby absolutely, unconditionally and irrevocably guarantee to the DIP Lender the due and punctual payment and discharge of all DIP Obligations (the "Guaranteed Obligations"). The guaranty of each Guarantor set forth in this Annex A (this "Guaranty") (and the guarantee contained herein) is an unconditional guarantee of payment and not of collection.

(B)    The Guarantors jointly and severally agree to make payment hereunder of the amount due under the DIP Obligations forthwith promptly following demand of the DIP Lender when the Guaranteed Obligations or any portion thereof is due in cash to the DIP Lender, whether at stated maturity, by acceleration or otherwise. Each Guarantor hereby waives and agrees not to assert any defense, whether arising in connection with or in respect of any of the following or otherwise, and hereby agrees that its obligations under this Guaranty are irrevocable, absolute and unconditional and shall not be discharged as a result of or otherwise affected by any of the following (which may not be pleaded and evidence of which may not be introduced in any proceeding with respect to this Guaranty, in each case except as otherwise agreed in writing by the DIP Lender):

(i)    the invalidity or unenforceability of any obligation of the Debtors or any other Guarantor under the DIP Agreement or the DIP Orders or any other agreement or instrument relating thereto (including any amendment, consent or waiver thereto), or any security for, or other guaranty of, any Guaranteed Obligation or any part thereof, or the lack of perfection or continuing perfection or failure of priority of any security for the Guaranteed Obligations or any part thereof;

(ii)    the absence of (i) any attempt to collect any Guaranteed Obligation or any part thereof from the DIP Borrower or any other Guarantor or other action to enforce the same or (ii) any action to enforce the DIP Agreement or the DIP Orders or any Lien thereunder;

(iii)    the failure by any Person to take any steps to perfect and maintain any Lien on, or to preserve any rights with respect to, any DIP Collateral;

(iv)    any workout, insolvency, bankruptcy proceeding, reorganization, arrangement, liquidation or dissolution by or against the DIP Borrower, any other Guarantor or any of the DIP Borrower's other Subsidiaries or any procedure, agreement, order, stipulation, election, action or omission thereunder, including any discharge or disallowance of, or bar or stay against collecting, any Guaranteed Obligation (or any interest thereon) in or as a result of any such proceeding;

(v)    any foreclosure, whether or not through judicial sale, and any other sale or other disposition of any DIP Collateral or any election following the occurrence of an Event of Default by the DIP Lender to proceed separately against any DIP Collateral in accordance with the DIP Lender's rights under any applicable requirement of law; or

(vi)    any other defense, setoff, counterclaim or any other circumstance that might otherwise constitute a legal or equitable discharge of the DIP Borrower, any other Guarantor or any of the DIP Borrower's other subsidiaries, in each case other than the payment in full of the Guaranteed Obligations.

Each Guarantor further agrees to make full payment to the DIP Lender under this Guaranty even if circumstances exist or arise which otherwise would constitute a legal or equitable discharge of such Guarantor as surety or guarantor of the DIP Obligations.

(C)    [Reserved].

(D)    To the fullest extent permitted by law, each Guarantor hereby expressly waives any and all rights or defenses arising by reason of any law that would otherwise require any election of remedies by a Holder. To the fullest extent permitted by law, each of the undersigned Guarantors hereby (a) waives notice of presentment, demand, notice of nonpayment, protest and notice of protest as to the Guaranteed Obligations and any other demands and notices required by law, (b) consents to the provisions of the DIP Agreement and the DIP Orders, (c) consents and agrees that the DIP Lender may waive or delay the exercise of any rights or remedies against the DIP Borrower or any surety or guarantor, and may (i) release or enter into compromises with the DIP Borrower, or any surety or guarantor of the Guaranteed Obligations, and (ii) renew, extend, waive or modify the terms of any Guaranteed Obligations guaranteed hereby of the DIP Agreement or the DIP Orders or any instrument or agreement evidencing the same, and assign its claims thereunder to other persons, (d) waives the defense of loss of contribution from any co-guarantor with respect to the DIP Obligations, (e) waives all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar law now or hereafter in effect, and (f) waives all suretyship defenses generally. Each Guarantor represents and warrants to the DIP Lender that: (x) no other agreement, representation or special condition exists between such Guarantor and the DIP Lender regarding the liability of such Guarantor hereunder; and (y) such Guarantor has no defense whatsoever (including any suretyship defense) to any action or proceeding that may be brought to enforce this Guaranty.

