**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC, *et al.*,[1] | ) Case No. 23-10047 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF KEN VANDEN BERG IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS AND APPLICATIONS**

I, Ken Vanden Berg, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Chief Financial Officer of each of the above-captioned debtors (each a "Debtor," and collectively, the "Debtors" or the "Company"). On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case (collectively the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). I am generally familiar with the Company's day-to-day operations, business, financial affairs, and books and records.

2. I submit this declaration (the "First Day Declaration") to provide the Court and other parties in interest with an overview of the Debtors' businesses and describe the circumstances that led to the commencement of these Chapter 11 Cases. I also submit this First Day Declaration in support of the first day motions[2] and any additional applications filed by the Debtors

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

[2] All references to agreements, pleadings, or other documentation or summaries thereof in this First Day Declaration are qualified in their entirety by the terms set forth in the relevant agreements, pleadings, or other documents.

10328628.v7

contemporaneously herewith, or as soon as reasonably practicable hereafter, by which the Debtors seek relief enabling the Debtors to continue as going concerns, operate effectively, minimize certain of the potential adverse effects of the commencement of their Chapter 11 Cases, preserve and maximize the value of the Debtors' estates, and continue the marketing and sale process for the Debtors' assets. The statements in this First Day Declaration are, except where expressly provided, based on my own personal knowledge. I am over the age of 18 years and authorized to submit this First Day Declaration on behalf of the Debtors. If called to testify, I could and would competently testify to the facts set forth herein.

## PRELIMINARY STATEMENT

3. The Debtors are in the business of adventure, selling dirt bikes, go-karts, ATVs, golf carts, and the like to retailers throughout the United States. This business is seasonal in nature, and its products are primarily purchased by consumers around the holidays. To capitalize on this demand, the Debtors purchase vehicles that it schedules for delivery in advance of the holidays.

4. The Debtors did just that with Huansong (defined herein), one of its then primary vendors, who was to deliver all-terrain and utility vehicles prior to the fourth quarter of 2021. Those vehicles were not, however, delivered until the beginning of January 2022. As a result, the Debtors could not capitalize on the 2021 holiday season and suffered losses from their inability to sell its vehicles when demand was high.

5. The Debtors' financial distress was further compounded by delays and costs in shipping caused by supply chain disruption felt across the country, increased costs associated with freight, shipping, demurrage and warehousing of inventory deliveries, and a "post-pandemic" reduction in demand from customers.

10328628.v7

6. As a result of these circumstances, the financial distress experienced by the Debtors has continued to worsen as the Debtors are suffering from an ongoing drain on cash flow and the lack of any source of long-term additional liquidity. Worse still, the very vendor that failed to timely deliver the product has commenced litigation against the Debtors for purportedly outstanding amounts and has threatened to file an involuntary petition against at least one of the Debtor entities. Recognizing this dire situation, the Debtors quickly took steps necessary to save the Company and maximize value for all stakeholders.

7. First, the Debtors hired outside advisors, including restructuring counsel and Portage Point Partners, LLP ("Portage Point") (who is serving as both a restructuring advisor and investment banker to the Debtors). In addition, the Debtors appointed a disinterested director to the boards (the "Disinterested Director"). The Disinterested Director was delegated authority to review and act upon any matters pertaining to a potential restructuring, refinancing, or sale transaction in which a conflict may exist between the Debtors on the one hand, and any of their senior management, board members, advisors, equity holders, and affiliates (or those entities' managers, directors, or officers) on the other hand.

8. Second, following the Debtors unsuccessful attempts to negotiate a commercial resolution with Huansong, the Debtors' restructuring counsel, restructuring advisor and investment banker, and Disinterested Director conducted a thorough review and analysis of the Debtors' strategic alternatives. After considering all reasonably available courses of action in light of the Debtors' circumstances and Huansong unwillingness to agree to a commercial resolution, the Debtors determined that a sale of their assets was in the best interests of the Debtors, their creditors, and all parties in interest. To that end, Portage Point contacted a number of parties who might be interested in acquiring the Debtors' assets. Though interest was limited, an affiliate of

10328628.v7

Kinderhook—who is also the Debtors' equity sponsor—agreed to serve as the Stalking Horse Bidder. In so doing, the Debtors and Kinderhook have agreed on a sale process that not only represents a value-maximizing, going concern sale of substantially all of the Debtors' assets, but provides for a recovery to Twin Brook Capital Partners and unsecured creditors whose contracts and/or claims will be assumed under the Stalking Horse Agreement. The sale process also will provide a recovery of approximately $500,000 to unsecured creditors whose claims were not assumed or assigned, plus the amounts needed to wind down the Debtors' estates. Moreover, Kinderhook's willingness to serve as the Stalking Horse Bidder will enhance the bidding process—which will continue post-petition—by providing a floor that prospective bidders must clear and may also provide further opportunity for a commercial resolution with Huansong.

9. Third, Kinderhook has agreed to provide a DIP Facility that will address the Debtors' immediate need for liquidity and prevent the liquidation that would otherwise occur absent such financing. Specifically, in the days leading up this filing, the Debtors and Kinderhook were able to reach terms on a $10 million second lien junior financing facility, which was approved by the Disinterested Director and the Debtors' senior secured lender, Twin Brook (defined herein). Most importantly, as a result of Kinderhook's willingness to provide the DIP Facility, the Debtors will have sufficient liquidity to stabilize their operations, pay vendors, and fund the administration of these Chapter 11 Cases.

10. In light of the above circumstances, the Debtors were required to move as fast as possible to lock in a Stalking Horse Purchaser and secure DIP Financing. But, in so doing, the Debtors now have a path forward to help maximize value for all stakeholders.

4

## BACKGROUND

**A.     The Company's Business**

11.     The Debtors' roots can be traced back to Rich Godfrey and Associates Inc., *d/b/a* Coleman Powersports (collectively, with its subsidiaries, "Godfrey & Associates"), which was founded by Mr. Rich Godfrey in 2010.  Godfrey & Associates was a lower-cost producer of high-quality, light-to-middle weight powersports equipment in the categories of utility task vehicles ("UTV"), all-terrain vehicles ("ATVs"), go-karts, and minibikes.  Godfrey & Associates sold products through prominent national and regional retail resellers such as Walmart, Tractor Supply Co., Dick's Sporting Goods, Camping World, Lowes, and Theisen's Home, Farm and Auto.

12.     At the time of its sale to Kinderhook, Godfrey & Associates maintained forty-nine (49) employees, with headquarters and assembly operations in Tempe, Arizona.  Specifically, Godfrey & Associates maintained a headquarters, showroom, and spare parts storage facility at 1775 E. University Dr. Tempe, Arizona (the "University Location"), as well as a mini-bike manufacturing and UTV assembly facility at 444 W. Geneva Dr. Tempe, Arizona (the "Geneva Location").

13.     Chongqing Huansong Industries (Group) Co., Ltd. and its partner company in Hai Phong City, Vietnam (collectively, "Huansong") were the Company's primary manufacturing vendor. Prior to the sale, Rich Godfrey owned and controlled the corporate entities that owned the University Location and the Geneva Location until approximately December 2022, when the properties were sold by Rich Godfrey to third parties.  Both locations ae continued to be leased by the Debtors.

14. In fiscal year ending 2020, Godfrey & Associates had revenues of approximately $133 million. In fiscal year ending 2021, the Debtors had revenues of approximately $218 million. As of the Petition Date the Debtors employ 78 employees.

**B.    The 2021 Sale Process**

15. In March 2021, Godfrey & Associates retained Hudson Capital Advisors BD, LLC ("Hudson Capital Advisors") to market a potential acquisition of, or investment in, Godfrey & Associates. Hudson Capital Advisors prepared a Confidential Information Memorandum ("CIM") and began to market the business.

16. Hudson Capital Advisors approached Kinderhook Industries, Inc. ("Kinderhook") with the potential transaction opportunity in approximately August 2021. Kinderhook conducted diligence on the potential transaction and ultimately submitted a letter of intent to Rich Godfrey. Soon thereafter, Kinderhook and Rich Godfrey began negotiating a definitive agreement.

17. The acquisition of the Company by Kinderhook was effectuated pursuant to a Stock Purchase and Contribution Agreement (the "Purchase Agreement") that closed on October 8, 2021 (the "2021 Transaction"). The Purchase Agreement involved four parties: Performance Powersports Group Investor, LLC ("Parent"), Performance Powersports Group Purchaser, Inc. ("Purchaser"), Rich Godfrey & Associates, Inc. ("Company"), and Rich Godfrey ("Seller").

18. The 2021 Transaction closed for a total purchase price of $112,000,000, inclusive of fees, expenses, and cash-to-balance-sheet amounts. That purchase price was comprised of $47,000,000 in equity contributions, $45,000,000 in debt financing (as described in further detail below), and a $20,000,000 Rollover Amount from the cash consideration otherwise paid to Rich Godfrey.

10328628.v7

19. The $47,000,000 equity contribution was from two sources. First, two Kinderhook funds, Kinderhook Capital Fund VI, L.P. and Kinderhook Capital Fund VI-B, L.P., contributed $45,000,000 in equity. Second, certain investors associated with the debt financing described below contributed an additional $2,000,000 in equity. Twin Brook Capital Partners, LLC acted as Agent for the various lenders.

**C.   Corporate and Capital Structure**

20. The Debtors are portfolio companies of Kinderhook's affiliates. Performance Powersports Group Investor, LLC owns 100% of the interests in Performance Powersports Group Holdings, Inc., which itself owns 100% of the interests in Performance Powersports Group Purchaser, Inc., which itself owns 100% of the interests in Performance Powersports Group, Inc. A Corporate Organizational Chart is attached hereto as **Exhibit A**.

21. As of the Petition Date, the Debtors' capital structure consists of funded-debt obligations in the aggregate principal amount of approximately $52.0 million outstanding under the Prepetition Credit Agreement (defined below) and unsecured trade debt of approximately $70 million but excluding lease obligations and lease rejection claims, if any. The unsecured trade debt includes two prior trade claims of vendors no longer doing business with the Company: (a) Huansong alleges it is owed approximately $60 million and (b) Hisun Motors Corp. U.S.A, ("Hisun USA") alleges it is owed $3.5 million), each subject to offsets, affirmative defenses and claims.

22. I understand that the Debtors' obligations under the Prepetition Loan Documents with Twin Brook are secured by liens on substantially all of the Debtors' assets and proceeds thereof.

10328628.v7

### *1.    Prepetition Secured Credit Facility.*

23.    Pursuant to (i) that certain Credit Agreement dated as of October 8, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement") by and among (a) Performance Powersports Group Purchaser, Inc. (the "Borrower"), (b) Twin Brook Capital Partners, LLC, as administrative agent (in such capacity, the "Prepetition Agent" or "Twin Brook"), and (c) the financial institutions party thereto from time to time (in such capacity, the "Prepetition Lenders"; together with the Prepetition Agent, collectively, the "Prepetition Secured Parties"), and (ii) that certain Guaranty and Collateral Agreement dated as of October 8, 2021 (the "Prepetition Security Agreement"; together with the Prepetition Credit Agreement, the Loan Documents (as defined in the Prepetition Credit Agreement) and any other agreements or documents executed or delivered in connection therewith, each as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Loan Documents") by and among the Borrower, Performance Powersports Group Holdings, Inc. ("Holdings"), and Performance Powersports Group, Inc. (together with Holdings, the "Guarantors"; collectively with the Borrower, the "Prepetition Obligors"), in favor of the Prepetition Agent; the Prepetition Lenders agreed to provide certain credit facilities and other financial accommodations to the Borrower.

24.    As set forth in the Prepetition Loan Documents, the Prepetition Obligors granted to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, a first-priority security interest in and continuing lien (the "Prepetition Liens") on certain "Collateral" (as defined in the Prepetition Loan Documents), including all real and personal property, other than certain specified "Excluded Property" (as defined in the Prepetition Loan Documents) of the Prepetition Obligors (collectively, as such, the "Prepetition Collateral"), as perfected by the filing of various UCC-1

10328628.v7

financing statements naming the Prepetition Obligors as debtors and the Prepetition Agent as secured party in the appropriate state recording offices.

### 2. *First Amended Prepetition Secured Credit Facility.*

25. On March 2, 2022, based on the Company's financial condition and the depletion of availability under the $7.5 million revolver under the Prepetition Credit Agreement, and in an effort to obtain further capital to take an advantage of a prospective business opportunity, the parties entered into that certain First Amendment to Credit Agreement pursuant to which: (1) certain Prepetition Lenders agreed to provide additional term loans to the Company to repay the outstanding Revolving Loans in an aggregate principal amount equal to $4,826,500 and to pay related fees, costs and expenses incurred by the Prepetition Obligors; and (2) the Term Loan total amount then outstanding was increased from $45,000,000 to $50,000,000.

### 3. *Second Amended Prepetition Secured Credit Facility.*

26. Subsequently, the Company notified the Prepetition Agent and the Prepetition Lenders that certain Defaults and/or Events of Default had arisen pursuant to various provisions of the Prepetition Credit Agreement for, *inter alia*, Borrower's failure to comply with the mandatory prepayment set forth in Section 2.10.2(c) of the Prepetition Credit Agreement and Borrower's failure to timely comply with requirements to deliver audited financial statements for 2021 and financial projections for 2022. As a result, on September 30, 2022, the parties entered into that certain Second Amendment to Credit Agreement and Limited Waiver pursuant to which: (1) certain Prepetition Lenders agreed to provide additional term loans to the Company to repay the outstanding Revolving Loans in an aggregate principal amount equal to $5,500,750 and to pay related fees, costs and expenses incurred by the Prepetition Obligors; and (2) the Term Loan total amount then outstanding was increased by $5,700,000 to $55,450,000.

10328628.v7

27. As of the Petition Date, the Prepetition Obligors were indebted to Prepetition Secured Parties on account of the obligations under the Prepetition Loan Documents in the aggregate principal amount of $52 million (plus accrued and accruing interest, fees, expenses and other charges, the "Prepetition Obligations").

**D.    Events Leading Up to the Chapter 11 Cases**

28. Several months after the 2021 Transaction, the Company brought on new leadership to address the financial and management challenges it was facing. This new leadership—including myself as chief financial officer—began to implement a series of strategic initiatives intended to revitalize the business model, sales strategy, and financial controls, all of which were necessary to reshape the business' long-term strategic direction.

29. Shortly thereafter, it became apparent that the Company was facing several headwinds negatively impacting the business and placing the Company in a difficult liquidity position, including a realization that pre-2021 Transaction inventory orders were far in excess of historical or anticipated customer demand, pre-2021 Transaction inventory deliveries did not occur within the time frame necessary to capture existing customer demand prior to the 2021 holiday season, delays in shipping caused by supply chain disruption felt across the country, and increased costs associated with freight, shipping, demurrage and warehousing of inventory deliveries. These liquidity constraints were exacerbated by a "post-pandemic" reduction in demand from customers.

30. Throughout the second half of 2022, the Company faced continuing pressure from the vendors that it no longer used as suppliers of product. These vendors ultimately initiated legal proceedings in December 2021. And, despite outreach from the Company seeking a business solution to their dispute, these vendors also threatened an involuntary bankruptcy filing.

31. In response to these challenges, the Company hired outside counsel and, in October 2022, hired Portage Point to serve as both the Company's restructuring advisor and investment

banker. Specifically, the Company engaged Portage Point to advise the Company in numerous areas including the evaluation of potential strategic alternatives. The Company also appointed the Disinterested Director to assist in evaluating these alternatives.

32. Following an evaluation of strategic alternatives, the Company tasked Portage Point with marketing their assets for sale as a going concern. Portage Point's marketing process involved the preparation of marketing materials intended for distribution to prospective buyers of the Debtors' Assets, which included a teaser, confidential information memorandum, and the aggregation of key company documents located in an online data room for further diligence. In addition, Portage Point worked with the Debtors to develop a list of suitable potential buyers that could be contacted on a discreet and confidential basis.

33. Specifically, beginning on December 6, 2022 and continuing thereafter, Portage Point began outreach to a broad universe of relevant strategic and financial parties to assess interest in an acquisition of the Company. Portage Point and/or the Debtors advisors reached out to approximately 33 parties and offered them the opportunity to participate in the sale process, including Rich Godfrey (the prepetition founder of the Debtors), Huansong (the Company's prior, primary vendor manufacturing partner), and Twin Brook Capital Partners, LLC (the Debtors' Prepetition Lender). Of these 33 parties, 9 of them negotiated and executed confidentiality agreements and were provided with a confidential information memorandum and access to a virtual data room containing detailed information about the Debtors' business. Portage Point then held follow-up calls with interested parties to respond to diligence requests and discuss the current situation and process.

34. The Company received no written indications of interest by the initial January 13, 2023 bid deadline. Meanwhile, the Company continued to suffer a drain on cash flow, lacked a

source of additional long-term liquidity, and faced litigation and mounting pressure from vendors, including the threatened filing of an involuntary bankruptcy proceeding.

35. Against this backdrop, and to avoid a potential value destructive outcome, the Company commenced negotiations with CPS USA Acquisition, LLC to potentially serve as a "stalking horse" purchaser for the proposed sale. As a product of these negotiations, the Company and CPS USA Acquisition, LLC, an affiliate of Kinderhook, entered into that certain Asset Purchase Agreement dated January 16, 2023 (the "Stalking Horse Agreement"), by and among the Company as sellers and CPS USA Acquisition, LLC as buyer (the "Stalking Horse Bidder").

36. In the interim, however, the Company continued to suffer a cash flow drain and lacked a source of necessary long-term liquidity. Due to the Debtors' cash position, the lack of any viable, actionable alternatives, the lack of any business solution with Huansong, and Huansong's threats of an involuntary bankruptcy proceeding, it became readily apparent that the most effective way to maximize the value of the Debtors' estates would be a continuation of the sale process through chapter 11.

**D.     Goals of the Chapter 11 Cases**

37. The Company commenced these Chapter 11 Cases to preserve value for its stakeholders, including its employees and creditors. In addition, the Debtors have negotiated a second lien junior debtor-in-possession financing facility with Tankas Funding VI, LLC, an affiliate of Kinderhook, that will allow the Debtors to continue to operate in the normal course, pay landlords and vendors, and have sufficient liquidity to pay the administrative costs, both operational and statutory, required in these Chapter 11 Cases.

38. Potage Point will continue to market the Debtors' assets for sale to potential purchasers other than the Stalking Horse Bidder, with the Stalking Horse Bidder serving as a bidding floor.

39. Contemporaneously with the filing of these Chapter 11 Cases, the Debtors filed their sale procedures motion and sale motion with the Court to approve the asset purchase agreement with the Stalking Horse Bidder and establish a formal sale timeline, which will include an auction process, with a goal of exposing the existing asset purchase agreement to higher and better offers.

40. The proposed sale timeline and DIP milestones are as follows:

| | |
|---|---|
| Interim DIP Order | Entered by January 19, 2023 at 4:00 p.m. prevailing Eastern time |
| Final DIP Order | Entered by February 15, 2023 at 4:00 p.m. prevailing Eastern time |
| Bidding Procedure Motion and Order | Motion filed by January 18, 2023 at 4:00 p.m. prevailing Eastern time<br><br>Order entered by February15, 2023 at 4:00 p.m. prevailing Eastern time |
| Cure/Assignment Objection Deadline | March 10, 2023 at 4:00 p.m. prevailing Eastern time |
| Bid Deadline | March 7, 2023 at 4:00 p.m. prevailing Eastern time |
| Stalking Horse Adequate Assurance Objection Deadline | March10, 2023 at 4:00 p.m. prevailing Eastern time |
| Auction | March 9, 2023 at 10:00 a.m. prevailing Eastern time |
| Sale Objection Deadline | March 10, 2023 at 4:00 p.m. prevailing Eastern time |
| Non-Stalking Horse Adequate Assurance Objection Deadline | March 16, 2023 at 4:00 p.m. prevailing Eastern time |
| Sale Hearing | On or before March 17, 2023 at [•] [•]. m. prevailing Eastern time |

41. The proposed sale timeline is necessary in order to allow the transaction to close prior to the ramp up of the summer season and to allow the Company to focus on its scheduled operational move to Texas which is planned for the first half of 2023. In order to secure inventory to meet such demand, the Debtors will be required to expend significant funds in advance for

10328628.v7

delivery of inventory. Furthermore, vendors may be less inclined to schedule production and shipment for the Debtors, and instead schedule production and shipment for their competitors, if the Debtors do not have certainty with respect to their new ownership. Moreover, any new owner, whether it be the Stalking Horse Bidder or another successful bidder, will want input into the mix and quantity of inventory that is purchased. Although the DIP Lender and Stalking Horse Bidder are willing to fund the process to get to a transaction, they are unwilling to fund the significantly increased expenditures that would be needed to build up the inventory for the peak season. As a result, the proposed sale timeline is necessary to maximize the value of the Debtors' estates.

42. The Debtors believe that a marketing and sale process through these Chapter 11 Cases is in the best interest of the Company's creditors and will maximize the value of these estates.

**Evidentiary Support for First Day Motions**

43. The Debtors have filed a number of first day pleadings (collectively, the "First Day Pleadings") seeking relief that the Debtors believe is necessary to avoid irreparable harm and will enable them to efficiently administer their estates and continue to operate with minimal disruption and loss of value during these Chapter 11 Cases. The First Day Pleadings are therefore necessary to ensure the best outcome for the Debtors, their estates, and their creditors.

44. I have reviewed each of the First Day Pleadings listed in **Exhibit B** attached hereto, and the facts set forth in each first day motion are true and correct to the best of my knowledge and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: January 16, 2023        */s/ Ken Vanden Berg*
                               By: Ken Vanden Berg
                               Title: Chief Financial Officer

10328628.v7