## EXHIBIT B

**First Day Pleadings**[3]

---

[3]    Capitalized terms not defined hereafter shall have the same meanings ascribed to them as in the respective First Day Pleadings.

## <u>Evidentiary Support for First Day Motions</u>[1]

I.   **Debtors' Motion For Entry of an Order (I) Directing Joint Administration of Their Related Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").**

1.   Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing procedural consolidation and joint administration of their related chapter 11 cases and (b) granting related relief.   Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any party in interest.

2.   Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.   For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.   The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.   Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding, instead of multiple independent chapter 11 cases.   Finally, joint administration will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.   Accordingly, I respectfully submit that the Joint Administration Motion should be approved.

II.   **Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' 30 Largest Unsecured**

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable first day motion.

**Creditors, (C) Redact Certain Personal Identification Information, and (II) Granting Related Relief (the "Creditor Matrix Motion").**

3.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order:  (a) authorizing the Debtors to (i) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor; (ii) file a consolidated list of the Debtors' 30 largest unsecured creditors in lieu of filing lists for each Debtor; (iii) redact certain personal identification information; and (b) granting related relief.

4.      Although I understand that a list of creditors usually is filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix "in the interest of justice."  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.[2]

5.      Additionally, I believe that it is appropriate to authorize the Debtors to file a single Top 30 List, in lieu of the requirement for each Debtor to file a separate Top 20 List, because the Top 20 Lists of the Debtors could overlap and certain Debtors may have fewer than twenty significant unsecured creditors.  Therefore, filing separate Top 20 Lists for each Debtor would be of limited utility.  Moreover, I believe that the exercise of compiling separate Top 20 Lists for each individual Debtor could consume an excessive amount of the Debtors' and their advisors' limited time and resources.  I believe that the Top 30 List will aid the U.S. Trustee in any efforts to communicate with creditors listed thereon.

6.      Additionally, I believe that it is appropriate to authorize the Debtors to redact from the Creditor Matrix address information of individual creditors—including the Debtors'

---

[2]    The Debtors submit that if any of these chapter 11 cases converts to a case under chapter 7 of the Bankruptcy Code, the applicable Debtor will file its own creditor mailing matrix.

employees and temporary workers because such information could be used to perpetrate identity theft or locate survivors of domestic violence, harassment, stalking, or phishing scams. The Debtors propose to provide an unredacted version of the Creditor Matrix to the Court, the U.S. Trustee, counsel to any official committee of unsecured creditors appointed in these chapter 11 cases, and any party in interest upon a request to the Debtors (email is sufficient) or to the Court that is reasonably related to these chapter 11 cases.

7.      Accordingly, I respectfully submit that the Court should approve the Creditor Matrix Motion.

**III.      Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "Customer Programs Motion").**

8.      Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to maintain and administer their Customer Programs as described in the Customer Programs Motion and honor certain prepetition obligations related thereto and (b) granting related relief.

9.      To help maintain their reputation for quality and to maximize customer loyalty, the Debtors have historically offered to customers, in the ordinary course of business and consistent with industry practice, general product warranties covering defects in equipment and parts to ensure that certain of the Debtors' products perform as intended (the "Warranty Program"). Although the details of each Warranty Program vary with the competitive environment in which particular products are sold, all of the Warranty Programs generally guarantee against damaged and defective products for a limited period of time. The security and certainty the Warranty Program provides ensures that customers can purchase the Debtors' products with confidence and that unintended product failures will not burden customers with undue coasts. If the Debtors

3

cannot provide their customers with this certainty, customers are likely to turn to a competing manufacturer who can offer it.  Through the Warranty Program, customers can contact a customer service center for assistance and take qualifying products to certain vendors for repair.  The Debtors pay the customer service call center and the service provider for the warranty work performed on the item.  The service providers determine if the product requires repair and if replacement parts are necessary to repair the product.  The Warranty Program requires a cash outlay to the extent that items qualify for repair work and/or replacement parts.

10.     The Debtors also provide certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships.  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  Accordingly, maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

11.     From time to time, the Debtors issue credits, adjustments, discounts, or other similar obligations to their customers, the vast majority of which ***do not*** entail the expenditure of cash.

12.     As more fully described in the Customer Programs Motion, the Debtors offer certain customers credits or discounts on merchandise for prompt payment, volume purchases, and certain special sales promotions and returns (each, a "Credit," and collectively, the "Credits").  I believe that continuing to administer the Customer Programs without interruption during the pendency of the chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and benefit their estates.  In contrast, if the Debtors are unable to continue the Customer Programs postpetition, the

4

Debtors risk alienating certain customers (who might then initiate business relationships with the Debtors' competitors) and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects maximizing the value of their estates.  The Debtors' Customer Programs are essential marketing strategies for attracting new customers.

13.    I believe that the failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the chapter 11 filings.  Such uncertainty could erode the Debtors' hard-earned reputation and brand loyalty, which, in turn, could adversely impact their prospects for a successful emergence from bankruptcy.

14.    I believe that the relief requested herein is vital to the long-term reorganization of their business, both in terms of profitability and the engendering of goodwill, particularly at this critical time following the filing of the chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

IV.    **Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms and (II) Granting Related Relief  (the "Cash Management Motion").**

15.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to (i) continue to operate their Cash Management System and maintain their existing Bank Accounts, (ii) pay any prepetition or postpetition amounts outstanding on account of the Bank Fees, and (iii) maintain existing Business Forms in the ordinary course of business, and (b) granting related relief.

16.    The Debtors' Cash Management System is similar to the centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective and efficient manner.  The Debtors use the Cash Management System to collect,

transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting. The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, receiving, and releasing funds, including in connection with any Intercompany Transactions. The Debtors' accounting department reconciles the Debtors' books and records on a daily basis to ensure that all transfers are accounted for properly.

17.     I believe that the Bank Accounts generally comply with section 345 of the Bankruptcy Code. JP Morgan Chase is an authorized depository, I believe it is a trustworthy, well-capitalized, and financially stable institution with a strong reputation, and is well positioned to continue to perform depository and cash management functions during these chapter 11 cases. The Debtors also maintain an account at Arizona Federal Credit Union ("AFCU" and with JP Morgan Chase, collectively, the "Bank Accounts") to receive credit card payments from retail customers as well as making payments for certain license and registration fees. The Bank Accounts are insured by the FDIC up to the applicable insured limits. Additionally, the Debtors' customers, suppliers, and vendors rely on the Bank Accounts, in particular the Operating Account, and it is therefore not feasible to consolidate all cash activities into the narrow group of financial institutions approved in the U.S. Trustee Guidelines.

18.     Because of the nature of the Debtors' business and the disruption thereto that would result if the Debtors were forced to close their existing Bank Accounts, I believe it is critical that the Cash Management System remain in place. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.

6

Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**V.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "Wages Motion").**

19.      As of the Petition Date, the Debtors employ approximately 78 employees, including three part-time employees (collectively, the "Employees") in the United States.[3]  In addition to the Employees, the Debtors also employ an independent contractor who is an integral part of the Debtors' workforce.  The Employees perform a wide variety of functions that are critical to the preservation of value and the administration of the Debtors' estates.  In many instances, the Employees include personnel who are intimately familiar with the Debtors' business, processes, and systems, and who cannot be easily replaced.  Without the continued, uninterrupted services of the Employees and Independent Contractor, the Debtors' business operations will be halted immediately and the administration of their estates materially impaired.

20.      The vast majority of the Employees rely on their compensation and benefits to pay their daily living expenses.  These workers will be unfairly harmed if the Debtors are not permitted to continue paying compensation and providing health and other benefits during these chapter 11 cases, and the Debtors' ability to retain such individuals and/or hire additional workers would be imperiled.  Consequently, I believe the relief requested is necessary and appropriate.

21.      The Debtors' estimates of the aggregate prepetition amounts owed on account of each Employee Compensation and Benefits program are set forth in the table below:

---

[3]      Full-time Employees are Employees who are regularly scheduled to work at least 30 hours or more per week.

7

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| **Employee Compensation** | **$215,000** | **$215,000** |
|     Employee Compensation | $140,000 | $140,000 |
|     Withholding Obligations | $40,000 | $40,000 |
|     Payroll Processing Fees | $5,000 | $5,000 |
|     Reimbursable Expenses | $30,000 | $30,000 |
| **Employee Benefits Programs** | **$90,000** | **$90,000** |
|     Health Benefit Plan Amounts | $60,000 | $60,000 |
|     Employee Assistance | $10,000 | $10,000 |
|     Life & Disability Program | $4,500 | $4,500 |
|     Vision | $1,000 | $1,000 |
|     Dental | $4,500 | $4,500 |
|     Paid Time Off | $10,000 | $10,000 |
| **Total** | **$305,000** | **$305,000** |

22.     As further described in the Wages Motion, the Debtors are seeking authority to (a) pay and honor prepetition claims relating to the Employee Compensation and Benefits; and (b) pay all costs incident to the Employee Compensation and Benefits. I believe that failure to pay the prepetition Employee-related obligations during the administration of these chapter 11 cases would jeopardize the Debtors' ability to retain Employees and thereby impair the Debtors' reorganization efforts.

23.     I believe the Employees provide the Debtors with services necessary to conduct the Debtors' business, and, absent the payment of the Employee Compensation and Benefits Programs owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time. I believe that, without these payments, the Employees may elect to seek alternative employment opportunities, disrupting the Debtors' business operations. I believe that the maximization of value of the Debtors' estates is inextricably tied to their workforce, which cannot be replaced without significant efforts—efforts that might not be successful and may be more expensive given the overhang of these chapter 11 cases. I believe enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. I, therefore, believe that payment of the prepetition obligations with respect to the Employee Compensation and

8

Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

24.     Therefore, I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

## VI.     Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Claims of Lien Claimants, Import Claimants, Foreign Vendors, 503(b)(9) Claimants, and Critical Vendors and Granting Related Relief (the "Vendor Motion").

25.     Pursuant to the Vendor Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay prepetition amounts in the ordinary course owing on account of certain lien claimants, import claimants, foreign vendors, 503(b)(9) claimants, and critical vendors in an aggregate interim amount not to exceed $2,845,000 and in an aggregate final amount, inclusive of amounts paid pursuant to the Interim Order, not to exceed $4,895,000 and granting related relief.

### I.     The Lien Claimants.

26.     The Debtors generally do not take possession of the inventory that comprises their core business.  Instead, their inventory typically is manufactured in Asia and shipped to the manufacturer's facilities in the United States.  From there, product is shipped directly to customers. The title to the goods either transfers to the customer upon receipt or, in some instances, transfers to the customer when it ships from the manufacturer's US facility.

27.     There are two categories of goods that the Debtors do take possession of or have taken possession of in the past.  The first category is ancillary goods and inventory.  Such goods consist of spare parts for repairs to units that have been sold and other inventory that is not in the

Debtors' core business model, such as minibikes, trampolines, generators, and snowplows.  In these instances, the Debtors do take physical possession of the goods.  The second category relates to certain inventory from Hisun.  The circumstances regarding the Debtors' acquisition of the Hisun Inventory are the subject of ongoing litigation.  The Debtors business is highly seasonal and they received an excess of goods from Hisun just after the Debtors' peak selling season and thus were unsalable in the normal course of business.  The Debtors, therefore, have been required to store such inventory in multiple warehouses and ship inventory from the warehouses when they are able to sell it and sometimes ship certain parts of the Hisun Inventory between warehouses when required.  These categories of goods create situations where parties may have possessory or other liens on the Debtors' goods.

28.     The Debtors' network of warehouses and logistics providers is integral to the Debtors' business.  The Shippers and Warehousemen  regularly possess the Debtors goods in the ordinary course of business.  Collectively, the Debtors estimate approximately $100,000 of third-party shipping and storage charges (collectively, the "Shipper Charges") have accrued as of the Petition Date, approximately $100,000 of which will become due and owing within 30 days after the Petition Date.  The Debtors estimate approximately $115,000 of charges relating to the Warehousemen (the "Warehousemen Charges") have accrued as of the Petition Date, approximately $115,000 of which will become due and owing within 30 days after the Petition Date.

29.     The Debtors also engage with other parties that may have other liens on the Debtors' property for repairs, service work, or warranty services.  These parties may be able to assert liens against the Debtors' property, or property of the Debtors' customers, that far exceeds the amounts that are owed to such vendors (the "Other Lien Claims," collectively with the Shipper

10

Charges and Warehousemen Charges, the "Lien Claims").  If the Debtors are unable to satisfy the claims of these vendors, these parties may encumber or otherwise hold the Debtors' property that will damage the Debtors' business far in excess of the costs of satisfying such claims. Accordingly, the Debtors seek authority to pay and discharge, on a case-by-case basis, the Lien Claims in an aggregate amount up to $215,000. For the avoidance of doubt, the Debtors seek authority to pay only those amounts that they determine are necessary or appropriate to (a) obtain release of critical or valuable goods being held by the Lien Claimants, (b) maintain a reliable, efficient, and smooth distribution system, and (c) induce the Lien Claimants to continue to carry goods, release goods when directed, make repairs, and make timely deliveries.  The Debtors intend to pay prepetition Lien Claimants only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs that their estates would incur by bringing an action to compel the turnover of such goods and the delay associated with such actions.

## II.    The Import Claimants.

30.    The vast majority of the Debtors inventory is imported by the manufacturer to the manufacturer's location in the U.S.  However, the Debtors have in the past, and continue to, import a small amount of inventory and spare parts.  Timely receipt of these goods is essential to the Debtors operations and ability to perform warranty services for customers and preserve goodwill. Any disruption or delay in receiving goods currently in transit would adversely affect the Debtors' business operations.

31.    In connection with the import of goods, the Debtors may be required to pay various charges (the "Import Charges"), including customs duties, detention and demurrage fees, tariffs and excise taxes, and other similar obligations. The Debtors estimate that approximately $30,000

in Import Charges for goods currently in transit is outstanding as of the Petition Date, approximately $30,000 of which will come due in the first 30 days after the Petition Date.

32.     Accordingly, the Debtors seek authority, but not direction, to pay and discharge, on a case-by-case basis, the Import Charges incurred on account of prepetition transactions in an aggregate amount up to $30,000.  Absent such payment, parties to whom the Debtors owe Import Charges (the "Import Claimants") may interfere with the Debtors receipt of the Imported Goods, to the detriment of all other stakeholders. The net value of the Imported Goods to the Debtors is far more than the amount of incurred but unpaid Import Charges the Debtors are seeking authority to pay. For the foregoing reasons, I believe that payment of the Import Charges is necessary to preserve and enhance the value of the Debtors' business for the benefit of all parties in interest

### III.     Foreign Vendors

33.     As discussed above, the Debtors obtain the vast majority of their inventory from vendors oversees (the "Foreign Vendors").  The Debtors typically place orders for this inventory for a calendar quarter, with some of such orders requesting goods three months from the date of the order.  The Debtors place deposits for inventory with certain of their vendors at the time the order is placed.   The deposits for inventory, if required, are typically ten percent (10%) of the purchase price.

34.     The inventory shipped to the Foreign Vendors' U.S. locations and title to the product remains in the name of the Foreign Vendor.  The Debtors will then direct the Foreign Vendor to ship the inventory from the Foreign Vendors' location directly to the Debtors' customers.  The Debtors will either satisfy the balance of the amount owed to these Foreign Vendors (the "Foreign Vendor Claims") either shortly before or shortly after the shipment to their customers.  In order to obtain the shipments to their customers, the Debtor must satisfy these

Foreign Vendor Claims.  Without the shipment of this inventory, the Debtors' business would be irreparably harmed.  Accordingly, the Debtors seek to satisfy these Foreign Vendor Claims in the ordinary course of business pursuant to their normal payment terms, regardless of whether the purchase order for such inventory was executed prepetition or postpetition.

**IV.    The 503(b)(9) Claimants**

35.    The Debtors may have received certain goods or materials from various vendors within the 20 days before the Petition Date (the "503(b)(9) Claimants").  Under section 503(b)(9) of the Bankruptcy Code, the value of such goods or materials would be accorded administrative priority (the "503(b)(9) Claims").  Pursuant to this motion, the Debtors seek authority to pay and discharge, on a case-by-case basis, the 503(b)(b) Claims in an aggregate amount up to $50,000.

**V.    Critical Vendors**

36.    By this Motion, the Debtors seek to pay prepetition amounts owed to certain vendors they deem critical to their operations (the "Critical Vendors" and, such claims, the "Critical Vendor Claims" up to $2.6 million on an interim basis (the "Interim Critical Vendors Cap") and, inclusive of amounts paid pursuant to the Interim Critical Vendors Cap, $4.6 million on a final basis (the "Final Critical Vendors Cap").

37.    The Critical Vendors are so essential to the Debtors' business that the lack of any of their particular goods or services, even for a short duration, could significantly disrupt the Debtors' operations and cause irreparable harm to the Debtors' business, goodwill, and market share.  The Critical Vendors generally fall into one of two categories, vendors that provide certain services (the "Outsourcing Vendors") and those that supply goods to the Debtors (the "Supply Vendors").  The Outsourcing Vendors provide services such as advertising, licensing, sales, customer service and warranty negotiation.  These Outsourcing Vendors do not have long term

13

contracts that would allow the Debtors to compel them to continue performing services postpetition.  The continuation of these services is essential to the continued operation of the Debtors business and sale of the enterprise.

38.    The Supply Vendors are vendors that supply the Debtors' core inventory.  The Debtors acquire inventory from these manufacturers on a purchase order basis and do not have long term contracts under which they could compel the manufacturers to continue supplying inventory.  One of the Debtors' key Supply Vendors has reached its maximum allowable credit with respect to the Debtors and has informed the Debtors that it will need to reduce its current exposure in order to supply product going forward and in exchange for such reduction will be willing to extend credit terms.  Accordingly, the extent that the Supply Vendors will not continue to supply product to the Debtors postpetition, the value of the Debtors' business will significantly deteriorate.

39.    The Debtors have identified the Critical Vendors as vital to the Debtors' go-forward operations.  In many cases, the Critical Vendors provide products and services that are only available from a limited number of vendors, and in some cases, only one vendor.  Even where alternative vendors exist, the costs and business disruptions associated with switching from one vendor to another are often significant and would be detrimental to the Debtors' estates.

40.    Accordingly, in light of the potential for immediate, irreparable consequences if the Critical Vendors fail to continue to provide uninterrupted and timely deliveries of goods and services, I have determined, in consultation with advisors and in the exercise of their business judgment, that payment of the Critical Vendor Claims is essential to preserve the go-forward business and to avoid costly disruptions in the Debtors' operations.

10332036.v3

41.    Recognizing that payment of all prepetition claims of these third-party vendors outside of a plan of reorganization would be extraordinary relief, I, with the assistance of the Debtors' advisors, reviewed their books and records, consulted with operations management and purchasing personnel, reviewed contracts and supply agreements, if any, and analyzed applicable laws, regulations, and historical practices to identify the limited number of vendors that are critical to the continued and uninterrupted operation of the Debtors' business—the loss of which could materially harm their business, shrink their market share, reduce their enterprise value, and impair going-concern viability.

42.    Accordingly, the Debtors seek authority to pay and discharge, on a case by case basis, the Critical Vendor Claims in an aggregate amount up to $2.6 million pursuant to the Interim Critical Vendors Cap and up to $4.6 million pursuant to the Final Critical Vendors Cap.  The Debtors intend to pay prepetition Critical Vendor Claims only where they believe, in their business judgment, that the benefits from making such payments will exceed the costs to their estates.

**43.    V.    Customary Trade Terms.**

44.    Subject to the Court's approval, the Debtors intend to pay the Critical Vendor Claims only to the extent necessary to preserve their business.  The Debtors have designated a core group of executives, advisors, and employees who have experience in the Debtors' business and in the reorganization process to review, assess, and potentially recommend any payment to a Critical Vendor.

45.    In return for paying the Critical Vendors, either in full or in part, the Debtors will make commercially reasonable efforts to ensure that the Critical Vendors provide customary or favorable trade terms for the postpetition procurement of goods and services.  Specifically, the Debtors seek authorization to condition payment of the Critical Vendor Claims upon such

15

claimant's agreement to continue—or recommencement of—supplying such products and services to the Debtors in accordance with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtors in their reasonable business judgment (the "Customary Trade Terms").

46.     In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then:  (a) the Debtors may take any and all appropriate steps to cause such Critical Vendor to repay payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such Critical Vendor; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

47.     The Debtors rely on timely and frequent delivery of critical inventory items, goods, and services and any interruption in this supply—however brief—would disrupt the Debtors' operations and could potentially cause irreparable harm to their businesses, goodwill, employees, customer base, and market share.   I believe that the relief requested in the Vendor Motion will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.  I believe that the relief requested

16

in the Vendor Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Vendor Motion.

**VII.**      **Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief (the "<u>Utilities Motion</u>").**

48.      Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (i) prohibiting utility providers from altering, refusing, or discontinuing utility services; (ii) determining adequate assurance of payment for future utility services; (iii) establishing procedures for determining adequate assurance of payment; and (iv) granting related relief.

49.      In connection with the operation of their business and management of their properties, the Debtors historically obtain Utility Services from a number of Utility Providers. The Debtors pay the Utility Providers directly for the Utility Services, including for Utility Services at the Debtors' facilities in Arizona and Texas.

50.      The Debtors propose depositing into a segregated account the Adequate Assurance Deposit of $13,745, which represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services, calculated based on the Debtors' average utility expenses over the 12-month period ending December 31, 2022, excluding deposits and letters of credit. The Adequate Assurance Deposit will be held in the Adequate Assurance Account at JP Morgan Chase for the benefit of the Utility Providers and for the duration of these chapter 11 cases and may be applied to any postpetition payment defaults owed to the Utility Providers by the Debtors. The Adequate Assurance Deposit will be held by the Debtors, and no liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account.

17

51.     Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures.  These procedures allow Utility Providers to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the proposed amount is not sufficient.  This ensures that all key stakeholder groups obtain notice of such request before it is honored.

52.     Furthermore, the Debtors request that the Utility Providers, including subsequently added Utility Providers, absent compliance with the Adequate Assurance Procedures, be forbidden from altering, refusing, or discontinuing service or requiring additional assurance of payment other than the Proposed Adequate Assurance.  Utility Services should be preserved on an uninterrupted basis because it is essential to the Debtors' ongoing operations and a successful reorganization.  Termination of any Utility Services could result in the Debtors' inability to operate their business to the detriment of all stakeholders.  Therefore, it is critical that Utility Services continue uninterrupted during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

## VIII.     Debtors' Application For Entry of an Order Appointing Omni Agent Solutions As Claims and Noticing Agent, Effective as of the Petition Date (the "Omni 156(c) Retention Application").

53.     Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order appointing Omni Agent Solutions ("Omni") as claims and noticing agent for the Debtors and their chapter 11 cases, effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.

54.     Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Omni to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates.  Moreover, it is my understanding that based on all

engagement proposals obtained and reviewed that Omni's rates are competitive and comparable to the rates charged by their competitors for similar services.

55.    The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Omni 156(c) Retention Application.

**IX.    Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing, But Not Directing, the Debtors to (A) Pay Their Obligations Under Insurance Policies Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Supplement, Modify, Purchase or Replace Insurance Coverage, and (C) Honor the Terms of the Financing Agreement and Pay Premiums Thereunder, and (II) Granting Related Relief (the "Insurance Motion").**

56.    The Debtors seek entry of interim and final orders:  (a) authorizing, but not directing, the Debtors to (i) continue honoring their obligations under the Insurance Policies and satisfy payment of prepetition obligations related thereto; (ii) renew, supplement, modify, purchase, or replace insurance coverage in the ordinary course of business on a postpetition basis; and (iii) honor the terms of the Financing Agreement and pay premiums thereunder; and (b) granting related relief.

The Debtors maintain approximately 10 Insurance Policies administered by multiple third-party Insurance Carriers.  The Insurance Policies provide coverage for, among other things, the Debtors' property, general liability, automobile, marine cargo, directors and officers liability, casualty, and network/cyber liability.  The Debtors finance some of the Insurance Policies through a Financing Agreement with Bank Direct Capital Finance.  Pursuant to the Financing Agreement,

19

which covers two Insurance Policies that provide coverage for the period ranging from June 1, 2022 to May 31, 2023, the Debtors are current with payments due prior to the Petition Date. However, approximately $600,000 may come due post-petition on account of the policies covered by the Financing Agreement during the expected duration that the policies will need to remain in place. With respect to the Insurance Policies not covered by the Financing Agreement, the Debtors pay the premiums directly to Federal Insurance Company - Chubb ("Chubb"). The Debtors estimate that, as of the Petition Date, they are current on payments due on account of the non-financed Insurance Policies. The Debtors seek the authority to honor any prepetition amounts outstanding under the terms of the Financing Agreement and to pay premiums thereunder (and premiums with respect to the non-financed Insurance Policies) in the ordinary course of business during the pendency of these chapter 11 cases.

57. The Debtors' Insurance Policies and Worker's Compensation Program are essential to the preservation of the value of the Debtors' business, properties, and assets. I understand that, in many cases, insurance coverage such as that provided by the Insurance Policies is required by diverse regulations, laws, and contracts. Failure to make the payments required by the Debtors' Insurance Policies, including the Financing Agreement, could have a significant negative impact on the Debtors' operations.

58. The Debtors maintain the Workers' Compensation Program for their employees at the statutorily required level. The insurance coverage for the Workers' Compensation Program is maintained through Federal Insurance Company. The Debtors are required to maintain the Workers' Compensation Program under the laws of the states in which the Debtors operate. The Debtors pay approximately $27,000 per year in Workers' Compensation Coverage Premiums to

fund the Workers' Compensation Program.  As of the Petition Date, the Debtors believe they are current with payments due under the Workers' Compensation Coverage Premiums.

59.    I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**X.      Debtors' Motion for Entry of an Interim and Final Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion").**

60.    The Debtors request: (a) authority to negotiate, remit, pay (or use tax credits to offset) or otherwise satisfy undisputed amounts owed on account of the Taxes and Fees in the ordinary course of business that are payable or become payable during the pendency of these chapter 11 cases; and (b) related relief.

61.    In the ordinary course of business, the Debtors collect, incur and pay certain Taxes and Fees and remit such Taxes and Fees to various Authorities.  The Debtors must continue to pay the Taxes and Fees to avoid potential costly distractions during these chapter 11 cases.  Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' estate because the governmental authorities could file liens or seek to lift the automatic stay.

62.    I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**XI.     Motion of the Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash**

10332036.v3

**Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief (the "Cash Collateral and DIP Motion").**

63.     The Debtors have an immediate need for access to incremental liquidity in the form of postpetition financing as well as access to Cash Collateral.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash.  The Debtors will use cash to, among other things, continue operating their businesses and satisfy other working capital needs during these chapter 11 cases.  The Debtors believe that all or substantially all of their available cash constitutes the cash collateral, as that term is used by section 363(c) of the Bankruptcy Code, of the Prepetition Secured Party.  The Debtors will therefore be unable to proceed with operating their businesses without the ability to use Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to finance their business operations, and the availability of sufficient working capital and liquidity to the Debtors through the use of Cash Collateral, is vital to the preservation and maintenance of the value of the Debtors' estates and the successful prosecution of these chapter 11 cases.

64.     Further support for the DIP Motion can be found in the First Day Declaration and the *Declaration of Steve Bremer in Support of the Cash Collateral and DIP Motion* (the "DIP Declaration") filed contemporaneously herewith.  The Cash Collateral and DIP Motion seeks authority for the Debtors to obtain a DIP Facility consisting of $10 million junior lien superpriority term loans that will provide the Debtors with (i) an initial draw in the aggregate principal amount of $3.5 million available upon entry of the Interim Order, and (ii) an additional draw of up to $6.5 million available upon entry of the Final Order, provided, that the DIP Borrower may elect to draw a portion (not to exceed $4,800,000) of such Final DIP Loan on one additional business day after the Final Closing Date that is specified by the Debtors on the terms and conditions set forth in the

22

DIP Orders and the DIP Term Sheet to be executed among each of the Debtors as borrowers and Tankas Funding VI, LLC as lender (the "DIP Lender").  Without access to postpetition financing, I believe the Debtors would lack sufficient funds to meet their working capital needs and operate their business during these chapter 11 cases, including payment of employees and vendors, resulting in significant impairment of the value of the Debtors' estates to the detriment of all stakeholders.

65.    In light of the Debtors' liquidity position, I have assisted the Debtors in an evaluation of the Debtors' financing needs and funding alternatives and have worked closely with the Debtors, their management team, and their advisors to evaluate the Debtors' cash requirements for their businesses.  As part of their evaluation of the Debtors' financing needs, I worked with the Debtors in developing a cash flow forecast, which took into account anticipated cash receipts and disbursements during the projected period and considered a number of factors, including the effect of the chapter 11 filing on the operations of the business, likely fees and interest expenses associated with any debtor-in-possession financing facility, professional fees, and required operational payments.  Given the Debtors' circumstances and for the reasons set forth below, I believe that the terms of the DIP Facility, as set forth in the DIP Term Sheet, are fair, reasonable, and adequate.

66.    Based on the foregoing, it is my belief that the DIP Facility and consensual use of Cash Collateral represents the best option available to address the Debtors' immediate liquidity needs and is a critical component of the Debtors' chapter 11 strategy.  It is also my belief that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances and were the product of extensive good-faith, arm's-length negotiations with the DIP Facility Lender.  Specifically, the Debtors determined that the milestones and covenants contained in the

DIP Term Sheet were negotiated and required by the DIP Lender as a condition to the DIP Facility. Under the circumstances of these chapter 11 cases, these provisions are reasonable and appropriate.

67.     Finally, the Debtors' businesses are cash intensive, with significant recurring costs required to satisfy obligations to vendors and employees.  As such, and due to their current limited liquidity, the Debtors require immediate access to the DIP Facility and the use of Cash Collateral to operate their businesses, preserve value, and to avoid irreparable harm pending the Final Hearing.  Absent funds available from the DIP Facility and access to Cash Collateral at this critical early stage, the Debtors could face a value-destructive interruption to their businesses—which, in turn, would hinder the Debtors' ability to maximize the value of their estates—and be forced to curtail their operations significantly and to the detriment of the Debtors, their estates, and their creditors.

68.     The Debtors seek further authorization to use the proceeds of the DIP Facility as expressly provided in the DIP Term Sheet and DIP Orders and consistent with the Budget to pay operational, employee, and other costs of the Debtors, and payments related to the working capital and other general corporate purposes of the Debtors, including the payment of professional fees and expenses, and other administrative costs of these Chapter 11 Cases.  As set forth in the Cash Collateral and DIP Motion, the Debtors also seek authorization to execute and deliver the DIP Term Sheet and related documents and to perform such other and further acts as may be necessary or appropriate in connection therewith.

69.     In exchange for the DIP Loans, the DIP Lender will receive a superpriority allowed administrative expense claim status in the chapter 11 cases and a postpetition  security interests in and liens on all property and assets of the Debtors, of every kind or type whatsoever, tangible, intangible, real, personal or mixed, whether now owned or hereafter acquired or arising, wherever

located; all property of the estate of the Debtors within the meaning of section 541 of the Bankruptcy Code (including avoidance actions arising under chapter 5 of the Bankruptcy Code and applicable state law, subject to entry of the Final Order); and all proceeds, rents and products of the foregoing, with the exception of certain assets as expressly provided in the DIP Term Sheet, subject to certain excluded assets and carve outs.

70.    The Cash Collateral and DIP Motion, if granted, provides authority for the Debtors to use, among other things, in accordance with the Budget, any cash collateral in which the Prepetition Secured Party may have an interest and the granting of adequate protection to the Prepetition Secured Party with respect to any diminution in value of their interests in the Prepetition Collateral arising from, inter alia, the Debtors' use of the Prepetition Collateral (including Cash Collateral), or the imposition of the automatic stay under section 362 of the Bankruptcy Code.

71.    The Debtors, therefore, request immediate authority to obtain postpetition financing in the form of the DIP Loans and use Cash Collateral on an interim basis, as set forth in the Cash Collateral and DIP Motion and in the Interim Order, to prevent immediate and irreparable harm to their estates pending the Final Hearing.

*[Remainder of page intentionally left blank]*

10332036.v3