**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| PERFORMANCE POWERSPORTS GROUP | ) | |
| INVESTOR, LLC, *et al.*,[1] | ) | Case No. 23-10047 (   ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF DEBTORS FOR ENTRY OF: (I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL ASSETS, (B) APPROVING THE BID PROTECTIONS TO THE STALKING HORSE BIDDER, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (E) AUTHORIZING ENTRY INTO THE STALKING HORSE AGREEMENT, (F) APPROVING BID PROTECTIONS, (G) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (H) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move this

Court (this "Motion"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United

States Code (the "Bankruptcy Code"); Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Rule 6004-1 of the Local Rules of

Bankruptcy Practice and Procedures of the Bankruptcy Court for the District of Delaware

(the "Local Rules"), for the entry of the following: (i) an order, substantially in the form attached

hereto as **Exhibit B** (the "Bid Procedures Order"), (a) approving procedures in connection with

the potential sale of substantially all of the assets of the Debtors ("Seller") substantially in the form

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380).  The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

attached to the Bid Procedures Order as **Exhibit 1** (the "Bid Procedures"), (b) approving the Bid Protections to the Stalking Horse Bidder (each as defined below), (c) scheduling the auction and hearing to consider approval of the Sale (as defined below), (d) approving the form and manner of notice thereof, (e) authorizing Seller to enter into the Stalking Horse Agreement (as defined below), (f) approving certain bid protections for the Stalking Horse Bidder (as defined below), (g) approving procedures related to the assumption and assignment of certain executory contracts and unexpired leases, and (h) granting related relief; and (ii) an order, substantially in the form attached hereto as **Exhibit C** (the "Sale Order"), (x) approving the Sale of the Assets (as defined below) free and clear of all liens, claims, encumbrances, and other interests (except certain assumed liabilities as set forth in the Stalking Horse Agreement), (y) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto, and (z) granting related relief.

In support of this Motion, the Debtors rely upon the *Declaration of Ken Vanden Berg in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.[2]  This Motion also is supported by the *Declaration of Steven Bremer in Support of the Bid Procedures and Sale Motions* (the "Bid Procedures Declaration"), filed contemporaneously herewith and incorporated herein by reference.[3]  In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended*

---

[2]      Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the First Day Declaration.

[3]      The Debtors also will file a declaration in advance of the Sale Hearing regarding entry of the Sale Order.

10339360.v5

*Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), to the entry of a final order by the Bankruptcy Court in connection with this motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      This is a core proceeding under 28 U.S.C. § 157(b).

3.      Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief requested in this Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1, 6004-1, and 9013-1(m).

## BACKGROUND

### A.      Chapter 11 Cases

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

6.      The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration.

7.      The Debtors have sought procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

8.      The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9.      No trustee or examiner has been requested in the Chapter 11 Cases, and no official committee of unsecured creditors (the "Committee") has been appointed in these Chapter 11 Cases by the United States Trustee for the District of Delaware (the "U.S. Trustee") to date.

**B.      The Sale and Marketing Process**

10.      The Debtors engaged Portage Point Partners, LLC ("Portage Point") in October, 2022 to serve as both its restructuring advisor and investment banker. Since commencing its engagement, Portage Point has provided assistance in numerous areas including in connection with the Debtors' evaluation of strategic alternatives. Portage Point has worked closely with the Debtors' management and other restructuring professionals and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

11.      In connection with the review and analysis of the Debtors' strategic alternatives, Portage Point worked closely with the disinterested director of the boards (the "Disinterested Director") who was delegated the authority to review and act upon any matters pertaining to a potential restructuring or refinancing or sale transaction in which a conflict may exist between the Debtors on the one hand, and their equity holders, affiliates (or those entities' managers, directors, or officers) on the other hand.  This process also included the Debtors' then-existing lender and that lender's retained advisors to evaluate potential strategic alternatives. After considering the reasonably available possible courses of action, the Debtors determined that a sale of its assets was in the best interest of the Debtors, their creditors, and all parties in interest under the circumstances, particularly considering the Debtors' liquidity constraints, litigation, vendor threats, and the anticipated difficulties in raising additional debt or equity financing.

12.      Portage Point expended significant efforts prior to the Petition Date marketing the Assets for sale. Portage Point's marketing process included the preparation of marketing materials

10339360.v5

intended for distribution to prospective buyers of the Debtors' assets including a teaser, confidential information memorandum, and the aggregation of key company documents located in an online data room for further diligence.  In addition, Portage Point worked with the Debtors to develop a list of suitable potential buyers to be contacted on a discreet and confidential basis. Specifically, beginning on December 6, 2022, and continuing thereafter, Portage Point began outreach to a broad universe of relevant strategic and financial parties to assess interest in an acquisition of the Debtors. Portage Point and/or the Debtors' advisors reached out to approximately 33 parties and offered them the opportunity to participate in the sale process, including Rich Godfrey (the prepetition founder of the Debtors), Huansong (the Company's prior, primary vendor manufacturing partner), and Twin Brook Capital Partners, LLC (the Debtors' Prepetition Lender).  Of these 33 parties, 9 negotiated and executed confidentiality agreements and were provided with a confidential information memorandum and access to a virtual data room containing detailed information about the Debtors' business.  Portage Point then held follow-up calls with interested parties to respond to diligence and discuss the current situation and process.

13.    The Debtors received no indications of interest by the January 13, 2023 deadline. Meanwhile, the Debtors continued to suffer a drain on cash flow and lacked a source of long-term additional liquidity and were facing litigation and threats by vendors, including the filing of an involuntary bankruptcy proceeding. Consequently, it became apparent that the Debtors liquidity position and other issues above would require that the sale process continue in a voluntary chapter 11 process.

14.    Faced with no actionable sale proposal, CPS USA Acquisition, LLC agreed to serve as the stalking horse bidder (the "Stalking Horse Bidder") pursuant to the terms of that certain

5

asset purchase agreement, dated January 16, 2023 (the "Stalking Horse Agreement")[4] to acquire the Debtors' assets as a going concern, to expose the stalking horse agreement to higher and better offers through a chapter 11 process, and to support the process by agreeing to provide needed debtor-in-possession financing to the Debtors on a junior lien basis.

15.    Under the terms of the Stalking Horse Agreement, the Stalking Horse Bidder will purchase the Assets for an aggregate purchase price consisting of: (a) a credit bid of the outstanding obligations under the DIP Credit Agreement in the amount of $10 million; (b) cash in an amount equal to $500,000; (c) assumption of the outstanding obligations under the Prepetition First Lien Credit Agreement; (d) assumption of certain other Assumed Liabilities as provided in the Stalking Horse Agreement[5]; (e) the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder and payment of any Determined Cure Costs associated with such Assumed Contracts; and (f) the Wind-Down Amount; provided that the Wind-Down Amount shall only become payable as a portion of the Purchase Price in the event that (i) Sellers have insufficient cash on hand at Closing to fund the Wind-Down Amount from such cash on hand and (ii) the Sellers have otherwise complied in all respects with the Financing Orders, in which case the Buyer shall only be required to fund the amount necessary to bring the Sellers' total cash on hand at Closing to equal to the amount of the Wind-Down Amount (each term as defined in the Stalking Horse Agreement).

16.    The Stalking Horse Agreement not only represents a going concern sale of substantially all of the Debtors' assets, but also provides for a recovery to unsecured creditors

---

[4]    To the extent there are any discrepancies between the Stalking Horse Agreement and the description or summary of the Stalking Horse Agreement or its terms herein, the terms of the Stalking Horse Agreement shall prevail.

[5]    For avoidance of doubt, any and all Liability of the Debtors to or any Claim held by Chongqing Huansong Industries (Group) Co., Ltd., Chongqing Huansong Science and Technology Industrial Co., Ltd., Vietnam New Century Industrial Company Limited, Hisun China, and Hisun Motors Corp. U.S.A. and each of their affiliates and subsidiaries are not being assumed by the Stalking Horse Bidder and are Excluded Liabilities.

whose contracts and/or claims the Stalking Horse Bidder is not otherwise assuming under the Stalking Horse Agreement and the assumption of various Assumed Liabilities. As a result, the proposal embodied in the Stalking Horse Agreement provides that a significant amount of prepetition unsecured claims will be assumed and paid by the Stalking Horse Purchaser.  To date, the Stalking Horse Agreement represents the highest and best offer for the Assets and will enhance the bidding process by providing a floor that prospective bidders must clear, ensuring that only serious, financially capable bidders participate in the Auction.

17.     The timeline for the formal marketing process and bankruptcy filing was driven by liquidity constraints, filed and threatened litigation, as well as a threatened involuntary bankruptcy filing.  Given this backdrop and no other actionable proposals, the Debtors began negotiations with the Stalking Horse Bidder, who among other things, insisted on the inclusion of "milestone" dates by which the Debtors would be required to have completed certain aspects of the proposed sale process (the "Milestones").  These Milestones are intended to preserve the going-concern value of the business through a timely, efficient sale process that culminates in a closing by March 31, 2023 to maximize value and avoid disruption and harm to the Debtors' business.

18.     Although the Debtors believe that the Assets were adequately marketed before the Petition Date, pursuant to the terms of the Stalking Horse Agreement, the Debtors and Portage Point have continued, and will continue, to market the Assets to likely potential buyers through and until the Bid Deadline (defined below). The Debtors believe that given the prepetition marketing effort, the number of parties that already have executed NDAs, the fact that the Assets were already recently marketed to the most likely bidders for Assets of the type being sold, and the other options available to the Debtors prior to the Stalking Horse Bidder's willingness to enter into the Stalking Horse Agreement and buy the Assets as a going concern compared with other

alternatives explored, the marketing process up to this point and as continued post-Petition Date pursuant to the Bid Procedures is adequate to achieve the greatest possible level of interest and consideration for the Assets in the Chapter 11 Cases.  Further, the marketing process will continue through the Auction in accordance with the terms set forth in the Bid Procedures.

### C.    Summary of the Proposed Transaction and Bid Procedures

19.    Under the terms of the Stalking Horse Agreement, the Stalking Horse Bidder will purchase the Assets for an aggregate purchase price (the "Purchase Price") consisting of:

(a)    a credit bid of the outstanding obligations under the DIP Credit Agreement pursuant to section 363(k) of the Bankruptcy Code in the amount of Ten Million Dollars ($10,000,000);

(b)    the payment of an amount in cash equal to Five Hundred Thousand Dollars ($500,000) (the "Cash Payment");

(c)    the assumption by the Buyer of the outstanding obligations under the Prepetition First Lien Credit Agreement  (as defined in the Financing Orders);

(d)    the assumption by Buyer of the Assumed Liabilities (including all Determined Cure Costs with respect to any Assumed Contract)[6];

(e)    the Wind-Down Amount; provided that the Wind-Down Amount shall only become payable as a portion of the Purchase Price in the event that (i) Sellers have insufficient cash on hand at Closing to fund the Wind-Down Amount from such cash on hand and (ii) the Sellers have otherwise complied in all respects with the Financing Orders, in which case the Buyer shall only be required to fund the amount necessary to bring the Sellers' total cash on hand at Closing to equal to the amount of the Wind-Down Amount.

20.    The Debtors and their advisors developed the Bid Procedures to be flexible, transparent, and competitive in order to attain the highest or otherwise best price for the business under the circumstances.  Under the Bid Procedures, qualified parties may submit bids that will be analyzed by the Debtors and their professionals, which will culminate in the Debtors designating

---

[6]    For avoidance of doubt, any and all Liability of the Debtors to or any Claim held by Chongqing Huansong Industries (Group) Co., Ltd., Chongqing Huansong Science and Technology Industrial Co., Ltd., Vietnam New Century Industrial Company Limited, Hisun China, and Hisun Motors Corp. U.S.A. and each of their affiliates and subsidiaries are not being assumed by the Stalking Horse Bidder and are Excluded Liabilities.

the Stalking Horse Bidder or other Qualified Bidder as the Successful Bidder to purchase the Assets (or a portion thereof).  The Debtors believe that the Bid Procedures, in connection with the Stalking Horse Agreement, will provide the best opportunity to consummate a value-maximizing transaction that also secures employment for the Debtors' employees and preserves the going-concern value of the enterprise.

21.    Given the prepetition marketing process and the exigencies facing the Debtors, the Debtors believe that it is critical and warranted that the sale process be consummated on the timeline set forth in the Bid Procedures and this Motion to allow the Debtors to satisfy the Milestones.  The sale timeline was specifically designed to balance the goals of (a) continuing a marketing process, and (b) preserving and maximizing the value of the Assets, while also considering the reasonably anticipated market value of the Assets, and the value deteriorating cost of a protracted Chapter 11 sale process.

## RELIEF REQUESTED

22.    By this Motion, first, the Debtors seek entry of the Bid Procedures Order substantially in the form attached hereto as **Exhibit B**:

(a)    authorizing and approving the Bid Procedures attached to the Bid Procedures Order as **Exhibit 1** in connection with the sale (the "Sale") of the Assets;

(b)    scheduling an auction (the "Auction") and sale hearing (the "Sale Hearing") with respect to the Sale of the Assets;

(c)    approving the form and manner of notice of the Auction and the Sale Hearing, a copy of which is attached to the Bid Procedures Order as **Exhibit 2** (the "Sale Notice");

(d)    authorizing the Seller to enter into the Stalking Horse Agreement with the Stalking Horse Bidder, subject to ultimate Bankruptcy Court approval at the Sale Hearing, pursuant to which the Stalking Horse Bidder seeks to purchase the Assets pursuant to the consideration set forth therein;

9

(e) approving certain bid protections as set forth in the Stalking Horse Agreement, consisting of:

    (i) a break-up fee of $2,200,000 (the "Break-Up Fee"); and

    (iii) expense reimbursement of the Stalking Horse Bidder's actual, out-of-pocket legal fees and hard costs incurred after execution of Stalking Horse Agreement of up to $500,000 (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bid Protections");

(f) approving procedures for the assumption and assignment (as set forth in the Bid Procedures Order, the "Assumption Procedures") of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "Assumed Contracts"); and

(g) granting related relief.

23.    Second, the Debtors intend to seek entry of the Sale Order at the Sale Hearing in substantially the form attached hereto as **Exhibit C**, providing the following relief:

(a) if an Auction is conducted, authorizing and approving the sale of the Assets to the Qualified Bidder (as defined in the Bid Procedures) that the Debtors determine has made the highest and best Qualified Bid (as defined in the Bid Procedures) for some or all of the Assets (the "Successful Bidder") (or, if the Successful Bidder fails to consummate the Sale, to the Qualified Bidder with the next-highest or second-best Qualified Bid at the Auction for the Assets (the "Backup Bidder"))[7], free and clear of all liens, claims, encumbrances, and other interests other than the Permitted Liens and the Assumed Liabilities (as defined in the Stalking Horse Agreement);

(b) if an Auction is not conducted, authorizing and approving the Sale of the Assets to the Stalking Horse Bidder free and clear of liens, claims, encumbrances, and other interests, other than the Permitted Liens and the Assumed Liabilities;

(c) authorizing the assumption and assignment of the Assumed Contracts; and

(d) granting any related relief.

---

[7]    For avoidance of doubt, the Stalking Horse Bidder has not obligation to serve as a Backup Bidder.

## STALKING HORSE AGREEMENT

24.    The key terms of the proposed transaction can be found in the Stalking Horse Agreement attached hereto as **Exhibit A**.  The material terms of the Stalking Horse Agreement, including those provisions required to be highlighted pursuant to Local Rule 6004-1(b)(iv), are as follows:

| MATERIAL TERMS OF STALKING HORSE AGREEMENT[8] | |
|---|---|
| **Purchase Price / Consideration** | In consideration of the sale of the Assets to Purchaser, and upon the terms and subject to the conditions set forth herein, the Purchase Price consisting of: <br><br> a) a credit bid of the outstanding obligations under the DIP Credit Agreement pursuant to section 363(k) of the Bankruptcy Code in the amount of Ten Million Dollars ($10,000,000); <br> b) the payment of an amount in cash equal to $500,000 (the "Cash Payment"); <br> c) the assumption by the Buyer of the outstanding obligations under the Prepetition First Lien Credit Agreement (as defined in the Financing Orders); <br> d) the assumption by Buyer of the Assumed Liabilities (including all Determined Cure Costs with respect to any Assumed Contract); <br> e) the Wind-Down Amount; provided that the Wind-Down Amount shall only become payable as a portion of the Purchase Price in the event that **(i)** Sellers have insufficient cash on hand at Closing to fund the Wind-Down Amount from such cash on hand and (ii) the Sellers have otherwise complied in all respects with the Financing Orders, in which case the Buyer shall only be required to fund the amount necessary to bring the Sellers' total cash on hand at Closing to equal to the amount of the Wind-Down Amount. <br><br> See Stalking Horse Agreement § 2.5. |
| **Purchased Assets** | Each Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from each Seller, on the Closing Date, the Purchased Assets, including the following assets, properties, rights and interests of such Seller: <br><br> a) all Accounts Receivable of Sellers as of the Closing; |

---

[8]    All capitalized terms that are used in this summary, but not otherwise defined herein, shall have the meanings set forth in the Stalking Horse Agreement. To the extent there are any discrepancies between the Stalking Horse Agreement, this summary, and the description or summary of the Stalking Horse Agreement or its terms herein, the terms of the Stalking Horse Agreement shall prevail.

b)  all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing;

c)  without duplication of the above, all deposits (including, without limitation, deposits in transit, customer deposits (the "<u>Customer Deposits</u>") and security deposits for rent, electricity, telephone, utilities or otherwise, but excluding deposits that are not transferable to Buyer or deposits that constitute Excluded Utility Deposits) and other prepaid charges and expenses of Sellers that relate to the Purchased Assets;

d)  all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.6 of the Stalking Horse Agreement;

e)  all Intellectual Property owned or purported to be owned by Sellers, including the items set forth on <u>Schedule 3.7(a) of the Disclosure Schedule</u> (the "<u>Assigned Intellectual Property Assets</u>"), together with (i) any and all claims, demands, or causes of action, known or unknown, for past, present, or future infringement, misappropriation, or other violation of such Assigned Intellectual Property Assets, (ii) all rights to collect income, royalties, damages, proceeds and payments due or payable at or after the Closing with respect to such Assigned Intellectual Property Assets and (iii) tangible embodiments of any of such Assigned Intellectual Property Assets;

f)  all industrial and motor vehicles owned by Sellers;

g)  all items of machinery, equipment, supplies, furniture, fixtures, and leasehold improvements (to the extent of Sellers' rights to any leasehold improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing;

h)  all Records (<u>provided</u> that Sellers are entitled to retain copies of all Records and Buyer will make all such Records available to Sellers upon request and at no charge), but excluding (i) personnel files for Excluded Employees and (ii) any materials exclusively related to any Excluded Assets and copies of all information relating solely to the Taxes and Tax Returns of the Business or the Purchased Assets in the possession of Sellers;

i)  all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned or purported to be owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of the Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

j)  all rights of the Sellers under non-disclosure and confidentiality, non-compete, non-solicitation, and other restrictive covenant agreements with Current Employees, Former Employees, directors, consultants, independent contractors and agents of any of Sellers to the extent

relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

k) all of the Assumed Permits or all of the rights and benefits accruing under any Permits relating to the Business to the extent transferrable or assignable (and such non-transferability or non-assignability is not overridden or canceled by the Sale Order or other order of the Bankruptcy Court) and held by Sellers;

l) the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets of a type set forth in Section 2.1(b), Section 2.1(e), Section 2.1(f) or Section 2.1(g) of the Stalking Horse Agreement, occurring on or after the Closing or (ii) any Assumed Liabilities;

m) all other rights, demands, claims, credits, allowances, rebates or other refunds (excluding any vendor or supplier rebates) and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Business as of the Closing, including all deposits (including Customer Deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances and prepayments;

n) (i) except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent); and (ii) all Avoidance Actions (collectively, the "Acquired Claims");

o) all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided to Sellers or to the extent affecting any Purchased Assets and/or Assumed Liabilities;

p) subject to section 363(b)(1)(A) of the Bankruptcy Code, all of the Sellers' telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names related to the Business;

q) all Cash and Cash Equivalents of Sellers and all Accounts Receivable other than the Excluded Cash;

r) sponsorship of the Health and Welfare Plans (and all trusts, rights, insurance policies, administrative services contracts, and other assets

13

| | |
|---|---|
| | set aside and specifically reserved solely to fund benefits payable under the applicable Health and Welfare Plan and/or any other Contracts relating to the funding or administration of an applicable Health and Welfare Plan); and<br><br>s) all other assets that are related to or used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets).<br><br>See Stalking Horse Agreement § 2.1. |
| **Excluded Assets** | Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Seller is not selling or assigning, any of the following assets, properties and rights of Sellers (the "<u>Excluded Assets</u>"):<br><br>a. the Cash Payment funded by Buyer pursuant to <u>Section 2.5(b)</u> of the Stalking Horse Agreement, (ii) the Wind-Down Amount funded by Buyer pursuant to <u>Section 2.5(e)</u> of the Stalking Horse Agreement, (iii) the amounts necessary to fund the "Carve Out" as set forth in the DIP Credit Agreement and in the order of the Bankruptcy Court approving the DIP Credit Agreement and (iv) all cash deposits in cash collateral, indemnity or other accounts solely to the extent comprising professional fee retainers, professional fee escrows, and indemnity accounts funded in accordance with the Financing Orders, held by or on behalf of the Sellers' or the bankrupt estates' professionals ("<u>Bankruptcy Deposit Accounts</u>" and collectively with (i), (ii) and (iii), the "<u>Excluded Cash</u>");<br><br>b) all bank accounts of Sellers;<br><br>c) all deposits that are not transferable to Buyer, and deposits that constitute Excluded Utility Deposits;<br><br>d) all of Sellers' certificates of incorporation, and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a corporation or other entity;<br><br>e) all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller;<br><br>f) all Leases (and related Leased Real Property) and Contracts, in each case, other than the Assumed Contracts;<br><br>g) the Excluded Claims and all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar |

14

rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) related thereto;

h)  any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances and other than loans or notes from any Transferred Employees);

i)  any (1) Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (3)) to the extent that such portions relate to the Business or any Purchased Asset;

j)  all Permits other than the Assumed Permits;

k)  all directors' and officers' liability insurance policies, including any tail insurance policies, and all rights of any nature with respect to any such insurance policies, including any recoveries thereunder and any rights to assess claims seeking any such recoveries;

l)  assets, rights and claims arising from or with respect to Taxes of any Seller, including all rights arising from any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers, all deferred tax assets, Tax deposits, Tax prepayments and estimated Tax payments;

m)  any assets expressly excluded from Purchased Assets pursuant to Section 2.1 of the Stalking Horse Agreement;

n)  the assets listed on Schedule 2.2(n) of the Disclosure Schedule;

o)  all Insurance Policies and any prepaid premiums with respect thereto;

p)  other than the Health and Welfare Plans, all Employee Benefit Plans and trusts, rights and other assets set aside and specifically reserved solely to fund benefits payable under the applicable Employee Benefit Plan; and

q)  the rights of Sellers under this Agreement and the Related Agreements and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement.

See Stalking Horse Agreement § 2.2.

15

| | |
|---|---|
| **Assumed Liabilities** | On the terms and subject to the conditions set forth in the Stalking Horse Purchase Agreement and the Sale Order, on the Closing Date, the Purchaser shall assume only the following Assumed Liabilities:<br><br>a) all Cure Amounts under any and all Assumed Contracts, including any Determined Cure Costs;<br><br>b) all outstanding obligations under the Prepetition First Lien Credit Agreement (as defined in the Financing Orders);<br><br>c) Liabilities under the Assumed Contracts and the Assumed Permits from and after the Closing Date as well as any Liabilities arising out of the conduct of the Business or the ownership of the Purchased Assets, in each case, by Buyer first arising from and after the Closing Date;<br><br>d) all current Liabilities, trade payables and accrued expenses of Sellers (including, for the avoidance of doubt, (i) invoiced accounts payable, (ii) accrued but un-invoiced accounts payable and (iii) any open purchase orders), in existence as of the Closing Date, as well as to the extent arising and related to the period following Closing Date;<br><br>e) all accrued payroll, accrued and unused vacation, and accrued payroll Taxes with respect to Transferred Employees as of the Closing Date (and not paid by Sellers prior thereto);<br><br>f) to the extent required by applicable law, Liabilities relating to continuation of health care coverage, to the extent required by COBRA, to Current Employees and Former Employees of the Sellers (and their qualified beneficiaries) who left employment or otherwise experienced a COBRA qualifying event on or prior to the Closing Date;<br><br>g) allowed 503(b)(9) Claims;<br><br>h) all Liabilities associated with Customer Deposits as of the Closing Date;<br><br>i) allowed mechanic's lien claims;<br><br>j) Liabilities expressly assumed by Buyer under this Agreement;<br><br>k) without duplication of the above, other Liabilities with respect to the Transferred Employees, including for (i) accrued vacation pay, sick pay, holiday pay, paid time off, (ii) accrued wages, salary, bonuses, severance, deferred compensation and other payments, (iii) garnishments, and (iv) workers' compensation (but excluding any Liabilities or obligations with respect to Employee Benefit Plans that are not assumed by Buyer);<br><br>l) all Taxes incurred for the period from and after the Petition Date through the Closing Date to the extent such Taxes are Administrative Claims; |

10339360.v5

|  | m) sponsorship of, and obligations under, the Health and Welfare Plans; provided, that Sellers pay all Liabilities and obligations described in this item as and when due through the Closing Date consistent with Sellers' past practices;<br><br>n) Priority Claims incurred prior to the Closing Date to the extent allowed by order of the Bankruptcy Court or agreed to (in writing) by Buyer;<br><br>o) claims for stub-rent pursuant to section 503(b) of the Bankruptcy Code (it being understood that Buyer shall pay such amounts no later than the later of (i) 10 days following Closing and (ii) the last day of the month in which the Closing occurs);<br><br>p) Liabilities for common area maintenance ("CAM"), CAM reconciliation and percentage rent under any Leases that are Assumed Contracts;<br><br>q) all Liabilities under or pursuant to all warranties, representations, guarantees and programs provided or offered by Sellers to customers in connection with the products sold or services provided by Sellers with respect to the Business;<br><br>r) all Liabilities and obligations for sales, use, withholding, trust fund or other employment related taxes for which officers and directors may have personal liability for non-payment under applicable Law;<br><br>s) all Transfer Taxes in accordance with Section 6.6 of the Stalking Horse Agreement; and<br><br>t) any and all personal property Taxes with respect to the Purchased Asset.<br><br>See Stalking Horse Agreement § 2.3. |
|---|---|
| **Agreements with Management (Local Rule 6004-1(b)(iv)(B))** | There are no management agreements between the Stalking Horse Bidder and employees of the Debtors, provided that existing management agreements with the Debtors may be assumed pursuant to the Stalking Horse Agreement. |
| **Private Sale/No Competitive Bidding (Local Rule 6004-1(b)(iv)(D))** | Not applicable as to the Stalking Horse Bidder. |
| **Closing and Other Deadlines (Local Rule 6004-1(b)(iv)(E))** | The Stalking Horse Agreement sets forth the following deadlines for closing the Sale:<br><br>a) within two (2) Business Days after the Effective Date, commence the Chapter 11 Cases; |

17

10339360.v5

|  | |
|---|---|
| | b) within two (2) Business Days after the Petition Date, the Sellers shall have filed the motion seeking approval of the Bid Procedures, including this Agreement and entry of the Bid Procedures Order, and the Bankruptcy Court shall have entered the Bid Procedures Order within thirty (30) calendar days after the Petition Date;<br><br>c) the final date for submitting a qualified bid, as set forth in the approved Bid Procedures, shall be no later than fifty (50) days following the Petition Date (the "<u>Bid Deadline</u>");<br><br>d) so long as at least one qualified bid has been received (other than from Buyer) the Auction shall be a date within two (2) Business Days after the Bid Deadline; and<br><br>e) within two (2) days after consummation of the Auction (or if the Auction is not necessary, within five (5) days after the Bid Deadline), but subject to availability of the Bankruptcy Court, the Sale Hearing shall have occurred and the Bankruptcy Court shall have approved the transaction contemplated by this Agreement; and<br><br>f) within sixty (60) calendar days after the Petition Date, subject to the availability of the Bankruptcy Court, the hearing to consider the approval of the sale transaction shall have occurred and the Bankruptcy Court shall have entered the Sale Order (the "<u>Sale Deadline</u>").<br><br><u>See</u> Stalking Horse Agreement § 9.3. |
| **Good Faith Deposit (Local Rule 6004-1(b)(iv)(F))** | Not applicable as to the Stalking Horse Bidder. |
| **Interim Arrangements with Proposed Buyer (Local Rule 6004-1(b)(iv)(G))** | The Stalking Horse Agreement sets forth customary provisions regarding the Debtors' conduct of its business pending the Closing Date.<br><br><u>See</u> Stalking Horse Agreement § 5.4. |
| **Tax Exemption (Local Rule 6004-1(b)(iv)(I))** | Applicable law shall apply. |
| **Record Retention (Local Rule 6004-1(b)(iv)(J))** | From and after the Closing, Buyer shall preserve all Records until the latest of (i) five (5) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases, or (iv) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes.<br><br><u>See</u> Stalking Horse Agreement § 6.3. |
| **Sale of Avoidance Actions (Local Rule 6004-1(b)(iv)(K)** | The Assets include Avoidance Actions.<br><br><u>See</u> Stalking Horse Agreement § 2.1(n). |

| | |
|---|---|
| **Requested Findings as to Successor Liability (Local Rule 6004-1(b)(iv)(L))** | The proposed Sale Order shall include a finding that the Sale of the Assets shall not subject Buyer or its designee(s) to any liability whatsoever (including any successor liability). |
| **Sale Free and Clear of Unexpired Leases (Local Rule 6004-1(b)(iv)(M))** | The Debtors are seeking to sell the Assets free and clear of all Claims, and other interests, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code, except as to the Permitted Liens and the Assumed Liabilities. |
| **Credit Bid (Local Rule 6004-1(b)(iv)(N))** | Included in the Purchase Price is a credit bid pursuant to section 363(k) of the Bankruptcy Code of all outstanding obligations under the DIP Facility in an amount of $10 million.<br><br>See Stalking Horse Agreement § 2.5. |
| **Relief from Bankruptcy Rule 6004(h) (Local Rule 6004-1(b)(iv)(O))** | As of the Closing Date, the Sale Order: (i) shall have been entered by the Bankruptcy Court, and (ii) shall not have been appealed or be subject to any pending appeal, and no stay with respect thereto (including any stay under Bankruptcy Rule 6004(h) or 6006(d)) shall be in effect.<br><br>See Stalking Horse Agreement § 2.8(b)(vii). |

## **THE PROPOSED SALE**

25.     The Debtors believe that a prompt sale of the Assets represents the best option available under the circumstances, including in light of the Stalking Horse Bidder's available credit bid rights from the DIP Obligations.  Moreover, it is critical for the Debtors to execute on any sale transaction as expeditiously as possible, as the Debtors are utilizing the Stalking Horse Bidder's debtor-in-possession financing to explore and facilitate this process.  Time, therefore, is of the essence.

26.     By this Motion, the Debtors respectfully request that this Court approve the following general timeline, with the related request that the Bankruptcy Court enter an order granting this Motion on shortened notice.

> (a)     ***Bid Deadline***: Bids for the Assets, including a marked-up form of the Stalking Horse Agreement, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bid Procedures) must be received by no later than **March 7, 2023 at 4:00 p.m. (prevailing**

19

**Eastern Time)** or such later date as may be agreed to by the Debtors (the "Bid Deadline").

(b)  ***Sale Objection Deadline***: Objections to the Sale shall be filed and served no later than **March 10, 2023 at 4:00 p.m. (prevailing Eastern Time)**.[9]

(c)  ***Contract Cure Objection Deadline***: Objections to the potential assumption and assignment of any Contract, including proposed cure amounts, shall be filed and served no later than **March 10, 2023 at 4:00 p.m. (prevailing Eastern Time)** (the "Cure or Assignment Objection").

(d)  ***Auction***: The Auction, if necessary, shall be held **in person** **March 9, 2023 at 10:00 a.m. (prevailing Eastern Time)**, or such other location as identified by the Debtors after notice to all Qualified Bidders.

(e)  ***Residual Objections***.  Residual Objections to the Sale shall be filed and served no later than **March 13, 2023 at 4:00 p.m. (prevailing Eastern Time)**.

(f)  ***Sale Hearing***: Subject to this Court's availability and schedule, the Sale Hearing shall commence on or before **March 17, 2023 2022 at __:__ _.m.**

27.    The Debtors believe that this timeline provides a reasonable prospect of receiving the highest and best offer under the circumstances without unduly prejudicing their estates, while ensuring that the Sale can close no later than March 31, 2023, as is contemplated under the Stalking Horse Agreement.

28.    Given the Debtors' prepetition marketing efforts and continued marketing process post-Petition Date pursuant to the Bid Procedures, the Debtors believe that the proposed timeline is sufficient to complete a fair, robust, and open sale process that will maximize the value received for the Assets.  To further ensure that the Debtors' proposed Auction and Sale process maximizes value for the benefit of the Debtors' estates, and in accordance with the Stalking Horse Agreement, the Debtors and their professionals will use the time following the Petition Date to continue to

---

[9]    This objection deadline applies to all objections to the Sale, with the exception of objections solely related to the identity of the Successful Bidder, adequate assurance of future performance by the Successful Bidder, and any changes to the form purchase agreement (the "Residual Objections").

actively market the Assets in an attempt to solicit the highest or best bids available.  The Debtors believe the relief requested by this Motion is in the best interests of creditors, other stakeholders, and all other parties in interest, and should be approved.

29.     As part of its bid, the Stalking Horse Bidder negotiated for the timeline requested herein.  The Debtors believe that the proposed sale process will minimize any further deterioration of the Assets and is in the best interests of all stakeholders.  Thus, the Debtors have determined that pursuing the potential Sale in the manner and within the time periods prescribed in the Bid Procedures is in the best interest of the estates and will provide interested parties with sufficient opportunity to participate under the circumstances.

## THE BID PROCEDURES

A.     **The Bid Procedures**

30.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bid Procedures, attached as **Exhibit 1** to the Bid Procedures Order.  The Bid Procedures were developed to permit an efficient (but sufficient) marketing and sale process, to promote participation and active bidding, and to ensure that the highest or best offer is received for the Assets.  As such, the Debtors believe the timeline for consummating the sale process established pursuant to the Bid Procedures is in the best interest of their estates and all parties in interest.

31.     The Bid Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining qualifying bids, and the criteria for selecting a successful bidder.

32.    The following summary describes the salient points of the Bid Procedures and

discloses certain information required pursuant to Local Rule 6004-1:[10]

| | |
|---|---|
| **Provisions Governing Qualifications of Bidders (Local Bankr. R. 6004-1(c)(i)(A))** | The Stalking Horse Bidder shall be deemed to be a Qualified Bidder and the Stalking Horse Agreement shall be deemed to be a Qualified Bid (the "Stalking Horse Bid"), without the need to comply with any of the requirements set forth below.<br><br>To receive due diligence information, including full access to the Debtors' electronic data room and to additional non-public information regarding the Debtors, an Interested Party must deliver to each of: (i) proposed counsel to the Debtors, Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic Pacitti (dpacitti@klehr.com) and Michael Yurkewicz (myurkewicz@klehr.com); and (ii) proposed restructuring advisor and investment banker to the Debtors, Portage Point, 1330 Avenue of the Americas, 22nd Floor, New York, New York 10019 Attn: Steven Bremer (sbremer@pppllc.com) and Geoffrey Schmitz (gschmitz@pppllc.com), the following documents (the "Preliminary Bid Documents"):<br><br>(i)    an executed Confidentiality Agreement on terms reasonably acceptable to the Debtors, to the extent not already executed;<br><br>(ii)    identification of the Interested Party and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Transaction(s); and<br><br>(iii)    a statement and other factual support, including evidence of sufficient financial capacity to close a proposed Transaction, demonstrating to the Debtors' satisfaction in the exercise of their reasonable business judgment that the Interested Party has a *bona fide* interest in purchasing some or all of the Purchased Assets, provided that such information shall not be required to the extent the Interested Party's interest and wherewithal are known to the Debtors' investment banker.<br><br>Only those Interested Parties who, in the Debtors' determination, have submitted acceptable Preliminary Bid Documents (each, a "Potential Bidder") may submit bids. Each of the Stalking Horse Bidder and First Lien Agent (even if the First Lien Agent has not submitted a formal bid) will at all times be deemed to be a Potential Bidder. For the avoidance of doubt, these participation requirements do not prohibit Portage Point from distributing teaser and other promotional materials to potentially interested parties advising them of the |

---

[10]    This summary of the Bid Procedures is qualified in its entirety by the Bid Procedures attached as **Exhibit 1** to the Bid Procedures Order. All capitalized terms that are used in this summary, but not otherwise defined herein, shall have the meanings set forth in the Bid Procedures. To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

|  | opportunity to acquire some or all of the Purchased Assets, from engaging in discussions with such parties about the opportunity, or from providing non-confidential documents and information to such parties.<br><br>Only Potential Bidders will be eligible to receive due diligence information concerning the Debtors and their assets.  The Debtors will provide to each Potential Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request, which information will be commensurate with the due diligence information given to the Stalking Horse Bidder, solely in its capacity as a Potential Bidder, prior to and after entry into the Stalking Horse Purchase Agreement; provided that if any Potential Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors reserve the right to withhold, redact, code, or delay providing any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such Potential Bidder at such time.  The due diligence period will end on the Bid Deadline and, thereafter, the Debtors will have no obligation to furnish any diligence information.<br><br>Each Potential Bidder will comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Potential Bidder and its contemplated transaction.  If the Debtors, after consultation with the Lender Parties, determine at any time in their reasonable discretion that a Potential Bidder is not reasonably likely to be a Qualified Bidder (as defined below), then the Debtors' obligation to provide due diligence information to such Potential Bidder will terminate and all information provided by the Debtors prior to such time shall be returned to the Debtors in accordance with the terms of the applicable Confidentiality Agreement. |
|---|---|
| **Good Faith Deposit (Local Rule 6004-1(b)(iv)(F))** | The Stalking Horse Bidder shall be deemed to be a Qualified Bidder at all times.  Likewise, the Stalking Horse Agreement shall at all times be deemed a Qualified Bid.  The Stalking Horse Bidder is not required to provide a deposit under the Stalking Horse Agreement.<br><br>Each Qualified Bid, other than the Stalking Horse Bid and any credit bid by the First Lien Agent (as defined in the DIP Order), must be accompanied by a cash deposit in the amount of $2,000,000 to be held in a non-interest-bearing escrow account to be identified and established by the Debtors (the "Deposit"); provided that the Stalking Horse Bidder will not be required to provide a Deposit with respect to the Stalking Horse Purchase Agreement. |
| **Other Highlighted Terms Under Del. Bankr. L.R. 6004-1(b)(iv)** | Private Sale/No Competitive Bidding:  The Sale is being conducted pursuant to the competitive bidding process detailed in the Motion.<br><br>Credit Bid: The Stalking Horse Bidder shall automatically be deemed a Qualified Bidder and shall have the right to credit bid on a dollar-for-dollar basis all or a portion of the DIP Facility Obligations pursuant to section 363(k) of the Bankruptcy Code. |

| | |
|---|---|
| | Relief from Bankruptcy Rule 6004(h):  As noted in this Motion, the Debtors are requesting relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d). |
| **Provisions Governing Qualified Bids (Local Bankr. R. 6004-1(c)(i)(A), (B))** | Each Potential Bidder must submit a bid that adheres to the following requirements (such a qualifying bid, a "Qualified Bid," and any person submitting such a bid, a "Qualified Bidder"): |

(i)    Stalking Horse Bidder.  The Stalking Horse Bidder shall be deemed to be a Qualified Bidder and the Stalking Horse Agreement shall be deemed to be a Qualified Bid, without the need to comply with any of the requirements as set forth below.

(ii)    Submission of Qualified Bids.  All Qualified Bids must be submitted by email to the Debtors' restructuring advisor and investment banker, Portage Point Partners, LLP, 1330 Avenue of the Americas, 22nd Floor, Attn: Steven Bremer (sbremer@pppllc.com) and Geoffrey Schmitz (gschmitz@pppllc.com), with a copy to   the Debtors' counsel, Klehr Harrison Havey Branzburg, LLP, Attn: Domenic Pacitti (email: dpacitti@klehr.com) and Michael Yurkewicz (email: murkewicz@klehr.com) not later than **4:00 p.m. (prevailing Eastern Time) on March 7, 2023**  (the "Bid Deadline").

(iii)    Form and Contents.  All Qualified Bids shall be in the form of an offer letter from a person or persons that the Debtors deem financially able to consummate the purchase of the Assets, which letter states and includes:

(A)    Purpose.  The Bid must clearly identify the following:  (i) the particular Purchased Assets, or the portion thereof identified with reasonable specificity, to be acquired;  and (ii) the liabilities and obligations to be assumed, including any debt to be assumed.

(B)    Total Consideration.  Each Bid must clearly identify the form and amount of the total consideration to be provided to the Debtors in cash and non-cash components to be paid, including assumed liabilities (the "Bid Value").

(C)    Deposit.  Each Bid (other than the Stalking Horse Bid and any credit bid by the Prepetition Secured Parties (as defined in the DIP Order)) must be accompanied by a cash deposit of $2,000,000 to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit"); *provided* that the Stalking Horse Bidder will not be required to provide a Deposit with respect to the Stalking Horse Purchase Agreement.

(D)    Minimum Bid.  The Bid Value (the "Minimum Bid") proposed by each Bid (or sum of Bids for different assets) must be equal to,  or exceed,  the sum of  (i) $500,00; plus  (ii) cash

24

consideration in an amount sufficient to provide for the repayment in full of (x) all outstanding obligations under the Prepetition First Lien Credit Facility (as defined in the Financing Order) and (y) all amounts outstanding under the DIP Agreement; plus (iii) cash sufficient to fund the Wind-Down Amount; plus (iv) cash or assumption of those Assumed Liabilities in the Stalking Horse Purchase Agreement that the Stalking Horse Bidder has agreed to pay or assume (including all Cure Costs with respect to any Assigned Contract; plus (v) cash consideration in an amount sufficient to provide for the payment of the Bid Protections to the Stalking Horse Bidder; and plus (vi) the minimum overbid amount of 500,00; *provided*, *however*, that in determining the Bid Value, the Debtors will not be limited to evaluating the dollar amount of a Bid, but may also consider factors including, the liabilities and other obligations to be performed or assumed by the Potential Bidder, the additional administrative and prepetition claims likely to be created by such Bid in relation to other Bids, the proposed revisions to the Stalking Horse Purchase Agreement, and other factors affecting the speed, certainty and value of the proposed transactions. For the avoidance of doubt, each Bid must be on terms no less favorable than the terms of the Stalking Horse Purchase Agreement.

(E)  Marked Agreement.  Each Bid must include a signed asset purchase agreement, together with all exhibits and schedules thereto, the form of which will be provided to any Potential Bidder before the Bid Deadline, along with a redline version of such agreement relative to the Stalking Horse Purchase Agreement, pursuant to which the Qualified Bidder proposes to effectuate the Transaction (collectively, the "Transaction Documents").

(F)  Tax Structure; Structure.   The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if the Debtors, under the Bid, will incur any incremental tax liabilities. The Bid must also identify the structure proposed for undertaking the Transaction, including the specific assets of the Debtors being acquired and liabilities being assumed, the proposed steps to accomplish such acquisition, and any financial, legal, or tax considerations upon which the Bid's proposed structure relies.

(G)  Timeline to Close.  The Bid must provide a commitment to close no later than the deadline for the Stalking Horse Bidder to close in the Stalking Horse Purchase Agreement.

(H)  Sources of Financing; Adequate Assurance.  To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the proposed Transaction(s) set forth in its Bid with cash on hand, each Bid must contain written

25

evidence of a commitment for financing or other evidence of the ability to consummate the Transaction at the purchase price (including sufficient financial or other information to establish adequate assurance of future performance pursuant to section 365(f)(2) of the Bankruptcy Code and, if applicable, section 365(b)(3) of the Bankruptcy Code to the non-Debtor counterparties to any executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Potential Bidder in connection with the proposed transaction) satisfactory to the Debtors in their reasonable discretion, after consultation with the Lender Parties, with appropriate contact information for such financing sources.

(I)     <u>No Financing Approval or Diligence Outs</u>.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions.

(J)     <u>Authorization</u>.    Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the Transactions contemplated in such Bid.

(K)     <u>Disclaimer of Fees</u>.  Each Bid must disclaim any right to receive a fee analogous to any break-up fee, termination fee, expense reimbursement or similar type of payment.

(L)     <u>Identity</u>.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Qualified Bidder, including if such Qualified Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors' advisors should contact regarding such Bid.  Nothing herein shall preclude multiple Qualified Bidders from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein.

(M)     <u>Consent to Jurisdiction</u>.  The Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these

26

Bidding Procedures, and the Transaction documents and the closing, as applicable.

(N) <u>No Collusion</u>.  The Bidder must acknowledge in writing (i) that it has not engaged in any collusion with respect to any Bids or the Transaction, specifying that it did not agree with any Qualified Bidders, Potential Bidders, or other interested third parties to control price or exert undue influence process; and (ii) agree not to engage in any such collusion or undue influence with respect to any Bids, the Auction, the Transaction, or the sale process.

(O) <u>Good Faith Offer</u>.  The Bid must constitute a good faith, *bona fide* offer to effectuate the Transaction.

(P) <u>As-Is, Where-Is</u>.    Each Bid must include a written acknowledgement and representation that the Potential Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer; (2) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its Bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Purchased Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid Documents.

(iv) <u>Designation of Qualified Bidders</u>.

(A) A qualified bidder ("<u>Qualified Bidder</u>") is a Potential Bidder that, in the Debtors' reasonable determination after consultation with the Lender Parties, (i) has timely submitted a Bid that satisfies each of the requirements listed above in the section entitled "Bid Requirements" and (ii) is able to consummate the proposed transaction within the required timeframe if selected as the Successful Bidder (such Bid submitted by a Qualified Bidder, a "<u>Qualified Bid</u>"); provided that the Debtors reserve the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid.

(B) Within two (2) Business Days after a Potential Bidder delivers all of the documents described above, the Debtors will determine in their reasonable discretion, and in consultation with the Lender Parties, whether such Potential Bidder is a Qualified Bidder, and notify the Potential Bidder of such determination.

| | |
|---|---|
| | (C)   For the avoidance of doubt, (i) the First Lien Agent shall be deemed a Qualified Bidder; provided that the Qualified Bid of the First Lien Agent must meet the requisite Minimum Bid requirements (unless the Stalking Horse Purchase Agreement has been terminated); provided, further, that the First Lien Agent shall not be required to serve as a Back-Up Bidder (defined below) except to the extent provided herein, (ii) the Stalking Horse Bidder is a Qualified Bidder, (iii) the Stalking Horse Purchase Agreement is a Qualified Bid; provided that the Stalking Horse Bidder shall not be required to serve as a Back-Up Bidder (defined below), and (iv) each of the Stalking Horse Bidder and the First Lien Agent is authorized to submit any Overbids (as defined below) during the Auction, in each instance without further qualification required of the Stalking Horse Bidder or First Lien Agent, as applicable. |
| **Stalking Horse Bid Protections (Local Rule 6004-1(c)(i)(C))** | Break-Up Fee.  As set forth in the Stalking Horse Agreement and the Bid Procedures Order, the Debtors have agreed to pay, subject to this Court's approval, a break-up fee of $2,200,000 payable to the Stalking Horse Bidder in the event that the Stalking Horse Bidder is not selected as the Successful Bidder in accordance with the terms of the Bid Procedures (the "Break-Up Fee") and this Court authorizes the Debtors to enter into a purchase agreement documenting the same with a different Qualified Bidder.<br><br>Fees and Expense Reimbursement. As set forth in the Stalking Horse Agreement and the Bid Procedures Order, the Debtors have agreed to pay, subject to this Court's approval, expense reimbursement to the Stalking Horse Bidder if the Stalking Horse Bidder is not the Successful Bidder of up to $500,000, which amount is limited to legal fees and hard costs actually incurred by the Stalking Horse Bidder related to the Stalking Horse Agreement or the Sale (the "Expense Reimbursement"). |
| **Bidding Increments (Local Rule 6004-1(c)(i)(C)(3))** | Any Minimum Overbid after the Baseline Bid (as defined in the Bid Procedures) shall be made in increments of at least $250,000 (the "Minimum Overbid Increment").   Additional consideration in excess of the amount set forth in the Baseline Bid may include cash and/or non-cash consideration; provided, however, that the value for such non-cash consideration shall be determined by the Debtors in their reasonable business judgment. |
| **Modifications of Bidding and Auction Procedures (Local Rule 6004-1(c)(i)(D))** | The Debtors reserve the rights to modify the Bid Procedures or the requirements for determining a Qualified Bid, subject to the prior consent of the Stalking Horse Bidder, the DIP Lender, and the Prepetition Secured Parties, to the extent that the Debtors determine that such modification is mandated by acquittal of their fiduciary duties, provided that the Stalking Horse Bidder reserves all rights to oppose any such modification.  Notwithstanding the foregoing and subject in all respects to the Stalking Horse Agreement, the Debtors may not impair or modify the Stalking Horse Bidder's rights and obligations under the Stalking Horse Agreement or the Stalking Horse Bidder's right to credit bid at the Auction, including, without limitation any modification of the Bid Procedures that alter the Stalking Horse Bid's status as a Qualified Bid or the Stalking Horse Bidder's status as a Qualified Bidder. |

| | |
|---|---|
| **Closing with Alternative Backup Bidders (Local Rule 6004-1(c)(i)(E))** | The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in the exercise of their reasonable business judgment, in consultation with the Lender Parties, to be the highest or otherwise best bid submitted by a Qualified Bidder during the Auction for the Purchased Assets (the "Successful Bid") and the next highest or otherwise best bid after the Successful Bid (the "Back-Up Bid"), at which point the Auction will be closed; provided that the Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then prevailing highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid. The Qualified Bidder that submits the Successful Bid will be deemed the "Successful Bidder." The Qualified Bidder that submits the Back-Up Bid, if any, will be deemed the "Back-Up Bidder"; provided, however, that if the Debtors indicate that they have identified a Bid of the Stalking Horse Bidder as the next highest or otherwise best bid after the Successful Bid, and a Bid of another party (other than the Successful Bid) remains open, either the Stalking Horse Bidder or the Prepetition Secured Parties may, at their option, decline to serve as the Back-Up Bidder in favor of the next highest or otherwise best bid if one exists. |
| **Provisions Governing the Auction (Local Rule 6004-1(c)(ii))** | (i)      Time and Place. The Auction, if necessary, will commence on **March 9, 2023 at 10:00 a.m. (prevailing Eastern Time)** at the Wilmington offices of Klehr Harrison Harvey Branzburg LLP, or on such other date and/or at such other location as determined by the Debtors and the Stalking Horse Bidder (provided that the DIP Lender, as defined in the Stalking Horse Purchase Agreement, the First Lien Agent, and the Stalking Horse Bidder's rights under the Financing Orders and the Stalking Horse Purchase Agreement shall remain unaffected. <br><br> (ii)      Baseline Bid. No later than one (1) day prior to the commencement of the Auction, the Debtors will (i) notify: (a) all Qualified Bidders, (b) counsel to the First Lien Agent, (c) the Lender Parties, (d) the Office of the U.S. Trustee for the District of Delaware, and (e) counsel to any statutory committee appointed in these chapter 11 cases, in writing of the highest or otherwise best Qualified Bid, as determined in the Debtors' business judgment, in consultation with the Lender Parties (the "Baseline Bid") and (ii) provide copies of the documents supporting the Baseline Bid to all Qualified Bidders. The determination of which Qualified Bid constitutes the Baseline Bid, and which Qualified Bid constitutes the highest or otherwise best bid such that it is the Successful Bid, shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the type and amount of assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Baseline Bid; (e) the projected percentage recovery to general unsecured creditors pursuant to such |

Qualified Bid, (f) whether administrative, priority, and secured claims will be paid in full; (g) the tax consequences of such Qualified Bid; (f) the assumption of obligations, including contracts and leases; (h) the cure amounts to be paid; and (i) the impact on employees, including the number of employees proposed to be transferred and employee-related obligations to be assumed, including the assumption of collective bargaining agreements (collectively, the "<u>Bid Assessment Criteria</u>").

(iii)    <u>Auction Procedures</u>.  The Auction shall be conducted in a timely fashion according to the following procedures:

(A)    The Debtors and their professional advisors shall direct, preside over, and transcribe the Auction.

(B)    At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid.  All incremental Bids made thereafter shall be Overbids and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid.

(C)    Only a Qualified Bidder that has submitted a Qualified Bid will be eligible to participate at the Auction.

(D)    Only the authorized representatives of each of the Qualified Bidders (including the Stalking Horse Bidder), the Debtors, and the Lender Parties (including their counsel) will be permitted to attend the Auction.  In addition, pursuant to Local Rule 6004-1, all creditors of the Debtors may attend the Auction, *provided* that they send an email to the Debtors' Representatives indicating that they intend to attend the Auction no less than two (2) Business Days prior to the Auction.

(iv)    <u>Reservation of Rights</u>.  The Debtors reserve the right to make one or more adjournments in the Auction to, among other things (i) facilitate private discussions with individual Qualified Bidders and negotiate the terms of their Overbids, (ii) allow individual Qualified Bidders to consider how they wish to proceed, and (iii) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors may require in their reasonable discretion to determine that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.  Notwithstanding the foregoing and subject in all respects to the Stalking Horse Agreement, the Debtors may not impair or modify the Stalking Horse Bidder's rights and obligations under the Stalking Horse

|  | Agreement or the Stalking Horse Bidder's right to credit bid at the Auction, including, without limitation any modification of the Bid Procedures that alter the Stalking Horse Bid's status as a Qualified Bid or the Stalking Horse Bidder's status as a Qualified Bidder. |
|--|--|
| (v) | <u>Closing the Auction</u>.  The Auction shall continue until there is only one Qualified Bid that the Debtors determine, after taking into account the Bid Assessment Criteria, to be the highest or best Qualified Bid for the Assets.  Such Qualified Bid shall be declared the Successful Bid, and such Qualified Bidder, the Successful Bidder; the next highest and best Qualified Bid shall be declared the Back-Up Bidder (subject to the Stalking Horse Bidder's right not to serve as the Back-Up Bidder); and the Auction shall be closed.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid. |
| (vi) | <u>No Collusion; Good-Faith Bona Fide Offer</u>.  Each Qualified Bidder participating at the Auction shall be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding, (ii) its Qualified Bid is a good-faith bona fide offer, and (iii) it intends to consummate the proposed Transaction if selected as the Successful Bidder or the Back-Up Bidder. |

33.     The Bid Procedures recognize the Debtors' fiduciary obligations to maximize the value of the assets and, as such, do not impair the Debtors' ability to consider all qualified bid proposals.  Additionally, as noted above, the Bid Procedures preserve the Debtors' rights to modify the Bid Procedures pursuant to the terms therein as necessary or appropriate to maximize value of the Debtors' estates.

## B.      The Auction and Sale

34.     If one or more Qualified Bid is received by the Bid Deadline (other than the Stalking Horse Bid), the Debtors shall conduct an Auction to determine the highest and best Qualified Bid.  If no Qualified Bid (other than the Stalking Horse Bid) is received by the Bid Deadline, the Debtors shall deem the Stalking Horse Bid to be the Successful Bid without conducting the Auction.  The Debtors seek authority from this Court to schedule the Auction on a date as further described in the Bid Procedures.

**C.      Form and Manner of Sale Notice**

35.      On or within two (2) business days after entry of the Bid Procedures Order, the Debtors shall cause the Sale Notice to be served on: (a) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Richard Schepacarter; (b) the holders of the thirty (30) largest, non-insider unsecured claims against the Debtors; (c) counsel to the Stalking Horse Bidder and DIP Lender; (d) counsel to the Prepetition Secured Parties; (e) counsel for the Committee, if any; (f) any other parties with known secured claims against the Debtors or their counsel, if known; (g) all parties that have executed a Confidentiality Agreement; (h) the United States Attorney's Offices for the District of Delaware and the District of Arizona; (i) the Internal Revenue Service; (h) all state and local taxing authorities with an interest in the Assets; (j) the Attorneys General for the State of Delaware and the State of Arizona; (k) all other governmental agencies with an interest in the Sale and transactions proposed thereunder; (l) all other parties known or reasonably believed to have asserted an interest in the Assets; (m) the counterparties to the Assumed Contracts (the "Assumed Contract Counterparties"); (n) the Debtors' insurance carriers; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.

**D.      Summary of the Assumption Procedures**

36.      The Debtors are seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Assumed Contracts in connection with the Sale. Pursuant to the Bid Procedures Order, notice of the proposed assumption and assignment of the Assumed Contracts to the Successful Bidder, the proposed cure amounts related thereto, and the right, procedures, and deadlines for objecting thereto, shall be provided in separate notices, attached to the Bid Procedures Order as **Exhibit 3** (the "Cure and Possible Assumption and Assignment Notice") to be sent to the applicable Assumed Contract Counterparties.

32

37.     Because the Bid Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein.  Generally, however, the Assumption Procedures: (i) outline the process by which the Debtors shall serve notice to all Assumed Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right, and the procedures, to object thereto, and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Assumed Contracts to the extent necessary.

## BASIS FOR RELIEF

**A.     The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Estates**

   **1.     The Proposed Notice of the Bid Procedures and the Sale Process Is Appropriate**

38.     The Debtors seek authority to sell the Assets through an Auction and related sale process.  The Debtors and their advisors have conducted and will conduct an extensive marketing process.  The Debtors have a list of "Contact Parties" who will receive a copy of the "Information Package."  The list of Contact Parties shall encompass those parties who: (i) have executed Confidentiality Agreements with the Debtors, and (ii) whom the Debtors believe may be interested in pursuing a Sale and whom the Debtors reasonably believe may have the financial resources to consummate such a transaction.  The Bid Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Assets, thus maximizing the value of the Debtors' estates for the benefit of their creditors and other stakeholders.

39.     Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections.  The Debtors respectfully submit that the Sale Notice is reasonably calculated to provide all interested parties

with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one will be held), (ii) the Bid Procedures, (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) a reasonably specific identification of the Assets, (v) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests other than the Assumed Liabilities (as such terms are defined in the Stalking Horse Agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds, and (vi) notice of the proposed assumption and assignment of the Assumed Contracts to the Successful Bidder.

40.     The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, and the Cure and Possible Assumption and Assignment Notice, as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtors further submit the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing process, while minimizing costs to the estates. Accordingly, the Debtors respectfully request the Court find the proposed notice procedures set forth in this Motion are sufficient, and no other or further notice of the Bid Procedures, Auction, Sale, or Sale Hearing is required.

### 2.     The Bid Procedures Are Appropriate and Will Maximize Value

41.     Bid procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets.  See In re Edwards, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  Courts have made clear that a debtor's business judgment is entitled to deference with respect to the procedures to be used in selling an

34

estate's assets.  See, e.g., In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'") (internal citations omitted)); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (quoting Schipper); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (same); see also In re Integrated Resources, Inc., 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (bid procedures that have been negotiated by a trustee are to be reviewed in accordance with the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

42.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004); Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003); see also In re Food Barn Stores, Inc., 101 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted); Edwards, 228 B.R. at 561.

43.    To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, appropriate in the context of bankruptcy transactions.  See, e.g., In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 537 (3d Cir. 1999); Integrated Resources, 147 B.R. at 659 (bid procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the

disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

44.     The Debtors believe the proposed Bid Procedures will establish the parameters under which the value of the Sale may be tested at the Auction.  The Bid Procedures will increase the likelihood the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.  The Debtors believe that the proposed Bid Procedures will promote active bidding (taking into account the Stalking Horse Bidder's credit bid rights) from seriously interested parties and will elicit the highest or best offers available for the Assets.  The proposed Bid Procedures will enable the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to close the transaction.

45.     Specifically, the proposed Bid Procedures contemplate an open auction process with appropriate barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.  At the same time, the proposed Bid Procedures provide the Debtors with an opportunity to consider competing bids and select the highest or best offer for the completion of the Sale.  Additionally, entering into the Stalking Horse Agreement with the Stalking Horse Bidder ensures the Debtors obtain fair market value by making a minimum purchase price for the Assets that will be tested in the marketplace.  As such, creditors can be assured the consideration obtained will be fair and reasonable and at or above the market.

46.     Accordingly, proposed Bid Procedures and associated Sale process timeline will provide the Debtors with ample time to complete their extensive and robust marketing process,

10339360.v5

while ensuring that the Debtors are not unnecessarily continuing to incur costs associated with preserving the value of the Assets pending consummation of a Sale.

47.     Similar bidding procedures and sale timelines have been approved by other courts in this district.  See, e.g., In re Armstrong Flooring, Inc., Case No. 22-10426 (Bankr. D. Del. May 31, 2022), ECF No. 233 (approving bid procedures 17 days after filing of motion and setting first bid deadline 14 days after entry of bid procedures order); In re Lucky Brand Dungarees, LLC, No. 20-11768 (CSS) (Bankr. D. Del. July 30, 2020), ECF No. 251 (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 8 days after entry of bidding procedures order and sale hearing 40 days after the petition date); In re Templar Energy LLC, No. 20-11441 (BLS) (Bankr. D. Del. June 23, 2020), ECF No. 101 (approving bidding procedures with bid deadline 13 days after entry of bidding procedures order and sale hearing 43 days after the petition date); In re CIBER, Inc., Case No. 17-10772 (BLS) (Bankr. D. Del. May 2, 2017), ECF No. 150 (bid procedures order providing for a sale hearing date approximately 40 days following the petition date); see also In re Transformation Tech Inv'rs, Inc., No. 20-12970 (MFW) (Bankr. D. Del. Dec. 2, 2020) (approving bidding procedures providing for 35 days between petition date and bid deadline); In re John Varvatos Enters., Inc., No. 20-11043 (MFW) (Bankr. D. Del. June 9, 2020) (approving bidding procedures providing for 38 days between petition date and bid deadline); The News-Gazette, Inc., No. 19-11901 (KBO) (Bankr. D. Del. Sept. 18, 2019) (approving bidding procedures providing for 27 days between petition date and bid deadline).

48.     Thus, the Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances because the Bid Procedures are designed to maximize the value to be received by the Debtors' estates.

### 3.    The Minimum Overbid Increment Is Appropriate

49.    One important component of the proposed Bid Procedures is the "Overbid" provision.  Once the Debtors determine the Baseline Bid, which shall equal or exceed the value of the Purchase Price under the Stalking Horse Agreement, as determined by the Debtors, plus the Initial Overbid, and hold the Auction, bidding on the Assets must be in Minimum Overbid Increments of at least **$250,000.00.**  The Debtors believe that such Minimum Overbid Increment is reasonable under the circumstances (including in light of the available credit bid of the Prepetition Secured Party) and will enable the Debtors to maximize the value received for the Assets while limiting any potential chilling effect in the marketing process.

### 4.    Entering into the Stalking Horse Agreement with Bid Protections Has a Sound Business Purpose and Should Be Approved

50.    Pursuant to the Motion, the Debtors are seeking the approval of this Court of the Stalking Horse Bidder and to offer the Bid Protections.  The Debtors believe that, in this case, such relief is warranted to ensure the Debtors' ability to take advantage of a potentially value-maximizing bid.  The ability of the Debtors to offer the Stalking Horse Bidder the Bid Protections is beneficial to the Debtors' estates and creditors in that, by providing these incentives, the Debtors will have an opportunity to induce a Potential Bidder to submit or increase its bid prior to the Auction.

51.    The United States Court of Appeals for the Third Circuit has established standards for reviewing bid protections in a bankruptcy case.  See In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533–38 (3d Cir. 1999); see also Reliant Energy Channelview LP v. Kelson Channelview LLC (In re Reliant Energy Channelview LP), 594 F.3d 200, 206 (3d Cir. 2010).  The Court has held that the administrative expense provisions of § 503(b) of the Bankruptcy Code govern in the bankruptcy context.  See In re Reliant Energy, 594

38

F.3d at 206 (finding that there is no "compelling justification for treating an application for a break-up fee and expenses under § 503(b) differently from other applications for administrative expenses under the same provision." (citing In re O'Brien, 181 F.3d at 535)).  Accordingly, protections must provide some postpetition benefit to the estate.  See In re Energy Future Holdings Corp., 904 F.3d 298, 314 (3rd Cir. 2018), In re O'Brien, 181 F.3d at 533.  For example, "such a benefit could be found if assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited" or by "serv[ing] as a catalyst to higher bids."  In re O'Brien, 181 F.3d at 537.  Break-up fees may also benefit the estate by "induc[ing] a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely," thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  Id.  Finally, a break-up fee may benefit the estate if it induces a bidder to remain committed to its purchase after an auction is ordered.  In re Reliant Energy, 594 F.3d at 207-08; see also In re Energy Future Holdings, 904 F.3d at 314.

52.    The Stalking Horse Bidder has expended, and will continue to expend, time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale, and its bid will be subject not only to Court approval, but also to overbidding by third parties.  The Bid Protections granted to the Stalking Horse Bidder were negotiated in good faith and at arm's length.  Thus, the Bid Protections are actual and necessary to preserve the value of the estates.  The Debtors agreed to the Bid Protections in the Stalking Horse Agreement because they ensure the Debtors will have the benefit of the option to accept the transaction with the Stalking Horse offered through the Stalking Horse Agreement, without sacrificing the potential for interested parties to submit overbids at the Auction.

53.     Furthermore, the proposed Break-Up Fee of $2,200,000 (which is approximately 3% of the Purchase Price) and the Expense Reimbursement capped at $500,000 are well within the range of similar fees approved by courts in this District.  See, e.g., Region, LLC, Case No. 21-11238 (CTG) (Bankr. D. Del. Oct. 14, 2021) [D.I. 103] (approving a break-up fee of 3% of the purchase price); In re Sequential Brands Grp., Inc., et al., Case No. 21-11194 (JTD) (Bankr. D. Del. Sept. 24, 2021) [D.I. 138] (approving a break-up fee of 3.65% of the purchase price); In re Knotel, Inc., et al., Case No. 21-10146 (MFW) (Bankr. D. Del. Case 22-10367 Mar. 11, 2021) [D.I. 418] (approving a break-up fee of 3% of the purchase price); In re Ursa Piceance Holdings LLC, et al., Case No. 20-12065 (BLS) (Bankr. D. Del. Sept. 29, 2020) [D.I. 124] (authorizing a break-up fee in an amount not to exceed 2.5% of the purchase price); In re Brooks Brothers Grp., Inc. et al., Case No. 20-11785 (CSS) (Bankr. D. Del. Aug. 3, 2020) [D.I. 285] (approving a break-up fee of 3% of the purchase price); In re Southland Royalty Co. LLC, Case No. 20-10158 (KBO) (Bankr. D. Del. Apr. 29, 2020) [D.I. 377] (authorizing a break-up fee in an amount not to exceed 3% of the purchase price); In re Earth Fare, Inc., et al., Case No. 20- 10256 (KBO) (Bankr. D. Del. Feb. 14, 2020) [D.I. 122] (authorizing a break-up fee in an amount not to exceed 3% of the purchase price); In re Celadon Grp., Inc., Case No. 19–12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) [D.I. 219] (authorizing a break-up fee of up to 3% of the purchase price); In re Bumblebee Parent Inc., et al., Case No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) (approving a break-up fee of approximately 2.5% of the purchase price) [D.I. 171]; In re Things Remembered, Inc., et al., Case No. 19-10234 (KG) (approving a break-up fee of 2.4% of the purchase price) [D.I. 150].[11]

---

[11]     The referenced orders are voluminous in nature and, therefore, are not attached to this Motion; however, in accordance with Local Rule 7007-2(a)(vii), the Debtors' proposed counsel has copies of each order and will make them available to this Court or to any party that requests them.  Additionally, the orders are available on this Court's CM/ECF PACER site at the cited docket numbers and on the dates specified above.

**5.    The Proposed Notice Procedures for the Assumed Contracts and the Identification of Related Cure Amounts Are Appropriate**

54.    As set forth above, the Sale contemplates the potential assumption and assignment of the Assumed Contracts to the Successful Bidder arising from the Auction, if any.  In connection with this process, the Debtors believe it is necessary to establish a process by which: (i) the Debtors and the Assumed Contract Counterparties can reconcile cure obligations, if any, in accordance with sections 105(a) and 365 of the Bankruptcy Code, and (ii) such counterparties can object to the potential assumption and assignment of the Assumed Contracts and/or related cure amounts.

55.    The Bid Procedures specify the process by which the Debtors will serve Cure and Possible Assumption and Assignment Notices and the procedures and deadline for Assumed Contract Counterparties to Assumed Contracts to file and serve Cure or Assignment Objections.

56.    Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assumed Contract, at the closing of the Sale, the Successful Bidder shall cure those defaults under the Assumed Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code, by (i) payment of the undisputed cure amount (the "Cure Amount") and/or (ii) reserving amounts with respect to any disputed cure amounts.

57.    As set forth in the Bid Procedures Order, the Debtors also request any party that fails to object to the proposed assumption and assignment of any Assumed Contract be deemed to consent to the assumption and assignment of the applicable Assumed Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the Cure Amounts identified in the Cure and Possible Assumption and Assignment Notice.

58.    The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Assumed Contract Counterparties of the potential assumption and assignment of its Assumed Contracts, and provide certainty to all parties in interest regarding their

obligations and rights with respect thereof.  Accordingly, the Debtors request this Court approve the Assumption Procedures set forth in the Bid Procedures Order.

**B.    Approval of the Proposed Sale Is Appropriate and in the Best Interests of the Estates**

    **1.    The Sale of the Assets Should Be Authorized Pursuant to Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment**

59.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to § 363 if a "sound business purpose" exists for the proposed transaction.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor-in-possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); In re ICL Holding Co. Inc., 802 F.3d 547, 551 (3d Cir. 2015); Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (approving a sale pursuant to section 363 where there was a "legitimate business justification").

60.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale, (ii) whether adequate and reasonable notice of the sale was given to interested parties, (iii) whether the sale will produce a fair and reasonable price for the property, and (iv) whether the parties have acted in good faith.  See Del. & Hudson, 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).  A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estates, creditors, or interest holders.  See, e.g., In re Abbotts Dairies of Pa, Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983).  "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily

42

or capriciously), courts will generally not entertain objections to the debtor's conduct." <u>Comm. of</u>

<u>Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>,

60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

61.     The Debtors have a sound business justification for selling the Assets.  First, the

Debtors believe the Sale will maximize the Assets' going-concern value by allowing a party to bid

on business assets that would have substantially less value on a stand-alone or liquidation basis.

Moreover, to the extent the Successful Bidder assumes certain of the Assumed Contracts and the

Assumed Liabilities, it will result in payment in full for virtually all of the Debtors' trade creditors.

Second, the sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to

receive the highest or otherwise best value for the Assets.  The value of the Assets will be tested

through the Auction conducted pursuant to and according to the Bid Procedures.  Ultimately, the

Successful Bid, after being subject to a "market check" in the form of the Auction and accepted

by the Debtors in the exercise of their reasonable business judgment, will constitute the highest

and best offer for the Assets and at this time the Debtors believe will provide a greater recovery

for their estates than any known or practically available alternative.  <u>See, e.g.</u>, <u>In re Trans World</u>

<u>Airlines, Inc.</u>, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section

363(b) sale transaction does not require an auction procedure . . . the auction procedure has

developed over the years as an effective means for producing an arm's-length fair value

transaction").  Consequently, the fairness and reasonableness of the consideration to be paid by

the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open

and fair auction process—the best means for establishing whether a fair and reasonable price is

being paid.

62.     Thus, absent a change in circumstances that causes the Debtors to abandon the sale process, the Debtors submit the Successful Bidder's purchase agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to explore selling the Assets through an Auction process and subsequently to enter into the asset purchase agreement with the Successful Bidder (to the extent the Successful Bidder is someone other than the Stalking Horse Bidder) will be a valid and sound exercise of the Debtors' business judgment.  The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request the Court make a finding the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

### 2.     Sale Provisions Highlighted Pursuant to Local Rule 6004-1(b)(iv)[12]

63.     The following discloses certain information required to be highlighted in any sale motion pursuant to Local Rule 6004-1:

| | |
|---|---|
| **Release of Claims (Local Rule 6004-1(b)(iv)(C))** | The Sale Order will provide that certain claims against the Debtors and/or the Purchaser are barred or otherwise waived. |
| **Closing and Other Deadlines (Local Rule 6004(b)(iv)(E))** | As set forth above, the Debtors are subject to certain deadlines, including that (a) the Bid Procedures Order must be entered on or prior to thirty (30) days after the Petition Date; (b) the Sale Order must be entered on or prior to sixty (60) days after the Petition Date; and (c) the Sale must close on or prior to **March 31, 2023**. |
| **Record Retention (Local Rule 6004-1(b)(iv)(J))** | The proposed Sale Order will provide that the Debtors shall have reasonable access to their books and records after Closing. |
| **Successor Liability (Local Rule 6004-1(b)(iv)(L))** | The proposed Sale Order will provide that the Buyer shall not have any successor liability related to the Debtors or the Assets. |
| **Credit Bidding (Local Rule 6004-1(b)(iv)(N))** | The Bid Procedures allow the Stalking Horse Bidder, in its capacity as the DIP Facility Lender, to credit bid its DIP Facility Obligations, in addition to its Break-Up Fee and Expense Reimbursement (provided that the Stalking Horse Bidder is credit bidding to out-bid another Qualified Bidder) pursuant to the Stalking Horse |

---

[12]     If a provision of Local Rule 6004-1(b)(iv) is not discussed in this section, it means that the provisions governing the sale of the Assets do not contain a provision that triggers disclosure under that rule.

44

| | |
|---|---|
| | Agreement and allows the Prepetition Secured Parties to credit bid the outstanding obligations under the Prepetition First Lien Credit Agreement. |
| **Relief from Bankruptcy Rule 6004(h) (Local Rule 6004-1(b)(iv)(O))** | As explained in further detail below, to maximize the value received for the Assets, the Debtors seek to close the transaction as soon as possible after the Sale Hearing.  Accordingly, the Debtors have requested the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d). |

### 3.    Adequate and Reasonable Notice of the Sale Will Be Provided

64.    As described above, the Sale Notice will: (i) be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing following entry of the Bid Procedures Order, (ii) inform parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Assumed Contract, and (iii) otherwise include all information relevant to parties interested in or affected by the Sale.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bid Procedures Order, after notice and a hearing, before it is served on parties in interest.

### 4.    The Sale and Purchase Price Will Reflect a Fair-Value Transaction

65.    It is well settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 457 (1999).  The Debtors will continue to market the Assets and solicit offers consistent with the Bid Procedures and Stalking Horse Agreement, including, without limitation, by providing acceptable Bidders, with executed NDAs, with access to the data room and requested information.  In this way, the number of Bidders that are eligible to participate in the competitive Auction process will be maximized.  On the other hand, if no Auction is held because no Auction is necessary, the Stalking Horse Agreement's purchase price conclusively will have been demonstrated to be fair value.

45

5.      **The Sale of the Assets Should Be Free and Clear of Interests Pursuant to Section 363(f) of the Bankruptcy Code**

66.      The Debtors submit it is appropriate to sell the Assets free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Interests") other than the Assumed Liabilities (as such term is defined in the Stalking Horse Agreement) pursuant to section 363(f) of the Bankruptcy Code, with any such Claims and Interests attaching to the net sale proceeds of the Assets, as and to the extent applicable.

67.      Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (i) applicable nonbankruptcy law permits such a free and clear sale, (ii) the holder of the interest consents, (iii) the interest is a lien and the sale price of the property exceeds the value of all liens on the property, (iv) the interest is the subject of a bona fide dispute, or (v) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  See 11 U.S.C. § 363(f).  Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to permit the Debtors' sale of the Assets free and clear of all interests (i.e., all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement.  See In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

68.      The Debtors will send the Sale Notice to, among others, all parties who assert liens or claims against the Assets.  Any holder of a claim against or interest in the Assets who does not object to the Sale will be deemed to have consented to the sale of the Assets free and clear.  See 11 U.S.C. 363(f)(2); see Hargrave v. Twp. of Pemberton, 175 B.R. 855, 858 (Bankr. D.N.J. 1994).  Moreover, the Debtors believe that any parties that do object on the basis that they hold liens or

46

claims against the Assets will either: (a) be holders of liens or claims that are subject to a bona fide dispute, or (b) would be compelled to accept cash in satisfaction of their interests.  Cf. 11 U.S.C. §§ 363(f)(3) & 363(f)(5).  Any lienholder also will be adequately protected by having its liens, if any, attach to any proceeds of the applicable Transaction, in the same order of priority, with the same validity, force, and effect, that such creditor had prior to the sale, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto.  Cf. id. § 363(f)(3). Therefore, pursuant to section 363 of the Bankruptcy Code, the Debtors may sell the Assets free and clear of all liens, claims, and encumbrances.

> **6.     The Assets and the Assumed Contracts Should Be Sold Free and Clear of Successor Liability.**

69.     The Sale Order provides the Successful Bidder shall not have any successor liability related to the Debtors or the Assets to the maximum extent permitted by law.  Extensive case law establishes that claims against a winning bidder may be directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against that buyer.

70.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. Courts, however, have consistently held a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims.  See Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.), 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a § 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); see also In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n

personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale.").

71.     The purpose and value of an order authorizing the transfer of the Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against the Successful Bidder.  Under section 363(f) of the Bankruptcy Code, the Successful Bidder is entitled to know the Assets are not tainted by latent claims that could be asserted against the Successful Bidder after the proposed transaction is completed.  Absent that ruling, the value of the Assets could be severely compromised.  Accordingly, consistent with the above-cited case law and provisions of the Bankruptcy Code, the order approving the sale of the Assets should state the Successful Bidder is not liable as a successor under any theory of successor liability, for Interests that encumber or relate to the Assets.

**7.**  **The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good-Faith Purchaser" Entitled to the Full Protection of Bankruptcy Code § 363(m); and the Sale of the Assets Does Not Violate Bankruptcy Code § 363(n)**

72.     The Debtors request that the Court find the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

73.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

48

74.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 from the risk it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser purchased or leased the assets in "good faith."   Although the Bankruptcy Code does not define "good faith," courts have held a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that, where there is a lack of such integrity, a good-faith finding may not be made.  See, e.g., Abbotts Dairies of Pa., 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); In the Matter of Andy Frain Servs., Inc., 798 F.2d 1113 (7th Cir. 1986) (same); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

75.     The Debtors submit the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the resulting purchase agreement would be a good-faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[13] First, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the Sale will be subject to a market process by virtue of Debtors' marketing efforts and the Auction and will be substantial, fair, and reasonable.  Second, the asset purchase agreement entered into by the Debtors and the Successful Bidder will be the result of extensive arm's-length negotiations, during which all parties will have the opportunity to be, and the Debtors will be, represented by

---

[13]     The Debtors believe a finding of good faith within the meaning of § 363(m) will be appropriate for the Successful Bidder arising from the Auction and the Bid Procedures.  Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures.  In addition, the Debtors will not choose as the Successful Bidder or the Backup Bidder any entity whose good faith under § 363(m) can reasonably be doubted and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of §363(m) has been satisfied.

competent counsel, and any purchase agreement with a Successful Bidder will be the culmination

of the Debtors' competitive market process and, if necessary, the Auction, in which all negotiations

will be conducted on an arm's-length, good-faith basis.  Third, where—as the Debtors anticipate

will be the case here—there is no indication of any "fraud or collusion between the purchaser and

other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or

similar conduct, there is no cause that would permit the Sale to be avoided pursuant to section

363(n) of the Bankruptcy Code.  Moreover, with respect to potential bidders, the Bid Procedures

are designed to ensure no party is able to exert undue influence over the process.  Finally, the

Successful Bidder's offer will be evaluated and approved by the Debtors in consultation with their

advisors.  Accordingly, the Debtors believe the Successful Bidder and the resulting purchase

agreement should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

76.     Moreover, because there will be no fraud or improper dealing of any kind, the Sale

does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code,

and, as a result, the Purchaser should receive the protections afforded good faith purchasers by

section 363(m) of the Bankruptcy Code.  Accordingly, the Debtors request the Court make a

finding at the Sale Hearing that the agreement reached with the Successful Bidder was at arm's

length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.  The

Debtors will submit evidence at the Sale Hearing to support these conclusions.

### 8.     Credit Bidding Should Be Authorized Pursuant to Section 363(k) of the Bankruptcy Code

77.     A secured creditor is allowed to "credit bid" the amount of its claims in a sale of

assets in which it has a security interest.  Section 363(k) of the Bankruptcy Code provides, in

relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by

property that is the subject of the sale "may bid at such sale, and, if the holder of such claim

purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the creditor's economic value. See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) ("It is well settled among district and bankruptcy courts that creditors can bid the full-face value of their secured claims under § 363(k)").

78.    In this District, absent cause for restriction on credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. See In re Source Home Entm't, LLC, No. 14-115533 (KG) (Bankr. D. Del. July 21, 2014) (order approving Bid Procedures which authorized parties with secured claims to credit bid); In re PTC Alliance Corp., No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative agent to credit bid); In re Hayes Lemmerz Int'l, Inc., No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing interested party to exercise its right under Bankruptcy Code § 363(k) to make a credit bid); In re Foamex Int'l Inc., 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155 million credit bid over a $151.5 million all-cash bid); see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) (citations omitted).

79.    Thus, pursuant to section 363(k) of the Bankruptcy Code and subject to the Bid Procedures, the Stalking Horse Bidder, in its capacity as the DIP Facility Lender, and the Prepetition Secured Parties with respect to the outstanding obligations under the Prepetition First Lien Credit Agreement, should be allowed to submit a Credit Bid as set forth in the Stalking Horse

Agreement at an Auction, which also contemplates a Credit Bid for the Bid Protections with respect to the Stalking Horse Bidder.

**C.      The Assumption and Assignment of the Assumed Contracts Should Be Approved**

**1.      The Assumption and Assignment of the Assumed Contracts Reflects the Debtors' Reasonable Business Judgment**

80.      To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority to assign the Assumed Contracts to the Successful Bidder to the extent required by such Successful Bidder.

81.      Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  See 11 U.S.C. § 365(b)(1).  The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate.  See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).  Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract.  See In re Decora Indus., Inc., 2002 WL 32332749, at *8 (D. Del. 2002); Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp), 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard").  A debtor's decision to assume or reject an executory contract or expired lease will not be subject to

52

review unless such decision is clearly an unreasonable exercise of such judgment.  See Sharon Steel, 872 F.2d at 40 (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); Network Access Solutions, 330 B.R. at 75; Exide Techs., 340 B.R. at 239.

82.    Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment.  First, the Assumed Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets.  Second, it is unlikely any purchaser would want to acquire the Assets unless a significant number of the contracts needed to manage the day-to-day operations were included in the transaction.  Third, the Assumed Contracts will be assumed and assigned as part of a process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in these Chapter 11 Cases.  Accordingly, the Debtors submit the assumption and assignment of the Assumed Contracts, if required by the Successful Bidder, should be approved as a sound exercise of the Debtors' business judgment.

83.    A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.  See 11 U.S.C. § 365(f)(2).  Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong

53

likelihood of succeeding).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

84.    Counterparties to Assumed Contracts will have the opportunity to object to adequate assurance of future performance by any of the Bidders.  Accordingly, the Debtors submit the assumption and assignment of the Assumed Contracts as set forth herein should be approved.

85.    To assist in the assumption, assignment, and sale of the Assumed Contracts, the Debtors also request the Sale Order approving the sale of the Assets provide that anti-assignment provisions in the Assumed Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

86.    Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(1).

87.    Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease.  See Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting

54

the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), <u>cert</u>. <u>denied</u>, 522 U.S. 1148 (1998).  Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  <u>See</u>, <u>e.g.</u>, <u>In re Jamesway Corp.</u>, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

88.    Other courts have recognized provisions that have the effect of restricting assignments cannot be enforced.  <u>See</u> <u>In re Rickel Home Ctrs., Inc.</u>, 240 B.R. 826, 831 (D. Del. 1998).  Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts, and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

89.    Orders granting motions to sell property and for the assumption and assignment of executory contracts frequently contain language explicitly stating the counterparty to the assumed contracts are barred from asserting against the debtor any default by reason of the closing, including any breach or right of termination relating to a change in control of the debtor.  <u>See</u>, <u>e.g.</u>, <u>In re Irish Bank Resolution Corp. Ltd.</u>, No. 13-12159 (CSS), 2014 WL 1759609, at *8 (Bankr. D. Del. Feb. 14, 2014) ("[n]o sections or provisions of the Contracts that purport to . . . declare a breach or default as a result of a change in control in respect of the Debtor…shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under 11

U.S.C. § 365(f) and/or are otherwise unenforceable under 11 U.S.C. § 365(e)."). The Debtors seeks such similar language here.

**D.      Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate**

90.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request the Sale Order be effective immediately upon its entry by providing the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

91.      The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for objecting party to appeal before an order can be implemented.  <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay periods, the leading treatise on bankruptcy suggests the 14-day stay periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 <u>Collier on Bankruptcy</u> ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id.</u>

92.      To maximize the value received from the Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

**NOTICE**

93.     Notice of this Motion will be given to: (a) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Richard Schepacarter; (b) the holders of the thirty (30) largest, non-insider unsecured claims against the Debtors; (c) counsel to the Stalking Horse Bidder, the DIP Facility Lender, and the Prepetition Secured Party; (d) counsel to the Committee, if any; (e) any other parties with known secured claims against the Debtors or their counsel, if known; (f) all parties that have executed a Confidentiality Agreement; (g) the United States Attorney's Offices for the District of Delaware and the District of Arizona; (h) the Internal Revenue Service; (i) all state and local taxing authorities with an interest in the Assets; (j) the Attorneys General for the State of Delaware and the State of Arizona; (k) the Securities and Exchange Commission; (l) all other governmental agencies with an interest in the Sale and transactions proposed thereunder; (m) all other parties known or reasonably believed to have asserted an interest in the Assets; (n) the Assumed Contract Counterparties; (o) the Debtors' insurance carriers; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

94.     In addition, copies of the Sale Notice, the Bid Procedures, and the Bid Procedures Order will be served on the applicable parties no later than two (2) business days after entry of the Bid Procedures Order by this Court.   In light of the nature of the relief requested herein, the Debtors submit no other or further notice is required.  A copy of the Motion, Sale Notice, the Bid Procedures, and the Bid Procedures Order also will be available on the website of the Debtors' claims and noticing agent, Omni Agent Solutions, located at https://omniagentsolutions.com/PerformancePowersports.

## NO PRIOR REQUEST

95.     No previous request for the relief sought herein has been made to this Court or any

other court.

WHEREFORE, the Debtors respectfully request this Court: (i) enter the Bid Procedures

Order, the form of which is attached as **Exhibit B** hereto, (ii) enter the Sale Order, the form of

which is attached as **Exhibit C** hereto, and (iii) grant such other and further relief as is just and

proper.

Dated: January 16, 2023          /s/ Domenic E. Pacitti
Wilmington, Delaware             Domenic E. Pacitti (DE Bar No. 3989)
                                 Michael W. Yurkewicz (DE Bar No. 4165)
                                 Sally E. Veghte (DE Bar No. 4762)
                                 **KLEHR HARRISON HARVEY BRANZBURG LLP**
                                 919 North Market Street, Suite 1000
                                 Wilmington, Delaware 19801
                                 Telephone:    (302) 426-1189
                                 Facsimile:    (302) 426-9193
                                 Email:  dpacitti@klehr.com
                                         myurkewicz@klehr.com
                                         sveghte@klehr.com

                                 -and-

                                 Morton R. Branzburg (*pro hac vice* pending)
                                 **KLEHR HARRISON HARVEY BRANZBURG LLP**
                                 1835 Market Street, Suite 1400
                                 Philadelphia, Pennsylvania 19103
                                 Telephone:    (215) 569-3007
                                 Facsimile:    (215) 568-6603
                                 Email:        mbranzburg@klehr.com

                                 *Proposed Counsel to Debtors and Debtors in Possession*

10339360.v5