IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| PERFORMANCE POWERSPORTS GROUP INVESTOR LLC, *et al.*,[1] | ) Case No. 23-10047 (___) |
| Debtors. | ) (Joint Administration Requested) |

**DECLARATION OF STEVEN BREMER IN SUPPORT OF
BID PROCEDURES AND SALE MOTION**

I, Steven Bremer, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a Managing Director at Portage Point Partners, LLC ("Portage Point"), which I joined in 2022. Portage Point is a business advisory and financial services firm with its principal place of business at 300 North LaSalle Drive, Suite 1420, Chicago, Illinois 60654. Portage Point is the proposed restructuring advisor and investment banker for the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 Cases.[2]

2. I submit this declaration (the "Declaration") in support of the *Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing Entry Into the Stalking Horse Agreement, (E) Approving Bid Protections, (F) Approving Procedures for the Assumption and Assignment of*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms as set forth in the *Declaration of Ken Vanden Berg in Support of Chapter 11 Petitions and First Day Motions and Applications* (the "First Day Declaration") or the Bid Procedures and Sale Motion as applicable, each filed contemporaneously herewith and fully incorporated herein.

10329549.v8

*Contracts and Leases, and (G) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* filed contemporaneously herewith (the "Bid Procedures and Sale Motion").

3. The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinions, or on information I obtained from the Debtors' employees or advisors, the Debtors' books and records, and/or from Portage Point employees working under my supervision, direction, or control.

4. I am not being specifically compensated for this testimony other than through payments received by Portage Point as a professional proposed to be retained by the Debtors pursuant to an application to be filed at a later date. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If called to testify, I could and would competently testify to the facts set forth herein.

**A.    Background and Qualifications**

5. Portage Point is a business advisory, interim management, investment banking, and financial services firm. Portage Point professionals have advised debtor, creditors and equity constituents in numerous reorganizations, and those advisory services have included financial analysis and budgeting, forecasting, cash management, operational assessments and improvements, dispute and litigation advisory, interim management services, and investment banking services.

6. I have over 15 years of experience advising and executing on financing and restructuring transactions, as well as mergers and acquisitions. My experience includes representing companies, boards, creditors, and other stakeholders in a variety of situations. Prior

to joining Portage Point, I was a Partner at Centerview Partners, a Director at Millstein & Co. and a Vice President at Miller Buckfire & Co. I hold M.S. and B.S. degrees with distinction in Systems Engineering from the University of Virginia and an MBA from the Wharton School at the University of Pennsylvania.

7. In addition to acting as the investment banker to the Debtors in these Chapter 11 Cases, I have provided financial advisory, investment banking or other services in connection with the in-court restructuring of numerous companies, including: *In re Patriot Coal Corp.*, Case No. 15-32450 (KLP) (Bankr. E.D.V.A.); *In re Peabody Energy Corp.*, Case No. 16-42529 (BSS) (Bankr. E.D. Mo.); *In re Dendreon Corp., et al.*, Case No. 14-12515 (LSS) (Bankr. D. Del.); *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del.); *In re Lenox Grp., Inc.*, Case No. 08-14680-ALG (Bankr. S.D.N.Y.); *In re Glob. Brokerage Inc.*, Case No. 17-13532 (MEW) (Bankr. S.D.N.Y.,); *In re Aspect Software, Inc.*, Case No. 16-10597 (MFW) (Bankr. D. Del.); *In re Seventy Seven Energy Inc.*, Case No. 16-11410 (LSS) (Bankr. D. Del.); *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y.); *In re Blackhawk Mining LLC, et al.*, Case No. 19-11595 (LSS) (Bankr. D. Del.); *Westmoreland Coal Company, et al.*, Case No. 18-35672 (DRJ) (Bankr. S.D. Texas); *In re Synergy Pharmaceuticals Inc., et al.*, Case No. 18-14010 (LGB) (Bankr. S.D.N.Y.); *In re Westinghouse Electric Company LLC, et al.*, Case No. 17-10751 (MEW) (Bankr. S.D.N.Y.).

**B.    Portage Point's Engagement**

8. The Debtors engaged Portage Point in October 2022 to serve as both a restructuring advisor and investment banker to the Debtors. Since commencing its engagement, Portage Point has provided assistance in numerous areas including in connection with the Debtors' evaluation of strategic alternatives. Portage Point has worked closely with the Debtors' management and other

restructuring professionals and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

## Bid Procedures and Sale Marketing Process

A.  **The Debtors Engaged in Extensive Prepetition Marketing and Sale Efforts.**

9. In connection with its review and analysis of the Debtors' strategic alternatives, Portage Point worked closely with the disinterested director of the boards ("Disinterested Director"). The Disinterested Director was delegated authority to review and act upon any matters pertaining to a potential restructuring, refinancing, or sale transaction in which a conflict may exist between the Debtors on the one hand, and any of their senior management, board members, advisors, equity holders, and affiliates (or those entities' managers, directors, or officers) on the other hand. This process also included the Debtors' existing lender and that lender's retained advisors to evaluate potential strategic alternatives. After considering all reasonably available courses of action, the Debtors determined that a sale of their assets was in the best interests of the Debtors, their creditors, and all parties in interest under the circumstances, particularly considering the Debtors' liquidity constraints, litigation, vendor threats surrounding the filing of an involuntary petition, and the anticipated difficulties in raising additional debt or equity financing.

10. In preparation for, and over the course of marketing the Debtors' assets, Portage Point reviewed the Debtors' operations and assets and engaged in extensive dialogue with the Debtors' senior management team and the Disinterested Director. The Debtors' senior management team, the Disinterested Director, and entire board of directors determined that the Debtors were most likely to maximize the value of their assets in a sale of substantially all assets on a going concern basis.

11. Portage Point expended significant efforts before the Petition Date marketing the Assets for sale. Portage Point's marketing process involved the preparation of marketing materials

intended for distribution to prospective buyers of the Debtors' Assets, which included a teaser, confidential information memorandum, and the aggregation of key company documents located in an online data room for further diligence. In addition, Portage Point worked with the Debtors to develop a list of suitable potential buyers that could be contacted on a discreet and confidential basis.

12. Specifically, beginning on December 6, 2022 and continuing thereafter, Portage Point began outreach to a broad universe of relevant strategic and financial parties to assess interest in an acquisition of the Company. Portage Point and/or the Debtors advisors reached out to approximately 33 parties and offered them the opportunity to participate in the sale process, including Rich Godfrey (the prepetition founder of the Debtors), Huansong (the Company's prior, primary vendor manufacturing partner), and Twin Brook Capital Partners, LLC (the Debtors' Prepetition Lender). Of these 33 parties, 9 of them negotiated and executed confidentiality agreements and were provided with a confidential information memorandum and access to a virtual data room containing detailed information about the Debtors' business. Portage Point then held follow-up calls with interested parties to respond to diligence requests and discuss the current situation and process.

13. The Debtors received no indications of interest by the January 13, 2023 deadline. Meanwhile, the Debtors continued to suffer a drain on cash flow, lacked a source of long-term additional liquidity, and faced litigation and pressure from vendors, including the threatened filing of an involuntary bankruptcy proceeding. Consequently, it became apparent that the Debtors' liquidity position and other issues described above would require the sale process to continue in a voluntary chapter 11 process.

**B.     The Stalking Horse Agreement Is the Best Offer Available to the Debtors.**

14.     Faced with no actionable sale proposal, CPS USA Acquisition, LLC agreed to (a) serve as the stalking horse bidder (the "Stalking Horse Bidder") pursuant to the terms of that certain asset purchase agreement, dated January 16, 2023 (the "Stalking Horse Agreement"); (b) acquire substantially all of the Debtors' Assets as a going concern; (c) expose the Stalking Horse Agreement to higher and better offers through a chapter 11 process; and (d) support the process by agreeing to provide necessary debtor-in-possession financing to the Debtors on a junior lien basis.

15.     I was involved in the negotiations of the Stalking Horse Agreement with the Stalking Horse Bidder as the Debtors' investment banker and also involved in the marketing of the Assets.

16.     Under the terms of the Stalking Horse Agreement, the Stalking Horse Bidder will purchase the Assets for an aggregate purchase price consisting of: (a) a credit bid of the outstanding obligations under the DIP Credit Agreement in the amount of approximately $10 million; (b) payment of an amount in cash equal to $500,000; (c) assumption of the obligations under the Prepetition First Lien Credit Agreement; (d) assumption of certain other assumed liabilities as provided in the Stalking Horse Agreement; (e) the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder and payment of any cure obligations associated with such Assumed Contracts; and (f) payment of the Wind-Down Amount ($600,000); provided that the Wind-Down Amount shall only become payable as a portion of the Purchase Price in the event that (i) Debtors have insufficient cash on hand at Closing to fund the Wind-Down Amount from such cash on hand and (ii) the Debtors have otherwise complied in all respects with the Financing Orders, in which case the Stalking Horse Bidder shall only be required to fund the amount necessary to bring the Debtors' total cash on hand at Closing to equal the amount of the Wind-

10329549.v8

Down Amount (each term as defined in the Stalking Horse Agreement). The Stalking Horse Agreement not only represents a going concern sale of substantially all of the Debtors' assets, but also provides for a recovery to unsecured creditors whose contracts and/or claims the Stalking Horse Bidder is not otherwise assuming under the Stalking Horse Agreement. As a result, the proposal embodied in the Stalking Horse Agreement provides that a significant amount of prepetition unsecured claims will be assumed and paid by the Stalking Horse Purchaser.

17. Based on my knowledge of the prepetition marketing process and the Debtors' present circumstances, I believe that the Stalking Horse Agreement currently represents the highest and best offer for the assets. I also believe that the Stalking Horse Agreement will enhance the bidding process by providing a floor that prospective bidders must clear and ensuring that only serious, financially capable bidders participate in the Auction.

18. Portage Point has continued, and will continue, to market the Assets to potential buyers after the Petition Date. Further, Portage Point will continue discussions with any party that executed an NDA prior to entry of the Bid Procedures Order or that approaches Portage Point or the Debtors with interest in the assets, with the goal of having such parties participate in the Auction. Portage Point has a list of "Contact Parties" who will receive a copy of the "Information Package" comprised of: (a) a copy of the Bid Procedures; and (b) a copy of the Stalking Horse Agreement.

19. I believe, based on my experience, that given the marketing efforts to date, the Debtors' current circumstances, the number of parties that already have executed NDAs, and the fact that Portage Point already has recently marketed the Assets to the most likely bidders for assets of the type the Debtors are selling, that the marketing process up to this point has been adequate to achieve the greatest possible level of interest and return for the Assets in the Chapter 11 Cases

10329549.v8

under the circumstances. Further, the marketing process will continue through the Auction in accordance with the terms set forth in the Bid Procedures and Sale Motion.

**C.    The Timeline Proposed in the Bid Procedures and Sale Motion Reflects an Efficient and Value-Maximizing Sale Process.**

20.    I also believe that the proposed timeline for the sale set forth in the Bid Procedures and Sale Motion will allow the Debtors to maximize the prospect of receiving the highest and best offer through a fair, robust, and open sale process, while still ensuring that the Debtors can close the sale in accordance with the Stalking Horse Agreement. In particular, the sale of the Assets will be subject to competing bids, thereby enhancing the Debtors' ability to receive the highest and best value for the Assets. The value of the Assets will also be tested through the Auction conducted pursuant to the Bid Procedures, which will provide a "market check" on the purchase price and ensure that the Successful Bidder constitutes the highest and best offer for the Assets under the circumstances.

21.    Further, the proposed timeline is prudent under the circumstances. I understand that the Debtors' business and its assets are at risk of being negatively impacted over time as customers, vendors, and employees become increasingly reluctant to engage with the Debtors under the current period of uncertainty. Moreover, the Debtors do not have the liquidity to support a protracted sale process. Instead, a sale on the requested timeline is reasonable under the present circumstances and provides a buyer with the best opportunity to retain the Debtor's customers and employees and continue its operations as a going concern.

**D.    The Proposed Bidding Procedures are Fair, Transparent, and Competitive, and the Proposed Bidding Protections are Reasonable and Necessary.**

22.    The bidding procedures proposed by the Debtor provide for a fair, open and competitive process that offers transaction certainty to prospective purchasers and to the Debtors'

customers and employees. I believe that the proposed bidding procedures will encourage and stimulate a bidding environment for the sale of the Debtors' assets that is as competitive as possible and offers the Debtors the best opportunity to maximize value for their estates in light of the liquidity situation.

23. The Stalking Horse Bidder has required and the Debtors request approval of certain bidding protections to the Stalking Horse Bidder that are customary in similar circumstances, including the following (collectively, the "<u>Bidding Protections</u>"):

(a) a break-up fee in the amount equal to $2.2 million (the "<u>Breakup Fee</u>");

(b) an Expense Reimbursement of reasonable and documented out-of-pocket expenses in connection with the Sale in an amount not to exceed $500,000.00 (the "<u>Expense Reimbursement</u>");

(c) an initial overbid equal to an amount equal to or greater than the Stalking Horse Bid, *plus* the Break-Up Fee *plus* the Expense Reimbursement *plus* the Minimum Bid Increment of $500.000.00 (collectively, the "<u>Initial Overbid</u>"); and

(d) bidding increments thereafter of not less than $250,000.

24. In my experience as a restructuring professional, I believe that the Bidding Protections are reasonable and necessary to induce the Stalking Horse Bidder to enter into the transactions encompassed by the Stalking Horse Agreement and obtain the highest price possible for the Debtors' assets.

25. In addition, the proposed Breakup Fee and Expense Reimbursement are the product of good-faith, arm's-length negotiations between the Debtors and the Stalking Horse Bidder.

26. The Stalking Horse Bidder may not have offered the price set forth in the Stalking Horse Agreement without the Bidding Protections, including the Breakup Fee. If higher offers for the Assets are received, it will be because Stalking Horse Purchaser Bidder has served as a "stalking horse" for such offers.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  January 16, 2023

*/s/ Steven Bremer*
Steven Bremer, Managing Director
Portage Point Partners, LLC

10

10329549.v8