## Exhibit A

*[Execution Version]*

**Junior Secured Superpriority Debtor in Possession Term Loan Facility Term Sheet**

This Junior Secured Superpriority Debtor in Possession Term Loan Facility Term Sheet (including all annexes and exhibits hereto, as may be amended, amended and restated, supplemented or otherwise modified from time to time, this "<u>DIP Term Sheet</u>" or this "<u>Agreement</u>") describes the terms and conditions of the secured superpriority debtor in possession term loan facility (the "<u>DIP Credit Facility</u>") provided by the DIP Lenders (as defined below) to Performance Powersports Group Purchaser, Inc., a Delaware corporation (the "<u>DIP Borrower</u>"), in connection with cases (collectively, the "<u>Bankruptcy Cases</u>") filed or to be filed by Performance Powersports Group Holdings, Inc., a Delaware corporation ("<u>Holdings</u>"), the DIP Borrower and the other Guarantors (as defined below) (collectively, the "<u>Debtors</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "<u>Bankruptcy Code</u>") on a date (such date, the "<u>Petition Date</u>") no later than January 16, 2023. Capitalized terms used but not defined herein have the meanings assigned to them in the Interim DIP Order (as defined below).

| | |
|---|---|
| **DIP Borrower**: | Performance Powersports Group Purchaser, Inc., as debtor and debtor-in-possession. |
| **Holdings**: | Performance Powersports Group Holdings, Inc., as debtor and debtor-in-possession. |
| **Guarantors**: | Holdings and Performance Powersports Group, Inc., a Delaware corporation, each as a debtor and debtor-in-possession, agrees (collectively, the "<u>Guarantors</u>" and each, individually, a "<u>Guarantor</u>") to the guaranty provisions set forth in <u>Annex A</u> attached hereto, incorporated herein by this reference. Such Guarantors, together with the DIP Borrower, are referred to herein each as a "<u>Debtor</u>" and collectively, as the "<u>Debtors</u>". |
| **DIP Lender**: | Tankas Funding VI, LLC (the "<u>DIP Lender</u>"). |
| **Prepetition Facilities**: | The senior secured first lien credit facility (the "<u>Prepetition First Lien Facility</u>") under that certain Credit Agreement, dated as of October 8, 2021 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Prepetition First Lien Credit Agreement</u>"), among Performance Powersports Group Purchaser, Inc., as borrower, Twin Brook Capital Partners, LLC, as agent (the "<u>Prepetition First Lien Agent</u>"), and the financial institutions party thereto from time to time (the "<u>Prepetition First Lien Lenders</u>"). |
| **DIP Credit Facility**: | The DIP Lender agrees to make junior lien superpriority debtor-in-possession term loans (the "<u>DIP Credit Facility</u>") in an aggregate principal amount not to exceed $10,000,000 in "new money" loans (the "<u>DIP Loans</u>", and such commitment of the DIP Lender, the "<u>DIP Commitment</u>") to the DIP Borrower, subject to the terms and conditions in this DIP Term Sheet, as it may be replaced and/or supplemented as set forth herein (this DIP Term Sheet, as it may be so replaced and/or supplemented the "<u>DIP Agreement</u>"), which DIP Loans shall be made available in two separate borrowings: (1) $3,500,000 under the DIP Credit Facility to be drawn, subject to the conditions set forth below, following entry in the Bankruptcy Cases (as defined below) of the Interim DIP Order approving the DIP Credit Facility (the "<u>Initial DIP Loan</u>") on the Closing Date, and (2) the remainder of the DIP Credit Facility (the "<u>Final DIP Loan</u>") to be drawn, subject to the conditions set forth below, following entry of a Final DIP Order upon the Final Closing Date (as defined below); provided, that the DIP Borrower may elect to draw a portion (not to exceed $4,800,000) of such Final DIP Loan on one additional business day after the Final Closing Date that is specified by |

the DIP Borrower (on not less than five (5) business days' notice (or such shorter period as the DIP Lender may agree)), subject to the conditions set forth below.

Concurrently with the funding of the Initial DIP Loan, proceeds of the DIP Loans shall be maintained in a segregated bank account over which DIP Lender shall retain control (the "DIP Loan Account") that shall be subject to the DIP Liens in favor of the DIP Lender, which shall be granted and perfected pursuant to the DIP Orders. Funds on deposit in the DIP Loan Account shall be made available to the DIP Borrower from time to time to be applied directly to the payment of amounts permitted to be paid under the Approved Budget (after giving effect to the Permitted Variances). Amounts repaid under the DIP Credit Facility may not be re-borrowed.

| | |
|---|---|
| **Closing Date:** | The date of initial borrowing under the DIP Credit Facility, on or before January 23, 2023, on which the "Conditions Precedent to the Closing Date" as set forth below shall have been satisfied or waived by the DIP Lender in accordance with the DIP Agreement. Upon the Debtors' filing of the Bankruptcy Cases in the Bankruptcy Court, the DIP Borrower or its counsel shall notify the DIP Lender of the anticipated date of the first day hearing (the "First Day Hearing Date"). |
| **Use of Proceeds:** | The proceeds of the DIP Loans will be used solely to: (i) fund the DIP Loan Account; (ii) pay fees, costs, administrative expenses and other expenses associated with the DIP Credit Facility and the Debtors' use of cash collateral; and (iii) finance working capital and general corporate purposes, subject to the Approved Budget (as defined below) and the terms and conditions of the DIP Credit Facility and the DIP Orders, including to (a) fund the costs of the administration of the Bankruptcy Cases and the consummation of a sale under section 363 of the Bankruptcy Code (as defined below) and (b) fund interest, fees, and other payments contemplated in respect of the DIP Credit Facility; *provided* that during the Challenge Period (as defined below), an investigation budget in an aggregate amount of $50,000 of the DIP Loans may be used by any official committee of unsecured creditors (the "Committee") to investigate, but not to prepare, initiate, litigate, prosecute, object to, or otherwise challenge, (i) the claims and liens of the Prepetition First Lien Lenders, and (ii) potential claims, counterclaims, causes of action or defenses against the Prepetition First Lien Lenders. |
| **Cash Collateral:** | Subject to entry of the Interim DIP Order, the Prepetition First Lien Agent and Prepetition First Lien Lenders and the DIP Lender hereby consent to the use of their "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**") on the terms and conditions set forth in the DIP Orders and the DIP Facility Documents. |
| **Interest Rates:** | Interest shall accrue on the DIP Loans at a rate of 15.0% per annum (the "Interest Rate"). Accrued interest with respect to any DIP Loan shall be paid in cash on (i) the last day of each month, until any and all DIP Loans and other obligations under the DIP Credit Facility (collectively, the "DIP Obligations") are paid in full and (ii) on the maturity of the DIP Loans. All interest and fees under this DIP Term Sheet shall be calculated on the basis of a 360-day year for the actual number of days elapsed. All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid. Following the occurrence and during the continuance of an Event of Default (as defined below) (after giving effect to any applicable grace periods), principal, interest and all other |

amounts due in respect of the DIP Obligations shall bear interest at a rate equal to 3.00% per annum in excess of the Interest Rate.

**Fees:**    The Debtors agree to pay the following fees to the DIP Lender:

Commitment Fee: A commitment fee of 6.0% on the full amount of the DIP Credit Facility, payable in kind, 35% of which shall be earned on the Petition Date and paid in kind upon entry of the Interim DIP Order and on the Closing Date and 65% of which shall be earned on the Petition Date and paid in kind upon entry of the Final DIP Order and on the Final Closing Date, and shall be payable in cash upon the Maturity Date.

Exit Fee: An exit fee of 10.0% of the amount of the full DIP Loans and commitments under the DIP Credit Facility (the "Exit Fee"), earned upon entry of the Final DIP Order and payable in cash upon the earlier of (i) the Maturity Date and (ii) any other payoff, refinancing or termination of the DIP Credit Facility; provided, that such Exit Fee shall not be due and payable if the Maturity Date, or such payoff, refinancing or termination, results from a transaction in which the DIP Lender or one or more affiliates of the DIP Lender are the buyer(s) of all or substantially all of the assets of the assets of the Debtors (or equity interests of entities representing all or substantially all of the assets of the Debtors).

**DIP Loan Documentation; DIP Term Sheet Controls:**    At the option of the DIP Lender, in its sole discretion, the Debtors shall execute definitive financing documentation with respect to the DIP Credit Facility, including, without limitation, guarantees and security documents, in each case, reasonably satisfactory in form and substance to the DIP Lender and the Debtors (the "DIP Facility Documents"), which such DIP Facility Documents shall contain the terms and conditions set forth in this DIP Term Sheet and such other terms as the DIP Borrower, the and the DIP Lender shall agree.  The provisions of the DIP Facility Documents shall, upon execution, amend, modify, supplement and (where applicable) supersede the provisions of this DIP Term Sheet; *provided* that if the DIP Lender determines not to require the Debtors to execute additional DIP Facility Documents, the provisions of this DIP Term Sheet, the Interim DIP Order and the Final DIP Order shall govern the DIP Credit Facility.  The provisions of the DIP Facility Documents shall be consistent with this DIP Term Sheet, the Interim DIP Order and, once entered, the Final DIP Order.

**Expenses and Indemnity:**    The DIP Borrower and each Guarantor shall jointly and severally pay promptly all reasonable and documented out-of-pocket costs and expenses of the DIP Lender (including reasonable and documented fees and expenses of counsel, which shall be Kirkland & Ellis, LLP and local counsel in each appropriate jurisdiction, including Delaware bankruptcy counsel), in connection with administering the DIP Credit Facility, preparing all documents and enforcing any and all right, remedies and obligations relating to the DIP Credit Facility.

The DIP Borrower and each Guarantor shall jointly and severally indemnify the DIP Lender in accordance with the indemnity provisions set forth in Annex B attached hereto.

**Voluntary Prepayments:**    Voluntary repayment of the DIP Obligations, whether in whole or in part, shall not be permitted; provided, for the avoidance of doubt, that the foregoing restriction shall not apply to any application of DIP Obligations as consideration for a transaction in which

3

the DIP Lender or one or more affiliates of the DIP Lender are the buyer(s) of all or substantially all of the assets of the assets of the Debtors (or equity interests of entities representing all or substantially all of the assets of the Debtors).

**Mandatory Prepayments:** The Debtors shall immediately pay or prepay the DIP Loans and all other DIP Obligations (including the Exit Fee) (together with a cash reserve established by the DIP Lender to cover asserted contingent and indemnity obligations) until such obligations are paid in full as follows (subject to any prior application of the proceeds of Prepetition Collateral (as defined below) to the Prepetition First Lien Facility, to the extent required by the DIP Orders):

(i) 100% of the net cash proceeds of any DIP Collateral in any sale or disposition of all or substantially all of Debtors' assets pursuant to section 363 of the Bankruptcy Code simultaneously with the consummation thereof, after funding the "Carve Out" (to the extent agreed upon by the DIP Lender and set forth in the DIP Orders, the "Carve Out"); provided, that the foregoing mandatory prepayment requirement (and the Exit Fee) shall not apply to any application of DIP Obligations as consideration for a transaction in which the DIP Lender or one or more affiliates of the DIP Lender are the buyer(s) of all or substantially all of the assets of the assets of the Debtors (or equity interests of entities representing all or substantially all of the assets of the Debtors);

(ii) 100% of the net cash proceeds of any other sale or other disposition by the DIP Borrower or any Guarantor of any DIP Collateral in excess of $50,000, in a single transaction or series of related transactions (except for asset sales in the ordinary course of business);

(iii) 100% of indemnity payments and insurance proceeds not included as proceeds of asset dispositions; and

(iv) 100% of the net cash proceeds received from the incurrence or issuance of indebtedness by Holdings, the DIP Borrower or any subsidiary not expressly permitted to be incurred or issued pursuant to clause (iii) of the section entitled "Negative Covenants" below.

Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any insurance proceeds, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lender.

Mandatory payments or prepayments and proceeds of DIP Collateral received by the DIP Borrower or any Guarantor outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the DIP Lender), after giving effect to the Carve Out, and any other payments required pursuant to the DIP Orders:

(1) first, to pay all documented out-of-pocket expenses of the DIP Lender (including, without limitation, fees and expenses of counsel and external advisors);

(2) second, to pay the Exit Fee to DIP Lender;

(3)  <u>third</u>, to pay an amount equal to all accrued and unpaid interest and fees, if any, owing to the DIP Lender;

(4)  <u>fourth</u>, to repay any principal amounts outstanding in respect of the DIP Loans (including any interest or other amounts that have been paid in kind and added to the principal balance thereof);

(5)  <u>fifth</u>, to pay all other amounts owing to the DIP Lender; and

(6)  <u>last</u>, the balance, if any, after all of the DIP Obligations have been paid in full, to the DIP Borrower subject in all respects to the rights, liens and claims of each of the Prepetition First Lien Agent and the Prepetition First Lien Lenders.

*provided*, *however*, that without the consent of a majority of the First Lien Lenders, the DIP Credit Facility cannot be repaid from proceeds of Prepetition Collateral until all "Obligations" (as such term is defined in the First Lien Credit Agreement) are paid in full, assumed in full, or otherwise treated in a manner satisfactory to the Prepetition Secured Parties. For the avoidance of doubt, in no event shall the DIP Lender be required to provide any consideration or recovery to the Prepetition First Lien Agent or Prepetition Secured Parties on account of the Prepetition Obligations or the Prepetition Collateral in the event that (y) it does not receive any recovery on account of the Prepetition Collateral or (y) the sale contemplated under that certain Asset Purchase Agreement, dated as of January 16, 2023, by and between the Debtors and CPS USA Acquisition, LLC (the "<u>Stalking Horse Purchase Agreement</u>") closes and the Prepetition Obligations are assumed by the buyer as contemplated thereunder.

**DIP Milestones:**    The Debtors shall be required to achieve the following milestones (collectively, the "<u>Milestones</u>"):

(i)    the Interim DIP Order shall be entered in the Bankruptcy Cases by no later than 5 calendar days of the date of commencement of the Bankruptcy Cases (the "<u>Petition Date</u>");

(ii)    a final order authorizing the borrowings under the DIP Credit Facility on terms acceptable to the DIP Lender (the "<u>Final DIP Order</u>" and, together with the Interim DIP Order, the "<u>DIP Orders</u>")) shall be entered in the Bankruptcy Cases within 30 calendar days of the Petition Date;

(iii)    the Debtors shall file a motion requesting an order from the Bankruptcy Court approving bid procedures relating to the solicitation of qualified bids for the sale of substantially all of the Debtors' assets and businesses (the "<u>Bidding Procedures</u>"), which motion shall be in form and substance satisfactory to the DIP Lender, within 2 calendar days of the Petition Date, and the Bankruptcy Court shall have entered an order approving the Bidding Procedures within 30 calendar days after the Petition Date; and

(iv)    within 60 calendar days after the Petition Date, subject to extension solely on account of the availability of the Bankruptcy Court, the hearing to consider the approval of the sale transaction shall have occurred and the Bankruptcy Court shall have approved the transaction contemplated by the Bidding Procedures.

**Events of
Default:**    The occurrence of any of the following shall constitute an "<u>Event of Default</u>".  The DIP Lender shall be permitted to exercise remedies, in its sole discretion, upon an Event of Default, as set forth in the DIP Orders and under the heading "Maturity" below.

(i)    the entry of an Interim DIP Order or Final DIP Order in form or substance that is not acceptable to the DIP Lender in its sole discretion;

(ii)    failure to pay principal or Adequate Protection Obligations in full when due, including without limitation, on the Maturity Date;

(iii)    failure to pay interest, fees or other amounts in full within three (3) business days after the date due, including without limitation, on the Maturity Date;

(iv)    failure of any representation, warranty or certification to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change (as defined below), in all respects) when made;

(v)    failure by any Debtor to be in compliance in all material respects with provisions of the DIP Agreement (subject to applicable grace periods as set forth in the DIP Orders, including a two (2) business day grace period for delivery of the Approved Budget, cash flow forecasts and Variance Reports), any other DIP Facility Document or any DIP Order;

(vi)    dismissal of any of the Bankruptcy Cases;

(vii)    the appointment in any of the Bankruptcy Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code) (without the prior written consent of the DIP Lender);

(viii)    failure of any Milestones to be satisfied by the specified deadline therefor;

(ix)    the filing of any application by any Debtor for the approval of (or an order is entered by the Bankruptcy Court approving) any claim arising under section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Bankruptcy Cases which is *pari passu* with or senior to the DIP Obligations, DIP Liens,  excluding the Carve Out, the Prepetition Permitted Liens, liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the DIP Lender;

(x)    the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Bankruptcy Cases with respect to any portion of the DIP Collateral with an aggregate value of at least $50,000 without the prior written consent of the DIP Lender;

(xi)    the filing of a plan of reorganization or liquidation by the DIP Borrower or any Guarantor without the written consent of the DIP Lender (any such plan,

an "<u>Unapproved Plan</u>");

(xii)  actual invalidity of any liens or security interests securing the DIP Obligations;

(xiii)  any Debtor (or any direct or indirect non-Debtor affiliate or subsidiary of a Debtor) commences (or supports) any action (other than an action permitted by the DIP Orders) against the DIP Lender or any of their agents or employees, to subordinate or avoid any liens granted hereunder, under any other DIP Facility Document or under any DIP Order in favor of the DIP Lender;

(xiv)  (a) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify this DIP Term Sheet, any other DIP Facility Document or any DIP Order, or the disallow any DIP Obligations, in whole or in part, or (b) any material provision of this DIP Term Sheet, any other DIP Facility Document or any DIP Order, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Lender);

(xv)  failure by the DIP Borrower or any Guarantor to comply in any material respect with the Interim DIP Order or Final DIP Order, as applicable;

(xvi)  conversion of any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code;

(xvii)  any request made by any Debtor for the reversal, modification, amendment, stay, reconsideration or vacatur of any DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Lender;

(xviii)  the entry of an order amending, modifying, staying, revoking, reversing, vacating or terminating the Interim DIP Order or Final DIP Order, as applicable, without the express written consent of the DIP Lender;

(xix)  the termination of any of the Debtors' exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code without the prior written consent of the DIP Lender;

(xx)  without the prior written consent of the DIP Lender, the filing with the Bankruptcy Court of a motion seeking approval of a sale of all or substantially all assets of the Debtors under section 363 of the Bankruptcy Code that, in either case, does not provide for indefeasible payment in full in cash to the DIP Lender of all DIP Obligations upon closing of such sale or the effective date of a plan pursuant to which such sale is made, unless otherwise agreed to by the DIP Lender;

(xxi)  the filing of any motion seeking approval of a sale of any DIP Collateral without the consent of the DIP Lender (other than any sale permitted by the Final DIP Order or permitted under "Negative Covenants" below), or any

> sale or other disposition of all or a material portion of the collateral securing the DIP Obligations other than as permitted by the Final DIP Order and any sale permitted under "Negative Covenants" below; and
>
> (xxii)   entry of any judgment for the payment of money by Debtors in an amount greater than $50,000 that would be enforceable on a post-Petition Date basis.

**Maturity:**   The DIP Credit Facility shall be repaid in full in cash (and, to the extent not already terminated, all commitments thereunder shall automatically and permanently terminate) on the earliest of the following dates (such earliest date, the "<u>Maturity Date</u>"):

  (i)     March 31, 2023;

  (ii)    the consummation of any sale of all or substantially all of the assets of the Debtors;

  (iii)   30 days after the Petition Date if the Final DIP Order has not been entered;

  (iv)    the acceleration of the DIP Credit Facility;

  (v)     the effective date of any plan of reorganization;

  (vi)    the filing of an Unapproved Plan;

  (vii)   the failure of DIP Borrower or any Guarantor timely to satisfy any Milestone; and

  (viii)  with respect to Events of Default other than those expressly set forth above, two (2) business days after receipt by the DIP Borrower of a written notice from the DIP Lender of the occurrence of any such Event of Default;

*provided*, *however*, that without the consent of a majority of the First Lien Lenders, the DIP Credit Facility cannot be repaid from proceeds of Prepetition Collateral until all "Obligations" (as such term is defined in the First Lien Credit Agreement) are paid in full, assumed in full, or otherwise treated in a manner satisfactory to the Prepetition Secured Parties. For the avoidance of doubt, in no event shall the DIP Lender be required to provide any consideration or recovery to the Prepetition First Lien Agent or Prepetition Secured Parties on account of the Prepetition Obligations or the Prepetition Collateral in the event that (y) it does not receive any recovery on account of the Prepetition Collateral or (y) the sale contemplated under the Stalking Horse Purchase Agreement closes and the Prepetition Obligations are assumed by the buyer as contemplated thereunder.

**Collateral:**   "<u>Collateral</u>" means, collectively, all assets of the DIP Borrower and each Guarantor (and, in the case of each Debtor, its bankruptcy estate) of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods (including fixtures), instruments, inventory, investment property, money, cash, cash equivalents, and all deposit accounts, securities accounts, commodities accounts and lockboxes

together with all money, cash, securities and other investment property on deposit from time to time therein, letters of credit, letter-of-credit rights and other supporting obligations, real property, books and records, and to the extent not otherwise included, all substitutions, replacements, accessions, products and other proceeds and products (whether tangible or intangible and including, without limitation, insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit) of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing (and subject to entry of the Final DIP Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code). All of the DIP Liens described herein with respect to the Collateral shall be effective and perfected by the Interim DIP Order and the Final DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the DIP Lender may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Lender in the DIP Collateral, or to enable the DIP Lender to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the DIP Collateral.

**Priority and Security under DIP Credit Facility:**

The DIP Orders (as defined below) shall grant and approve, among other things, the liens, claims and security interests in the Collateral in the order of priority described below:

(i) pursuant to section 364(c)(1) of the Bankruptcy Code, a joint and several superpriority administrative expense claim in the Bankruptcy Cases in respect of all DIP Obligations (the "DIP Superpriority Claim") with priority over all other administrative expenses and claims; *provided, however,* that the DIP Superpriority Claims shall be junior to (1) a customary "Carve-Out" (to the extent agreed upon by the DIP Lender and set forth in the DIP Orders) and (2) the Prepetition Superpriority Claims (each as defined below);

(ii) pursuant to section 364(c)(2) of the Bankruptcy Code, but subject and junior to the Carve-Out and only upon entry of the Final DIP Order, all DIP Obligations shall be secured by automatically perfected and unavoidable first priority priming security interests in, and liens on, all cash borrowed under the DIP Facility (which shall constitute cash collateral of the DIP Lender) (the "DIP Proceeds"), which cash shall be held in the segregated DIP Loan Account and not otherwise co-mingled with any other Cash Collateral, and all unencumbered Collateral of the Debtors, whether now existing or hereafter arising and wherever located, tangible and intangible (collectively, the "Unencumbered Collateral"), which, in both cases, shall be senior in priority to the "Adequate Protection Liens" granted under the DIP Orders on the DIP Proceeds or Unencumbered Collateral; and

(i) pursuant to section 364(c)(3) of the Bankruptcy Code, but subject and junior to the Carve-Out, all DIP Obligations shall be secured by automatically perfected and unavoidable junior second priority security interests in, and all liens on, all Collateral of the Debtors securing the Prepetition First Lien Facility (for the avoidance of doubt, expressly junior to the liens securing the Prepetition First Lien Credit Agreement) (the "Prepetition Collateral"), whether now existing or hereafter arising and wherever located, tangible and intangible (clauses (ii) and

(iii), collectively, the "DIP Collateral").

The DIP Collateral shall not include actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the "Avoidance Actions"), but, subject to and upon entry of the Final DIP Order, shall include the proceeds of Avoidance Actions ("Avoidance Action Proceeds").

Subject to the priorities and conditions set forth herein, the liens granted on the DIP Collateral in respect of the DIP Credit Facility are referred to herein as the "DIP Liens".

**DIP Superpriority Claim:**

All of the DIP Obligations shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having a superpriority over any and all customary administrative expenses a DIP loan would have priority over, subject only to the Carve-Out.

**Conditions Precedent to the Closing Date:**

The obligations of the DIP Lender to make the Initial DIP Loan on the Closing Date will be subject to satisfaction, or written waiver by the DIP Lender, of each of the following conditions precedent:

(i)     Debtors shall have delivered to the DIP Lender a written request for borrowing the Initial DIP Loan no later than 5:00 p.m. Eastern time on the business day preceding the Closing Date;

(ii)    Debtors shall each have delivered to the DIP Lender an executed counterpart of this DIP Term Sheet;

(iii)   the DIP Borrower shall have delivered to the DIP Lender a closing certificate duly executed, in form reasonably satisfactory to the DIP Lender, by the chief executive officer, president or chief financial officer of the DIP Borrower, delivered to the DIP Lender, appropriately completed, by which such officer shall certify to the DIP Lender that (x) the conditions precedent to the Initial DIP Loan set forth in clauses (v) and (vii) hereof have been satisfied and (y) that the Interim DIP Order has been entered by the Bankruptcy Court (which may be satisfied by providing the DIP Lender with a copy of the signed Interim DIP Order).

(iv)    subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this DIP Term Sheet and the Interim DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this DIP Term Sheet and the Interim DIP Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change;

(v)     all representations and warranties of the Debtors hereunder shall be true and correct in all material respects on the Closing Date (except those qualified by materiality or Material Adverse Change, which shall be true and correct in

all respects) and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date;

(vi)    receipt by the DIP Lender of a certificate, in form and substance reasonably satisfactory to the DIP Lender, executed by the secretary, chief executive officer, president, chief financial officer, treasurer or chief controller of each Debtor on behalf of each such Debtor, certifying that attached to such certificate are true, correct and complete copies of (a) (x) the certificate of incorporation, certificate of limited partnership or articles of organization, as applicable, of such Debtor and (y) the by-laws, partnership agreement or an operating, limited liability company agreement, as applicable, of such Debtor, in each case, then in full force and effect, (b) the resolutions then in full force and effect adopted by the board of directors (or comparable governing body) of such Debtor authorizing and ratifying the execution, delivery and performance by such Debtor of this DIP Term Sheet and the transactions contemplated hereby, (c) a certificate of good standing, dated as of a recent date, from the secretary of state of the state under whose laws such Debtor was incorporated or formed and (d) an incumbency certificate evidencing the identity, authority and capacity of the chief executive officer, president, chief financial officer, treasurer or controller thereof authorized to execute the DIP Term Sheet and any other related document to which such Debtor is a party or is to be a party and specimen signatures thereof;

(vii)    no default or Event of Default under the DIP Credit Facility or the under the Interim DIP Order shall have occurred and be continuing on the Closing Date or shall exist after giving effect to the Initial DIP Loan to be made on the Closing Date;

(viii)    payment of all fees and expenses required to be paid by the Debtors on or prior to the date of funding of the Initial DIP Loan;

(ix)    payment of fees and expenses of any professional advisors retained by the DIP Lender or its counsel;

(x)    receipt of an Approved Budget in form and substance acceptable to the DIP Lender;

(xi)    the DIP Lender shall be satisfied that the liens and security interests of the DIP Lender in the DIP Collateral have been perfected by the Interim DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements with the priority set forth in this Term Sheet; and Debtors shall have confirmed to the DIP Lender in writing that the DIP Loan Account exists and that the DIP Proceeds will be held in such account until applied as permitted by this DIP Term Sheet;

(xii)    receipt of all first day motions and material other motions acceptable to the DIP Lender and the DIP Lender's counsel;

(xiii)    an interim financing order authorizing the DIP Credit Facility on the terms and conditions contemplated by this Term Sheet (the "<u>Interim DIP Order</u>") and otherwise on terms acceptable to DIP Lender, and, inter alia, modifying the automatic stay, authorizing and granting the security interests and liens described above, and granting a super-priority administrative expense claim to DIP Lender with respect to all obligations to DIP Lender, subject to no priority claim or administrative expenses of the Bankruptcy Cases or any other entity, and any future proceeding which may develop out of any such cases, including liquidation in bankruptcy, shall have been entered within 5 calendar days after the Petition Date and be in full force and effect and not have been vacated, reversed, modified amended or stayed and not be subject to a pending appeal or motion or motion for leave to appeal or other proceeding to set aside any such order or the challenge to the relief provided for in it;

(xiv)    no Material Adverse Change shall have occurred since [December 31], 2022 ("<u>Material Adverse Change</u>" means a material adverse change in (a) the business, assets, operations or financial condition of the DIP Borrower and its subsidiaries, taken as a whole, (b) the ability of DIP Borrower to pay the Loan or any of the other Obligations in accordance with the terms of the DIP Agreement and the other loan documents, (c) the DIP Collateral or the DIP Lender's liens on the DIP Collateral or the priority of such liens, or (d) the DIP Lender's rights and remedies under the Agreement and the other loan documents; provided that the effects and events that typically result from the commencement and administration of a chapter 11 case shall not be deemed to be a material adverse change; and

(xv)    the Debtors shall have filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") for Holdings, the DIP Borrower and its subsidiaries (collectively, the "<u>Bankruptcy Cases</u>") by no later than January 16, 2023.  The Debtors shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner acceptable to DIP Lender, with respect to the Interim DIP Order, and DIP Lender shall have received such evidence thereof as it shall reasonably require.  No trustee, or other disinterested person with expanded powers pursuant to section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Debtor or their respective businesses, properties or assets and no motion shall be pending seeking any such relief.

**Conditions Precedent to the Final Closing Date:**    The obligations of the DIP Lender to make the Final DIP Loan on the business day following entry of the Final DIP Order (such day, the "<u>Final Closing Date</u>") will be subject to satisfaction, or written waiver by the DIP Lender, of each of the following conditions precedent (provided, that in the event the DIP Borrower elects to draw a portion of such Final DIP Loan after the final Closing Date as described under "DIP Credit Facility" above, the obligations of the DIP Lender to make such portion of the Final DIP Loan on the applicable drawing date will be subject to satisfaction, or written waiver by the DIP Lender, of each of the following conditions precedent):

(i)     Debtors shall have timely delivered to the DIP Lender the Approved Budget or any update thereto required to be delivered in accordance with this DIP Term Sheet;

(ii)    Debtors shall have delivered to the DIP Lender a written request for borrowing the Final DIP Loan no later than 5:00 p.m. Eastern time on the business day preceding the Final Closing Date, which Final Closing Date shall occur no later than the business day following the entry by the Bankruptcy Court of the Final DIP Order (provided, that in the event the DIP Borrower elects to draw a portion of such Final DIP Loan after the Final Closing Date as described under "DIP Credit Facility" above, the Debtors shall have delivered to the DIP Lender a written request for borrowing such portion of the Final DIP Loan no later than 5:00 p.m. Eastern time five (5) business days (or such shorter period as the DIP Lender may agree) prior to such funding date);

(iii)   the DIP Borrower shall have delivered to the DIP Lender a closing certificate duly executed, in form reasonably satisfactory to the DIP Lender, by the chief executive officer, president or chief financial officer of the DIP Borrower, delivered to the DIP Lender, appropriately completed, by which such officer shall certify to the DIP Lender that (x) the conditions precedent to the Final DIP Loan set forth in clauses (v) and (v) hereof have been satisfied and (y) that the Final DIP Order has been entered by the Bankruptcy Court (which may be satisfied by providing the DIP Lender with a copy of the signed Final DIP Order).

(iv)    subject to Bankruptcy Court approval, (a) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this DIP Term Sheet and the Final DIP Order, and (b) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this DIP Term Sheet and the Final DIP Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change;

(v)     all representations and warranties of the Debtors hereunder shall be true and correct in all material respects on the Final Closing Date and date of funding (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects) and except to the extent that such representations and warranties expressly relate to any earlier date, in which case such representations and warranties shall have been true and correct in all material respects, as applicable, as of such earlier date;

(vi)    no default or Event of Default under the DIP Credit Facility or the under the Final DIP Order shall have occurred and be continuing on the Final Closing Date and date of funding or shall exist after giving effect to the Final DIP Loan to be made on the Final Closing Date or other date of funding;

(vii)   payment of all fees and expenses required to be paid by the DIP Borrower on or prior to the date of funding of the Final DIP Loan;

(viii)  payment of fees and expenses of any professional advisors retained by the DIP Lender or its counsel;

(ix)    the DIP Lender shall be satisfied that the liens and security interests of the DIP Lender in the DIP Collateral have been perfected by the Final DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements with the priority set forth in this Term Sheet;

(x)     the Final DIP Order on terms acceptable to DIP Lender, and, inter alia, modifying the automatic stay, authorizing and granting the security interests and liens described above, and granting a super-priority administrative expense claim to DIP Lender with respect to all obligations to DIP Lender, subject to no priority claim or administrative expenses of the Bankruptcy Cases or any other entity, and any future proceeding which may develop out of any such cases, including liquidation in bankruptcy, shall have been entered within 30 calendar days after the Petition Date and be in full force and effect and not have been vacated, reversed, modified amended or stayed and not be subject to a pending appeal or motion or motion for leave to appeal or other proceeding to set aside any such order or the challenge to the relief provided for in it; and

(xi)    no Material Adverse Change shall have occurred since the Closing Date.

**Representations and Warranties:**   The Debtors represent and warrant to the DIP Lender on the Closing Date and the Final Closing Date (and any other date of funding of the DIP Loans) as set forth on Annex C attached hereto.

**Affirmative Covenants:**   Until the date the DIP Obligations are paid in full, the Debtors hereby covenant and agree that the Debtors shall:

(i)     timely deliver to the DIP Lender the weekly proposed updates to the Approved Budget and Variance Reports in accordance with the provisions set forth under the heading "Budget Covenant" below and in the DIP Orders;

(ii)    comply with the Approved Budget (after giving effect to the Permitted Variances) and with provisions of this DIP Term Sheet and the Interim DIP Order and/or the Final DIP Order (as applicable);

(iii)   maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of such person;

(iv)    cooperate, consult with, and provide to the DIP Lender, all such information as required under this DIP Term Sheet or the DIP Orders or as reasonably requested by the DIP Lender, and permit representatives and independent contractors of the DIP Lender to visit and inspect any of its properties, to

examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the reasonable expense of the DIP Borrower (provided that the DIP Borrower shall only be obligated to reimburse such expenses for two visits during the pendency of the Bankruptcy Cases) and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the DIP Borrower; *provided* that any and all information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or information where such disclosure would not be permitted by any applicable requirements of law shall be excluded from this "Affirmative Covenants" subparagraph (iv);

(v)    take, or cause to be taken, all reasonably appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the DIP Lender to carry out the provisions of this DIP Term Sheet, the other DIP Facility Documents and the DIP Orders;

(vi)    except to the extent contemplated by the Approved Budget or otherwise consented to by the DIP Lender in writing, continue, and cause to be continued, the business of the Debtors, maintain, and cause to be maintained, the Debtors' existence and material relationships, rights and privileges, and comply with all material contractual obligations of the Debtors;

(vii)    take, or cause to be taken, all appropriate action to remain the sole owner of the DIP Collateral, free of liens other than the Prepetition Permitted Liens, liens permitted to be incurred or exist pursuant to subparagraph (i) of the "Negative Covenant" section of this DIP Term Sheet, liens granted or incurred after the Petition Date in the ordinary course of business or other liens granted or imposed pursuant to an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the DIP Lender;

(viii)    take, or cause to be taken, all appropriate action to comply with all material applicable laws applicable to the Debtors or the DIP Collateral unless failure to comply could not reasonably be expected to result in a Material Adverse Change;

(ix)    subject to the Approved Budget, pay when due all taxes prior to the date on which penalties attach, except where such tax is being contested in good faith and adequate reserves have been established in accordance with GAAP or to the extent payment and/or enforcement thereof is stayed as a result of the Bankruptcy Cases;

(x)    provide copies of all material pleadings, motions, applications, judicial information, financial information and other documents intended to be filed by or on behalf of any Debtor with the Bankruptcy Court in the Bankruptcy Cases to counsel to the DIP Lender at least two (2) days in advance of such filing or as promptly as practicable; *provided, however,* that the following are not material: ministerial notices and similar ministerial documents; retention applications; fee applications; fee statements; any similar pleadings or

motions relating to the retention or fees of any professional; or statements of financial affairs and schedules of assets and liabilities;

(xi)     promptly provide such additional information concerning the Debtors, or the DIP Collateral as the DIP Lender may reasonably request; *provided* that any and all information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or information where such disclosure would not be permitted by any applicable requirements of law shall be excluded from this "Affirmative Covenants" subparagraph (xi);

(xii)    maintain its cash management system in a manner reasonably acceptable to the DIP Lender (which shall be deemed satisfied if the cash management system is substantially the same as the cash management system in existence on the Petition Date, with such modifications as permitted under the cash management order, as entered);

(xiii)   cause the Debtors' senior management and legal and financial advisors to be available to conduct a telephonic conference at least once every other calendar week at reasonable times during normal business hours and upon reasonable prior notice, if reasonably requested by the DIP Lender, to discuss the Approved Budget, the Bankruptcy Cases, and the financial condition, performance and business affairs of the Debtors;

(xiv)    upon and at all times after the Closing Date, maintain proceeds of the DIP Loans in the DIP Loan Account solely for the benefit of the DIP Lender until disbursed by the DIP Borrower as permitted by this DIP Term Sheet;

(xv)     comply with the affirmative covenants set forth in sections 6.1 (other than any covenant referenced in subparagraph (xvi) below or sections 6.1.4, 6.1.5, 6.1.6, 6.1.7, 6.1.8, 6.1.9, 6.1.10 and 6.1.11), 6.2, 6.3(b), 6.4 and 6.5 of the Prepetition First Lien Credit Agreement as in effect on the Petition Date, incorporated herein by this reference, (1) as if such affirmative covenants were set forth herein and references to "this Agreement" therein were references to this DIP Term Sheet and references to the "Administrative Agent" or the "Agent" therein were references to the DIP Lender, and (2) with such other definitional or non-substantive updates deemed made thereto as the context may require;

(xvi)    deliver to the DIP Lender (x) promptly upon the occurrence thereof, written notice of any default or Event of Default, and (y) the financial statements, compliance certificates and other financial reporting deliverables that would be required to be delivered to the Prepetition First Lien Agent under the Prepetition First Lien Credit Agreement pursuant to sections 6.1.1, 6.1.2 and 6.1.3 of the Prepetition First Lien Credit Agreement (as in effect on the Closing Date), incorporated herein by this reference, (1) as if such affirmative covenants were set forth herein and references to "this Agreement" therein were references to this DIP Term Sheet and references to the "Administrative Agent" or the "Agent" therein were references to the DIP Lender, and (2) with such other definitional or non-substantive updates deemed made thereto as the context may require; and

(xvii)  timely comply with the Milestones.

**Negative Covenants:**

Until the date the DIP Obligations are paid in full, the Debtors hereby covenant and agree that no Debtor shall, without the express, prior written consent of the DIP Lender, do, cause to be done, or agree to do or cause to be done, any of the following:

(i)  other than liens securing indebtedness required or permitted by this DIP Term Sheet and the DIP Orders, create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except (a) the Carve Out, (b) liens permitted by the Prepetition First Lien Credit Agreement which, other than prepetition liens securing the Prepetition First Lien Facility (the "Prepetition Permitted Liens"), or other liens that are permitted to be senior to the DIP Liens by the DIP Lender, are junior to the liens securing the DIP Credit Facility, (c) the "Adequate Protection Liens" set forth and as defined in the DIP Orders, (d) other liens securing obligations in an aggregate principal amount at any time outstanding not to exceed $50,000;

(ii)  convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or hereafter acquired, other than (a) asset sales approved by an order of the Bankruptcy Court that is in form and substance reasonably acceptable to the DIP Lender, (b) asset sales in the ordinary course of business, (c) dispositions of obsolete, worn out, used or surplus property in the ordinary course of business and dispositions of property no longer used or useful in the conduct of the business of the Debtors and (d) dispositions of property not otherwise permitted so long as the aggregate fair market value of all assets so disposed shall not exceed $50,000;

(iii)  create, incur assume or permit to exist any indebtedness outside of the ordinary course of business, other than the DIP Obligations (it being agreed that trade payables in the ordinary course of business shall not be restricted);

(iv)  (a) amend, modify or compromise any material term or material amount owed under a real property lease or material contract without the prior written consent of the DIP Lender, or (b) assume or reject any executory contract or lease pursuant to section 365 of the Bankruptcy Code without the prior written consent of the DIP Lender;

(v)  incur or make any expenditure, Restricted Payment (as defined below), investment, loan or other payment without the prior written consent of the DIP Lender, other than in accordance with the Approved Budget, after giving effect to the Permitted Variances;

(vi)  create or acquire any ownership interest in any subsidiaries (whether direct or indirect) other than those existing on the Petition Date;

(vii)  modify or alter (a) in any material manner the nature and type of its business or the manner in which such business is conducted or (b) its organizational documents, except as required by the Bankruptcy Code or in a manner that is

not materially adverse to the interests of the DIP Lender (in its capacity as such) without the prior written consent of the DIP Lender;

(viii)    pay pre-petition indebtedness, except (a) payments contemplated by this DIP Term Sheet and the DIP Orders, (b) payments authorized by an order of the Bankruptcy Court and (c) adequate protection payments as set forth in the Interim DIP Order;

(ix)    not make, commit to make, or permit to be made any bonus payments to executive officers of the Debtors and their subsidiaries in excess of the amounts set forth in the Approved Budget; and

(x)    not permit the Debtors to seek authorization for, and not permit the existence of, any claims other than that of the DIP Lender entitled to a superpriority under section 364(c)(1) of the Bankruptcy Code that is senior or pari passu with the DIP Lender's section 364(c)(1) claim, except for the Carve-Out or as otherwise acceptable to the DIP Lender in writing.

"Restricted Payment" means, with respect to any person, (a) the declaration or payment of any dividend (whether in cash, securities or other property or assets) or distribution of cash or other property or assets in respect of equity interests of such person; (b) any payment (whether in cash, securities or other property or assets) on account of the purchase, redemption, defeasance, sinking fund or other retirement of the equity interests of such person or any other payment or distribution (whether in cash, securities or other property or assets) made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal or premium, if any, or interest, fees or other charges on or with respect to, or any redemption, purchase, retirement, defeasance, sinking fund or similar payment or any claim for rescission with respect to, any indebtedness (other than adequate protection payments in respect of the pre-petition indebtedness as expressly provided for herein, in the Interim DIP Order or in the Approved Budget); and (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire equity interests of such person now or hereafter outstanding, in each case of (a) through (d), other than any payment to any Debtor (other than Holdings).

**Budget Covenant:**    "Approved Budget" means the rolling 13-week cash flow forecast of the Debtors containing line items of sufficient detail to reflect the Debtors' projected receipts and disbursements for the applicable 13-week period, in form and substance satisfactory to the DIP Lender, delivered most recently prior to the Closing Date, and as modified following the Closing Date by any rolling 13-week cash flow forecast of the Debtors delivered no later than 5:00 p.m. Eastern time two (2) business days after each Friday of each calendar week following the Closing Date (each such Friday, a "Specified Reference Date"), covering the 13-week period beginning on the first business day to occur after each such Specified Reference Date, together with (following the first such forecast) a Variance Report (as defined below) setting forth (i) actual results against the forecasted results from the most recent cash flow forecast for the prior period, on a line-item basis and in the aggregate as of the end of such period and as of the end of the Testing Period (as defined below) ending on such date, (ii) the variance in dollar amounts and percentages for the week ending with such Specified Reference Date and for the Testing Period ending on such date, and (iii) such other information with respect to cash flows as the DIP Lender may reasonably request. Notwithstanding anything

herein to the contrary, any such 13-week cash flow forecast delivered to the Lender after the Closing Date shall only become the effective "Approved Budget" for purposes hereof following the DIP Lender's acknowledgement that the proposed budget is in substance satisfactory to the DIP Lender.

The Debtors shall deliver to the DIP Lender, no later than 5:00 p.m. Eastern time two (2) business days after each Specified Reference Date, a proposed revision to the Approved Budget covering the 13-week period beginning on the first business day to occur after such Specified Reference Date (as defined below), together with a variance report (certified by the Debtors) (each a "Variance Report") setting forth (i) actual results against the forecasted results from the most recent cash flow forecast for the prior period, on a line-item basis and in the aggregate as of the end of such period and as of the end of the Testing Period ended on such date, (ii) the variance in dollar amounts and percentages for the week ending with such Specified Reference Date and for the Testing Period ending on such date, and (iii) such other information with respect to cash flows as the DIP Lender may reasonably request. The Debtors represent and warrant that the projections and pro forma financial information, taken as a whole, contained in the Approved Budget and any such proposed revisions to the Approved Budget are based upon good faith estimates and assumptions believed by management of the Debtors to be reasonable at the time made, it being recognized by the DIP Lender that such financial information as it relates to future events is not to be viewed as fact, forecasts and projections are subject to uncertainties and contingencies, actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount and no assurance can be given that any forecast or projections will be realized. "Testing Period" means each four-week period (or in the case of the first, second and third Testing Periods following the Closing Date, the one-week, two-week and three-week period, respectively) period ending on (and including) Sunday of each calendar week occurring after the Closing Date, commencing (a) in the case of the first, second and third such Testing Periods, with the Monday most recently prior to the Closing Date, and ending on (and including) Sunday of the calendar week in which the Closing Date occurs, Sunday of the next calendar week, and Sunday of the calendar week after that, respectively, and (b) in the case of each Testing Period, with the fourth Monday preceding the end of such Testing Period.

The Debtors shall not permit, for any Testing Period (A) (x) the amount of actual Cumulative Expenditures (as defined below) for such Testing Period to exceed (y) the projected amount of Cumulative Expenditures set forth in the Approved Budget for such Testing Period, by more than 15.0% of the aggregate amount projected for Cumulative Expenditures in the Approved Budget for such Testing Period, or (B) (x) the projected amount of Cumulative Receipts (as defined below) set forth in the Approved Budget for such Testing Period to be less than (y) the amount of actual Cumulative Receipts for such Testing Period by more than 15.0% of the aggregate amount projected for Cumulative Receipts in the Approved Budget for such Testing Period (the applicable foregoing limitations being referred to herein as the "Permitted Variance"). For the avoidance of doubt, the parties hereto acknowledge and confirm that this covenant measures, at the end of each applicable Testing Period, variance against the Approved Budget for the period from the first day of each Testing Period through the last day of such Testing Period. "Cumulative Expenditures" shall mean, for any period of determination, the aggregate cash expenditures of the Debtors during such period, expressed as a positive number (in each case, calculated on an actual and

not a GAAP basis); and "<u>Cumulative Receipts</u>" shall mean, for any period of determination, the aggregate cash receipts of the Debtors during such period (excluding proceeds of the DIP Loans that may be deemed a receipt), expressed as a positive number (in each case, calculated on an actual and not a GAAP basis).

**Other Bankruptcy Matters:**

The DIP Orders shall be in form and substance satisfactory to the DIP Lender and shall include the following provisions:

(i)      modifying the automatic stay to permit the creation and perfection of the DIP Lender's liens on the DIP Collateral and the Prepetition Adequate Protection Liens, in each case, subject to the Carve Out;

(ii)     authorizing and approving the DIP Credit Facility and the transactions contemplated thereby, including the granting of the superpriority status, security interests and liens and the payment of all premiums, payments and fees referred to herein;

(iii)     without limiting the scope of the releases described herein, subject to a customary challenge period for parties in interest, including, but not limited to, any official committee appointed in these cases, of 75 days from the entry of the Interim DIP Order (the "<u>Challenge Period</u>"), acknowledging the validity and enforceability of the Prepetition First Lien Facility, the debt outstanding thereunder and the liens granted in connection therewith; *provided*, that the Challenge Period with respect to the DIP Lender and its affiliates, including the releases set forth in the Interim DIP Order, shall be the earliest of (A) the date of confirmation of the plan of reorganization, (B) entry of an order approving the sale of the Debtors' assets to the DIP Lender or its affiliates; or (C) the date of entry of the Final Order;

(iv)     providing that the DIP Lender and its counsel, advisors, and consultants shall be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code;

(v)     subject to and upon entry of (A) the Interim DIP Order, providing that the DIP Lenders shall have the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the full amount of the DIP Loans approved pursuant to the Interim DIP Order, and (B) subject to and upon entry of the Final DIP Order, the DIP Lender shall have the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the full amount of the DIP Loans, as applicable, in each case, in whole or in part, in connection with any sale or disposition of assets in the Bankruptcy Cases and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code; provided that any such credit bid shall require assumption in full of the Prepetition Obligations (or other treatment satisfactory to the Prepetition Secured Parties);

(vi)     subject to and upon entry of the Final DIP Order, prohibiting the assertion of claims arising under section 506(c) of the Bankruptcy Code against any of the Prepetition First Lien Lenders;

(vii)     subject to and upon entry of the Final DIP Order, providing that the Prepetition Secured Parties are entitled to all of the benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception thereunder shall not apply to any of the Prepetition First Lien Lender with respect to proceeds,

product, offspring, or profits of any of the Prepetition Collateral;

(viii)  subject to and upon entry of the Final DIP Order, providing that in no event shall any of the Prepetition Secured Parties or Existing Secured Facility Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral; and

(ix)  provide for the release attached hereto as <u>Annex D</u>.

| | |
|---|---|
| **DIP Orders Govern:** | To the extent of any conflict or inconsistency between this DIP Term Sheet, the DIP Agreement and any DIP Order, such DIP Order shall govern. |
| **Adequate Protection:** | Prepetition First Lien Lenders shall receive, in each case subject to the Carve-Out, (i) current payment of all reasonable and documented out-of-pocket fees, costs and expenses of the Prepetition First Lien Agent (including all fees and expenses of their outside counsel, Winston & Strawn LLP, and one firm of local counsel engaged in connection with the Bankruptcy Cases); (ii) replacement liens on the collateral securing the Prepetition First Lien Credit Agreement (the "<u>Prepetition Adequate Protection Liens</u>"); (iii) superpriority administrative expense claims with respect to the foregoing and to the extent of any post-petition diminution in value of the Prepetition First Lien Lenders' interest in the collateral securing the Prepetition First Lien Credit Agreement (the "<u>Prepetition Superpriority Claims</u>"); and (iv) access to the Debtors' books and records and such financial reports as are provided to the DIP Lender. |
| **Amendments:** | No provision of this DIP Term Sheet, any other DIP Facility Document or any DIP Order may be amended or waived other than by an instrument in writing signed by (i) the DIP Lender and (ii) the Debtors. |
| **Assignments** | The DIP Lender may assign all or any part of the DIP Loans or its commitments hereunder from time to time with the consent of the DIP Borrower; *provided* that no consent of the DIP Borrower shall be required (i) so long as an Event of Default has occurred and is continuing after giving effect to any applicable grace period or (ii) for any assignment to any of its affiliates. |
| **Governing Law**: | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this DIP Term Sheet. The Debtors will submit to the exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then [in any state or federal court of competent jurisdiction in the State, County and City of New York, borough of Manhattan]. |
| **Counterparts and Electronic Transmission:** | This DIP Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument.   The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this DIP Term Sheet shall be deemed to include Electronic Signatures (as defined below), deliveries or the keeping of records in any electronic form (including deliveries by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually |

executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be.

As used herein, "Electronic Signature" shall mean an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

**Notices:**

Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

if to the DIP Borrower or any Guarantor, to
Performance Powersports Group Purchaser, Inc.
1775 E. University Drive
Tempe, AZ 85281
Attention: Ken Vanden Berg
Email: kenv@colepow.com

with a copy (which shall not constitute notice) to:
Klehr Harrison Harvey Branzburg LLP
919 N. Market Street, Suite 1000
Wilmington, DE 19801
Attention:  Domenic Pacitti, Esq.
Email:  dpacitti@klehr.com

if to the DIP Lender:
c/o Kinderhook Industries, LLC
505 Fifth Avenue
25th  Floor
New York, NY 10017
Attn: Christian P. Michalik, Managing Director
Email: cmichalik@kinderhook.com

with a copy (which shall not constitute notice) to:
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY  10022
Attention:  Brian Schartz and Yongjin Im
Email: brian.schartz@kirkland.com; yim@kirkland.com
Telecopy:  (212) 446 6460

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopy shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).

**Counsel to the
DIP Lender:**

Kirkland & Ellis LLP

**IN WITNESS WHEREOF**, each of the undersigned has caused this DIP Term Sheet to be duly executed and duly delivered by its duly authorized officer as of the day and year first above written.

**PERFORMANCE POWERSPORTS GROUP PURCHASER, INC.**

By: 
Name:  Ken Vanden Berg
Title:  Chief Financial Officer

**PERFORMANCE POWERSPORTS GROUP HOLDINGS, INC.**

By: 
Name:  Ken Vanden Berg
Title:  Chief Financial Officer

**PERFORMANCE POWERSPORTS GROUP, INC.**

By: 
Name:  Ken Vanden Berg
Title:  Chief Financial Officer

**TANKAS FUNDING VI, LLC**

By: _____

    Name: Christian Michalik
    Title: Managing Director

[Signature Page to DIP Term Sheet]

**Annex A**

**Guaranty**

(A)    The Guarantors jointly and severally hereby absolutely, unconditionally and irrevocably guarantee to the DIP Lender the due and punctual payment and discharge of all DIP Obligations (the "Guaranteed Obligations"). The guaranty of each Guarantor set forth in this Annex A (this "Guaranty") (and the guarantee contained herein) is an unconditional guarantee of payment and not of collection.

(B)    The Guarantors jointly and severally agree to make payment hereunder of the amount due under the DIP Obligations forthwith promptly following demand of the DIP Lender when the Guaranteed Obligations or any portion thereof is due in cash to the DIP Lender, whether at stated maturity, by acceleration or otherwise. Each Guarantor hereby waives and agrees not to assert any defense, whether arising in connection with or in respect of any of the following or otherwise, and hereby agrees that its obligations under this Guaranty are irrevocable, absolute and unconditional and shall not be discharged as a result of or otherwise affected by any of the following (which may not be pleaded and evidence of which may not be introduced in any proceeding with respect to this Guaranty, in each case except as otherwise agreed in writing by the DIP Lender):

(i)    the invalidity or unenforceability of any obligation of the Debtors or any other Guarantor under the DIP Agreement or the DIP Orders or any other agreement or instrument relating thereto (including any amendment, consent or waiver thereto), or any security for, or other guaranty of, any Guaranteed Obligation or any part thereof, or the lack of perfection or continuing perfection or failure of priority of any security for the Guaranteed Obligations or any part thereof;

(ii)    the absence of (i) any attempt to collect any Guaranteed Obligation or any part thereof from the DIP Borrower or any other Guarantor or other action to enforce the same or (ii) any action to enforce the DIP Agreement or the DIP Orders or any Lien thereunder;

(iii)    the failure by any Person to take any steps to perfect and maintain any Lien on, or to preserve any rights with respect to, any DIP Collateral;

(iv)    any workout, insolvency, bankruptcy proceeding, reorganization, arrangement, liquidation or dissolution by or against the DIP Borrower, any other Guarantor or any of the DIP Borrower's other Subsidiaries or any procedure, agreement, order, stipulation, election, action or omission thereunder, including any discharge or disallowance of, or bar or stay against collecting, any Guaranteed Obligation (or any interest thereon) in or as a result of any such proceeding;

(v)    any foreclosure, whether or not through judicial sale, and any other sale or other disposition of any DIP Collateral or any election following the occurrence of an Event of Default by the DIP Lender to proceed separately against any DIP Collateral in accordance with the DIP Lender's rights under any applicable requirement of law; or

(vi)    any other defense, setoff, counterclaim or any other circumstance that might otherwise constitute a legal or equitable discharge of the DIP Borrower, any other Guarantor or any of the DIP Borrower's other subsidiaries, in each case other than the payment in full of the Guaranteed Obligations.

Each Guarantor further agrees to make full payment to the DIP Lender under this Guaranty even if circumstances exist or arise which otherwise would constitute a legal or equitable discharge of such Guarantor as surety or guarantor of the DIP Obligations.

(C)    [Reserved].

(D)    To the fullest extent permitted by law, each Guarantor hereby expressly waives any and all rights or defenses arising by reason of any law that would otherwise require any election of remedies by a Holder. To the fullest extent permitted by law, each of the undersigned Guarantors hereby (a) waives notice of presentment, demand, notice of nonpayment, protest and notice of protest as to the Guaranteed Obligations and any other demands and notices required by law, (b) consents to the provisions of the DIP Agreement and the DIP Orders, (c) consents and agrees that the DIP Lender may waive or delay the exercise of any rights or remedies against the DIP Borrower or any surety or guarantor, and may (i) release or enter into compromises with the DIP Borrower, or any surety or guarantor of the Guaranteed Obligations, and (ii) renew, extend, waive or modify the terms of any Guaranteed Obligations guaranteed hereby of the DIP Agreement or the DIP Orders or any instrument or agreement evidencing the same, and assign its claims thereunder to other persons, (d) waives the defense of loss of contribution from any co-guarantor with respect to the DIP Obligations, (e) waives all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar law now or hereafter in effect, and (f) waives all suretyship defenses generally. Each Guarantor represents and warrants to the DIP Lender that: (x) no other agreement, representation or special condition exists between such Guarantor and the DIP Lender regarding the liability of such Guarantor hereunder; and (y) such Guarantor has no defense whatsoever (including any suretyship defense) to any action or proceeding that may be brought to enforce this Guaranty.

(E)    Each Guarantor, for the benefit of the DIP Lender, waives and agrees not to enforce any of the rights of such Guarantor against the DIP Borrower, including: (a) any right of such Guarantor to be subrogated in whole or in part to any right or claim with respect to any Guaranteed Obligations or any portion thereof to the DIP Lender which might otherwise arise from payment by Guarantor to the DIP Lender on the account of the Guaranteed Obligations or any portion thereof, any right of contribution or indemnification against the DIP Borrower, and any right to participate in any claim or remedy of the DIP Lender against the DIP Borrower in connection with the Guaranteed Obligations or any portion thereof, in each case, until (i) payment in full in cash of the DIP Obligations (including interest accruing during the pendency of any insolvency or liquidation proceeding, regardless of whether allowed or allowable in an insolvency proceeding and regardless of whether then due or payable), (ii) payment in full in cash of all DIP Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (including any contingent indemnification obligations to the extent asserted), and (iii) termination or expiration of all commitments to lend under the DIP Agreement and the DIP Orders and (b) any right of such Guarantor to require the marshalling of assets of the Debtors which might otherwise arise from payment by such Guarantor to the DIP Lender on account of the Guaranteed Obligations or any portion thereof. Each Guarantor acknowledges that it will receive direct and indirect benefits from DIP Loans and that the waivers set forth in this Guaranty are knowingly made in contemplation of such benefits.

**Annex B**

**Indemnification**

Subject to and upon entry of a Final DIP Order, the Debtors hereby absolutely and unconditionally and jointly and severally agree to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless the DIP Lender and its officers, directors, employees, agents, advisors, attorneys and affiliates (collectively, the "<u>Indemnitees</u>"), from and against any and all Indemnified Liabilities (as hereinafter defined); *provided* that the Debtors shall not have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise solely from the gross negligence or willful misconduct of that Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction.   As used herein, "<u>Indemnified Liabilities</u>" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, actions, judgments, suits, claims, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any hazardous materials activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel (including allocated costs of internal counsel) for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and environmental laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this DIP Term Sheet or the other DIP Facility Documents or the Bankruptcy Cases or the transactions contemplated hereby or thereby (including the DIP Lender's agreement to make the DIP Loans hereunder or the use or intended use of the proceeds thereof ), or any enforcement of any of the DIP Term Sheet or the other DIP Facility Documents (including any sale of, collection from, or other realization upon any of the Collateral)), or (ii) any environmental claim or any hazardous materials activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Debtors and their subsidiaries.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this paragraph may be unenforceable in whole or in part because they are violative of any law or public policy, the Debtors shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.  Notwithstanding anything in this DIP Term Sheet or the DIP Facility Documents to the contrary, the agreements in this paragraph shall survive the termination of the DIP Credit Facility and the repayment, satisfaction or discharge of all the other DIP Obligations.  All amounts due under this paragraph shall be payable on written demand by the DIP Lender therefor.  Any such amounts not paid when due shall, if due prior to the maturity of the DIP Loans, be charged to the DIP Borrower and shall thereafter constitute DIP Loans hereunder and shall accrue interest at the rate then applicable to DIP Loans hereunder.

**Annex C**

**Representations and Warranties**

The Debtors represent and warrant to the DIP Lender on the date hereof and on the date of the making of any of the DIP Loans that: (a) each Debtor is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware or Arizona; (b) each Debtor has all requisite power and authority and full legal right to carry on the business in which it is presently engaged and will be engaged upon consummation of the transactions contemplated hereby; (c) all necessary action has been taken by each Debtor to execute and deliver this DIP Term Sheet and the DIP Facility Documents and to make the borrowings hereunder; (d) the DIP Term Sheet and each of the DIP Facility Documents is a legal, valid and binding obligation of the Debtors party thereto, enforceable against such Debtor in accordance with its terms; (e) the execution, delivery and performance by such Debtor of the DIP Term Sheet and the other DIP Facility Documents do not and will not conflict with (i) any provision of applicable law, (ii) the charter, by-laws or other organizational documents of such Debtor or (iii) any contract or other agreement, indenture, instrument or other document to which a Debtor is a party, other than conflicts which have been waived by the applicable third party thereto or would not reasonably be expected to have, either individually or in the aggregate, a material adverse effect; (f) no Debtor is an "investment company" or a company "controlled by an "investment company" or a "subsidiary" of an "investment company", within the meaning of the Investment Company Act of 1940, in each case, required to be registered as such in accordance with the Investment Company Act of 1940; (g) all property of the Debtors is free and clear of all Liens, except Permitted Liens (as defined in the Prepetition First Lien Credit Agreement as in effect on the Petition Date); (h) the provisions of the DIP Term Sheet, the Interim DIP Order and the Final DIP Order are effective to create in favor of the DIP Lender a legal, valid, perfected, nonavoidable and enforceable security interest in all right, title and interest of the Debtors in the DIP Collateral described therein (having the priority provided for herein and in the Interim DIP Order or the Final DIP Order, as applicable); and (i) no statement or information concerning Debtors contained in this DIP Term Sheet, any other DIP Facility Document, or any other document, certificate or statement furnished by or on behalf of any Debtor and each Guarantor to the DIP Lenders for use in connection with the transactions contemplated by this DIP Term Sheet or the other DIP Facility Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not materially misleading.

## Annex D

## Release

Subject to and upon entry of a Final DIP Order, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Debtors, (in their own right, on behalf of their estates and their current and former direct and indirect subsidiaries, and each such entity's and its current and former direct and indirect subsidiaries' current and former directors, officers, managers, predecessors, and successors and assigns, and each of such entity's current and former officers, members, managers, directors, principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), and representatives, in each case to the extent permitted by applicable law and solely in such parties capacity as such) (collectively, the "***Releasing Parties***") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the DIP Lender, and each such entity's current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "***Released Parties***") and their respective property and assets from any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of the Final DIP Order, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement, recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the Prepetition First Lien Credit Agreement, but excluding obligations of the DIP Lender under the DIP Credit Facility arising after the date of the Final DIP Order (collectively, the "***Released Claims***").  This paragraph is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties.  Notwithstanding the releases and covenants in favor of the Released Parties contained above in this paragraph, such releases and covenants in favor of the Released Parties shall be deemed acknowledged and reaffirmed by the Debtors each time there is an advance of funds, extension of credit, or financial accommodation under this DIP Term Sheet, an Interim DIP Order or the DIP Documents.  As of the date hereof, there exist no claims or causes of action against the DIP Lenders with respect to, in connection with, related to, or arising from this DIP Term Sheet, an Interim DIP Order or the DIP Facility Documents that may be asserted by the Debtors or, to the Debtors' knowledge, any other person or entity.

**PERFORMANCE POWERSPORTS GROUP PURCHASER, INC.**


By: _____
    Name:
    Title:


**PERFORMANCE POWERSPORTS GROUP HOLDINGS, INC.**


By: _____
    Name:
    Title:


**PERFORMANCE POWERSPORTS GROUP, INC.**


By: _____
    Name:
    Title:

**TANKAS FUNDING VI, LLC**

By: _____
   Name:
   Title: