```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 23-10047 (LSS)
 4   PERFORMANCE POWERSPORTS       .
     GROUP INVESTOR, LLC, et al.,.  Joint Administration Requested
 5                                 .
                                   .
 6                                 .  Courtroom No. 2
                                   .  824 Market Street
 7             Debtors.            .  Wilmington, Delaware 19801
                                   .
 8                                 .  Wednesday, January 18, 2023
     . . . . . . . . . . . . . .   .  10:00 a.m.
 9
                     TRANSCRIPT OF FIRST DAY HEARING
10          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                 CHIEF UNITED STATES BANKRUPTCY JUDGE
11
     APPEARANCES:
12
     For the Debtors:         Domenic Pacitti, Esquire
13                            Sally Veghte, Esquire
                              Michael Yurkewicz, Esquire
14                            KLEHR HARRISON HARVEY BRANZBURG LLP
                              919 North Market Street
15                            Suite 1000
                              Wilmington, Delaware 19801
16

17

18
     (APPEARANCES CONTINUED)
19
     Audio Operator:          Jermaine Cooper
20
     Transcription Company:   Reliable
21                            The Nemours Building
                              1007 N. Orange Street, Suite 110
22                            Wilmington, Delaware 19801
                              Telephone: (302)654-8080
23                            Email:  gmatthews@reliable-co.com

24   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
25
```

```
 1   APPEARANCES (CONTINUED):

 2   For the U.S. Trustee:    Richard Schepacarter, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
 3                            844 King Street, Suite 2207
                              Lockbox 35
 4                            Wilmington, Delaware 19801

 5   For Kinderhook:          Brian Schartz, Esquire
                              KIRKLAND & ELLIS LLP
 6                            609 Main Street
                              Houston, Texas 77002
 7
     For the First Lien
 8   Agent:                   Gregory Gartland, Esquire
                              WINSTON & STRAWN LLP
 9                            200 Park Avenue
                              New York, New York 10166
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX

2  MOTIONS:                                         PAGE

3
   Agenda
4  Item 3:  Joint Administration Motion. Debtors' Motion    21
              for Entry of an Order (I) Directing Joint
5             Administration of their Related Chapter 11
              Cases and (II) Granting Related Relief
6             [Docket No. 3; Filed 1/16/2023]

7
               Court's Ruling:                            22
8
   Agenda
9  Item 4:  Section 156(c) Retention Application. Debtors'   22
              Application for Entry of an Order Appointing
10            Omni Agent Solutions as Claims and Noticing
              Agent Effective as of Petition Date
11            [Docket No. 4; Filed 1/16/2023]

12             Court's Ruling:                            23

13
   Agenda
14 Item 5:  Creditor Matrix Motion. Debtors' Motion Seeking   23
              Entry of an Order (I) Authorizing the Debtors
15            To (A) File a Consolidated List of Creditors in
              Lieu of Submitting a Separate Mailing Matrix for
16            Each Debtors, (B) File a Consolidated List of the
              Debtors' 30 Largest Unsecured Creditors, (C)
17            Redact Certain Personal Identification
              Information, and (III) Granting Related Relief
18            [Docket No. 5; Filed 1/16/2023]

19             Court's Ruling:                            24

20

21

22

23

24

25

1                                INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
4    Item 6:  Insurance Motion. Debtors' Motion for Entry of      25
                 an Interim and Final Order (I) Authorizing, But
5                Not Directing, the Debtors to (A) Pay Their
                 Obligations Under Insurance Policies Entered
6                into Prepetition and Satisfy Prepetition
                 Obligations Related Thereto, (B) Renew,
7                Supplement, Modify, Purchase or Replace
                 Insurance Coverage, and (C) Honor the Terms of
8                the Financing Agreement and Pay Premiums
                 Thereunder and (II) Granting Related Relief
9                [Docket No. 6; Filed 1/16/2023]

10               Court's Ruling:                                   27

11   Agenda
     Item 7:  Taxes Motion. Debtors' Motion for Entry of          28
12               Interim and Final Orders (I) Authorizing the
                 Payment of Certain Prepetition Taxes and Fees
13               and (II) Granting Related Relief
                 [Docket No. 7; Filed 1/16/2023]
14

15               Court's Ruling:                                   29

16   Agenda
     Item 8:  Customer Programs Motion. Debtors' Motion           29
17               Seeking Entry of Interim and Final Orders (I)
                 Authorizing the Debtors to Maintain and
18               Administer Their Existing Customer Programs
                 and Honor Certain Prepetition Obligations
19               Related Thereto and (II) Granting Related
                 Relief [Docket No. 8; Filed 1/16/2023]
20

21               Court's Ruling:                                   31

22

23

24

25

1                                    INDEX

2      MOTIONS:                                              PAGE

3      Agenda
4      Item 9: Cash Management Motion. Debtors' Motion for    32
               Entry of Interim and Final Orders (I)
5              Authorizing the Debtors to (A) Continue to
               Operate Their Cash Management System, (B) Honor
6              Certain Prepetition Obligations Related Thereto,
               and (C) Maintain Existing Business Forms, and
7              (III) Granting Related Relief
               [Docket No.9; Filed 1/16/2023]
8
               Court's Ruling:                                34
9
       Agenda
10     Item 10: Utilities Motion. Debtors' Motion for Entry of  34
                Interim and Final Orders (I) Prohibiting
11              Utility Providers from Altering, Refusing, or
                Discontinuing Utility Services, (II)
12              Determining Adequate Assurance of Payment for
                Future Utility Services, (III) Establishing
13              Procedures for Determining Adequate Assurance
                of Payment, and (IV) Granting Related Relief
14              [Docket No. 10; Filed 1/16/2023]
15
                Court's Ruling:                               35
16
       Agenda
17     Item 11: Wages Motion. Debtors' Motion for Entry of    35
                Interim and Final Orders (I) Authorizing, but
18              not Directing, the Debtors to (A) Pay
                Prepetition Employee Wages, Salaries, Other
19              Compensation, and Reimbursable Employee
                Expenses and (B) Continue Employee Benefits
20              Programs and (II) Granting Related Relief
                [Docket No. 11; Filed 1/16/2023]
21
                Court's Ruling:                               36
22

23

24

25

1

INDEX

2      MOTIONS:                                                    PAGE

3      Agenda
4      Item 12: Vendor/Shippers/503(b)(9) Motion. Debtors'          36
               Motion for Entry of Interim and Final Orders
5              Authorizing, but not Directing, the Debtors
               to Pay Certain Prepetition Claims of Lien
6              Claimants, Import Claimants, Foreign Vendors,
               503(b)(9) Claimants, and Critical Vendors
7              [Docket No. 12; Filed 1/16/2023]

8              Court's Ruling:                                      42

9      Agenda
       Item 13: DIP/Cash Collateral Motion. Motion of the          43
10             Debtors for Entry of Interim and Final Orders,
               Pursuant to 11 U.S.C. §§ 105, 361, 362, 363,
11             364 and 507 (I) Authorizing Debtors to Obtain
               Senior and Junior Secured Superpriority
12             Postpetition Financing; (II) Granting Liens
               and Superpriority Administrative Expense Claims;
13             (III) Authorizing Use of Cash Collateral; (IV)
               Modifying the Automatic Stay; (V) Scheduling a
14             Final Hearing; and (VI) Granting Related Relief
               [Docket No. 13 Filed 1/16/2023]
15

16             Court's Ruling:                                     107

17

18

19

20

21

22

23

24

25

1    (Proceedings commenced at 10:07 a.m.)

2         THE COURT:  Please be seated.  Mr. Pacitti.

3         MR. PACITTI:  Good morning, Your Honor.

4         THE COURT:  Morning.

5         MR. PACITTI:  Good to see you.  For the record,

6    Your Honor, Domenic Pacitti, Michael Yurcewicz, and Sally

7    Veghte, from Klehr Harrison Harvey Branzburg, as proposed

8    counsel for the Debtors here today.  Your Honor, thank you so

9    much for hearing us on our first day matters today.  I'd like

10   to make a couple preliminary introductions of folks that are

11   on the phone, preliminary, folks from the Debtors' side, if

12   that's okay.

13        THE COURT:  Yes.

14        MR. PACITTI:  Your Honor, on Zoom today are

15   Declarants Mr. Ken Vanden Berg, who's the CFO of the company.

16   He's our first-day declarant.  And also on Zoom with us today

17   are Steven Bremer and Alyssa Lozynski, both of Portage Point

18   Partners.  They are our proposed restructuring advisors and

19   investment bankers, and they are the declarants.

20        We've had two declarations with respect to the DIP

21   financing, one from Mr. Bremer as it related to shopping of

22   the DIP and other bona fides.  And the other from Ms.

23   Lozynski, with respect to the budgeting and the need for the

24   DIP and the fact that it's, in fact, sufficient to run these

25   cases.

1        Your Honor, also on the line today is Mr. Peter

2   Kravitz.  Mr. Kravitz was appointed the independent

3   disinterested director of each of our debtors, and he's with

4   us today, as well.

5        Also, Your Honor, I'd like to thank Mr.

6   Schepacarter.  He worked very tirelessly with us over the

7   last couple of days and actually before we filed, so that the

8   pleadings that were presented to Your Honor have all of his

9   comments, except for the DIP order that we filed a revised

10  one late last night, and I think it's on Your Honor's bench

11  today, as well.  It has two changes that we agreed to with

12  Mr. Schepacarter yesterday.  So we included that, as well.

13       I'd also like to thank Mr. Schartz, Ms. Smith, and

14  Mr. Arnault from Kirkland & Ellis, as well as Mr. Gartland

15  from Winston and Strawn and his team, and Mr. Magaziner from

16  Young Conaway, and of course, Mr. O'Neill from Pachulski.

17  They represent the first-lien lenders and the DIP lenders,

18  respectively, and worked with us tirelessly, as well, over

19  the last couple of days to get this thing in a position to

20  file.

21       Your Honor, if it's okay with you, I'd like to

22  just do sort of a brief overview.  I know you've read the

23  papers.  I'll be -- I won't be longwinded about it.  And

24  then, turn -- and then, present sort of the declarations as

25  the evidentiary evidence for the hearing today.

1          And then, if it's okay with Your Honor, I would
2    like to turn the podium then over to Sally Veghte to go
3    through some of the pleadings that she was responsible for,
4    and then, Mr. Yurcewicz for the pleadings he was responsible
5    for.  And then, turn back to the DIP, which is what I was
6    responsible for.

7          So the heavy lifting's over there here today.  Is
8    that an okay way to proceed, Your Honor?

9          THE COURT:  Sounds like a plan.

10          MR. PACITTI:  Great.  Thank you so much.  So Your
11   Honor, just briefly, as you know, the company is a lower cost
12   producer of light to middleweight power sports equipment,
13   such as go-carts, UTVs, minibikes, all-terrain vehicles, and
14   golf carts.  It's located in Tempe, Arizona, and its business
15   is seasonal in nature, in that its high-peak seasons are over
16   the holidays.  Those holidays are, obviously, the end-of-the-
17   year holidays and then, the Memorial Day holidays in advance
18   of the summer.

19          The Debtors' customers include national and
20   regional retail resales, such as Lowe's, Walmart, Tractor
21   Supply, and the like.  As of the petition date, the Debtors
22   employed 78 employees.

23          And its capital structure, as of the petition
24   date, was pretty simple, Your Honor.  It had a first lien
25   secured facility with Twin Brook Capital that had about $52

1  million outstanding as of the petition date.  And then, it

2  had trade obligations of approximately $70 million as of the

3  petition date.

4          And the large measure of those, approximately 60

5  million, are with a former vender of the company, Hyosung,

6  and its U.S. affiliates, and it's an entity we're in

7  litigation with as of December and have disputes with them

8  over the last several months.

9          The equity ownership also is simple, Your Honor.

10  This company is a portfolio company of Kinderhook Industries.

11  It's pretty straightforward.  The top co-debtor, Performance

12  Powersports Group Investor, LLC, owns 100 percent of

13  Performance Powersports Group Holdings, who, in turn, owns

14  100 percent of Performance Powersports Group Purchaser, who,

15  in turn, owns 100 percent of the interest in Performance

16  Powersports Group, Inc.

17          As I said, Your Honor, this was a company acquired

18  by Kinderhook.  That acquisition was in October of 2021.  And

19  at that time, Your Honor, the company was adequately funded

20  post-acquisition.  It was poised to move forward, had a

21  healthy balance sheet, had sufficient cash on hand, and had

22  access to a revolving credit facility, as well, with Twin

23  Brook.

24          Now, several things happened during 2022 that

25  negatively impacted the business and placed the company in

1  the difficult liquidity position that it remains in today.

2  And those things include, among others, inventory orders that

3  were placed that were supposed to arrive prior to the 2021

4  year-end holiday season, primarily from the vendor, Hyosung,

5  that I talked about earlier.  And that inventory didn't

6  arrive until first quarter and quite frankly, close to the

7  end of the first quarter of 2022.

8          Consequently, the company couldn't capture its

9  existing customer demand during that holiday season but yet

10  had a ton of inventory that it had to deal with at that point

11  in time.

12          Typically, the company brings in inventory and

13  sells it right through to its end-user customers, but if that

14  demand is not there and you have all that inventory, you have

15  to store it, you have to pay for shipping demerge other

16  costs, which were extremely large in this case, Your Honor,

17  upwards of close to $30 million over 2022.

18          Additionally, Your Honor, inventory orders leading

19  into 2022 were placed -- were in -- ended up being in excess

20  of historical and anticipated customer demand, and further,

21  the post-COVID demand that was anticipated did not

22  materialize.  So demand that had been potentially budgeted

23  for did not materialize through 2022.

24          So obviously, Your Honor, this -- these increased

25  costs and this unexpected confluence of events really caused

1  the liquidity position that the company was in in 2022 and

2  suffered through through today.

3         THE COURT:  Kinderhook bought the company at just

4  the wrong time.

5         MR. PACITTI:  Well, I'm a lawyer, not an

6  investment banker, Your Honor.  So it's -- we'll see, I

7  think, how things turn out, but certainly, there were events

8  that happened post-close that --

9         THE COURT:  That they didn't anticipate.

10        MR. PACITTI:  Correct.

11        THE COURT:  Okay.

12        MR. PACITTI:  So Your Honor, in October of 2022,

13 the company hired outside counsel, our firm, and also hired

14 Portage Point Partners to serve as the company's

15 restructuring advisor and investment banker.  During that

16 time, the company also proactively evaluated their corporate

17 governance structure and decided to retain Mr. Kravitz as an

18 independent disinterested director of each of the now

19 debtors.

20        And he was appointed to assist in evaluating

21 strategic alternatives and was delegated the authority to

22 review and act upon any matters pertaining to a potential

23 restructuring, a refinancing transaction, and any matters in

24 which there would be a conflict of interest or otherwise that

25 might exist between the debtors and any of their equity

1  security holders, affiliates, managers, directors, or

2  officers.

3          The Debtor worked with those advisors to consider

4  strategic options, including a potential sale of all of the

5  Debtor's business operations.  Your Honor, following those

6  evaluations, the company made a decision to instruct Portage

7  Point to go out and seek investment and seek a buyer.  In

8  this time, it was really contemplated that it was seeking a

9  sale outside of process.

10          So that effort continued.  While those marketing

11 efforts were ongoing, the company continued to face pressure

12 from its vendors, particularly with respect to Hyosung.  And

13 in mid-December of 2022, Hyosung initiated litigation in the

14 Southern District of New York and filed an action against the

15 Debtors.

16          Your Honor, the company and its advisors

17 immediately thereafter reached out to Hyosung to seek a

18 business solution to their disputes.  Discussions regarding

19 that potential business commenced.  Ultimately, they were

20 unsuccessful, clearly.  Otherwise, we wouldn't be here today.

21          In January, early January of 2023, when those

22 discussions became apparent that were not going to be

23 fruitful, Hyosung threatened to file an involuntary

24 bankruptcy proceeding.

25          So rather than face the value-destructive,

1  involuntary process, with a marketing bid deadline

2  approaching -- and January 13th was the pre-petition

3  marketing deadline -- the company sought and tried to cobble

4  together what it thought would be a rational, voluntary

5  Chapter 11 process rather than an involuntary, or God forbid,

6  a Chapter 7, which would certainly be value destructive.

7          So that's what the company did.  At that point,

8  approached its equity sponsor and asked whether there was

9  interest in funding a DIP, whether there was interest in

10  serving as a stalking horse to be a floor for the continued

11  marketing process that would have to happen post-bankruptcy.

12          And discussions ensued, and negotiations and a lot

13  of paper started flying around, to the point where we reached

14  an understanding with affiliates of the equity sponsor to put

15  in a second lien DIP and become a stalking horse purchaser

16  that's going to be subject to higher and better bids through

17  a bankruptcy sale process that we filed along with our first

18  day papers, but obviously, is not before the Court today.

19          So Your Honor, after the bid deadline passed,

20  there were no expressions of interest at all.  And faced with

21  sort of a deadline, either file a voluntary or you're going

22  to be put into an involuntary, we filed a voluntary on the

23  16th.  That's where we are today, Your Honor.

24          So what are the goals here?  Well, clearly, we

25  wanted to avoid a destructive involuntary filing.  We wanted

1   to be ready to put a more rational Chapter 11 process in

2   place that would be preserve value and have the potential of

3   enhancing value by continuing the sale process post-

4   bankruptcy.

5           The Debtors negotiated the debtor-in-possession

6   financing facility to allow it to continue to operate in the

7   normal course, pay landlords, vendors, and have sufficient

8   liquidity to pay administrative costs of this Chapter 11

9   process.

10          The Debtors also filed, as I said, Your Honor, the

11  bid procedures and sale motion with the Court to establish

12  that formal sale timeline.  It also includes the auction

13  process and the continuing marketing by the Portage Point

14  folks to hopefully find higher and better offers.

15          Although that sale process is not before Your

16  Honor, I'll sort of just run through sort of a little bit of

17  what the price, the purchase price is here so you have a

18  flavor of it.  I know when you see a sale motion, it's two

19  inches thick and it's not on for today.  Probably you don't

20  want to read it, so I'll go through the purchase price.

21          So currently, the way the purchase price is

22  structured, the stalking horse buyer is going to assume the

23  first lien debt of Twin Brook.  It's going to credit bid its

24  then-outstanding DIP obligations.  It's going to pay a cash

25  portion of purchase price of $500,000.  It's going to assume

1  a host of liabilities.

2        They include cure amounts associated with any

3  assumed leases and executory contracts, current liabilities

4  and trade payables that are accrued and unpaid, payroll and

5  employee-related expenses and benefit plans, 503(b)(9)

6  claims, customer deposit claims, warranty obligations,

7  transfer taxes, and others.

8        So Your Honor, we've got a purchase price that we

9  think serves as a floor and is out there for other bid, and

10 to the extent that there's higher and better offers, you

11 know, may have an auction.

12       So Your Honor, I think for purposes of today,

13 that's my presentation, but for purpose of today, with

14 respect to the evidentiary record, I would request that I

15 just be able to move in the declarations into evidence of the

16 folks that are on Zoom and available.  They are the

17 declaration of Mr. Vanden Berg that was filed at Docket

18 Number 16, the declaration of Mr. Bremer that was filed at

19 Docket Number 14, and the declaration of Ms. Lozynski that

20 was filed at Docket Number 15.

21       THE COURT:  Is there any objections?  I hear none.

22 They're admitted.

23       MR. PACITTI:  Thank you, Your Honor.  Your Honor,

24 I did have a proposed sale timeline, but I think we can deal

25 with that at the bid procedures hearing, which just for your

1  own -- I don't know if your chambers let you know, but we've

2  selected February 13th as the second day hearing and the bid

3  procedures hearing, despite my protestations that the Super

4  Bowl's the day before, and the Eagles will be in it.

5          THE COURT:  Ever the optimist.

6          MR. PACITTI:  Your Honor, if I can, I'd like to

7  turn the podium over to Ms. Veghte.  She'll go through sort

8  of the beginning part of the agenda, and then, Mr. Yurcewicz

9  will take the rest.

10         THE COURT:  Before you do that, can you give me

11 Mr. Kravitz's background, please?  Or he can do that, but --

12         MR. PACITTI:  I -- he's on the phone.  I don't

13 have his CV in front of me.  I know he's one of the founding

14 partners of Province, Inc., I believe.  He's -- I know, he's

15 -- he was a restructuring attorney for 20 years.  He's been

16 in the financial advisory business for another -- I won't say

17 how many, Mr. Kravitz.  That'll tell people how old you are.

18 But a long time.

19         And obviously, he's involved in a host of

20 restructuring companies throughout the country, both on

21 creditor side, company side, and other constituent side.  He

22 also does a lot of litigation trustee work where he is

23 appointed to pursue litigation against parties that flow out

24 of bankruptcy cases.

25         THE COURT:  Thank you.

1          MR. PACITTI:  I think perhaps Mr. Schartz may want

2  to make a comment or two, Your Honor.

3          THE COURT:  Okay.

4          MR. SCHARTZ:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. SCHARTZ:  Brian Schartz, from Kirkland &

7  Ellis, on behalf of Kinderhook and its various affiliates

8  that are proposed buyers and the DIP lender in the case.

9  I'll be very quick.  I won't repeat what Mr. Pacitti said

10 because we agree with it.

11         Just from Kinderhook perspective, you know, this

12 is not a happy day.  This transaction closed in '21, and I

13 think you summed it up very well when you said this is

14 probably the wrong time.  It is the wrong time, but also

15 there were series of bad decisions by old management that led

16 to the perfect storm for this company.  So it's pretty

17 unfortunate.

18         Faced with that prospect, what does a sponsor do?

19 Well, you got to give up some control, right, because you

20 have the potential where the company is worth less the amount

21 that the company owes to its creditors.  That's where this

22 whole process comes in.

23         When we started it from a Kinderhook perspective,

24 this was all about can we raise new debt, can we find a

25 buyer.  No one was talking about bankruptcy.  Can we find a

1  negotiated path forward with Hyosung?  Maybe we give up some

2  equity, we get some cash, we get some notes.  We wanted to be

3  as flexible as possible.

4          The response back, and I'm not faulting them

5  there, they're entitled to do whatever they want to do in a

6  negotiation, but the response back is, that's very nice,

7  please pay us full in cash, we'll take this percentage now,

8  and we'll take the rest later.

9          And you know, there's some point the sponsor has

10 to say, look, we're not going to put in equity to support the

11 value of something if we don't think it goes through anymore.

12 The lawsuit was filed in December, just before Christmas, you

13 know.  That put us on our heels.  Okay, we got to think about

14 what we're going to do with that.

15         We don't think the claims are valid.  I'm not

16 going to spend time on that here, but we don't think the

17 claims are valid.  We think that Kinderhook will prevail in

18 that litigation in the Southern District of New York.

19         But the other thing that happened is the threat of

20 the involuntary, you know.  And I had the best holiday season

21 I've ever had as a bankruptcy professional ever.  I came

22 back, said, okay, that's great, let's figure out what's going

23 to happen, not anticipating that we'd be in a dead sprint,

24 putting together from a cold start a DIP.  That's why we're

25 funding on a DIP term sheet, not a credit agreement.  We

1   didn't have time for that.

2          An APA, you know, we had the companies form an APA

3   because they launched the marketing process and did the right

4   thing.  We sent it to the sponsor.  You want to participate

5   in this?  Had no Chapter 11 provisions in it at all, so we

6   quickly pivoted, put this thing together because we really

7   had a Hobson's choice.  Do you let the thing go in

8   involuntary, say file for a seven, or do you give the company

9   a fighting chance on terms that are as reasonable as

10  possible?

11         And I think that last route is where we've ended

12  up.  I know I'm talking my own book, but we did try to be

13  very reasonable in putting together.  It's going to be a

14  junior DIP, right, so junior to Twin Brook.  You know, we're

15  not asking for liens on avoidance actions on day 1, the final

16  order, things like that.

17         There is a stalking horse bid, just as Mr. Pacitti

18  described it, you know.  I hope someone tops this.  I hope

19  someone comes in and beats it because it is designed to set a

20  floor that, I think, left to the devices of parties who are

21  threatening the involuntary, that floor wouldn't exist.

22         So at least we are going to have the floor.  As we

23  sit there, we're naked today, obviously.  No bid protections

24  as we sit here today.  We got to wait 30 days for that.  But,

25  you know, our hope is that we can get through this process,

1  get this thing on firm footing, and I think if I was to say

2  something in open court that I think is very important, we're

3  open to further conversation.

4        We're still open to resolution, get through the

5  case, keep the fee burn down, get through it as fast as

6  possible, and give the company the best chance it has to

7  maximize value.  That's how we see this.

8        So I just wanted you to hear that.  If you have

9  any questions for me, I'm happy to talk about them.  I'm sure

10  we'll have a discussion back and forth when we get to the

11  DIP, and thank you.

12        THE COURT:  Thank you.  Anyone else?  Ms. Veghte.

13        MS. VEGHTE:  Good morning, Your Honor.  Sally

14  Veghte with Klehr Harrison Harvey Branzburg for the Debtors.

15        Unless Your Honor would like to proceed any

16  differently, we were just going to present the motions and

17  the order that's listed on the agenda.  I plan to present

18  Agenda Items 3 through 8, and Mr. Yurcewicz will present 9

19  through 12, and Mr. Pacitti will return for the financing

20  motion.

21        THE COURT:  That's fine.

22        MS. VEGHTE:  The first matter going forward today

23  is Agenda Item Number 3, which is the Debtor's joint

24  administration motion.  This is procedural and customary

25  relief sought by the Debtors to jointly administer their four

1  cases.  This will promote efficiencies in the bankruptcy and

2  also notice to creditors.  We believe that the motion and the

3  relief is in compliance with Bankruptcy Rule 1015.

4           And the -- we did run the motion and the order by

5  the United States Trustee.  Mr. Schepacarter did not have any

6  comments on this order, so unless Your Honor has questions or

7  comments, we would request entry of the order.

8           THE COURT:  I do not have any questions.  Does

9  anyone wish to be heard with respect to joint administration?

10  I hear no one.  I've reviewed it.  It's appropriate, and it

11  will be signed.

12           MS. VEGHTE:  Thank you, Your Honor.  The next item

13  on the agenda is Item Number 4, which is the Debtor's

14  application to employ a claims and noticing agent.  That

15  agent is Omni Agent Solutions.

16           This relief is sought because the local rules

17  direct that if the Debtors have more than 200 creditors, we

18  should follow the claims agent protocol, review solicited

19  bids, and ultimately, the Debtors did select Omni as its

20  claims agent, as they're well-qualified, and their pricing is

21  competitive.

22           Omni did agree to modify their standard

23  indemnification language, which is located in Paragraph 13 of

24  the proposed order.  And the Debtors do have over 200

25  creditors, so the relief is appropriate.

1    Mr. Schepacarter did provide us with several

2 comments to the Deutch declaration and also the proposed form

3 of order, and those comments were incorporated prior to

4 filing those items.

5    So unless Your Honor has questions or comments,

6 we'd request entry of the order approving the retention of

7 Omni Agent Solutions as our claims and noticing agent.

8    THE COURT:  Thank you.  I do not have any

9 questions.  Does anyone wish to be heard with respect to the

10 retention of Omni?  I do not hear anyone.  I read the

11 application, and I read Mr. Deutch's declaration.  I do see

12 he is attending.  I have no questions.  It's all in line with

13 our protocol, and I understand Mr. Schepacarter has signed

14 off on the form of order, so I will approve it as submitted.

15    MS. VEGHTE:  Thank you, Your Honor.  The next item

16 is Number 5 on the agenda, the Debtor's creditor matrix

17 motion.  With this motion, the Debtors seek to maintain a

18 single creditor matrix that -- and mailing matrix.  This, of

19 course, will not impact our schedules and statements, which

20 will report the creditors by entity.

21    So the motion does seek authority to redact

22 certain personal names and addresses for the Debtor's

23 employees and some customers.  That relief has not been

24 objected to.  The U.S. -- the U.S. Trustee did have minor

25 comments to the proposed form of order, which were

1  incorporated prior to filing.

2        And unless Your Honor has questions or comments,

3  we seek entry of the order approving the creditor matrix

4  motion.

5        THE COURT:  I do not have any questions.  Does

6  anyone wish to be heard with respect to the creditor matrix

7  motion?  Mr. Schepacarter?

8        MR. SCHEPACARTER:  Good morning, Your Honor.  Rich

9  Schepacarter: for the United States Trustee.  Just I'm not

10 sure if counsel misspoke, but I think that the order only

11 redacts the addresses, not the names.  I think that's --

12       MS. VEGHTE:  Your Honor, that's correct.  I did

13 misspeak.  It would be silly to redact the names, but yes,

14 just the addresses for safety reasons.

15       THE COURT:  Yes.

16       MR. SCHEPACARTER:  Thank you.

17       THE COURT:  Thank you.

18       MS. VEGHTE:  Thank you.

19       THE COURT:  Anyone else?  Okay.  I've reviewed

20 this motion and the request for a consolidated creditor

21 matrix, which appropriate, and I will also approve the

22 redaction of personally identifiable information as

23 requested.  So this order will be entered.

24       MS. VEGHTE:  Thank you, Your Honor.

25       THE COURT:  Thank you.

1              MS. VEGHTE:  Number 6 on the agenda is the

2    Debtor's motion for an interim order regarding our insurance

3    policies.  In the ordinary course, the Debtors do maintain

4    approximately ten insurance policies.  We've listed those

5    policies on Exhibit C to the motion, and we're seeking to

6    continue the insurance practices and to make payments to

7    renew insurance policies and also to make payments on the

8    financing agreement that those policies sometimes come due

9    under.

10             We do believe that the Debtors are current on

11   their insurance policy payments as of the petition date, and

12   those policies generally renew in June, so we do not

13   anticipate that amounts will come due in the interim period.

14             However, there may be amounts that come due post-

15   petition in the final period, which will -- we can address

16   during the final order, and that amount would be close to

17   $600,000, but not in the interim period.

18             So unless Your Honor has questions or concerns

19   concerning the insurance, we seek entry of the order

20   approving the motion.

21             THE COURT:  Okay.  Well, I think you answered one

22   of the questions I had as I was looking through the motion

23   and at the order in Paragraph 3.  The order doesn't request

24   any interim approval of payment.  It really is just, as I'm

25   reading it, authority to continue the policies.  Am I missing

1  anything there?

2         MS. VEGHTE:  That's correct, Your Honor.

3         THE COURT:  Okay.

4         MS. VEGHTE:  Because we've -- the company has made

5  it so that they generally come due in the summer, we don't

6  anticipate anything coming due in the interim period, but we

7  do --

8         THE COURT:  Okay.

9         MS. VEGHTE:  -- the final.

10         THE COURT:  Well, certainly the company can

11  continue with its current policies in place.  Paragraph 4,

12  I've wondered about.  And I guess I wonder whether I have the

13  authority to order what's in Paragraph 4.  Is there some

14  concern that filing these cases is a default under the

15  financing agreement that, I take it, finances the insurance

16  policies?

17         MS. VEGHTE:  Your Honor, I don't think that there

18  is a concern there.  It's more of a protective measure in

19  case there were an issue.

20         THE COURT:  And what does the -- and I think the

21  policy -- the financing agreement was attached, yeah.  What

22  does the financing agreement provide with respect to default

23  and cures?  I'm not sure I get to change the terms of the

24  agreement.

25         MS. VEGHTE:  I believe that's listed in Paragraph

1  7, and it deals with nonpayment.  And Item 7D deals with the

2  insurance companies being insolvent or involved in a

3  bankruptcy, the insured or the insurance companies.

4          THE COURT:  I'm not sure that's enforceable, but -

5  - and is there a notice provision and a cure provision?  I'm

6  not sure I get to do this.  I mean, the policy is what it is,

7  and if it has a cure period and a notice period, then, it

8  does.  I don't think I get to change that.  If you want to

9  notice this out -- if you want to make -- this is an interim.

10         If you want to make this subject to final and you

11  want to notice this out to your insurance company, I guess

12  you can do that, but I'm not comfortable with the provision

13  in the order that may change the contract between the

14  parties.

15         MS. VEGHTE:  Understood, Your Honor.

16         THE COURT:  And I actually would hope that we

17  would not have to deal with this kind of a provision.  I

18  don't suspect the financing company's going to try to declare

19  a default because of the filing of bankruptcy, but I guess

20  we'll see.  So if you make that -- if you make this subject

21  to a final and notice it out --

22         MS. VEGHTE:  We will do that, Your Honor.

23         THE COURT:  -- and make sure the financing company

24  gets notice.  Okay.  With that change, I will approve the

25  motion.  The Debtor needs to continue in place its insurance.

1  There is actually no request for the typical interim relief
2  of permitting a payment on prepetition invoices.

3          And the code requires certain types of insurance
4  to be in place, so I'll approve it as necessary to avoid
5  immediate and irreparable harm and will sign it with that one
6  change.

7          I'm not sure if I asked if anybody had -- wanted
8  to be heard with respect to the insurance motion; is there
9  anyone that wants to be heard?  Okay.  I hear no one, so
10 that's my ruling.

11          MS. VEGHTE:  Thank you, Your Honor.  We'll turn
12 next to the taxes motion at Agenda Item Number 7.  This is
13 the Debtor's request to pay any taxes or regulatory fees that
14 may come due in the interim period and in the final period.
15 The Debtors estimate that they have no accrued or outstanding
16 tax debt as of the petition date, but there is the potential
17 that some could come due in the interim period, which is why
18 we're requesting $100,000, a cap to pay during the interim
19 period in case there are taxes or fees.

20          The company does occasionally incur license,
21 regulatory, servicing fees, and some of the taxes that were
22 listed on the exhibit to the motion, so we would seeking
23 authority to pay those as they come due.  Unless Your Honor
24 has questions about those, we would seek entry of the interim
25 order at this time.

1        THE COURT:  Does anyone wish to be heard with

2   respect to the taxes motion?  I hear no one.  I will approve

3   this request.  The Debtors have represented that there are no

4   outstanding obligations that would fall in this category, and

5   they're seeking $100,000 really as a precautionary measure,

6   and I'll permit that as a precautionary measure, and it's on

7   an interim basis.

8        I take it, then, because of the Debtors' position

9   that it has no outstanding amounts owed that any amounts that

10  could surface during this period would not be paid if they're

11  old, if they're old for outstanding taxes, but this would

12  only be for anything current.  Okay.

13       MS. VEGHTE:  Correct, Your Honor, yes.

14       THE COURT:  So with that understanding, I will

15  approve this.  The Debtors have cited authority that

16  satisfies me that in the event that something does surface,

17  it's appropriate to pay it under the circumstances of this

18  case and necessary to avoid immediate and irreparable harm.

19       MS. VEGHTE:  Thank you, Your Honor.  We'll move

20  then to Item 8 on the agenda, which is the Debtor's customer

21  programs motion.  Through this motion, the Debtors seek to

22  maintain their prepetition customer programs.  Some of these

23  programs include honoring certain sales promotes or early

24  payment credits, certain discounts that may have been given

25  to customers.

1    These items promote customer and vendor good will,
2  and they also do not require a cash outlay.  There is a
3  separate warranty program that does require a cash outlay by
4  the Debtors.  The Debtors have a robust warranty program to
5  help maintain their reputation for quality and also to
6  maximize customer loyalty.  And this warranty program really
7  sets the Debtors apart from its competitors.
8    The Debtors, through this program, provide
9  warranties that cover defects in equipment and parts, and it
10 ensures that the Debtors' products perform as intended.  So
11 the customers can contact a customer service center for
12 assistance and then take qualifying repairs to certain
13 vendors.
14   The Debtors do pay a customer call center and the
15 service provider for warranty work that is performed on
16 products, and so this warranty program does provide -- it
17 requires a cash outlay to the extent that the items do
18 qualify for repair work or replacement parts.
19   In order to maintain this program, the Debtors
20 seek authority to pay up to $300,000 during the interim
21 period for accrued obligations and the same -- and an
22 additional 300 during the final period, so that the Debtor's
23 customers and vendors are protected during this time.
24   There are also warranty work that may be kind of
25 in the pipeline that's not on the Debtor's books and records

1  at this time, and so the Debtors seek $300,000 during the

2  interim period for those items that may come up.

3        If Your Honor doesn't have any questions or

4  comments on the order, we would request entry of that order

5  approving the motion.

6        THE COURT:  I don't have any questions.  Does

7  anyone wish to be heard with respect to the customer programs

8  motion?  I reviewed the motion.  I think it's appropriate.

9  Obviously, the Debtor needs to keep its customer base in

10 place and happy, and also to build and continue good will

11 with its vendors.

12       The request -- Paragraph 4 of the order requests

13 that the customer programs, which I assume includes the

14 warranty program obligations, is 130,000 in the interim

15 period.  I thought the request was 300.

16       MS. VEGHTE:  It is 300, Your Honor.  That's a typo

17 in the order that we'll fix before uploading.

18       THE COURT:  Okay.  The program obviously needs to

19 continue in place, and the customer warranty program, again,

20 helps build good will.  I note that revenues, if my notes are

21 right, in 2021 were $218 million, so I think $300,000 is an

22 appropriate expenditure for that type of a program.  And I

23 approve it as necessary to avoid an immediate and irreparable

24 harm to the estate.

25       MS. VEGHTE:  Thank you, Your Honor.  I'll now turn

1  the podium over to Mr. Yurcewicz, who will continue with the

2  presentation of motions.

3           THE COURT:  Thank you.  Mr. Yurcewicz.

4           MR. YURCEWICZ:  Good morning, Your Honor.  For the

5  record, Michael Yurcewicz of Klehr Harrison Harvey Branzburg.

6  Thanks again for seeing us this morning.

7           Picking up at Item Number 8 or Item Number 9 of

8  the agenda, it's Debtor's cash management motion.  We seek to

9  maintain the cash management structure that was in place

10 prepetition.

11          There are four accounts essentially used by the

12 Debtor.  Three of them are at Chase, one is at Arizona

13 Federal Credit Union.  We have an operating account where

14 most of the funds go through a separate payroll account used

15 for payroll funding, a restricted account that holds cash

16 collateral for a customs bond, and we have a credit card

17 account which receives incoming credit card payments, which

18 are somewhat de minimis in the company, but still --

19 nevertheless, we'd like to be able to capture.

20          Moving banks at this time would be very

21 disruptive.  It would impair the operations of the business,

22 so we'd prefer to keep the current cash management system and

23 also be able to use our current business forms until they run

24 out.

25          We will be opening two new accounts.  Those

1  accounts will both be at Chase.  We'll later get to a utility

2  motion in this presentation, and we need a place to hold that

3  utility deposit, and we also will be operating a separate

4  account to receive funds from the DIP.

5          One item that I guess we didn't touch in some of

6  the other ones, in our items, we have interim relief.  We had

7  selected February 13th as the hearing for these.  We need to

8  plug in an objection deadline for that.  We were considering

9  using the 6th, which is just one week ahead of that, if that

10  would be fine with you.

11          THE COURT:  That's fine.

12          MR. YURCEWICZ:  Okay.  Thank you, Your Honor.

13  With that, does Your Honor have any questions about the

14  motion?

15          THE COURT:  No, I do not have any questions.  Does

16  anyone wish to be heard with respect to the cash management

17  motion?  Okay.  I reviewed it.  It's a fairly simple system,

18  and I see no reason to disrupt it.  And I assume that all the

19  banks are part of the trustee system.  If the Arizona one

20  isn't, then --

21          MR. YURCEWICZ:  The Arizona item is not a UDA

22  signatory.  I'm sure Mr. Schepacarter will be having some

23  conversations with us.

24          THE COURT:  Okay.

25          MR. YURCEWICZ:  It has gone well so far.  We hope

1  to continue that in a positive fashion.

2          THE COURT:  Okay.  Very good.  I have no

3  questions, and I assume that Mr. Schepacarter has signed off

4  on this form of order, which is within his bailiwick, so I

5  will approve it.

6          MR. YURCEWICZ:  Yes.  I didn't want to belabor the

7  point, but Mr. Schepacarter was quite helpful to us by

8  addressing and giving us a ton of comments earlier.  We

9  apologize for jamming his schedule with that, but it makes

10 these hearings much easier for us and appreciate his efforts.

11         THE COURT:  Okay.  Well, that is approved in the

12 form it was submitted.

13         MR. YURCEWICZ:  Okay.  Item Number 10, Your Honor,

14 is the utilities motion.  As is customary, we seek to

15 establish procedures to provide adequate assurance for the

16 utility providers.  We plan to deposit half a month of

17 payments into a new account.

18         That amount is roughly about $13,745, where there

19 are procedures in place to -- if a utility is not satisfied

20 with it, and there's also ability to add additional utilities

21 to this and corresponding with that, to add additional funds

22 into the utility deposit for that.  And the funds will come

23 back to the estate when the accounts are reconciled and those

24 final bills are reconciled and paid by the Debtors.

25         Does Your Honor have any questions regarding that?

1           THE COURT:  I do not.

2           MR. YURCEWICZ:  Okay.

3           THE COURT:  Does anybody wish to be heard with

4    respect to the utilities motion?  I hear no one.  I reviewed

5    it; it's appropriate.  And adequate assurance is required

6    under Section 366 of the Code, this meets that, and I will

7    approve it on an interim basis.

8           MR. YURCEWICZ:  Thank you, Your Honor.  Item

9    Number 11 is our employee wage motion.  The Debtors have 78

10   employees at the time of filing, three of which are part-

11   time, the remainder of which are full-time.  None are

12   unionized.  We have one independent contractor that performs

13   services for the company.

14          We typically have a biweekly payroll that -- where

15   we will fund to the payroll -- the Debtors will fund to a

16   payroll account, roughly one week before the payment is made

17   to the employees.  Then, it is ACHed out of that to our

18   payroll provider, who then issues direct deposits to the

19   employees.

20          We're seeking relief for the wages and all of our

21   benefits totaling about 305,000, and we expect that all of

22   those payments will need to come due during the interim

23   period.  Paragraph 11 of the motion summarizes more detail of

24   exactly the breakout of that by the way withholding

25   obligations, processing fees, and the like.

1          We would ask that -- we think our employees are

2     critical to the operation of the business.  We obviously

3     can't lose them at this point, and if we were not to satisfy

4     their benefits, we expect that the employees would not

5     continue providing services for us and would also suffer

6     great hardship because they rely on our funds, these

7     payments, to operate their lives.

8          Does Your Honor have any questions about the

9     motion?

10          THE COURT:  No, I do not have any questions.  Does

11     anyone wish to be heard with respect to the employee wages

12     and benefits motion?  I hear no one.  I've reviewed the

13     motion and the declarations that support the factual

14     assertions in it.

15          The amounts and categories of wages and benefits

16     payable are standard, and I agree that it's necessary to pay

17     employees to ensure that they don't suffer their own personal

18     hardship and to ensure that, to the extent possible, they

19     stay employed with the Debtor.  So I will approve this as

20     necessary to avoid immediate and irreparable harm to the

21     estate.

22          MR. YURCEWICZ:  Thank you, Your Honor.  Item

23     Number 12 is our -- what we call our vendor motion, which

24     covers a number of different categories of vendors.  We have

25     general subcategories of lien claimants, import claimants,

1   503(b)(9) complaints, and a critical vendor component of

2   that.

3          We're seeking $2.845 million of relief on an

4   interim basis, bumping up to 5.345 on a final basis.  Of

5   that, there are subcategories for each one of these with

6   about 215,000 to be on lien claims, 30,000 on import charges.

7   We're not seeking any relief with respect to 503(b)(9) on an

8   interim basis, but we'll save all that for final basis.  On

9   our critical vendors, we're seeking 2.6 million on an interim

10  basis.

11         Typically, the way the company operates is they

12  don't take physical possession of a lot of their goods.  And

13  as you heard before, we had our initial issues with Hyosung

14  and inventory that came from them.  We've had to warehouse

15  and ship that material that's out there, and that covers the

16  large amount or the bulk of the lien claimants.

17         Of that material that is now warehoused, it is

18  worth more to the Debtors to be able to remove it and sell it

19  than it is -- than actual warehouse and shipping charges that

20  would be required to do so.  So we'd seek authority to be

21  able to pay those amounts.

22         And for each of these categories, the Debtors have

23  a process set in place between the Debtors and their advisors

24  to make sure that each one of these payments is, in fact,

25  beneficial to the estate and fits the categories in which it

1 || should fit.

2 ||           Obviously, when we get down to the critical

3 || vendors, I know that is often a sensitive issue, and we are

4 || focused on that, making sure that only we will make these

5 || payments when it is critical or beneficial to the estate and

6 || we should do so.

7 ||           Next item of category is we have some import

8 || charges.  We do import a small amount of goods, mostly spare

9 || parts and the like.  We seek to be able to pay those import

10 || charges associated with them.  We do have a section for

11 || foreign vendors that we purchase most -- the bulk of our

12 || inventory from foreign vendors.

13 ||           And we seek to have -- to pay for those goods in

14 || the ordinary course.  We typically pay a deposit on the goods

15 || and then pay the remainder when -- we have two main vendors

16 || at this point.  We pay one of them when the goods are shipped

17 || to our customers, the other ones will ship in -- and bill --

18 || provide credit to us at this point.

19 ||           Obviously, they will not be doing so and will not

20 || ship our product if we cannot have ability to pay for that,

21 || so we seek the ability to pay the foreign vendors in the

22 || ordinary course.

23 ||           For our 503(b)(9) claims, as we said, we typically

24 || do not take possession of a lot of goods, so we don't have

25 || very many that are delivered within 20 days of the filing

1  date.  We -- there may be some.  There are accessories, and

2  spare parts, and the like that may fall into this category,

3  so we're seeking to capture those and be able to pay those to

4  the extent that those arise.

5           We believe that that would just be a timing

6  change, that those claims will eventually be paid in the

7  case, seeking to have the authority to pay them earlier in

8  the case if it's in the Debtor's best interest.

9           Last item, Your Honor, is the critical vendors.

10 We're seeking 2.6 million in the interim.  Again, we have two

11 subcategories of this.  We have service vendors.  As Ms.

12 Veghte mentioned, we have a call center that's in Mexico that

13 bills us in arrears, so we would like to continue to be able

14 to provide warranty services.

15          We have some sales and advertising channels that

16 also are providing credit to us.  None of these items are

17 under long-term contract, so we cannot compel these parties

18 to perform.

19          However, that is necessary for the business that

20 they do perform, so we'd seek the ability to satisfy their

21 claims when it's in the best interest of the estate, subject

22 also to using our best effort to receive customary trade

23 terms from them such that this continues.

24          We also have supply vendors, and this is the bulk

25 of what the money is requested for.  We do not purchase any

1  items on long-term credits or long-term contracts.  We have

2  products that are specified by our customers, and the designs

3  are approved, so we really cannot quickly or easily swap in a

4  different manufacturer.

5            So we have a one key supplier that has reached its

6  credit limit and lost its credit insurance with respect to us

7  pre-petition.  We were in discussions with them prepetition

8  about finding other credit enhancements and ways for them to

9  be able to continue supplying us.  Without that vendor at

10 this point, we would have no product to sell to our major

11 customers, so we think it is critical to have the ability to

12 do so.

13           We built in the customary trade terms so that when

14 we have these negotiations with that vendor about what is

15 appropriate, how much of these critical vendor monies should

16 go to them and when, we can do so in a fashion where it is

17 only where it's beneficial to the company and hopefully be

18 able to get something in exchange for that so that we can

19 continue this business relationship and have it go forward --

20 a strong go-forward business partner that is able to help us

21 perform in this market.

22           Does Your Honor have any questions with respect to

23 the motion?

24           THE COURT:  Well, the critical vendor amount of

25 $2.5 million is a significant amount of the outstanding

1 | undisputed pre-petition trade debt.  If -- am I right on

2 | that?

3 |        MR. YURCEWICZ:  It is significant in terms of

4 | that.  I think we have about 8 or 10 million total debt, and

5 | there is 2.6 that is significant to that.  However, on the

6 | other side of that, without paying that, we may not have

7 | anything to sell to our customers.  So the revenue line in

8 | the company is also significant.

9 |        THE COURT:  Yeah.  Does anyone have any questions

10 | or comments with respect to this combined lien --

11 |        MR. YURCEWICZ:  We call it a vendor motion.

12 |        THE COURT:  -- vendor motion, foreign vendors, et

13 | cetera?

14 |        MR. YURCEWICZ:  In this case, there's not as much

15 | overlap between categories as there usually is, but we do

16 | find usually a significant overlap.

17 |        THE COURT:  Does anyone wish to be heard?  Okay.

18 | I hear no one.  I'm going to grant the request on an interim

19 | basis as capped by -- as set forth in the order at Paragraph

20 | 3.

21 |        The lien claims and the import charges, I think,

22 | quite frankly, are easy in the sense that the lien claims are

23 | required to be paid to release inventory to go to customers,

24 | and the representation of counsel, and the declarations and

25 | support of the motion show that it's worth the candle, that

1  the revenue that's going to be generated from the inventory

2  being released is more than the amounts of the claims.

3          And the import charges similarly,, are required to

4  import the inventory and to, again, generate revenue.  So

5  those are actually easy.

6          I had some pause over the 2.6 million in critical

7  vendor payment amount requested, given that that's a quarter

8  to a third of the undisputed trade claims.  So it's not an

9  insignificant percentage, which is one of the factors we look

10 at, but obviously, it's not the only factor we consider.

11         And here, based on the declaration that has been

12 filed, I find that these two categories that make up the

13 critical vendor portion are necessary to keep the supply

14 chain moving and to be able -- for the Debtor to be able to

15 supply its core inventory.

16         As the Debtors have stated in their declarations,

17 they don't manufacture their product, and I guess -- except

18 for the inventory that came too late, and so maybe a -- it's

19 an unusual situation that they have so much stored.

20         They need to be able to continue -- the Debtors

21 need to be able to continue purchasing inventory, and the

22 only way to do that, if there is no long-term contract and

23 this is done on purchase order, is to pay for it or to

24 otherwise arrange -- make arrangements with its suppliers.

25         So on an interim basis and as capped, I will --

1  I'll permit it, and if we get a committee formed, I'm sure

2  they'll take a look at the Debtor's exercise of its judgment

3  with respect to critical vendors as -- and everything else.

4  So I will find that it meets Bankruptcy Rule 6003.

5         MR. YURCEWICZ:  Thank you, Your Honor.  We hear

6  your concerns, and shared them with the company, and don't

7  like coming here asking for $2.6 million for the critical

8  vendor on the first day.  The payments will be scrutinized

9  very well from the company, and we'll make sure we can be as

10 conservative as possible on that.

11        THE COURT:  Thank you.

12        MR. YURCEWICZ:  With that, Your Honor, I'd like to

13 turn the podium back over to Mr. Pacitti to go through the

14 DIP financing and cash flow.

15        THE COURT:  Thank you.  Before we do that, Mr.

16 Schepacarter, do you have a sense of when you're going to be

17 able to -- I guess you're not holding the meetings anymore,

18 but when you're going to have a committee formed?

19        MR. SCHEPACARTER:  Thank you, Your Honor.  Again,

20 Rich Schepacarter: for the United States Trustee.  You're

21 correct, we don't have the traditional meetings in the light

22 of COVID and the like.  But we have served out or sent out --

23 it's rarely served -- but we sent out all the questionnaires

24 for the committee participation.

25        And we've posted it to our website, so if anybody

 1  has it, they can go to our website.  I've actually given that

 2  link to Debtor's counsel, so if anybody asks of them, they

 3  can send it out -- send the link out and they can get the

 4  questionnaire.

 5          But the deadline for the submission, I made it a

 6  week from the filing, so it's the 24th, which will be this

 7  coming Tuesday.  Generally, it takes a day or so after that,

 8  so I should have a committee maybe by the end of the next

 9  week up and running.  It depends.  Sometimes they take time.

10  In my last case, we got it running right away because it was

11  a hurry up and stop kind of thing going on with that case,

12  and for whatever reason, the committee took another week to

13  retain professionals.  So be that as it may.

14          But hopefully we'll have a committee up and

15  running.  It should be in time for the deadline for the bid

16  procedure, second day hearing, but I'm sure if they do retain

17  counsel, that counsel will all work together cooperatively,

18  and everybody will make sure that they can get their position

19  presented in court if they need to.

20          THE COURT:  I'm sure they will.  Thank you.

21          MR. SCHEPACARTER:  Thank you.

22          THE COURT:  Mr. Pacitti.

23          MR. PACITTI:  Thank you, Your Honor.  For the

24  record, again, Domenic Pacitti for Harrison Harvey Branzburg,

25  on behalf of the Debtors as proposed counsel.  Your Honor,

1  the last matter is our motion for request to approve on an

2  interim basis use of cash collateral and debtor-in-possession

3  financing.

4        Your Honor, this motion provides for a $10 million

5  debtor-in-possession facility, $3.5 million of which would be

6  -- we're seeking approval of on an interim basis.  With

7  respect to the terms of that proposed financing, Your Honor,

8  as you know, know, it's a second lien position.

9        It's got an interest rate of 15 percent, a

10 commitment fee of -- that's paid during the case, a

11 commitment fee of 6 percent that is PIK'd, paid in kind, 35

12 percent of which would be earned on the petition date and

13 PIK'd as of the interim order entry and the balance of 65

14 earned on the petition and paid -- and payable in kind upon

15 entry of a final order.

16        Your Honor, there is also an exit fee component to

17 the debtor-in-possession financing of 10 percent.  That's

18 earned upon entry of a final order and payable whether

19 there's -- upon the earlier of maturity date or payoff or

20 refinancing of the DIP facility.

21        As I said, Your Honor, these liens are junior to

22 the liens of existing lenders and other liens.  The lien with

23 respect to the actual advancing of funds, though, is a first

24 lien.  So the way this is working, Your Honor, the financing

25 gets funded into a DIP funding account.

1           THE COURT:  Right.

2           MR. PACITTI:  Twin Brook won't -- will have a

3    second lien on that account.  The DIP lender will have a

4    first lien on that account.  So as cash flow comes in from

5    operations, if there's a need for cash, DIP funding account

6    funds into the general operating account and then gets out to

7    pay whatever costs and fees, et cetera, are necessary to be

8    paid during that week.  If there's anything remainder, then,

9    the lien will remain on that remaining fund.

10          The anticipation is that through this case and the

11   budgeting and as the declarations reflect, the folks at

12   Portage and the company worked hard to put together a budget

13   they think is adequate to fund the operations and the

14   administrative costs of the case.

15          As Your Honor saw, there's a contemplated, sort of

16   a last out sort of funding of the DIP.  So our anticipation

17   is that upon a closing of a sale, the DIP will be fully

18   funded, so there won't be anything in the DIP funding account

19   any longer, so there's not a first lien on that anymore

20   because it will be used and because it's necessary to use it

21   to pay expenses, costs, and what have you in the operations

22   of the company.  So --

23          THE COURT:  Now, is this separate, segregated

24   because it's a junior lien?  Because I really haven't seen

25   something like this before.

1          MR. PACITTI:  Well, it's a junior lien on

2  everything else.

3          THE COURT:  Right.

4          MR. PACITTI:  It's a first lien on what they're

5  putting in.  So I think the notion of the DIP funding account

6  is merely to segregate those funds.  So to the extent that

7  there is a remainder of funds, if there's some leftover money

8  or if there's, God forbid, something bad happens in the case

9  and that money's not needed, they have a first lien on that

10  funding account as between the DIP lender and Twin Brook.

11          THE COURT:  Yeah, it's a little unusual.

12          MR. PACITTI:  Yeah.

13          THE COURT:  But I don't necessarily have any

14  problem with it.

15          MR. PACITTI:  Right.

16          THE COURT:  Okay.

17          MR. PACITTI:  It's the first that I've done one

18  like this, but actually not a bad idea if we can get second

19  liens.  And as you know, Your Honor, how often have we seen a

20  second lien come in here for DIP financing?  It's my first,

21  actually.

22          So Your Honor, the other components of the

23  facility is, obviously, there are, subject to final order,

24  the other types of relief, like liens on avoidance action,

25  proceeds, Section 506(c) waiver, Section 552 equities of the

1  case waiver, now marshalling provision.

2          There's an indemnification by the Debtors of the

3  DIP lender that's subject to final order, and more

4  importantly is there's a release that's subject to final

5  order, as well, that the Debtors are giving the DIP lender.

6          Your Honor, with respect to that release, you

7  know, part of Mr. Kravitz's charge was to investigate and

8  investigate potential claims, both against Kinderhook and the

9  affiliates of Kinderhook and other parties.  And you know, at

10 the final hearing, we'll be in a position to present to Your

11 Honor, if necessary, the bona fides of why we believe that

12 that release is appropriate under these circumstances.

13         But for purposes of today, that's not really

14 before you today.  And I'm sure it'll be a product --

15         THE COURT:  I noticed the --

16         MR. PACITTI:  -- of discussion.

17         THE COURT:  I noticed the breadth of the releasing

18 parties.  I noticed the breadth of the released parties.  I

19 noticed what I think is a non-qualified, in any way, release,

20 so the breadth of the scope.  So we'll see.

21         MR. PACITTI:  Understood, Your Honor.

22         THE COURT:  But it isn't a today issue.  But I'm -

23 - just set all that out there.

24         MR. PACITTI:  Yeah.  And Your Honor, when you

25 think about it, right, one thing is clear, and one thing I

1  can say for purposes of the investigation and Mr. Kravitz's

2  role in it.  What is clear is that you will see on the final

3  hearing that his investigation and his role in this case is

4  clearly independent.  His role and his investigation in this

5  case will be completely thorough, and it will also have sound

6  conclusions.

7          So Your Honor, I think when we make that record,

8  you'll be comfortable with that.  Clearly, there's going to

9  be other constituents likely in this case that we'll have

10  discussions with, and we'll have to, you know, cross that

11  bridge if and when we get to that.

12          But the other part of it, and one of the things

13  from the Debtors' perspective, Your Honor, and I think it's

14  reflective of a lot of comments today, both myself, Mr.

15  Schartz, as well, you know, there really wasn't a whole heck

16  of a lot of choice here, right?  It was either get into an

17  involuntary or get a DIP loan that gets us a chance to

18  maximize value, get a stalking horse in place that, as I said

19  in the -- in the opening remarks, sets a floor, number one,

20  but also, takes care of a lot of -- of -- of debt that's out

21  there.

22          So from the perspective of who's benefiting from

23  this, a large majority of the constituents in this case are

24  benefiting from this process, so that --

25          THE COURT:  Or may be better than to wait till the

1  release until we see the results of that potential benefit.

2           MR. PACITTI:  Yeah.

3           THE COURT:  I'm not sure you could get this

4  release in a plan.  So that's --

5           MR. PACITTI:  Well --

6           THE COURT:  -- that's a consideration, again.

7           MR. PACITTI:  Yeah, sure, but the other side of

8  that, Your Honor, is, you know -- and I don't want to play

9  private equity person, otherwise I would be on a beach

10  somewhere rather than here in Wilmington.

11           THE COURT:  We'd all be, yeah.

12           MR. PACITTI:  But Your -- but Your Honor, it's $10

13  million of new, fresh capital, right?  The last thing --

14           THE COURT:  Right.

15           MR. PACITTI:  -- somebody wants to do is be

16  obligated to put $10 million in and then be sued.

17           THE COURT:  I get it, and I get it that the

18  circumstances, as they've been described to me, that the

19  Debtor found itself in, but I do know -- at least, if I'm

20  reading the budget correctly -- that the Debtors are

21  operationally solvent.  And even to put in nonoperating

22  disbursements and be marginally solvent, it's really the --

23  the expense of the case that's creating the issue.  And that

24  maybe have been unavoidable under the circumstances --

25           MR. PACITTI:  Yeah.

1          THE COURT:  -- and if it were put into an

2    involuntary, it would have been there anyway because I assume

3    the Debtor would have converted the case.  But nonetheless,

4    the DIP is really going to fund the case.  And something has

5    to fund the case, so I get that.

6          MR. PACITTI:  Yeah, I think in large measure,

7    that's true, but I, also, think it's there to fund sort of

8    the ebbs and flows of collections, right?

9          THE COURT:  Well, there -- there is cash -- yes.

10          MR. PACITTI:  Yeah.

11          THE COURT:  I mean, there is a cashflow, and there

12    may be a negative -- I'm sure there is a negative cashflow at

13    some point.

14          MR. PACITTI:  Right.

15          THE COURT:  But on an overall basis, and it's

16    something, apparently, the Debtors were managing, I have to

17    say -- I'm -- I have to think because my understanding of --

18    of the circumstances here was not -- didn't sound operational

19    in the sense of day-to-day operations.  It was the -- the

20    mishap with the inventory --

21          MR. PACITTI:  Right.

22          THE COURT:  -- and then the threat -- and the

23    threatened and actual litigation and the threaten in

24    voluntary, so --

25          MR. PACITTI:  I think that's right, Your Honor,

1   among -- among the other things we've -- we've set forth in

2   the papers, for sure.

3            THE COURT:  Um-hum.

4            MR. PACITTI:  Your Honor, we did have a lot of

5   comments from Mr. Schepacarter before we filed this pleading.

6   We incorporated all of them.  I think we've satisfied him,

7   except for the two points that we ended up resolving

8   yesterday and are reflected in the proposed order that we

9   filed last night at Docket Number 33.  I think you,

10  hopefully, have the one that has the little tabs on it for

11  ease of reference.

12           So the first one is on Page 44 of the redline, and

13  that was in the sort of binding effect provision where Mr.

14  Schepacarter wanted that language, either tempered or

15  stricken because there was a concern about how it sought to

16  perhaps characterize provisions of the Bankruptcy Code rather

17  than just citing a Bankruptcy Code provision, so we're happy

18  to strike that, and -- and that was agreed upon both Twin

19  Brook, the DIP lender, and -- and Mr. Schepacarter.

20           And then the second on is on Page 48 as it relates

21  to the challenge deadline and the provision about seeking

22  Court authorization to extend the challenge period.  And

23  there was a request that that be -- have a provision that it

24  may be done on short notice, which we were happy, obviously,

25  to do, as well.

1      I didn't know if Your Honor had any other

2 questions, but in terms of the need, the two declarations

3 that we filed, both of Mr. Bremer and Ms. Lozynski, I think,

4 demonstrate that there's a clear need for the Debtor in

5 possession financing and for use of cash collateral.  Without

6 it, the Debtors would not be able to operate its business as

7 a going concern.

8      With respect to the bona fides of -- of the -- the

9 DIP itself, as Mr. Bremer's declaration sets forth, there

10 were no other financing alternatives, despite reaching out to

11 a host of parties, including Twin Brook and Hyosung

12 (phonetic) and -- and others.  So Your Honor, there really

13 was no other option but this DIP.

14      Again, the DIP facility has provisions that are

15 subject to final order, and clearly, it's necessary to avoid

16 irreparable harm for this company on a go-forward basis.

17      So Your Honor, we would request that Your Honor

18 approve the DIP and the use of cash collateral and the relief

19 afforded in the interim order on an interim basis and happy

20 to address any questions you may have with respect to the

21 proposed order.

22      THE COURT:  And thank you.  May I ask if anyone

23 wishes to heard with respect to the DIP?

24      MR. SCHARTZ:  Hello again.  Brian Schartz,

25 Kirkland, also on behalf of Kinderhook, DIP -- proposed DIP

1 lender, equity sponsor and stock horse bidder.  But look,

2 this has been really tough, like I said earlier, and we -- we

3 hear your comments on the release.

4         I think from a Kinderhook perspective, putting in

5 approximately $47 million of equity a year ago, putting

6 another $100 million, all for the benefit of getting sued

7 with your own money is not really a palatable proposition.

8 That's why the release is in there.  I think you understand

9 that.  We'll -- we'll hear at the end of the day what their

10 investigation was.

11         From our perspective, you know, they put us

12 through a bit of a proctology exam, right?  We gave a lot of

13 information to the Debtors.  Mr. Kravitz is -- you know,

14 knows his job.  We don't know what the investigations -- we

15 haven't seen the report, but we did everything we could --

16 knowing that we were making the ask, we did everything we

17 could to comply with whatever the Debtor needed to get

18 comfortable to make it.  So that's how it looks on our side.

19         And we do think it's an important component of it.

20 You know, my client asks me repeatedly, can I get the release

21 on day one?  No, you can't get the release on day one.  And

22 we may have to have a discussion with the judge and other

23 stakeholders about it.  But it is a very --

24         MR. PACITTI:  Your Honor, if I may, not that they

25 didn't ask.

 1          MR. SCHARTZ:  Not that we didn't ask.  So it is a

 2  very important component of it.  You know, Kinderhook's

 3  really just lost a lot of money in this, and they want to

 4  give the company the best chance possible, like I said.

 5          You know, I think that -- I think from a fee

 6  perspective, you know, I just wanted to highlight for one

 7  second --

 8          THE COURT:  Um-hum.

 9          MR. SCHARTZ:  Again, take the 15 percent, for

10  example, Judge -- I just want to walk through what that looks

11  like.  You know, this is not a long case.  You see 15 percent

12  on a $10 million DIP, you're like, woah, that's crazy number.

13  That's per annum, right?  The actual cash expense on a DIP

14  that goes through the end of March, if you look at the second

15  line from the bottom on disbursements DIP interest is

16  $171,000.  It's $171,063.  That's what the total expense --

17  interest expense is on this DIP.  Everything else picks.  And

18  so if you move down to the DIP roll-forward, the commitment

19  is only about 35 percent of it that's due on the first draw.

20  It's $210,000.

21          So when you look at the relative cost, the numbers

22  -- you know, you could say, well, 15 percent is really high.

23  But you're trying to navigate -- we're putting capital

24  towards this business on a second lien basis.

25          THE COURT:  Yeah, the 15 percent, actually, didn't

1   bother me --

2            MR. SCHARTZ:  Okay.

3            THE COURT:  -- under the circumstances of the

4   case.  The million-dollar exit fee was -- was -- I noticed --

5            MR. SCHARTZ:  Yeah.

6            THE COURT:  -- more than the 15 percent of this.

7            MR. SCHARTZ:  Right.  So the million-dollar exit

8   fee is -- our view of that is, if we're doing a second lien

9   structure -- yes, our -- our new money has a first lien, but

10  our new money is going to be spent.  I don't know how much is

11  going to actually be there.  It looks interesting.  We would

12  be stupid if we didn't do it that way.  I don't know what

13  it's actually going to mean when we need it.

14           THE COURT:  I don't know.  That's why I thought it

15  was interesting.

16           MR. SCHARTZ:  Right.

17           THE COURT:  I hadn't seen it, so --

18           MR. SCHARTZ:  Why not do it that way is what we

19  decided.  On the commitment fee, the view is, we're taking

20  the risk; we're stabilizing the business.  If someone else

21  wants to come in and take the DIP out -- and presumably, the

22  other -- if there's another bidder, that's what they're going

23  to do.  They're going to say, Judge, we got a better bid.

24  It's $80 million; here's our replacement DIP.  That was done

25  on Kinderhook back, and we haven't really been paid a lot of

1  fees up the way, although we've committed capital, tied it up

2  for this process.  That -- that should be a win from a DIP

3  lender perspective.

4        So if we can get that win, we can help the company

5  maximize value.  They'll make whatever decision they'll make.

6  We should get some sort of fee in helping stabilize the

7  business and taking the risk on a second lien basis.

8        There is a chance it doesn't work out.  No one

9  shows up; the company can't perform; vendors don't supply;

10  revenue dries up -- there's a lot of things that could happen

11  for this business because it's kind of tenuous.  So that's

12  the idea with the exit fee.

13        Importantly, that exit fee is not due and payable

14  until final order.  We made that very clear.  Actually, when

15  I read the order this morning, I probably could have been a

16  little bit more clear.  It is very clear in the term sheet,

17  and we're not trying to get more in the order than what's in

18  the term sheet, so it's only going to be due at the -- at the

19  exit fee.

20        The last point I want to make, when you talk about

21  the purchase price -- and I meant to say this in my initial

22  comments -- Mr. Pacitti said, when you get to purchase price,

23  it's $10 million DIP.  If all the fees are approved -- as we

24  go along, interest is paid, and it's all in this budget, then

25  the total amount of the DIP that is the credit bit at close

1  is not 10; it's 11.6 when you add in the commitment fee and

2  the exit fee.

3          So that -- you know, that's going to be a higher

4  number, arguably, when you think about that.  So that's been

5  -- you'll see that in the DIP budget, that sort of bottom

6  right-hand number.

7          That's all I have, unless you have more questions

8  for me.

9          THE COURT:  Well, I have questions on the order,

10  so whoever's going to --

11          MR. SCHARTZ:  Sure. I'll let Mr. Pacitti tap-dance

12  --.

13          THE COURT:  Whoever's on the line.

14          MR. SCHEPACARTER:  Again, good morning, Your

15  Honor.  Richard Schepacarter:, United States Trustee.  When

16  Mr. Pacitti called me and told me this case was going to be

17  filed, he mentioned that there was going to be releases

18  involved, and I said, okay.  There's no problem.  I've seen

19  DIP releases before and the like, but when I actually read

20  the release, I read that as almost like a plan release, most

21  likely a plan release that we would object to.

22          THE COURT:  Um-hum.

23          MR. SCHEPACARTER:  So that -- that's -- that's of

24  major concern here because that issue's going to have to be

25  resolved, not only in the context of the DIP, but also in the

1  context of the sale when we get down to the bid procedures

2  and sale because Mr. Schartz stole a little bit of my thunder

3  in indicating that the credit bid will include the 11.6,

4  which is the other numbers that come in with respect to

5  what's going to get paid towards -- I'm assuming that they're

6  going towards a plan.

7         So that's all going to have to be factored into --

8  this -- this is all going to be one big ball that's kind of

9  got to roll forward in going forward.

10        I have no doubt that the investigation will be

11  done by Mr. Kravitz thoroughly.  I've known Mr. Kravitz for

12  quite a long time, and part of his resume's -- part of my

13  resume, which is that we both served on the Energy Future

14  Holdings Fee Committee, which is unique because I think we

15  only had two in this district, and that one probably was the

16  most prominent one because it went on for years and was a fee

17  committee I thought was very successful in -- in managing the

18  fees in what was probably one of the largest cases that was

19  ever filed in this district.

20        THE COURT:  Um-hum.

21        MR. SCHEPACARTER:  So like I said, we -- I have no

22  -- no doubt that the investigation will be done thoroughly.

23  But it's going to be a little bit for -- or a lot for,

24  depending on how it works out, for the committee to --

25        THE COURT:  For the committee.

1    MR. SCHEPACARTER:  -- swallow, once the committee

2  gets -- and depending on who the members are.  So there's a

3  big shoe that's going to have to drop at some point in -- in

4  this case, and it'll probably be sometime next month, so

5  thank you.

6    THE COURT:  Thank you.  Okay.  I do have a

7  question in terms of another how-does-it-work thing.  There's

8  -- So the -- the DIP can come down 3.5 on interim, and then

9  on the budget it shows 2 more draws --

10    MR. PACITTI:  Correct, Your Honor.

11    THE COURT:  -- a million 8 in week 6 and 4 7 in

12  week 11.

13    MR. PACITTI:  Correct, Your Honor.

14    THE COURT:  But there's a provision I just want to

15  make sure I understand it that says that the Debtor may elect

16  to draw a portion, not to exceed 4 million 8 on one

17  additional business day after the borrowing in connection

18  with the issues of the final order.  So is that just moving

19  up the -- a 4.8 draw?  What is that?

20    MR. PACITTI:  No, it's actually electing to move

21  it back, I believe, Your Honor, at the end of -- at the end

22  of the budget period.  So if you do the math, I think it's

23  351 -- whatever that number was in the 48 adds up to the $10

24  million.

25    THE COURT:  Um-hum.

1    MR. PACITTI:  So it's -- it's electing to move it

2 to the last week of the budget.  I have the budget, but I

3 don't have it with me.

4    UNIDENTIFIED: Here you go.

5    MR. PACITTI:  Thanks.  Yours is going to be

6 better.  This is much smaller.  Yeah, the 47 is -- is listed

7 at a sort of post-petition forecast week 11, I believe, Your

8 Honor.

9    THE COURT:  Um-hum.

10    MR. PACITTI:  So it -- and the thought process is,

11 to the extent that we need it beforehand, we have the option

12 to do it, to take -- to draw down.  Otherwise, it's -- it's

13 that -- it's at the end of the process.

14    THE COURT:  Okay.  So an advance is an ability to

15 draw.

16    MR. PACITTI:  Right.

17    THE COURT:  Okay.  That's what I thought, but I

18 wasn't positive.

19    Okay.  The declarations support the need for a

20 borrowing and use of cash collateral and so does the budget.

21 We've already sort of gone through that.  Certainly, the

22 budget, the -- the use of cash collateral, and the draw are

23 necessary to fund, based on what we know to date and the

24 budget that's been presented, the costs -- the operating

25 costs, plus the restructuring costs together.

1          And based on the declaration, there are no --

2   currently, no financing alternatives.  The Debtors did shop

3   this, too.  I think the declaration said four other providers

4   of DIP financing.  And so I think there's no question that

5   the Debtor needs to do be able to look to use of cash

6   collateral and debtor in possession financing.

7          I do have, though, some questions with respect to

8   the order.  I do notice that there is discussion of credit

9   bid rights in two sections of the order, but that's a Debtor

10  acknowledgement and a Debtor stipulation, and that's not a --

11  that doesn't suggest others can't object or the Court can't,

12  eventually, rule if there's some contest of that.

13          In Paragraph -- it's 1.4D.  It's on Page 19, I

14  believe,

15          MR. PACITTI:  Are you looking at the redline or

16  the green?

17          THE COURT:  I'll pull the -- yeah, this part is

18  still the same, so it's Page 19.

19          MR. PACITTI:  Of the -- of the redline, Your

20  Honor?

21          THE COURT:  Yes.

22          MR. PACITTI:  Okay.  Yeah, I only ask because the

23  way the redline worked, there were a couple of, like, blank

24  pages, so the page -- pagination sort of --

25          THE COURT:  Oh.

1        MR. PACITTI:  -- went -- went out the door.

2   Sorry.

3        THE COURT:  Well, it's 19 at the bottom, using --

4        MR. PACITTI:  Great.  Thank you.  Perfect.

5        THE COURT:  -- the pagination.  Right in the

6   middle, it talks about the -- well, it starts at the bottom

7   of the previous page: executing additional definitive DIP

8   loan documents.

9        MR. PACITTI:  Yes.

10       THE COURT:  I'm not pre-blessing documents that

11  are not in front of me.

12       MR. PACITTI:  Understood.

13       THE COURT:  So y'all can execute whatever you

14  want, but I'm not pre-blessing it, and -- and materiality,

15  also, has to include that it can't adversely affect the

16  rights of third parties.

17       So there can't be anything, obviously, in any DIP

18  document that, you know, eviscerates someone's lien that's

19  not already in here or that in -- impact a third party in any

20  way.  That's the -- for example, you can't put in remedies

21  that I wouldn't approve in a DIP document that impact third

22  parties.

23       So you can execute whatever definitive documents

24  you want.  I suggest you get them on file before the final,

25  if you're going to do that.

1       MR. PACITTI:  I'm hopeful that we're not going to

2  do that, Your Honor.

3       THE COURT:  I'm not pre-blessing --

4       MR. PACITTI:  We understand that.

5       THE COURT:  I'm not pre-blessing.

6       MR. PACITTI:  Your Honor, does your comment

7  require a change, do you believe, or -- in -- in the language

8  or no?

9       MALE VOICE:  Your Honor, we're --

10      THE COURT:  Yeah, I mean, it says the provision

11 shall, upon execution and then modify supplement.  No, I'm

12 not doing that.

13      MR. SCHARTZ:  Yeah, we'll -- I think we modify --

14 this is Brian Schartz, for the record.  I think we just

15 modify that sentence that says instead of any sort of

16 immediate effect and we file with the Court, and any change

17 will have to be accepted by the Court and presented to the

18 Court at final hearing.

19      THE COURT:  That's fine.

20      MR. SCHARTZ:  So we'll add -- we can -- we can

21 modify that to address that.

22      THE COURT:  Okay.  In -- on the next page, on 20,

23 1.5, indemnification.  It does say subject to the entry of a

24 final order.  But then the last clause of that paragraph

25 says, which indemnification is hereby authorized and

1  approved.  I think that's contradictory.

2          MR. PACITTI:  We can either add --

3          MR. SCHARTZ:  That's a hold-over.

4          THE COURT:  Okay.

5          MR. PACITTI:  Yeah, we can just strike that.

6          THE COURT:  Yes.

7          Okay.  We talked about that.

8          Page 22 -- Paragraph D.  Not sure I've seen this

9  put this way before.  To the extent that any applicable

10  nonbankruptcy law otherwise would restrict the granting,

11  scope, enforceability, attachment, or perfection of any liens

12  created by the interim order, I'm preempting.

13          Where's -- where's -- I guess, what is this

14  anticipating?  I -- I haven't really -- don't think seen this

15  quite this way before.  So --

16          MR. PACITTI:  Yeah.  You know, I think -- my -- my

17  view of this was more focused on fees in filing registration

18  requirements.

19          THE COURT:  Um-hum.

20          MR. PACITTI:  But I see what you're saying.

21  Clearly, to the extent you can't preempt other law, I

22  understand that.  It's -- but I -- and the liens we're

23  granting are not, like, foreign liens or liens that aren't

24  just subject to normal U.S. law, right?  You file UCC1 or you

25  do other things that are just normal course stuff.  So I

1  don't know that it really is applicable in our situation.  I

2  -- believe it or not, I think I have seen this before in

3  other DIPs.

4          THE COURT:  It may be there.

5          MR. PACITTI:  Yeah, but I -- I don't think anyone

6  really raised it.

7          THE COURT:  You know, you read some -- something

8  one day and it strikes you, and you read something another --

9  same thing another day, and it doesn't.

10          MR. PACITTI:  And they read much differently at

11  3:00 in the morning, Your Honor.

12          THE COURT:  Um-hum.  That's true, too.

13          MR. PACITTI:  So -- yeah.

14          THE COURT:  So I just don't know what this goes

15  to.  I don't know that I have the right to preempt.  And I

16  noticed that with respect to the fees, which is something

17  I've addressed before and I've said, and it's reflected here.

18  I can't excuse.  If you have to pay a local fee to file

19  something, you have to pay a local fee.  If you have to pay a

20  local fee to pay a license, you got to do that.  I can't -- I

21  could order it, but I don't think I would really be able to

22  enforce it if I ordered it, so --

23          MR. PACITTI:  I think, Your Honor --

24          THE COURT:  -- I -- I -- I'm there, but I don't

25  understand what this goes to --

1        MR. PACITTI:  Yeah.

2        THE COURT:  -- what laws you want me to preempt.

3        MR. PACITTI:  Yeah, Your Honor, I think when you

4   think about it, we always say that these orders effectuate

5   liens as -- as -- as of the final of the, you know, entry of

6   the order.  And I guess what it's getting to is, okay, to the

7   extent that you're asking -- you got to get a mortgage lien,

8   and the mortgage lien doesn't go on for two weeks or three

9   weeks, but the effectiveness of -- of lien is when Your Honor

10  enters and grants that lien when it enters the order.

11       THE COURT:  Um-hum.

12       MR. PACITTI:  I think it's sort of meant to cover

13  those types of situation where there might be a gap, where

14  there might be no -- no filing made, but the DIP lender wants

15  to get the benefit of the lien that you're granting.

16       THE COURT:  Well, I think that's covered somewhere

17  else.  I'm sure I read that.

18       MR. SCHARTZ:  I think, Your Honor, referring to

19  Paragraph C in the prior page of the lien on 23, where we say

20  it's -- it's prior perfected by filing this order.  And I

21  think what Mr. Pacitti is referencing is a situation where

22  there is attachment and not perfection with the DIP when it's

23  coming in.  That's probably the best(inaudible).

24       THE COURT:  But I don't -- I don't -- maybe I'm

25  misreading this.  I'm not reading this relative to the liens

1   I'm granting.  This is saying that to the extent that some

2   nonbankruptcy law would prevent me from -- from granting a

3   lien, that law's preempted, and I don't know what law that

4   would be.

5           So that's what concerns me is I don't know what

6   law I'm preempting here.  I'm -- I'm okay with the concept

7   that the liens are attaching -- I think, actually, this order

8   says, as of the petition date.

9           MR. SCHARTZ:  Correct.

10          THE COURT:  So I think that's covered elsewhere.

11          MR. SCHARTZ:  Yeah.

12          THE COURT:  I have that -- I couldn't point you to

13  it, but it's in here somewhere.  I remember reading that.

14  I'm okay with that.  I guess I can do that.

15          MR. PACITTI:  I think there's, also --

16          THE COURT:  That doesn't bother me as much --

17          MR. PACITTI:  Yeah.

18          THE COURT:  -- as preempting some law that I don't

19  know what it is.

20          MR. PACITTI:  There's, also, a parenthetical that

21  to the maximum extent permitted by the --

22          THE COURT:  Yeah.

23          MR. PACITTI:  -- Bankruptcy Code, which, if it's

24  not in the Code, then it doesn't exist, I -- I suspect, Your

25  Honor.

1              THE COURT:  Well --

2              MR. PACITTI:  And that's sort of the -- the cover

3   that we have here.

4              THE COURT:  But where -- where is it in the

5   Bankruptcy Code?  I mean, there's nothing in the Bankruptcy

6   Code that says --

7              MR. PACITTI:  That's what I mean.  It -- so --

8              THE COURT:  -- I can do that.

9              MR. PACITTI:  -- it's authorized -- it says that

10  you're doing this to the extent -- to the maximum extent

11  permitted.

12             THE COURT:  Well --

13             MR. PACITTI:  If it's not permitted, then it's not

14  permitted, right?

15             THE COURT:  Yeah, it suggests it could be

16  permitted, and I'm not aware of anything in the Bankruptcy

17  Code that says that I -- that I can preempt state law.  I'm

18  aware of some cases in some very specific contexts which say

19  I can preempt state law but not sort of generally.  And we

20  know in other contexts, for example, such as sales, 363,

21  which -- where state law prohibits --

22             MR. PACITTI:  Right.

23             THE COURT:  -- you know, the sale of something.

24  The Third Circuit has said I can't order that.  So I'm not

25  comfortable with this.  I'm comfortable with -- and I'm --

1  and I don't think it's necessary because I don't know what it

2  means.

3         MR. SCHARTZ:  So Your Honor, you would delete --

4  so I understand the comment, you would delete in -- I guess

5  it's --

6         MR. PACITTI:  D.

7         MR. SCHARTZ:  -- 2.1D on Page 24 everything in D

8  up to the sentence starting by virtue?

9         THE COURT:  Um-hum.  That would solve it on Page

10  22, but yeah.

11         Okay.  On Page 24 -- yes, Romanette ii, other

12  adequate protection.  I'm not sure I'm fully understanding

13  one part of this.  So it starts out with the pre-petition

14  secured parties are going to get paid reasonable fees and

15  expenses.  Okay.  And then it says, Romanette ii -- okay.

16  Which, if we go back up, would read: the pre-petition secure

17  party shall receive, ii, super priority administrative

18  expense claims with -- with respect to the foregoing.

19         MR. PACITTI:  I think that's meant to capture to

20  the extent that those fees and costs are accrued but are not

21  paid, they have a super priority administrative claim for

22  them until they're paid.

23         THE COURT:  Why?

24         MR. PACITTI:  As adequate protection.  Super

25  priority adequate protection.

1          THE COURT:  No, super priority --

2          MR. PACITTI:  Claim, rather.

3          THE COURT:  -- adequate protection claim goes to

4    the diminution in value, right?  That's where you get a super

5    priority under the Code, I think.

6          MR. PACITTI:  Okay.

7          THE COURT:  But I don't know that I've ever seen

8    that the actual fees and expenses of the pre-petition lender

9    get a super priority administrative expense claim.  I know

10   they -- as adequate protection they get paid --

11         MR. PACITTI:  They can be paid.  Understood.

12         THE COURT:  -- and I've never had -- had to have

13   an argument about whether what happens if you -- because I

14   haven't had the diminution fight.

15         MR. PACITTI:  Right.

16         THE COURT:  And if there were no diminution, maybe

17   those would have to come back.  I've never had that argument,

18   but I don't actually think that I've seen -- I may have, and

19   I may have approved it, but here, this time, as I'm reading

20   it, it -- it's -- you know, but it's given a super priority

21   expense to the fees and to the adequate protection liens to

22   the extent of post-petition diminution.  I think it's just

23   very confusing.

24         MR. PACITTI:  I think that Mr. Garland from

25   Winston is on the line, and Mr. Magaziner's here.  But I

1  think, if I'm hearing Your Honor, your suggestion is to take

2  out with respect to the foregoing.

3          MR. SCHARTZ:  And delete -- subparagraph 2.

4  Delete super-priority administrative expense claims with

5  respect to the foregoing, and just delete that.  Start with -

6  -

7          THE COURT:  They get the adequate protection

8  liens.

9          MR. SCHARTZ:  Subject to diminution of value.

10         THE COURT:  Yeah.

11         MR. PACITTI:  Okay.

12         MR. SCHARTZ:  As with, Your Honor --

13         THE COURT:  That's what I'm saying.  I'm --

14 because I'm not sure that why they should get a super-

15 priority admin.

16         MR. PACITTI:  Got it.

17         MR. SCHARTZ:  Right.

18         MR. PACITTI:  Okay.

19         THE COURT:  Okay.

20         MR. GARTLAND:  Your Honor, Greg Gartland from

21 Winston.

22         THE COURT:  Mr. Gartland.

23         MR. GARTLAND:  If I may.

24         THE COURT:  Um-hum.

25         MR. GARTLAND:  And thank you -- thank you for

1   allowing -- by the way, I'm -- as you mentioned, Mr.

2   Magaziner is in the courtroom, and I'm on the line with my

3   colleague --

4           THE COURT:  I see him.

5           MR. GARTLAND:  -- for me.  And thank you for

6   allowing us to appear remotely in this first-day hearing.

7           THE COURT:  Sure.

8           MR. GARTLAND:  Very helpful.  I heard the

9   exchange, and I think the comment is acceptable.  So that

10  deletion would work for us.

11          THE COURT:  Thank you.  Further down on that page,

12  24, in the super-priority admin expense of the DIP loans, in

13  the listing of code sections, 543(c) should be subject to a

14  final order.  Page 29, Section 3.2, Debtor's waivers.  A

15  question on Romanette iii.  So it would be the Debtor cannot

16  file a plan without consent prior to payment in full.  That

17  seems a little broad.  So that's restricting the Debtor's

18  ability to file a plan just because there's a DIP loan

19  outstanding.

20          I do note in Paragraph B on the next page that

21  it's a termination event.  If prior to -- if the Debtors

22  support a plan that doesn't pay them under the plan, I get

23  that.  But -- and why do we need both of those, I guess?  And

24  what's the purpose of having it here?

25          MR. SCHARTZ:  Your Honor, it's here -- sorry, your

1  question here is relating to --

2        THE COURT:  Romanette iii.

3        MR. SCHARTZ:  Romanette iii?

4        THE COURT:  3.2

5        MR. SCHARTZ:  If Your Honor suggests to delete

6  Romanette iii and leave it as is in B, I think that's fine.

7  The idea for these provisions is, like I said at the podium

8  earlier, if the Debtor wants to go in another direction,

9  they're going to have another DIP lender, they'll file their

10  papers, ask for an emergency hearing, and we'll be back here

11  on however many hours' notice we can get here.

12        But you know, it's -- to that point, we've gone in

13  a different direction, and whatever the DIP is at that point

14  is -- is whatever the DIP is at that point.

15        Also, we don't want them to file a plan if it has

16  a provision that says something crazy, you know, that the DIP

17  will be -- receive no recovery or something nuts.  You know,

18  we're not going to let that stand out there because we're not

19  going to fund that process.

20        THE COURT:  Well, then it's a termination event,

21  and y'all have the ability to accelerate the loan and stop

22  use of cash collateral and do all kinds of things.

23        MR. SCHARTZ:  So if we in the DIP order on

24  Paragraph 3.2(iii) -- 3.2(b)(iii), just mark it as reserved.

25  Delete that sentence and leave 3.2(b), I think that works for

1  us.

2          THE COURT:  Yeah.  I don't like 3.2(b), but I see

3  it, and I understand it.  But I think the Debtor should be

4  able to file a plan.

5          MR. SCHARTZ:  Your Honor, I hear you on that,

6  actually.  If you wanted to add a sentence the Debtors have

7  the ability to file a plan that otherwise complies with the

8  DIP budget, if they want to file a liquidating plan that

9  complies with the DIP budget and the DIP term sheet, you

10 know, that's -- I think we'd be okay with that, right?  If

11 they wanted to get that on file, we wouldn't -- we wouldn't

12 have to consent to that.  If they wanted to get that going,

13 we would -- that'd be fine.

14         THE COURT:  We don't need to add --

15         MR. PACITTI:  I'm trying to think of a scenario

16 where that would be possible, Your Honor.

17         THE COURT:  I don't make DIP orders longer.  In

18 Romanette v in 3.2, this is a very broad restriction.

19         MR. PACITTI:  I'm sorry, Your Honor, which --

20         THE COURT:  On 3.2, Romanette v, it's the bottom

21 of Page 29.

22         MR. PACITTI:  Got it.

23         THE COURT:  Carrying over.  It's a very broad,

24 unenumerated restriction.  And it --

25         MR. PACITTI:  I think it's meant to not allow 105

1  to be a work-around about what we've just agreed to with the

2  DIP lender and the first lien secure parties.

3              THE COURT:  Right.  But it could be read to mean

4  that the Debtor can't seek relief during a remedies notice

5  period.  And I'm not going to read it that way.

6              MR. PACITTI:  Yes, I think -- I won't speak for

7  the DIP lender, but when I read it, I didn't think it was

8  that, but if we can add language that allows us to --

9              THE COURT:  And then you get to B, it's actually

10  clearer, B-X.  The exercise of rights or remedies by the DIP

11  lender against the Debtor in accordance with the DIP loan

12  documents.  And maybe the same for Y.

13              So these -- we've started to see over the past

14  couple of years these very broad -- you can't do anything to

15  impair the pre-petition lenders or the post-petition lenders'

16  rights and remedies.  That's super-broad because basically,

17  almost anything the Debtor files could fall within that

18  category because the whole bankruptcy stops, right, the

19  rights and remedies of lenders, particularly pre-petition

20  lenders under their documents.

21              So it's a very broad provision, which I would

22  interpret narrowly.  But it's there, and I'm just saying

23  maybe it needs to all be qualified by subject to a remedies

24  notice period or something of that sort because I think

25  that's where it could really come into play.

1          So I'll let y'all think about that.  It ties into
2    in 3.3, which is the remedies notice period, the way I'm
3    reading it is that after three days of the delivery of a
4    written notice that the DIP lender can do what it wants, can
5    do everything.  And same for the pre-petition lender.
6    Without the suggestion that the Court can order otherwise,
7    and it's just like the passage of time --

8          MR. PACITTI:  Unless the Court orders otherwise
9    within such period?

10          THE COURT:  Yeah.

11          MR. PACITTI:  I'm sorry.

12          MR. SCHARTZ:  I'm still on 3.2.

13          THE COURT:  That's okay.  I realize that.  I
14    realize that, but I'm throwing it in with that because
15    they're related concepts.

16          MR. SCHARTZ:  I wanted to address very much Your
17    Honor's concern.  I'm trying to think through an elegant
18    solution on 3.2(a) that doesn't necessarily throw the DIP
19    baby out with the bath water here.

20          So if we said -- 3.2(a), I'm just summarizing, is
21    the NB now.  So those are DIP events and defaults, right, the
22    termination events.  Okay.  Which is subject to the remedies
23    and notice period in 3.3.

24          So I think the way this is set up, to address your
25    first concern, Judge, on 3.3(iii)(v), is it's all subject to

1  --

2          THE COURT:  It's all subject?

3          MR. SCHARTZ:  -- there's always -- there's always

4  going to be subject to the remedies notice period.  So we

5  call -- it's a DIP termination event because it's broad.  And

6  Your Honor says you guys are out of your mind.  I'm reading

7  this much more narrowly.  That's on us.  Fine.

8          They can then come to the Bankruptcy Court under

9  3.3(b), remedies notice period, and if Your Honor wants to

10 add a sentence that says after three business days following

11 delivery of written notice of the current(inaudible) or other

12 such period of time as ordered by the Court, I think that

13 would get you there.

14          If they don't come to -- if they don't come to

15 Your Honor within three business days, the notice period

16 lapses.  If they come to Your Honor within three business

17 days and Your Honor gives them more time, then the notice

18 period will be held in abeyance for as long as you rule.

19          MR. PACITTI:  So it's incumbent upon the Debtors

20 to get in front of Your Honor quickly, which --

21          THE COURT:  Right.  Somebody has to get in front

22 of me within the notice period, and I don't have a problem

23 with that.  But it's not just -- so I appreciate that offer,

24 if you will.  But the --

25          MR. SCHARTZ:  I'm just trying to clarify.

1        THE COURT:  But the -- but extending the notice

2   period, which is maybe helpful, is not the same thing as

3   saying and in that notice period, the Court can order that

4   you can't do any of these things.  Now, maybe that's

5   implicit.

6        MR. PACITTI:  That is implicit.  That's the whole

7   purpose of the notice period, I think.

8        THE COURT:  Some are explicit.  But it's implicit

9   here.  That's fine.

10        MR. PACITTI:  Okay.

11        THE COURT:  Then yes, if 3.2 is all subject to the

12   remedies notice period -- and y'all are more familiar with

13   Your Honor than I am -- then that's fine.  Then that works,

14   and --

15        MR. PACITTI:  I think we're only talking about

16   3.2(a)(v), though.

17        THE COURT:  Well, no, the whole thing.

18        MR. SCHARTZ:  3.2(a), the only change is to mark

19   Romanette iii as reserved.  We'll leave that as is.

20        THE COURT:  Um-hum.

21        MR. SCHARTZ:  We're going to address Your Honor's

22   concern about additional time (inaudible) order makes sense.

23   3.3 where it says during the period covered by this internal

24   order, after three business days following written notice of

25   the current termination event, dah, dah, dah, dah, dah, or

1  such later time if it is extended during that three-business-

2  day period.  I know that's totally tortured language.  But I

3  think that gets to Your Honor's point.

4          You guys come into -- the Debtor comes into the

5  Court within that period.

6          THE COURT:  Okay.  So the same implicit

7  understanding as in 3.4 where it says after the remedies

8  notice period, and in 3.5 with the automatic stay.  That

9  during the remedies notice period, the Court can order

10 otherwise.

11         Okay.  On Page 35, 4.8(a), binding effect.  After

12 the listing of the bankruptcy rules, this order shall

13 continue in full force and effect and shall survive entry of

14 any other order or action.  That's really broad.  I can't

15 anticipate what might be entered.  But even contemplating

16 somebody comes in and wants to provide a DIP.  I don't know

17 that that's needed, and I say that for two reasons.  One

18 because you list an order confirming a plan.  And then you

19 have all of Paragraph B.

20         So I don't know what this is contemplating that

21 isn't covered in your examples or Paragraph B.  But I could

22 envision an order that this wouldn't survive.  Not too many,

23 but I could.

24         MR. SCHARTZ:  That would be a bad day.

25         THE COURT:  Well, it probably means you're paid.

1        MR. SCHARTZ:  Yep.  That's really what it comes

2   down to.  So -- well --

3        THE COURT:  I mean, it's going to survive

4   converting the case.  It's going to survive -- I'm going to

5   say it's okay that it confirms the plan.  Dismissing.  You

6   know, sometimes when you get too broad, then it's -- doesn't

7   make sense.

8        MR. SCHARTZ:  Your Honor, if I understand the

9   comment, I think what you're suggesting in this Paragraph

10  4.8(a), kind of in the middle, shall survive -- delete entry

11  of any other order or action including without limitation and

12  just say survive any order.

13        THE COURT:  Yes.

14        MR. SCHARTZ:  Okay.  And we'll leave, if I

15  understood your comment correctly, we'll leave 4.8(b) as is

16  or is there a change there too?

17        THE COURT:  No change.

18        MR. SCHARTZ:  Okay.

19        THE COURT:  Okay.  And 4.9 starts on 37.  Okay.  I

20  was having some concern over this provision till I went to

21  Paragraph G at the end that says that any trustee appointed

22  or elected can raise any issues because of the Paragraph 4

23  attempting -- or A, attempting to bind.

24        MR. PACITTI:  I think G was a comment from Mr.

25  Schepacarter --

1              THE COURT:  Okay.  So that's how that got in
2   there?

3              MR. PACITTI:  Yes, Your Honor.

4              THE COURT:  Okay.  Yeah.  Or maybe could even be
5   stronger.  Notwithstanding above in all circumstances, any
6   trustee --

7              MALE VOICE:  If Your Honor wants to strengthen it

8              THE COURT:  Okay.  So we're all understanding.
9   That's meant to avoid what could be read in this prior to it
10  to bind a trustee prior to the expiration of the date.  Okay.
11  And the use of the word estate representative in A, I don't
12  like either, but we'll deal with it because I think that
13  could be -- if you give committee standing, they're in a
14  state representative, and clearly, this isn't binding on the
15  committee until and unless.

16             So I don't like the language, but I'm okay with
17  the fix in G.  And I'm not thrilled with the language in A,
18  quite frankly, at all.  But I'm content that I can have a
19  committee or some other person who has standing and be okay
20  here.

21             But what is the parenthetical in A that's now on
22  Page -- where is it?  It's down at the bottom of Page 37.
23  What's the -- in each case, subject to the limitations set
24  forth in this interim order, including this Paragraph 4.9,
25  what are those limitations?

1          MR. SCHARTZ:  Those limitations relate to the

2   challenge period and if the challenge period lapses and the

3   release goes effective.

4          THE COURT:  I'm sorry, challenge period and what?

5          MR. SCHARTZ:  If the challenge period lapses and

6   the release goes effective.  That's what we're getting at in

7   that provision.  Because you have to read it together with

8   the -- in Section 4.9(a)(i) unless -- that's the key

9   operative language, right -- unless this happens, then the

10  rest of A is operative.  And that's just clarifying, in an

11  admittedly clunky matter, that's what we mean when we say the

12  rest of 4.9(a) is effective.

13         THE COURT:  Unless the committee does what it just

14  says it had to do?

15         MR. SCHARTZ:  Correct.

16         THE COURT:  I'm not sure you've clarified

17  anything, but okay.

18         MR. SCHARTZ:  I'm not --

19         THE COURT:  There's nothing additional.

20         MR. SCHARTZ:  I'm not going to submit that it's

21  perfect drafting.

22         THE COURT:  There's nothing additional than what

23  it just said it had to do in Romanette i.

24         MR. SCHARTZ:  That is correct.

25         THE COURT:  Okay.  And in B, if no such challenge

1   is filed prior to the challenge deadline or the Court -- I

2   don't know how that's defined as -- the Court does not rule

3   in favor of Plaintiff, then the Debtor stipulation -- if the

4   Court doesn't rule in favor of Plaintiff and after any

5   appeal, right?  If I were to rule against the committee, but

6   the committee were successful on appeal, then the Debtor's

7   stipulations don't take effect.  It's got to be a final

8   order.  I don't know why we're always reinventing these

9   provisions.

10          Okay.  The challenge deadline, D.  Page 40.  Why

11   are we deviating from the rule?

12          MR. PACITTI:  With respect to the DIP lender, Your

13   Honor?

14          THE COURT:  Well --

15          MR. PACITTI:  I mean, we're not deviating with

16   respect to the first lien.  The party has the 75 days under

17   the local rule, and we were clear that we would -- we were

18   clear about the release and the stipulations be going

19   effective as it relates to the DIP lender that it had to be

20   subject to final order.

21          But it would be effective after final order, and

22   we recognize that that's something that we're going to need

23   to discuss at the final hearing.  I mean, for the same

24   purpose.  You know, you think about sort of the budget, Your

25   Honor, right, if it was a full 75-day period of time, under

1    our contemplated timeline that would be after a sale closed.

2                  THE COURT:  See, it's interesting.  When you throw

3    the DIP lender into a provision that's meant to address the

4    pre-petition lender, then you end up with this --

5                  MR. PACITTI:  Yeah, and --

6                  THE COURT:  -- fakakta would be the word.  This

7    fakakta provision.  Because this provision was never meant to

8    address the DIP lender.

9                  MR. PACITTI:  Right.

10                  THE COURT:  This provision was meant to address a

11   pre-petition lender.  So now you're seeking to use a

12   challenge period with respect to a DIP lender.  Where's --

13   where's the challenge -- where's the definition of challenged

14   deadline for the pre-petition lender?  Or is it the same?

15                  MR. PACITTI:  It's D -- I think it's just the

16   challenge deadline begins the day the challenge deadline

17   shall mean 75 days, provided that -- and it's just a proviso

18   as it relates to the challenge with respect to Debtor stips

19   with respect to the DIP lender.  It's the proviso that carves

20   out from that 75-day challenge period definition.  I think I

21   got that right.

22                  THE COURT:  Okay.  But then it does shorten the

23   period for the pre-petition lender to the date of

24   confirmation of a plan if confirmation were to occur.  So why

25   are we doing that?  Why aren't we just going with the rule?

1        MR. PACITTI:  I'm trying to -- I would be fine

2   with that, Your Honor, because I can't imagine we're going to

3   have a plan confirmed before the 75-day period.  But -- and

4   Mr. Gartland's on the phone and can weigh in on that.

5        MR. GARTLAND:  Thank you.  Greg Gartland again on

6   behalf of the first lien agent.  I didn't read the order that

7   way, Your Honor.  But if, to the extent anyone does, I'm

8   happy to make that clarification to conform with the rule.

9        THE COURT:  How do you read it?  What -- how do

10  you read it?

11       MR. GARTLAND:  Well, I read -- I read that proviso

12  only referencing the DIP lender.

13       MR. PACITTI:  No.  We're talking about -- I'm

14  sorry, Mr. Gartland.

15       MR. GARTLAND:  Unless I'm looking at the wrong

16  spot.

17       MR. PACITTI:  Yeah.  I think we're talking about -

18  -

19       THE COURT:  Yeah.  I'm just reading the first --

20       MR. GARTLAND:  Oh, I see.  I'm sorry.  I skipped -

21  - I was skipping down to the proviso based on the -- yeah.

22  That's fine.  I have no issue with this -- with deleting that

23  you know, with respect to the first lien parties.

24       MR. SCHARTZ:  I think Your Honor's suggestion

25  about -- very quick, Brain Schartz for the record -- in

1  4.9(d) you delete the words right in the lead in, the earlier

2  of one, the date of confirmation of a plan.  So it will read,

3  the challenge deadline shall mean 75 days following with that

4  deletion.  Is that correct?

5            THE COURT:  Yes.

6            MR. SCHARTZ:  There's an assumption buried in this

7  that so that we're not complete fools.  The assumption buried

8  in this, we're not -- we would never have a plan confirming

9  this Case before 75 days, but I understand Your Honor's

10  point, it's not clear.  So we're fine deleting it for that

11  reason.

12            THE COURT:  Okay.  And so now we just have the

13  shortened period with respect to the DIP lender.

14            MR. SCHARTZ:  Right.

15            THE COURT:  Mr. Schepacarter, I take it the U.S.

16  Trustee -- I don't know what the -- if the U.S. Trustee has

17  distinguished between the two before, the pre-petition lender

18  and the DIP lender.

19            MR. SCHEPACARTER:  No.  For the record, Richard

20  Schepacarter: for the United States Trustee.  No.  I've never

21  really see this kind of -- I think we addressed that earlier

22  -- never seen this kind of DIP order where you have the first

23  lien lender and then you have this other lender -- you have

24  this kind of weird lending relationship.  It's just -- I

25  imagine there were negotiations that went on to try to

1  accomplish this.

2        And I think from the entire presentation today

3  that this was done on an expedited basis.  I'll put it that

4  way.  So I think this is the product of expedition.  And this

5  is what happens to something where you're trying to create a

6  new thing, so to speak.

7        THE COURT:  The -- I mean, we certainly have cases

8  where the pre-petition lender is the DIP lender.  We have

9  those all the time.

10       MR. PACITTI:  Right.  And I don't think it's --

11       THE COURT:  And I don't shorten the period.

12       MR. PACITTI:  I understand that, Your Honor.

13       THE COURT:  I have yet to shorten the period.

14       MR. PACITTI:  I understand that, Your Honor.  I

15  guess from our perspective, number one, we were very up front

16  about that, I think, in our presentation that this would only

17  be effective as a final order.

18       So, you know, our view of this is that, you know,

19  there's going to be, maybe, a committee appointed.  But

20  clearly we're going to have an opportunity to weigh in on

21  whether there's an appropriateness to the release and

22  convince the parties in this case that they are appropriate,

23  given the facts and circumstances here.

24       So our view of this was that, quite frankly, this

25  was not a today issue.

1          THE COURT:  Well, but it is.  The challenge

2  deadline is a today issue.  Because this is the order I'm

3  entering.  It's -- this is not subject to a final.  And look

4  at F.  So maybe F -- again, when you try to stick a DIP

5  lender into a provision that's not geared toward a DIP

6  lender.  But you have F.  This is your real thing.  This is

7  the release provision.  Doesn't this cover you?

8          MR. PACITTI:  I'm sorry.  I'm reading it, Your

9  Honor.

10          THE COURT:  Um-hum.

11          MR. PACITTI:  So you're saying that

12  notwithstanding that this Paragraph D might say something

13  different than it does, or that if the final order is

14  entered, then the challenge period, whatever is, lapsed?

15          THE COURT:  I think that's what this says.  I

16  don't think that's what I'm saying.  I think that's what the

17  order says.  And I don't like it because I don't want this to

18  become precedent now for every case in which I've got a pre-

19  petition lender that's also the DIP lender.

20          The DIP lender is a wholly different animal than a

21  pre-petition lender.  And if somebody's going to -- what is

22  somebody going to challenge?  I don't know.  Qua DIP lender,

23  qua DIP loan.  Okay?  What the DIP lender's really trying to

24  do is get protection for its -- in its capacity as a non-DIP

25  lender.  And that's what's complicating this.

1      MR. PACITTI:  I agree that that's what's

2  happening.  I'm not necessarily agreeing it's complicating

3  it.  I think it's necessity.  When you think about it, Your

4  Honor, as both I and Mr. Schartz, I think, said in the

5  presentation, the whole notion here is that the DIP lender,

6  affiliates of Kinderhook who are putting the DIP lender -- or

7  the DIP lender and the stalking horse bidder, are willing to

8  fund this process up to a point where if it's going to have

9  to fund $10 million to be sued, they want to be able to make

10 that choice.

11     THE COURT:  How is that different than any number

12 of cases that I have in front of me where the DIP lender's a

13 pre-petition lender and maybe there's a stalking horse

14 lender, in fact, I have one that was in front of me

15 yesterday.  Okay?  What's the difference?  And why am I

16 shortening a period to accommodate this DIP lender who, quite

17 frankly, is the sponsor and knows more about this business

18 than anybody else and should be able to make any decision it

19 wants to make?

20     And if it -- and if in fact this company is not

21 worth enough, then let's liquidate it.  I mean, the DIP

22 lender knows everything about this company that nobody else

23 knows.  So it should feel confident that there are no claims

24 against it, and it shouldn't even need a release.  And it

25 shouldn't need a challenge period.  It should need nothing.

1  It knows everything.  It's not a new party.

2          But we'll treat it for -- we'll treat as a DIP

3  lender for DIP lending, you know.  But it doesn't get extra

4  protection.  It knows more than anybody.

5          MR. SCHEPACARTER:  Right.  And I think that's the

6  problem.  It's the release is the problem.  See, that's the

7  goal.  That's what they're trying to get to.  That's the --

8          THE COURT:  And I'm not going to give you a

9  release through the back door, through the challenge period.

10  I'm not going to do it.

11          MR. SCHEPACARTER:  I think they're trying to --

12  and I don't speak it for them.  But I think what they're

13  trying to do is they're trying to get that release, trying to

14  get to that point where they could just say, we got the

15  release.  And they're going to want it -- well, they've

16  already said they wanted it today.  Not getting it.  They're

17  going to want it at the final hearing.  God only knows what's

18  going to happen.

19          THE COURT:  And we'll see.

20          MR. SCHEPACARTER:  We'll see.  But I think that's

21  the problem.  They're trying to get to that release portion

22  like it's not the usual -- because usually the DIP lender

23  would have pre-petition lending relationship.  And that

24  period would be investigated.  And that would be the 75 days.

25          THE COURT:  Right.

1    MR. SCHEPACARTER:  And that would be okay.  And

2 then they would get a release for that lending relationship.

3 What they want here, is they want this not under a lending

4 relationship, but they want this giant release of everything

5 that ever happened in the world tangentially related to this

6 case.  And I think that's where all the mishigas is coming

7 from.  So thank you.

8    THE COURT:  Another technical term.

9    MR. SCHEPACARTER:  Another technical term.

10    MR. SCHARTZ:  Brian Schartz for the record, on

11 behalf of Kinderhook.  I hear you, Your Honor.  And we're not

12 trying to pull a fast one.  We're trying to be very up front

13 here.  And the logic of, you know, the sponsor knows

14 everything, doesn't need a release, it's also true that if we

15 know everything, we should -- we don't think we did anything,

16 we should get a release.

17    We don't want to have spurious claims.  We're

18 cognizant of the fact that unsecured creditors here are not

19 getting large recovery if this goes forward.  So what do you

20 do if you're an unsecured creditor?  You make as much noise

21 as possible and go after the perceived deep pockets.  That's

22 not going to be this case from a Kinderhook perspective.

23 We're not funding that.  It's not going to happen.  We cannot

24 let that happen.

25    And we're different from a DIP lender.  We're

1  different from your normal DIP lender because a lot of times

2  the pre-petition lender has, you know, they have liens,

3  they're going to -- is it perfected, is it properly

4  perfecting, did they do all the things that they're supposed

5  to do?  We're not in that seat.

6           We're in the seat as a sponsor, saying, we're

7  taking the extraordinary step doing a second lien DIP, give

8  this thing the footing it needs to have.  If there's an issue

9  then, you know, we'll hear about it.  And one of the changes

10 we did take to the order is that if -- this is the language

11 in the red line that's in subparagraph D of the definition of

12 the challenge deadline.

13          If the committee has an issue, right, committee

14 gets appointed, they have advisors.  They're going to get a

15 bunch of information from the Debtor, I presume, about the

16 investigation, everything you've heard about it.  If the

17 committee looks at it and says, this is a total joke, that's

18 fine.  They're going to be in here on short notice saying we

19 have to move the challenge deadline.  We'll have that

20 discussion again.

21          THE COURT:  Well, that's not a -- that's not a

22 concession.  Because I would do that anyway.

23          MR. SCHARTZ:  Right.

24          THE COURT:  So it's not a real concession.

25          MR. SCHARTZ:   It's a concession from our

1  perspective.  And I don't mean to be difficult.  Because that

2  means, now we've teed this up for litigation against the

3  sponsor.  So it is a concession from our perspective because

4  there is no other DIP.  We were pushed into this process.  We

5  didn't want to be here.  But we also don't want to get sued.

6          THE COURT:  Listen, I understand all of that.  And

7  being up front doesn't mean that it's correct.  Being up

8  front just means you're doing what you're supposed to be

9  doing, and you're candid with the Court.  And I appreciate

10 that.  But it doesn't make your position more correct or less

11 correct just because you're being up front about it.

12          Here, I really don't see the difference.  I had,

13 just yesterday, I had the exact same case.  Somebody who'd

14 come in, somebody who the committee actually before the

15 period said, yeah, we looked at it, there's nothing here.  It

16 was a traditional bank.  It was actually a bank, okay?  A

17 commercial relationship, an actual bank --

18          MR. SCHARTZ:  Right.

19          THE COURT:  -- who had -- had a UCC on file, and

20 had a docket and had all the stuff.  Okay.  There was nothing

21 to look at.  They said that from the beginning.  And guess

22 what?  The committee and its deal, ah, yes, hello,

23 representative of the bank.  The committee in its deal said,

24 yeah, we've looked at it, there's nothing.  This is not that

25 unusual.

1           And I get where the sponsor's coming from.  But

2   we'll deal with the release at the final hearing.  But this

3   is sort of -- this is a way to enhance the release.  That's

4   what this is.  And to shorten the period -- if you get the

5   release, you don't need to shorten period, right?  Because

6   you get the release.  This is just another way to get it.

7           And I'm not inclined to do it because I haven't

8   done it in any of my cases.  I haven't done it where there's

9   a sale before the 75-day period because the leverage then

10  goes the other way.  You're changing the leverage.  You're

11  changing the leverage.

12          And I have -- I'm not making any comment on --

13  that any cause of action could exist against these lenders.

14  But there is a dynamic.  We have a rule.  All of the judges

15  try to stick by that rule.  There may be an exception here or

16  there.  I don't think I've granted an exception.  And that's

17  what you're looking for here.

18          And it's, as I said, it's cramming into a

19  provision meant to address a pre-petition lender, it's

20  cramming the DIP in there.  And I'm seeing more of that.  And

21  I don't really understand why people are trying to do that.

22  But here it's just evident.  I think your fight's at final.

23  I think your fight's the release.  I think Mr. Schepacarter

24  is right.

25          And if I don't grant you the release, why would I

1  shorten the period?  And if I'm going to grant you the

2  release, I don't need to shorten the period.

3          MR. SCHARTZ:  Right.  And just so we're clear, if

4  we don't get the release, then we're not fronting the rest of

5  the DIP.

6          THE COURT:  You may not.  You'll make that choice.

7          MR. SCHARTZ:  Right.  Right.

8          THE COURT:  You will make that economic choice and

9  you'll decide the -- the DIP lender will decide at that point

10  what is in its best interest.

11          MR. SCHARTZ:  Right.

12          THE COURT:  Which I'm sure is exactly what it's

13  doing right now.  And it should do.  And it should do.

14          MR. SCHARTZ:  Well -- so I don't want to negotiate

15  with you.  I'm not doing that.  I learned that a long time

16  ago.  But I want to make sure I understand.  So from a

17  Kinderhook perspective, the single most important issue on

18  this topic is that we are not loaning more money to the

19  company unless we get a release.  That's the position.  Okay?

20          THE COURT:  I understand you.

21          MR. SCHARTZ:  Your Honor is saying, as I

22  understand it, that's fine, but we're not shortening the

23  challenge period.  Which means that the final hearing on this

24  -- on this DIP order will have to be 75 days out when our

25  sale process is supposed to run 60 days.

 1            THE COURT:  No.  I guess we'll have the fight.

 2  No.  I'm not doing that.

 3            MR. SCHARTZ:  Oh, okay.

 4            THE COURT:  That's not how -- that's not how this

 5  order tees it out.

 6            MR. SCHARTZ:  I'm just trying to understand how

 7  you would change it.  That's why I was --

 8            THE COURT:  This order requires a release on

 9  final.

10            MR. SCHARTZ:  Correct.

11            THE COURT:  I will grant that or I won't grant

12  that.

13            MR. SCHARTZ:  Correct.

14            THE COURT:  If I grant it, the challenge period's

15  no longer relevant, right?

16            MR. SCHARTZ:  Correct.

17            THE COURT:  Okay.  If I don't grant it, the

18  challenge period is what it is.  But Kinder -- I keep wanting

19  to say Kinder Morgan -- Kinderhook will do what it's going to

20  do.  It can choose at that point in time to not lend any

21  further.  That's its decision, right?  If it doesn't get the

22  final order it wants, I assume that's a termination event,

23  you know, and we go forward.  But that's, as I understand it

24  -- and again come back at me if I'm wrong, that's what you

25  want.

1          You want the release.  I'm not saying you can't
2   ask for the release on final.  You can.  Whether you get it
3   or not, that -- we'll figure out at final.
4          MR. SCHARTZ:  Right.  And I understand all of
5   that.  Where I'm confused -- I'm sorry if I'm being dense.
6          THE COURT:  Okay.  No.  That's okay.  I'm missing
7   something.
8          MR. SCHARTZ:  That final order gets entered --
9          THE COURT:  Um-hum.
10          MR. SCHARTZ:  Say we have that hearing 30 days
11   from now.  That final order gets entered.  Challenge period's
12   still running in your mind.
13          THE COURT:  But it grants a release?
14          MR. SCHARTZ:  Correct.
15          THE COURT:  No.  The challenge period would be
16   gone.
17          MR. SCHARTZ:  Right.
18          THE COURT:  Because you'd get a release.
19          MR. SCHARTZ:  Correct.
20          THE COURT:  Yes.  The challenge period would be
21   irrelevant.  Then I'd be having an order that had a challenge
22   period but a release in it.  We'd have to figure that -- you
23   know, we'd have to -- that doesn't work.  The release would
24   be the release.
25          MR. SCHARTZ:  Correct.  All right.

1          THE COURT:  Yeah.  Yeah.  Yeah.

2          MR. SCHARTZ:  I was using a crazy example just to

3    make sure I understand.

4          THE COURT:  No.

5          MR. SCHARTZ:  So -- okay.  So from -- from our

6    perspective, if the company needs money between now and exit,

7    there's has to be a final DIP hearing.  That final DIP

8    hearing, Kinderhook's not making more money available under

9    the DIP unless the release is granted.  How would that work,

10   from your perspective, I want to make sure I understand this,

11   when we only have a 60-day sale process teed up?  I'm sorry

12   if that's convoluted.

13         THE COURT:  Relative to what?  Yeah.  So now

14   you've thrown in another -- now I've got a sale period.

15         MR. SCHARTZ:  I'm trying to find a way to say --

16   because I'm going to have to get on the phone with my client

17   and explain to them, this is why this works, right?

18         THE COURT:  You don't want to just show them this

19   transcript.

20         MR. SCHARTZ:  They're probably listening right

21   now.  I'm sure highly criticizing everything I'm doing.

22         But the point is, I'm trying to find a way to meet

23   in the middle. And I can say, look, this is what the Judge's

24   concern is.  It makes a lot of sense.  Right.  They have a

25   rule in Delaware, 75-day period.

1          My client's going to say, Brian, we're not loaning

2    more money for this company to get sued, we got have a

3    release upon a final order.  How do I marry the two of those

4    in order to work within a process that's really only 60 days?

5    That's when I'm -- that we just strike this provision, then

6    we have a problem.

7          MR. PACITTI:  I thought what I was hearing that

8    notwithstanding the existence of a challenge period, if the

9    release is granted, then the challenge is, there's really

10   nothing to challenge anymore.  The release --

11         MR. SCHARTZ:  All right.  So maybe I'm being very

12   -- maybe I'm just being very dense, right?  What if we just

13   said that the release is 75 days -- I'm sorry, the challenge

14   period is 75 days unless the final order is entered?  Does

15   that work for you?  Does that address your concern?  Again,

16   I'm not negotiating.  I'm sorry.

17         THE COURT:  You know, it might be helpful to take

18   a break and let you guys talk about it.

19         MR. SCHARTZ:  Okay.

20         THE COURT:  And I could be being the one who's not

21   getting something, which, believe me, happens.  So you could

22   explain it to me again if I'm not getting it.  But maybe

23   let's take a -- let's go through the rest of this.

24         MR. SCHARTZ:  Okay.

25         THE COURT:  See if I have anything else.  Then

1  we'll take a break.  And y'all can talk.  But I will say,

2  again, I have not shortened a challenge period either because

3  of a sale that was going to take place before the 75 days or

4  confirmation that could take place before 75 days.  Parties

5  work it out.  Parties understand how to -- how to -- or a

6  credit bid, haven't -- haven't shortened a challenge to

7  permit a credit bid.

8          Parties know how to work those things out to get

9  beyond these dates.  And I had one yesterday where the

10  committee took a look at stuff and said, yeah, nothing here.

11  So I guess enough said.  We'll take a break on that.  Okay.

12  On Page 48.

13          Okay.  4.20.  I think I'm okay with this, with the

14  recognition that after a final order, if we get to one, and

15  there are advances made, that they'll be made in reliance on

16  the final order and not on the interim order.  I've only had

17  one situation where I didn't get to a final.  And it does

18  create problems with what's in an interim order.

19          So that's why we have to look at them carefully.

20  And 4.21, I want to understand.  It seems either premature or

21  maybe working only as between the two parties because the

22  rest of the -- the first sentence says everything is

23  irrevocable, which we know is not the case because it's

24  subject to a challenge period.

25          And it also says it's free and clear of 506(c) and

1  552(b), which we know is not correct yet because that's all

2  subject to a final.  So the first part of this, I think, is

3  premature.  But the second, the provided however, seems to be

4  some agreement between the pre- and post-petition lenders.

5  Which, quite frankly, I don't care about, if that's the

6  agreement.

7           So I just want to make sure I understand what this

8  is -- what this provision intends to do.

9           MR. SCHARTZ:  Judge, I think that 4.21, you're

10  right, should be subject to the final order.  So I think for

11  purposes of the interim order, everything up to the right

12  after the provided, however, we would delete, and we would

13  put it in the final order.  So 4.21, you're right that the

14  proviso what's actually important.

15           So 4.21 would be renamed Turnover, because that's

16  really what it is.  And it will say, to the extent the

17  prepetition obligations, the rest of that stuff including the

18  last sentence is for purpose for clarity.  Because we're not

19  doing a full intercreditor agreement for a $10 million debt

20  on a junior basis.

21           THE COURT:  Okay.  And as long as this an

22  agreement, I'm fine.

23           MR. SCHARTZ:  Correct.  Yeah.  So I think we'll

24  stet that as discussed, and we'll save it for the final

25  order, what we deleted for later.

1          MR. GARTLAND:  And Your Honor, for the record,

2    Greg Gartland, that works for the pre-petition parties.

3          THE COURT:  Thank you.  Okay.  4.27, which should

4    be on the next page or so.  I think I had a representation,

5    and I think it's in the declarations I have, that the -- that

6    the budget includes all necessary payments to keep this --

7    that are coming due.

8          MR. PACITTI:  Correct, Your Honor.

9          THE COURT:  And I also assume that budget includes

10   payments that I authorized today, earlier, to the extent the

11   Debtor chooses to make them.

12         MR. PACITTI:  Correct, Your Honor.  We've backed

13   into the numbers and the motions from the budget.

14         THE COURT:  Okay.  And I have some pretty hefty

15   DIP expenses and pre-petition attorneys' fees.  Are those in

16   the budget somewhere?

17         MR. PACITTI:  DIP expenses.

18         THE COURT:  The fees.  I'm sorry.  Attorneys' fees

19   and --

20         MR. PACITTI:  I think that any fees pre-petition

21   have already been delt with.  I'm looking at the screen.

22         THE COURT:  Secured lender professionals.

23         MR. PACITTI:  These are just go-forward expenses.

24         THE COURT:  Okay.  Those are all of my comments

25   and questions.  So let's take a break.  How long do y'all

1  want?

2         MR. PACITTI:  15.  15 minutes?

3         THE COURT:  Okay.  So take 15 minutes.

4         MR. PACITTI:  If we need longer, we'll knock on

5  the door.

6         THE COURT:  Let me know.  We're in recess.

7         MR. PACITTI:  Thank you, Your Honor.

8         MR. SCHARTZ:  Judge.

9      (Recess taken at 12:38 p.m.)

10     (Proceedings resumed at 1:07 p.m.)

11         THE COURTROOM DEPUTY:  Please rise.

12         THE COURT:  Please be seated.

13         MR. PACITTI:  Thank you, Your Honor.

14         So there was a lot of confusion on our part and I

15  think we all came to a conclusion that now we understood, I

16  think, what you were saying, Your Honor.

17         So on 4.9(d), the challenge period, your concern

18  was that proviso.  And I think what the fix here is, is that

19  we're not changing the challenge deadline period, right, its

20  75 days.  So it complies with the local rule, there's no

21  earlier of language.

22         So what we would do is, and let me know when

23  you're there – sorry, Your Honor.

24         THE COURT:  Hold on.  Okay.

25         MR. PACITTI:  D as in Domenic.  The beginning of

1  4.9(d), Your Honor, if you're there.

2           THE COURT:  Got it.

3           MR. PACITTI:  So shall mean strike the earlier of

4  (I) the date of confirmation of a plan of reorganization, and

5  (II) – so it will just say shall mean 75 days following the

6  entry of the interim order.  And then strike the provided for

7  till the balance of that sentence.  So that is what Your

8  Honor had concern about.

9           So the notion, I think, what we understood from

10  what Your Honor said was the challenge period is the

11  challenge period.  It applies to the prepetition lender in

12  this case to the DIP, potentially in this case, but if we get

13  a release approved at final order then the release is

14  approved and its effective against, you know, everybody.

15           THE COURT:  Its effective against the release

16  parties, yes.

17           MR. PACITTI:  I think that is something we're okay

18  with.

19           THE COURT:  I just want to make sure we're on the

20  same page.  I could be missing something.

21           MR. PACITTI:  No, Your Honor.  You're not.

22           THE COURT:  I haven't thought this through as much

23  as you guys have.

24           MR. PACITTI:  More time would have created more

25  thought, perhaps, Your Honor, and better drafting, but I

1  apologize for that.

2          So I think we're all there then.  Your Honor, I

3  think what we'll do is we'll circulate a clean and redline.

4  I know that Ms. Smith was following the changes.  Hopefully

5  we will get that around shortly and we will just file it

6  under certification of counsel.

7          THE COURT:  Yeah, and I'm just looking at (f) now.

8  So I think – yeah, I mean this assumes that its entered.

9          MR. PACITTI:  Right.

10          THE COURT:  Yes.

11          MR. PACITTI:  Sorry for the confusion.

12          THE COURT:  Its okay.  I read these cold with no

13  preconception of anything. It does depend on the time of

14  night you're reading it and it depends on a lot of things.

15  So it certainly can be me.  As people know we generally have

16  a lively discussion of a DIP order.

17          I want people to pushback because I want to make

18  sure I understand what's happening and I don't want to cause

19  confusion. I can always – it can always be me that is

20  misreading something and sometimes it is.  People can explain

21  to me why something is necessary and appropriate, and why I

22  am misreading it.  So, I appreciate the conversation.  Not a

23  problem.

24          MR. PACITTI:  With that I don't think we have

25  anything other then we're going to upload orders that haven't

1 | changed with the dates for final hearing. I believe it is the

2 | 13th at – oh, orders have been entered.  I haven't checked my

3 | emails.  So, everyone knows it's the 13th at 2 o'clock and any

4 | objection deadline is the 6th at four on all these things.  We

5 | will use that as well for the bid procedures hearing.

6 | THE COURT:  So, let's keep it at 2 o'clock and

7 | let's see what happens.  If as you get closer to the hearing

8 | we see that its going to be contested, the release issue

9 | isn't worked out, we should maybe move the hearing up so we

10 | have some more time if we're really going to have an

11 | evidentiary hearing and we need it, but it's going out that

12 | way, let's leave it at 2, and let's see if the matter can be

13 | resolved.

14 | MR. PACITTI:  Then we'll have it at 4:30, Your

15 | Honor.

16 | THE COURT:  Okay.  But I will leave the morning

17 | open so that if it turns out its going to be a contested

18 | evidentiary matter and you think we need more time that we

19 | will have more time for it.

20 | MR. PACITTI:  Thank you.  We appreciate that, Your

21 | Honor.

22 | THE COURT:  Okay.  So, I will look for the revised

23 | form of order.  I think we only had one order that needed –

24 | MR. YURKEWICZ:  Two, Your Honor.

25 | THE COURT:  Two, we had two.  Okay.  So, if you

1  communicate with my Chambers when those are uploaded that

2  will be helpful and we will get them entered.

3          MR. PACITTI:  We will, Your Honor.  Thank you so

4  much.

5          THE COURT:  Thank you.  We're adjourned.

6      (Proceedings concluded at 1:13 p.m.)

7

8

9

10

11

12                        CERTIFICATION

13          We certify that the foregoing is a correct

14  transcript from the electronic sound recording of the

15  proceedings in the above-entitled matter to the best of our

16  knowledge and ability.

17

18  /s/ Mary Zajaczkowski                  January 19, 2023

19  Mary Zajaczkowski, CET-531

20  Certified Court Transcriptionist

21  For Reliable

22

23

24

25