## **EXHIBIT A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PERFORMANCE POWERSPORTS GROUP | ) | Case No. 23-10047 (LSS) |
| INVESTOR, LLC, *et al.,*[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Related Docket No. _____ |

**ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF**
**TRIPLE P RTS, LLC AS RESTRUCTURING ADVISOR AND TRIPLE P SECURITIES,**
**LLC AS INVESTMENT BANKER FOR THE DEBTORS AND DEBTORS IN**
**POSSESSION EFFECTIVE AS OF THE PETITION DATE**

Upon the application (the "Application")[2] of the above-captioned debtors and debtors in

possession (collectively, the "Debtors") for the entry of an order (this "Order") authorizing the

Debtors to retain and employ Triple P RTS, LLC ("Triple P RTS") as their restructuring advisor

and Triple P Securities, LLC ("Triple P Securities," together with Triple P RTS, "Portage Point")

as investment banker for the Debtors effective as of the Petition Date, pursuant to sections 327(a),

328(a), and 330 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014(a) and

2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1

and 2016-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"); and the Court having reviewed

the Application, the Declaration of Steven W. Bremer, a managing director at Portage Point

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380).  The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Application.

Partners, LLC (the "Bremer Declaration"); and the Court having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Debtors having confirmed their consent to entry of final orders or judgment by this Court pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f); and the Court having found that venue of this proceeding and the Application in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found based on the representations made in the Application and in the Bremer Declaration that (a) Portage Point does not hold or represent an interest adverse to the Debtors' estates and (b) Portage Point is a "disinterested person" as defined in section 101(14) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code; and the Court having found that the relief requested in the Application is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors provided adequate and appropriate notice of the Application under the circumstances and that no other or further notice is required; and the Court having reviewed the Application; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and any objections to the relief requested herein having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Application is granted to the extent set forth herein.

2.      The Debtors are authorized to retain and employ Triple P RTS, LLC ("Triple P RTS") as their restructuring advisor and Triple P Securities, LLC ("Triple P Securities, together with Triple P RTS, "Portage Point") as their investment banker, effective as of the Petition Date in accordance with the terms and conditions set forth in the Application and in the Engagement Letter attached hereto as **Exhibit 1**.

3.      Portage Point is authorized to provide the Debtors with the professional services as described in the Application and the Engagement Letter.

4.      Portage Point shall apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtors' chapter 11 cases in compliance with sections 330, and 331 of the Bankruptcy Code for the Restructuring Advisory services and section 328 of the Bankruptcy Code for the Investment Banking services and shall also comply with the applicable provisions of the Bankruptcy Rules, Local Rules, and any other applicable procedures and orders of the Court.

5.      Notwithstanding the preceding paragraph, with respect to Portage Point's Restructuring Advisory services, the compensation and fees and expenses to be paid to Portage Point shall be subject to review under section 330 of the Bankruptcy Code and with respect to Portage Point's Investment Banking services, the compensation and fees and expenses to be paid to Portage Point, including without limitation the Monthly Fee, Sale Transaction Fee, the Restructuring Fee and the Financing Fee, shall be reviewable under section 328 of the Bankruptcy Code; provided, however, that with respect to the Investment Banking services, the U.S. Trustee shall retain the right to object to the compensation and fees and expenses paid to Portage Point pursuant to the Application and the Engagement Letter, based on the reasonableness standard provided for in section 330 of the Bankruptcy Code.

6.      In light of the Investment Banking services to be provided by Portage Point and the compensation structure in the Engagement Letter, solely with respect to the Investment Banking services, Portage Point and its professionals shall be excused from: (i) the requirement to maintain or provide detailed time records in accordance with Bankruptcy Rule 2016(a) and Local Rule 2016-2; and (ii) conforming with a schedule of hourly rates for its professionals. Instead, Portage

Point shall maintain reasonably detailed time records in 0.5 hour increments containing descriptions of those Investment Banking services rendered for the Debtors, and the individuals who provided those services, and will present such records together with its fee applications filed with this Court. For the Restructuring Advisory services, Portage Point shall maintain time records in accordance with Bankruptcy Rule 2016(a) and Local Rule 2016-2.

7.     Notwithstanding anything in the Engagement Letter to the contrary, Portage Point shall apply any remaining amounts of its prepetition retainers as a credit toward postpetition fees and expenses, after such postpetition fees and expenses are approved pursuant to an order of the Court awarding fees and expenses to Portage Point.  Portage Point is authorized without further order of the Court to reserve and apply amounts from the prepetition retainers that would otherwise be applied toward payment of postpetition fees and expenses as are necessary and appropriate to compensate and reimburse Portage Point for fees or expenses incurred on or prior to the Petition Date consistent with its ordinary course billing practices.

8.     Notwithstanding anything to the contrary in the Engagement Letter, the Application or the Bremer Declaration, to the extent that Portage Point uses the services of independent contractors or subcontractors (collectively, the "Contractors") or affiliates in these chapter 11 cases, Portage Point shall (i) pass through the cost of such Contractors to the Debtors at the same rate that Portage Point pays the Contractors; (ii) seek reimbursement for actual costs only; (iii) ensure that the Contractors and affiliates are subject to the same conflicts checks as required for Portage Point; and (iv) file with this Court such disclosures required by Bankruptcy Rule 2014(a) with respect to such Contractors and affiliates.

9. The Debtors shall be bound by the indemnification, contribution, reimbursement and exculpation provisions set forth in the Engagement Letter, subject during the pendency of these cases to the following:

a. Subject to the provisions of subparagraphs (b) and (c) below, the Debtors are authorized to indemnify, and shall indemnify, Portage Point for any claims arising from, related to, or in connection with the services to be provided by Portage Point as specified in the Application, but not for any claim arising from, related to, or in connection with Portage Point's post-petition performance of any other services (other than those in connection with the engagement), unless such post-petition services and indemnification therefor are approved by this Court;

b. The Debtors shall have no obligation to indemnify Portage Point, or provide contribution or reimbursement to Portage Point, for any claim or expense that is either (i) judicially determined (the determination having become final) to have arisen from Portage Point's bad faith, gross negligence or willful misconduct, (ii) for a contractual dispute in which the Debtors allege the breach of Portage Point's contractual obligations if the Court determines that indemnification, contribution, or reimbursement would not be permissible pursuant to applicable law, or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by this Court, after notice and a hearing pursuant to subparagraph (c) infra, to be a claim or expense for which Portage Point is not entitled to receive indemnity, contribution, or reimbursement under the terms of the Engagement Letter as modified by this Order; and

c. If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order closing these chapter 11 cases, Portage Point believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Engagement Letter (as modified by this Order), including, without limitation, the advancement of defense costs, Portage Point must file an application therefor in this Court, and the Debtors may not pay any such amounts to Portage Point before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period during which the Court shall have jurisdiction over any request for fees and expenses by Portage Point for indemnification, contribution, or reimbursement, and not as a provision limiting the duration of the Debtors' obligation to indemnify Portage Point.

10. Portage Point shall use its reasonable best efforts to avoid duplication of services provided to any of the Debtors' other retained professionals in these chapter 11 cases.

11.     The Debtors and Portage Point are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

12.     Notice of the Application as provided therein is deemed to be good and sufficient notice of such Application, and the requirements of the Local Rules are satisfied by the contents of the Application.

13.     To the extent the Application, the Bremer Declaration, or the Engagement Letter is inconsistent with this Order, the terms of this Order shall govern.

14.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

15.     Notwithstanding anything to the contrary in the Application or the Engagement Letter, the Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**<u>Exhibit 1</u>**

**Engagement Letter**

 PORTAGE POINT PARTNERS

Triple P RTS, LLC &
Triple P Securities, LLC
300 North LaSalle, Suite 1420
Chicago, IL 60654
portagepointpartners.com

As amended on January 12, 2023

Jay Pearson
Chief Executive Officer
Performance Powersports Group Investor, LLC
1775 East University Drive
Tempe, AZ 85281

*Re:  Retention to Provide Restructuring Advisory and Investment Banking Services*

Dear Mr. Pearson:

This letter agreement (this "Agreement") confirms the understanding and agreement between Triple P RTS, LLC and Triple P Securities, LLC (collectively, "Portage Point") on the one hand, and Performance Powersports Group Investor, LLC and its controlled subsidiaries (collectively, the "Company") on the other hand, regarding the Company's engagement of Portage Point to provide certain restructuring advisory and investment banking services to the Company on the terms and conditions set forth herein (the "Engagement").

All defined terms used in this Agreement shall have the meanings ascribed to them in this Agreement. This Agreement refers to Portage Point and the Company each as a "party" and to Portage Point and the Company together as the "parties."

The Company hereby retains Triple P RTS, LLC as its restructuring advisor and Triple P Securities, LLC as its sole investment banker to provide the Company with general restructuring advice and to advise it in connection with any Restructuring, Sale Transaction, and/or Financing (each as defined below) on the terms and conditions set forth herein. By signing this Agreement, Portage Point hereby accepts its appointment as restructuring advisor and investment banker under the terms and conditions hereof.

## **Description of Services**

1.  Portage Point agrees, in consideration of the compensation provided for herein, to perform such of the following services as the Company may reasonably request.

    *Investment Banking*

    (a) reviewing and analyzing the Company's business, operations, and financial projections;

    (b) evaluating the Company's potential debt capacity in light of its projected cash flows;

    (c) assisting in the determination of a capital structure for the Company;

    (d) assisting in the determination of a range of values for the Company on a going-concern basis;

    (e) advising and assisting the Company in evaluating any potential Financing by the Company, and, on behalf of the Company, contacting potential sources of capital as the Company may designate and assisting the Company in implementing such Financing;



(f) assisting the Company in identifying and evaluating candidates for any potential Sale Transaction, advising the Company in connection with negotiations and aiding in the consummation of any Sale Transaction;

(g) advising the Company on the timing, nature, and terms of new securities, other consideration or other inducements to be offered pursuant to any Restructuring, Sale Transaction and/or Financing;

*Restructuring Advisory*

(h) assisting in the evaluation and/or development of a short-term cash flow model and / or related liquidity management tools for the Company for such purpose(s) as the Company may require;

(i) assisting in the evaluation and/or development of a business plan and / or such other related forecasts and analyses for the Company for such purpose(s) as the Company may require;

(j) assisting in the evaluation and implementation of contingency planning related to Company's commencing or otherwise becoming the subject of a case under chapter 11 of title 11 of the United States Code (any such case, a "Chapter 11 Case");

(k) assisting in obtaining and presenting information required by parties in interest in a Chapter 11 Case, including any statutory committees appointed in the Chapter 11 Case, or by the court presiding over the Chapter 11 Case (the "Bankruptcy Court");

*General*

(l) advising the Company on tactics and strategies for negotiating with the Constituents as defined below;

(m) rendering financial advice to the Company and participating in meetings or negotiations with the Constituents and/or rating agencies or other appropriate parties in connection with any Restructuring, Sale Transaction and/or Financing;

(n) assisting the Company in preparing documentation within Portage Point's area of expertise that is required in connection with any Restructuring, Sale Transaction and/or Financing;

(o) attending meetings of the board of directors (or similar governing body) of the Company with respect to matters on which Portage Point has been engaged to advise hereunder;

(p) providing testimony, as necessary, with respect to matters on which Portage Point has been engaged to advise hereunder in any proceeding in a Chapter 11 Case; and

(q) providing the Company with other financial restructuring advice as may be specifically agreed upon in writing by the Company and Portage Point.

## Commencement of Engagement

2. Portage Point shall commence the Engagement on or about October 27, 2022.



## Fees, Retainer and Expense Reimbursement

3. As consideration for the services to be provided, the Company shall pay the following compensation to Portage Point:

   (a) *Hourly Fees*: In consideration for Portage Point's restructuring advisory services, Portage Point's hourly fees (the "Hourly Fees") shall be based on the time worked by Portage Point personnel at Portage Point's hourly rates, which as of the date of this Agreement are as follows.

| Title | Hourly Rate |
|---|---|
| Managing Partner | $945 |
| Service Line Leader | $875 |
| Senior Advisor | $830-$880 |
| Managing Director | $765 - $795 |
| Director | $645 - $695 |
| Vice President | $545 - $630 |
| Associate | $390 - $425 |

   (b) Portage Point's Hourly Fees shall be calculated separately from, and shall be in addition to, Portage Point's fees in clauses (c) – (f) below. The Company agrees Portage Point may adjust its hourly billing rates in the ordinary course one time during the Engagement consistent with the range disclosed to the Company; *provided, however,* any additional, subsequent adjustments are subject to the Company's consent.

   (c) *Monthly Fee*: A monthly fee of $50,000 (the "Monthly Fee"), payable on execution of this Agreement and on the first day of each month thereafter until the earlier of the completion of the Restructuring or the termination of Portage Point's Engagement pursuant to Section 21 of this Agreement. Fifty percent (50%) of all Monthly Fees actually paid to Portage Point after the payment of $100,000 in Monthly Fees shall be credited once, without duplication, against the Restructuring Fee or Sale Transaction Fee (each as defined below), if any, subsequently payable to Portage Point by the Company.

   (d) *Restructuring Fee*: A fee equal to $1,250,000, payable upon the consummation of a Restructuring (the "Restructuring Fee"); *provided, however*, that if a Restructuring is to be completed through a "prepackaged" or "prearranged" chapter 11 plan, the Restructuring Fee shall be deemed earned and payable as follows: (i) 50% of the Restructuring Fee upon the earlier of (a) execution of definitive agreements with respect to such plan; and (b) delivery of binding acceptances of such plan by a sufficient number of Stakeholders to bind all Stakeholders to the plan under the Bankruptcy Code and (ii) 50% of the Restructuring Fee upon the consummation of the Restructuring; *provided, further*, that if Portage Point is paid a fee in connection with a "prepackaged" or "prearranged" chapter 11 plan and a chapter 11 plan is not consummated, Portage Point shall return such fee to the Company (less any Monthly Fees that have accrued).

   (e) *Sale Transaction Fee*:



(i) If, whether in connection with the consummation of a Restructuring or otherwise, the Company consummates a Sale Transaction incorporating all or a majority of the Company's assets or all or a majority of or a controlling interest in the Company's equity securities, Portage Point shall be paid a fee (the "Sale Transaction Fee") equal to the Restructuring Fee plus 5% of the Aggregate Consideration (as defined in Schedule I hereto) above $100,000,000.

(ii) Any Sale Transaction Fee shall be payable upon consummation of the applicable Sale Transaction.

(f) *Financing Fee*: A fee, payable upon the consummation of a Financing (the "Financing Fee"), equal to the applicable percentages of gross proceeds as follows based on the security type issued in the Financing: (i) 2.0% of any senior secured debt financing, government financing, or "debtor-in-possession" financing, *plus* (ii) 4.0% of any junior secured or unsecured debt financing, *plus* (iii) 6.0% of any equity, equity-linked or equity-stapled or similarly bundled equity financing; *provided, however,* Portage Point will not be entitled to a Financing Fee for any Financing provided to the Company by Kinderhook Industries, LLC and its respective affiliates*; provided, further,* Portage Point only will be entitled to a Financing Fee for that portion of any Financing provided to the Company by Twin Brook Capital Partners, LLC and its respective affiliates that includes new money proceeds and/or commitments.

(g) For the avoidance of any doubt, more than one fee may be payable pursuant to clauses (d), (e) and (f) above*; provided, however,* Portage Point will not be paid both a Restructuring Fee and a Sale Transaction Fee.

(h) Upon the execution of the Agreement, the Company shall pay Portage Point an advance payment retainer in the amount of $100,000.  The Company agrees to pay one or more additional advance payment retainers to Portage Point upon request by Portage Point so that the amount of any advance payment retainers remains at or above Portage Point's estimated fees and expenses. Portage Point may apply the advance payment retainers to any outstanding fees as services are rendered and to expenses as they are incurred; *provided, however,* Portage Point shall apply any outstanding retainer to the Restructuring Fee or Sale Transaction Fee, if any, at the time such fee becomes earned and payable pursuant to this Agreement. The Company understands and acknowledges that any advance payment retainers are earned by Portage Point upon receipt, any advance payment retainers become the property of Portage Point upon receipt, and the Company no longer has a property interest in any advance payment retainers upon Portage Point's receipt thereof.

(i) In addition to the fees payable under this Agreement, and regardless of whether any transaction occurs, the Company shall promptly reimburse Portage Point for all reasonable and documented expenses incurred by Portage Point in connection with the Engagement and the reasonable and documented fees and expenses of counsel, if any, retained by Portage Point.  Direct reimbursable expenses include outside copy services, travel, lodging, meals, and services of outside vendors. The Company shall also reimburse Portage Point, at such times as Portage Point shall request, for any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with the Engagement (and regardless of whether any transaction occurs). Portage Point will provide the Company with a reasonably itemized statement of expenses incurred in connection with the Engagement upon request.



    (j) Portage Point will submit invoices from time to time setting forth its fees for services rendered and its expenses incurred. All invoices shall be due and payable immediately upon receipt and paid via wire transfer to Portage Point's bank account, as set forth in the invoice.

    (k) As part of the compensation payable to Portage Point hereunder, the Company agrees to the indemnification, reimbursement, contribution, and other provisions (the "Indemnification Letter") attached to this Agreement as **Addendum A** and incorporated herein in their entirety.

4.  No fee payable to any third party, by the Company or any other person or entity, shall reduce or otherwise affect any fee payable to Portage Point under this Agreement.

### Confidentiality; Use of Information

5.  The Company will furnish or cause to be furnished to Portage Point such current and historical financial information and other information regarding the business of the Company as Portage Point may request in connection with the Engagement. The Company represents and warrants to Portage Point that all of the foregoing information will be accurate and complete at the time it is furnished and agrees to keep Portage Point advised of all developments materially affecting the Company or its financial position. In performing its services pursuant to this Agreement, Portage Point shall be entitled to rely upon information furnished to it on behalf of the Company or any third party and information that is publicly available, may assume the accuracy and completeness of such information and shall not assume any responsibility for independent verification of any such information.

6.  Portage Point shall use reasonable efforts to keep confidential all non-public confidential or proprietary information of the Company obtained during the performance of its services hereunder (the "Company Confidential Information") and will not disclose Company Confidential Information to any other person or entity except as provided in Section 7 of this Agreement. This obligation shall survive the termination of this Agreement or Portage Point's Engagement hereunder for a period of one year following the date of such termination.

7.  Portage Point may make such disclosures of Company Confidential Information as Portage Point reasonably believes are required by applicable law or any regulatory requirement or authority. Portage Point may disclose Company Confidential Information to Portage Point personnel who have a need to know the Company Confidential Information as it relates to the services being provided under this Agreement. Portage Point may make reasonable disclosures of Company Confidential Information to third parties, such as the Company's Stakeholders, in connection with the performance of Portage Point's services hereunder if Portage Point reasonably believes that such third party is bound by confidentiality obligations to or for the benefit of the Company.

8.  The Company agrees that Portage Point shall have the right to publish and distribute, at Portage Point's expense, marketing materials that contain a factual summary of Portage Point's Engagement hereunder and indicate generally the results achieved.

9.  All analyses, final reports, presentation materials, and other work product that Portage Point creates or develops specifically for the Company and delivers to the Company as part of the Engagement (collectively, "Work Product") shall be owned by the Company; *provided* that all methodologies, processes, techniques, ideas, concepts, know-how, procedures, software, tools, templates, models, utilities and other intellectual property that Portage Point has created, acquired, or developed or will create, acquire, or develop (collectively, "Engagement Tools"), are, and shall be, the sole and exclusive



18. The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the Company, Portage Point, and any other person or entity entitled to indemnity under the Indemnification Letter. The Company's obligations pursuant to this Agreement shall be joint and several. This Agreement and the related Indemnification Letter embody the entire agreement and understanding among the parties hereto and supersede any and all prior agreements, arrangements, and understandings, related to the matters provided for herein. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound.

19. For the convenience of the parties hereto, any number of counterparts of this Agreement may be executed by the parties hereto, each of which shall be an original instrument and all of which taken together shall constitute one and the same Agreement. Delivery of a signed counterpart of this Agreement by facsimile transmission or in the form of an electronic signature shall constitute valid, sufficient delivery thereof.

20. This Agreement is governed by and shall be construed in accordance with the laws of the State of Illinois with respect to contracts made and to be performed entirely therein and without regard to choice of law principles.

21. Portage Point's Engagement hereunder may be terminated by the Company or by Portage Point at any time only upon written notice by the terminating party to the other party (and not by any other action, conduct, or event), without liability or continuing obligation to either party following any such termination, except that (a) following any termination of the Engagement, Portage Point shall remain entitled to any fees accrued pursuant to Section 3 but not yet paid prior to such termination and to reimbursement of expenses incurred prior to such termination; and (b) if Portage Point's Engagement is terminated by the Company pursuant to this Agreement, Portage Point shall remain entitled to full payment of all fees described in Section 3 in respect of any Restructuring, any Financing, and/or any Sale Transaction announced or resulting from negotiations occurring during the period from the date of this Agreement until eighteen months following such termination.

22. Simultaneously herewith, the Company and Portage Point are entering into the Indemnification Letter. The Indemnification Letter shall survive any termination of this Agreement or Portage Point's Engagement hereunder.

23. The Company acknowledges and agrees that Portage Point has made a significant monetary investment recruiting, hiring, and training its personnel. Accordingly, the Company acknowledges and agrees to the following:

   (a) During the term of this Agreement and for a period of two years after the final invoice is rendered by Portage Point with respect to the Engagement (the "Restrictive Period"), the Company and its affiliates shall not directly or indirectly hire, contract with, or solicit the employment of any Portage Point personnel.

   (b) If during the Restrictive Period the Company or any of its affiliates directly or indirectly hires or contracts with any Portage Point personnel in violation of Section 23(a) above, the Company agrees to pay to Portage Point as liquidated damages and not as a penalty the sum total of (i) $1,000,000 for a Managing Director or higher, (ii) $700,000 for a Director, (iii) $600,000 for a Vice President, (iv) $500,000 for an Associate, and (v) $250,000 for any other Portage Point personnel.



including any Restructuring, Sale Transaction and / or Financing, including any such discussions or inquiries that have occurred during the six-month period prior to the date of this Agreement. If Portage Point receives an inquiry concerning any transaction, Portage Point will promptly inform the Company of such inquiry.

14. If, as a result of or in connection with Portage Point's Engagement hereunder, Portage Point becomes involved in any legal proceeding or investigation or is required by government regulation, subpoena, or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, the Company will reimburse Portage Point for the reasonable and documented fees and expenses of its counsel incurred in responding to such a request. Nothing in this Section 14 shall affect in any way the Company's obligations under the Indemnification Letter.

15. The Portage Point Parties (as defined below) shall not be liable to the Company, or to any party asserting any claims on behalf of the Company, except for direct damages found in a final determination by a court of competent jurisdiction to be the direct result of the gross negligence, bad faith, self- dealing or intentional misconduct of Portage Point. The Portage Point Parties shall not be liable for incidental, consequential, or special damages, lost profits, lost data, reputational damages, punitive damages, or any other similar damages under any circumstances, even if they have been advised of the possibility of such damages. The Portage Point Parties' aggregate liability, whether in tort, contract, or otherwise, is limited to the amount of fees paid to Portage Point for services under this Agreement (the "Liability Cap"). The Liability Cap is the total limit of the Portage Point Parties' aggregate liability for any and all claims or demands by anyone pursuant to or in connection with this Agreement, including liability to the Company, to any other parties hereto, and to any others making claims relating to the work performed by Portage Point pursuant to this Agreement. Any such claimants shall allocate any amounts payable by the Portage Point Parties among themselves as appropriate, but if they cannot agree on the allocation it will not affect the enforceability of the Liability Cap. Under no circumstances shall the aggregate of all such allocations or other claims against the Portage Point Parties pursuant to this Agreement exceed the Liability Cap. The "Portage Point Parties" comprise Portage Point, its current and future affiliates, and its and their respective directors, managers, officers, members, employees, agents, and other personnel.

16. Subject to Section 17 and Section 26 of this Agreement, any claim arising out of or relating to the Agreement, or the breach thereof, shall be resolved by arbitration. In any such arbitration, Portage Point shall appoint one non-neutral arbitrator, and the Company shall appoint one non-neutral arbitrator. The two party arbitrators shall select a third arbitrator. If within thirty days after their appointment the two party arbitrators do not select a third arbitrator, the third arbitrator shall be selected by the American Arbitration Association ("AAA"). The arbitration shall be conducted in Chicago, Illinois under the AAA Commercial Arbitration Rules, and the arbitrators shall issue a reasoned award. The arbitrators may award costs and attorneys' fees to the prevailing party. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

17. Notwithstanding Section 16 of this Agreement, Portage Point may in its sole discretion proceed directly to a court of competent jurisdiction to (a) enforce the terms of this Agreement for any claim (and any subsequent counterclaim) against the Company relating to either the non-payment of fees or expenses due under this Agreement or (b) enforce the Company's obligations under the Indemnification Letter. **In any court action or proceeding arising out of this Agreement, the Company waives any right to trial by jury.**



property of Portage Point and shall not constitute Work Product. The Company shall not acquire any interest in the Engagement Tools other than a limited, worldwide, perpetual, non-transferable license to use the Engagement Tools to the extent they are contained in the Work Product. Unless otherwise specified in this Agreement, any Engagement Tools provided to the Company are provided "as is" and without any warranty or condition of any kind, express, implied or otherwise, including, implied warranties of merchantability or fitness for a particular purpose.

10. The Company shall not disseminate any Work Product to any third parties at any time in any manner or for any purpose without Portage Point's prior approval (not to be unreasonably withheld or delayed), except to the extent required by applicable law.

**Other**

11. In performing its services pursuant to this Agreement, Portage Point is not assuming any responsibility for the decision of the Company or any other party to pursue (or not to pursue) any business strategy or to effect (or not to effect) any transaction. In addition, Portage Point shall not be responsible for providing or deemed to have provided any tax, accounting, actuarial, legal, or other specialist advice.

12. Portage Point has been retained under this Agreement as an independent contractor to the Company, and nothing herein is intended to confer any rights or remedies as against Portage Point upon any person or entity (including the Company's governing body, management, employees, creditors, and securityholders) other than the Company. It is further understood and agreed that this Agreement and the Engagement do not create any fiduciary relationship between Portage Point and any person or entity. No one, other than senior management or the board of directors (or similar governing body) of the Company (in their capacities as such), is authorized to rely upon the Company's Engagement of Portage Point or any statements, advice, opinions or conduct by Portage Point. Without limiting the foregoing, any advice, written or oral, rendered in the course of the Company's Engagement of Portage Point is solely for the purpose of assisting senior management and / or the board of directors (or similar governing body) of the Company (in their capacities as such) in evaluating potential strategic, operational and / or financial initiatives and/or relevant potential transaction(s), including any Restructuring, Sale Transaction and / or Financing and does not constitute a recommendation to any stakeholder of the Company that such stakeholder might or should take in connection with any such potential strategic, operational and / or financial initiative and / or transactions, including any Restructuring, Sale Transaction and / or Financing. The Company agrees that, notwithstanding any termination of Portage Point's Engagement, any advice, written or oral, rendered by Portage Point and the terms of our Engagement hereunder may not be disclosed publicly or made available to third parties without Portage Point's prior written consent. This Section 12 shall survive the termination of Portage Point's Engagement. In connection with the services to be provided hereunder, Portage Point may employ the services of its affiliates and may share with any such entity any information concerning the Company, provided that Portage Point and such entities shall hold any non¬public information confidential in accordance with this Agreement and their respective customary policies relating to non¬public information. Any such entity so employed shall be entitled to all of the benefits afforded to Portage Point hereunder and under the Indemnification Letter and shall be entitled to be reimbursed for its expenses on the same basis as Portage Point.

13. To coordinate efforts on behalf of the Company during the period of Portage Point's Engagement hereunder, the Company will promptly inform Portage Point of any discussions, negotiations and / or inquiries regarding any potential strategy, operational and / or financial initiatives and / or transactions,



(c) Liquidated damages in the amounts set forth in Section 23(b) above are (i) fair, reasonable and necessary under the circumstances to reimburse Portage Point for the costs of recruiting, hiring and training its personnel as well as the lost profits and opportunity costs related to such personnel, and to protect the significant investment that Portage Point has made in its personnel and (ii) appropriate due to the difficulty of calculating the exact amount and value of that investment.

(d) Section 23 of this Agreement shall survive the termination of Portage Point's Engagement.

**Retention Related Matters**

24. If the Company obtains support commitments from one or more of the Company's key Constituents (as defined below) with respect to a transaction (such Constituents, the "Supporting Constituents," and any documentation of such support commitments, a "Support Agreement"), the Company agrees that it will use best efforts to include in the Support Agreement a provision that the Supporting Constituents affirmatively agree to support and will not object to or in any way oppose (a) the retention of Portage Point, (b) the terms and conditions set forth in this Agreement, including the fee and expense structure set forth herein, and (c) any fee statement or application submitted by Portage Point to the Bankruptcy Court for allowance of the fees and expenses payable to Portage Point under the terms of this Agreement.

25. If the Company commences or otherwise becomes the subject of a Chapter 11 Case, the Company shall use its best efforts to obtain prompt authorization from the Bankruptcy Court to retain Portage Point on the terms and conditions set forth in this Agreement under the provisions of sections 327 and 328(a) of the Bankruptcy Code, with such retention to be effective as of the date the Company became a debtor under the Bankruptcy Code. Subject to being so retained, Portage Point agrees that during the pendency of any Chapter 11 Case, it shall continue to perform its obligations under the Agreement and that it shall file statements and/or applications for allowance of the fees and expenses payable to it under the terms of this Agreement pursuant to the applicable Federal Rules of Bankruptcy Procedure and the local rules and order of the Bankruptcy Court. The Company shall supply Portage Point with a draft of the application and proposed retention order authorizing Portage Point's retention sufficiently in advance of the filing of such application and proposed order to enable Portage Point and its counsel (if any) to review and comment thereon. Portage Point shall be under no obligation to provide any services under this Agreement if the Company becomes a debtor under the Bankruptcy Code unless Portage Point's retention under the terms of this Agreement is approved under sections 327 and 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court, which order is acceptable to Portage Point.

26. If the Company commences or otherwise becomes the subject of a Chapter 11 Case, the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement during the pendency of the Chapter 11 Case.

**Key Definitive Terms**

27. As used in this Agreement, the following defined terms have the meanings specified below:

(a) "Restructuring" means, collectively, any restructuring, reorganization (whether or not pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")), and/or recapitalization of all or a significant portion of the Company's outstanding indebtedness (including bank debt, bond debt, and other on and off balance sheet indebtedness), trade claims, leases (both on and off balance sheet), litigation-related claims and obligations, or other liabilities (collectively, the



"<u>Existing Obligations</u>") that is achieved, without limitation, through a solicitation of waivers and consents from the holders of Existing Obligations (collectively, the "<u>Stakeholders</u>," and together with the Company's other constituents, the "<u>Constituents</u>"); a rescheduling of the maturities of Existing Obligations; a change in interest rates, repurchase, settlement, or forgiveness of Existing Obligations; a conversion of Existing Obligations into equity or other securities; an exchange offer involving the issuance of new securities in exchange for Existing Obligations; the issuance of new securities, sale or disposition of assets, sale of debt or equity securities or other interests; or otherwise through another similar transaction or series of transactions.

(b) "<u>Financing</u>" means any transaction or series of transactions involving the public or private issuance, sale, or placement of newly-issued (including securities held in treasury) equity, equity-linked or debt securities, instruments, or obligations of the Company, as well as any federal, state or local government loan, grant or investment, and including any debtor-in-possession financing or exit financing in connection with a case under the Bankruptcy Code.

(c) "<u>Sale Transaction</u>" means any transaction or series of transactions involving (1) an acquisition, merger, consolidation, or other business combination pursuant to which the business or assets of the Company are, directly or indirectly, combined with another company; (2) the acquisition, directly or indirectly, by a buyer or buyers (which term shall include a "group" of persons as defined in section 13(d) of the Securities Exchange Act of 1934, as amended), of equity interests or options, or any combination thereof constituting a majority of the Company's then-outstanding stock or possessing a majority of the Company's then-outstanding voting power (except as may occur with current Stakeholders pursuant to a Restructuring); (3) any other purchase or acquisition or agreement or commitment to sell, directly or indirectly, by a buyer or buyers (including, without limitation, any liquidator that participates in a sale process) of significant assets, securities, or other interests of the Company or (4) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purpose of effecting a transfer of an interest in the Company to a third party. For purposes of this Agreement, any sale of newly issued securities (including securities held in treasury) shall be deemed a "Financing" and not a "Sale Transaction."

[*Signature Page Follows*]



If the above is in accordance with your understanding of the terms of Portage Point's Engagement, please sign and return this Agreement at your earliest convenience.

We look forward to our work together.

Sincerely,

Triple P RTS, LLC

Matthew D. Ray
Founder & Managing Partner

Triple P Securities, LLC

Steven W. Bremer
Managing Director

*Acknowledged and agreed to as of the date first written above:*

PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC

By: _____ CEO.
        Jay Pearson

Title: _____
        Chief Executive Officer



## Schedule I

For purposes hereof, the term "<u>Aggregate Consideration</u>" means (1) the total amount of cash and the fair market value (on the date of payment) of all of the property paid and payable (including amounts paid into escrow) in connection with the Sale Transaction (or any related transaction), including amounts paid and payable in respect of convertible securities, preferred equity securities, warrants, stock appreciation rights, option or similar rights, whether or not vested, *plus* (2) the principal amount of all indebtedness for borrowed money or other liabilities of the Company or relevant Company entity, as applicable, as set forth on the most recent balance sheet, or, in case of the sale of assets, all indebtedness for borrowed money or other liabilities (including pension liabilities and guarantees of borrowings) assumed, cancelled, exchanged or forgiven directly or indirectly by a third party. Aggregate Consideration shall also include the aggregate amount of any dividends or other distributions declared by the Company or relevant Company entity, as applicable, after the date hereof other than normal quarterly cash dividends, and, in the case of the sale of assets, the net value of any current assets not sold by the Company or relevant Company entity, as applicable.

For purposes of calculating Aggregate Consideration, (1) all shares will be deemed transferred where a Sale Transaction is effected by the transfer of shares, (a) constituting more than 30% of the then outstanding equity securities of or equity interest in the Company or relevant Company entity, as applicable, or (b) possessing more than 30% of the then outstanding voting power of the outstanding equity securities of or equity interest in the Company or relevant Company entity, as applicable, (2) in the case of a "credit bid" or other contribution or exchange of Existing Obligations, the value of such Existing Obligations shall be the face value, and (3) the value of securities (whether debt or equity) that are freely tradable in an established public market will be determined on the basis of the average closing price in such market for the ten trading days prior to the closing of the Sale Transaction (the "<u>Valuation Date</u>"); *provided* that the value of securities that have no established public market or other property will be the fair market value of such securities or other property on such Valuation Date, and any restricted stock (*i.e.*, stock in a public company not freely tradeable) received shall be valued at 85% of the public market price of such stock. If the Aggregate Consideration is subject to increase by contingent payments related to future events, the portion of Portage Point's fee relating thereto shall be calculated by Portage Point in good faith and paid to Portage Point upon consummation of the Sale Transaction.

\* \* \* \* \*

Confidential



Triple P RTS, LLC &
Triple P Securities, LLC
300 North LaSalle, Suite 1420
Chicago, IL 60654
portagepointpartners.com

**Addendum A**

October 27, 2022

Jay Pearson
Chief Executive Officer
Performance Powersports Group
1775 East University Drive
Tempe, AZ 85281

Ladies and Gentlemen:

1.    In connection with the engagement of Triple P RTS, LLC and Triple P Securities, LLC (collectively, "Portage Point") to advise and assist Performance Powersports Group Investor, LLC and its controlled subsidiaries (collectively, the "Company") as to the matters set forth in the engagement letter of even date herewith, the Company and Portage Point are entering into this letter agreement. It is understood and agreed that in the event that Portage Point or any of its current or future affiliates, or any of its or their respective directors, officers, members, employees, agents or controlling persons, if any (each of the foregoing, including Portage Point, being an "Indemnified Person"), become involved in any capacity in any action, claim, proceeding or investigation brought or threatened by or against any person, including the Company's securityholders, related to, arising out of or in connection with our engagement, the Company will promptly reimburse each such Indemnified Person for its legal and other expenses (including the cost of any investigation and preparation) as and when they are incurred in connection therewith. The Company will indemnify and hold harmless each Indemnified Person from and against any losses, claims, damages, liabilities or expenses to which any Indemnified Person may become subject under any applicable federal or state law, or otherwise, related to, arising out of or in connection with Portage Point's engagement, whether or not any pending or threatened action, claim, proceeding or investigation giving rise to such losses, claims, damages, liabilities or expenses is initiated or brought by the Company or on the Company's behalf and whether or not in connection with any action, claim, proceeding or investigation in which the Company or any such Indemnified Person are a party, except to the extent that any such loss, claim, damage, liability or expense is found by a court of competent jurisdiction in a judgment which has become final (in that it is no longer subject to appeal or review) to have resulted solely from such Indemnified Person's bad faith or gross negligence. The Company also agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its securityholders or creditors related to, arising out of or in connection with our engagement except to the extent that any loss, claim, damage or liability is found by a court of competent jurisdiction in a judgment which has become final (in that it is no longer subject to appeal or review) to have resulted solely from such Indemnified Person's bad faith or gross negligence. If multiple claims are brought against any Indemnified Person in an arbitration related to, arising out of or in connection with Portage Point's engagement, and indemnification is permitted under applicable law with respect to at least one such claim, the Company agrees that any arbitration award shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for hereunder, except to the extent the arbitration award expressly states that the award, or any portion thereof, is based solely on a claim as to which indemnification is not available.

2.    If for any reason the foregoing indemnification is held unenforceable or is otherwise unavailable, then the Company shall contribute to the loss, claim, damage, liability or expense for which such indemnification is held unenforceable in such proportion as is appropriate to reflect the relative benefits received, or sought to be received, by the Company and its securityholders and creditors, on the



one hand, and the Indemnified Persons, on the other hand, in the matters contemplated by Portage Point's engagement as well as the relative fault of the Company and such persons with respect to such loss, claim, damage, liability or expense and any other relevant equitable considerations. The Company agrees that for the purposes hereof the relative benefits received, or sought to be received, by the Company and its securityholders and creditors and the Indemnified Persons shall be deemed to be in the same proportion as (a) the total value paid or proposed to be paid by or to the Company and its securityholders and creditors, as the case may be, pursuant to any transaction (whether or not consummated) for which Portage Point has been engaged to perform restructuring advisory and investment banking services bears to (b) the fees paid or proposed to be paid to Portage Point in connection with such engagement; *provided, however*, that, to the extent permitted by applicable law, in no event shall Portage Point or any other Indemnified Person be required to contribute an aggregate amount in excess of the aggregate fees actually paid to Portage Point for such restructuring advisory and investment banking services. The Company's reimbursement, indemnity and contribution obligations under this agreement shall be joint and several, shall be in addition to any liability that the Company may otherwise have, shall not be limited by any rights Portage Point or any other Indemnified Person may otherwise have, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, Portage Point, and any other Indemnified Persons.

3.      The Company agrees that, without Portage Point's prior written consent (which will not be unreasonably withheld), the Company will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action, proceeding or investigation in respect of which indemnification or contribution could be sought hereunder (whether or not Portage Point or any other Indemnified Persons are an actual or potential party to such claim, action, proceeding or investigation), unless such settlement, compromise or consent includes an unconditional release of each Indemnified Person from all liability arising out of such claim, action, proceeding or investigation. No waiver, amendment or other modification of this agreement shall be effective unless in writing and signed by each party to be bound thereby.

4.      This agreement and any claim related directly or indirectly to this agreement shall be governed and construed in accordance with the laws of the State of Illinois (without giving regard to the conflicts of law provisions thereof). Any such claim shall be resolved by arbitration. In any such arbitration, Portage Point shall appoint one non-neutral arbitrator, and the Company shall appoint one non-neutral arbitrator. The two party arbitrators shall select a third arbitrator. If within thirty days after their appointment the two party arbitrators do not select a third arbitrator, the third arbitrator shall be selected by the American Arbitration Association ("AAA"). The arbitration shall be conducted in Chicago, Illinois under the AAA Commercial Arbitration Rules, and the arbitrators shall issue a reasoned award. The arbitrators may award costs and attorneys' fees to the prevailing party. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

5.      Notwithstanding Section 4 of this agreement, Portage Point may in its sole discretion proceed directly to a court of competent jurisdiction to enforce the terms of this agreement and the Company's obligations hereunder. In any court action or proceeding related to, arising out of, or in connection with this agreement, the Company waives any right to trial by jury.

6.      This agreement shall remain in effect indefinitely, notwithstanding any termination of Portage Point's engagement.

[*Signature Page Follows*]



Very truly yours,

Triple P RTS, LLC

Matthew D. Ray
Founder & Managing Partner

Triple P Securities, LLC

Steven W. Bremer
Managing Director

*Agreed to and accepted as of the date first above written:*

Performance Powersports Group Investor, LLC, on behalf of itself and its controlled subsidiaries

By: _____
    Jay Pearson

Title: _____
      Chief Executive Officer