**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PERFORMANCE POWERSPORTS GROUP | ) Case No. 23-10047 (LSS) |
| INVESTOR, LLC, *et al.*,[1] | ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Related to Docket No. 13** |

**SUPPLEMENT TO THE MOTION OF THE DEBTORS FOR
ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO 11 U.S.C.
§§ 105, 361, 362, 363, 364, 503, AND 507 (I) AUTHORIZING THE DEBTORS
TO OBTAIN SENIOR AND JUNIOR SECURED SUPERPRIORITY
POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS; (III) AUTHORIZING USE OF
CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY;
(V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in further support of the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 13] (the "Cash Collateral and DIP Motion"), and in particular with respect to the Release (defined below) set forth therein: [2]

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380).  The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the (a) *Declaration of Ken Vanden Berg of Performance Powersports Group Holdings, Inc., in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 16] (the "First Day Declaration"), (b) the Cash Collateral and DIP Motion, or (c) *the Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain*

## PRELIMINARY STATEMENT

1.     The Debtors seek final approval of their requested debtor-in-possession financing. This critical financing will allow the Debtors to continue operating as a going concern while pursuing a sales and marketing process that will culminate in the sale of substantially all the Debtors' assets to the Stalking Horse Bidder or any other bidder with a higher and better offer. The Stalking Horse Agreement provides for, among other things, assumption of the first lien secured debt to Twin Brook Capital Partners, a credit bid of the outstanding obligations under the DIP Facility, and payment to unsecured creditors whose contracts and/or claims will be assumed, thereby maximizing the value of the Debtors' estates.   Specifically, the consideration under the Stalking Horse Agreement includes: (a) a credit bid of the outstanding obligations under the DIP Facility in the amount of $10,000,000; (b) assumption of the outstanding obligations under the Prepetition First Lien Credit Agreement (approximately $52 million); (c) assumption of the Assumed Liabilities; (d) a cash payment of $500,000; and (e) payment of the Wind-Down Amount of $600,000.  The cash payment and Wind-Down Amount—totaling $1.1 million—is otherwise available for the Debtors' estates under the Stalking Horse Agreement.  The Assumed Liabilities under the Stalking Horse Agreement include, among others: (a) all current Liabilities, trade payables and accrued expenses of Sellers (including, for the avoidance of doubt, (i) invoiced accounts payable, (ii) accrued but un-invoiced accounts payable, and (iii) any open purchase orders) in existence as of the Closing Date, as well as to the extent arising and related to the period following Closing Date (and specifically excluding those Liabilities as set forth in the Stalking Horse Agreement); (b) all accrued payroll, accrued and unused vacation, and accrued payroll Taxes

---

*Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 54] (the "Interim Order"), as applicable.

with respect to Transferred Employees as of the Closing Date (and not paid by Sellers prior thereto); (c) allowed 503(b)(9) Claims; (d) all Liabilities associated with Customer Deposits as of the Closing Date; (e) Priority Claims incurred prior to the Closing Date to the extent allowed by order of the Bankruptcy Court or agreed to (in writing) by Buyer; (f) all Liabilities under or pursuant to all warranties, representations, guarantees and programs provided or offered by Sellers to customers in connection with the products sold or services provided by Sellers with respect to the Business; and (g) all Liabilities and obligations for sales, use, withholding, trust fund or other employment related taxes for which officers and directors may have personal liability for non-payment under applicable law, and any Transfer Taxes and personal property Taxes with respect to the Purchased Asset (each as defined in the Stalking Horse Agreement).

2.      Accordingly, the DIP Lender's willingness to fund these cases will provide immense benefits to the Debtors' estates and help facilitate a favorable sale to the Stalking Horse Bidder or another successful bidder.  In exchange, the DIP Lender (which is an affiliate of Kinderhook Industries, LLC (the Debtors' equity sponsor) ("Kinderhook")) requires the release of the Debtors' potential claims and causes of action against it before fully funding the DIP Facility on a final basis.

3.      The Debtors believe that this compromise is both reasonable and necessary to maximize the value of their estates, and is fully supported by an investigation they performed. Following an independent and thorough investigation of any potential claims that the Debtors may have against Kinderhook, the Debtors concluded that they do not have any claims that are worth pursuing.  Exchanging those weak potential claims for favorable and necessary postpetition financing makes good sense. The Release is fair, equitable, and in the best interests of the Debtors'

10349149.v10

estates, and thus, the Debtors exercised sound business judgment in agreeing to it.  The Release should there be approved by this Court.

4.      Most critically, the Debtors are unlikely to prevail on any potential claims against Kinderhook.  And this is not mere speculation. The Debtors' disinterested director, Peter Kravitz, (the "<u>Disinterested Director</u>"), with the assistance of the Debtors' advisors, conducted an independent, thorough, and supportable investigation into potential claims that the Debtors may have against Kinderhook. As part of this investigation, the Disinterested Director and the Debtors' advisors obtained thousands of documents from Kinderhook and the Debtors, interviewed two Kinderhook-appointed directors who spearheaded the Kinderhook team in the 2021 Transaction, interviewed the Debtors' directors and executives, and met with the Debtors' restructuring advisor to understand the financial aspects of the Debtors' prepetition transactions.

5.      The Disinterested Director considered corporate governance claims such as breach of fiduciary duty, intentional fraudulent transfer, constructive fraudulent transfer, preference, and additional claims and theories of recovery.  Ultimately, there is no evidence that the Debtors or Kinderhook acted with the intent to delay, hinder, or defraud creditors.  Nor are there other supportable, valuable claims.

6.      Based on this investigation, the Disinterested Director concluded that the Debtors did not have any claims worth pursuing against Kinderhook.  As a result, the Debtors further believe that agreeing to the Release as part of the DIP Facility and upon entry of the Final Order, thereby permitting the sale process to reach conclusion, was in the best interests of the Debtors and their estates.

7.      Even if the facts suggested the Debtors had valuable claims, Kinderhook has strong defenses and there are other significant legal obstacles to the potential claims. These include

10349149.v10

contractual waivers of liability, lack of actionable transfers, and lack of cognizable harm.  In short, there are simply no legal or factual bases to conclude that the Debtors have valuable claims against Kinderhook.

8.      In contrast, there should be no dispute that the DIP Facility has substantial value to the Debtors' estates. The DIP Facility contains many terms that are favorable to the Debtors. Specifically, the DIP Facility is junior to the prepetition claims and liens of the Prepetition First Lien Lenders, will be part of the credit bid as part of the Stalking Horse Agreement (including principal, commitment fees, and exit fees), and contains no significant commitments following the entry of the Interim DIP Order.  This means that any party may offer, and ultimately provide, a more favorable DIP facility at any time postpetition. Moreover, prior to filing, the Debtors and their advisors conducted a thorough marketing process, including outreach to potential third-party financers. No party was willing to provide a term sheet to the Debtors on an unsecured, junior priority or priming basis.

9.      The DIP Facility is critical to the Debtors' ability to operate during chapter 11 and emerge post sale closing as a going concern. It provides $10 million in new money debtor-in-possession financing to reasonably fund the Debtors' ongoing operations and sale process. The Debtors were forecasting to have a negative liquidity position as early as January 22, 2023 without the initial interim amount of DIP Facility funding.  Further, the Debtors will not have sufficient liquidity to operate through a closing on a sale without access to the remaining availability under the DIP Facility.

10.      However, over the course of the DIP Facility negotiations, Kinderhook was clear: without the Release, effective upon entry of the Final DIP Order, it would be unwilling to provide new money postpetition financing. The Debtors do not grant the Release lightly.  The significant

10349149.v10

benefits of the DIP Facility, including the pathway it provides to continue the sale process and the ability to expose the Stalking Horse Agreement to higher and better bids, was clearly the goal heading into these cases. The Debtors do not have any other viable alternative to continue this pathway without the DIP Facility. Notwithstanding the necessity of the DIP Facility, the Disinterested Director still pursued a thorough and methodical investigation into affiliates of the DIP Lender, but ultimately concluded that the Debtors do not have claims worth pursuing against Kinderhook and that the Release is well within the scope of the Debtors' business judgment.

11.     The other factors courts consider when assessing a settlement of claims—like the Release in the Final Order—are also satisfied.  Even if the potential claims had merit, they raise complicated issues of fact and law that would be expensive and time-consuming to litigate. Moreover, many unsecured creditors directly benefit from the Release.  Indeed, the approval of the Stalking Horse Agreement that contemplates the payment of a host of Assumed Liabilities outlined above would not be possible without the DIP Facility and is an outcome that is not guaranteed under any other available and actionable alternative in these cases.  The alternative to this pathway results in a significantly worse outcome for creditors.

12.     Finally, the DIP Facility is the result of arm's-length negotiations between the Debtors and their legal and financial advisors, on the one hand, and the DIP Lender and its advisors on the other. Kinderhook has been clear that, in a situation where it is providing critical liquidity to keep the Debtors afloat, it simply will not lend into a case where its financing will be used to pay the legal fees incurred litigating against it.

13.     For these and other reasons set forth herein and in the Cash Collateral and DIP Motion, as well as the evidence presented at the hearing, the Court should approve the Cash Collateral and DIP Motion on a final basis, including the compromise reflected in the Release.

10349149.v10

## JURISDICTION AND VENUE

14.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

15.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

16.     The bases for the relief requested in the Cash Collateral and DIP Motion as supplemented herein are sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 9014, and 9019 of the Bankruptcy Rules, and Rules 2002-1, 4001-1, 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND[3]

### I.     The Debtors and Their Corporate and Capital Structure

17.     The Debtors are a lower-cost producer of high-quality, light-to-middle weight powersports equipment, such as utility task vehicles (UTVs), all-terrain vehicles, go-karts, minibikes and golf carts.  They are headquartered in Tempe, Arizona.

18.     The Debtors' customers include national and regional retail resellers such as Walmart, Tractor Supply Co., Dick's Sporting Goods, Camping World, Lowes, and Theisen's Home, Farm and Auto.

19.     As of the Petition Date, the Debtors employ approximately 78 employees.

---

[3]     Rather than recite the entire background and facts and circumstances surrounding these cases, the Debtors refer to the First Day Declaration, which is incorporated herein by reference.

20.     As of the Petition Date, the Debtors' capital structure consists of a First Lien Secured Credit Facility with Twin Brook Capital Partners, LLC, as administrative agent (in such capacity, "Twin Brook") with approximately $52.0 million outstanding and unsecured trade debt of approximately $70 million.

21.     The Debtors are a portfolio company of Kinderhook.  Performance Powersports Group Investor, LLC owns 100% of the interests in Performance Powersports Group Holdings, Inc., which itself owns 100% of the interests in Performance Powersports Group Purchaser, Inc., which itself owns 100% of the interests in Performance Powersports Group, Inc.

22.     Kinderhook acquired its interest in the Debtors pursuant to a Stock Purchase and Contribution Agreement (the "Purchase Agreement") that closed on October 8, 2021 (the "2021 Transaction"). The Purchase Agreement involved four parties: Performance Powersports Group Investor, LLC, Performance Powersports Group Purchaser, Inc. as purchaser, Rich Godfrey & Associates, Inc., and Rich Godfrey as seller.

23.     The 2021 Transaction closed for a total purchase price of $112,000,000, inclusive of fees, expenses, and cash-to-balance-sheet amounts.  That purchase price was comprised of $47,000,000 in equity contributions, $45,000,000 in debt financing from Twin Brook, and a $20,000,000 Rollover Amount from the cash consideration otherwise paid to Rich Godfrey.

24.     The $47,000,000 equity contribution was from two sources.  First, two Kinderhook funds, Kinderhook Capital Fund VI, L.P. and Kinderhook Capital Fund VI-B, L.P., contributed $45,000,000 in equity.  Second, certain investors associated with Twin Brook contributed an additional $2,000,000 in equity.

## II.     The Debtors Appoint a Disinterested Director to Ensure Robust Governance in Anticipation of a Potential Transaction

25.     In fall 2022, the Debtors and their advisors reviewed the Debtors' existing corporate governance in light of a potential transaction. Following this review, the Board determined that certain modifications to the existing governance structure should be made to further ensure the Board was appropriately guided at all times through any transaction process. Specifically, the Board unanimously agreed that it should appoint a new disinterested director who possesses the financial and restructuring expertise necessary to assist the Board in exploring strategic alternatives and improving liquidity through a potential strategic transaction.

26.     To ensure the independence of any newly appointed director, the Board required that candidates execute non-disclosure agreements and submit a "director questionnaire" documenting their financial and professional relationships to identify any potential conflicts or connections, including to Kinderhook.

27.     Through this process, the Board identified Peter Kravitz as disinterested, independent, and possessing the financial, restructuring, and operational expertise necessary to evaluate any transaction. Mr. Kravitz has no prior connection to the Debtors, Twin Brook, Kinderhook, or any Kinderhook portfolio companies.

28.     Mr. Kravitz is a principal at Province, Inc.,  a financial advisory firm, and has over 25 years of professional experience in a wide range of roles, including Chief Restructuring Officer, advisor to and member of bankruptcy oversight and creditor committees, Chapter 11/Liquidating Trustee/Plan Administrator, Disbursing Agent, and member of boards of directors. Prior to joining Province, he served as Executive Vice President of Business Affairs to the largest privately held RV dealership group ($475+ million in annual revenues) in the United States. In his role as

9

representing post-confirmation trusts, Mr. Kravitz has overseen the recovery of over $1 billion in litigation recoveries.

29.     In October, 2022, it was recommended that Mr. Kravitz be appointed to the Board. The Board approved the appointment of Mr. Kravitz to the Board, and he was  delegated the authority to review and act upon any matters pertaining to a potential restructuring, refinancing, or sale transaction in which a conflict may exist between the Debtors on the one hand, and their equity holders, affiliates (or those entities' managers, directors, or officers) on the other hand.  This mandate ultimately included negotiating and obtaining the DIP Facility and Stalking Horse Agreement.

30.     The Debtors worked with their advisors to consider their strategic options, including a potential sale of all or certain of the Debtors' business operations. Following an evaluation of strategic alternatives, the Company tasked Portage Point with the marketing of their assets for sale as a going concern, which they did in earnest.

## III.    Events Leading to the Chapter 11 Filing

31.     While the marketing effort was ongoing, the Company faced continuing pressure from its former vendors Chongqing Huansong Industries (Group) Co., Ltd., Chongqing Huansong Science and Technology Industrial Co., Ltd. and Vietnam New Century Industrial Company Limited, and its U.S. affiliate Hisun Motors Corp. U.S.A (collectively, "Hisun").  In mid-December 2022, Hisun initiated legal proceedings in two jurisdictions.  The Company and its advisors reached out to Hisun seeking a business solution to their dispute. Discussions regarding a potential business solution ultimately were unsuccessful when in early January 2023 Hisun threatened an imminent involuntary bankruptcy filing.  The Debtors were able to obtain a one-week reprieve from the threatened imminent involuntary filing. To avoid a value-destructive involuntary bankruptcy upon the expiration of the Hisun-imposed deadline and with its marketing bid deadline

10349149.v10

approaching on January 13, 2023, the Company cobbled together a more rational voluntary proceeding.  The Company approached, among others, its equity sponsor, Kinderhook, to support a chapter 11 with a DIP Facility and to serve as a Stalking Horse Bidder for the Company's assets in order to set the floor for the continued sale process in a voluntary chapter 11 proceeding.  After the Bid deadline passed with no expressions of interest and faced with looming threats of an involuntary proceeding, the Debtors commenced these cases.

32.     The Debtors received an initial DIP term sheet from Kinderhook on January 5, 2023. From the outset, Kinderhook indicated that it would require a release as a condition to providing DIP financing. As described in greater detail in the Cash Collateral and DIP Motion, all negotiations concerning the DIP Facility and the Stalking Horse Agreement were conducted at arm's length. Indeed, at all times in connection with negotiations regarding the DIP Facility (and the Stalking Horse Agreement), Kinderhook and its affiliates employed their own counsel, Kirkland & Ellis, LLP, to advise Kinderhook  in connection with these Chapter 11 Cases.

33.     In parallel with the ongoing negotiations with Kinderhook, the Debtors, through their advisors, continued to seek alternative financing.  No other party was interested in providing debtor-in-possession financing and Twin Brook indicated they would not consent to being primed by any third-party debtor-in-possession financing.

## IV.    The Disinterested Director Concludes That The Debtors Do Not Have Valuable Claims Against Kinderhook

34.     The Disinterested Director, assisted by the Debtors' advisors, undertook an independent investigation of potential claims against Kinderhook, including an assessment of whether it would be in the Debtors' best interest to prosecute, waive, release, and/or settle any such potential claims (the "Investigation"). The Investigation focused primarily, but not exclusively, on the 2021 Transaction.

11

35.     The Investigation was comprehensive. ***First***, the Disinterested Director and the Debtors' advisors obtained from Kinderhook a set of core documents, including transaction documents for the 2021 Transaction, corporate formation and governance documents, corporate structure charts, Board minutes, and documents related to these topics.

36.     ***Second***, the Disinterested Director and the Debtors' advisors submitted numerous document requests to Kinderhook and the Debtors seeking additional materials. In total, the Disinterested Director and his advisors (a) received and analyzed approximately 170 documents contained in a virtual data room populated by the Debtors, (b) ran targeted searches on and reviewed approximately 3,700 documents from custodians Richard Godfrey (former CEO) and Christopher Hunter (former CFO) (c) issued twenty-one (21) requests for documents to the Company and Kinderhook; and (d) reviewed both Kinderhook's written responses, as well as an additional 1,279 documents produced in response to those requests.

37.     ***Third***, the Debtors' advisors conducted interviews of the two Kinderhook directors who were also primarily responsible for analyzing and seeking approval from Kinderhook of the 2021 Transaction, to discuss, among other things, the Debtors' capital structure and financial condition leading up to the 2021 Transaction, the development, structuring, and negotiation of the 2021 Transaction, the financing by Twin Brook, and the operation of the Debtors post-2021 Transaction.

38.     ***Fourth***, the Disinterested Director and the Debtors' advisors conducted several videoconferences with Kirkland & Ellis to discuss documents and information provided by Kinderhook relating to the 2021 Transaction and financing from Twin Brook.

10349149.v10

39.     ***Fifth***, throughout the Investigation, the Disinterested Director and the Debtors' advisors researched and analyzed numerous legal issues to determine whether the facts that were developed through the Investigation could give rise to potential claims against Kinderhook.

40.     Throughout the Investigation, the Debtors' advisors had almost daily videoconferences with the Disinterested Director in which the advisors provided regular updates and legal advice to the Disinterested Director on the status of the Investigation, and the Disinterested Director provided input and direction to the advisors.

41.     Before the Petition Date, the advisors presented the findings of the Investigation for review and discussion with the Disinterested Director.  Based upon the information collected during the Investigation and the legal analysis provided by counsel, the Disinterested Director determined that there were no valuable causes of action against Kinderhook.

42.     Accordingly, and after considering the expected benefits that releasing the identified potential claims in exchange for the DIP Facility would bring to the estates and the Debtors' stakeholders, the Disinterested Director recommended to the Board that it was a reasonable exercise of the Debtors' business judgment and in the best interests of the Debtors' estates to grant the Release to Kinderhook as part of the consideration for the funding of the $10 million new money secured DIP Facility on a final basis as contemplated in the Final DIP Order.

43.     Based on the Disinterested Director's Investigation and recommendation, and after the Debtors explored all credible, actionable alternatives, the Debtors concluded that the DIP Facility offered by Kinderhook was the best and only alternative, and that the Release is fair, reasonable, and necessary to maximize the value of the Debtors' estates.

**BASIS FOR RELIEF**

**V.     Courts Should Approve Compromises Where, As Here, They Are Fair, Equitable, And In The Best Interests Of The Debtors' Estates And The Valid Exercise Of The Debtors' Business Judgment**

44.     "To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (internal quotations omitted) (citing 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)). Settlements are considered "a normal part" of the chapter 11 process. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). Indeed, "compromises are favored in bankruptcy" because they minimize litigation and expedite the administration of a bankruptcy estate. *See Martin*, 91 F.3d at 393; *see also In re Key3Media Group, Inc.*, No. 03–10323 (MFW), 2006 WL 2842462, at *3 (D. Del. Oct. 2, 2006). Ultimately, approval of a compromise is within the "sound discretion" of the bankruptcy court who must "balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *E.g., Martin*, 91 F.3d at 393.   Assessing this balance includes consideration of the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Id.; see also In re Nutraquest, Inc.*, 434 F.3d 639, 644-45 (3d Cir. 2006).

45.     Notably, in determining whether to approve a proposed settlement, courts should not determine whether the debtor is getting the best possible settlement, but rather whether the compromise is reasonable. *See In re Integrated Health Services, Inc.*, Case No. 00-398 (MFW), 2001 WL 1820426, at *2 (Bankr. D. Del. Jan. 3, 2001) (explaining that in approving a settlement, a court is not to determine that the settlement is the best that can be achieved by the debtor but

14

"rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness'").

46.     Moreover, when deciding whether to approve a compromise, a court will normally accept the judgment of the movant if a legitimate business justification exists. *E.g., Martin*, 91 F.3d at 395; *In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 250 (D. Del. 1998); *see also In re Penn Central Transportation Co.*, 347 F. Supp. 1351, 1353 (E.D. Pa. 1972) (approving settlement agreement as reflection of business judgment). Once a debtor has articulated a valid business justification for a settlement, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (*quoting Smith v. Van Gorkam*, 488 A.2d 858, 872 (Del. 1985)).

47.     As discussed herein and as will be shown at the evidentiary hearing on February 13, 2023, Kinderhook did not exert undue influence over the course of the arm's-length negotiations of the DIP Facility or in conducting the Investigation. Kinderhook was represented by its own counsel prior to and in connection with these Chapter 11 Cases. The Debtors and their financial and legal advisors negotiated at length with Kinderhook and its advisors concerning the terms of the DIP Facility and Stalking Horse Agreement in the weeks leading up to the Petition Date and were able to obtain some key concessions. The Disinterested Director also played a key and active role in the negotiations to ensure the independence of the Debtors' decision-making with respect to the DIP Facility and the Stalking Horse Agreement. The Investigation was conducted by the Disinterested Director and was comprehensive. The Disinterested Director and

the Debtors' advisors reviewed thousands of documents, conducted numerous interviews, and undertook a detailed legal analysis of potential claims.

48.      Upon the recommendation of the Disinterested Director, the members of the Board—with all interested or conflicted members recused—unanimously approved entry into the DIP Facility after determining that entering into the DIP Facility and granting the Release was appropriate.  Given the independent governance process that led to the approval of the DIP Facility, business judgment is the appropriate standard for examining the Debtors' decision to grant the Release and enter into the DIP Facility.

## VI.    The Court Should Approve The Release Because It Is Fair, Equitable, And In The Best Interests Of The Estates

49.      In determining whether a compromise is "fair, equitable, and in the best interest of the estate," courts in the Third Circuit consider four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Martin*, 91 F.3d at 393*; see also In re Nutraquest, Inc.*, 434 F.3d 639, 644-45 (3d Cir. 2006).

### A.    Any Potential Claims or Causes of Action That The Debtors Have Against Kinderhook are Unlikely to Succeed on The Merits.

50.      The Debtors are unlikely to succeed on any potential claims against Kinderhook.

### (i)    *Potential Intentional Fraudulent Transfer or Actual Fraud Claims Related to Kinderhook's Acquisition via the 2021 Transaction.*

51.      Claims of actual fraud, "transfers or obligations incurred by a debtor may be avoided if made with actual intent to hinder, delay, or defraud a past or future creditor." *Fedders N. Am., Inc. v. Goldman Sachs Credit Partners, L.P.* (*In re Fedders N. Am., Inc.*), 405 B.R. 527, 544–45 (Bankr. D. Del. 2009). It is extremely unlikely that a claim for actual fraud would be viable

under these facts, given the high bar for proving such claims, and the lack of any direct evidence of fraudulent intent on the part of the relevant parties.

52.    That said, "[b]ecause direct evidence of fraudulent intent is often unavailable, courts usually rely on circumstantial evidence to infer fraudulent intent." *Id.* at 545. "Searching for such circumstantial evidence, courts often look to badges of fraud that include, but are not limited to: (i) the relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency or indebtedness of the debtors; (iv) how much of the debtor's estate was transferred; (v) reservation of benefits, control or dominion by the debtor over the property transferred; and (vi) secrecy or concealment of the transaction. The presence or absence of any single badge of fraud is not conclusive." *Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 565 (Bankr. D. Del. 2012) (hereinafter, "*Autobacs*").

53.    There is no evidence that the 2021 Transaction was consummated to hinder, delay, or defraud any past or future creditor, nor does a review of the 2021 Transaction reveal that circumstantial evidence of badges of fraud exist. There was no pre-existing relationship between the relevant parties. The purchase price, as well as the amount of debt placed on the Company as a result of the 2021 Transaction and the Credit Agreement, was based on a supportable EBIDTA multiple. Based on the relevant facts, and in light of the analysis of those facts by the Debtors' advisors and Disinterested Directors, the Company does not appear to have been insolvent or near insolvency at the time of the 2021 Transaction, and Kinderhook took efforts to confirm that was the case, given that it would not have purchased its equity interest in the Company if it were insolvent or close to insolvency. Godfrey acceded majority control to Kinderhook as a result of the 2021 Transaction. And the 2021 Transaction appears in all relevant respects to have been a

result of an arm's-length negotiation process that was subject to proper due diligence and daylight. There are simply no viable or valuable intentional fraudulent transfer or actual fraud claims.

    *(ii)*    **Potential Constructive Fraudulent Transfer Claims Related to Kinderhook's Acquisition via the 2021 Transaction.**

    54.    A constructive fraudulent transfer only exists, and could be avoided, where there are facts sufficient to establish that the Company: (1) received less than reasonably equivalent value in exchange for such transfer or obligation; and (2) either (a) the Company was insolvent on the date that such transfer was made or obligation incurred, or became insolvent as a result of such transfer or obligation or (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Company was an unreasonably small capital.  *See* 11 U.S.C § 548(a)(1)(B)(i), (ii)(I)-(II); 6 Del C. §§ 1304(a)(2), 1305; *In re AgFeed USA, LLC*, 546 B.R. 318, 336 (Bankr. D. Del. 2016) ("A claim of constructive fraud, however, 'need not allege the common variety of deceit, misrepresentation, or fraud in the inducement . . . because the transaction is presumptively fraudulent and all that need be alleged is that the conveyance was made without fair consideration while the debtor was functionally insolvent.'" (internal citations omitted)); N.Y. Debt. & Cred. Law § 273(a)(2); *Loreley Fin. (Jersey) No. 4 Ltd. v. UBS Ltd.*, 40 Misc. 3d 323, 337 (N.Y. Sup. Ct. 2013) (explaining claim of fraudulent conveyance requires (1) a conveyance; (2) made without fair consideration; (3) by a person who is insolvent or who becomes insolvent as a consequence of the transfer); Ariz. Rev. Stat. Ann. §§ 44-1004(A)(2), 44-1005; *Hullett v. Cousin*, 63 P.3d 1029, 1032 (Ariz. 2003) (stating that, in Arizona, "[n]o proof of intent is required to maintain a fraudulent transfer action", "[n]or is a good faith defense available to a debtor in a fraudulent transfer action" (citing Ariz. Rev. Stat. Ann. §§ 44–1005; 1008(A))).  In terms of burden, under Delaware law, a transfer can be avoided if a plaintiff proves, by preponderance of the evidence, that the transaction was intentionally or

constructively fraudulent.  *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 550 (D. Del. 2005), *aff'd sub nom.*, 278 F. App'x 125 (3d Cir. 2008).  In New York, though, "[f]raudulent conveyance must be proven by clear and convincing evidence." *Symbax, Inc. v. Bingaman*, 219 A.D.2d 552, 553 (N.Y. App. Div. 1995).  A plaintiff in Arizona has a burden to prove fraudulent transfer "by clear and satisfactory evidence." *Beals v. Moore*, No. 2 CA-CV 2008-0090, 2009 WL 499531, at *3 (Ariz. Ct. App. Feb. 27, 2009).

55.    "The concept of reasonably equivalent value unfortunately has not been defined in the Code." *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 148 (3d Cir. 1996).  The determination of whether a debtor received a reasonably equivalent value for a transfer or for incurring an obligation is a two-fold inquiry:  (1) first, "the court must make an express factual determination as to whether the debtor received any value . . . at all," as statutorily defined in Section 548(d)(2)(A) of the Code; and (2) if the court determines that some value was obtained, apply a "totality of the circumstances test to determine if that value was reasonably equivalent." *Id.* at 149, 153.  Among factors that may be considered when determining if the transfer or assumption of obligation provided a reasonably equivalent value are: "the fair market value compared to the actual price paid[,] the arm's length nature of the transaction," and whether the transaction was made in "good faith." *Id.* at 153; *Forman v. HBK Master Fund L.P. (In re Glencoe Acquisition, Inc.)*, No. 14-50464, 2015 WL 3777972, at *3 (Bankr. D. Del. Jun. 16, 2015).

56.    Application of the traditional reasonably equivalent value analysis to the 2021 Transaction does not appear to be appropriate, because in this transaction the Company pledged assets to secure debts, while the former shareholders' equity was purchased, in part, using that debt.  For example, the Third Circuit has opined that "it seems difficult to reconcile the original

purpose of fraudulent conveyance laws with what has become a common, arms-length transaction-the leveraged buyout" as the transaction "does not seem at all like the Elizabethan deadbeat who sells his sheep to his brother for a pittance." *Mellon Bank, N.A. v. Metro Communc'ns*, 945 F.2d 635, 645 (3d Cir. 1991) (internal quotation omitted).

57.    However, because "the typical LBO transaction reveals that there is a potential for abuse of the debtor's creditors . . . the question [of] whether the debtor *received* reasonable value must be determined from the standpoint of the creditors." *Id*. at 645–46.  Thus, "in evaluating whether reasonably equivalent value has been given the debtor under section 548, indirect benefits may also be evaluated." *Id.* at 646.  If the value of the indirect benefits approximates the value the company gave to the LBO-lenders, reasonably equivalent value may be found.  *Id.*  Indirect value includes "intangible assets not carried on the debtor's balance sheet, including *inter alia*, good will." *Id.* at 647.

58.    Further, "[t]he ability to borrow money has considerable value in the commercial world" and must be considered as an intangible benefit of a leveraged buyout, even if quantification of that value "is difficult." *Id*. at 647.  Access to relationships that "would produce a strong synergy" through "highly sophisticated equipment and an experienced and reputable . . . staff" is also valuable. *Id*.  The Third Circuit later clarified its *Mellon Bank* holding, stating that a consideration of reasonably equivalent value in this context should include "*potential*, intangible benefits that, although incapable of precise measurement, confer value" for the purposes of assessing reasonably equivalent value for section 548 analysis.  *R.M.L., Inc.*, 92 F.3d at 151.

59.    Unlike a preference claim, there is no presumption of insolvency in a constructive fraudulent transfer case. *See Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.)*, 507 B.R. 452, 473 (Bankr. S.D.N.Y. 2014) ("There is no presumption of insolvency in a [constructive]

fraudulent conveyance action as there is in the preference statute.").  A plaintiff in a constructive fraudulent transfer case bears the burden to prove insolvency by a preponderance of the evidence. *See Peltz v. Hatten*, 279 B.R. 710, 742 (D. Del. 2002) (plaintiff must prove insolvency by "a preponderance of the evidence").  "The term insolvent is defined in the Bankruptcy Code generally to mean a 'financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation.'" *EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 355 (Bankr. D. Del. 2008) (quoting 11 U.S.C. § 101(32)(A)).  When a court considers whether a debtor was insolvent at the time of, or as a result of, the transaction, it must consider the value of the debtor as either a going concern or the debtor's liquidation value. *Travelers Int'l AG v. Trans World Airlines, Inc. (In re: Trans World Airlines, Inc.)*, 134 F. 3d 188, 193 (3d Cir. 1998); *EBCI I, Inc.*, 380 B.R. at 355; *Am. Classic Voyages Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages Co.)*, 367 B.R. 500, 508 (Bankr. D. Del. 2007).  The Third Circuit has opined that "[w]here bankruptcy is not 'clearly imminent' on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going concern basis." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992) (collecting authorities).

60.    As to the issue of whether the debtor was left with unreasonably small capital, the Third Circuit has opined that "'unreasonably small capital' . . . refer[s] to the inability to generate sufficient profits to sustain operations." *Moody*, 971 F.2d at 1070.  In the context of a leveraged buyout, however, "[t]he focus of the adequacy of capital inquiry in a leveraged buyout should be the reasonableness of the parties' cash flow projections." *Id*.  Furthermore, a Bankruptcy Court will not find that a debtor "was left with an unreasonably small capital merely because after the leveraged buyout its sole source of operating capital was its line of credit" because "'[t]he ability to borrow money has considerable value in the commercial world,'" especially "in the case of

leveraged buyouts, which are predicated on the exchange of equity for debt and the ability to borrow." *Id*. at 1072-73 (quoting *Mellon Bank*, 945 F.2d at 647); *see also Whyte v. Ritchie SG Holdings LLC (In re Semcrude, L.P.)*, 526 B.R. 556, 560-61 (Bankr. D. Del. 2014). Thus, the test to determine whether a debtor will have unreasonably small capital resulting from a leveraged buyout is whether there was "reasonable foreseeability" that the debtor organization would be left with unreasonably small capital to sustain its operations. *Moody*, 971 F.2d at 1073.

61.    Although the applicable test to determine whether a leveraged buyout left a company with unreasonably small capital centers on the reasonable foreseeability of such an occurrence pre-transaction, a company's post-transaction performance without the effects of unreasonably small capital is indicative that the transaction did not leave the corporation with unreasonably small capital. *Moody v. Sec'y Pac. Bus. Credit, Inc.*, 127 B.R. 958, 985, 987-89 (Bankr. W.D. Pa. 1991), *aff'd* 971 F.2d 1056. For instance, in *Moody,* the debtor-corporation went "a full cycle of 12 months, during which [the corporation] had paid out to vendors, other creditors, and employees over $75 million, had always met its payroll, had positive cash flows, and had substantial inventory for the coming peak season" and the Court determined that the company's problem "was not capital, but sales." *Moody*, 127 B.R. at 985, 987-89.

62.    The 2021 Transaction did not constitute a constructive fraudulent transfer. Specifically, even assuming that the Company received less than equivalent value in exchange for the assets it pledged under the Credit Agreement executed in connection with the 2021 Transaction (which it did not), from the interviews conducted and documents reviewed, the Company was likely solvent on the Closing Date of the 2021 Transaction and the 2021 Transaction likely did not leave the Company with unreasonably small capital to sustain its obligations.

**Reasonably Equivalent Value**

63.     As an initial matter, it is unnecessary to determine whether the Company received reasonably equivalent value for the 2021 Transaction because, as discussed more fully herein, the Company was likely solvent at the time of the transaction and, post-Closing, the Company likely was not left with unreasonably small capital.   Nonetheless, a Bankruptcy Court may look at the 2021 Transaction and believe that the Court would determine that the 2021 Transaction provided value to the Company.   Specifically, through the 2021 Transaction, the Company acquired, in return for pledging its assets as collateral for the Credit Agreement, access to increased capital funds and an ongoing partnership with Kinderhook, whose experience and business acumen was expected to continue the Company's growth and success long into the future.   Correspondingly, Twin Brook and the lenders underlying the Credit Agreement provided value for the funds lent in the term loan and revolver because they were based on the ongoing and actual EBIDTA numbers of the Company and based on the projected value of the Company on a going-forward basis, taking into account the Company's historic performance and the added prospects of success with Kinderhook as a partner.

64.     Finally, Kinderhook provided reasonably equivalent value as it paid $45 million in equity to purchase a controlling interest in the Company, and the Purchase Price, as described above, was based on a multiple of the Company's then-existing EBIDTA, which Kinderhook diligenced itself in collaboration with its own financial advisors.  In addition,  Kinderhook has not taken any equity or dividends out of the Company since the 2021 Transaction, and has  refrained from taking even the management fees due to it pursuant to the Management Services Agreement. In fact, the only cash that Kinderhook has received as a result of the 2021 Transaction was its $1.5 million transaction fee ("Transaction Fee "), which is charged by Kinderhook in every similar transaction in which it participates.

**Solvency, Unreasonably Small Capital and Ability to Pay Debts**

65.    It is likely that the Bankruptcy Court would determine that the Company was solvent at the time of the 2021 Transaction, and that the 2021 Transaction likely did not leave the Company with unreasonably small capital.  First, the Company was not imminently facing bankruptcy following the consummation of the 2021 Transaction, and accordingly a Bankruptcy Court would value the Company as a going concern. *Moody*, 971 F.2d at 1067.  The Company's financial statements ending August 2021 also showed more than sufficient assets to cover its liabilities, and it is highly likely that the Court would conclude that, at the time of the 2021 Transaction, the Company was solvent.  Indeed, as described above, Kinderhook's own analysis, performed during diligence and aided by the financial analysis performed by Kinderhook's own financial advisor, evidenced that the Company's assets outweighed its liabilities both before and at the Closing of the 2021 Transaction, even when taking into account the irregularities in the financial reporting that were identified during the diligence time-period.  As described above, the Debtors' restructuring advisor confirmed that, based on its review of the relevant documents, participation in the interviews conducted during the course of this Investigation, and its own analysis, the Company was likely solvent at the time of the 2021 Transaction.

66.    Similarly, the 2021 Transaction did not leave the Company with unreasonably small capital.  First, the Investigation has confirmed that the Company had substantially enough capital to operate post-2021 Transaction, and that its financial decline was not caused by consummation of the 2021 Transaction.  At Closing, as described above, the Company had at least $13 million in cash and cash equivalents on its balance sheet as well as access to a $7.5 million revolving line of credit.  Indeed, as set forth above, the Company operated profitably, paying all of its ongoing obligations without accruing an inappropriate amount of debt, even shortly after the 2021 Transaction.  Rather, the Company's financial troubles did not arise until March 2022, and arose

24

because of the Company's business relationship and ordering process with Hisun, which occurred independently from the 2021 Transaction.

67.    Furthermore, as described above, the Company operated without any cash-flow difficulties for a sustained period of time following the 2021 Transaction.  And, the evaporation of the $7.5 million revolving line of credit occurred not because of any result of the 2021 Transaction, but due to payment of increased costs associated with the Hisun relationship.  In total, these facts indicate that the Company was not left with unreasonably small capital post-2021 Transaction.  In fact, the Company had approximately $13 million of cash and cash equivalents at the time of closing of the 2021 Transaction.

**Practicality of Bringing Constructive Fraudulent Transfer Claims against Kinderhook**

68.    Claims regarding the 2021 Transaction are not likely to be viable.  Thus, the likelihood of the bankruptcy estate prevailing on any claim for constructive fraudulent transfers concerning the 2021 Transaction is remote.  The adjudication of those claims will likely involve initial dispositive motions, which could take months to decide, followed by months (if not years) of ongoing discovery practice between the parties that will include depositions and document exchanges.  Following discovery, the parties likely will engage in lengthy and time-consuming dispositive motions that will take additional time to be decided.  And, given that the questions of insolvency and reasonably equivalent value are highly fact-specific, the likelihood that the parties will be forced to engage in a lengthy trial on the merits of any constructive fraudulent transfer claim is high.  Accordingly, attempting to realize any remote potential for recovery would require significant expenditures over a protracted period of time, including substantial legal fees and other

professional fees, such as expert fees and discovery costs.[4]  Thus, the Debtors believe that any

potential constructive fraudulent transfer claims against Kinderhook concerning the 2021

Transaction are of no value to the Debtors.

        *(iii)*     *Potential Constructive Fraudulent Transfer Claims Arising from the Debt Loaned to the Company in 2021 and 2022.*

69.     As part of the 2021 Transaction, the Company entered into the Credit Agreement

with Twin Brook and the various lenders, which provided for a $45 million term loan and a $7.5

million revolving line of credit.  The Company also amended that Credit Agreement twice in 2022.

Based on the investigation, it is unlikely that there are any viable claims arising from the debt

loaned to the Company in 2021 and 2022.

70.     Section 548(a)(1)(B)(III) of the Bankruptcy Code provides that a fraudulent

transfer occurs when the transfer was made without reasonably equivalent value and the debtor

"intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's

ability to pay as such debts matured."  Bankruptcy Courts have interpreted this section to require

that "the debtor must have made the transfer or incurred an obligation contemporaneous with an

intent or belief that subsequent creditors would more than likely not be paid once their claims

matured."  *See Stanziale v. Brown-Minneapolis Tank ULC, LLC (In re BMT-NW Acquisition, LLC)*,

582 B.R. 846, 860 (Bankr. D. Del. 2018) (citing *Burtch v. Masiz (In re: Vaso Active Pharma., Inc.)*,

No. 10-10855 & 11-52005, 2012 WL 4793241, at *20 (Bankr. D. Del. Oct. 9, 2012)).

71.     The Credit Agreement was negotiated and executed based on a multiple of the

Company's then-existing EBIDTA and was intended to place upon the Company no more debt

than it could handle at the time of Closing and thereafter.  Indeed, the Investigation and interviews

---

[4]     Although it is impossible to estimate precisely the cost of such a litigation, based on the Investigation, it would likely entail the production of tens of thousands of pages of documents, the depositions of dozens of witnesses, and the retention of experts to opine on, among other things, issues relating to the Company's solvency and valuation.

with relevant witnesses confirmed that there is no reason to suspect that Twin Brook would have imposed an undue debt burden on the Company, given the fact that it was a trusted lender in some of Kinderhook's other portfolio companies. In addition, the Credit Agreement included a $7.5 million revolving line of credit, which permitted the Company additional access to capital in the event that it faced any financial troubles during the course of the Credit Agreement.

72.     Neither would the First nor the Second Amendment to the Credit Agreement constitute a constructive fraudulent transfer. Both of those Amendments were based off of the then-current needs of the Company and, in the view of the Kinderhook witnesses interviewed, were justified based on the Company's ongoing financials and capital needs, even given the Company's post-Closing cash flow troubles. Accordingly, any claims for fraudulent transfer based on the 2021 Credit Agreement or the two Amendments thereto in 2022 are unlikely to be successful.

### (iv)     *Potential Breach of Fiduciary Duty Claims.*

73.     Delaware applies the "hallmark principles of agency law" to traditional corporate fiduciaries, such as officers and directors, and also key managerial personnel. *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010). Under fundamental principles of agency law, an agent owes his principal a duty of loyalty, good faith, and fair dealing. *Id.* These duties encompass the corollary duties of an agent to disclose information that is relevant to the affairs of the agency entrusted to him and refrain from placing himself in a position antagonistic to his principal concerning the subject matter of his agency. *Id.* An agent is not, however, prohibited from acting in good faith outside his employment even though it may adversely affect his principal's business, or from making arrangements or preparations to compete with his principal before terminating his agency, provided he does not act unfairly or injure his principal. *Id.*

27

74.     As a result, a claim for breach of fiduciary duty requires proof of two elements:
(1) a fiduciary duty existed and (2) the defendant breached that duty.  *Id.*  Generally, courts
recognize the core principle of a fiduciary duty as follows: "one who controls property of another
may not, without implied or express agreement, intentionally use that property in a way that
benefits the holder of the control to the detriment of the property or its beneficial owner."  *Stewart
v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 297 (Del. Ch. 2015) (internal citations omitted).
There are duties of care and loyalty that flow from that "central aspect" of the fiduciary
relationship.  *Id.*  Inherent in the fiduciary relationship is that the fiduciary exercises control over
the property of another.  *Id.*  By virtue of that control, the fiduciary is obliged to act with care and
loyalty to interests of the beneficial owner.  *Id.*  Courts have recognized that officers and key
managerial personnel owe a fiduciary duty to the company.  *Beard Rsch.,* 8 A.3d 573 at 601.

75.     Generally, a fiduciary breaches his duty where he fails to "use that amount of care
which ordinarily careful and prudent men would use in similar circumstances," and "consider all
material information reasonably available" in making business decisions.  *In re Walt Disney Co.
Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005).  When analyzing a breach of fiduciary duty
action, courts apply the business judgment rule, which presumes that "in making a business
decision the directors of a corporation acted on an informed basis, in good faith and in the honest
belief that the action taken was in the best interests of the company."  *Firefighters' Pension Sys. of
City of Kansas City, Missouri Tr. v. Presidio, Inc*., 251 A.3d 212, 249 (Del. Ch. 2021) (internal
citations omitted).  Bad faith and a breach of duty will not be inferred unless "a decision lacks any
rationally conceivable basis."  *Id.*  New York law is in accord and explicitly includes damages as
an element of a breach of fiduciary duty claim.  To establish a prima facie case for breach of
fiduciary duty in New York, a plaintiff must allege "(1) the existence of a fiduciary relationship,

(2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Vill. of Kiryas Joel v. Cnty. of Orange*, 144 A.D.3d 895, 898 (2016) [2d Dept 2016] (internal citations and quotations omitted). New York courts regularly cite Delaware's business judgment rule during analyses of breach of fiduciary duty claims. *See, e.g., Giuliano v. Gawrylewski*, 40 Misc. 3d 1210(A), (N.Y. Sup. 2013); *In re Bear Stearns Litig.*, 23 Misc. 3d 447, 462, (N.Y. Sup. 2008).  Arizona law is similar.  Under Arizona law, directors are under "a fiduciary duty to serve the corporation with fidelity, and to avoid engaging in any act by which the assets of the corporation are wrongfully diverted from corporate purposes."  *Singh v. Malhotra*, No. 1 CA-CV 17-0033, 2018 WL 1004282, at *7 (Ariz. Ct. App. Feb. 22, 2018) (internal citations and quotations omitted).  These duties exist alongside the business judgment rule, "which presumes a director has acted in good faith in making a business decision."  *Id.*  The business judgment rule "precludes judicial inquiry into actions taken by a director in good faith and in exercise of honest judgment in the legitimate and lawful furtherance of a corporate purpose."  *Id.*

76.     It is unlikely that the Company has any breach of fiduciary duty claim arising from the Company's entry into the Credit Agreement as part of the 2021 Transaction or the First or Second Amendments to the Credit Agreement.  Specifically, it is unlikely that the Bankruptcy Court would conclude that the Company's management breached their fiduciary duties by causing the Company to enter into the Credit Agreement.  To the contrary, the Credit Agreement was based on certifiable business metrics in the form of the EBIDTA multiple, and it made business sense for the 2021 Transaction, especially insofar as it provided the Company with a $7.5 million revolving line of credit post-Closing.  The First and Second Amendments also were both based on current business needs—to wit, the Company's need for access to additional capital to, among other things,

take advantage of business opportunities. Furthermore, there is no evidence that there was a conflict of interest involved in the Credit Agreement or the First or Second Amendments.

      *(vi)*    ***Potential Claims Related to the Transaction Fee Paid to Kinderhook***

77.     Kinderhook was paid a $1.5 million Transaction Fee in connection with the 2021 Transaction. For the reasons discussed below, it is unlikely that the Company has any claim against Kinderhook premised on the Transaction Fee.

78.     Because the Company likely was not insolvent at the time or left with unreasonably small capital as a result of the 2021 Transaction, it is unlikely that a claim for constructive fraudulent transfer to recover the Transaction Fee would be successful. But, even assuming insolvency, the Company received reasonably equivalent value in return for the Transaction Fee. Specifically, the Company received the ability to realize the opportunity presented to the Company by the 2021 Transaction with Kinderhook, including increased resources, business acumen, and access to capital funds.

79.     Additionally, it is unlikely that there is a viable breach of fiduciary duty claim based on Kinderhook's Transaction Fee. Specifically, the payment of the Transaction Fee in return for the Company capitalizing on the opportunity presented by the 2021 Transaction was a rational business decision that presented value to the Company, and no potential conflicts arising from that payment have been identified.

      *(vii)*   ***Potential Claims Related to Advisor Fees Under the Management Services Agreement***

80.     Kinderhook was entitled pursuant to the Management Services Agreement to receive certain advisor fees for the performance of its management-related services. As uncovered in the course of the Investigation, the Company never paid Kinderhook the advisor fees pursuant to the Management Services Agreement. Accordingly, there can be  claims based on advisor fees.

**B. Pursuing Any Alleged Claims Against Kinderhook Would Involve Complexities in Litigation, be Detrimental to the Debtors and their Estates and Cause Considerable Expense, Inconvenience, and Delay.**

81.    The third *Martin* factor[5] is clearly met in the present case. Even setting aside that the Debtors are unlikely to succeed on their potential claims, pursuing them would impose substantial costs on the Debtors and their estates. As with most settlements of potential litigation claims, the proposed settlement would avoid time-consuming and costly litigation.

82.    But the costs of pursuing these potential claims would be even greater here than in the typical case. By refusing to provide the Release in favor of preserving these highly uncertain claims, the Debtors would have to forego certain benefits from the DIP Facility. Currently, the DIP Facility is the only actionable DIP financing proposal the Debtors have received. The DIP Facility contains many terms that will allow for a value-maximizing sale transaction to occur. The DIP Facility provides much needed liquidity that will allow the Debtors to continue operating as a going concern and have the necessary financing to successfully close a sale transaction—one that inures to the benefit of employees, vendors, customers, and a substantial number of creditors. This is not only essential but also is a strong signal to customers and vendors that the Debtors will be on strong financial footing both before and after the sale process.

83.    Trading highly uncertain litigation claims for the highly certain benefits of the DIP Facility makes eminent sense. The compromise is fair, equitable, and in the best interest of the Debtors' estates.

**C.    Granting the Release Satisfies the Paramount Interests of Creditors.**

84.    The fourth *Martin* factor—the paramount interest of the Debtors' creditors—is satisfied in the present case. The proposed compromise of providing a Release in exchange for

---

[5]    We assume for purposes of these cases that the second *Martin* factor—the likely difficulty in collection—does not appear to be an issue.

31

10349149.v10

the DIP Facility is in the "paramount interest of creditors" and results in an efficient, certain, value-maximizing resolution that is superior to any alternative outcome. The Debtors have no other actionable postpetition financing alternatives and a requirement of the DIP Facility is the Release. The DIP Facility and Stalking Horse Agreement provides for assumption of a large portion of the Debtors' creditors and paves the way for the Debtors' business to remain a viable going concern. Put simply, time is of the essence.  Further, if the Debtors were to waste time and money pursuing these highly speculative and valueless claims and causes of action, the Debtors would quickly deplete their limited estate resources to the detriment of all creditors. In such a scenario, Kinderhook may terminate the DIP Facility and terminate the Stalking Horse Agreement, risking any recovery to creditors.

85.     The DIP Facility, including the Release, is the product of good faith, extensive, and arm's-length negotiations between the Debtors and Kinderhook and its affiliates, each of which was adequately represented by separate counsel during the negotiations.

86.     In exchange for the Release, the Debtors are receiving $10 million of new money to fund these cases and close a value-maximizing sale transaction as a going concern. Unlike many postpetition financings of this scale, the DIP Lenders have agreed that the DIP Facility will be "credit bid" as part of the Stalking Horse Agreement.

87.     Based upon the foregoing, there can be no question that granting the Release in the DIP Facility does not "fall below the lowest point in the range of reasonableness." *Integrated Health*, 2001 WL 1820426, at *2 (*quoting Cosoff v. Rodman (In re WW.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983)). The DIP Facility is the result of substantial good-faith, arm's-length negotiations between the Debtors and Kinderhook, and constitutes a reasonable exercise of the

10349149.v10

Debtors' business judgment. Accordingly, this Court should approve the Cash Collateral and DIP Motion on a final basis including the approval of the Release contained therein.

## **NOTICE**

88.     The Debtors will provide notice of this Supplement to the Cash Collateral and DIP Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the Debtors' twenty (20) largest unsecured creditors or their counsel, (c) counsel to the Stalking Horse Bidder and DIP Lender, (d) counsel to the Prepetition Secured Parties, (e) all known holders of filed liens on the Debtors' assets, and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service.  The Debtors believe that no further notice is required.

*[Remainder of the Page Intentionally Left Blank]*

10349149.v10

## <u>CONCLUSION</u>

WHEREFORE the Debtors respectfully request entry of the Final Order on the Cash Collateral and DIP Motion including the approval of the Release contained therein, granting the relief requested in the Cash Collateral and DIP Motion, and such other and further relief as this Court may deem just and appropriate.

Dated: January 31, 2023
Wilmington, Delaware

*/s/ Domenic E. Pacitti*
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Sally E. Veghte (DE Bar No. 4762)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193
Email:  dpacitti@klehr.com
              myurkewicz@klehr.com
              sveghte@klehr.com

-and-

Morton R. Branzburg (admitted *pro hac vice*)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:    (215) 569-3007
Facsimile:    (215) 568-6603
Email:  mbranzburg@klehr.com

*Proposed Counsel to the Debtors and Debtors in Possession*

10349149.v10