## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

In re:

PERFORMANCE POWERSPORTS GROUP
INVESTOR LLC, *et al.*[1],

       Debtors.

-------------------------------------------------------------x

: Chapter 11

: Case No. 22-10047 (LSS)

: (Jointly Administered)

: **Hearing Date: 2/23/23 at 10:00 a.m.**
: **Objections Due: 2/16/23 at 4:00 p.m.**[2]

**OBJECTION OF THE UNITED STATES TRUSTEE TO THE MOTION OF DEBTORS FOR ENTRY OF: (I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL ASSETS, (B) APPROVING THE BID PROTECTIONS TO THE STALKING HORSE BIDDER, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (E) AUTHORIZING ENTRY INTO THE STALKING HORSE AGREEMENT, (F) APPROVING BID PROTECTIONS, (G) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (H) GRANTING RELATED RELIEF [D.I. 17]**

In support of his *Objection* (the "Objection") *to the Motion of Debtors for Entry of: (I) An Order (A) Approving Bid Procedures in Connection With the Sale of Substantially All Assets, (B) Approving the Bid Protections to the Stalking Horse Bidder, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, (E) Authorizing Entry Into the Stalking Horse Agreement, (F) Approving Bid Protections, (G) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (H) Granting Related Relief*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

[2] Objection deadline extended for the U.S. Trustee.

(the "Motion") [D.I. 17][3], Andrew R. Vara, the United States Trustee for Regions Three and

Nine (the "U.S. Trustee"), through his counsel, states:

## JURISDICTION, VENUE AND STANDING

1.      This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. §

1334.  This Court is authorized to hear and determine the Motion pursuant to 28 U.S.C. § 157(a,

b), and the amended standing order of reference issued by the United States District Court for the

District of Delaware dated February 29, 2012.  Venue of the cases is proper in this District pursuant

to 28 U.S.C. § 1408(1).

2.      Under 28 U.S.C. § 586, the U.S. Trustee is generally charged with monitoring the

federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia*

*Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest

standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco*

*D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as

a "watchdog").  Specifically, the U.S. Trustee is charged with "monitoring the progress of cases

under title 11 and taking such actions as the United States trustee deems to be appropriate to

prevent undue delay in such progress."  28 U.S.C. § 586(a)(3)(G).

3.      The U.S. Trustee has standing to be heard with respect to the Motion pursuant to

11 U.S.C. § 307.

## STATEMENT OF RELEVANT FACTS

4.      On January 16, 2023 (the "Petition Date"), the Debtors commenced these chapter

11 cases by filing petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11

Cases").  On January 30, 2023, the U.S. Trustee appointed an Official Committee of Unsecured

---

[3] Capitalized terms herein are ascribed the same meaning in the relevant, referenced or cited pleading or
document.

Creditors. [D.I. 82].[4]

5.      Prior to the Petition Date and as described in paragraphs 15 through 19 of the Vanden Berg Declaration, Kinderhook Industries, Inc. ("Kinderhook") conducted diligence with respect to purchasing Rich Godfrey and Associates Inc., d/b/a Coleman Powersports ("Godfrey & Associates" or the "Company") and on October 8, 2021, closed a transaction that resulted in Kinderhook's acquisition of the Company for a total purchase price of $112,000,000, inclusive of fees, expenses, and cash-to-balance-sheet amounts. Kinderhook's purchase was comprised of $47,000,000 in equity contributions, $45,000,000 in debt financing and a $20,000,000 Rollover Amount from the cash consideration otherwise paid to Rich Godfrey.[5] Vanden Berg Decl. ¶¶ 15-19.

6.      Shortly after the Petition Date, the Debtors sought certain "first day" relief -- including approval of post-petition financing -- in order to facilitate the administration of these chapter 11 cases and the eventual sale of substantially all of the Debtors' assets. Accordingly, Tankas Funding VI, LLC, a Kinderhook affiliate,[6] (the "DIP Lender") provided the Debtors with debtor-in-possession financing in the form of a junior lien, superpriority debtor-in-possession term

---

[4] In support of the first day relief, the Debtors relied upon the *Declaration of Ken Vanden Berg in Support of Chapter 11 Petitions and First Day Pleadings* (the "Vanden Berg Declaration") [D.I.16].

[5] The $47,000,000 equity contribution was from two sources. First, two Kinderhook funds, Kinderhook Capital Fund VI, L.P. and Kinderhook Capital Fund VI-B, L.P., contributed $45,000,000 in equity. Second, certain investors associated with the debt financing described below contributed an additional $2,000,000 in equity. Twin Brook Capital Partners, LLC acted as Agent for the various lenders. Vanden Berg Decl. ¶ 18.

[6] Tankas Funding VI, LLC is an affiliate of Kinderhook. Vanden Berg Decl. ¶ 37.

loan (the "DIP Financing") in an aggregate principal amount not to exceed $10,000,000 (the "DIP Loans"). Vanden Berg Decl. ¶¶ 9, 37, 64.[7]

7.        Through the Motion[8] the Debtors seek to, *inter alia*, sell substantially all of their assets to CPS USA Acquisition, LLC[9], ("CPS USA"), another Kinderhook affiliate, as a going concern.  CPS USA is the stalking horse bidder (the "Stalking Horse Bidder") pursuant to a January 16, 2023 asset purchase agreement (the "Stalking Horse Agreement"), subject to higher and better offers.  Mot. ¶ 14; Vanden Berg Decl. ¶ 35.

8.        Under the terms of the Stalking Horse Agreement, the Stalking Horse Bidder will purchase the Assets[10] for an aggregate purchase price consisting of:

> (a) a credit bid of the outstanding obligations under the DIP Credit Agreement in the amount of $10 million;
> (b) cash in an amount equal to $500,000;
> (c) assumption of the outstanding obligations under the Prepetition First Lien Credit Agreement;
> (d) assumption of certain other Assumed Liabilities as provided in the Stalking Horse Agreement;
> (e) the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder and payment of any Determined Cure Costs associated with such Assumed Contracts; and
> (f) the Wind-Down Amount.[11]

---

[7] The DIP Loans are subject to a senior secured, first-lien credit facility in favor of Twin Brook Capital Partners, LLC, as agent for the Prepetition First Lien Lenders, in the approximate sum of $ 52 million. Vanden Berg Decl. ¶¶ 23, 27.

[8] In support of the Motion, the Debtors rely upon the Vanden Berg Declaration [D.I.16] and the Declaration of Steven Bremer in Support of the Bid Procedures and Sale Motions (the "Bid Procedures Declaration") [D.I. 18].

[9] CPS USA Acquisition, LLC is an affiliate of Kinderhook.  Vanden Berg Decl. ¶ 35.

[10] The assets to be purchased are set forth in section 2.1 of the Stalking Horse Agreement.  Among the purchased Assets are "Acquired Claims" which includes all causes of action, lawsuits, claims, rights of recovery and other similar rights of any Seller arising under Chapter 5 of the Bankruptcy Code.  Mot. Ex. A (Stalking Horse Agreement) § 2.1(n).

[11] As set forth in the Stalking Horse Agreement, the Wind-Down Amount shall only become payable as a portion of the Purchase Price in the event that (i) Sellers have insufficient cash on hand at Closing to fund the Wind-Down Amount from such cash on hand and (ii) the Sellers have otherwise complied in all respects

Mot. ¶¶ 15, 19.

**A. The Motion and the Requested Bid Protections**

9.      In the Motion, the Debtors seek the approval certain Bid Protections:

(i)      a break-up fee of $2,200,000 (the "Break-Up Fee"); and

(ii)     expense reimbursement of the Stalking Horse Bidder's actual, out-of- pocket legal fees and hard costs incurred after execution of Stalking Horse Agreement of up to $500,000 (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bid Protections").

Mot. ¶ 22(e).

10.      In the Motion, the Debtors seek approval of prospective bid protections that reward CPS USA with a break-up fee far in excess of the $500,000 cash component of the Stalking Horse Bid; the proposed break-up fee amounts to 20.9% of the total of the (i) cash component of the Stalking Horse Bid ($500,000) plus (ii) the credit bid component ($10,000,000).

11.      In addition, the Purchase Price is subject to many unknown variables and yet-to-be determined amounts, such as:   (i) Assumed Liabilities, (ii) assumption and assignment of the Assumed Contracts, (iii) payment of the Determined Cure Costs associated with such Assumed Contracts; and (iv) the Wind-Down Amount.  Mot. ¶¶ 15, 19.

12.      In addition, the Debtors seek award the Stalking Horse Bidder with an allowed superpriority administrative claim in the Debtors' chapter 11 cases in an amount equal to the Break-Up Fee and Expense Reimbursement under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.  Mot. Ex. B (Proposed Form of Order) ¶ 6 [D.I. 17-2].

---

with the Financing Orders, in which case the Buyer shall only be required to fund the amount necessary to make the Sellers' total cash on hand at Closing equivalent to the amount of the Wind-Down Amount (each capitalized term defined in the Stalking Horse Agreement). Mot. ¶¶ 15, 19.

## <u>LAW, ANALYSIS AND ARGUMENT</u>

**A.  General Requirements for Approval of a Pre-Confirmation Sale of Substantially All of the Debtors Assets.**

13.    11 U.S.C. § 363 sets forth the requirements for pre-confirmation transactions that involve the sale of all or substantially all of a debtor's assets.  Without question, it is imperative that the Debtors in these cases comply with section 363's requirements and the Third Circuit's mandate for Chapter 11 pre-confirmation sales of substantially all of their assets set forth in *In re Abbotts Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986).

14.    The Debtors must provide evidence that any such sale is for fair value and that a good business reason exists.  *In re Lionel Corp.*, 722 F.2d 1063 (2nd Cir. 1983).  The Debtors and the proposed purchaser must prove by credible evidence that the transaction is proposed in "good faith" and that it is an arms-length transaction.  For example, if the proposed purchaser is an insider or an insider-controlled entity, or the transaction confers benefits upon insiders, the sales transaction must be given the highest scrutiny.

15.    Initially, this Court must determine that the proposed sale and the attendant sale procedures will bring the best and highest price for the Debtors' assets.  The Debtors must show that the assets have been fully marketed and that the sale is sufficiently publicized in order to prove that the assets will be sold for a fair and reasonable price.  The Court must also find that the sale is free of any collusion.  Any relationship to the purchaser, such as an insider relationship, must be fully disclosed and evaluated, including any employment agreements or other agreements or understandings.  *In re Abbotts Dairies, Inc.*, 788 F.2d at 147.

16.    In essence, the proposed sale must satisfy the *Abbotts Dairies* requirements and comply with Fed. R. Bankr. P. 6004 so that the U.S. Trustee, the Court, creditors, and other parties

have the ability and opportunity to evaluate the proposed transaction's *bona fides* and determine

that the sale is in the creditors' best interests and complies with applicable law.

17.     As courts in this District have previously noted, pre-plan sales of all or substantially

all of a debtor's assets "requires a bankruptcy court's careful review." *In re Exaeris, Inc.*, 380 B.R.

741, 744 (Bankr. D. Del. 2008).  Where there is a proposed sale or sales, in the context of a Chapter

11 proceeding of substantially all of a debtor's property without the creditor protections of the

disclosure statement and plan process, such transaction must be closely scrutinized, and the

proponent bears a heightened burden of proving the elements necessary for authorization.  *See In

re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (*citing In re

Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.,* 77 B.R. 15, 17 (Bankr. E.D. Pa.

1987)); *see also In re CGE Shattuck, LLC*, 254 B.R. 5, 12 (Bankr. D. N.H. 2000); ("The closer a

proposed transaction gets to the heart of the reorganization process, the greater scrutiny the Court

must give to the matter."); *In re Wilde Horse Enterprises, Inc.,* 136 B.R. 830, 841 (Bankr. C.D.

Cal. 1991).

18.     Courts have expressed significant concern that asset sales, particularly sales of a

substantial portion or all of an estate's assets, should not be used to circumvent the protections

afforded by Chapter 11 and the Bankruptcy Code. For example, in *Abbotts Dairies*, the Third

Circuit Court of Appeals expressed concern that Section 363 sales should not be used to

circumvent the protections afforded to creditors under the plan confirmation process and Section

1129 of the Bankruptcy Code.  *Abbotts Dairies*, 788 F.2d at 150.

19.     In *Abbotts Dairies*, the Third Circuit held that the "good faith" requirement of a

Section 363 sale should be used as assurance that a debtor does not, by means of an asset sale,

abrogate the protections afforded to creditors and shareholders by Section 1129 of the Bankruptcy

Code and the plan confirmation process. *Id*. at 150. Even those cases that require only a "good business justification" to approve a sale of substantially all of the estate's assets expressed concern that courts not adopt a "construction of § 363(b) [that] swallows up Chapter 11's safeguards." *Lionel,* 722 F.2d at 1069.  Therefore, this Court needs to (i) find that there is a good faith purpose behind the sale, (ii) ensure that the sale protects the estate, creditors, and other parties-in-interest and (iii) make certain that the record is complete with admissible evidence in order to approve the sale. *Exaeris*, 380 B.R. at 746.

20.    In this case, the Debtors must provide evidentiary support for all of the requirements for pre-confirmation section 363 sales.

### B.  Bid Protections Are Unnecessary and Should Not Be Awarded Under Section 503(b)(1)(A)

21.    Bid Protections should not be permitted in these cases because they are not an incentive for CPS USA to bid for the Debtors' assets.  In the context of these cases, the Bid Protections will more likely chill other potential bids rather than incentivize competing bids.

22.    In addition, CPS USA should not be awarded any expense reimbursement for due diligence.  The record in this case clearly indicates that Kinderhook performed its due diligence in connection with its pre-petition purchase of the Debtors' assets and, separately, in connection with the DIP Financing.

23.    Bid protections, if sought, must be analyzed under, section 503(b) of the Bankruptcy Code.  *See Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("[A] bidder must seek a break-up fee under 11 U.S.C. § 503(b)[.]") (citing *Calpine Corp. v. O'Brien Envt'l Energy (In re O'Brien Envt'l Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999)).  Section 105(a) is not a basis to award an administrative expense.  *See In re Women First Healthcare, Inc.*, 332 B.R. 115, 120-21 (Bankr. D. Del. 2005).

24.    The analysis of bid protections under Section 503(b) "must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of bid protections, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d at 535; *see In re Energy Future Holdings Corp. ("EFH I")*, 904 F.3d 298, 313 (3d Cir. 2018) ("[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503[.]").

25.    An administrative expense's benefit to the estate "must be *actual*, not hypothetical." *In re Energy Future Holdings Corp. ("EFH II")*, 990 F. 3d 728, 742 (3d Cir. Mar. 15, 2021) (emphasis in original) (citing *In re Continental Airlines, Inc.*, 146 B.R. 520, 526 (Bankr. D. Del. 1992)).

26.    A break-up fee may provide a benefit to the estate where (1) assurance of the break-up fee promotes more competitive bidding, such as by inducing a bid that otherwise wouldn't have been made, (2) availability of the break-up fee induces a buyer to perform diligence and set a floor price.  *See EFH I*, 904 F.3d at 313-14 (citing *O'Brien*, 181 F.3d at 537).

27.    Even if a break-up fee would benefit the estate, the Court is not required to approve it.  *See EFH I*, 904 F.3d at 313-14 ("We have never held that bankruptcy courts must allow fees whenever they find that [a break-up fee confers a benefit on the estate.]").  Court must determine, based upon the totality of the circumstances of the case, "whether the proposed fee's potential benefits to the estate outweigh any potential harms, such that the fee is actually necessary to preserve the value of the estate."  *Id.* (citing *O'Brien*, 181 F.3d at 535) (quotation marks omitted).

28.    The party requesting bid protections has the burden of showing that the attendant fees are actually necessary to preserve the value of the estate.  *See O'Brien*, 181 F.3d at 535.

29.     In *EFH II*, the Third Circuit considered, in the context of a motion to dismiss based upon the sufficiency of the pleading, an administrative expense application submitted by an unsuccessful bidder.  Initially, the unsuccessful bidder argued that the lower courts erred in measuring whether its bid had conferred a benefit using hindsight (as opposed to measuring the benefit at the time the bid was submitted).  *See EFH II* at 743.  The Third Circuit rejected that argument and concluded that, consistent with the well-established Bankruptcy Code policy of limiting administrative expenses, it was "entirely appropriate to consider" the asserted benefit "through the rearview mirror."  *EFH II* at 744.

30.     The unsuccessful bidder in *EFH II* also asserted two potential benefits to the process:  that it served as a stalking horse bidder, and that its unsuccessful efforts provided a "roadmap" for other viable bids that were later submitted, including the successful bid.  *Id*.   The Third Circuit rejected the argument that the unsuccessful bidder had stated a plausible argument for allowance of an administrative expense on a theory that its bid served as a catalyst for the submission of other bids, as it was the only bid at the time it was submitted.  *Id*.  While the bid did not technically establish a "floor" because the estates ultimately accepted a substantially lower offer after the unsuccessful bid fell through, the Third Circuit found that the argument that the bid had provided a "roadmap" for other bids post-termination was a plausible argument in favor of benefit to the estate.  *EFH II* at 745.  The Third Circuit remanded the matter in *EFH II* so that a sufficient record could be developed to enable the bankruptcy court to determine, in hindsight, the extent to which the unsuccessful bidder's participation had actually benefitted the estate more than it had harmed the estate.  *EFH II* at 747-8.  In this case, the CPS USA bid neither sets a roadmap for other bids nor is not a catalyst for other bids.

31.     Moreover, as recognized by the Third Circuit in *O'Brien*:

> [E]ven if the purpose for the break-up fee is not impermissible, the break-up fee may not be needed to effectuate that purpose. For example, in some cases a potential purchaser ***will bid whether or not break-up fees are offered*** . . . . In such cases, the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate.

*O'Brien,* 181 F.3d at 535 (emphasis added); *see In re Reliant Energy*, 200 F.3d at 594 (affirming disallowance of retroactive grant of break-up fee that was sought after the stalking horse bidder had already bid for the assets).

32.     A similar situation appears to be present here. Kinderhook is incentivized to make a bid for the Debtors' assets regardless of whether bid protections are offered. CPS USA either will be the winning bidder or, if it is outbid, the sale proceeds will be used to satisfy Tankas Funding VI's DIP Financing. Because CPS USA does not require an incentive to make the stalking horse bid, the break-up fee and expense reimbursement is not "actually necessary to preserve the value of the estate," as required under *O'Brien.*

33.     The proposed bid protections are blocking devices which make proposing a qualified bid more expensive for other bidders. Under the facts and circumstances here, approving a break-up fee and expense reimbursement will chill the bidding process and disincentivize potential bidders from participating, making such cost impermissible under the *O'Brien* standard.

### C. The Bid Protections Should Not Be Granted Superpriority Status

34.     Section 503(b) does not provide for superpriority status. Superpriority status is provided for only in Sections 364(c)(1) and 507(b). Those sections are addressed exclusively to (a) the provision of post-petition financing and (b) secured creditors who have received insufficient "adequate protection" for the post-petition diminution in the value of their collateral. Neither section 364(c)(1) nor section 507(b) is at play here. "[C]ourts do not have the authority to create a right to recover from [a] bankruptcy estate where no such right exists under the Bankruptcy Code."

11

*See EFH I*, 904 F.3d at 313 (*quoting O'Brien,* 181 F.3d at 532) (quotation marks omitted). Giving a break-up fee superpriority status has no basis in the Bankruptcy Code and should be denied.

35.     While the Stalking Horse Bidder is affiliated with the DIP Lender in these cases, approval of Bid Procedures and Bid Protections is not the same as approving DIP Financing, and the affiliation does not alter the standard under which Bid Protections must be analyzed. In *O'Brien,* the Third Circuit "rejected application of a business judgment rule, under which a requested termination fee would be approved if the debtor had a good faith belief that the fee would benefit the estate." *EFH I*, 904 F.3d at 313. Even if a break-up fee would benefit the estate, the Court must still determine "whether the proposed fee's potential benefits to the estate outweigh any potential harms, such that the fee is actually necessary to preserve the value of the estate." *Id.* at 314 (*citing O'Brien*, 181 F.3d at 535) (quotation marks omitted).  Simply put, there is no basis under Section 503(b) to elevate the Bid Protections to superpriority status.

36.     The U.S. Trustee reserves any and all rights, remedies, and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

## **CONCLUSION**

WHEREFORE, for all the above-stated reasons, the United States Trustee respectfully requests that this Court deny the Motion to the extent of this Objection and/or grant such other relief as this Court deems fair, appropriate, and just.

Respectfully submitted,

**ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 & 9**

Dated: February 16, 2023

By:/s/Richard L. Schepacarter
Richard L. Schepacarter
Trial Attorneys
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 fax
Richard.Schepacarter@usdoj.gov