## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------x
In re:

PERFORMANCE POWERSPORTS GROUP
INVESTOR LLC, et al.¹,

                                    Debtors.
------------------------------------------------------------- x
```

Chapter 11

Case No. 23-10047 (LSS)

(Jointly Administered)

**Hearing Date: 2/23/23 at 10:00 a.m.**
**Objections Due: 2/16/23 at 4:00 p.m.²**

**OBJECTION OF THE UNITED STATES TRUSTEE TO THE DEBTORS' MOTION
FOR ENTRY OF A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364,
503, AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR AND JUNIOR
SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING LIENS
AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III)
AUTHORIZING USE OF CASH COLLATERAL; (IV) MODIFYING THE
AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF [D.I. 13, 33, 54, 88]**

In support of the United States Trustee's Objection to the *Debtors' Motion* (the "Motion")

*for Entry of a Final Order* (the "Final Order") *Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364,*

*503, and 507 (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority*

*Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims;*

*(III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a*

*Final Hearing; and (VI) Granting Related Relief* [D.I. 13, 33, 54, 88],³ Andrew R. Vara, the United

States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his counsel, states:

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

² Objection deadline extended for the U.S. Trustee.

³ Capitalized terms herein are ascribed the same meaning in the relevant, referenced or cited pleading or document.

## JURISDICTION, VENUE AND STANDING

1.      This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. § 1334.  This Court is authorized to hear and determine the Motion pursuant to 28 U.S.C. § 157(a, b), and the amended standing order of reference issued by the United States District Court for the District of Delaware dated February 29, 2012.  Venue of the cases is proper in this District pursuant to 28 U.S.C. § 1408(1).

2.      Under 28 U.S.C. § 586, the U.S. Trustee is generally charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").  Specifically, the U.S. Trustee is charged with "monitoring the progress of cases under title 11 and taking such actions as the United States trustee deems to be appropriate to prevent undue delay in such progress."  28 U.S.C. § 586(a)(3)(G).

3.      The U.S. Trustee has standing to be heard with respect to the Motion pursuant to 11 U.S.C. § 307.

## STATEMENT OF RELEVANT FACTS

4.      On January 16, 2023 (the "Petition Date"), the Debtors commenced these chapter 11 cases by filing petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").[4]  On January 30, 2023, the U.S. Trustee appointed an Official Committee of Unsecured Creditors. [D.I. 82].

---

[4] Background leading up to the filing of these chapter 11 cases and in support of the first day relief, the Debtors relied upon the Declaration of Ken Vanden Berg in Support of Chapter 11 Petitions and First Day Pleadings (the "Vanden Berg Declaration") [D.I.16].

5.      Prior to the Petition Date and as described in paragraphs 15 through 19 of the Vanden Berg Declaration, Kinderhook Industries, Inc. ("Kinderhook") conducted diligence with respect to purchasing Rich Godfrey and Associates Inc., d/b/a Coleman Powersports ("Godfrey & Associates" or the "Company").  On October 8, 2021, the parties closed a transaction that resulted in Kinderhook's acquisition of the Company for $112,000,000, inclusive of fees, expenses, and cash-to-balance-sheet amounts. Kinderhook's purchase was comprised of $47,000,000 in equity contributions, $45,000,000 in debt financing and a $20,000,000 Rollover Amount from the cash consideration otherwise paid to Rich Godfrey.[5]  Vanden Berg Decl. ¶¶ 15-19.

6.      Shortly after the Petition Date, the Debtors sought certain "first day" relief, including approval of post-petition financing (the "DIP Motion"), in order to facilitate the administration of these chapter 11 cases and the eventual sale of substantially all of the Debtors' assets.  Accordingly, Tankas Funding VI, LLC, a Kinderhook affiliate,[6] (the "DIP Lender") provided the Debtors with debtor-in-possession financing in the form of a junior lien superpriority debtor-in-possession term loans (the "DIP Financing") in an aggregate principal amount not to exceed $10,000,000 (the "DIP Loans"). Vanden Berg Decl. ¶¶ 9, 37, 64.[7] An order authorizing and approving the DIP Financing on an interim basis (the "Interim DIP Order") was entered on January 18, 2023 [D.I. 54].

---

[5]  The $47,000,000 equity contribution was from two sources. First, two Kinderhook funds, Kinderhook Capital Fund VI, L.P. and Kinderhook Capital Fund VI-B, L.P., contributed $45,000,000 in equity. Second, certain investors associated with the debt financing described below contributed an additional $2,000,000 in equity. Twin Brook Capital Partners, LLC acted as Agent for the various lenders. Vanden Berg Decl. ¶ 18.

[6]  Tankas Funding VI, LLC is an affiliate of Kinderhook and Kinderhook Industries, LLC.  Vanden Berg Decl. ¶ 37; DIP Motion Suppl. (referenced in ¶ 12, *infra*) ¶ 2.

[7]  The DIP Loans are subject to a senior secured first lien credit facility in favor of Twin Brook Capital Partners, LLC, as agent for the Prepetition First Lien Lenders in the approximate sum of $52 million. Vanden Berg Decl. ¶¶ 23, 27.

7.       As part of the terms and conditions for the DIP Financing and the DIP Loans, a

number of important provisions were reserved for consideration at the final hearing, including:

- The Debtors' indemnification of the DIP Lender and its respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present, and future, and their respective heirs, predecessors, successors, and assigns, in accordance with, and subject to, the DIP Loan Documents. Interim DIP Order § 1.5.

- A first priority security interests in, and liens on, the proceeds of any Avoidance Action; and (iii) junior second priority security interests in, and all liens on, all real and personal property of the Debtors securing the Prepetition First Lien Credit Agreement. Interim DIP Order § 2.1(b)(ii).

- Superpriority administrative expense status awarded to current and future all DIP Obligations.  Interim DIP Order § 2.2(a).

- A waiver of all costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases at any time pursuant to section 506(c). Interim DIP Order § 4.11.

- A waiver of the "equities of the case" exception under section 552(b). Interim DIP Order § 4.12.

- A waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral, and all proceeds shall be received and applied in accordance with the Prepetition Documents. Interim DIP Order § 4.13.

8.       Additionally, and most relevant to this Objection, the Interim DIP Order[8]

included a broad release that states:

> Subject to and upon entry of a Final Order, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Debtors, (in their own right, on behalf of their estates and their current and former direct and indirect subsidiaries, and each such entity's and its current and former direct and indirect subsidiaries' current and former directors, officers, managers, predecessors, and successors and assigns, and each of such entity's current and former officers, members, managers, directors, principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund

---

[8] See D.I. 54.

advisors, investment advisors, financial advisors, partners (including both general and limited partners), and representatives, in each case to the extent permitted by applicable law and solely in such parties capacity as such) (collectively, the "Releasing Parties") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the DIP Lender, and each such entity's current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "Released Parties") and their respective property and assets from any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of the Final Order, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement, recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the Prepetition First Lien Credit Agreement, but excluding obligations of the DIP Lender under the DIP Facility arising after the date of the Final Order (collectively, the "Released Claims"). This paragraph is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing

Parties in favor of the Released Parties. As of the entry of the Final Order, the releases granted in this paragraph 4.14 are final and binding and are not subject to a Challenge.

Interim DIP Order §4.14.

9.      Specifically, under section 4.14 of the Interim DIP Order the relevant terms contained within that paragraph are as follows:

- "Releasing Parties" are each of the Debtors, (in their own right, on behalf of their estates and their current and former direct and indirect subsidiaries, and each such entity's and its current and former direct and indirect subsidiaries' current and former directors, officers, managers, predecessors, and successors and assigns, and each of such entity's current and former officers, members, managers, directors, principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), and representatives, in each case to the extent permitted by applicable law and solely in such parties capacity as such) (collectively, the "Releasing Parties").

- "Released Parties are the DIP Lender, and each such entity's current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "Released Parties")

- "Released Claims" are defined to be any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of the Final Order, at law or in equity, by statute or common law, in contract or in tort, including, without

limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement, recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the Prepetition First Lien Credit Agreement, but excluding obligations of the DIP Lender under the DIP Facility arising after the date of the Final Order (collectively, the "Released Claims").

10.     Additionally, hand-in-hand with the DIP Financing, the Debtors also seek court approval to sell substantially all of their assets to CPS USA Acquisition, LLC ("CPS USA"), another Kinderhook affiliate, as a going concern; CPS USA is proposed to serve as the stalking horse bidder (the "Stalking Horse Bidder").[9] Sale Mot. ¶ 14, Vanden Berg Decl. ¶ 35.

11.     Among the terms of the Stalking Horse Agreement, the CPS USA will purchase the Assets for an aggregate purchase price that includes a credit bid of the outstanding obligations under the DIP Credit Agreement in the amount of $10 million.  Sale Mot. ¶¶ 15, 19.

---

[9]  On the Petition Date, the Debtors filed the *Motion for Entry of: (I) An Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All Assets, (B) Approving the Bid Protections to the Stalking Horse Bidder, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, (E) Authorizing Entry Into the Stalking Horse Agreement, (F) Approving Bid Protections, (G) Approving Procedures For The Assumption And Assignment of Contracts And Leases, and (H) Granting Related Relief; And (II) an Order (A) Approving the Sale of Substantially all Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, And (C) Granting Related Relief* (the "Sale Motion") [D.I.17].

12.     In further support of the DIP Motion and the entry of the Final Order, the Debtors filed a Supplement to the DIP Motion on January 31, 2023. (the "DIP Motion Supplement") [D.I. 88].

13.     As set forth in the DIP Motion Supplement, the Debtors assert, among other things, that (i) because the DIP Lender is willing to fund the sale process, the equity sponsor Kinderhook and its affiliates are entitled to a release of the Debtors' potential claims and causes of action against it before funding the DIP Loans on a final basis, (ii) the DIP Financing and the Release are a compromise supported by an independent investigation of any potential claims that the Debtors may have against Kinderhook, and (iii) the Debtors do not have any claims worth pursuing, and the exchange of those weak potential claims for the favorable and necessary post-petition financing makes good sense.  DIP Mot. Suppl. at 2-6.

## LAW, ANALYSIS AND ARGUMENT

**A.      The Proposed Broad Release Is Inappropriate in the Context of DIP Financing.**

14.     The broad release sought by the Debtors and the DIP Lender is not proper for inclusion in an order approving debtor-in-possession financing at this early stage of the cases before a chapter 11 plan is proposed.

15.     Pursuant to this Court's decision in *In re Tribune Company*, 464 B.R. 126 (Bankr. D. Del. 2011) (Carey, J.), and *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) (Walrath, J.), among others, the Court considers the five factors set forth in *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del 1999) and *In re Master Mortgage Inv. Fund, Inc.,* 168 B.R. 930, 937-38 (Bankr. W. D. Mo. 1994) to determine whether, notwithstanding § 524(e) of the Code, a plan may provide for releases by debtors of non-debtor entities. *See Tribune*, 464 B.R. at 186; *Wash. Mut.,* 442 B.R. at 346; *In re Spansion, Inc*., 426 B.R. 114, 142-43, n. 47 (Bankr. D.

Del 2010) (Carey, J.); *In re Coram Healthcare Corp.,* 315 B.R. 321, 335 (Bankr. D. Del. 2004)

(Walrath, J).  Those five factors are as follows:

a.   an identity of interests between debtor and non-debtor releasee, so that a suit against the non-debtor will deplete the estate's resources (e.g., due to a debtor's indemnification of a non-debtor).

b.   a substantial contribution to the plan by non-debtor.

c.   the necessity of release to the reorganization.

d.   the overwhelming acceptance of plan and release by creditors; and

e.   the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*See Tribune*, 464 B.R. at 186 (*citing Wash. Mut.*, 442 B.R. at 346 (*citing Zenith*, 241 B.R. at 110)).

"The factors are neither exclusive nor conjunctive requirements, but simply provide guidance in

the Court's determination of fairness." *Id.*

16.    In the present case, even if the first factor could be established, the remaining four

factors cannot.  Here the Court is not approving a plan through the DIP Financing, and the DIP

Financing has none of the procedural safeguards contained in the Bankruptcy Code's provisions

governing solicitation of votes on a proposed plan.  Even if the Court were to consider the

distributions proposed under the DIP Financing as payments properly considered in evaluating the

*Master Mortgage* factors, it is unclear what distribution, if any, general unsecured creditors might

receive under any potential plan.

17.    The Committee has recently been appointed and would need time to consider, vet

and weigh in upon any potential plan (or eventually propose its own plan).  Simply put, there is no

evidence of any contribution being given by any of the Released Parties to support this

extraordinary relief in such a novel context.

18.     Here the Released Parties are a plethora of entities, including the DIP Lender, and each such entity's current and former affiliates[10], and their current and former directors, officers, managers and direct and indirect equityholders, predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, direct and indirect equityholders, principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and general and limited partners.  The Debtors have not addressed any of the *Zenith* or *Master Mortgage* factors for each of these parties being released. The reasonableness of the releases (in the context of a plan) must be evaluated separately with respect to each of the released parties to determine if the particular release is appropriate. *See Wash. Mut.,* 442 B.R. at 346. The Debtors have the burden to establish whether the *Master Mortgage/Zenith* factors have been met as to each of the non-debtor Released Parties. Neither the Debtors nor the DIP Lender can do so in these cases.

**B.      The Release is Imposed Upon Parties Without Consent.**

19.     Here the Release will be imposed on all of the persons and entities covered by the vast categories of Releasing Parties without their consent or their ability to muster any opposition to the Release and, most likely, without receipt of any notice of the DIP Financing, let alone the Release.  It does not appear that the Debtors served this Motion on the numerous unnamed and unidentified Releasing Parties who will be bound by the Release, such as the employees, agents, independent contractors, representatives, and other parties who may have claims against the Released Parties.

---

[10] Affiliates of Kinderhook include Debtor Performance Powersports Group Investor, LLC, the DIP Lender, and the Stalking Horse Bidder.

20.    It does not appear that the Releasing Parties have received any document that would notify them that the DIP Financing and proposed Final DIP Order strip them of their rights to pursue direct claims against a large number of non-debtor parties.  There is no affirmative consent to the Release given by the Releasing Parties and, as such, the Releases are non-consensual.

21.    In the context of a chapter 11 plan, courts in this District have determined that third-party releases of non-debtors should be allowed only if the releasing parties have affirmatively consented to same.  In *Washington Mutual* the Court held that "any third-party release is effective only with respect to those who *affirmatively consent* to it by voting in favor of the Plan and not opting out of the third-party releases."  *Wash. Mut.* 442 B.R. at 355 (emphasis added).

22.    Other decisions from Courts in this District are in accord with *Washington Mutual*. *See Emerge Energy Services LP*, Case No. 19-11563, 2019 Bankr. LEXIS 3717, *52 (Bankr. D. Del., Dec. 5, 2019) (Owens, J.) (ruling that consent to a third-party release "cannot be inferred by the failure of a creditor or equity holder to return a ballot or Opt-Out Form."); *See also, Coram*, 315 B.R. at 335 (Court held that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be based on consent of the releasing party); *In re Exide Technologies*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (approving releases which were binding only on those creditors and equity holders who accepted the terms of the plan); *Zenith*, 241 B.R. at 111 (noting the release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the plan).[11]

---

[11]    In a more recent decision, the District Court for the Eastern District of Virginia vacated an order confirming a plan which deemed consent to third party releases from parties who did not return opt-out forms.  *See Joel Patterson v. Mahwah Bergen Retail Group, Inc.*, 636 B.R. 641 (E.D. Va., 2022).  The *Patterson* court found that:

> [T]he Bankruptcy Court erred both factually and legally in finding the Third-Party Releases

23.    Although not all decisions from this District have required affirmative consent for third party releases, *see In re Indianapolis Downs, LLC*, 486 B. R. 286, 304-05 (Bankr. D. Del. 2013); *Spansion,* 426 B.R. at 144 (holding that affirmative consent was not required, but only as to releases being given by unimpaired classes); *In re Mallinckrodt PLC,* 639 B.R. 837, 873, 881 (Bankr. D. Del. 2022) (addressing third-party releases in a mass tort context), in the context of these cases and the DIP Financing, the Release is unilaterally imposed upon the Releasing Parties without any opportunity to opt-out or other procedural safeguards to alert them to impairment of their rights.  While the parties to the DIP Financing may negotiate and decide to release certain claims related to the DIP Financing, the scope of the Release and the effect that is has vis-à-vis the Releasing Parties' direct claims against the non-debtor Released Parties is far broader than any claims related to the DIP Financing.

24.    Here, there is no proposed plan for creditors to review or to vote upon, and no opportunity for the Releasing Parties to review and object to the Release under the DIP Financing. The Release is not being consensually agreed to by the non-debtor third-parties parties, given that the Releasing Parties (i) may not have received notice of the proposed release and (ii) are not being provided with a vehicle to manifest consent to, or to opt out of, the Release.  Even under the most draconian or permissive interpretation of plan-related releases (either debtor releases or third-party releases), no such release terms and conditions would be unilaterally imposed upon the Releasing Parties without the demonstration of consent.  Accordingly, under the holdings of the afore-

---

to be consensual.  Failure to opt out, without more, cannot form the basis of consent to the release of a claim. Whether the Court labels these "nonconsensual" or based on "implied consent" matters not, because in either case there is a lack of sufficient affirmation of consent.

*Id.* at 688.

mentioned cases, the Release would render any plan unconfirmable.  The Release is not consensual and should not be allowed.

**C.     The Releasing Parties Are Not Afforded Due Process Under the DIP Financing.**

25.     In connection with the release proposed under the DIP Financing, not only is there no affirmative consent from any of the Releasing Parties, but these parties (i) may not have received notice of the Release and (ii) do not have an opportunity to consent to, or opt out from giving, the Release.  In addition, as discussed above, the vast majority of the Releasing Parties will not receive notice of these cases, let alone the DIP Financing and the Release.  The claims to be released under the relevant provision are not limited to claims that such "Released Parties" could assert derivatively by or through the DIP Financing, but rather, the scope of the Release is so broad that direct claims held by Releasing Parties against the Released Parties would be released without their knowledge or consent.

26.     In *Folger Adam Security, Inc. v. DeMatteis/MacGregor*, 209 F.3d 252 (3d Cir. 2000), the Third Circuit stated: "Due process requires 'notice reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Id*. at 265 (citations omitted).  The Related Releasing Parties did not receive notice that is "reasonably calculated, under all the circumstances, to apprize [them] of the pendency of the action and afford them an opportunity to present their objections" to being compelled to give Third Party Releases.  *Id*.[12]

---

[12]  *See In re Boy Scouts of America and Delaware BSA, LLC*, 642 B.R. 504, 678 (Bankr. D. Del. 2022) (identifying Court was unable to find that the 22 categories of  "Related Releasing Parties" received notice, and because Court had concluded that "a request for opt-out consent must be grounded in adequate notice, it is inconsistent to permit releases from persons who do not receive notice by virtue of creditor (or shareholder) status."); *see also Joel Patterson v. Mahwah Bergen Retail Group, Inc.*, 636 B.R. 641, 660 (E.D. Va. 2022 (vacating the Bankruptcy Court's order confirming the plan, the District Court noted that "[t]he Bankruptcy Court did not order that any notice or opt-out forms be sent to all of the Releasing Parties,

**D.      The Release Makes No Exception for Actual Fraud, Willful Misconduct, or Gross Negligence.**

27.      There is another aspect of the Release that is problematic:  there is no exception for actual fraud, willful misconduct, or gross negligence.  This is objectionable for a number of reasons.  To the extent that the Debtors are included in the definition of "Released Party," by virtue of being affiliates of Kinderhook and therefore receiving the benefit of the Release, they are most likely not entitled to a discharge,[13] as the Bankruptcy Code would bar them from being discharged for claims of fraud and willful misconduct.  *See* 11 U.S.C. § 523(a) (2, 4 and 6).  Nor should non-debtor parties be able to receive a release from claims for actual fraud and willful misconduct when the Debtors are not entitled to a discharge for such claims.  *See In re Purdue Pharma, L.P.* 635 B.R. 26, 44 (S.D.N.Y. 2021).

28.      The Release does not include any exception for actual fraud, willful misconduct, or gross negligence.  Through this Release, the Released Parties and the Debtors are releasing, among others, all of their own employees.[14]  The Debtors have the burden to establish how the Release of claims in favor of the Released Parties, including (but not limited to) claims for known and unknown fraud, willful misconduct, and gross negligence of their employees and the other

---

including the current and former employees, consultants, accountants or attorneys of Debtors, their affiliates, lenders, creditors or interest holders.").

[13] One aspect of the consideration for the Debtors' Assets is the "Wind-Down Amount" means cash and cash equivalents in the amount of Six Hundred Thousand Dollars ($600,000), reserved for use in connection with the wind-down of the Sellers' Chapter 11 Cases, whether via a liquidating chapter 11 plan or otherwise. Sale Mot. Ex A (Stalking Horse Agreement) Art. I, § 2.5; *see also* 11 U.S.C. § 1141(d)(3).

[14] If, for example, it is later learned that an officer, manager, or employee of the Debtors misappropriated Debtor funds at any time up to the Effective Date, it appears that any claim based on such misappropriation would be released by the DIP Financing.

Released Parties, meet the requirements of *Zenith,* 241 B.R. at 110, *Master Mortgage,* 168 B.R. at 937-38.

**E.    The Release Does Not Satisfy the Third Circuit's Exacting Standards and Hallmarks of Permissible Non-Consensual Releases.**

29.    In *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 (3d Cir. 2000), the Third Circuit surveyed cases from various circuits as to when, if ever, a non-consensual third-party release is permissible.  The Court acknowledged that a number of Circuits do not allow such non-consensual releases under any circumstances. *See id.* at 212.  Other Circuits, the Court found, "have adopted a more flexible approach, albeit in the context of extraordinary cases."  *Id.* at 212-13 (citing Second Circuit cases where releases were upheld for "widespread claims against co-liable parties" and a Fourth Circuit mass tort case).  "A central focus of these three reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties.  Substantial debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible."  *Id.* at 213; *see In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005) (noting a third-party release may be granted "only in rare cases").

30.    The Third Circuit in *Continental Airlines* ultimately determined that the proposed releases in that case, which enjoined shareholder lawsuits against debtors' directors and officers, did "not pass muster under even the most flexible test for the validity of non-debtor releases." *Continental*, 203 F.3d at 214.  Therefore, the Court determined that it "need not speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration."  *Id.* at 214, n. 11 (emphasis added). However, the Court did describe the "hallmarks of permissible non-consensual releases" to be

"fairness, necessity to the reorganization, and special factual findings to support these conclusions." *Id.* at 214.

31.     The Third Circuit Court of Appeals recently referenced *Continental* in *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019), as one of the precedents, along with *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011), regarding nonconsensual Third Party releases. The Third Circuit indicated that these decisions "set forth *exacting standards* that must be satisfied if such releases and injunctions are to be permitted." 945 F.3d at 139 (emphasis added).

32.     In *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001), the Court held that a clause in the plan which released claims of any creditors or equity holders against the senior lenders for any act or omission in connection with the bankruptcy cases and reorganization process required factual showings under *Continental* – that the releases were necessary for the reorganization and were given in exchange for fair consideration. *Id.* at 607. The Court elaborated that "necessity" under Continental requires a showing: (a) that the success of the debtors' reorganization bears a relationship to the release of the non-debtor parties and (b) that the non-debtor parties being released from liability have provided "a critical financial contribution to the debtors' plan" in exchange for the receipt of the release. *Id.* at 607. A financial contribution is considered "critical" if without the contribution, the debtors' plan would be infeasible. *Id.* Fairness of a release is determined by examining whether non-consenting non-debtors are receiving reasonable consideration in exchange for the release. *Id.* at 608; *see also In re Spansion, Inc.*, 426 B.R. at 144 (applying similar analysis).

33.     The *Genesis* Court found that the senior lenders had made a financial contribution to the plan, which allowed the debtors to make the 7.34% distribution to the unsecured creditors,

who otherwise would be "out of the money." *Id.* at 608. Ultimately, though, the Court found that such contribution was not enough, because "even if the threshold *Continental* criteria of fairness and necessity for approval of non-consensual third-party releases were marginally satisfied by these facts . . . . [the] financial restructuring plan under consideration here would not present the *extraordinary circumstances* required to meet even the most flexible test for third party releases." *Id.* (emphasis added).

34.     Here, in the context of the DIP Financing, there is nothing in the record to indicate the presence of "extraordinary circumstances," or that that the high threshold necessary for approval of a non-consensual Release has been met with respect to each of the non-debtor parties that would be the recipients of the Release.  First, the Debtors cannot meet the requirement that the non-consensual Release is a "necessity to the reorganization," because the Debtors are not reorganizing at this time.  Even if the Release might be permitted in a liquidation plan, there does not appear to be any necessity for the Release at this time, especially in the absence of the procedural safeguards afforded by the plan process.

35.     The Debtors also cannot meet the second *Continental* requirement that the Release be given "in exchange for fair consideration."   The Debtors must establish what, if any, "critical financial contribution" was made by each and every recipient of the Release, and how such contribution benefits those parties on whom the Release is being imposed.  There is no evidence of any "extraordinary circumstances" to meet even the most flexible test for such Release. *Genesis*, 266 B.R. at 608.

36.     Here, at this early point in these cases, the Debtors certainly cannot specify any critical financial contribution made by each of the countless number of persons that will benefit from the Release.  The Third Circuit Court of Appeals and this Court have already determined that

the Debtors' directors and officers, who are included among the parties that will benefit from the Release would not be entitled to the same. *See In re PWS Holding Corp.,* 228 F.3d 224, 245-46 (3d Cir. 2000) ("§ 524(e) makes clear that a discharge in bankruptcy does not extinguish claims by third parties against guarantors or directors and officers of the debtor for the debt discharged in bankruptcy."); *Continental,* 203 F.3d at 215 ("[W]e have found no evidence that the non-debtor D & Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability"); *Wash. Mut.,* 442 B.R. at 354 ("[T]here is no basis for granting third party releases of the Debtors' officers and directors, even if it is limited to their post-petition activity. The only 'contribution' made by them was in the negotiation of the Global Settlement and the Plan. Those activities are nothing more than what is required of directors and officers of debtors in possession (for which they have received compensation and will be exculpated); they are insufficient to warrant such broad releases of any claims third parties may have against them ...."); *see also Genesis*, 266 B.R. at 606–07 (in rejecting a debtor's release of its directors, officers and employees, the Court held that, "the officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization.").

37.    In the context of a plan, the Debtors have the burden of establishing whether the *Continental/Genesis* factors have been met for each of the non-debtor released parties who are the beneficiaries of a non-consensual release, including whether the release is "both necessary and given in exchange for *fair consideration*." *Continental,* 203 F.3d at 214, n. 11 (emphasis added). Here at this early junction of these chapter 11 cases, it is at best premature to make any determination that the Release is appropriate absent a showing of "extraordinary circumstances."

*See Continental*, 203 F.3d at 212; *Tribune*, 464 B.R. at 178 (interpreting *Continental* to allow non-consensual releases only in "extraordinary cases."); *Genesis*, 266 B.R. at 608.

**F.     The Release Is Impermissible Because It Is Not a Settlement Between and Among the Released Parties and the Releasing Parties.**

38.     To the extent the Debtors seek approval of the Release as part of a settlement pursuant to Federal Rule of Bankruptcy Procedure 9019, there has been no offer and, by extension, no acceptance between and among the Released Parties and Releasing Parties, nor any evidence of any compromise of any such claims.  The standard for approval of a settlement under Rule 9019 is guided by the following criteria: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (citations omitted). But the parties cannot even meet this threshold.

39.     For example, in the context of a plan, Bankruptcy Code section 1123(b)(3)(A) allows a plan proponent to "provide for [] the settlement or adjustment of any claim or interest *belonging to the debtor or to the estate*." 11 U.S.C. § 1123(b)(3)(A) (emphasis added).  Thus, section 1123(b)(3) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims other parties may have against it.  *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 409, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest *belonging* to the debtor or to the estate.  It is significant that there is no parallel authorization regarding claims *against* the estate.") (emphasis in original) (quoting section 1123(b)(3)(A)) (internal citation omitted).  The resolution of claims against the Debtor is governed by sections 1129 and 1141.

40.    Section 1123(b)(3)(A) also does not authorize a plan proponent to "settle" claims that a debtor's creditors hold against it or claims that a debtor's creditors hold against non-debtor parties.  In addition, while a plan may incorporate one or more negotiated settlements, a plan is not itself a settlement.  Sending a plan to impaired creditors for a vote is not the same thing as parties negotiating a settlement among themselves.  A "settlement" is "an agreement ending a dispute or lawsuit."  Black's Law Dictionary (10th ed. 2014).  An "agreement" is "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons."  Black's Law Dictionary (10th ed. 2014).

41.    Approval of settlements is governed by Federal Rule of Bankruptcy Procedure 9019, which provides that, "[o]n motion by the trustee [or chapter 11 debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."  But, because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing general "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" their claims.[15]

42.    Despite arguments and assertions to the contrary, there is no negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" vis-à-vis all of the Released Parties and the entirety of the Releasing Parties.  The DIP Financing and the attendant Release cannot be approved simply because it purports to be a "settlement" with parties who have

---

[15] The decision of whether to approve a settlement under Rule 9019 is left to the sound discretion of the bankruptcy court, which "must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'"  *In re Wash. Mut.*, 442 B.R. at 338 (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).  In contrast, plans are subject to the many requirements of Code sections 1123 and 1129.

no formal agreements with the Debtors or the DIP Lender.  Calling the DIP Financing a "settlement" does not supplant other legal standards governing the release of such claims in the proper context of confirmation of a chapter 11 plan.

43.    The U.S. Trustee reserves any and all rights, remedies, and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

## **CONCLUSION**

WHEREFORE, for all the above-stated reasons, the United States Trustee respectfully requests that Court deny the DIP Motion and grant such other relief as this Court deems fair, appropriate, and just.

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 & 9**

Dated: February 16, 2023

By:/s/ Richard L. Schepacarter
Richard L. Schepacarter
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 fax
Richard.Schepacarter@usdoj.gov