**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Performance Powersports Group Investor, LLC, *et al.*,[1] | Case No. 23-10047 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re:** Docket Nos. 13 and 17<br>**Hearing Date:** Feb. 23, 2023 at 10:00 a.m. (ET)<br>**Obj. Deadline:** Feb. 20, 2023 at 4:00 p.m. (ET)<br>(extended for the Committee) |

**OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTORS' (I) MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING AND (II) MOTION FOR ENTRY OF ORDER APPROVING BIDDING
PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned

debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned

proposed counsel, hereby submits this omnibus objection (this "Objection") to the (i) *Debtors'*

*Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior and*

*Junior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority*

*Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the*

*Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No.

13] (the "DIP Motion"), and (ii) *Debtors' Motion for Entry of: (I) an Order (A) Approving Bid*

*Procedures in Connection With the Sale of Substantially All Assets, (B) Approving the Bid*

*Protections to the Stalking Horse Bidder, (C) Scheduling an Auction and a Sale Hearing, (D)*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

*Approving the Form and Manner of Notice Thereof, (E) Authorizing Entry into the Stalking Horse Agreement, (F) Approving Bid Protections, (G) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (H) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 17] (the "Bid Procedures Motion" and together with the DIP Motion, the "Motions").[2]   In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

As was not lost on the Court at the initial January 18 hearing, the modest $10 million in DIP funding to be provided by an affiliate of Kinderhook – the Debtors' current majority equityholder and proposed stalking horse bidder[3] – is contingent on a highly unorthodox and improper release by the Debtors (on behalf of themselves and various related parties, such as their employees and agents) of *any and all claims against Kinderhook and virtually all related entities and individuals,*[4] *effective upon entry of the Final DIP Order.*   Given the extraordinary breadth, scope, and timing of the proposed release, the Committee immediately launched its investigation

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion and Bid Procedures Motion, as applicable.

[3] The Kinderhook-affiliated lending entity is Tankas Funding VI, LLC (the "DIP Lender"), and the Kinderhook-affiliated bidder is CPS USA Acquisition, LLC (the "Stalking Horse Bidder").   Both entities are affiliates of Kinderhook Industries, LLC (together with its affiliates, "Kinderhook"), the Debtors' equity sponsor.

[4] The "Released Parties" include the DIP Lender and "such entity's current and former affiliates, **and each such entity's** current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, **and each of such entity's** current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners)" (emphasis added).   Interim DIP Order § 4.14.

of potential estate claims, including those arising from the leveraged buyout of the company by Kinderhook from its prior owner and CEO, Richard Godfrey, only 16 months ago (the "2021 Transaction").  Upon information and belief, in connection with the 2021 Transaction, Mr. Godfrey received nearly $70 million in cash for this now worthless stock, awarded nearly $6 million in bonuses to certain employees without justification, and extended the Debtors' lease obligations to 10 years on two of his owned properties on the eve of closing to increase their value to potential buyers at the Debtors' expense, all while saddling the Debtors with $45 million in debt to finance the transaction.  Mr. Godfrey remained CEO and a member of the Debtors' board, along with two Kinderhook-designated members for which releases are being sought, following the 2021 Transaction.  These facts, of course, warrant a thorough investigation for which releases cannot be brazenly granted as part of a postpetition financing order.  Doing so could strip unsecured creditors of their only meaningful source of recovery following Kinderhook's cleansing of its company's balance sheet in these Chapter 11 Cases.

Even with the Debtors' cooperation,[5] the Committee's independent investigation of claims against Kinderhook, Godfrey, and others has only begun in earnest.  The Committee simply cannot conclude, a mere *three weeks* into these Chapter 11 Cases, that the estates do not possess colorable claims against Kinderhook and the numerous related parties that will be released under the Final DIP Order, including the Kinderhook board members who oversaw the Debtors' quick spiral into bankruptcy following the 2021 Transaction.

---

[5] To date, the Debtors have shared with the Committee hundreds of documents and other information collected in connection with their investigation.  As a result of that process, the Committee also promptly served targeted discovery requests on Mr. Godfrey related to the 2021 Transaction and certain of his actions undertaken in his capacity as the company's CEO that warrant further scrutiny.

Such a broad release of numerous unidentified parties tangentially related to the DIP Lender[6] has no place in a financing order, and one should only be granted – if ever – through a Chapter 11 plan (a process which Kinderhook has not agreed to finance). Any releases granted in a financing order should be appropriately tailored as between the estates and the lending entity itself, and must be made expressly subject to the Committee's customary 60 to 75-day challenge period. Kinderhook should not be permitted to buy a blanket release for itself and countless affiliated parties simply by committing modest financing to protect its existing equity investment through a section 363 sale, especially given the multiple roles Kinderhook and its affiliates/employees play in these cases as the Debtors' existing owner, board members, DIP Lender, and Stalking Horse Bidder.

In addition to the improper release, Kinderhook seeks a host of other objectionable protections in the proposed financing order, including liens on the proceeds of avoidance actions (including claims commenced against Kinderhook itself), above-market DIP fees and interest that amount to approximately 18% of the new money lent, a waiver of the estates' surcharge rights under section 506(c), and undue restrictions on the Committee's challenge rights and professional fee budget in this case. The Debtors seek approval of this highly conditional and expensive second lien financing under the deferential business judgment standard. Such standard does not apply. The DIP Facility is an insider transaction subject to heightened scrutiny under which the Debtors have the burden of proving the "entire fairness" of both the process leading to the transaction and its substantive terms. The Debtors have not met, and cannot meet, their heavy burden of

---

[6] Given Kinderhook's role as the Debtors' majority equity owner, the broad and circuitous definition of "Released Parties" in the Interim DIP Order could be reasonably interpreted to release all of the Debtors' current and former directors and officers from estate claims, including Mr. Godfrey.

demonstrating that this insider DIP loan was the result of a fair process[7] and that its terms, including the limitless release of the Kinderhook-related parties, are fair.

Kinderhook's overreaching continues in the proposed Bid Procedures, which will govern an expedited sale of substantially all of the Debtors' assets (including any and all estate litigation claims) to the Kinderhook-affiliated Stalking Horse Bidder, subject to a brief public marketing process designed to deter competition from third parties.  The proposed Bid Procedures contain several conditions that will allow Kinderhook to acquire the company, free of pending multimillion dollar litigation exposure from certain of its vendors,[8] for the lowest price possible, including (i) an aggressive 60-day sale timeline despite the Debtors' limited prepetition marketing efforts conducted over the holiday season, (ii) excessive bid protections that, together with the DIP fees and interest, inflate the minimum overbid to approximately $66.2 million, and (iii) the exclusion of the Committee as a consultation party in the sale process.

Taken together, the DIP Facility and Bid Procedures will allow Kinderhook to obtain broad, Plan-like releases for itself and countless affiliates/individuals and re-acquire the company through a barebones section 363 sale that provides no meaningful value to unsecured creditors other than the payment of cure costs to those creditors whose contracts Kinderhook decides to assume in its sole discretion.[9]  Absent the relief requested herein, the Motions should be denied.

---

[7] The Debtors' filings provide no detail into what, if any, efforts were made to obtain alternative DIP financing proposals, including from Twin Brook Capital, LLC ("Twin Brook"), their existing first lien lender.

[8] As discussed herein, shortly prior to the Petition Date, certain of the Debtors' former vendors commenced an action against the Debtors and Kinderhook in state court to recover no less than $60 million on account of unpaid inventory allegedly ordered by the Debtors.

[9] The Stalking Horse Bid provides only $500,000 to be shared *pro rata* by unsecured creditors whose contracts are not ultimately assumed or assigned to Kinderhook, which pool will include the $60+ million in litigation claims from the Debtors' former vendors among others, providing pennies on the dollar to those creditors at best.

## BACKGROUND

**A.**     **The Chapter 11 Cases**

1.     On January 16, 2023, each of the Debtors commenced a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware. These Chapter 11 Cases have been jointly consolidated for administrative purposes only.

2.     The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     No request has been made for the appointment of a trustee or examiner in these Chapter 11 Cases.

4.     On January 30, 2023, the United States Trustee for Region 3 and 9 appointed the Committee, comprised of the following members: (i) Hisun Motors Corp. – USA, (ii) Tao Motor, Inc., and (iii) Vietnam New Century Industrial Co, Ltd. *See* Docket No. 82.

5.     Additional information regarding the Debtors, including their businesses and affairs, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases is set forth in Ken Vanden Berg's *Declaration in Support of the Debtors' Chapter 11 Petitions and First Day Motions and Applications* [Docket No. 16] (the "First Day Declaration").

**B.**     **Events Leading to These Chapter 11 Cases**

    a.     The 2021 Transaction

6.     In March of 2021, Rich Godfrey and Associates Inc., *d/b/a* Coleman Powersports (collectively, with its subsidiaries, "Godfrey & Associates"), then majority-owned by Richard

Godfrey, retained Hudson Capital Advisors BD, LLC to market a potential acquisition of, or investment in, Godfrey & Associates. First Day Declaration ¶ 15.

7.      As a result of that process, on October 8, 2021, Godfrey & Associates, Rich Godfrey, and Performance Powersports Group Purchaser, Inc., an affiliate of Kinderhook Industries, Inc., entered into an agreement to effectuate the 2021 Transaction, whereby Kinderhook acquired substantially all of the equity in Godfrey & Associates through a leveraged buyout. The 2021 Transaction closed with a total purchase price of $112 million, which comprised of, *inter alia*, a $45 million equity contribution from Kinderhook and $45 million in third-party senior secured financing supplied by Twin Brook. First Day Declaration ¶¶ 17-18.

    b.  The Prepetition Vendor Dispute

8.      On December 16, 2022, Chongqing Huansong Industries (Group) Co., Ltd., Chongqing Huansong Science, and Technology Industrial Co., Ltd., and Vietnam New Century Industrial Company Limited (collectively, "Hisun") commenced an action against the Debtors and Kinderhook in the United States District Court for the Southern District of New York under Case Number 1:22-cv-10652 (the "Vendor Litigation"). Through the Vendor Litigation, Hisun alleges that the Debtors and Kinderhook are liable to Hisun for no less than $60 million on account of unpaid inventory allegedly purchased by the Debtors. The Vendor Litigation remains pending as of the Date hereof.

    c.  The Prepetition Marketing Process and DIP Negotiations

9.      According to the Debtors' filings, the Debtors conducted a brief prepetition marketing process for their assets that spanned from December 6, 2022, through January 13, 2023 (*i.e.*, 38 days). In connection therewith, the Debtors' advisors solicited interest from only 33 parties, nine of which ultimately executed confidentiality agreements. Bremer Declaration

(defined below) ¶¶ 10-12.  The Debtors received no indications of interest prior to their initial

January 13, 2023 prepetition bid deadline.  Bremer Declaration ¶ 13.[10]

10.    After failing to find an interested buyer through the brief prepetition marketing

process, the Debtors and their advisors quickly entered into the Stalking Horse Agreement with

the Stalking Horse Bidder.  Concurrently therewith, the Debtors entered into negotiations with the

DIP Lender to obtain postpetition financing to fund the sale process and the Chapter 11 Cases

generally.  Lozynski Declaration (defined below) ¶ 10.  The Committee understands the

Disinterested Director approved the DIP Agreement, and that the Kinderhook-designated board

members abstained from voting on the transaction.

**C.    The Bid Procedures Motion**

11.    On the Petition Date, the Debtors filed (i) the Bid Procedures Motion and (ii) the

*Declaration of Steven Bremer in Support of Bid Procedures and Sale Motion* [Docket No. 18] (the

"Bremer Declaration").

12.    Through the Bid Procedures Motion, the Debtors seek authority to (i) designate

CPS USA Acquisition, LLC as the Stalking Horse Bidder for substantially all of their assets and

grant the Stalking Horse Bidder certain bid protections in connection therewith, (ii) conduct a 60-

day public marketing and sale process for their assets, and (iii) establish certain bid procedures

governing the sale of their assets.

13.    The Stalking Horse Bid is comprised of the following consideration:

  a.  a credit bid of the expected outstanding DIP obligations in the approximate amount
      of $11.7 million (inclusive of fees and interest);

---

[10] Notably, this period included religious, cultural, and Federal holidays including Hannukah (December 18 through December 26, 2022), Christmas Eve, Christmas Day (observed December 26, 2022), Kwanzaa (December 26, 2022, through January 1, 2023), New Year's Eve, New Year's Day (observed January 2, 2023), and the Friday of Dr. Martin Luther King Jr. Day weekend (January 13, 2023).

b. the assumption of the outstanding $52 million in senior secured first lien debt obligations with Twin Brook;

c. $500,000 in cash to be used to pay the claims of creditors whose contracts are not assumed and assigned to the Stalking Horse Bidder;

d. the assumption of certain liabilities and contracts as provided in the Stalking Horse Agreement; and

e. approximately $600,000 in wind-down funding.

Bid Procedures Motion ¶ 16.

14. In return, the Stalking Horse Bidder will receive the following benefits and protections under the proposed Bid Procedures:

a. <u>Bid Protections</u>:  The Debtors seek to grant the Stalking Horse Bidder a $2.2 million break-up fee and expense reimbursement of up to $500,000 in the event it is not the successful bidder.  Bid Procedures Motion ¶ 32.

b. <u>Consultation Rights</u>:  The Debtors seek to grant the DIP Lender consultation rights with respect to any bid for (i) materially less than all of the Purchased Assets or (ii) assets other than the "Purchased Assets[.]"  Critically, the Bid Procedures do not grant the Committee any consultation rights over the sale process.  *See* Bid Procedures Motion, Schedule 1 § IX.

c. <u>Aggressive Milestones</u>.  The Debtors seek approval of an abbreviated 60-day sale timeline pursuant to the following milestones set forth in the DIP Motion (the "<u>Milestones</u>"):

| Date | Event |
|------|-------|
| January 18, 2023 | Commencement of the Debtors' Chapter 11 cases. |
| January 18, 2023 | Filing of Bid Procedures Motion |
| March 7, 2023 | Bid Deadline |
| March 9, 2023 | Auction Date (if necessary) |
| March 11, 2023 | Sale Hearing (if Auction is held) |
| March 12, 2023 | Sale Hearing (if Auction is not necessary) |
| March 17, 2023 | Sale Deadline |

Bid Procedures Motion ¶ 17, DIP Motion ¶ 36.

D.     **The DIP Motion**

15.     On the Petition Date, the Debtors filed the DIP Motion and the *Declaration of Alyssa Lozynski in Support of Cash Collateral and DIP Motion* [Docket No. 15] (the "Lozynski Declaration").

16.     On January 18, 2023, the Court entered an order approving the DIP Motion on an interim basis [Docket No. 54] (the "Interim DIP Order").

17.     On January 31, 2023, the Debtors filed the *Supplement to the Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 88] (the "DIP Supplement").

18.     Through the DIP Motion, the Debtors seek approval of a $10 million second lien postpetition DIP financing facility from Tankas Funding IV, LLC, an affiliate of Kinderhook.  The salient terms of the proposed DIP Facility are summarized below:

i.     **The Kinderhook Release**

19.     The proposed DIP Facility contemplates a full release by the Debtors' estates, on behalf of themselves and certain related parties, of any claims against the DIP Lender and a litany of related entities and individuals immediately upon entry of the final order approving the DIP Motion (the "Kinderhook Release").  Specifically, section 4.14 of the Interim DIP Order provides, in pertinent part, as follows:

> Subject to and upon entry of a Final Order, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Debtors, (in their own right, on behalf of their estates and their current and former direct and indirect subsidiaries,

and each such entity's and its current and former direct and indirect subsidiaries' current and former directors, officers, managers, predecessors, and successors and assigns, and each of such entity's current and former officers, members, managers, directors, principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), and representatives, in each case to the extent permitted by applicable law and solely in such parties capacity as such) (collectively, the "Releasing Parties") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the DIP Lender, and each such entity's current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "Released Parties") and their respective property and assets from any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of the Final Order, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance,

avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement, recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the Prepetition First Lien Credit Agreement, but excluding obligations of the DIP Lender under the DIP Facility arising after the date of the Final Order (collectively, the "Released Claims"). This paragraph is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties. As of the entry of the Final Order, the releases granted in this paragraph 4.14 are final and binding and are not subject to a Challenge.

Interim DIP Order § 4.14.

20.    Specifically, under section 4.14 of the Interim DIP Order, the relevant terms contained within that paragraph are as follows:

a.    "Releasing Parties" are each of the Debtors, (in their own right, on behalf of their estates and their current and former direct and indirect subsidiaries, and each such entity's and its current and former direct and indirect subsidiaries' current and former directors, officers, managers, predecessors, and successors and assigns, and each of such entity's current and former officers, members, managers, directors, principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), and representatives, in each case to the extent permitted by applicable law and solely in such parties capacity as such) (collectively, the "Releasing Parties").

b.    "Released Parties" are the DIP Lender, and each such entity's current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "Released Parties").

c.    "Released Claims" are defined to be any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations,

objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of the Final Order, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement, recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the Prepetition First Lien Credit Agreement, but excluding obligations of the DIP Lender under the DIP Facility arising after the date of the Final Order (collectively, the "Released Claims").

Interim DIP Order § 4.14.

21.    As set forth in the DIP Supplement, the Debtors assert, among other things, that (i) because the DIP Lender is willing to fund the sale process, Kinderhook and its affiliates are entitled to a release of the Debtors' potential claims and causes of action against it before funding the DIP Loans on a final basis, (ii) the DIP financing and the Kinderhook Release are a compromise supported by an independent investigation of any potential claims that the Debtors may have against Kinderhook, and (iii) the Debtors do not have any claims worth pursuing, and the exchange of those weak potential claims for the favorable and necessary postpetition financing is an exercise of sound business judgment.  DIP Supplement ¶ 2-6.

### ii.    DIP Lender Protections and Fees

22.    In exchange for the limited funding under the DIP Facility, the Debtors propose to grant the DIP Lender the following liens, fees, and other protections:

a. <u>DIP Liens</u>:  The DIP Lender will receive first-priority security interests in all cash lent under the DIP Facility and liens on all unencumbered assets, including the proceeds of Avoidance Actions, and junior second lien security interests in and liens on all the Debtors' collateral under the Prepetition First Lien Facility.  Interim DIP Order § 2.1(b).

b. <u>DIP Fees and Interest</u>:  The DIP Lender will receive (i) a commitment fee of $600,000, (ii) an exit fee of $1,000,000, and (iii) interest at the rate of 15% per annum.  DIP Motion ¶ 36.

c. <u>Waivers</u>:  Upon entry of the final order approving the DIP Motion (the "<u>Final DIP Order</u>"), the estates will waive their (ii) surcharge rights under section 506(c) of the Bankruptcy Code, (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (iii) the equitable doctrine of marshaling.  Interim DIP Order §§ 4.11 – 4.13.

## DIP OBJECTION

**A.**     **<u>The DIP Facility is an Insider Transaction Subject to the "Entire Fairness" Standard, and the Debtors Have Not Met their Heavy Burden of Demonstrating that the Financing is the Product of a Fair Process and that its Terms are Fair</u>**

23.     Under section 364(c) of the Bankruptcy Code, a court may not approve proposed financing unless a debtor proves that: (1) they are unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy code; (2) the credit transaction is necessary to preserve assets of the estate; and (3) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrow and the proposed lender.  *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (citing *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988)).

24.     Notwithstanding 364(c), transactions between a debtor and its insiders, including postpetition financing arrangements, must be subjected to heightened scrutiny.  *See, e.g., Los Angeles Dodgers,* 457 B.R. at 313 ("[T]he Court must review Debtors' decision to accept the [insider financing] applying the entire fairness standard."); *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) ("[C]ourts apply a 'heightened scrutiny' test in assessing the bona fides of a transaction among a debtor and an insider of the debtor.") (collecting cases);

*Pepper v. Litton*, 308 U.S. 295, 306-07 (1939) (stating that controlling shareholder's "dealings with the corporation are subjected to rigorous scrutiny"); *Schubert v. Lucent Technologies, Inc. (In re Winstar Communications, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) (dealings between a debtor and an insider must be rigorously scrutinized by the courts).  Insider transactions are inherently suspect and require careful scrutiny to ensure fair dealing in a proposed transaction.  *Los Angeles Dodgers*, 457 B.R. at 313 (holding business judgment rule inapplicable where debtor's principal personally benefitted from the proposed transaction); *In re Bidermann Indus. U.S.A. Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (stating that insider transactions "are rife with the possibility of abuse"); *In re Anchorage Boat Sales, Inc.*, 29 B.R. 275, 278 (Bankr. E.D.N.Y. 1983) (noting that insider transactions present "opportunities which tempt the principals of interlocking businesses to forsake and loot the bankrupt estate in an effort to enhance their personal interests.").

25.     To approve a proposed insider transaction, a debtor has the burden of proving the "entire fairness" of the transaction.  This burden has two prongs, requiring a showing that both (a) the process leading up to the transaction and (b) the terms of the transaction are fair.  *Pepper*, 308 U.S. at 6 (holding that good faith of the transactions and inherent fairness to the corporation must be shown in an insider transaction); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holdings Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fair-ness from the viewpoint of the corporation and those with interests therein."), *aff'd*, 160 F.3d 982 (3d Cir. 1998); *Los Angeles Dodgers*, 457 B.R. at 313 (insider DIP financing "requires proof of fair dealing and fair price and terms"); *see also Bidermann*, 203 B.R. at 549 (quoting *Knapp v. Seligson (In re Ira Haupt & Co.)*, 361 F.2d 164, 168 (2d Cir. 1966) ("[T]he conduct of bankruptcy proceedings not

only should be right but must seem right.").  This scrutiny ensures the "protection of the entire community of interests in the corporation-- creditors as well as stock-holders."  *Pepper*, 308 U.S. at 7.

21.    Even where negotiations of a transaction are spearheaded by an independent/disinterested director who has been given full authority to negotiate independently and at arm's-length on behalf of the company, that does not take an insider transaction out of entire fairness review.  *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1116 (Del. 1994) ("Entire fairness remains the proper focus of judicial analysis . . . irrespective of whether the burden of proof remains upon or is shifted away from the [insider], because the unchanging nature of the . . . 'interested' transaction requires careful scrutiny."); *In re John Q. Hammons Hotels Inc. S'holder Litig.*, No. Civ. A. 758-CC, 2009 WL 3165613, at *10 (Del. Ch. Oct. 2, 2009) (independent director approval, in some circumstances, can "shift the burden of proof on the issue of fairness to the [challenger], but would not change that entire fairness was the standard of review").

    **i.**    **The Debtors Have Not Demonstrated that the DIP Facility is the Product of a Fair Process**

26.    The Debtors have failed to meet their burden of demonstrating that the DIP Facility is the result of a fair process.  While the Debtors' filings make clear they conducted a limited prepetition marketing process for their assets, the DIP Motion, DIP Supplement, and First Day Declaration are bereft of any detail regarding the Debtors' efforts to secure postpetition financing from any other source, including from Twin Brook, their existing first lien lender.  It is unclear whether the Debtors conducted any marketing process for postpetition financing.  Instead, it appears that when the brief prepetition marketing process failed to produce any bids, the Debtors simply agreed to entered into the DIP Agreement (and the highly unorthodox terms thereof, including the Kinderhook Release) in connection with the Stalking Horse Bid.  While a debtor

need not turn over every rock in search of possible financing, it still must make a reasonable effort to find the best source of credit possible.  S*ee, e.g., In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); *In re Crouse Grp., Inc.*, 71 B.R. 544, 550 (Bankr. E.D. Pa. 1987) (describing the requirement to seek unsecured financing as "exhaustive" prior to granting junior or senior liens to a lender).  The Debtors have not met their burden of showing such efforts were made.

ii.     **The Terms of the Insider DIP Facility Are Not Fair**

a.   *The Kinderhook Release Is Improper and Should Not Be Granted*

27.     Through the Kinderhook Release, the Debtors seek to waive all estate claims, as well as the direct claims of their current or former officers, directors, employees, and professionals, amongst others, against the "Released Parties," which definition includes virtually any Kinderhook-related individual or affiliate.  The Kinderhook Release is highly improper for several reasons, including (i) a release of non-debtors other than those directly related to the financing itself should only be granted through a Chapter 11 plan (which has not been proposed here), (ii) the Kinderhook Release is impermissibly broad and can be read to release all claims against a plethora of entities/individuals related to Kinderhook, including the Debtors' current and former directors and officers, (iii) the Kinderhook Release does not contain a carve-out for actual fraud, willful misconduct, or gross negligence, and (iv) the Kinderhook Release appears to release direct claims of non-debtor parties without their consent.

28.     Pursuant to this Court's decision in *In re Tribune Company*, 464 B.R. 126 (Bankr. D. Del. 2011) (Carey, J.), and *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) (Walrath, J.), among others, the Court considers the five factors set forth *in In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del 1999) and *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 937-38 (Bankr. W. D. Mo. 1994) to determine whether, notwithstanding § 524(e) of the

Code, **a plan** may provide for releases by debtors of non-debtor entities. *See Tribune*, 464 B.R. at 186; *Wash. Mut.*, 442 B.R. at 346; *In re Spansion, Inc.*, 426 B.R. 114, 142-43, n. 47 (Bankr. D. Del 2010) (Carey, J.); *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) (Walrath, J). Those five factors are as follows:

    a.   an identity of interests between debtor and non-debtor releasee, so that a suit against the non-debtor will deplete the estate's resources (e.g., due to a debtor's indemnification of a non-debtor);

    b.   a substantial contribution to the plan by non-debtor;

    c.   the necessity of release to the reorganization;

    d.   the overwhelming acceptance of plan and release by creditors; and

    e.   the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*See Tribune*, 464 B.R. at 186 (citing *Wash. Mut.*, 442 B.R. at 346 (citing *Zenith*, 241 B.R. at 110)). "The factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *Id.*

    29.    Even if the Debtors can satisfy the first factor, they cannot do so with respect to remaining four factors. Here, the Debtors seeks to circumvent the procedural safeguards contained in the Bankruptcy Code's provisions governing solicitation of votes on a proposed plan by requiring the release as a condition to lending. The breadth and scope of the Kinderhook Release is impermissibly broad and wholly inconsistent with releases provided to postpetition lenders in financing orders in this District and virtually all others. *See e.g., In re PhaseBio Pharmaceuticals, Inc.*, Case No. 22-10995 (LSS) [Docket No. 142] (Bankr. D. Del. Nov. 15, 2022) (limiting release to prepetition loan lien and claim matters, subject to customary committee challenge period); *In re Carestream Health, Inc.*, et al., Case No. 22-10778 (JKS) [Docket No. 179] (Bankr. D. Del. Sept.

28, 2022) (same); *In re GenapSys, Inc.*, Case No. 22-10621 (BLS) [Docket No. 173] (Bankr. D. Del. Aug. 17, 2022) (same). Such a release should not be granted outside of a Chapter 11 plan.

30.    The definition of "Released Parties" is improperly broad and must be limited to the DIP Lender itself. The definition presently includes numerous entities and individuals affiliated with Kinderhook, including the DIP Lender, and each such entity's current and former affiliates, and their current and former directors, officers, managers and direct and indirect equityholders, predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, direct and indirect equityholders, principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and general and limited partners.

31.    Given the breadth of the Kinderhook Release, it is virtually impossible to tell who or what falls under the definition of the "Released Parties." For example, since Performance Powersports Group Investor, LLC is itself an affiliate of Kinderhook, the definition of "Released Parties" could be reasonably read to release all of the Debtor's current and former directors and officers from any and all estate claims. The reasonableness of the releases (in the context of a plan) must be evaluated separately with respect to *each* of the released parties to determine if the particular release is appropriate. *See Wash. Mut.*, 442 B.R. at 346. The Debtors have the burden to establish whether the *Master Mortgage/Zenith* factors have been met as to each of the non-debtor Released Parties. Neither the Debtors nor the DIP Lender can do so in these cases.

32.    Further, the Kinderhook Release will be imposed on all of the persons and entities covered by the vast categories of Releasing Parties without their consent or an opportunity to opt-out and, most likely, without receipt of any notice of the DIP Motion at all. In the context of a

Chapter 11 plan – which, again, is not before the Court – courts in this District have determined that third-party releases of non-debtors should be allowed only if the releasing parties have affirmatively consented to same.  *See, e.g., Wash. Mut.* 442 B.R. at 355 (emphasis added) ("[A]ny third-party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third-party releases.").

33.    Finally, the scope of the "Released Claims" is impermissibly broad and includes every potential claim regardless of whether it relates to the proposed DIP Facility or the Chapter 11 Cases generally, and includes no exception for actual fraud, willful misconduct, or gross negligence.  To the extent that the Debtors are included in the definition of "Released Parties" by virtue of being affiliates of Kinderhook, the release conflicts with the Bankruptcy Code, which would bar them from being discharged for claims of fraud and willful misconduct. *See* 11 U.S.C. § 523(a).  Under no circumstances should non-debtor parties be released from claims for actual fraud and willful misconduct when the Debtors themselves are not entitled to a discharge for such claims. *See In re Purdue Pharma*, L.P. 635 B.R. 26, 44 (S.D.N.Y. 2021).

34.    Any releases granted to the DIP Lender in connection with the DIP Facility must be narrowly tailored between the estates and the DIP Lender itself and be made subject to the Committee's customary 60 to 75-day challenge period, consistent with financing orders approved in this District.  Kinderhook should not be permitted to bypass the procedural safeguards of the Chapter 11 Plan process simply by committing modest postpetition financing to acquire the company through a section 363 sale.

> **b.  The DIP Lender Should Not Receive Liens on Avoidance Action Proceeds or Commercial Tort Claims Commenced Against Kinderhook**

33.    Through the DIP Motion, the Debtors seek to grant the DIP Lender liens on Avoidance Action Proceeds and commercial tort claims.  The Committee objects to any grant of

liens on, or superpriority claims to, the Avoidance Action Proceeds, as courts have consistently held that chapter 5 causes of action (and the proceeds thereof) are uniquely reserved for the benefit of unsecured creditors of a chapter 11 estate, not secured creditors, and are rarely encumbered in favor of secured lenders. *In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law permits all unsecured creditors to benefit from avoidance action recoveries").

34.    The intent behind avoidance powers and a debtor's power to bring causes of actions is to allow the debtor-in-possession to gain recoveries for the benefit of all unsecured creditors. *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partn. IV*, 229 F.3d 245, 250 (3d Cir. 2000); *In re Cybergenics Corp.*, 226 F.3d 237, 244 (2d Cir. 2000) (stating that "the debtor in possession is similarly endowed to bring [avoidance] claims on behalf of, and for the benefit of, all creditors"); *In re Sweetwater*, 55 B.R. 724, 735 (D. Utah 1985), *rev'd on other grounds*, 884 F.2d 1323 (10th Cir. 1989) (avoiding powers are meant to benefit creditors generally and promote equitable distribution among all creditors); *see also Official Comm. of Unsecured Creditors v. Gould Elecs. Corp.*, 1993 U.S. Dist. LEXIS 14318, at *12 (N.D. Ill. Sep. 22, 1993) (vacating financing order "to the extent that the order assigns to the bank a security interest in the debtor's preference actions").

35.    At minimum, however, the DIP Lender should not receive liens on, or superpriority claims to, the proceeds of *any claims* commenced against it or any Kinderhook-related entity or individual.  In connection with its ongoing investigation, the Committee may ultimately determine that the estates possess colorable claims against Kinderhook and/or certain related parties. Kinderhook should not be permitted to obtain a backdoor release of potentially valuable claims against it and its affiliates through the provision of the DIP liens on those assets. *See, e.g.*, *Matter*

*of Penn Transp. Co.*, 458 F. Supp. 1346, 1355 (E.D. Pa. 1978) ("The bankruptcy laws are intended to be a shield, not a sword.").

>       *c.  Other Terms of the DIP Facility Are Unreasonable*

36.    The Committee further submits the following objections to the DIP Facility and requests that the Final DIP Order be amended accordingly:

>       a.  <u>Undue Restrictions on Committee Challenge Rights</u>.  The Interim DIP Order currently requires the Committee to first obtain standing before it can commence a Challenge.  *See* Interim DIP Order ¶ 4.9(a).  Such provision is unduly burdensome and should be revised to permit the Committee to file a motion for standing with a draft complaint attached within the Challenge Period, at which point the Challenge Period should be tolled pending a determination on the standing motion.  This is a standard accommodation in this District and others designed to promote judicial efficiency.

>       b.  <u>Excessive DIP Fees/Interest</u>.  The DIP fees and interest collectively total approximately $1.77 million, which amount equals approximately 18% of the new money lent.  Such fees are above market.  While the Debtors attempt to justify the fees as reasonable due to the DIP Facility's subordinated nature, there is virtually no risk associated with repayment since Kinderhook seeks to credit bid all outstanding DIP obligations (including the fees and interest) in connection with the sale.  Indeed, the above-market fees and interest serve only to inflate the purchase price to deter competing bidders from participating in the sale process.

>       c.  <u>Disparate Budget for Committee Professional Fees</u>.  The DIP Budget presently allocates only $175,000 for the Committee's professionals, which amount is insufficient for the Committee to fulfill its fiduciary duties in these Chapter 11 Cases.  The Committee's budget should be increased to an amount equal to one-third of the amount allocated to the Debtors' counsel and financial advisor.

>       d.  <u>Section 506(c) Surcharge Waiver.</u>  It is presently unclear whether the DIP Budget, which runs through April 2, 2023, provides for the payment in full of outstanding administrative claims not otherwise contemplated to be paid through the sale.  Until such time as it becomes clear that all costs of administering these Chapter 11 Cases have been adequately provided or reserved for, including the payment of all unpaid postpetition rent claims, stub rent claims, claims arising under section 503(b)(9) of the Bankruptcy Code (if any), and all priority claims of any kind, the Debtors should not be permitted to waive their section 506(c) surcharge rights.

**BID PROCEDURES OBJECTION**

37.     As with the DIP Facility and all other insider transactions, where a debtor seeks to sell substantially all assets through an expedited sale process under section 363 to an insider the sale requires closer scrutiny.  *See Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *see also In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, *27-28 (Bankr. D. N.J. Mar. 26, 2008) (quoting *In re Medical Software Solutions*, 286 B.R. 431, 445 (Bankr. D. Utah 2002) ("[W]hen a pre-confirmation [section] 363(b) sale is of all, or substantially all, of the Debtor's property, and is proposed during the beginning stages of the case, the sale transaction should be closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization").

**A.     The Proposed Sale Timeline is Unreasonable and Should be Extended**

38.     Given the limited scope and duration of the prepetition marketing process, the proposed 60-day sale timeline is insufficient for the Debtors to run a meaningful sale process in Chapter 11.  The Debtors' filings make clear that they only initiated their prepetition marketing efforts immediately before the Petition Date in December 2022, and that such process was conducted over the height of the holiday season.  The Committee has not yet determined whether unsecured creditors would benefit from additional marketing and a longer postpetition sale timeline more consistent with those typically approved in this District.  *See, e.g., In re Nine Point Energy Holdings, Inc*., Case No 21-10570 (MFW) (Bankr. D. Del. April 12, 2021) [Docket No. 239] (order approving 94-day sale process); *In re Orchids Paper Products Co.,* Case No 19-10729 (MFW) (Bankr. D. Del. May 20, 2019) [Docket No. 179] (order approving 91-day sale process*); In re Melinta Therapeutics, Inc.,* Case No. 19-12748 (LSS) (Bankr. D. Del. Feb. 11, 2020) [Docket

No. 280] (order approving 74-day sale process); *In re Apex Linen Service LLC*, Case No. 20-11774 (LSS) (Bankr. D. Del. Sept. 22, 2020) [Docket No. 227] (order approving 78-day sale process); *In re Alex and Ani, LLC*, Case No. 21-10918 (CTG) (Bankr. D. Del. July 16, 2021) [Docket. No. 218] (order approving 79-day sale process); *In re BC Hospitality Grp. Inc.*, Case No. 20-13103 (BLS) (Bankr. D. Del. Jan. 7, 2021) [Docket No. 102] (order approving 80-day sale process).

39.     At minimum, the sale timeline should be sufficiently extended to allow the Committee to complete its investigation into potential estate claims before the bid deadline, so all parties-in-interest have transparency regarding the Debtors' assets and the value thereof. Kinderhook should not be permitted to impose artificial sale milestones and funding constraints to deprive the Committee of its statutory investigation rights, and quickly close a sale on the assets of the company it's owned for over a year.

**B.     The Proposed Bid Procedures Will Chill Bidding for Kinderhook's Benefit**

40.     One of the primary purposes of the Bankruptcy Code is to maximize the value of the bankruptcy estate for the benefit of all creditors.  *See Metropolitan Airports Comm'n v. Northwest Airlines (In re Midway Airlines)*, 6 F.3d 492, 494 (7th Cir. 1993); *see also Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (a debtor, as a fiduciary to the estate, has a duty to maximize the value of the estate). To further this purpose, sale procedures must seek to "facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-66 (8th Cir. 1997) (bankruptcy courts are given discretion and latitude in order to facilitate a fair and open public sale focused on maximizing value).

41.     Bid procedures must be evaluated for their fairness and reasonableness.  *See In re American Safety Razor Co., LLC*, Case No. 10-12351 (MFW) (Bankr. D. Del. Sept. 30, 2010) Tr.

at 132-33 ("I don't think, as the debtors suggest, that my consideration of bid procedures is based on the business judgment rule. I need not accept the debtors' business judgment with respect to process. The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all matters . . . for the Court's determination as to what is fair and reasonable. In fact, I think that's my only role in this case; to determine what is fair for all the parties."). Any procedures that would have the net effect of discouraging, rather than encouraging, potential bidders should be rejected. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 535-37 (3d Cir. 1999) (recognizing that more competitive bidding will bring greater benefit to the estate).

42.     The Bid Procedures presently include several provisions that unduly benefit Kinderhook and will chill bidding:

   a.  <u>No Committee Consultation Rights</u>.  The Bid Procedures improperly strip the Committee of its customary consultation rights over the sale process, including with respect to, among other things, the designation of Qualified Bidders and the selection of the Successful Bid.

   b.  <u>Excessive Bid Protections</u>.  The Bid Procedures currently provide for the payment of a $2.2 million break-up fee and an expense reimbursement of up to $500,000 to the Stalking Horse Bidder in the event it is not the successful bidder.  Such fees are excessive given that the Stalking Horse Bidder is affiliate of the Debtors' existing equity sponsor.  Kinderhook already has in-depth knowledge of the Debtors' financial condition, operations, and financial projections, and unfettered access to whatever information it needs. While the amount of the break-up fee and expense reimbursement may be consistent with fees awarded to non-insider buyers outside of the Debtors' capital structure, these fees are excessive given Kinderhook's role as the Debtors' equity sponsor and should be reduced.

## <u>RESERVATION OF RIGHTS</u>

43.     The Committee expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections to the Motions and the final orders approving the foregoing, and to introduce evidence

prior to or at any hearing regarding the Motions in the event that the Committee's objections are not resolved prior to such hearing.

WHEREFORE, the Committee respectfully requests that this Court sustain this Objection and grant the Committee such other and further relief as this Court deems just and appropriate under the circumstances.

Dated:  February 20, 2023
      Wilmington, Delaware

COLE SCHOTZ P.C.

*/s/ G. David Dean*
G. David Dean (No. 6403)
Michael E. Fitzpatrick (No. 6797)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com
mfitzpatrick@coleschotz.com

-and-

Seth Van Aalten, Esq. (admitted *pro hac vice*)
Sarah A. Carnes, Esq. (admitted *pro hac vice*)
Bryant P. Churbuck, Esq. (admitted *pro hac vice*)
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
scarnes@coleschotz.com
bchurbuck@coleschotz.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*