# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC, *et al.*,[1] | ) |
| | ) Case No. 23-10047 (LSS) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) Related to Docket Nos. 17 and 150 |
| | ) |

**DEBTORS' REPLY IN FURTHER SUPPORT OF MOTION FOR ENTRY OF: (I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL ASSETS, (B) APPROVING THE BID PROTECTIONS TO THE STALKING HORSE BIDDER, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (E) AUTHORIZING ENTRY INTO THE STALKING HORSE AGREEMENT, (F) APPROVING BID PROTECTIONS, (G) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (H) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") hereby submit this reply ("Reply") in support of the *Debtors' Motion for Entry of : (I) an Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All Assets, (B) Approving the Bid Protections to the Stalking Horse Bidder, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, (E) Authorizing Entry into the Staking Horse Agreement, (F) Approving Bid Protections, (G) Approving Procedures for the Assumption and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

10386720.v4

*Assignment of Contracts and Leases, and (H) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 17] ("<u>Sale and Bidding Procedures Motion</u>")[2] and in response to the objections filed by the United States Trustee (the "<u>UST</u>") [Docket No. 150] (the "<u>UST Objection</u>") and the Official Committee of Unsecured Creditors (the "<u>Committee</u>") [Docket No. 152] (the "<u>Committee Objection</u>") related thereto.

## PRELIMINARY STATEMENT

1.  In late December 2022, the Debtors were experiencing financial distress with an ongoing drain on cash flow and the lack of any source of long-term additional liquidity. Worse still, one of the members of the Committee had threatened to file an involuntary petition against at least one of Debtor entities. Against this backdrop, Kinderhook, through its affiliated entities, agreed to serve as both the DIP Lender and the Stalking Horse Bidder—when no other parties were willing to do so, including a member of the Committee.

2.  In so doing, the Debtors and Kinderhook have agreed on a sale process that not only represents a value-maximizing, going concern sale of substantially all of the Debtors' assets, but provides for a recovery to Twin Brook, the Debtors' senior secured lender, and certain unsecured creditors. Moreover, Kinderhook's willingness to serve as the Stalking Horse Bidder will enhance the bidding process—which has continued post-petition—by providing a floor that prospective bidders must clear. In exchange, Kinderhook requested certain customary bid protections.

---

[2]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms as set forth tin the Sale and Bidding Procedures Motion.

2

3. Though the Debtors now have a path forward to help maximize value for all stakeholders, the UST and Committee have lodged objections that, if sustained, could derail that sale process and harm the Debtors' customers, employees, vendors, and other stakeholders.

4. The Committee, for its part, complains that the proposed sale timeline is unreasonable, particularly in light of "the limited scope and duration of the prepetition marketing process." However, the Committee also indicates that it has not yet determined whether unsecured creditors would benefit from additional marketing and a longer postpetition sale timeline." *See* Committee Objection ¶38. First, the Committee should not be heard to complain about the purportedly brief prepetition marketing process when it was the actions of its members that forced the Debtors to accelerate a filing. Secondly, the Debtors have demonstrated that additional marketing is not necessary and will be value destructive, especially if the proposed Stalking Horse Agreement is lost.

5. In fact, the timeline for the formal marketing process and bankruptcy filing was driven by liquidity constraints, filed and threatened litigation, and the threatened involuntary bankruptcy filing. Given these circumstances and no other actionable proposals, the Debtors began negotiations with the Stalking Horse Bidder, who among other things, insisted on the inclusion of "milestone" dates by which the Debtors would be required to complete certain aspects of the proposed sale process (the "Milestones"). These Milestones are intended to preserve the going-concern value of the business through a timely, efficient sale process that culminates in a closing by March 31, 2023, which will maximize value and avoid disruption and harm to the Debtors' seasonal business.

6. Although the Assets were adequately marketed before the Petition Date, pursuant to the terms of the Stalking Horse Agreement, the Debtors and their professionals will continue

to market the Assets to potential buyers through the Bid Deadline. Given the prepetition marketing effort, the number of parties that already have executed NDAs, the fact that the Assets were already recently marketed to the most likely bidders for Assets of the type being sold, and the other options available to the Debtors prior to the Stalking Horse Bidder's willingness to enter into the Stalking Horse Agreement and buy the Assets as a going concern compared with other alternatives explored, the marketing process up to this point and as continued post-Petition Date pursuant to the Bid Procedures is adequate to achieve the greatest possible level of interest and consideration for the Assets in the Chapter 11 Cases.  Further, the marketing process will continue through the Auction in accordance with the terms set forth in the Bid Procedures.

7. In addition to the proposed sale timeline, both the UST and the Committee provide some cursory objections to the Bid Procedures.  But the Bid Procedures proposed by the Debtors provide for a fair, open, and competitive process that offers transaction certainty to prospective purchasers and the Debtors' customers and employees. The proposed bidding procedures also encourage and stimulate a bidding environment for the sale of the Debtors' assets that is as competitive as possible and offers the Debtors the best opportunity to maximize value for their estates in light of their liquidity situation.  The Bid Protections are also reasonable and necessary to induce the Stalking Horse Bidder to enter into the transactions encompassed by the Stalking Horse Agreement and obtain the highest price possible for the Debtors' assets.

8. To date, the Stalking Horse Agreement represents the highest and best offer for the Assets and will enhance the bidding process by providing a floor that prospective bidders must clear, ensuring that only serious, financially capable bidders participate in the Auction. Without the Bid Protections, including the Break-up Fee, the Stalking Horse Bidder would not have offered the purchase price.  If higher offers for the Assets are received, it will be because

the Stalking Horse Bidder agreed to serve as a "stalking horse" for such offers and set a minimum floor no one else was prepared to provide.

9.	Finally, the Bid Procedures, Bid Protections, and DIP Facility, which is required to fund the process, are the product of arm's-length negotiations between the Debtors and the Stalking Horse Bidder and DIP Lenders, respectively, and they furnish the Debtors with the means to both sell their assets at the highest possible price in a fair and expeditious process and wind down their affairs (with the aid of a wind-down budget) in a manner most likely to enhance the recoveries of all creditors.

## REPLY

**A.	Summary of the Proposed Transaction and Bid Procedures**

10.	Under the terms of the Stalking Horse Agreement, the Stalking Horse Bidder will purchase the Assets for an aggregate purchase price (the "Purchase Price") consisting of:

(a)	a credit bid of the outstanding obligations under the DIP Credit Agreement pursuant to section 363(k) of the Bankruptcy Code in the amount of Ten Million Dollars ($10,000,000);

(b)	the payment of an amount in cash equal to Five Hundred Thousand Dollars ($500,000) (the "Cash Payment");

(c)	the assumption by the Buyer of the outstanding obligations under the Prepetition First Lien Credit Agreement (as defined in the Financing Orders);

(d)	the assumption by Buyer of the Assumed Liabilities (including all Determined Cure Costs with respect to any Assumed Contract)[3]; and

(e)	the Wind-Down Amount; provided that the Wind-Down Amount shall only become payable as a portion of the Purchase Price in the event that (i) Sellers have insufficient cash on hand at Closing to fund the Wind-Down Amount from such cash on hand and (ii) the Sellers have otherwise complied in all respects with the Financing Orders, in which case the Buyer shall only be required to fund the amount

---

[3]	For avoidance of doubt, any and all Liability of the Debtors to or any Claim held by Chongqing Huansong Industries (Group) Co., Ltd., Chongqing Huansong Science and Technology Industrial Co., Ltd., Vietnam New Century Industrial Company Limited, Hisun China, and Hisun Motors Corp. U.S.A. and each of their affiliates and subsidiaries are not being assumed by the Stalking Horse Bidder and are Excluded Liabilities.

necessary to bring the Sellers' total cash on hand at Closing to equal to the amount of the Wind-Down Amount.

11. The Debtors and their advisors developed the Bid Procedures to be flexible, transparent, and competitive in order to attain the highest or otherwise best price for the business under the circumstances. Under the Bid Procedures, qualified parties may submit bids that will be analyzed by the Debtors and their professionals, which will culminate in the Debtors designating the Stalking Horse Bidder or other Qualified Bidder as the Successful Bidder to purchase the Assets (or a portion thereof). The Debtors believe that the Bid Procedures, in connection with the Stalking Horse Agreement, will provide the best opportunity to consummate a value-maximizing transaction that also secures employment for the Debtors' employees and preserves the going-concern value of the enterprise.

12. Given the prepetition marketing process and the exigencies facing the Debtors, the Debtors believe that it is critical and warranted that the sale process be consummated on the timeline set forth in the Bid Procedures and this Motion to allow the Debtors to satisfy the Milestones. The sale timeline was specifically designed to balance the goals of (a) continuing a marketing process, and (b) preserving and maximizing the value of the Assets, while also considering the reasonably anticipated market value of the Assets, and the value deteriorating cost of a protracted Chapter 11 sale process.

**B. The Break-Up Fee, Expense Reimbursement, and Bid Protections are Necessary**

13. The Debtors and Stalking Horse Bidder engaged in extensive negotiations with respect to the Expense Reimbursement and Break Up Fee, the required deposit for qualified bidders, and other Bid Protections. As an initial matter, these terms were material to the Stalking Horse Bidder's ultimate decision to assist in the preparation of the Debtors' business and assets for sale and the DIP Lenders' decision to fund the Debtors' cases and sale process. The Debtors,

in their business judgment, have determined that these terms are in the best interest of the Debtors and their creditors, and will ultimately lead to a robust auction and sale process.

14.     The Bid Protections are integral components of the Stalking Horse Agreement and were necessary to induce the Stalking Horse Bidder to provide binding commitments to purchase certain of the Debtors' assets.  Further, the Stalking Horse Agreement is the product of hard fought, arms'-length negotiations.  In return for the significant benefits provided by the Stalking Horse Agreement, the Debtors agreed to provide the Bid Protections to the Stalking Horse Bidder.

15.     The Break-Up Fee was calculated as a percentage of the overall purchase price and takes into account the Assumed Liabilities.  The Stalking Horse Bidder's assumption of the Assumed Liabilities provides a significant amount of value to the Debtors as it provides for the payment of all of the Debtors' secured debt and a significant amount of the Debtors' unsecured debt.  Ignoring the Assumed Liabilities in the calculation of the appropriate bid protections, as the UST suggests, would treat the Stalking Horse Agreement the same as an agreement that did not provide for the assumption of liabilities.  The cash component of the Stalking Horse Agreement, if it was the only consideration, would be sufficient to fund a single digit recovery to only the first lien secured creditor, therefore, the cash component alone is not the true measure of the consideration under the Stalking Horse Agreement.  Such an agreement is vastly inferior to the reality of the Stalking Horse Agreement, which provides for the full recovery to the Debtors' secured creditors and the majority of its unsecured creditors, and assumes the outstanding obligations under the DIP Facility.  Ignoring such components of the Stalking Horse Agreement ignores the realities of the transaction.  When the Assumed Liabilities are accounted for in the overall purchase price, the Break-Up Fee is approximately 3% which is standard in this District as set forth below.

16. The Debtors also seek authority to pay expense reimbursement to the Stalking Horse Bidder in an amount up to $500,000 if the Stalking Horse Bidder is not the Successful Bidder. For the reasoning set forth below, the proposed expense reimbursement is standard in this District.

    **a. Applicable Standard**

17. Break-up fees and related bid protections are designed to encourage competitive bidding with respect to the debtor's assets and assure that the highest and best price for such assets is ultimately obtained at the auction. In keeping with this purpose, approval of break-up fees and related bid protections is governed by the standards established by the Third Circuit Court of Appeals in *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F. 3d 527 (3d Cir. 1999) and *In re Reliant Energy Channelview LP*, 594 F.3d 200 (3rd Cir. 2010).

18. In *O'Brien*, the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must benefit a debtor's estate. *O'Brien*, 181 F.3d at 533.

19. The *O'Brien* court identified at least two circumstances in which bidding incentives may benefit the estate. First, there may be a benefit if "assurance of break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537; *see Reliant*, 594 F.3d at 206 (break-up fee is not "'necessary to preserve the value of the estate' when the bidder would have bid even

without the break-up fee." (*citing* Bruce A. Markell, The Case Against Breakup Fees in Bankruptcy, 66 Am. Bankr. L.J. 349, 359 (1992)).

20. Where the availability of bidding incentives induce a bidder to fully diligence the value of the debtor's assets and perform the work necessary to submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *O'Brien*, 181 F.3d at 537.

### b. Application to The Facts in These Cases

21. Under the standards adopted by the Third Circuit in *O'Brien* and *Reliant*, the Break-Up Fee and Expense Reimbursement should be approved. Both the threshold criteria as to the benefit to the estates and all of the other factors enumerated by the Third Circuit have been satisfied in the case of the Stalking Horse Agreement. As to benefit to the estate, the Stalking Horse Bidder was in no way obligated to come to the table as a stalking horse bidder here.

22. At the time the Bid Protections were negotiated, if no bids were received—which, without a stalking horse bid, was the only possibility—the Debtors had no other options other than a freefall bankruptcy process with no path forward towards a positive outcome or proposed outcome. Such a scenario would have been devastating to the Debtors and their business.

23. Instead, the Debtors and Stalking Horse Bidder spent the remaining time available before an impending involuntary bankruptcy filing deadline negotiating a stalking horse purchase agreement with the Debtors that set a floor for any additional bids. This floor provides for the assumption of all of the secured debt of the Debtors as well as a significant amount of the unsecured debt, providing for a full recovery to a significant amount of the Debtors' creditors. The alternative to such floor would be a recovery that would be speculative at best and unlikely

to exceed the Debtors' first lien debt. In exchange for setting the floor of meaningful recoveries to all creditor classes, the Stalking Horse Bidder required the Bid Protections. Thus, as in *O'Brien*, this is a circumstance where "assurance of break-up fee" engendered material benefits for the Debtors by "promot[ing] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537.

24. This is also a case where the work done by a bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtors' assets are sold will reflect its true worth. *Id*. at 537. Despite the contentions to the contrary by the UST and Committee, this is not a circumstance where the Stalking Horse Bidder had no need to undertake due diligence or perform significant work to make a stalking horse bid. U.S. Trustee Obj. ¶ 22; Committee Obj. ¶ 42. While the Stalking Horse Bidder has familiarity with the Debtors and their assets, the decision to serve as the Stalking Horse Bidder has compelled them to take their knowledge of the Debtors and their assets to a new level by engaging in hours of diligence and the incurrence of significant legal fees associated with negotiating, documenting and facilitating approval of the Stalking Horse Agreement. Among other things, the work undertaken by the Stalking Horse Bidder was necessary to determine that the Debtors' business was worth the incurrence of an additional $10 million of new money to preserve the going concern of the business.

25. In the process, the Stalking Horse Bidder has worked side by side with the Debtors to evaluate all potentially saleable assets, contracts, and claims, ultimately refining an asset purchase agreement and preparing schedules that all other potential purchasers may use. These efforts were not necessary for the Stalking Horse Bidders' interests in the Debtors prior to this

process and have provided a roadmap for other potential purchasers as to what the Debtors' go-forward business should look like. All of this will make it more likely than not that "the price at which the debtor is sold will reflect its true worth." *O'Brien*, 181 F.3d at 537. Thus, the Break-Up Fee and the Expense Reimbursement are, contrary to the contentions of the UST and Committee contentions, "truly bid protections," and not "blocking devices," and, in no way will these "bid protections," if approved, "chill the bidding process" or "unduly benefit Kinderhook."

26. Finally, paying the Break-Up Fee and Expense Reimbursement to a stalking horse bidder that is not the successful bidder is both reasonable and customary in this type of transaction (*i.e.*, in cases involving both existing secured creditor and non-existing secured creditor stalking horse bids). *See, e.g., In re Celadon Grp., Inc.*, Case No. 19–12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) (authorizing a break-up fee of up to 3% of the purchase price); *In re Bumblebee Parent Inc., et al.,* Case No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) (approving a break-up fee of approximately 2.5% of the purchase price); *In re Bayou Steel BD Holdings, L.L.C.,* Case No. 19–12153 (KBO) (Bankr. D. Del. Nov. 8, 2019) (approving a break-up fee of up to 3% of the purchase price); *In re Fisker Automotive Holdings*, Case No. 13-13087 (KG) (Bankr. D. Del. Jan. 23, 2014) (granting expense reimbursement of $500,000 to competing existing secured creditor and non-existing secured creditor stalking horse bidders); *In re SRC Liquidation*, Case No. 15-10541 (BLS) (Bankr. D. Del. April 15, 2015) (maximum reimbursement amount not to exceed $1.5 million granted to prepetition lender for serving as stalking horse); *In re Emerald Oil*, Case No. 16- 10704 (KG) (Bankr. D. Del. July 28, 2016)(approving break-up fee of 3% and expense reimbursement up to 1% of the $73 million base purchase price to certain prepetition lenders for serving as stalking horse purchaser); *In re Vertis Holdings, Inc.*, Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) (approving break-up fee of 3.0% for non- existing secured creditor

stalking horse bidder in connection with a $258 million sale of assets); *In re Solyndra LLC*, Case No. 11-12799 (MFW) (Bankr. D. Del. Sept. 28, 2012) (approving break-up fee of 2.6% for non-existing secured creditor stalking horse bidder in connection with $90 million sale of assets); *In re Conex Holdings, LLC*, Case No. 11-10501 (CSS) (Bankr. D. Del. Sept. 14, 2011) (approving break-up fee of 3% of final purchase price for non-existing secured creditor stalking horse bidder). *In re RM Holdco LLC*, Case No. 18-11795 (Bankr. D. Del. Sep. 6, 2018) (MFW) (same).[4] There is no reason that such bid protections should not be afforded to the Stalking Horse Bidder with respect to the Stalking Horse Agreement.

27. The amount of the proposed Bid Protections and Expense Reimbursement are reasonable and appropriate in light of the size and nature of the Sale and the efforts that have been and will be expended by the Stalking Horse Bidder. The Stalking Horse Bidder has performed and will continue to perform substantial incremental work to formulate, document, and close the Stalking Horse Transaction, and has conducted substantial due diligence concerning the Debtors' business and Assets. These efforts have placed the Debtors in a position to maximize the going concern value of their business for the benefit of all stakeholders.

28. Moreover, the Bid Protections, including the Break-Up Fee, and the Expense Reimbursement are necessary to preserve the value of the estate and were necessary to secure the Stalking Horse Bidder's commitment under the Stalking Horse Transaction. As such, the Bid Protections provide the Debtors with a platform from which to ensure a value-maximizing transaction for the benefit of their estates, creditors, and stakeholders.

29. Finally, the Break-Up Fee and Expense Reimbursement were material to the negotiation of the relevant agreements with the Stalking Horse Bidder. The Debtors, after

---

[4] Copies of all unreported decisions cited herein will be made available at the Court's request.

extensive marketing and negotiations, have received no offers from potential purchasers that are superior to those described in the Bid Procedures Motion.[5]

WHEREFORE, the Debtors respectfully request this Court: (i) enter the Bid Procedures Order, and (ii) grant such other and further relief as is just and proper.

| | |
|---|---|
| Dated: February 21, 2023<br>Wilmington, Delaware | */s/ Michael W. Yurkewicz*<br>Domenic E. Pacitti (DE Bar No. 3989)<br>Michael W. Yurkewicz (DE Bar No. 4165)<br>Sally E. Veghte (DE Bar No. 4762)<br>**KLEHR HARRISON HARVEY BRANZBURG LLP**<br>919 North Market Street, Suite 1000<br>Wilmington, Delaware 19801<br>Telephone:    (302) 426-1189<br>Facsimile:    (302) 426-9193<br>Email:  dpacitti@klehr.com<br>            myurkewicz@klehr.com<br>            sveghte@klehr.com<br><br>-and-<br><br>Morton R. Branzburg (admitted *pro hac vice*)<br>**KLEHR HARRISON HARVEY BRANZBURG LLP**<br>1835 Market Street, Suite 1400<br>Philadelphia, Pennsylvania 19103<br>Telephone:    (215) 569-3007<br>Facsimile:    (215) 568-6603<br>Email: mbranzburg@klehr.com<br><br>*Counsel to Debtors and Debtors in Possession* |

---

[5] The Committee also complains that it has not been given consultation rights over the sale process, including with respect to the designation of Qualified Bidders and the selection of the Successful Bid, and that this unduly benefits Kinderhook and will chill bidding. Yet at no point does the Committee even attempt to explain how the lack of any such consultation rights could chill bidding or unduly benefit Kinderhook. Moreover, the fact that two out of the three members of the Committee initiated litigation against the Debtors and have no shown no interest in seeing the Debtors successfully reorganize, Committee consultation rights would be wholly inappropriate in this case.