**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: <br><br> PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC, *et al.*,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 23-10047 (LSS) <br><br> (Jointly Administered) <br><br> Related to Docket Nos. 13 and 151 |

**DEBTORS' REPLY IN FURTHER SUPPORT OF MOTION FOR ENTRY OF A FINAL ORDER PURSUANT TO U.S.C. §§ 105, 361, 362, 363, 364, 503, AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR AND JUNIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) AUTHORIZNG USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") hereby submit this reply ("Reply") in support of the *Debtors' Motion for Entry of Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 13] ("DIP Motion") and in response to the objections filed by the United States Trustee (the "UST") [Docket No. 151] (the "UST Objection") and Official Committee of Unsecured Creditors (the "Committee") [Docket No. 152] (the "Committee Objection") related thereto.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

1

10386646.v6

**PRELIMINARY STATEMENT**

1.  There is no dispute that the Debtors' proposed DIP Facility[2] is critical to preserving the value of the Debtors' estates and maximizing the likelihood of a going-concern sale and exit plan. Nor is there any dispute that the Debtors' decision to enter into the DIP Facility occurred after an arms'-length negotiation surrounding the terms of the DIP Facility, and that each provision of the DIP Facility is integral to the overall agreement. The Debtors would not be able to obtain the DIP Facility without the release in question here, which is necessary to the Debtors' value-maximizing sale process. Indeed, as all the stakeholders in this case have recognized, the Debtors need the DIP Facility as it will provide them with the liquidity necessary to fund these chapter 11 cases and the Debtors' going-concern sale and exit plan. Without the release, the Debtors would be unable to obtain the DIP Facility and thus would be unable to conduct the sale process and all going-concern value would be lost.

2.  Against this backdrop, it is no surprise that the UST and Committee's primary objection to the DIP Facility relates to the scope, breadth, and timing of the release. But this objection has now been addressed, as the Debtors have narrowed the definition of "Releasing Parties" so that it includes only the Debtors. Moreover, the Debtors have made clear that Godfrey[3] is not released of any claims the Debtors may have against him. In so doing, the Debtors have resolved the concerns raised by the US Trustee and the Committee surrounding the scope and breadth of the release by limiting the release to claims the Debtors may have against Kinderhook. And, while the Debtors and the DIP Lender were willing to narrow the scope of the release, the release was—and is—critical to the DIP Lender's willingness to

---

[2]   Capitalized terms used but not defined herein have the meaning ascribed to them in the DIP Motion.

[3]   [We will update Final DIP Order] [Need to conform release quoted in this reply to Final DIP Order language]

2

provide the DIP Facility. As such, the DIP Facility continues to provide for a release of the DIP Lender and affiliates upon entry of the Final DIP Order.

3.      The Debtors submit that the release is necessary and appropriate at this time. The Debtors' willingness to agree to this release was informed by an investigation that the Debtors and their advisors, including the Disinterested Director, performed pre-petition into the potential claims being released. Based on the work performed in this investigation, the Debtors concluded that they do not have any viable claims against the DIP Lender or its affiliates and were therefore willing to agree to the release contained in the DIP Facility.

4.      Immediately after the Committee retained counsel (in fact, within 30 minutes) the Debtors provided Committee counsel with thousands of pages of documents collected during the course of their investigation. This production included, among others, (a) transaction documents related to the 2021 transaction, Twin Brook Credit Agreement, First Amendment to the Twin Brook Credit Agreement, Second Amendment to the Twin Brook Credit Agreement, and UCC searches; (b) company documents collected from the form CEO's and CFO's company email accounts totaling 5,176 documents, (c) documents and email of the Disinterested Director totaling 697 documents, (d) miscellaneous documents including documents surrounding both the 2021 marketing process and the pre-petition marketing process, and (e) 1,270 documents from Kinderhook in response to document requests during the Disinterested Directors investigation. The Debtors also had several meetings with Committee counsel, and Committee counsel conducted a three hour interview of the Debtors' Disinterested Director. Additionally, the Committee's proposed financial advisor meet with the Portage Pont Partners and received information related to the Debtors' financial condition, forecasts, and a full download of the sales and marketing process. Since that time, the Committee has not asked for

any additional information or documents and has not requested any follow-up interviews. Most tellingly, the Committee has failed to identify any potentially viable claim against Kinderhook.

5.  Indeed, as the Committee itself notes, the facts of this case warrant a thorough investigation. But the Committee wrongly suggests that it needs to conduct that investigation. As noted, that thorough investigation has already been conducted by the Disinterested Director. And, as the evidence at the hearing will show, there are no viable claims against Kinderhook, and the release should be approved as part of the settlement contained in the DIP Facility.

## REPLY

5.  The Debtors' decision to seek approval of the DIP Facility on a final basis, including the release, is a reasonable exercise of the Debtors' business judgment. Notwithstanding the Committee's assertions to the contrary, the business judgment standard is applied to the selection of DIP financing unless the opposing party can demonstrate one of four elements:

(1) The directors did not in fact make a decision,
(2) The directors' decision was uninformed,
(3) The directors were not disinterested or independent, or
(4) The directors were grossly negligent.

*In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011). Beyond some conclusory allegations, the Committee has not demonstrated that any of these elements are met, much less pointed to ***any*** supporting facts or evidence. Instead, all of the facts and evidence will demonstrate that the decision to enter into the DIP Facility was made by an independent director who exercised his well-informed independent judgment with due care. Without proof to the contrary (and again, there is none), the business judgement standard must be applied.

Unable to point to any evidence, the Committee suggests that the entire fairness doctrine should be applied to the transaction by citing two cases that are wholly inapplicable to the Debtors and the financing at issue. First, the Committee cites *Kahn v. Lynch Communication Sys., Inc*.,

638 A.2d 110 (1994), which involved a cash-out merger case where a dominating shareholder sat on both sides of the transaction. *Kahn* has no application here as the Disinterested Director made the decision to enter into the DIP Facility. Kinderhook was not involved in any way in the approval of the DIP Facility or the Investigation. Second, the Committee asserts that *In re John Q. Hammons Hotels Inc. S'holder Litig*, Civ. Act. No. 758-CC, 2009 WL 3165613 (Del. Ch. Oct. 2, 2009) suggests that the entire fairness standard should be applied. To the contrary, the Chancery Court in that case concluded that the business judgment standard would be applied "if the transaction were (1) recommended by a disinterested and independent special committee, and (2) approved by stockholders in a non-waivable vote of the majority of all of the minority stockholders." That scenario is essentially what has occurred here – the independent Disinterested Director negotiated and recommended the DIP Facility, including the release, and the DIP Facility was approved unanimously by all other disinterested directors. Accordingly, the business judgment standard should be applied.[4]

6.    Courts are highly deferential to a debtor's reasonable business judgment when determining if entry into a financing agreement is permissible. *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990). "The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

---

[4] In any event, even if the entire fairness doctrine were applied to the decision to enter into the DIP Facility, the transaction should still be approved.

7. Bankruptcy courts defer to a debtor's business judgment with respect to the decision to seek additional financing and incur additional indebtedness. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003). A debtor's decision to obtain secured financing is entitled to judicial deference and may be overruled "only if it is made clear that [the] decision [is], inter alia, clearly erroneous, [is] made on the basis of inadequate information or study, [is] made in bad faith, or [is] in violation of the Bankruptcy Code." *Id.* Under the "business judgment" standard, "courts defer to corporate officers' decisions on matters entrusted to their business judgment absent a showing of bad faith or gross abuse of that judgment, and this rule extends to bankruptcy proceedings." *In re Spansion, Inc.*, 426 B.R. 114, 140 (Bankr. D. Del. 2010) ("It is not appropriate to substitute the judgement of the objecting creditors over the business judgment of the Debtors."); *Quality Inns Int'l., Inc. v. L.B.H. Assocs. Ltd. P'ship*, Nos. 89-2443 to 89-2445, 1990 WL 116761, at *7 (4th Cir. July 26, 1990), *cert. denied*, 498 U.S. 1083 (1991); *see also In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (describing generally the business judgment standard).

      **A.**     **The Proposed Final DIP Order Removes Provisions of the Release Which Are Otherwise Objectionable to the UST and the Committee and Satisfies Bankruptcy Rule 9109.**

8. The UST and the Committee take issue with the broad release sought by the Debtors. UST Objection ¶ 14; Committee Objection at p. 4. Mindful of the issues raised by the UST and the Committee, the Debtors and the DIP Lender worked to revise the release language to address those objections. Specifically, the UST and the Committee found objectionable the breadth of the definition of Releasing Parties as including non-debtors, who may not have been afforded notice or who are not otherwise part of the settlement. Both the Debtors and DIP Lender believe the revised release language addresses the UST's and the Committee's concerns.

9. The release, which is found at paragraph 4.14 of the Proposed Final DIP Order (marked to show changes form the provision in the Interim DIP Order) now provides as follows:

4.14 <u>Releases</u>. ~~Subject to and upon entry of a Final Order, in~~<u>In</u> exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Debtors, (in their own right~~,~~ <u>and</u> on behalf of their estates and ~~their current and former direct and indirect subsidiaries, and each such entity's and its current and former direct and indirect subsidiaries' current and former directors, officers, managers, predecessors, and successors and assigns, and each of such entity's current and former officers, members, managers, directors, principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, partners (including both general and limited partners), and~~<u>on behalf of each of their past, present, and future predecessors, heirs, subsidiaries, successors, and assigns) and any party acting by, through, or under any of the Debtors, or any of their estates, including any successor trustee or other estate</u> representative~~s~~, in ~~each case to the extent permitted by applicable law and solely in such parties capacity as such~~)<u>these Chapter 11 Cases or any Successor Case or party that could act by, through, or under any of the Debtors or their estates</u> (collectively, the "<u>Releasing Parties</u>") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the DIP Lender, and each such entity's current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "<u>Released Parties</u>") and their respective property and assets from any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of ~~the~~<u>this</u> Final Order, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated,

fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement, recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the Prepetition First Lien Credit Agreement, but excluding obligations of the DIP Lender under the DIP Facility arising after the date of ~~the~~this Final Order (collectively, the "Released Claims"). This paragraph is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties. ~~As of the entry of the Final Order, the~~Notwithstanding the releases and covenants in favor of the Released Parties contained above in this paragraph, such releases and covenants in favor of the Released Parties shall be deemed acknowledged and reaffirmed by the Debtors each time there is an advance of funds, extension of credit, or financial accommodation under this DIP Term Sheet, an Interim DIP Order or the DIP Loan Documents. As of the date hereof, there exist no claims or causes of action against the DIP Lenders with respect to, in connection with, related to, or arising from this DIP Term Sheet, an Interim DIP Order or the DIP Loan Documents that may be asserted by the Debtors or, to the Debtors' knowledge, any other person or entity. For the avoidance of doubt, the Released Claims do not include any claims that the Debtors may have against Richard Godfrey, Todd Gentry, and Christopher Hunter, or any entities affiliated with the same of any nature.  The releases granted in this paragraph 4.14 are final and binding and are not subject to a Challenge.

10. Critically, the changes to the release provision clarify that the release is by the Debtors and their estates and parties acting by or through the Debtors or their estates. The Debtors believe that this change addresses the issues raised by UST Objection and the Committee Objection.

**B.    The Release Should Be Approved as a Settlement**

11. As set forth in the *Supplement to the Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting*

*Related Relief* [Docket No. 88] (the "Supplement"), the release (as modified) should be approved as a settlement under Bankruptcy Rule 9019.

12. "To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (internal quotations omitted) (citing 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)). Settlements are considered "a normal part" of the chapter 11 process. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). Indeed, "compromises are favored in bankruptcy" because they minimize litigation and expedite the administration of a bankruptcy estate. *See Martin*, 91 F.3d at 393; *see also In re Key3Media Group, Inc.*, No. 03–10323 (MFW), 2006 WL 2842462, at *3 (D. Del. Oct. 2, 2006). Ultimately, approval of a compromise is within the "sound discretion" of the bankruptcy court who must "balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *E.g., Martin*, 91 F.3d at 393. Assessing this balance includes consideration of the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Id.; see also In re Nutraquest, Inc.*, 434 F.3d 639, 644-45 (3d Cir. 2006).

13. Notably, in determining whether to approve a proposed settlement, courts should not determine whether the debtor is getting the best possible settlement, but rather whether the compromise is reasonable. *See In re Integrated Health Services, Inc.*, Case No. 00-398 (MFW), 2001 WL 1820426, at *2 (Bankr. D. Del. Jan. 3, 2001) (explaining that in approving a settlement, a court is not to determine that the settlement is the best that can be achieved by the debtor but

"rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness'").

14. Moreover, when deciding whether to approve a compromise, a court will normally accept the judgment of the movant if a legitimate business justification exists. *E.g., Martin*, 91 F.3d at 395; *In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 250 (D. Del. 1998); *see also In re Penn Central Transportation Co.*, 347 F. Supp. 1351, 1353 (E.D. Pa. 1972) (approving settlement agreement as reflection of business judgment).

15. The Debtors and their financial and legal advisors negotiated at length with Kinderhook and its advisors concerning the terms of the DIP Facility and Stalking Horse Agreement in the weeks leading up to the Petition Date and were able to obtain some key concessions. The Disinterested Director also played a key and active role in the negotiations to ensure the independence of the Debtors' decision-making with respect to the DIP Facility and the Stalking Horse Agreement. The investigation was conducted by the Disinterested Director and was comprehensive. The Disinterested Director and the Debtors' advisors reviewed thousands of documents, conducted numerous interviews, and undertook a detailed legal analysis of potential claims. Upon the recommendation of the Disinterested Director, the members of the Board—with all interested or conflicted members recused—unanimously approved entry into the DIP Facility after determining that entering into the DIP Facility and granting the release was appropriate.

16. Further, the *Martin* factors have been satisfied by the Debtors.[5] *First*, as set forth in more detail in the Supplement, the likelihood of success on any potential claims is speculative. *Second*, even setting aside that the Debtors are unlikely to succeed on their potential claims,

---

[5] We assume for purposes of these cases that the second *Martin* factor—the likely difficulty in collection—does not appear to be an issue.

pursuing them would impose substantial costs on the Debtors and their estates. As with most settlements of potential litigation claims, the proposed settlement would avoid time-consuming, costly, and uncertain litigation. *Third*, the proposed compromise of providing a release in exchange for the DIP Facility is in the "paramount interest of creditors" and results in an efficient, certain, value-maximizing resolution that is superior to any alternative outcome. The Debtors have no other actionable postpetition financing alternatives and a requirement of the DIP Facility is the release. The DIP Facility and Stalking Horse Agreement provides for assumption of a large portion of the Debtors' creditors and paves the way for the Debtors' business to remain a viable going concern. Put simply, time is of the essence.

17. The DIP Facility, including the release, is the product of good faith, extensive, and arm's-length negotiations between the Debtors and Kinderhook and its affiliates, each of which was adequately represented by separate counsel during the negotiations. In exchange for the release, the Debtors are receiving $10 million of new money to fund these cases and close a value-maximizing sale transaction as a going concern. Unlike many postpetition financings of this scale, the DIP Lender has agreed that the DIP Facility will be "credit bid" as part of the Stalking Horse Agreement.

18. Based upon the foregoing, there can be no question that granting the release in the DIP Facility does not "fall below the lowest point in the range of reasonableness." *Integrated Health*, 2001 WL 1820426, at *2 (*quoting Cosoff v. Rodman (In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983)). The DIP Facility is the result of substantial good-faith, arm's-length negotiations between the Debtors and Kinderhook, and constitutes a reasonable exercise of the Debtors' business judgment. Accordingly, this Court should approve the Cash Collateral and DIP Motion on a final basis including the approval of the release contained therein.

**C. Agreeing to the Release Is an Appropriate Exercise of the Debtors' Business Judgment**

19. The release provisions are part of an agreement between the Debtors and the DIP Lender to provide the DIP Facility on a final basis. Without the release provisions included as part of the overall deal, the Debtors do not believe that the DIP Lender would have agreed to proceed with the DIP Facility. The Debtors' decision to seek approval of the DIP Facility on a final basis, including the grant of release contemplated therein, satisfies this highly deferential business judgment standard.

20. The Debtors believe the release provisions are an appropriate tradeoff under the circumstances and entirely customary for DIP lenders. It is customary and typical to give releases to DIP lenders and affiliates. *See Transformation tech Investors, Inc.*, Case No. 20-12970 (MFW) (Bankr. D. Del. Dec. 2, 2020) [D.I. 46] at ¶18 (releases provided for affiliates of DIP lender); *In re In-Shape Holdings*, Case No. 20-13130 (LSS) (Bankr. D. Del. Jan 20, 2021) [D.I. 181] at ¶ 30 (releases provided for affiliates of DIP lender).

21. In this case, the DIP Facility must be viewed comprehensively and with regard to the facts and circumstances of these chapter 11 cases. As described more fully in the DIP Motion, the Bremer Declaration, and this Reply, the DIP Facility, including the release, is the product of extensive good faith, arms'-length negotiations between the DIP Lender and the Debtors, and represents not only the best, but the only viable, financing option available to the Debtors. The DIP Facility provides the Debtors with the necessary liquidity to fund the costs of these chapter 11 cases, fund operational costs that will lead to the sale of substantially all of the Debtors' assets as a going-concern, and allow for the orderly wind down of the Debtors' estates—all of which will directly benefit unsecured creditors.

22. Indeed, the Debtors' business cannot survive without financing, and no party has seriously argued otherwise. Without the DIP Facility, the Debtors will be forced to convert these cases to chapter 7 of the Bankruptcy Code and cease operations, to the detriment of all parties-in-interest, including the Committee's constituents. In fact, if not for the first tranche of the interim DIP Facility, the Debtors would have begun a chapter 7 liquidation weeks before the Petition Date. Further, it would not be possible to administer the Debtors' chapter 11 cases on a "cash collateral" basis as the Debtors would have been out of liquidity days after filing and would have been highly unlikely to last more than a few weeks on their liquidity runway.

23. The DIP Facility ensures stability in the Debtors' business operations as they proceed through these cases. Prior to their filing, the Debtors recognized the importance of demonstrating to their suppliers and vendors that the Debtors would be able to stem their prepetition financial deterioration and resume meeting their commitments during these chapter 11 cases. The Debtors' ability to direct such parties to their committed DIP financing was invaluable in this regard.

24. For these reasons, entry into the DIP Facility is a sound exercise of the Debtors' business judgment. Accordingly, the Debtors have satisfied the statutory requirements under sections 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rule 9019, and the UST Objection and Committee Objection should be overruled.

    **D.**    **The Investigation into Claims by the Debtors' Disinterested Director and Advisors Eliminates the Need for the Release to Include Exceptions for Actual Fraud, Willful Misconduct, or Gross Negligence.**

25. As noted above, the Debtors agreed to condition the grant of the release on the investigation of the Disinterested Director into the propriety of the proposed release and concluded that granting the release is a reasonable exercise of the Debtors' business judgment and is in the

best interest of the Debtors' estates. The scope of the investigation focused on any acts and omissions of the DIP Lender as well as an independent examination and assessment of legal issues relevant to the requested release. As a result of that investigation, the Debtors concluded that there are no viable claims against the DIP Lender or its affiliates and, as such, there is no need for the release to carve out actual fraud, willful misconduct, or gross negligence.

### B.     Entire Fairness

26.     <u>Fairness of Process</u>.  The Committee makes insufficient assertions to challenge the DIP Facility even if the entire fairness doctrine is applied.  The Disinterested Director conducted a fair and thorough investigation into the estates' causes of action.  Tellingly, the Committee and UST do not challenge the process that the Debtors' conducted except for a meager complaint about the Debtors' search for alternative financing.  The Committee's sole complaint is their assertion that the Debtors' filings are "bereft of any detail regarding the Debtors' efforts to secure postpetition financing from any other source, including from Twin Brook, their existing first lien lender." (Committee Obj. ¶ 26).  How or why the Committee makes such an assertion is unclear— particularly when the Debtors' filings thoroughly detail how they could not reasonably obtain alternative sources of financing given the realities imposed by the Debtors' existing capital structure and the deadline imposed by certain of the Committee members themselves.  Moreover, the Debtors' pleadings and declarations described how they entered into the DIP Facility only after their advisors performed a thorough analysis of potential alternative financing sources to the proposed DIP Facility, including Twin Brook.  Bremer Declaration ¶ 15.  The Debtors' advisors engaged with a wide range of stakeholders as potential sources of financing, including but not limited to the Debtors' sponsor, Kinderhook Industries, LLC and the Debtors' Prepetition Secured Parties, Twin Brook Capital Partners.  In addition, the Debtors' advisors reached out to third-party

institutions to inquire whether any of those parties would be willing to extend financing to the Debtors on an unsecured or junior priority basis. Bremer Declaration ¶ 15. Moreover, the DIP Facility is junior to the secured lender and there are no significant commitments following the entry of the Interim DIP Order, meaning that any party could have offered, and ultimately provided, a more favorable DIP facility at any time postpetition. Bremer Declaration ¶ 18. Absent the willingness of the DIP Lender to commit to DIP financing, the Debtors did not believe that any other party would be willing to offer DIP financing on terms equal to or better than the terms of the DIP Facilities. Bremer Declaration ¶¶ 15, 16.

27. Section 364(c) of the Bankruptcy Code only requires a debtor to demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *See Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). Although the Debtors attempted to locate DIP financing on more favorable terms, the Debtors were unable to procure alternative adequate financing and found further efforts to obtain comparable DIP lending futile. Bremer Declaration ¶¶ 15–16. Nor has any party since submitted an offer to commit financing on better terms than the DIP Facilities, including any financing on either an unsecured or administrative priority basis, *cf.* 11 U.S.C. 364(b), (c)(1).

28. <u>Fairness of Terms</u>. With respect to the fairness of the terms prong of the entire fairness doctrine, the Committee attacks the DIP Facility as containing release that are allegedly overly broad, that do not contain a carve out for fraud, willful misconduct, or gross negligence, and that release direct claims without the consent of the parties holding such claims. Each of these assertions have been addressed above. The Debtors have been able to negotiate significantly narrower release that should eliminate any complaint as to the terms of the DIP Facility. The

investigation conducted by the Disinterested Director eliminates the need for any carve-out for fraud, willful misconduct, or gross negligence. As modified, the release is necessary and appropriate and constitutes an integral part of the negotiation that will allow the Debtors to complete a value-maximizing transaction for the benefit of their estates and all creditors. The release is integral to the DIP Facility, which is integral to the Debtors' sale process. Simply put, without the release, there is no DIP Facility, there is no sale process, and instead the Debtors are in a forced liquidation that is unlikely to provide any recovery to any party outside of the Debtors' first lien lender.

      WHEREFORE, the Debtors respectfully request this Court enter the Final DIP Order and grant such other and further relief as is just and proper.

Dated: February 21, 2023  
Wilmington, Delaware

*/s/ Michael W. Yurkewicz*  
Domenic E. Pacitti (DE Bar No. 3989)  
Michael W. Yurkewicz (DE Bar No. 4165)  
Sally E. Veghte (DE Bar No. 4762)  
**KLEHR HARRISON HARVEY BRANZBURG LLP**  
919 North Market Street, Suite 1000  
Wilmington, Delaware 19801  
Telephone:   (302) 426-1189  
Facsimile:   (302) 426-9193  
Email:  dpacitti@klehr.com  
       myurkewicz@klehr.com  
       sveghte@klehr.com

-and-

Morton R. Branzburg (admitted *pro hac vice*)  
**KLEHR HARRISON HARVEY BRANZBURG LLP**  
1835 Market Street, Suite 1400  
Philadelphia, Pennsylvania 19103  
Telephone:   (215) 569-3007  
Facsimile:   (215) 568-6603  
Email:   mbranzburg@klehr.com

*Counsel to Debtors and Debtors in Possession*