(E)    Each Guarantor, for the benefit of the DIP Lender, waives and agrees not to enforce any of the rights of such Guarantor against the DIP Borrower, including: (a) any right of such Guarantor to be subrogated in whole or in part to any right or claim with respect to any Guaranteed Obligations or any portion thereof to the DIP Lender which might otherwise arise from payment by Guarantor to the DIP Lender on the account of the Guaranteed Obligations or any portion thereof, any right of contribution or indemnification against the DIP Borrower, and any right to participate in any claim or remedy of the DIP Lender against the DIP Borrower in connection with the Guaranteed Obligations or any portion thereof, in each case, until (i) payment in full in cash of the DIP Obligations (including interest accruing during the pendency of any insolvency or liquidation proceeding, regardless of whether allowed or allowable in an insolvency proceeding and regardless of whether then due or payable), (ii) payment in full in cash of all DIP Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (including any contingent indemnification obligations to the extent asserted), and (iii) termination or expiration of all commitments to lend under the DIP Agreement and the DIP Orders and (b) any right of such Guarantor to require the marshalling of assets of the Debtors which might otherwise arise from payment by such Guarantor to the DIP Lender on account of the Guaranteed Obligations or any portion thereof. Each Guarantor acknowledges that it will receive direct and indirect benefits from DIP Loans and that the waivers set forth in this Guaranty are knowingly made in contemplation of such benefits.

**Annex B**

**Indemnification**

Subject to and upon entry of a Final DIP Order, the Debtors hereby absolutely and unconditionally and jointly and severally agree to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless the DIP Lender and its officers, directors, employees, agents, advisors, attorneys and affiliates (collectively, the "<u>Indemnitees</u>"), from and against any and all Indemnified Liabilities (as hereinafter defined); *provided* that the Debtors shall not have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise solely from the gross negligence or willful misconduct of that Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction. As used herein, "<u>Indemnified Liabilities</u>" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, actions, judgments, suits, claims, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any hazardous materials activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel (including allocated costs of internal counsel) for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and environmental laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this DIP Term Sheet or the other DIP Facility Documents or the Bankruptcy Cases or the transactions contemplated hereby or thereby (including the DIP Lender's agreement to make the DIP Loans hereunder or the use or intended use of the proceeds thereof ), or any enforcement of any of the DIP Term Sheet or the other DIP Facility Documents (including any sale of, collection from, or other realization upon any of the Collateral)), or (ii) any environmental claim or any hazardous materials activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Debtors and their subsidiaries. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this paragraph may be unenforceable in whole or in part because they are violative of any law or public policy, the Debtors shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them. Notwithstanding anything in this DIP Term Sheet or the DIP Facility Documents to the contrary, the agreements in this paragraph shall survive the termination of the DIP Credit Facility and the repayment, satisfaction or discharge of all the other DIP Obligations. All amounts due under this paragraph shall be payable on written demand by the DIP Lender therefor. Any such amounts not paid when due shall, if due prior to the maturity of the DIP Loans, be charged to the DIP Borrower and shall thereafter constitute DIP Loans hereunder and shall accrue interest at the rate then applicable to DIP Loans hereunder.

**Annex C**

**Representations and Warranties**

The Debtors represent and warrant to the DIP Lender on the date hereof and on the date of the making of any of the DIP Loans that: (a) each Debtor is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware or Arizona; (b) each Debtor has all requisite power and authority and full legal right to carry on the business in which it is presently engaged and will be engaged upon consummation of the transactions contemplated hereby; (c) all necessary action has been taken by each Debtor to execute and deliver this DIP Term Sheet and the DIP Facility Documents and to make the borrowings hereunder; (d) the DIP Term Sheet and each of the DIP Facility Documents is a legal, valid and binding obligation of the Debtors party thereto, enforceable against such Debtor in accordance with its terms; (e) the execution, delivery and performance by such Debtor of the DIP Term Sheet and the other DIP Facility Documents do not and will not conflict with (i) any provision of applicable law, (ii) the charter, by-laws or other organizational documents of such Debtor or (iii) any contract or other agreement, indenture, instrument or other document to which a Debtor is a party, other than conflicts which have been waived by the applicable third party thereto or would not reasonably be expected to have, either individually or in the aggregate, a material adverse effect; (f) no Debtor is an "investment company" or a company "controlled by an "investment company" or a "subsidiary" of an "investment company", within the meaning of the Investment Company Act of 1940, in each case, required to be registered as such in accordance with the Investment Company Act of 1940; (g) all property of the Debtors is free and clear of all Liens, except Permitted Liens (as defined in the Prepetition First Lien Credit Agreement as in effect on the Petition Date); (h) the provisions of the DIP Term Sheet, the Interim DIP Order and the Final DIP Order are effective to create in favor of the DIP Lender a legal, valid, perfected, nonavoidable and enforceable security interest in all right, title and interest of the Debtors in the DIP Collateral described therein (having the priority provided for herein and in the Interim DIP Order or the Final DIP Order, as applicable); and (i) no statement or information concerning Debtors contained in this DIP Term Sheet, any other DIP Facility Document, or any other document, certificate or statement furnished by or on behalf of any Debtor and each Guarantor to the DIP Lenders for use in connection with the transactions contemplated by this DIP Term Sheet or the other DIP Facility Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not materially misleading.

**Annex D**

**Release**

Subject to and upon entry of a Final DIP Order, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Debtors, (in their own right, on behalf of their estates and their current and former direct and indirect subsidiaries, and each such entity's and its current and former direct and indirect subsidiaries' current and former directors, officers, managers, predecessors, and successors and assigns, and each of such entity's current and former officers, members, managers, directors, principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), and representatives, in each case to the extent permitted by applicable law and solely in such parties capacity as such) (collectively, the "***Releasing Parties***") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the DIP Lender, and each such entity's current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "***Released Parties***") and their respective property and assets from any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of the Final DIP Order, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement, recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the Prepetition First Lien Credit Agreement, but excluding obligations of the DIP Lender under the DIP Credit Facility arising after the date of the Final DIP Order (collectively, the "***Released Claims***").  This paragraph is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties.  Notwithstanding the releases and covenants in favor of the Released Parties contained above in this paragraph, such releases and covenants in favor of the Released Parties shall be deemed acknowledged and reaffirmed by the Debtors each time there is an advance of funds, extension of credit, or financial accommodation under this DIP Term Sheet, an Interim DIP Order or the DIP Documents.  As of the date hereof, there exist no claims or causes of action against the DIP Lenders with respect to, in connection with, related to, or arising from this DIP Term Sheet, an Interim DIP Order or the DIP Facility Documents that may be asserted by the Debtors or, to the Debtors' knowledge, any other person or entity.

**PERFORMANCE POWERSPORTS GROUP PURCHASER, INC.**

By: _____
   Name:
   Title:

**PERFORMANCE POWERSPORTS GROUP HOLDINGS, INC.**

By: _____
   Name:
   Title:

**PERFORMANCE POWERSPORTS GROUP, INC.**

By: _____
   Name:
   Title:

**TANKAS FUNDING VI, LLC**

By: _____
  Name:
  Title: