## Exhibit A

**Stalking Horse Purchase Agreement**

*Execution Version*

**AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

**by and among**

**PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC,**

**PERFORMANCE POWERSPORTS GROUP HOLDINGS, INC.,**

**THE SUBSIDIARIES SET FORTH ON SCHEDULE I ATTACHED HERETO,**

**and**

**CPS USA ACQUISITION, LLC**

**February 24, 2023**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ..................................................................2

ARTICLE II PURCHASE AND SALE ............................................................13

**Section 2.1**    **Purchase and Sale of Purchased Assets** ....................13
**Section 2.2**    **Excluded Assets** ..................................................16
**Section 2.3**    **Assumption of Assumed Liabilities** .......................17
**Section 2.4**    **Excluded Liabilities** ...........................................19
**Section 2.5**    **Consideration** ....................................................19
**Section 2.6**    **Assumption and Assignment of Contracts.** ...........20
**Section 2.7**    **Closing** .............................................................21
**Section 2.8**    **Deliveries at Closing** .........................................21
**Section 2.9**    **Allocation** .........................................................22
**Section 2.10**   **Indemnification** ................................................22
**Section 2.11**   **Withholding** .....................................................22

ARTICLE III SELLERS' REPRESENTATIONS AND WARRANTIES ..................................23

**Section 3.1**    **Organization of Sellers; Good Standing.** ...............23
**Section 3.2**    **Authorization of Transaction** ...........................23
**Section 3.3**    **Noncontravention; Consents and Approvals** .......24
**Section 3.4**    **Compliance with Laws** ......................................24
**Section 3.5**    **Title to Purchased Assets** ..................................24
**Section 3.6**    **Contracts** ..........................................................25
**Section 3.7**    **Intellectual Property.** ........................................25
**Section 3.8**    **Litigation** .........................................................27
**Section 3.9**    **Employees and Employment Matters** ................27
**Section 3.10**   **Employee Benefit Plans.** ...................................28
**Section 3.11**   **Real Property.** ..................................................29
**Section 3.12**   **Permits** ...........................................................30
**Section 3.13**   **Environmental Matters** ....................................30
**Section 3.14**   **Brokers' Fees** ..................................................31
**Section 3.15**   **Tax Matters** ....................................................31
**Section 3.16**   **No Other Representations or Warranties** .............31

ARTICLE IV BUYER'S REPRESENTATIONS AND WARRANTIES ..................................32

**Section 4.1**    **Organization of Buyer** ......................................32
**Section 4.2**    **Authorization of Transaction** ...........................32
**Section 4.3**    **Noncontravention** .............................................33
**Section 4.4**    **Litigation** .........................................................33
**Section 4.5**    **Financial Capacity** ............................................33
**Section 4.6**    **Good Faith Purchaser** .......................................34
**Section 4.7**    **Brokers' Fees** ..................................................34

**Section 4.8** **No Outside Reliance** ..........................................................................34

ARTICLE V PRE CLOSING COVENANTS ....................................................................35

**Section 5.1** **Certain Efforts; Cooperation** ............................................................35
**Section 5.2** **Notices and Consents** ........................................................................36
**Section 5.3** **Bankruptcy Actions** ...........................................................................36
**Section 5.4** **Conduct of Business** ..........................................................................37
**Section 5.5** **Notice of Developments** ......................................................................39
**Section 5.6** **Access** ................................................................................................40
**Section 5.7** **Press Releases and Public Announcements** ........................................40
**Section 5.8** **Bulk Transfer Laws** ...........................................................................40

ARTICLE VI OTHER COVENANTS ...............................................................................41

**Section 6.1** **Cooperation** ......................................................................................41
**Section 6.2** **Further Assurances** ...........................................................................41
**Section 6.3** **Availability of Business Records** ........................................................41
**Section 6.4** **Employee Matters** ..............................................................................42
**Section 6.5** **Reserved** ............................................................................................44
**Section 6.6** **Transfer Taxes** ...................................................................................44
**Section 6.7** **Wage Reporting** .................................................................................44
**Section 6.8** **Acknowledgements** .............................................................................44
**Section 6.9** **Insurance Policies** ..............................................................................46
**Section 6.10** **Collection of Accounts Receivable** ....................................................46
**Section 6.11** **Data Privacy Protection** ....................................................................46
**Section 6.12** **Alternative Transactions** ...................................................................47
**Section 6.13** **Covenant Not to Sue** .........................................................................47
**Section 6.14** **Certain Tax Matters** ..........................................................................47
**Section 6.15** **Confidentiality** ..................................................................................47

ARTICLE VII 48

**Section 7.1** **Conditions to Buyer's Obligations** .....................................................48
**Section 7.2** **Conditions to Sellers' Obligations** .....................................................49
**Section 7.3** **No Frustration of Closing Conditions** ................................................50
**Section 7.4** **Waiver of Conditions** ..........................................................................50

ARTICLE VIII TERMINATION ........................................................................................50

**Section 8.1** **Termination** .......................................................................................50
**Section 8.2** **Procedure upon Termination** ..............................................................52
**Section 8.3** **Effect of Termination or Breach** ........................................................52

ARTICLE IX BANKRUPTCY COURT MATTERS .........................................................52

**Section 9.1** **Competing Bids** ..................................................................................52
**Section 9.2** **Bankruptcy Court Filings** ...................................................................53

**Section 9.3**    **Bankruptcy Court Milestones**..................................................53

ARTICLE X MISCELLANEOUS ......................................................................54

**Section 10.1**    **Remedies** .........................................................................54
**Section 10.2**    **Expenses** .........................................................................54
**Section 10.3**    **Entire Agreement**...........................................................54
**Section 10.4**    **Incorporation of Schedules, Exhibits and Disclosure Schedule** ..........54
**Section 10.5**    **Amendments and Waivers** ..............................................54
**Section 10.6**    **Succession and Assignment** ...........................................55
**Section 10.7**    **Notices** ............................................................................55
**Section 10.8**    **Governing Law; Jurisdiction** ........................................56
**Section 10.9**    **Consent to Service of Process**........................................57
**Section 10.10**   **WAIVERS OF JURY TRIAL**..........................................57
**Section 10.11**   **Severability** ....................................................................57
**Section 10.12**   **No Third Party Beneficiaries** ........................................57
**Section 10.13**   **No Survival of Representations, Warranties and Agreements**............58
**Section 10.14**   **Non-Recourse** .................................................................58
**Section 10.15**   **No Right of Set-Off** ........................................................58
**Section 10.16**   **Construction** ...................................................................58
**Section 10.17**   **Computation of Time**......................................................59
**Section 10.18**   **Mutual Drafting** .............................................................59
**Section 10.19**   **Disclosure Schedule** .......................................................59
**Section 10.20**   **Headings; Table of Contents**.........................................60
**Section 10.21**   **Counterparts; Facsimile and Email Signatures** ...................60
**Section 10.22**   **Time of Essence** .............................................................60

| Exhibit A | - | Form of Bill of Sale |
|---|---|---|
| Exhibit B | - | Form of Assignment and Assumption Agreement |
| Exhibit C | - | Form of Trademark Assignment Agreement |
| Exhibit D | - | Bid Procedures Order |
| Schedule I | - | Schedule of Seller Subsidiaries |
| Schedule 1.1 | - | Excluded Claims |
| Schedule 2.2(n) | - | Excluded Assets |
| Schedule 2.6(a) | - | Assumed Contract List |
| Schedule 3.3(b) | - | Consents and Approvals |
| Schedule 3.6 | - | Contracts |
| Schedule 3.7 | - | Intellectual Property |
| Schedule 3.8 | - | Litigation |
| Schedule 3.9(b) | - | Employees and Employment Matters |
| Schedule 3.10 | - | Employee Benefit Plans |
| Schedule 3.11 | - | Real Property |
| Schedule 3.12 | - | Permits |
| Schedule 3.13 | - | Environmental Matters |
| Schedule 5.4 | - | Conduct of Business |

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of February 24, 2023, by and among Performance Powersports Group Investor, LLC, a Delaware limited liability company ("PPG Investor"), Performance Powersports Group Holdings, Inc, a Delaware corporation and wholly owned subsidiary of PPG Investor ("PPG Holding"), each of the Subsidiaries set forth on Schedule I attached hereto (the "Seller Subsidiaries", and together with PPG Investor and PPG Holding, "Sellers"), and CPS USA Acquisition, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

WHEREAS, the Parties hereto desire to amend and restate in its entirety that certain Asset Purchase Agreement, by and among the Parties, dated as of January 16, 2023 (the "Original Effective Date");

WHEREAS, on January 16, 2023 (the "Petition Date"), the Sellers commenced voluntary cases (such cases, the "Chapter 11 Cases") under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, each Seller continues in possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor in possession;

WHEREAS, Sellers presently conduct the business of producing and selling light-to-middle-weight powersports equipment, including utility task vehicles, all-terrain vehicles, go-karts, mini bikes and golf carts, to third party retailers throughout the United States (collectively, the "Business");

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, the Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth herein;

WHEREAS, the board of directors of PPG Investor, in its capacity as a Seller and the sole stockholder of PPG Holding and sole indirect equity owner of the Seller Subsidiaries, and the boards of directors of each of the Sellers, acting on behalf of each of the applicable Sellers, has determined that it is advisable and in the best interests of Sellers to consummate the Contemplated Transactions provided for herein;

WHEREAS, the Sellers and Buyer have agreed that the sale, transfer and assignment of the Purchased Assets and the Assumed Liabilities from the Sellers to Buyer shall be effected pursuant to motion by the Sellers pursuant to sections 105, 363 and 365 and/or, with the prior written consent of Buyer which may be withheld in its sole discretion, pursuant to a plan (a "Chapter 11 Plan") under section 1129 of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"); and

WHEREAS, in connection with the Chapter 11 Cases and subject to the terms and conditions contained herein, following entry of the Sale Order finding Buyer as the Successful

Bidder at the Auction (if any), the Sellers shall sell and transfer to Buyer, and Buyer shall purchase and acquire from the Sellers, pursuant to sections 105, 363 and 365 and/or, with the prior written consent of Buyer which may be withheld in its sole discretion, 1129 of the Bankruptcy Code, the Purchased Assets, and Buyer shall assume from the Sellers the Assumed Liabilities, all as more specifically provided herein and in the Sale Order.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

"Accounts Receivable" means (a) all accounts, accounts receivable, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor and supplier rebates of Sellers in connection with the Business as conducted by the Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Accrued PTO" has the meaning set forth in Section 6.4(c).

"Acquired Claims" has the meaning set forth in Section 2.1(n).

"Adequate Assurance Deposit" means all deposits (whether maintained in escrow or otherwise) or other security provided in favor of a utility as adequate assurance of payment pursuant to section 366 of the Bankruptcy Code.

"Administrative Claim" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Alternative Transaction" means a sale or sales of any of the Purchased Assets to a Person other than Buyer or an Affiliate of Buyer, whether effected pursuant to a merger, consolidation, asset acquisition, share exchange, amalgamation or plan of reorganization, excluding any sales of Inventory in the Ordinary Course of Business.

"Asset Purchase Agreement" has the meaning set forth in the preamble.

"Assigned Intellectual Property Assets" has the meaning set forth in Section 2.1(e).

2

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.8(a)ii.

"Assumed Contract List" has the meaning set forth in Section 2.6(a).

"Assumed Contracts" means those Leases and Contracts that have been assumed by Sellers and assigned to Buyer pursuant to Section 2.6 and section 365 of the Bankruptcy Code. For the avoidance of doubt, "Assumed Contracts" shall not include any Non-Real Property Contract or Lease that is excluded and rejected pursuant to Section 2.6.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Permits" means all Permits relating to the Business that are transferable, assignable or capable of being reissued in accordance with their terms and under applicable Law, but excluding all Permits to the extent related to any Excluded Asset (including any Lease that is not an Assumed Contract).

"Auction" has the meaning ascribed to such term in the Bid Procedures Order.

"Avoidance Actions" means all causes of action, lawsuits, claims, rights of recovery and other similar rights of any Seller arising under Chapter 5 of the Bankruptcy Code.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Court Milestones" has the meaning set forth in Section 9.3.

"Bankruptcy Deposit Accounts" has the meaning set forth in Section 2.2(a).

"Bid Deadline" has the meaning set forth in Section 9.3(b).

"Bid Procedures" has the meaning ascribed to such term in the Bid Procedures Order.

"Bid Procedures Order" means an order of the Bankruptcy Court in substantially the form attached hereto as Exhibit D.

"Bill of Sale" has the meaning set forth in Section 2.8(a)i.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Group" means Buyer, any Affiliate of Buyer and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, advisors, Representatives, successors or permitted assigns.

3

"CAM" has the meaning set forth in Section 2.3(n).

"Cash and Cash Equivalents" means, collectively, all of the Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, net of uncleared checks issued by Sellers that are not yet reflected in the applicable bank account of Sellers.

"Cash Payment" has the meaning set forth in Section 2.5(a).

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Chapter 11 Plan" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 2.7.

"Closing Date" has the meaning set forth in Section 2.7.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state Law.

"Company IPR Agreements" has the meaning set forth in Section 3.7(c).

"Confidential Information" means, in relation to a Party (the "Discloser"): (a) all information, in whatever form communicated or maintained, whether orally, in writing, electronically, in computer readable form or otherwise, that the Discloser discloses to, or that is gathered by inspection by a Party (the "Recipient") or any of the Recipient's Representatives in the course of the Recipient's review of the transactions contemplated by this Agreement, whether provided before, on or after the date of this Agreement, including information that contains or otherwise reflects information concerning the Discloser or its businesses, affairs, financial condition, assets, liabilities, operations, prospects or activities, and specifically includes financial information, budgets, business plans, ways of doing business, business results, prospects, customer lists, forecasts, engineering reports, environmental reports, evaluations, legal opinions, names of venture partners and contractual parties, and any information provided to the Discloser by third parties under circumstances in which the Discloser has an obligation to protect the confidentiality of such information; (b) all plans, proposals, reports, analyses, notes, studies, forecasts, compilations or other information, in any form, that are based on, contain or reflect any confidential information regardless of the identity of the Person preparing the same ("Notes"); (c) the existence and terms of this Agreement; and (d) the fact that information has been disclosed or made available to the Recipient or the Recipient's Representatives; but does not include any information that: (x) is at the time of disclosure to the Recipient or thereafter becomes generally available to the public, other than as a result of a disclosure by the Recipient or any of the Recipient's Representatives in breach of this Agreement; (y) is or was received by the Recipient on a non-confidential basis from a source other than the Discloser or its Representatives if such source is not known to the Recipient to be prohibited from disclosing the information to the

Recipient by a confidentiality agreement with, or a contractual, fiduciary or other legal confidentiality obligation to, the Discloser; or (z) was known by the Recipient prior to disclosure in connection with the transactions contemplated by this Agreement and was not subject to any contractual, fiduciary or other legal confidentiality obligation on the part of the Recipient.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization.

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"Contract" means any written or oral agreement, contract, Lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding.

"COVID-19 Measures" means any action taken by any Seller directly in response to COVID-19, including any compliance with any quarantine, "shelter in place," "stay at home," social distancing, shut down, closure, sequester, safety or similar applicable Law, directive, guidelines or recommendations promulgated by any Governmental Entity, including the Centers for Disease Control and Prevention and the World Health Organization.

"Cure Amounts" has the meaning set forth in Section 2.6(b).

"Current Employees" means all individuals (including directors, officers, independent contractors or other individual service providers) employed or engaged by Sellers, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Customer Deposits" has the meaning set forth in Section 2.1(c).

"Data Security Requirements" has the meaning set forth in Section 3.7(f).

"Dataroom" has the meaning set forth in Section 4.8.

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Determined Cure Cost" means, with respect to the Cure Amount of any particular Contract, that such Cure Cost is finally established, by (i) the Bankruptcy Court or by (ii) with the consent of Buyer, agreement by the parties to such Contract.

"DIP Credit Agreement" means that certain Junior Secured, Superpriority Debtor-in-Possession Credit Agreement or Term Sheet, dated as of January 16, 2023, by and among

Performance Powersports Group Purchaser, Inc, the "Guarantors" party thereto, and the "DIP Lender" thereunder, as amended, supplemented, amended and restated or otherwise modified from time to time.

"DIP Lender" means the "Lender" under and as defined in the DIP Credit Agreement.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and any other benefit or compensation plan, program, agreement or arrangement of any kind, in each case, sponsored, maintained or contributed to (or required to be contributed to) by any Seller or in which any Seller participates and that provides benefits to any Current Employee or Former Employee or otherwise with respect to which any Seller has any Liability or obligation.

"Environmental Laws" all applicable Laws concerning public or worker health or safety (regarding exposure to Hazardous Substances), pollution or protection of the environment.

"Equity Commitment Letter" has the meaning set forth in Section 4.5.

"Equity Commitment Source" has the meaning set forth in Section 4.5.

"Equity Financing" has the meaning set forth in Section 4.5.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Benefits and Compensation" has the meaning set forth in Section 6.4(a).

"Excluded Cash" has the meaning set forth in Section 2.2.

"Excluded Claims" means all rights (including rights of set-off and rights of recoupment), refunds, claims, counterclaims, demands, causes of action and rights to collect damages solely with respect to those claims set forth on Schedule 1.1 of the Disclosure Schedule.

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Utility Deposits" means (a) any utility deposits related exclusively to Excluded Assets and (b) any post-Petition Date adequate assurance deposits provided to the provider of any utility services or held by Sellers and excludes any Adequate Assurance Deposit.

"Express Representations" has the meaning set forth in Section 4.8.

"Final Order" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or

amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the bankruptcy rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"Financing Orders" means the interim and final orders approving the DIP Credit Agreement.

"Former Employees" means all individuals (including directors, officers, independent contractors or other individual service providers) who have been employed or engaged previously by the Sellers (or any of their predecessors) who are not Current Employees.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time, applied on a consistent basis.

"Governmental Entity" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Hazardous Substance" means any toxic or hazardous material, substance or waste as to which Liability or standards of conduct may be imposed under any applicable Environmental Laws.

"Health and Welfare Plans" means those Employee Benefit Plans set forth on Schedule 3.10(a) providing for medical, dental, life, disability, long-term care or other welfare insurance.

"Hisun" means collectively, Chongqing Huansong Industries (Group) Co., Ltd., Chongqing Huansong Science and Technology Industrial Co., Ltd., Vietnam New Century Industrial Company Limited, Hisun China, and Hisun Motors Corp. U.S.A. and each of their affiliates and subsidiaries.

"Information Presentation" has the meaning set forth in Section 2.8(a)iii.

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other forms of insurance owned or held by or on behalf, or providing insurance coverage to the Business, Sellers and their operations, properties and assets, including, without limitation, all stop-loss insurance policies with respect to Sellers' self-insured medical and/or dental insurance programs.

"Intellectual Property" means any and all rights, title and interest in or relating to intellectual property or proprietary rights, which may exist or be created under the Laws of any

jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) rights in software (including object code, source code, systems, tools, firmware, interfaces, and related documentation and materials), data and databases; (e) inventions (whether or not patentable or reduced to practice) and all improvements thereto, processes, methods, designs, technologies, techniques, protocols, methodologies, formulae, formulations, algorithms, layouts, specifications, discoveries, compositions, industrial models, architectures, drawings, plans, ideas, research and development, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, trade secrets, know-how, and other proprietary confidential information (collectively, "Trade Secrets"); and (f) copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"Intellectual Property Assignments" has the meaning set forth in Section 2.8(a)iii.

"Inventory" means all of Sellers' inventory of parts, subassemblies, finished goods, raw materials and work-in-process therefor related to the Business and all of Sellers' tangible property used in connection with the Business, including, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law.

"IRC" means the United States Internal Revenue Code of 1986, as amended.

"Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, Decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity.

"Leased Real Property" means all of the right, title and interest of the Seller under all written leases, subleases, licenses, concessions and other agreements, pursuant to which Seller holds a leasehold or sub-leasehold estate in, or is granted the right to use or occupy, any land, buildings, improvements, fixtures or other interest in real property which is used in the operation of the Business.

"Leases" means all leases, subleases, licenses, concessions and other agreements (written or oral) pursuant to which the Seller holds any Leased Real Property, together with all amendments, extensions, renewals, guaranties and other agreements with respect thereto, and including the right to all security deposits and other amounts and instruments deposited by or on behalf of the Seller thereunder.

"<u>Liability</u>" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"<u>License Agreement</u>" means that certain License Agreement, dated April 1, 2010, between the Coleman Company, Inc. and certain of the Sellers, as amended or modified from time to time.

"<u>Lien</u>" means any lien, license, encumbrance, claim, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

"<u>Litigation</u>" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

"<u>Material Adverse Effect</u>" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is materially adverse to the financial condition or results of operations of the Purchased Assets (taken as a whole); <u>provided</u>, <u>however</u>, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military, cyber or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) compliance with this Agreement or any Related Agreement, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (iv) any changes attributable to or arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Buyer or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, or (C) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of Buyer, including the impact thereof on the relationships, contractual or otherwise, of the business of the Sellers with employees, customers, lessors, suppliers, vendors or other commercial partners;

(v) arising from or relating to any existing event, occurrence, or circumstance with respect to which Buyer has knowledge as of the date hereof, including any matter set forth in the schedules hereto, (vi) arising from or relating to changes in Laws or other binding directives or determinations issued or made by or agreements with or Consents of any Governmental Entity, (vii) resulting from any act of God or other force majeure event (including natural disasters, disease, epidemics, pandemics (including COVID-19 and COVID-19 Measures) or famine); (viii) in the case of Sellers or the Business, (A) the failure to meet or exceed any Projection or forecast or (B) changes in the business or operations of Sellers or any of their respective Affiliates (including changes in credit terms offered by suppliers or financing sources) resulting from Sellers' and their respective Affiliates' financial condition; (ix) seasonal changes in the results of operations; (x) changes in Law or in GAAP or interpretations thereof; (xi) the commencement or pendency of the Chapter 11 Cases, (xii) any objections in the Bankruptcy Court to (A) this Agreement or any of the transactions contemplated hereby or thereby, (B) the reorganization of Sellers, any plan of reorganization or any disclosure statement, (C) the Bid Procedures Order, or (D) the assumption or rejection of any Assumed Contract; or (xiii) any order of the Bankruptcy Court or any actions or omissions of Sellers or their Subsidiaries in compliance therewith; or (b) would reasonably be expected to prevent, materially delay or materially impair the ability of any Seller to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein.

"Non-Real Property Contracts" means the Contracts to which any Seller is a party other than the Leases.

"Offeree" has the meaning set forth in Section 6.4(a).

"Off-the-Shelf Software" means off-the-shelf personal computer software as such term is commonly understood, that is non-exclusively licensed and commercially available under non-discriminatory pricing terms on a retail basis for less than Fifty Thousand Dollars ($50,000) per year per software title.

"Ordinary Course of Business" means the ordinary course of business of Sellers taken as a whole consistent with past custom and practice and taking into account the preparation for and pendency of the Chapter 11 Cases.

"Original Effective Date" has the meaning set forth in the recitals.

"Outside Date" has the meaning set forth in Section 8.1(e).

"Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means (a) Liens for utilities and Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established under GAAP; (b) with respect to leased or licensed personal property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assumed

Contract; (c) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business for amounts which are not delinquent and which are not material or which are being contested in good faith by appropriate proceedings; (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (e) any Liens associated with or arising in connection with any Assumed Liabilities; (f) non-exclusive licenses of Assigned Intellectual Property Assets granted in the Ordinary Course of Business; and (g) any Liens that are not reasonably likely to result in a Material Adverse Effect.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Petition Date" has the meaning set forth in the recitals.

"PII" has the meaning set forth in Section 6.11.

"Portage" has the meaning set forth in Section 3.14.

"PPG Holding" has the meaning set forth in the preamble.

"PPG Investor" has the meaning set forth in the preamble.

"Priority Claim" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"Projections" has the meaning set forth in Section 6.8(b).

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Representations and Warranties Insurance Policy" means that certain Buyer-Side Representations and Warranties Insurance Policy, dated as of October 8, 2021, by and between Performance Powersports Group Purchaser, Inc. and DUAL Transactional Risk, a division of DUAL Commercial LLC.

"Records" means the books, records, information, ledgers, files (including personnel files), invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement and the Intellectual Property Assignments and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Sale Hearing" means the hearing seeking entry of the Sale Order, which hearing may, with the prior written consent of Buyer which may be withheld in its sole discretion, take the form of a hearing to consider confirmation of the Sellers' Chapter 11 Plan.

"Sale Motion" means a combined motion filed by the Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Bid Procedures Order and the Sale Order.

"Sale Order" means an order in form and substance satisfactory to the Sellers and Buyer (it being understood and agreed that if the Sale Order requires Buyer to assume, pay or otherwise become responsible for any Liabilities of the Sellers that do not constitute Assumed Liabilities as expressly defined herein, then such Sale Order shall not be satisfactory to Buyer). For the avoidance of doubt, the "Sale Order" may, with the prior written consent of Buyer which may be withheld in its sole discretion, also take the form of an order confirming the Sellers' Chapter 11 Plan.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Subsidiaries" has the meaning set forth in the preamble.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge of J. Pearson and Ken Vanden Berg.

"Stock Purchase Agreement" means that certain Stock Purchase and Contribution Agreement, dated as of October 8, 2021, by and among PPG Investor, the Seller Subsidiaries, and Richard Godfrey, an individual resident of Arizona.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority

ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Successful Bidder" has the meaning ascribed to such term by the Bid Procedures Order.

"Systems" means servers, software, computer firmware, computer hardware, electronic data processing equipment, websites, databases, interfaces, platforms, circuits, networks, network equipment, peripherals, computer systems, and other computer, communications, and telecommunications devices and equipment, and other information technology systems, and data or information contained therein or transmitted thereby, in each case owned, leased, licensed or otherwise used or relied on by the Sellers in connection with the Business.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" has the meaning set forth in Section 6.6.

"Transferred Employee" has the meaning set forth in Section 6.4(a).

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar Laws.

"Wind-Down Amount" means cash and cash equivalents in the amount of Six Hundred Thousand Dollars ($600,000), reserved for use in connection with the wind-down of the Sellers' Chapter 11 Cases whether via a liquidating chapter 11 plan or otherwise.

"Withholding Amount" has the meaning set forth in Section 2.11.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.1    Purchase and Sale of Purchased Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Buyer shall purchase, acquire and accept from Sellers, on an "as is, where is" basis and without any representation or warranty on the part of Sellers as to fitness, merchantability or otherwise, and Sellers shall sell, transfer, assign, convey

and deliver to Buyer, all of the Purchased Assets, free and clear of all Liens (other than Permitted Liens and any Liens relating to or included in the Assumed Liabilities), for the consideration specified in <u>Section 2.5</u>. "Purchased Assets" shall mean all of the direct or indirect right, title and interest of Sellers in and to the tangible and intangible assets, properties, rights, claims and Contracts used, useful, or held for use in, or related to, the Business (but excluding the Excluded Assets) as of the Closing, including:

(a)    all Accounts Receivable of Sellers as of the Closing;

(b)    all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing;

(c)    without duplication of the above, all deposits (including, without limitation, deposits in transit, customer deposits (the "<u>Customer Deposits</u>") and security deposits for rent, electricity, telephone, utilities or otherwise, but excluding deposits that are not transferable to Buyer or deposits that constitute Excluded Utility Deposits) and other prepaid charges and expenses of Sellers that relate to the Purchased Assets;

(d)    all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to <u>Section 2.6</u>;

(e)    all Intellectual Property owned or purported to be owned by Sellers, including the items set forth on <u>Schedule 3.7(a) of the Disclosure Schedule</u> (the "<u>Assigned Intellectual Property Assets</u>"), together with (i) any and all claims, demands, or causes of action, known or unknown, for past, present, or future infringement, misappropriation, or other violation of such Assigned Intellectual Property Assets, (ii) all rights to collect income, royalties, damages, proceeds and payments due or payable at or after the Closing with respect to such Assigned Intellectual Property Assets and (iii) tangible embodiments of any of such Assigned Intellectual Property Assets;

(f)    all industrial and motor vehicles owned by Sellers;

(g)    all items of machinery, equipment, supplies, furniture, fixtures, and leasehold improvements (to the extent of Sellers' rights to any leasehold improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing;

(h)    all Records (<u>provided</u> that Sellers are entitled to retain copies of all Records and Buyer will make all such Records available to Sellers upon request and at no charge), but excluding (i) personnel files for Excluded Employees and (ii) any materials exclusively related to any Excluded Assets and copies of all information relating solely to the Taxes and Tax Returns of the Business or the Purchased Assets in the possession of Sellers;

(i)    all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned or purported to be owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of the Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

14

(j)     all rights of the Sellers under non-disclosure and confidentiality, non-compete, non-solicitation, and other restrictive covenant agreements with Current Employees, Former Employees, directors, consultants, independent contractors and agents of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(k)     all of the Assumed Permits or all of the rights and benefits accruing under any Permits relating to the Business to the extent transferrable or assignable (and such non-transferability or non-assignability is not overridden or canceled by the Sale Order or other order of the Bankruptcy Court) and held by Sellers;

(l)     the amount of, and all rights to any, insurance proceeds received by any of Sellers, including pursuant to the Representations and Warranties Insurance Policy, after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets of a type set forth in <u>Section 2.1(b)</u>, <u>Section 2.1(e)</u>, <u>Section 2.1(f)</u> or <u>Section 2.1(g)</u>, occurring on or after the Closing or (ii) any Assumed Liabilities;

(m)     all other rights, demands, claims, credits, allowances, rebates or other refunds (excluding any vendor or supplier rebates) and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Business as of the Closing, including all deposits (including Customer Deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances and prepayments;

(n)     (i) except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent); and (ii) all Avoidance Actions (collectively, the "<u>Acquired Claims</u>");

(o)     all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided to Sellers or to the extent affecting any Purchased Assets and/or Assumed Liabilities;

(p)     subject to section 363(b)(1)(A) of the Bankruptcy Code, all of the Sellers' telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names related to the Business;

(q)     all Cash and Cash Equivalents of Sellers and all Accounts Receivable other than the Excluded Cash;

(r)     sponsorship of the Health and Welfare Plans (and all trusts, rights, insurance policies, administrative services contracts, and other assets set aside and specifically reserved solely to fund benefits payable under the applicable Health and Welfare Plan

and/or any other Contracts relating to the funding or administration of an applicable Health and Welfare Plan); and

(s)     all other assets that are related to or used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets).

**Section 2.2     Excluded Assets**. Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Seller is not selling or assigning, any of the following assets, properties and rights of Sellers (the "Excluded Assets"):

(a)     (i) the Cash Payment funded by Buyer pursuant to Section 2.5(b), (ii) the Wind-Down Amount funded by Buyer pursuant to Section 2.5(e), (iii) the amounts necessary to fund the "Carve Out" as set forth in the DIP Credit Agreement and in the order of the Bankruptcy Court approving the DIP Credit Agreement and (iv) all cash deposits in cash collateral, indemnity or other accounts solely to the extent comprising professional fee retainers, professional fee escrows, and indemnity accounts funded in accordance with the Financing Orders, held by or on behalf of the Sellers' or the bankrupt estates' professionals ("Bankruptcy Deposit Accounts" and collectively with (i), (ii) and (iii), the "Excluded Cash");

(b)     all bank accounts of Sellers;

(c)     all deposits that are not transferable to Buyer, and deposits that constitute Excluded Utility Deposits;

(d)     all of Sellers' certificates of incorporation, and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a corporation or other entity;

(e)     all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller;

(f)     all Leases (and related Leased Real Property) and Contracts, in each case, other than the Assumed Contracts;

(g)     the Excluded Claims and all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) related thereto;

(h)     any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances and other than loans or notes from any Transferred Employees);

(i)     any (1) Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (3)) to the extent that such portions relate to the Business or any Purchased Asset;

(j)     all Permits other than the Assumed Permits;

(k)     all directors' and officers' liability insurance policies, including any tail insurance policies, and all rights of any nature with respect to any such insurance policies, including any recoveries thereunder and any rights to assess claims seeking any such recoveries;

(l)     all assets, rights and claims arising from or with respect to Taxes of any Seller, including all rights arising from any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers, all deferred tax assets, Tax deposits, Tax prepayments and estimated Tax payments;

(m)     any assets expressly excluded from Purchased Assets pursuant to Section 2.1;

(n)     the assets listed on Schedule 2.2(n) of the Disclosure Schedule;

(o)     all Insurance Policies except for the Representations and Warranties Insurance Policy, and any prepaid premiums with respect thereto;

(p)     other than the Health and Welfare Plans, all Employee Benefit Plans and trusts, rights and other assets set aside and specifically reserved solely to fund benefits payable under the applicable Employee Benefit Plan; and

(q)     the rights of Sellers under this Agreement and the Related Agreements and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement.

**Section 2.3     Assumption of Assumed Liabilities**. On the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing (or, with respect to Assumed Liabilities under Assumed Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Sections 2.6), Buyer shall assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Buyer, the following Liabilities, without duplication and only to the extent not paid prior to the Closing and no other Liabilities (collectively, the "Assumed Liabilities"):

17

(a)     all Cure Amounts under any and all Assumed Contracts, including any Determined Cure Costs;

(b)     all outstanding obligations under the Prepetition First Lien Credit Agreement (as defined in the Financing Orders);

(c)     Liabilities under the Assumed Contracts and the Assumed Permits from and after the Closing Date as well as any Liabilities arising out of the conduct of the Business or the ownership of the Purchased Assets, in each case, by Buyer first arising from and after the Closing Date;

(d)     all current Liabilities, trade payables and accrued expenses of Sellers (including, for the avoidance of doubt, (i) invoiced accounts payable, (ii) accrued but un-invoiced accounts payable and (iii) any open purchase orders), in existence as of the Closing Date, as well as to the extent arising and related to the period following Closing Date;

(e)     all accrued payroll, accrued and unused vacation, and accrued payroll Taxes with respect to Transferred Employees as of the Closing Date (and not paid by Sellers prior thereto);

(f)     to the extent required by applicable law, Liabilities relating to continuation of health care coverage, to the extent required by COBRA, to Current Employees and Former Employees of the Sellers (and their qualified beneficiaries) who left employment or otherwise experienced a COBRA qualifying event on or prior to the Closing Date;

(g)     allowed 503(b)(9) Claims;

(h)     all Liabilities associated with Customer Deposits as of the Closing Date;

(i)     allowed mechanic's lien claims;

(j)     Liabilities expressly assumed by Buyer under this Agreement;

(k)     without duplication of the above, other Liabilities with respect to the Transferred Employees, including for (i) accrued vacation pay, sick pay, holiday pay, paid time off, (ii) accrued wages, salary, bonuses, severance, deferred compensation and other payments, (iii) garnishments, and (iv) workers' compensation obligations with respect to events occurring from and after the Closing (but excluding any Liabilities or obligations with respect to Employee Benefit Plans that are not assumed by Buyer);

(l)     all Taxes incurred for the period from and after the Petition Date through the Closing Date to the extent such Taxes are Administrative Claims;

(m)     sponsorship of, and obligations under, the Health and Welfare Plans; provided, that Sellers pay all Liabilities and obligations described in this item as and when due through the Closing Date consistent with Sellers' past practices;

(n)      Priority Claims incurred prior to the Closing Date to the extent allowed by order of the Bankruptcy Court or agreed to (in writing) by Buyer;

(o)      claims for stub-rent pursuant to section 503(b) of the Bankruptcy Code (it being understood that Buyer shall pay such amounts no later than the later of (i) ten (10) days following Closing and (ii) the last day of the month in which the Closing occurs);

(p)      Liabilities for common area maintenance ("CAM"), CAM reconciliation and percentage rent under any Leases that are Assumed Contracts;

(q)      all Liabilities under or pursuant to all warranties, representations, guarantees and programs provided or offered by Sellers to customers in connection with the products sold or services provided by Sellers with respect to the Business;

(r)      all Liabilities and obligations for sales, use, withholding, trust fund or other employment related taxes for which officers and directors may have personal liability for non-payment under applicable Law;

(s)      all Transfer Taxes in accordance with Section 6.6; and

(t)      any and all personal property Taxes with respect to the Purchased Asset.

**Section 2.4     Excluded Liabilities**. Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on or prior to the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities"). For the avoidance of doubt, any Liability of Sellers or any Claim held by Hisun or any of its Affiliates are Excluded Liabilities.

**Section 2.5     Consideration**. The aggregate consideration payable by the Buyer for the sale and transfer of the Purchased Assets by the Sellers shall be composed of the following (the "Purchase Price"):

(a)      a credit bid of the outstanding obligations under the DIP Credit Agreement pursuant to section 363(k) of the Bankruptcy Code in the amount of Ten Million Dollars ($10,000,000), it being understood that any amounts not drawn thereunder shall be drawn in full prior to, and as a condition to, the Closing;

(b)      the payment of an amount in cash equal to Five Hundred Thousand Dollars ($500,000) (the "Cash Payment");

(c)      the assumption by the Buyer of the outstanding obligations under the Prepetition First Lien Credit Agreement (as defined in the Financing Orders);

(d)      the assumption by Buyer of the Assumed Liabilities (including all Determined Cure Costs with respect to any Assumed Contract); and

19

(e)     the Wind-Down Amount; provided that the Wind-Down Amount shall only become payable as a portion of the Purchase Price in the event that (i) Sellers have insufficient cash on hand at Closing to fund the Wind-Down Amount from such cash on hand and (ii) the Sellers have otherwise complied in all respects with the Financing Orders, in which case the Buyer shall only be required to fund the amount necessary to bring the Sellers' total cash on hand at Closing to equal to the amount of the Wind-Down Amount.

**Section 2.6    Assumption and Assignment of Contracts.**

(a)     Schedule 2.6(a) of the Disclosure Schedule (the "Assumed Contract List") sets forth a list of all Contracts and Leases to which a Seller is a party and which the Parties have agreed to be an Assumed Contract, together with estimated Cure Amounts for each Assumed Contract, if any.  For the avoidance of doubt, the License Agreement will be an Assumed Contract.

(b)     In connection with the assumption and assignment to Buyer of any Assumed Contract pursuant to this Section 2.6, (i) the cure amounts, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts necessary to assign such Assumed Contract to the Buyer pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code (such amounts, the "Cure Amounts"), shall be paid by Buyer at the Closing, and not by Sellers and Sellers shall have no Liability therefor, and neither the Cure Amounts paid by Buyer nor any other expense or obligation set forth in this Section 2.6(b) shall reduce, directly or indirectly, any consideration payable to or received by Sellers hereunder and (ii) Buyer shall provide sufficient adequate assurance of future performance as of the Sale Hearing necessary to satisfy the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to Assumed Contracts.

(c)     Sellers shall use their respective commercially reasonable efforts to assign the Assumed Contracts to Buyer on the terms set forth in this Section 2.6, including taking all reasonable actions required to obtain a Bankruptcy Court order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Entities, contract counterparties, and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder (including with respect to the Cure Amounts) and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(d)     Notwithstanding the foregoing, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) constitutes an Employee Benefit Plan (that is not a health or welfare plan) or an Insurance Policy, (ii) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on

or prior to the Closing and is not continued or otherwise extended upon assumption, or (iii) requires a Consent of any Governmental Entity or other third party (except as permitted by the Bankruptcy Code) in order to permit the sale or transfer to Buyer of Sellers' rights under such Contract, and no such Consent has been obtained prior to the Closing. In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

**Section 2.7**     **Closing**. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by electronic exchange of counterpart signature pages commencing at 10:00 a.m. local time on the date (the "Closing Date") that is the first Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto. The Closing shall be deemed to have occurred at 12:01 p.m. (prevailing Eastern Time) on the Closing Date.

**Section 2.8**     **Deliveries at Closing**.

(a)     At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

i.     one or more Bills of Sale substantially in the form of Exhibit A attached hereto ("Bill of Sale");

ii.     one or more Assignment and Assumption Agreements substantially in the form of Exhibit B attached hereto ("Assignment and Assumption Agreement");

iii.     instruments of assignment substantially in the form of Exhibit C, attached hereto for the Assigned Intellectual Property Assets (collectively, the "Intellectual Property Assignments");

iv.     any other Related Agreements required to be executed by Sellers to consummate the transactions contemplated hereby; and

v.     to the extent applicable, a properly completed and duly executed IRS Form W-9.

(b)     At the Closing, Buyer shall deliver to Sellers the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

i.     the Bills of Sale;

ii.     the Assignment and Assumption Agreement(s);

      iii.      the Intellectual Property Assignments;

      iv.      any other Related Agreements required to be executed by Buyer to consummate the transactions contemplated hereby;

      v.      the Cash Payment, by wire transfer of immediately available funds to one or more bank accounts designated by Sellers in writing to Buyer;

      vi.      duly executed board resolutions and applicable insurer consents relating to the transfer of the Health and Welfare Plans to Buyer; and

      vii.      a true and correct copy of the Sale Order, which shall be a Final Order.

**Section 2.9**  **Allocation**. Within sixty (60) calendar days after the Closing Date or within a reasonable amount of time thereafter as mutually agreed by Sellers and Buyer, Buyer shall in good faith prepare and deliver to the Sellers a proposed allocation of the Purchase Price (and all capitalized costs and other relevant items) among the Purchased Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate). Sellers shall have sixty (60) calendar days following receipt of Buyer's proposed allocation to review and comment on such proposed allocation and Buyer shall consider such comments in good faith. Thereafter, Buyer shall provide Sellers with Buyer's final allocation schedule. Sellers shall also retain the right to dispute Buyer's proposed and final allocations, with any unresolved dispute to be determined by the Bankruptcy Court. Buyer and Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation. Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation unless required to do so by applicable Law.

**Section 2.10**  **Indemnification**. Buyer shall indemnify and hold each Seller and its Representatives harmless from and against all claims, demands, penalties, losses, Liability or damage to the extent arising from or relating to the operation of the Business by Buyer from and after the Closing Date, including, without limitation , reasonable attorneys' fees and expenses, resulting from, or related to: (i) Buyer's breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement and the Related Agreements, any Assumed Contract or applicable Law; (ii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers or Representatives of any Seller by Buyer or any of its Representatives; (iii) any actual or threatened claims, charges or lawsuits by or on behalf of any party engaged, or alleged to be engaged, by Buyer as an employee, intern, agent, consultant or independent contractor arising out of such employment or contractor relationship; (iv) the gross negligence (including omissions) or willful misconduct of Buyer, its officers, directors, employees, agents or Representatives; (v) violations of Law by Buyer, its officers, directors, employees, agents or Representatives; and (vi) any Assumed Liabilities.

**Section 2.11**  **Withholding**. Buyer and Sellers shall be entitled to withhold and deduct from the amounts otherwise payable to any recipient pursuant to this Agreement such amounts as may be required to be withheld or deducted under the IRC or any other provision of federal, state,

local or foreign Tax laws (collectively, the "Withholding Amount"); provided, however, that, Buyer will use commercially reasonable efforts to provide written notice to Sellers at least five (5) Business Days prior to withholding any Withholding Amount, or, if sooner, as soon as reasonably practicable after becoming aware thereof, and will reasonably cooperate with Sellers to eliminate or reduce the Withholding Amount. Any Withholding Amount shall be timely remitted to the appropriate Governmental Entity and treated for all purposes under this Agreement as having been paid to the Person to whom such Withholding Amount otherwise would have been paid.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers hereby represent and warrant to Buyer as of the Original Effective Date, as of the date hereof and as of the Closing Date, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule"), the statements contained in this Article III are true and correct.

**Section 3.1    Organization of Sellers; Good Standing**.

(a)    Each Seller is a corporation duly incorporated, validly existing and in good standing under the Laws of its state of incorporation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its Business is currently being conducted. Each Seller has all requisite corporate power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

(b)    Each Seller is duly authorized to do business and is in good standing as a resident or foreign corporation in each jurisdiction where the ownership or operation of the Purchased Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)    None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

**Section 3.2    Authorization of Transaction**. Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)    Each Seller has all requisite corporate power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by such Seller and no other company action on the part of any Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)    This Agreement has been duly and validly executed and delivered by each Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been

duly and validly executed and delivered by each such Seller, as applicable. Assuming that this Agreement constitutes a valid and legally-binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3    <u>Noncontravention; Consents and Approvals</u>**.

(a)    Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) conflict with or result in a breach of the certificate of incorporation, bylaws or other organizational documents of any Seller, (ii) violate any Law to which any Seller is, or its respective assets or properties are, subject, or (iii) subject to the entry of the Sale Order, conflict with any Assumed Contract, and, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    Except as set forth in <u>Schedule 3.3(b) of the Disclosure Schedule</u>, subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing), no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement. After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of any Contract that is an Assumed Contract hereunder, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, Consent or approval would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.4    <u>Compliance with Laws</u>**. Sellers are in compliance with all Laws applicable to the Business or the Purchased Assets, except in any such case where the failure to be in compliance would not have a Material Adverse Effect.

**Section 3.5    <u>Title to Purchased Assets</u>**. Sellers, as of immediately prior to the Closing, will have good and valid title to, or, in the case of leased assets, have good and valid leasehold

interests in, the Purchased Assets, free and clear of all Liens (except for Permitted Liens), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under <u>Section 2.6</u>, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

      **Section 3.6**    <u>**Contracts**</u>. <u>Schedule 3.6 of the Disclosure Schedule</u> sets forth an accurate list, as of the Original Effective Date and the date hereof, of all material Contracts (other than any Employee Benefit Plans), including the Company IPR Agreements, to which a Seller is a party with respect to the Business as of the date hereof (and Sellers have made available to Buyer true and complete copies of all such Contracts).

      **Section 3.7**    <u>**Intellectual Property**</u>.

      (a)    <u>Schedule 3.7(a) of the Disclosure Schedule</u> sets forth a true and complete list of all patents, patent applications, trademark registrations and applications for registration, copyright registrations, domain names and material proprietary software included in the Assigned Intellectual Property Assets. Each item listed or required to be listed on <u>Schedule 3.7(a) of the Disclosure Schedule</u>, is valid, subsisting and enforceable and none of the foregoing are subject to any outstanding Decree adversely affecting the Sellers' use thereof or rights thereto.

      (b)    The Sellers' exclusively own all right, title and interest in and to each item of Assigned Intellectual Property Assets free and clear of all Liens (except for Permitted Liens and subject to the Sale Order). The Sellers' own or have a valid and enforceable right or license to use all Intellectual Property used in or necessary for the operation of the Business as currently conducted. Subject to entry of the Sale Order, no Assigned Intellectual Property Assets are subject to any consent or settlement, or any writ, order, judgment, injunction or decree issued, made or rendered by any Governmental Entity, prohibiting or restricting the Sellers' ownership, enforcement or other exploitation or disposition thereof.

      (c)    None of the Sellers are in breach in any material respect of any of the terms of any third party license agreement in any way related to or affecting any software owned or used by the Business. <u>Schedule 3.7(c) of the Disclosure Schedule</u> sets forth a true and complete list of the Contracts included in the Purchased Assets: (i) pursuant to which any Seller obtains the right to use any third party Intellectual Property (other than Off-The-Shelf Software), (ii) pursuant to which any Seller grants to any other Person the right to use any Assigned Intellectual Property Assets (other than nonexclusive licenses to customers granted in the Ordinary Course of Business); and (iii) relating to the research, development or assignment of Intellectual Property, or otherwise affecting any of the Sellers or any third party's ability to enforce, own, register, license, use, disclose, transfer or otherwise exploit any Intellectual Property (including any covenant not to sue or co-existence or settlement agreements) (collectively, the "<u>Company IPR Agreements</u>").

(d)      Except as set forth on <u>Schedule 3.7(d)(i) of the Disclosure Schedule</u>, in the past three (3) years, none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as currently conducted, nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith, has infringed, misappropriated or otherwise violated the Intellectual Property of any other Person. Except as set forth on <u>Schedule 3.7(d)(ii) of the Disclosure Schedule</u>, the Sellers have not in the past three (3) years received any written notice, or been subject to any proceeding, (i) with respect to any alleged infringement, misappropriation or other violation by the Sellers with respect to the Business of any Intellectual Property owned by any other Person or (ii) challenging the ownership, use, validity, patentability, registrability or enforceability of any Assigned Intellectual Property Assets. To Sellers' Knowledge, in the past three (3) years, no third party has infringed, misappropriated, or otherwise violated any Assigned Intellectual Property Assets.

(e)      The Sellers have taken commercially reasonable measures to protect and maintain the Assigned Intellectual Property Assets and have taken commercially reasonable steps to protect and maintain the confidentiality of the Trade Secrets and other material confidential information used in the conduct of the Business. No such Trade Secrets have been or authorized to be disclosed to any Person, other than in the Ordinary Course of Business pursuant to a written confidentiality and non-disclosure agreement with such Person with reasonable protections of, and preserving all rights of, the Sellers with respect to the Business or other obligation of confidentiality.

(f)      With respect to the Business, the Sellers maintain commercially reasonable policies and procedures regarding data security, data privacy, collection of data, data transfer, and the use of data, has commercially reasonable written agreements in place, or otherwise has commercially reasonable safeguards in place, in each case to protect PII and confidential information in the Business' possession or control from unauthorized access by third Persons and to ensure that the operation of the Business (including with respect to employee matters) is in compliance in all material respects with all applicable Laws, with all applicable contractual commitments and privacy policies of the Sellers with respect to PII or privacy, security, or security breach notification requirements, and with any applicable industry standards to which the Business is subject (collectively, "<u>Data Security Requirements</u>"). The Sellers, with respect to the Business, and the conduct of the Business are and have been in compliance with all Data Security Requirements in all material respects. In the last three (3) years, with respect to the Business, there has been no (i) actual, suspected, or alleged (in writing) unauthorized access to or use, acquisition, destruction, damage, loss, corruption, unintended or improper disclosure, or breaches of the security of any PII or confidential information collected, maintained, or stored by or on behalf of the Sellers with respect to the Business or in the Sellers' possession or control, or any System, or (ii) written assertion, claim or other proceeding that has given rise or may give rise to any liability under applicable Laws or industry regulation in relation to data protection, data security, or data privacy for PII or other Data Security Requirement. With respect to the Business, the Sellers have not been subject to any external investigations or audits concerning any Data Security Requirement.

(g)    All Systems are (i) free from any material defect, bug, virus, or programming, design, or documentation error or corruptant or other software routines or hardware components that permit unauthorized access or the unauthorized disablement or erasure of such Systems, (ii) in sufficiently good working condition to effectively perform all information technology operations as currently conducted, and (iii) sufficient for the current needs of the Business. The Sellers own or have valid, enforceable and sufficient rights to use all Systems and have complied in all material respects with the terms and conditions of the agreements corresponding to such Systems. The Sellers have taken commercially reasonable actions to protect the confidentiality, security and integrity of these Systems, has implemented and maintained commercially reasonable back-up, disaster recovery and business continuity procedures for the Systems, and acted in compliance therewith. In the past three (3) years, there have been no failures, breakdowns or continued substandard performance of any Systems that have caused any material disruption or material interruption in or to the use of the Systems or the operation of the Business.

**Section 3.8**    **Litigation**. Other than the Chapter 11 Cases, Schedule 3.8 of the Disclosure Schedule sets forth all unresolved material Litigation brought by or against any Seller in the past three (3) years with respect to the Business or any of the Purchased Assets, and to Sellers' Knowledge, there is no other material Litigation threatened before any Governmental Entity against any Seller which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Contemplated Transactions.

**Section 3.9**    **Employees and Employment Matters**.

(a)    No Seller is a party to or bound by any collective bargaining agreement or other Contract with any labor union, works council, or other labor organization, and no Current Employees are represented by any labor union, works council, or other labor organization with respect to their employment with Seller. There is no strike, walkout, work stoppage, lockout, picketing, handbilling, material labor grievance, labor arbitration, unfair labor practice charge, or other material labor dispute affecting any Seller with respect to the Business, and there has been no such dispute within the past three years. To Sellers' Knowledge, there is, and in the past three years there has been, no organizational effort made or threatened by or on behalf of any labor union with respect to the Current Employees or Former Employees.

(b)    Schedule 3.9(b) of the Disclosure Schedule sets forth an accurate list of all Current Employees, including each such Current Employee's (i) name, (ii) accrued but unused vacation or paid time off, and (iii) payroll information.

(c)    Each Seller, with respect to the Business, is in compliance in all material respects with all Laws related to employment, employment practices, and labor, including all laws respecting terms and conditions of employment, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), immigration (including the completion of Forms I-9 for all employees and the proper confirmation of employee visas), discrimination, retaliation, harassment, disability rights

and benefits, equal opportunity, plant closures and layoffs (including the WARN Act), employee trainings and notices, workers'' compensation, labor relations, employee leave issues, COVID-19, affirmative action, and unemployment insurance. No Seller, with respect to the Business, has any material Liability for (i) any unpaid wages, salaries, wage premiums, commissions, bonuses, fees, or other compensation to its current or former directors, officers, employees and independent contractors under applicable Law, Contract, or policy; and/or (ii) any fines, Taxes, interest, or other penalties for any failure to pay or delinquency in paying such compensation.

(d)     To the Sellers' Knowledge, no Current Employee, Former Employee, or current or former independent contractor of the Business is in any material respect in violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement, nonsolicitation agreement or other restrictive covenant obligation: (i) owed to any Seller; or (ii) owed to any third party with respect to such person's right to perform duties for or provide services to the Business.

(e)     Each Seller, with respect to the Business, has reasonably investigated all sexual harassment, or other harassment, discrimination or retaliation allegations against any of its officers, directors, employees, contractors and agents of which it is aware. With respect to each such allegation with potential merit, the applicable Seller has taken prompt corrective action that is reasonably calculated to prevent further improper action. No Seller reasonably expects any material Liabilities with respect to any such allegations and is not aware of any allegations relating to its officers, directors, employees, contractors, or agents, that, if known to the public, would bring the Business into material disrepute.

**Section 3.10    Employee Benefit Plans**.

(a)     Schedule 3.10 of the Disclosure Schedule lists each material Employee Benefit Plan. Any Employee Benefit Plan that is a Health and Welfare Plan is identified on Schedule 3.10 with an "*." With respect to each Employee Benefit Plan:

        i.     no Employee Benefit Plan is intended to meet the requirements of a "qualified plan" under Section 401(a) of the IRC; and

        ii.    Sellers have made available to Buyer copies of the current plan documents for all such Employee Benefit Plans.

(b)     Each Employee Benefit Plan has been established, funded, maintained and administered, in each case, in all material respects, in accordance with its terms and all applicable Laws. As of the Original Effective Date and the date hereof, there is no pending or, to Sellers' Knowledge, threatened, Litigation relating to the Employee Benefit Plans. All contributions, premiums and other payments with respect to any Employee Benefit Plan have been timely paid.

(c)     Neither the execution or delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement could, either alone or in combination with any other event: (i) result in the payment of any material compensation or benefits

becoming due to any Current Employees or Former Employees under any Employee Benefit Plan or otherwise, (ii) accelerate the time of payment, vesting, or funding of, or materially increase the amount of, any compensation or benefits under any Employee Benefit Plan or otherwise, or (iii) limit or restrict the ability of Buyer to merge, amend or terminate any Employee Benefit Plan.

(d)     Neither the execution or delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement could, either alone or in combination with any other event, result in any payment that would constitute an "excess parachute payments" (within the meaning of Section 280G of the IRC).

(e)     Each Employee Benefit Plan that is subject to Section 409A of the IRC has been maintained and administered in material compliance in both form and operation with Section 409A of the IRC and the rules and regulations promulgated thereunder.

(f)     Sellers do not have any indemnity or gross-up obligation with respect to any Current Employees or Former Employees for any Taxes imposed under Sections 4999 or 409A of the IRC.

(g)     No Employee Benefit Plan is, and the Sellers do not have any Liability or obligation with respect to (i) any "defined benefit plan" (as defined in Section 3(35) of ERISA) or any other plan that is or was subject to Title IV of ERISA or Sections 412 or 430 of the IRC, (ii) any "multiemployer plan" (as defined in Section 3(37) of ERISA), (iii) "multiple employer plan" (within the meaning of Section 210 of ERISA or Section 413(c) of the IRC), or (iv) a "multiple employer welfare arrangement" (as such term is defined in Section 3(40) of ERISA). No Employee Benefit Plan provides for, and no Seller has promised to provide, post-termination or retiree health or welfare benefits to any Person, other than as required by COBRA.

**Section 3.11     Real Property**.

(a)     Sellers do not own any real property, has never owned any real property, and is not party to any agreement or option to purchase any real property or interest therein.

(b)     Schedule 3.11(b) of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true and complete list of all Leases (including dates and names of parties thereto) for such Leased Real Property. Sellers have made available to Buyer true and complete copies of such Leases, as amended through the date hereof.

(c)     Except as described on the Schedule 3.11(c): (a) Sellers have a valid leasehold or sub-leasehold (as applicable) interest in all Leased Real Property, free and clear of all Liens, other than Permitted Liens, (b) Seller is not in breach of, or default under, any Lease governing the Leased Real Property beyond the applicable cure period, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a breach or permit the termination, modification or acceleration of rent under such Lease, (c) Seller has not subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Property (or any portion thereof), (d) Seller has not collaterally assigned or granted any other security interest in

such Leased Real Property or any interest therein, and (e) Seller's possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed, and there are no disputes with respect to any Lease.

(d)     The Leased Real property comprises all of the real property owned, leased, occupied or otherwise used in the operation of the Business, and all buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the Leased Real Property are in good condition and repair, free of any structural deficiencies or latent defects, and sufficient for the operation of the Business.

**Section 3.12    Permits**. Schedule 3.12 of the Disclosure Schedule contains a list of all material Permits that Sellers hold as of the Original Effective Date and as of the date hereof in connection with the operations of the Business. As of the Original Effective Date and as of the date hereof, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, except where a failure of this representation and warranty to be so true and correct could not reasonably be expected to have a Material Adverse Effect. To Sellers' Knowledge, all required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed, except where a failure of this representation and warranty to be so true and correct could not reasonably be expected to have a Material Adverse Effect.

**Section 3.13    Environmental Matters**. Except as set forth in Schedule 3.13 of the Disclosure Schedule:

(a)     Each Seller is, and has been during the prior two (2) years, in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining, maintaining and complying in all material respects with all Permits required under applicable Environmental Laws that are material to the operations of the Business taken as a whole;

(b)     No Seller has received during the prior two (2) years written notice from any Governmental Entity or is currently subject to any Litigation regarding any actual or alleged violation of or Liability under Environmental Laws that is material to the Business taken as a whole;

(c)     No Seller has released, disposed of or arranged for the disposal of any Hazardous Substance, in each case so as has given or would reasonably be expected to give rise to Liability to any Seller or the Business under any Environmental Law, except for such release, disposal, arrangement or Liability that is not material to the Business taken as a whole; and

(d)     Sellers have made available to Buyer copies of all material environmental audits, assessments and reports in their possession relating to the Business and prepared during the prior two (2) years.

(e)     Section 3.12 and this Section 3.13 contain the sole and exclusive representations and warranties of Sellers with respect to any environmental, health or safety

matters, including any arising under any Environmental Law or with respect to any Hazardous Substance.

**Section 3.14    Brokers' Fees**. Except for amounts due to Portage Point Partners LLC ("Portage"), no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated to pay.

**Section 3.15    Tax Matters**.

(a)    All Tax Returns required to be filed under applicable Law by Sellers with respect to the Purchased Assets have been filed and such Tax Returns are true, complete and correct, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    All Taxes shown as due from Sellers with respect to the Purchased Assets have been paid, except (i) to the extent nonpayment of which is permitted or required by the Bankruptcy Code or (ii) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 3.16    No Other Representations or Warranties**. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), NEITHER A SELLER NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY PURCHASED ASSET), THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), EACH SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE PURCHASED ASSETS BY BUYER AFTER THE CLOSING), AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF

ANY SELLER OR ANY OF THEIR AFFILIATES). THE DISCLOSURE OF ANY MATTER OR ITEM IN THE DISCLOSURE SCHEDULE SHALL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED OR IS MATERIAL OR THAT SUCH MATTER WOULD RESULT IN A MATERIAL ADVERSE EFFECT.

BUYER HAS PERFORMED AN INDEPENDENT INVESTIGATION, ANALYSIS, AND EVALUATION OF THE PURCHASED ASSETS.

THE PROVISIONS OF THIS <u>SECTION 3.15</u> SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

**ARTICLE IV**
**BUYER'S REPRESENTATIONS AND WARRANTIES**

Buyer represents and warrants to Sellers as follows as of the Original Effective Date, as of the date hereof and as of the Closing Date:

**Section 4.1    Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2    Authorization of Transaction**.

(a)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally-binding obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms

32

and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3    Noncontravention**. Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in Section 2.6) will (i) conflict with or result in a breach of the certificate of formation, operating agreement, or other organizational documents of Buyer, (ii) violate any Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements. Except in relation to the Chapter 11 Cases, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, Consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any of the Related Agreement, except where the failure to give notice, file or obtain such authorization, Consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.

**Section 4.4    Litigation**. There are no Litigation pending or, to Buyer's knowledge, threatened against or affecting Buyer that will adversely affect Buyer's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

**Section 4.5    Financial Capacity**. Buyer is capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code in connection with the assignment of the Assumed Contracts and has delivered to Sellers a true, complete and correct copies, including all exhibits, schedules or amendments thereto, of the fully executed commitment letter, dated as of January 16, 2023, between Buyer and Kinderhook Capital Fund VI, L.P. (the "Equity Commitment Source") (as may be amended, modified, waived or replaced in accordance with the terms hereof, the "Equity Commitment Letter"), pursuant to which the Equity Commitment Source has committed, upon the terms and subject to the conditions set forth therein, to invest in Buyer the cash amounts set forth therein (the "Equity Financing"). As of the Original Effective Date and as of the date of this Agreement, the commitments contained in the Equity Commitment Letter have not been withdrawn, terminated or rescinded in any respect.  The Equity Commitment Letter is in full force and effect against Buyer and, to the knowledge of Buyer, each of the other parties thereto as of the Original Effective Date and as of the date of this Agreement, and is a legal, valid and binding obligation of Buyer and, to the knowledge of Buyer, each of the other parties thereto.  There are no conditions precedent or other contractual contingencies between Buyer and the Equity Commitment Source related to the funding of the full amount of the Equity Financing, other than as expressly set forth in the Equity Commitment Letter.  The proceeds to be disbursed pursuant to the agreements contemplated by the Equity Commitment Letter will be sufficient to fund all of the amounts required to be provided by Buyer for the consummation of the transactions contemplated hereby at or prior to Closing. As of the Original Effective Date and as of the date hereof, assuming the satisfaction of the conditions set forth in Article VII, (i) no

event has occurred that would result in any breach or violation of or constitute a default (or an event that with notice or lapse of time or both would become a default) by Buyer under the Equity Commitment Letter, and (ii) Buyer does not have any reason to believe that any of the conditions of the Equity Financing will not be satisfied or that the Equity Financing will not be available to Buyer on the Closing Date.  Buyer acknowledges that its obligations hereunder are not subject to any conditions regarding Buyer's or any other Person's ability to obtain financing for the consummation of this Agreement and the other transactions contemplated by this Agreement. As of the Closing and immediately after consummating the transactions contemplated by this Agreement (including the Equity Financing), Buyer will not, assuming the accuracy of the Sellers' representations and warranties under this Agreement, (a) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the present fair value of its assets will be less than the amount required to pay its Liability on its debts as they become absolute and matured), (b) have unreasonably small capital with which to engage in its business, or (c) have incurred or plan to incur debts beyond its ability to repay such debts as they become absolute and matured.

Section 4.6    **Good Faith Purchaser**. Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder. Buyer is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to all of the Purchased Assets. Buyer has negotiated and entered into this Agreement in good faith and without any improper conduct, including collusion or fraud of any kind.

Section 4.7    **Brokers' Fees**. Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated to pay.

Section 4.8    **No Outside Reliance**. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Buyer acknowledges and agrees, on its own behalf and on behalf of Buyer Group, that the representations and warranties made by the Sellers to Buyer in Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive representations, warranties, and statements of any kind made to Buyer or any member of Buyer Group and on which Buyer and Buyer Group may rely in connection with the transactions contemplated by this Agreement. Buyer acknowledges and agrees, on its own behalf and on behalf of Buyer Group, that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations), including in the Confidential Information Memorandum prepared by Portage (the "Information Presentation"), that certain datasite established by the Sellers (the "Dataroom"), or any Projections, meetings, calls or correspondence with management of Sellers and their Representatives, or any other Person on behalf of Sellers or any of their respective Affiliates or Representatives, and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, and prospects of Sellers, or the quality, quantity or condition of Sellers' assets, are, in each case, specifically disclaimed by Sellers and that neither Buyer nor any member of Buyer Group has relied on any such representations,

warranties or statements. Buyer acknowledges, on its own behalf and on behalf of Buyer Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, Liabilities, properties, Contracts and prospects of Sellers, and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the results of Buyer Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any Seller, the Information Presentation, any information, statements, disclosures, documents, Projections, forecasts or other material made available to Buyer or any of its Affiliates or Representatives in the Dataroom or otherwise, Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or Sellers or any of their respective Affiliates or Representatives, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Buyer and Buyer Group have relied only on the Express Representations). Buyer will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS."

## ARTICLE V
## PRE CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Original Effective Date and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1     Certain Efforts; Cooperation**.

(a)     Subject to the terms and conditions of this Agreement, each of the Parties shall use its commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in Article VII), except as otherwise provided in Section 5.2; provided, however, Sellers shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Chapter 11 Cases (including, soliciting higher or better offers for the Purchased Assets in any Auction).

(b)     On and after the Closing, Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Sellers and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to more effectively vest in Buyer all of Sellers' right, title and interest to the Purchased Assets, free and clear of all Liens (other than Permitted Liens expressly contemplated by the Sale Order); provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

**Section 5.2    Notices and Consents**.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(b)    Sellers and Buyer shall cooperate with one another (i) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (ii) in promptly making any such filings, furnishing information required in connection therewith and seeking to timely obtain any such consents, permits, authorizations, approvals or waivers; provided, however, that (A) Sellers shall not incur any costs associated with the obligations hereunder and (B) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

**Section 5.3    Bankruptcy Actions**.

(a)    Sellers have commenced the Chapter 11 Cases.

(b)    The Sellers shall have filed the Sale Motion, which motion shall seek the Bankruptcy Court's: (i) entry of the Bid Procedures Order, and (ii) the Sale Hearing to be held no later than March 17, 2023 that provides the parties, inter alia, consummate the Closing as soon as practicable after the entry of the Sale Order and no later than three (3) days following the entry of the Sale Order, subject to the satisfaction of all conditions to the obligations of Sellers and Buyer as set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions).

(c)    Sellers, to the extent practicable, will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the transactions contemplated by this Agreement prepared by Sellers or any Affiliates (including forms of orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Cases. All motions, applications, and supporting papers prepared by Sellers and relating to the transactions contemplated by this Agreement to be filed on behalf of Sellers after the Original Effective Date must be reasonably satisfactory in form and substance to Buyer.

(d)    Buyer shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(e)    Each of Buyer and Sellers will promptly take such actions as are reasonably requested by the other party to assist in obtaining entry of the Sale Order and the Bid Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary

assurances of performance by Sellers of their obligations under this Agreement and the Related Agreements and demonstrating that Buyer is a good faith buyer under section 363(m) of the Bankruptcy Code.

(f)     Pursuant to the terms of the proposed Bid Procedures Order, Buyer shall provide information to the Sellers to be disseminated to counterparties to Assumed Contracts, sufficient to satisfy a finding of adequate assurance of future performance as required in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

(g)     Pursuant to the terms of the proposed Bid Procedures Order, Sellers will solicit bids from other prospective purchasers for the sale of all or substantially all of the Purchased Assets on terms and conditions substantially the same in all respects to this Agreement (or more favorable terms to Sellers) in accordance with the procedures set forth in the proposed Bid Procedures Order.

(h)     Sellers shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens in the Purchased Assets, all parties to the Assumed Contracts and all Taxing authorities in jurisdictions applicable to Sellers and as otherwise required by the Bankruptcy Code and bankruptcy rules.

(i)     Sellers shall file with the Bankruptcy Court and serve a cure notice (the "Cure Notice") by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases as required by the Bid Procedures Order and provide a copy of the same to Buyer.

**Section 5.4    Conduct of Business**. Until the earlier of the termination of this Agreement and the Closing, subject to the terms and conditions of the DIP Credit Agreement or use of cash collateral and any DIP Budget (as defined in the Financing Orders), and except as expressly contemplated by this Agreement or as set forth on Section 5.4 of the Disclosure Schedule, or required under the Bankruptcy Code or other applicable Law and except to the extent waived by Buyer's prior written consent (such consent not to be unreasonably withheld, conditioned, delayed or denied) and except with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed):

(a)     Sellers shall use commercially reasonable efforts to maintain, preserve and protect all of the Purchased Assets in the condition in which they existed on the Original Effective Date, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business;

(b)     Sellers shall use commercially reasonable efforts not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(c)     Except as permitted by this Agreement, no Seller shall, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Purchased Assets other than in the Ordinary Course of Business;

(d)     No Seller shall, directly or indirectly, permit, offer, agree or commit to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien or Claim except for Permitted Liens;

(e)     No Seller shall assume, reject or assign any Contract that may become an Assumed Contract other than through the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement, to Buyer (or to a third party in connection with an Alternative Transaction);

(f)     No Seller shall enter into new Contracts other than in the Ordinary Course of Business or amend in a way that is materially adverse to the Business, voluntarily terminate or cancel any Contracts (other than any non-renewal expiration of such Contract according to such Contract's terms);

(g)     Sellers shall make all post-petition payments related to Assumed Contracts (other than Cure Amounts) that become or became due or payable pursuant to the terms thereof to the extent provided in the budget contained in any cash collateral or debtor-in-possession financing orders of the Bankruptcy Court;

(h)     Sellers shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Purchased Asset;

(i)     No Seller shall, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of any Seller, in each case that constitutes a Purchased Asset;

(j)     No Seller shall (i) establish, adopt, amend or terminate any Employee Benefit Plan or any other plan, program, policy, agreement or arrangement that would be an Employee Benefit Plan if it were in existence as of the date hereof, (ii) increase or decrease the compensation or benefits payable or provided to, or to become payable or be provided to, any Current Employees or Former Employees, (iii) grant, promise or announce any severance, equity or equity-based incentive compensation or bonus (including any retention, transaction or change in control bonus) or (iv) accelerate the time of vesting, funding or payment of any compensation or benefit under any Employee Benefit Plan or otherwise;

(k)     No Seller shall negotiate, modify, extend or enter into any collective bargaining agreement or other Contract with any labor union, works council, or other labor organization or recognize or certify any labor union, labor organization, works council or group of employees as the bargaining representative for any employees of the Sellers;

(l)     No Seller shall implement or announce any employee layoffs, plant closings, reductions in force, furloughs, temporary layoffs or other such actions that could implicate the WARN Act;

(m)     No Seller shall hire, engage, terminate (without cause), furlough or temporarily lay off any employee or independent contractor;

(n)     No Seller shall waive or release, in writing, any non-competition, non-solicitation, non-disclosure, non-interference, non-disparagement or other restrictive covenant obligation of any Current Employee or Former Employee;

(o)     No Seller shall (i) sell, assign, transfer, abandon, license, allow to lapse or expire or dispose of any Assigned Intellectual Property Asset in any material respect and (ii) disclose any confidential information to any Person other than in the Ordinary Course of Business in circumstances involving reasonable and customary confidentiality restrictions;

(p)     Sellers shall maintain in full force and effect each Assumed Permit held by any Seller as of the Original Effective Date or otherwise obtained by any Seller prior to the Closing (to the extent that such maintenance does not require the Sellers to incur any costs or make any payments), and shall comply with the terms of each such Permit and no Seller shall permit any such Permit to terminate, expire or lapse other than in the Ordinary Course of Business;

(q)     Sellers shall (i) conduct the Business in the Ordinary Course of Business, (ii) use commercially reasonable efforts to preserve the existing business organization and keep management of the Business intact, (iii) use commercially reasonable efforts to keep available the services of the Current Employees, and use commercially reasonable efforts to maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Current Employees and others having business dealings with the Business, to the extent reasonably feasible; and

(r)     Sellers shall not extend the Bid Deadline without prior consent of Buyer.

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

**Section 5.5     Notice of Developments**. From the Original Effective Date until the Closing Date, each of the Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any material failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.5 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement if such party objects to the disclosures contained in such notice within five (5) days of receipt of such notice.

**Section 5.6**     **Access**.

(a)     Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access during normal business hours, subject to the terms of Leases and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all premises, properties, personnel, Records and Contracts related to the Business, in each case, for the sole purpose of evaluating the Business; provided, however, that, for avoidance of doubt, (i) the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law, and (ii) Buyer shall not be permitted to conduct any sampling, monitoring or other surface, subsurface or invasive investigation, assessment or analysis of soil, groundwater, indoor or ambient air, building materials or other environmental media of the sort generally referred to as a Phase II environmental investigation.

(b)     Buyer will not, and will not permit any member of Buyer Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, noteholder or other material business relation of Sellers prior to the Closing with respect to Sellers, the Business or the transactions contemplated by this Agreement without the prior consent of Sellers for each such contact.

(c)     All information obtained pursuant to this Section 5.6 shall be subject to the terms and conditions of the confidentiality obligations contained herein.

**Section 5.7**     **Press Releases and Public Announcements**.     After notice to and consultation with Buyer, Sellers shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, parties in interest in the Chapter 11 Cases and other Persons bidding on assets of Sellers. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), no Party shall issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior written consent of the other Parties, which shall not be unreasonably withheld or delayed; provided, however, (i) Sellers, without the prior consent of Buyer, may (A) issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law or any Governmental Entity with competent jurisdiction and (B) communicate with its and its Affiliates' investors and potential investors relating to the transactions contemplated by this Agreement and (ii) Buyer and its Affiliates, without the prior consent of Sellers, are permitted to report and disclose the status of this Agreement and the transactions contemplated hereby and the financial return and other financial performance or statistical information regarding Buyer's investment to their direct and indirect limited partners and prospective limited partners in connection with fundraising, marketing, information or reporting activities of the kind customarily provided with respect to investments of this kind, in each case, only to Persons who are subject to customary confidentiality restrictions with respect to such information.

**Section 5.8**     **Bulk Transfer Laws**.    Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the

transactions contemplated by this Agreement, and hereby waives all claims related to the noncompliance therewith. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens), including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**ARTICLE VI**
**OTHER COVENANTS**

The Parties agree as follows with respect to the period from and after the Closing, provided that (i) Sellers shall not incur any costs associated with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed:

**Section 6.1    Cooperation**. Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions, including regarding the transfer, assignment or revocation and reissuance of the Assumed Permits.

**Section 6.2    Further Assurances**. In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discovers any additional assets or properties which the Parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discovers any assets or properties which the Parties mutually agree should have been retained by Sellers as Excluded Assets, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Sellers. If any Seller, Buyer or any of their respective Subsidiaries, from time to time, identifies any Assumed Liability that was not transferred to Buyer, or any Excluded Liability that was transferred to Buyer, Sellers and Buyer shall use their commercially reasonable efforts to transfer those Liabilities to the correct Party as promptly as reasonably practicable after Closing.

**Section 6.3    Availability of Business Records**. From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Purchased Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for any Seller (as applicable) to comply with

41

applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) five (5) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases, or (iv) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain originals or copies of all Records included in the Purchased Assets for periods prior to the Closing.  With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending or prosecuting such Litigation or claim and shall make available to Sellers such personnel as are most knowledgeable about the matter in question, at Sellers' cost and expense. Without limitation of any of the foregoing, such assistance by Buyer to Sellers shall include reasonable assistance to Sellers by the Transferred Employees after the Closing with respect to the wind down of the Chapter 11 Cases, which shall include during the pendency of the Chapter 11 Cases, maintaining the accounting infrastructure and reporting and filings that are required to be filed with the Bankruptcy Court.

### Section 6.4    **Employee Matters**.

(a)    Effective as of (and contingent upon the occurrence of) the Closing Date, Buyer shall offer (or cause a designee of Buyer to offer) employment to each Current Employee that Buyer, in its sole discretion, desires to employ, with employment commencing as of the Closing Date. For purposes of this Agreement, each Current Employee who receives such an offer of employment shall be collectively referred to as an "Offeree." Sellers shall, regardless of whether such an offer is accepted, terminate the employment of each Offeree. On the Closing Date, Buyer will provide Sellers with a schedule setting forth a list of the names of all Offerees. Each Offeree who (A) is an employee of Sellers immediately prior to the Closing, (B) accepts such offer of employment, and (C) actually commences employment with Buyer or one of its Affiliates immediately following the Closing shall be referred to herein as a "Transferred Employee." Except to the extent Sellers fail to comply in any material respects with Section 6.4(d)ii, Buyer hereby agrees that the written offer to an Offeree shall include a level of base salary, wages, annual bonus opportunities and benefits (excluding any defined benefit pension, equity or equity-based, nonqualified deferred compensation, or post-termination or retiree health or welfare benefits or compensation (together, the "Excluded Benefits and Compensation") that are substantially comparable in the aggregate to the base salary, wages, annual bonus opportunities and benefits (excluding any Excluded Benefits and Compensation) provided to such Offeree by Sellers immediately prior to the Closing Date.

(b)    Each Current Employee of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."  For the avoidance of doubt, Sellers shall be solely responsible for all Liabilities related to any Former Employee and Excluded Employee (whether accruing prior to, on, or following the Closing Date).

(c)    To the extent required by applicable Law, and in the time frame required by applicable Law, Seller shall pay out all paid time off accrued but not used by Transferred

Employees and Excluded Employees through the Closing Date ("Accrued PTO"). In the event that such Accrued PTO is not required by applicable Law to be paid out by Seller to a Transferred Employee upon termination of employment with Sellers, such Accrued PTO shall be rolled over to Buyer (or one of its Affiliates) as of the Closing Date.

(d)    Buyer shall indemnify and hold each Seller and its Representatives harmless from and against all claims, demands, penalties, losses, Liability or damage arising from or relating to the Buyer's discriminatory or otherwise unlawful decision not to hire any Current Employee (but for the avoidance of doubt, not for any Seller's severance, notice or WARN Act obligations, or other Liabilities with respect to Excluded Employees).

(e)    Following the Closing:

i.    Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate, to (A) interfere with Buyer's or its Representatives' rights under Section 6.4(a) to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment;

ii.    Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of terms and conditions of employment for any Offeree;

iii.    Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all Current Employees and Former Employees of Sellers. Seller shall withhold and remit all applicable payroll taxes as required by Law on the Closing Date with respect to all Current Employees and Former Employees of Sellers as of such date; and this Section shall be binding upon and inure solely to the benefit of each of the Parties to this Agreement, and nothing in this Section, express or implied, shall confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Section; and

iv.    Buyer shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that accrue after the Closing Date with respect to all Transferred Employees. Buyer shall withhold and remit all applicable payroll taxes as required by Law after the Closing Date with respect to Transferred Employees. In addition, Buyer shall (or shall cause its designee to) process all employee and Tax reporting covering the Closing Date in connection with the Excluded Employees and the Transferred Employees that will be required to be prepared and delivered after the Closing; provided, that the foregoing shall not be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue the employment (or any particular term or condition of employment) of any specific Person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this

Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the Parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

v.      Notwithstanding the terms of any noncompetition, non-solicit or other restrictive covenant obligation between the Seller and an Offeree, such Offeree shall be permitted to provide services to Buyer and its Affiliates following the Closing, and Sellers will not seek to enforce the terms of any such restrictive covenant following the Closing with respect to such Offeree's services to Buyer and its Affiliates.

**Section 6.5**   **Reserved**.

**Section 6.6**   **Transfer Taxes**. To the extent not exempt under section 1146 of the Bankruptcy Code, Buyer shall pay any and all sales, use, stamp, documentary, registration, transfer (including real estate transfer tax), stock transfer, registration, gross receipts, duty, securities transactions, stamp, documentary, registration, transfer, added value or similar Tax (each, a "Transfer Tax") imposed under any applicable Law in connection with the transactions contemplated by this Agreement, regardless of the Person liable for such Transfer Taxes under applicable Law. Sellers and Buyer shall cooperate to prepare any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence. The Party that is responsible under applicable law to file such Tax Returns shall timely file such returns.

**Section 6.7**   **Wage Reporting**. Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the standard procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

**Section 6.8**   **Acknowledgements**.

(a)      Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, Liabilities, properties, Contracts and prospects of Sellers and the Purchased Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer and Buyer Group have relied solely on the results of Buyer Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any Sellers, the Information Presentation, any information, statements, disclosures, documents, Projections, forecasts or other material made available to Buyer or any of its Affiliates or Representatives in the Dataroom, Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Buyer and Buyer Group have relied only on the Express

Representations). Buyer acknowledges and agrees, on its own behalf and on behalf of Buyer Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Buyer or any member of Buyer Group and on which Buyer or any member of Buyer Group may rely in connection with the transactions contemplated by this Agreement; and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (1) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Information Presentation, the Dataroom, Projections, meetings, calls or correspondence with management of Sellers or any other Person on behalf of Sellers or any of their respective Affiliates or Representatives and (2) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, and prospects of Sellers, or the quality, quantity or condition of Sellers' assets, are, in each case, specifically disclaimed by Sellers. Buyer, on its own behalf and on behalf of Buyer Group: (x) disclaims reliance on the items in clause (ii) in the immediately preceding sentence and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in clause (i) in the immediately preceding sentence. Without limiting the generality of the foregoing, Buyer acknowledges and agrees, on its own behalf and on behalf of Buyer Group, that neither Sellers nor any other Person, has made, is making or is authorized to make, and Buyer, on its own behalf and on behalf of Buyer Group, hereby waive, all rights and claims it or they may have against any Seller with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (A) any potentially material information regarding the Sellers or any of their respective assets (including the Purchased Assets), Liabilities (including the Assumed Liabilities) or operations and (B) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of Sellers' business, operations, assets, Liabilities, prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by Buyer Group of Sellers, Buyer and the members of Buyer Group, and the Representatives of each of the foregoing, have received or may receive, from or on behalf of Sellers, certain projections, forward-looking statements, and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, the Dataroom, management meetings, etc.) (collectively, "Projections"). Buyer acknowledges and agrees, on its own behalf and on behalf of Buyer Group, that (i) such Projections are being provided solely for the convenience of Buyer to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Buyer is familiar with such uncertainties, and (iv) Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)     Buyer acknowledges and agrees, on its own behalf and on behalf of Buyer Group, that it will not assert, institute, or maintain, and will cause each member of Buyer Group not to assert, institute or maintain, any Litigation that makes any claim contrary to the agreements and covenants set forth in this Section 6.8, including any such action with

respect to the distribution to Buyer or any member of Buyer Group, or Buyer's or any member of Buyer Group's use, of the Information Presentation, the Dataroom, Projections, or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by Sellers or any failure of any of the foregoing to disclose any information.

**Section 6.9    Insurance Policies**. Buyer acknowledges that, upon Closing, all insurance coverage provided in relation to Sellers and the Purchased Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyer and the Purchased Assets and no further coverage shall be available to Buyer or the Purchased Assets under any such policies.

**Section 6.10    Collection of Accounts Receivable**.

(a)    As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Sellers' order, for Buyer's own account.

(b)    As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments. In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

(c)    As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.11    Data Privacy Protection**. Buyer acknowledges that the Purchased Assets include personally identifiable information ("PII") within the meaning of section 363(b) of the Bankruptcy Code, along with associated personal information about the Sellers' customers. In connection with the same, Buyer agrees to: (i) employ security controls and procedures (technical, operational and managerial) designed to protect PII and personal information, (ii) abide by all applicable Laws and regulations, in all material respects, with respect to PII and (iii) take such further actions with respect to PII as may be agreed between the Parties. Buyer agrees that it shall,

absent a customer's express consent received after adequate notice: (a) abide by the Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date, (b) respect prior requests of customers to opt out of receipt of marketing messages (to the extent Sellers make Buyer aware of such requests), and (c) use personal information only for the purposes of continuing Business operations and continuing to provide similar goods and services to customers, including marketing the products and services related to Purchased Assets consistent with the foregoing. Buyer shall require express consent of a customer for any unapproved use of PII or personal information or before making material changes to the privacy policies that weaken a customer's consumer protection.

Section 6.12    **Alternative Transactions**.  Notwithstanding any provision herein to the contrary, nothing in this Agreement shall restrict Sellers' right to pursue one or more Alternative Transactions, including but not limited to marketing the Sellers' assets or providing due diligence materials. In the event of any Alternative Transaction, the obligations under the Prepetition First Lien Credit Agreement (as defined in the Financing Orders) shall be repaid in full in connection therewith.

Section 6.13    **Covenant Not to Sue**. Buyer hereby covenants and agrees that it shall not bring suit or otherwise assert (a) any claim relating to any Acquired Claims or (b) any claims against Sellers' current or former officers and directors which constitute Purchased Assets before any court, arbitrator, mediator or administrative agency anywhere in the world. Buyer further covenants and agrees that it shall not assign the Acquired Claims or claims against Sellers' current or former officers and directors to any third party.

Section 6.14    **Certain Tax Matters**. Buyer and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and, at no cost or expense to the cooperating Party, in any action, audit, litigation, or other proceeding with respect to Taxes.

Section 6.15    **Confidentiality**.

(a)    Each Recipient shall treat confidentially and not disclose, other than as expressly contemplated by this Agreement, any Confidential Information of a Discloser, except that the Recipient shall be at liberty to disclose the Confidential Information of a Discloser (i) to the Recipient's Representatives; <u>provided</u>, that such Representatives acknowledge the existence of these confidentiality obligations and agree to be bound thereby and; _provided_, _further_, that the Recipient shall not disclose Confidential Information of a Discloser to its Representatives that are direct or indirect competitors of such Discloser, and (ii) to any court of competent jurisdiction, to the extent required; _provided_, that the foregoing obligations of Buyer shall automatically terminate at the Closing and be of no further force or effect; _provided_, _further_, that, after the Original Effective Date, Buyer and its Representatives may provide customary information to rating agencies, potential lenders to the extent such rating agencies and potential lenders are made aware of the confidential nature of such information.

(b)    A Recipient may disclose Confidential Information only to those of its Representatives who need to know such Confidential Information for the purpose of

implementing the transactions contemplated by this Agreement. No Recipient shall use, nor permit its Representatives to use, Confidential Information for any other purpose nor in any way that is, directly or indirectly, detrimental to the applicable Discloser.

(c)     If a Recipient or any of its Representatives receives a request or is legally required to disclose all or any part of the Confidential Information of a Discloser, such Recipient shall (i) immediately notify the Discloser of the request or requirement, (ii) consult with the Discloser on the advisability of taking legally available steps to resist or narrow the request or lawfully avoid the requirement, and (iii) if requested by the Discloser, take all necessary steps to seek a protective order or other appropriate remedy. If a protective order or other remedy is not available, or if the Discloser waives compliance with the provisions of this <u>Section 6.15(c)</u>, (A) the Recipient receiving the request for disclosure or its Representatives, as the case may be, may disclose to the Person requiring disclosure only that portion of the Confidential Information which such Recipient is advised by written opinion of counsel is legally required to be disclosed, and (B) such Recipient shall not be liable for such disclosure unless such disclosure was caused by or resulted from a previous disclosure by such Recipient or its Representatives not permitted by this Agreement.

(d)     Following the termination of this Agreement in accordance with the provisions of this Agreement, each Recipient shall (and shall cause each of its Representatives to) (i) return promptly to the Discloser all physical copies of the Confidential Information of the Discloser, excluding Notes, then in such Recipient's possession or in the possession of its Representatives, (ii) destroy all (A) electronic copies of such Confidential Information, and (B) Notes (including electronic copies thereof) prepared by such Recipient or any of its Representatives, in a manner that ensures the same may not be retrieved or undeleted by such Recipient or any of its Representatives, and (iii) deliver to the Discloser a certificate executed by one of the Recipient's duly authorized officers indicating that the requirements of this <u>Section 6.15(d)</u> have been satisfied in full.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1     Conditions to Buyer's Obligations**.     Subject to <u>Section 7.3</u>, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)     as of the Original Effective Date, as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in <u>Section 3.1</u>, <u>Section 3.2</u> or <u>Section 3.3</u> shall be true and correct in all respects other than de minimis exceptions, and (ii) each other representation or warranty set forth in <u>Article III</u> shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; <u>provided, however</u>, that for purposes of determining the accuracy of representations and warranties referred to in clause

(ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.8(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)    the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal;

(e)    from the date of this Agreement until the Closing Date, Sellers shall have maintained a supply of Inventory necessary for operation in the Ordinary Course of Business and the Assumed Contracts shall provide for the reasonable continuation of such supply from and after the Closing;

(f)    Buyer shall have consented to all Assumed Contracts and any Non-Real Property Contract or Lease that is excluded and rejected by Seller pursuant to Section 2.6; and

(g)    Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(e) has been satisfied.

**Section 7.2    Conditions to Sellers' Obligations**. Subject to Section 7.3, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    as of the Original Effective Date, as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2 or Section 4.3 shall be true and correct in all respects other than de minimis exceptions, and (ii) each other representation or warranty set forth in Article IV shall be true and correct in all material respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)    Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all

material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.8(b) to be delivered to Sellers (or tendered subject only to Closing);

(c)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)     the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal; and

(e)     Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

**Section 7.3     No Frustration of Closing Conditions**. Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

**Section 7.4     Waiver of Conditions**.  Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

## ARTICLE VIII
## TERMINATION

**Section 8.1     Termination**.  This Agreement may be terminated in accordance with this Article VIII and the Contemplated Transactions abandoned at any time prior to the Closing:

(a)     by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)     by written notice of either Buyer or Sellers, upon the issuance of a Final Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Final Order was caused by the breach or action or inaction of such Party;

(c)     by Buyer by giving written notice to Sellers at any time prior to Closing  in the event Sellers have breached any material covenant contained in this Agreement in any material respect, Buyer has notified Sellers of the breach, and the breach has continued without cure for a period of thirty (30) days after the notice of the breach;

(d)      by Sellers by giving written notice to Buyer at any time prior to Closing in the event Buyer has breached any material covenant contained in this Agreement in any material respect, Sellers have notified Buyer of the breach, and the breach has continued without cure for a period of thirty (30) days after the notice of the breach;

(e)      by written notice of either Buyer or Sellers, if the Closing shall not have occurred on or before March 31, 2023 (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(e) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

(f)      by Buyer if Sellers withdraw or seek authority to withdraw the Bid Procedures Order or the Sale Order, or announce any stand-alone plan of reorganization or liquidation (or support any such plan filed by any other party), other than a wind-down plan of Sellers' estates post-Closing;

(g)      by Buyer if the Bankruptcy Court has not held the Sale Hearing by March 17, 2023;

(h)      by written notice of either Buyer or Sellers, if the Chapter 11 Cases is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Chapter 11 Cases; provided that Sellers shall not be permitted to terminate this Agreement pursuant to this Section 8.1(h) if Sellers sought such dismissal of the Chapter 11 Cases, conversion to a case or cases under Chapter 7 of the Bankruptcy Code, or appointment of a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers in the Chapter 11 Cases;

(i)      by Buyer if there is a termination of any Financing Order or a material change to the "Approved Budget" thereunder without the express written approval of Buyer;

(j)      automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon:

        i.      the consummation of an Alternative Transaction; or

        ii.      if Buyer is not selected as the Successful Bidder at the conclusion of the Auction, unless Buyer is designated a "back-up bidder" under the Sale Order;

(k)      by Buyer if any of the Bankruptcy Court Milestones are not met;

(l)      by written notice from Sellers to Buyer, if all of the conditions set forth in Section 7.1 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Buyer fails to complete the Closing at the time required by Section 2.7; or

(m)    by written notice from Sellers or Buyer to Buyer or Sellers, respectively, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties.

Notwithstanding anything to the contrary contained herein, in no event may Buyer terminate this Agreement under Section 8.1(c) on account of Buyer's failure to satisfy the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to any proposed Assumed Contract.

**Section 8.2    Procedure upon Termination**. In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3    Effect of Termination or Breach**.

(a)    Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(b)    Except as set forth in Section 8.1(j), no termination of this Agreement pursuant to Section 8.1 shall be effective until written notice thereof is given to the non-terminating party specifying the provision hereof pursuant to which such termination is made.  If the transactions contemplated hereby are not consummated: (i) this Agreement shall become null and void and of no further force and effect (except that Article I, Section 2.12, this Section 8.3, Article IX and Article X, shall survive any such termination); and (ii) if this Agreement is terminated by Buyer pursuant to a termination right set forth in this Article VIII or by Sellers for any reason other than under Sections 8.1(d) or (l), Sellers shall not be entitled to any damages, losses, or payment from Buyer, and Buyer shall have no further Liability of any kind to Sellers, any of their Affiliates, or any third party on account of this Agreement.

(c)    Nothing herein shall preclude the Sellers from exercising their remedies under Section 10.1.

## ARTICLE IX
## BANKRUPTCY COURT MATTERS

**Section 9.1    Competing Bids**. This Agreement and the transactions contemplated hereby are subject to the Sellers' rights and ability to consider higher or better competing bids with respect to the Business and the Purchased Assets pursuant to the Bid Procedures, as approved by the Bid Procedures Order. In accordance with the Bid Procedures, until the conclusion of the Auction, the Sellers shall have the right to, and may cause their Representatives and Affiliates to, (a) initiate contact with, solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate with, any Person (in addition to Buyer and its Affiliates and Representatives) in

connection with any sale or other disposition of the Purchased Assets or any Alternative Transaction; (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person; and (c) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing.

**Section 9.2    Bankruptcy Court Filings**. The Sellers shall use reasonable best efforts to obtain entry of the Bid Procedures Order and the Sale Order in accordance with the Milestones (as defined in the DIP Credit Agreement). Buyer agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Bid Procedures Order and the Sale Order and a finding of adequate assurance of future performance by Buyer of the Assumed Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Sellers shall consult with Buyer and its representatives concerning any order of the Bankruptcy Court relating to this Agreement or the Chapter 11 Cases and use reasonable best efforts to provide Buyer with copies of all applications, pleadings, proposed orders and other material documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. If any order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such order), Sellers shall diligently defend against such appeal, petition or motion and shall use commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motions; provided, that Sellers shall consult with Buyer regarding the status of any such actions. Any changes to the form of the Bid Procedures Order or the Sale Order must be approved by Buyer. Sellers further covenant and agree that, after the Closing, the terms of any reorganization plan submitted to the Bankruptcy Court or any other court by or with the support of Sellers for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

**Section 9.3    Bankruptcy Court Milestones**. Sellers shall comply with the following timeline ("Bankruptcy Court Milestones"):

(a)    the Bankruptcy Court shall have entered the Bid Procedures Order within thirty-nine (39) calendar days after the Petition Date;

(b)    the final date for submitting a qualified bid, as set forth in the approved Bid Procedures, shall be no later than fifty (50) days following the Petition Date (the "Bid Deadline");

(c)    so long as at least one qualified bid has been received (other than from Buyer) the Auction shall be a date within two (2) Business Days after the Bid Deadline; and

(d)    within two (2) days after consummation of the Auction (or if the Auction is not necessary, within five (5) days after the Bid Deadline), but subject to availability of the

Bankruptcy Court, the Sale Hearing shall have occurred and the Bankruptcy Court shall have approved the transaction contemplated by this Agreement; and

(e)    within sixty-three (63) calendar days after the Petition Date  the Bankruptcy Court shall have entered the Sale Order (the "Sale Deadline").

## ARTICLE X
## MISCELLANEOUS

**Section 10.1    Remedies**. Buyer recognizes that if Buyer breaches or refuses to perform any covenant set forth in this Agreement or the Sale Order, monetary damages alone would not be adequate to compensate Sellers for their injuries. Sellers shall therefore be entitled, in addition to any other remedies that may be available at law or in equity, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants. If any Litigation is brought by Sellers to enforce such covenants, Buyer shall waive the defense that there is an adequate remedy at Law. Buyer agrees to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants. Buyer agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

**Section 10.2    Expenses**. Except as otherwise provided in this Agreement or a Related Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including, but not limited to, all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.

**Section 10.3    Entire Agreement**. This Agreement and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof.

**Section 10.4    Incorporation of Schedules, Exhibits and Disclosure Schedule**. The schedules, appendices and exhibits to this Agreement, and the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 10.5    Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder,

whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 10.5</u> except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

   **Section 10.6** **<u>Succession and Assignment</u>**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; <u>provided</u>, <u>however</u>, that Buyer shall be permitted to assign any of its rights hereunder (i) to one or more of its Affiliates, as designated by Buyer in writing to Sellers or (ii) to any lender to Buyer or any of its Affiliates as collateral security in connection with the transactions that are the subject of this Agreement; <u>provided, however</u>, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment; <u>provided, further</u>, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed chapter 11 plan or pursuant to an order of the Bankruptcy Court.

   **Section 10.7** **<u>Notices</u>**. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

   If to any Sellers, then to:

        Performance Powersports Group Investor, LLC
        1775 East University Drive
        Tempe, Arizona 85281
        Attention:  Ken Vanden Berg
        Email:  kenv@colepow.com

   With a copy to (which shall not constitute notice):

        **Klehr Harrison Harvey Branzburg LLP**
        919 North Market Street, Suite 1000
        Wilmington, DE 19801
        Attention: Domenic E. Pacitti, Esquire
        Email: dpacitti@klehr.com

If to Buyer, then to:

> CPS USA Acquisition, LLC
> c/o Kinderhook Industries, LLC
> 505 Fifth Avenue, 25th Floor
> New York, NY 10017
> Attention: Chris Michalik
>            Paul Cifelli
> Email: cmichalik@kinderhook.com
>        pcifelli@kinderhook.com

with copies (which shall not constitute notice) to:

> Kirkland & Ellis, LLP
> 601 Lexington Avenue
> New York, NY 10022
> Attention: Brian Schartz, P.C.
>            Shawn OHargan, P.C.
>            Allyson B. Smith
> Email:    brian.schartz@kirkland.com
>            shawn.ohargan@kirkland.com
>            allyson.smith@kirkland.com

with copies (which shall not constitute notice) to:

> Pachulski Stang Ziehl & Jones LLP
> 919 North Market Street, 17th Floor
> Wilmington, DE 19801
> Attention: Laura Davis Jones
> Email:    ljones@pszjlaw.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this <u>Section 10.7</u>.

     **Section 10.8   <u>Governing Law; Jurisdiction</u>**. This Agreement shall in all aspects be governed by and construed in accordance with  the Federal Bankruptcy Law, to the extent applicable, and where state law is implicated, the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it

may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; <u>provided</u> that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

**Section 10.9    <u>Consent to Service of Process</u>**. Each of the Parties hereby Consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 10.7</u>.

**Section 10.10  <u>WAIVERS OF JURY TRIAL</u>**.

(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF DELAWARE LOCATED IN NEW CASTLE COUNTY, DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE DISTRICT OF DELAWARE WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

**Section 10.11  <u>Severability</u>**. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 10.12  <u>No Third Party Beneficiaries</u>**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 10.13  No Survival of Representations, Warranties and Agreements**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such party prior to the Closing) of the Parties set forth in this Agreement, the Sale Order, or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for twenty (20) years following the Closing Date, and nothing in this Section 10.13 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Buyer and Sellers acknowledge and agree, on their own behalf and, with respect to Buyer, Buyer Group, that the agreements contained in this Section 10.13 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for twenty (20) years; and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 10.13, none of the Parties would enter into this Agreement.

**Section 10.14  Non-Recourse**. This Agreement may only be enforced against, and any Litigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as Parties to this Agreement. Except to the extent named as a Party to this Agreement, and then only to the extent of the specific obligations of such Parties set forth in this Agreement or the Sale Order, no past, present or future  direct or indirect shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Representative of any Party to this Agreement will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the Parties to this Agreement or for any Litigation based upon, arising out of or related to this Agreement. Each Party to this Agreement hereby waives, from and after the Closing, any and all rights, claims and causes of action it may have at any time under any Environmental Law, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, and any analogous state or local Laws, in each case in respect of the Business and this Agreement.

**Section 10.15  No Right of Set-Off**. Buyer, on its own behalf and on behalf of Buyer Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment, or similar rights that Buyer, any member of Buyer Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Buyer pursuant to this Agreement or any other document or instrument delivered by Buyer in connection herewith.

**Section 10.16  Construction**. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar

import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

Section 10.17 **Computation of Time**. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

Section 10.18 **Mutual Drafting**. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 10.19 **Disclosure Schedule**. The Disclosure Schedule has been arranged for purposes of convenience in separately numbered Sections corresponding to the Sections of this Agreement; however, each Section of the Disclosure Schedule will be deemed to incorporate by reference all information disclosed in any other Section of the Schedules, and any disclosure in the Disclosure Schedule will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Disclosure Schedule and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business or consistent with past practice, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedule or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Disclosure Schedule or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Disclosure Schedule will be deemed to broaden in any way the scope of the parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Disclosure Schedule is a summary only and is qualified in its entirety by the

terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Disclosure Schedule and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of contract.

Section 10.20 **Headings; Table of Contents**. The Section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 10.21 **Counterparts; Facsimile and Email Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

Section 10.22 **Time of Essence**. Time is of the essence of this Agreement.

[END OF PAGE]
[SIGNATURE PAGES FOLLOW]

**SIGNATURE PAGE TO
AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

<u>**SELLERS**</u>**:**

**PERFORMANCE POWERSPORTS
GROUP INVESTORS, LLC**

By: _____
     Name:
     Title:

**PERFORMANCE POWERSPORTS
GROUP HOLDINGS, INC.**

By: _____
     Name:
     Title:

**PERFORMANCE POWERSPORTS
GROUP PURCHASER, INC.**

By: _____
     Name:
     Title:

**PERFORMANCE POWERSPORTS
GROUP, INC.**

By: _____
     Name:
     Title:

## SIGNATURE PAGE TO
## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**BUYER:**

**CPS USA ACQUISITION, LLC**

By _____
    Name:
    Title:

**SCHEDULE I**

**Schedule of Seller Subsidiaries**

1.  Performance Powersports Group Purchaser, Inc., a Delaware corporation

2.  Performance Powersports Group, Inc. (f/k/a Rich Godfrey & Associates, Inc.), an Arizona corporation

10291330.v15

**EXHIBIT A**

**<u>Form of Bill of Sale</u>**

See attached.

A-1

# BILL OF SALE

This Bill of Sale, dated as of [_____], 202[__] (this "Bill of Sale"), is made and entered into by and among Performance Powersports Group Investor, LLC, a Delaware limited liability company ("PPG Investor"), Performance Powersports Group Holdings, Inc, a Delaware corporation and wholly owned subsidiary of PPG Investor ("PPG Holding"), each of the Seller Subsidiaries (together with PPG Investor and PPG Holding, "Sellers"), and CPS USA Acquisition, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Amended and Restated Asset Purchase Agreement, dated as of February 24, 2023 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens).

2.      From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Bill of Sale.

3.      This Bill of Sale is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Bill of Sale or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Bill of Sale shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

A-2

5.      None of the provisions of this Bill of Sale may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Bill of Sale is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Bill of Sale shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Bill of Sale as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Bill of Sale is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      EXCEPT AS AND TO THE EXTENT PROVIDED IN THE ASSET PURCHASE AGREEMENT, SELLERS EXPRESSLY AND SPECIFICALLY DISCLAIM ANY AND ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, WHETHER ORAL OR WRITTEN, AND WHETHER GIVEN OR MADE OR DEEMED TO HAVE BEEN GIVEN OR MADE AT ANY TIME OR TIMES IN THE PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING THE NATURE OR CONDITION OF THE PURCHASED ASSETS, INCLUDING WITHOUT LIMITATION ANY AND ALL WARRANTIES AS TO THE MERCHANTABILITY OF THE PURCHASED ASSETS OR THE SUITABILITY OR FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR FOR ANY PURPOSE.

8.      This Bill of Sale shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

9.      This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Bill of Sale or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature Page Follows]*

10291330.v15

IN WITNESS WHEREOF, the parties have caused this Bill of Sale to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC**

By: _____
      Name:
      Title:

**PERFORMANCE POWERSPORTS GROUP HOLDINGS, INC.**

By: _____
      Name:
      Title:

**PERFORMANCE POWERSPORTS GROUP PURCHASER, INC.**

By: _____
      Name:
      Title:

**PERFORMANCE POWERSPORTS GROUP, INC.**

By: _____
      Name:
      Title:

**BUYER:**

**CPS USA ACQUISITION, LLC**

By: _____
      Name:
      Title:

[Signature Page to Bill of Sale]

**EXHIBIT B**

**Form of Assignment and Assumption Agreement**

See attached.

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated as of [_____], 202[__] (this "<u>Agreement</u>"), is made and entered into by and among Performance Powersports Group Investor, LLC, a Delaware limited liability company ("<u>PPG Investor</u>"), Performance Powersports Group Holdings, Inc, a Delaware corporation and wholly owned subsidiary of PPG Investor ("<u>PPG Holding</u>"), each of the Seller Subsidiaries (together with PPG Investor and PPG Holding, "<u>Sellers</u>"), and CPS USA Acquisition, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "<u>Buyer</u>"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Amended and Restated Asset Purchase Agreement, dated as of February 24, 2023 (the "<u>Asset Purchase Agreement</u>"), by and among Buyer and Sellers.

WHEREAS, pursuant to the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, the Assumed Contracts, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, pursuant to <u>Section 2.3</u> of the Asset Purchase Agreement, Buyer has agreed to assume, effective as of the Closing, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1. Sellers hereby assign and delegate the Assumed Contracts and the Assumed Liabilities to Buyer and Buyer hereby accepts assignment and delegation of and assumes the Assumed Contracts and the Assumed Liabilities as set forth in the Asset Purchase Agreement. Buyer assumes none of the Excluded Liabilities and the parties agree that all such Excluded Liabilities remain the responsibility of Sellers.

2. From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Agreement.

3. This Agreement is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4. No provision of this Agreement, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Agreement

or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

5.    None of the provisions of this Agreement may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.    This Agreement is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Agreement shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Agreement as provided and subject to the limitations set forth in the Asset Purchase Agreement. To the extent any provision of this Agreement is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.    This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

8.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature page follows]*

B-3

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS**:

**PERFORMANCE POWERSPORTS
GROUP INVESTOR, LLC**

By: _____
　　　Name:
　　　Title:

**PERFORMANCE POWERSPORTS
GROUP HOLDINGS, INC.**

By: _____
　　　Name:
　　　Title:

**PERFORMANCE POWERSPORTS
GROUP PURCHASER, INC.**

By: _____
　　　Name:
　　　Title:

**PERFORMANCE POWERSPORTS
GROUP, INC.**

By: _____
　　　Name:
　　　Title:

**BUYER**:

**CPS USA ACQUISITION, LLC**

By: _____
　　　Name:
　　　Title:

[Signature Page to Assignment and Assumption Agreement]

**EXHIBIT C**

**Form of Intellectual Property Assignment Agreement**

See attached.

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This Intellectual Property Assignment Agreement ("Assignment"), dated as of [_____], 202[__], is made and entered into by and among Performance Powersports Group Investor, LLC, a Delaware limited liability company ("PPG Investor"), Performance Powersports Group Holdings, Inc, a Delaware corporation and wholly owned subsidiary of PPG Investor ("PPG Holding"), each of the Seller Subsidiaries (together with PPG Investor and PPG Holding, "Sellers"), and CPS USA Acquisition, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Amended and Restated Asset Purchase Agreement, dated as of February 24, 2023 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, the Assigned Intellectual Property Assets, including the registered Intellectual Property set forth on Exhibit A attached hereto, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer, assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets, including the Assigned Intellectual Property Assets.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Each Seller hereby irrevocably sells, transfers, assigns, conveys and delivers to Buyer all of its worldwide right, title and interest in and to the Assigned Intellectual Property Assets, together with the goodwill of the business symbolized thereby, the right to sue for past infringement of the foregoing, all rights to collect income, royalties, damages, proceeds, and payments due or payable at or after the Closing relating to the foregoing, and the registrations thereof free and clear of all Liens (other than Permitted Liens), and hereby instructs, authorizes and directs the United States Patent and Trademark Office, and the corresponding entity or agency in any applicable foreign country, to record Buyer as assignee and owner of the applicable items set forth on Exhibit A.

2.      From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Assignment.

3.      This Assignment is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Assignment shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

5.      None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      This Assignment shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

8.      This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC**

By: _____
     Name:
     Title:

**PERFORMANCE POWERSPORTS GROUP HOLDINGS, INC.**

By: _____
     Name:
     Title:

**PERFORMANCE POWERSPORTS GROUP PURCHASER, INC.**

By: _____
     Name:
     Title:

**PERFORMANCE POWERSPORTS GROUP, INC.**

By: _____
     Name:
     Title:

**BUYER:**

**CPS USA ACQUISITION, LLC**

By: _____
     Name:
     Title:

**<u>Exhibit A to Intellectual Property Assignment Agreement</u>**

**To be provided**

**EXHIBIT D**

**Bid Procedures Order**

Attached.

## <u>Schedule 1</u>

**Bidding Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PERFORMANCE POWERSPORTS GROUP | ) | Case No. 23-10047 (LSS) |
| HOLDINGS, INC, *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 17** |

_____

## BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS

On January 16, 2023, Performance Powersports Group Holdings, Inc., and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  On January 16, 2023, the Debtors filed the *Motion of Debtors For Entry of: (I) an Order (A) Approving Bid Procedures in Connection With the Sale of Substantially All Assets, (B) Approving the Bid Protections to the Stalking Horse Bidder, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, (E) Authorizing Entry Into The Stalking Horse Agreement, (F) Approving Bid Protections, (G) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (H) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 17] (the "Bidding Procedures and Sale Motion"), seeking approval of, among other things, the procedures to determine the highest or otherwise best offer for the purchase of some or all of the Debtors' assets (the "Purchased Assets") pursuant to section 363 of the Bankruptcy Code under the Bidding Procedures and Sale Motion, chapter 11 plan (the "Plan"), or otherwise (any such purchase, a "Transaction").[2]

On January 16, 2023, in the exercise of their good faith reasonable business judgment, the Debtors entered into an asset purchase agreement (as amended on February 24, 2023, the "Stalking Horse Purchase Agreement") with CPS USA Acquisition, LLC (the "Stalking Horse Bidder"), pursuant to which, among other things, the Stalking Horse Bidder proposed to purchase, acquire,

_____

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380).  The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

[2]  A sale transaction may be structured as an asset sale, equity sale, plan of reorganization, or otherwise, as determined by the Debtors in consultation with the Successful Bidder.

and/or take assignment and delivery of the Purchased Assets[3] in exchange for consideration composed of (i) a credit bid of the outstanding obligations under the DIP Agreement pursuant to section 363(k) of the Bankruptcy Code, (ii) cash in an amount equal to $500,000, (iii) the assumption of the outstanding obligations under the Prepetition First Lien Credit Agreement; (iv) the assumption of the Assumed Liabilities (including all Determined Cure Costs with respect to any Assigned Contract), and (v) cash in an amount equal to the Wind-Down Amount (the "Stalking Horse Bid"); *provided* that the Wind-Down Amount shall only become payable as a portion of the Purchase Price in the event that (i) Sellers have insufficient cash on hand at Closing to fund the Wind-Down Amount from such cash on hand and (ii) the Sellers have otherwise complied in all respects with the Financing Orders, in which case the Buyer shall only be required to fund the amount necessary to bring the Sellers' total cash on hand at Closing to equal to the amount of the Wind-Down Amount.

On February 24, 2023, the Court entered an order approving the Bidding Procedures (the "Bidding Procedures Order"). These Bidding Procedures (the "Bidding Procedures") set forth the process by which the Debtors are authorized to conduct an auction for the sale (the "Sale") of the Purchased Assets (the "Auction") to determine the Successful Bidder.

Subject to the entry of the Sale Order, the Sale may be implemented pursuant to the terms and conditions of the Stalking Horse Agreement, as the same may be amended pursuant to the terms thereof, subject to the receipt of higher or otherwise better Bids (as defined below) in accordance with these Bid Procedures.

### **Important Dates**

- **February 24, 2023:** Debtors to send Cure and Possible Assumption and Assignment Notices to All Contract Counterparties.

- **March 7, 2023, at 4:00 p.m.:** Deadline to submit bids.

- **March 9, 2023, at 10:00 a.m.:**  Auction to be conducted.

- **March 10, 2023, at 4:00 p.m.:** Deadline to file and serve objections to relief requested at Sale Hearing (except for any Residual Objection that arises at the Auction).

- **March 10, 2023, at 4:00 p.m.:** Cure Objection Deadline.

- **March 13, 2023, at 4:00 p.m.:** Debtors deadline to file notice of Successful Bidder and Contract Assignment Notices.

---

[3]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding and Sale Motion or Stalking Horse Purchase Agreement, as applicable.

- **March 13, 2023, at 4:00 p.m.:** Residual Objection Deadline.

- **March 20, 2023, at 10:00 a.m.:** Date and time of Sale Hearing.

## **Bidding Process**

### I.    **Contact Parties**

1.    The Debtors, in consultation with their proposed restructuring advisor and investment banker, Portage Point Partners, LLC ("Portage Point") and other advisors, developed a list of parties whom they believe may be interested in, and whom the Debtors reasonably believe would have the financial resources to consummate, a Transaction. The list of parties includes both strategic investors and financial investors (collectively, the "Contact Parties"). As part of a pre-petition marketing process, Portage Point has already reached out to the Contact Parties to explore their interest in pursuing a Transaction. Portage Point will continue to reach out to the Contact Parties, as well as any other interested party or potential bidder (each, an "Interested Party"), to gauge their interest in acquiring the Purchased Assets. The Interested Parties may include parties whom the Debtors or their advisors previously contacted regarding a transaction, regardless of whether such parties expressed any interest at such time in pursuing a transaction.

2.    The Debtors may distribute (to the extent not already distributed) to each Contact Party and Interested Party an "Information Package" consisting of: (i) a copy of the Bidding Procedures, the Bidding Procedures Order, and the Bidding Procedures and Sale Motion; (ii) a form confidentiality agreement (a "Confidentiality Agreement"); and (iii) such other materials as appropriate under the circumstances.

### II.    **Participation Requirements**

3.    To receive due diligence information, including full access to the Debtors' electronic data room and to additional non-public information regarding the Debtors, an Interested Party must, on or before January 13, 2023 at 5:00 p.m. (prevailing Eastern Time), deliver to each of: (i) proposed counsel to the Debtors, Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic Pacitti (dpacitti@klehr.com) and Michael Yurkewicz (myurkewicz@klehr.com); and (ii) proposed restructuring advisor and investment banker to the Debtors, Portage Point, 1330 Avenue of the Americas, 22nd Floor, New York, New York 10019 Attn:  Steven Bremer (sbremer@pppllc.com) and Geoffrey Schmitz (gschmitz@pppllc.com), the following documents (the "Preliminary Bid Documents"):

a.    an executed Confidentiality Agreement on terms reasonably acceptable to the Debtors, to the extent not already executed;

b.    identification of the Interested Party and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Transaction(s); and

c.    a statement and other factual support, including evidence of sufficient financial capacity to close a proposed Transaction, demonstrating to the Debtors' satisfaction

in the exercise of their reasonable business judgment that the Interested Party has a *bona fide* interest in purchasing some or all of the Purchased Assets, provided that such information shall not be required to the extent the Interested Party's interest and wherewithal are known to the Debtors' investment banker.

Only those Interested Parties who, in the Debtors' determination, have submitted acceptable Preliminary Bid Documents (each, a "Potential Bidder") may submit bids. Each of the Stalking Horse Bidder and First Lien Agent (even if the First Lien Agent has not submitted a formal bid) will at all times be deemed to be a Potential Bidder. For the avoidance of doubt, these participation requirements do not prohibit Portage Point from distributing teaser and other promotional materials to potentially interested parties advising them of the opportunity to acquire some or all of the Purchased Assets, from engaging in discussions with such parties about the opportunity, or from providing non-confidential documents and information to such parties.

### III.   Obtaining Due Diligence

Only Potential Bidders will be eligible to receive due diligence information concerning the Debtors and their assets. The Debtors will provide to each Potential Bidder reasonable due diligence information, as requested, as soon as reasonably practicable after such request, which information will be commensurate with the due diligence information given to the Stalking Horse Bidder, solely in its capacity as a Potential Bidder, prior to and after entry into the Stalking Horse Purchase Agreement; provided that if any Potential Bidder is (or is affiliated with) a competitor of the Debtors, the Debtors reserve the right to withhold, redact, code, or delay providing any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such Potential Bidder at such time. The due diligence period will end on the Bid Deadline and, thereafter, the Debtors will have no obligation to furnish any diligence information.

Each Potential Bidder will comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Potential Bidder and its contemplated transaction. If the Debtors, after consultation with the Lender Parties and the Official Committee of Unsecured Creditors (together with the Lender Parties, the "Consultation Parties"), determine at any time in their reasonable discretion that a Potential Bidder is not reasonably likely to be a Qualified Bidder (as defined below), then the Debtors' obligation to provide due diligence information to such Potential Bidder will terminate and all information provided by the Debtors prior to such time shall be returned to the Debtors in accordance with the terms of the applicable Confidentiality Agreement.

### **Auction Process**

### I.   Bid Deadline

A Potential Bidder that desires to make a proposal, solicitation, or offer (each, a "Bid") shall transmit such Bid via email (in pdf format) so as to be **actually received** on or before **March 7, 2023 at 5:00 p.m. (prevailing Eastern Time)** (as may be extended from time to time

by the Debtors in their business judgment, the "Bid Deadline") by the Debtors' Representatives at the address listed below.

(a)     Portage Point Partners, LLP, 1330 Avenue of the Americas, 22nd Floor, Attn: Steven Bremer (sbremer@pppllc.com) and Geoffrey Schmitz (gschmitz@pppllc.com); and

(b)     Klehr Harrison Harvey Branzburg LLP, 919 North Market Street, Suite 1000, Wilmington, Delaware 19801, Attn: Domenic Pacitti (dpacitti@klehr.com) and Michael Yurkewicz (myurkewicz@klehr.com).

## II.     Bid Requirements

Each Bid by a Potential Bidder must be submitted in writing and satisfy the following requirements (collectively, the "Bid Requirements").

(a)     <u>Purpose</u>.  The Bid must clearly identify the following:  (i) the particular Purchased Assets, or the portion thereof identified with reasonable specificity, to be acquired; and (ii) the liabilities and obligations to be assumed, including any debt to be assumed.

(b)     <u>Total Consideration</u>.  Each Bid must clearly identify the form and amount of the total consideration to be provided to the Debtors in cash and non-cash components to be paid, including assumed liabilities (the "Bid Value").

(c)     <u>Deposit</u>.  Each Bid (other than the Stalking Horse Bid and any credit bid by the First Lien Agent (as defined in the DIP Order)) must be accompanied by a cash deposit of $2,000,000 to be held in an non-interest-bearing escrow account to be identified and established by the Debtors (the "Deposit"); *provided* that the Stalking Horse Bidder will not be required to provide a Deposit with respect to the Stalking Horse Purchase Agreement.

(d)     <u>Minimum Bid</u>.  The Bid Value (the "Minimum Bid") proposed by each Bid (or sum of Bids for different assets) must be equal to, or exceed, the sum of (i) $500,000; plus (ii) cash consideration in an amount sufficient to provide for the repayment in full of (x) all outstanding obligations under the Prepetition First Lien Credit Facility (as defined in the Financing Order) and (y) all amounts outstanding under the DIP Agreement; plus (iii) cash sufficient to fund the Wind-Down Amount;  plus (iv) cash or assumption of those Assumed Liabilities in the Stalking Horse Purchase Agreement that the Stalking Horse Bidder has agreed to pay or assume (including all Cure Costs with respect to any Assigned Contract); plus (v) the minimum overbid amount of $500,000; *provided*, *however*, that in determining the Bid Value, the Debtors will not be limited to evaluating the dollar amount of a Bid, but may also consider factors including, the liabilities and other obligations to be performed or assumed by the Potential Bidder, the additional administrative and prepetition claims likely to be created by such Bid in relation to other Bids, the proposed revisions to the Stalking Horse Purchase Agreement, and other factors affecting the speed, certainty and value of the proposed transactions.  For the avoidance of doubt,

each Bid must be on terms no less favorable than the terms of the Stalking Horse Purchase Agreement.

(e)   <u>Marked Agreement</u>.  Each Bid must include a signed asset purchase agreement, together with all exhibits and schedules thereto, the form of which will be provided to any Potential Bidder before the Bid Deadline, along with a redline version of such agreement relative to the Stalking Horse Purchase Agreement, pursuant to which the Qualified Bidder proposes to effectuate the Transaction (collectively, the "<u>Transaction Documents</u>").

(f)   <u>Tax Structure; Structure</u>.  The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if the Debtors, under the Bid, will incur any incremental tax liabilities.  The Bid must also identify the structure proposed for undertaking the Transaction, including the specific assets of the Debtors being acquired and liabilities being assumed, the proposed steps to accomplish such acquisition, and any financial, legal, or tax considerations upon which the Bid's proposed structure relies.

(g)   <u>Timeline to Close</u>.  The Bid must provide a commitment to close no later than the deadline for the Stalking Horse Bidder to close in the Stalking Horse Purchase Agreement.

(h)   <u>Sources of Financing; Adequate Assurance</u>.  To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the proposed Transaction(s) set forth in its Bid with cash on hand, each Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the Transaction at the purchase price (including sufficient financial or other information to establish adequate assurance of future performance pursuant to section 365(f)(2) of the Bankruptcy Code and, if applicable, section 365(b)(3) of the Bankruptcy Code to the non-Debtor counterparties to any executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Potential Bidder in connection with the proposed transaction) satisfactory to the Debtors in their reasonable discretion, after consultation with the Consultation Parties, with appropriate contact information for such financing sources.

(i)   <u>No Financing Approval or Diligence Outs</u>.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions.

(j)   <u>Authorization</u>.  Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the Transactions contemplated in such Bid.

(k)     <u>Disclaimer of Fees</u>.  Each Bid must disclaim any right to receive a fee analogous to any break-up fee, termination fee, expense reimbursement or similar type of payment.

(l)     <u>Identity</u>.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Qualified Bidder, including if such Qualified Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors' advisors should contact regarding such Bid.  Nothing herein shall preclude multiple Qualified Bidders from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein.

(m)     <u>Consent to Jurisdiction</u>.  The Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, and the Transaction documents and the closing, as applicable.

(n)     <u>No Collusion</u>.  The Bidder must acknowledge in writing (i) that it has not engaged in any collusion with respect to any Bids or the Transaction, specifying that it did not agree with any Qualified Bidders, Potential Bidders, or other interested third parties to control price or exert undue influence process; and (ii) agree not to engage in any such collusion or undue influence with respect to any Bids, the Auction, the Transaction, or the sale process.

(o)     <u>Good Faith Offer</u>.  The Bid must constitute a good faith, *bona fide* offer to effectuate the Transaction.

(p)     <u>As-Is, Where-Is</u>.  Each Bid must include a written acknowledgement and representation that the Potential Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer; (2) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its Bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Purchased Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid Documents.

By submitting its Bid, each Potential Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of these Bidding Procedures and to refrain from submitting a Bid or seeking to reopen the Auction after conclusion of the Auction.  **The submission of a Bid shall constitute a binding and irrevocable offer to acquire the Purchased Assets as reflected**

**in such Bid**.  As soon as reasonably practicable following the designation of a Bid as a Qualified Bid in accordance with these Bidding Procedures, the Debtors shall notify each Qualified Bidder of such designation.

### III.    Designation of Qualified Bidders

A qualified bidder ("Qualified Bidder") is a Potential Bidder that, in the Debtors' reasonable determination after consultation with the Consultation Parties, (i) has timely submitted a Bid that satisfies each of the requirements listed above in the section entitled "Bid Requirements" and (ii) is able to consummate the proposed transaction within the required timeframe if selected as the Successful Bidder (such Bid submitted by a Qualified Bidder, a "Qualified Bid"); *provided* that the Debtors reserve the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid.

Within two (2) Business Days after a Potential Bidder delivers all of the documents described above, the Debtors will determine in their reasonable discretion, and in consultation with the Consultation Parties, whether such Potential Bidder is a Qualified Bidder, and notify the Potential Bidder of such determination.

For the avoidance of doubt, (i) the First Lien Agent shall be deemed a Qualified Bidder; *provided* that the Qualified Bid of the First Lien Agent must meet the requisite Minimum Bid requirements (unless the Stalking Horse Purchase Agreement has been terminated); *provided, further*, that the First Lien Agent shall not be required to serve as a Back-Up Bidder (defined below) except to the extent provided herein, (ii) the Stalking Horse Bidder is a Qualified Bidder, (iii) the Stalking Horse Purchase Agreement is a Qualified Bid; *provided* that the Stalking Horse Bidder shall not be required to serve as a Back-Up Bidder (defined below) except to the extent provided herein or in the Stalking Horse Purchase Agreement, and (iv) each of the Stalking Horse Bidder and the First Lien Agent is authorized to submit any Overbids (as defined below) during the Auction, in each instance without further qualification required of the Stalking Horse Bidder or First Lien Agent, as applicable.

If no Qualified Bids (other than the Stalking Horse Purchase Agreement) are obtained by the Bid Deadline, then the Stalking Horse Bidder will be deemed the Successful Bidder, the Stalking Horse Purchase Agreement will be the Successful Bid, and the Debtors will seek final Court approval of the sale of the Purchased Assets to the Stalking Horse Bidder as contemplated by the Stalking Horse Purchase Agreement.

### IV.    The Auction

If the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Purchase Agreement, the Debtors will conduct the Auction to determine the highest or otherwise best bid with respect to the Purchased Assets.  The Auction will commence on **March 9, 2023 at 10:00 a.m. (prevailing Eastern Time)** at the Wilmington offices of Klehr Harrison Harvey Branzburg LLP, or on such other date and/or at such other location as determined by the Debtors and the Stalking Horse Bidder (provided that the DIP Lender, as defined in the Stalking Horse

Purchase Agreement, the First Lien Agent, and the Stalking Horse Bidder's rights under the Financing Orders and the Stalking Horse Purchase Agreement shall remain unaffected).

No later than one (1) day prior to the commencement of the Auction, the Debtors will (i) notify: (a) all Qualified Bidders, (b) counsel to the First Lien Agent (as defined below), (c) the Lender Parties, (d) the Office of the U.S. Trustee for the District of Delaware, and (e) Cole Schotz, P.C., 1325 Avenue of the Americas, 19th Floor, New York, NY 10019, Attn: Seth Van Aalten (svanaalten@coleschotz.com) and Sarah A. Carnes (scarnes@coleschotz.com) and 500 Delaware Avenue, Suite 1410, Wilmington, DE 19801 Attn: G. David Dean (ddean@coleschotz.com), proposed counsel to the Official Committee of Unsecured Creditors, in writing of the highest or otherwise best Qualified Bid, as determined in the Debtors' business judgment, in consultation with the Consultation Parties (the "Baseline Bid") and (ii) provide copies of the documents supporting the Baseline Bid to all Qualified Bidders. The determination of which Qualified Bid constitutes the Baseline Bid, and which Qualified Bid constitutes the highest or otherwise best bid such that it is the Successful Bid, shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the type and amount of assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Baseline Bid; (e) the projected percentage recovery to general unsecured creditors pursuant to such Qualified Bid, (f) whether administrative, priority, and secured claims will be paid in full; (g) the tax consequences of such Qualified Bid; (f) the assumption of obligations, including contracts and leases; (h) the cure amounts to be paid; and (i) the impact on employees, including the number of employees proposed to be transferred and employee-related obligations to be assumed, including the assumption of collective bargaining agreements (collectively, the "Bid Assessment Criteria").

If there is an Auction, it will be conducted in accordance with the following procedures:

(a) The Debtors and their professionals will direct and preside over the Auction. At the start of the Auction, the Debtors will describe the terms of the Baseline Bid. All Bids made thereafter must be Overbids (as defined below) and will be made and received on an open basis, and all material terms of each Bid will be fully disclosed to all other Qualified Bidders. The Debtors will maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, the Successful Bid, and the Back-Up Bid.

(b) Only a Qualified Bidder that has submitted a Qualified Bid will be eligible to participate at the Auction. Only the authorized representatives of each of the Qualified Bidders (including each of the Stalking Horse Bidder and the First Lien Agent), the Debtors, the Lender Parties (including their counsel), and the Official Committee of Unsecured Creditors (including their counsel) will be permitted to attend the Auction. In addition, pursuant to Local Rule 6004-1, all creditors of the Debtors may attend the Auction, *provided* that they send an email to the Debtors' Representatives indicating that they intend to attend the Auction no less than two (2) Business Days prior to the Auction.

(c)     During the Auction, bidding will begin initially with the Baseline Bid and subsequently continue in minimum increments of at least $250,000 in cash (each, an "Overbid"); *provided, however,* that the (i) Stalking Horse Bidder may satisfy the minimum bid increment requirement by credit bidding at least $250,000 of outstanding obligations under the DIP Credit Agreement that do not already form part of the purchase price under the Stalking Horse Purchase Agreement, if any; and (ii) the First Lien Agent may satisfy the minimum bid increment requirement by credit bidding up to the amount of outstanding obligations under the Prepetition First Lien Credit Agreement as of the Auction, if any.  The Debtors will announce at the Auction the material terms of each Overbid, value each Overbid in accordance with these Bid Procedures and provide each Qualified Bidder with an opportunity to make a subsequent Overbid.  Subject to the requirement (other than with regard to the Stalking Horse Bidder) that each Overbid include at least $250,000 in cash more than the cash component of the Baseline Bid or prevailing Overbid, additional consideration in excess of the amount set forth in the Baseline Bid or the prevailing Overbid may include cash and/or other consideration acceptable to the Debtors in accordance with these procedures.  To the extent that an Overbid has been accepted entirely or in part because of the addition, deletion, or modification of a provision or provisions in the applicable Transaction Documents or the Stalking Horse Purchase Agreement, the Debtors will provide notice to each participant of the value ascribed by the Debtors to any such added, deleted, or modified provision or provisions, with such value being determined by the Debtors in their reasonable discretion after consultation with the Consultation Parties.

(d)     Any Overbid made from time to time by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (i) the Debtors accept a higher or otherwise better bid submitted by another Qualified Bidder during the Auction as an Overbid and (ii) such Overbid is not selected as the Back-Up Bid (as defined below).  To the extent not previously provided (which will be determined by the Debtors), a Qualified Bidder submitting an Overbid must submit at the Debtors' request, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Qualified Bidder's ability to close the transaction at the purchase price contemplated by such Overbid.

(e)     Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding, and (ii) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed Transaction if selected as the Successful Bidder.

(f)     The Debtors, in their reasonable business judgment and after consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Qualified Bid, any bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures or (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders.

The Debtors reserve the right to make one or more adjournments in the Auction to, among other things (i) facilitate private discussions with individual Qualified Bidders and negotiate the terms of their Overbids, (ii) allow individual Qualified Bidders to consider how they wish to proceed, and (iii) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors may require in their reasonable discretion to determine that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

The Debtors may not modify or announce additional procedures for conducting the Auction, or otherwise modify these Bidding Procedures, without the prior reasonable consent of the Stalking Horse Bidder, the DIP Lender, and the First Lien Agent.

### V.    Selection of Successful Bid

The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in the exercise of their reasonable business judgment, in consultation with the Consultation Parties, to be the highest or otherwise best bid submitted by a Qualified Bidder during the Auction for the Purchased Assets (the "Successful Bid") and the next highest or otherwise best bid after the Successful Bid (the "Back-Up Bid"), at which point the Auction will be closed; *provided* that the Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then prevailing highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid. The Qualified Bidder that submits the Successful Bid will be deemed the "Successful Bidder." The Qualified Bidder that submits the Back-Up Bid, if any, will be deemed the "Back-Up Bidder"; *provided, however*, that if the Debtors indicate that they have identified a Bid of the Stalking Horse Bidder as the next highest or otherwise best bid after the Successful Bid, and a Bid of another party (other than the Successful Bid) remains open, either the Stalking Horse Bidder or the First Lien Agent may, at their option, decline to serve as the Back-Up Bidder in favor of the next highest or otherwise best bid if one exists.

The Back-Up Bid, if any, will remain open and binding on the Back-Up Bidder until consummation of the Successful Bid with the Successful Bidder. If the Successful Bidder fails to consummate the Successful Bid within the time set forth therein, the Debtors will be authorized, but not required, to select the Back-Up Bidder, if any, as the new Successful Bidder, and shall proceed to consummate the Successful Bid of the new Successful Bidder.

### VI.    Sale Hearing

The hearing to consider approval of the sale transaction in relation to the Successful Bid (or confirmation of the Plan if the Successful Bid contemplates consummation of the Transaction pursuant to a chapter 11 plan) (the "Hearing") will be held before the Court no later than **March 20, 2023** (or such other date as the Court determines) and otherwise in accordance with any scheduling order entered by the Court; *provided* that if no Auction is held the Debtors reserve

the right to schedule the Hearing before such time and in accordance with the timeline set forth in the Stalking Horse Purchase Agreement.

The Hearing may be adjourned or rescheduled, in consultation with the Consultation Parties and the Stalking Horse Bidder (provided that the DIP Lender, the First Lien Agent, and the Stalking Horse Bidder's rights under the Financing Orders and Stalking Horse Purchase Agreement shall remain unaffected), by the Debtors to a time and date consistent with the Court's calendar, as set forth in notice on the docket of these chapter 11 cases, a notice of agenda, or stated orally at the Confirmation / Sale Hearing.

## VII.    Return of Deposit

The Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more non-interest-bearing escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder and the Back-Up Bidder) on the date that is three business days after the Auction, or as soon as is reasonably practicable thereafter.  Upon the return of the Deposits, the applicable Qualified Bidders shall receive any and all interest that will have accrued thereon.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed transaction with the applicable Back-Up Bidder without the need for an additional hearing or order of the Court.

## VIII.    Lender Parties

The term "Lender Parties" shall mean (i) Twin Brook Capital Partners, LLC, solely in its capacity as first lien agent (the First Lien Agent") and (ii) Tankas Funding VI, LLC, solely in its capacity as postpetition financing lender (the "DIP Lender"); *provided*, *however*, that the DIP Lender shall be a Lender Party with respect to any Bid for (i) materially less than all of the Purchased Assets or (ii) assets other than the "Purchased Assets" as defined in any current Bid of the Stalking Horse Bidder; *provided*, *further*, that without limiting the foregoing proviso, at and after any time that the Stalking Horse Bidder is no longer bidding on any of the Purchased Assets, the DIP Lender shall be a Lender Party for all purposes.  The Debtors shall consult with the Lender Parties as required by these Bidding Procedures.  Any failure to specifically identify consultation rights in any section of these Bidding Procedures shall not limit or otherwise impair the rights of the Lender Parties to consult with the Debtors.

### Fiduciary Duties

Notwithstanding anything to the contrary contained herein, nothing in the Bidding Procedures will prevent the Debtors or their management or boards of directors from exercising their respective fiduciary duties under or otherwise complying with applicable law.

### Reservation of Rights

The Debtors reserve the right, in their reasonable discretion and subject to the exercise of their business judgment, after consultation with the Consultation Parties, to alter or terminate these Bid Procedures, to alter or modify any Auction rules or procedures, to waive terms and conditions set forth herein with respect to all Potential Bidders, extend the deadlines set forth herein, alter the assumptions set forth herein, and/or to terminate discussions with any and all prospective acquirers and investors at any time and without specifying the reasons therefor, in each case in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Purchased Assets; *provided* that the Debtors shall only be permitted to modify or amend the terms of the Stalking Horse Purchase Agreement in accordance with the applicable Stalking Horse Purchase Agreement.

*        *        *        *

**<u>Schedule 2</u>**

**Form of Hearing Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PERFORMANCE POWERSPORTS GROUP | ) Case No. 23-10047 (LSS) |
| HOLDINGS, INC., *et al.*,[1] | ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. _____** |

## NOTICE OF STALKING HORSE BID, BIDDING
## PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Court") on January 16, 2023 (the "Petition Date").

**PLEASE TAKE FURTHER NOTICE** that, on January 16, 2023, the Debtors filed a motion [Docket No. 17] (the "Bidding Procedures Motion")[2] with the Court seeking entry of an order, (a) approving the Bidding Procedures in connection with the sale of substantially all of the Debtors' assets, as attached to the Bidding Procedures Order as Schedule 1, (b) the form and manner of this notice, the Bid Deadline, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Schedule 2, (c) scheduling an auction and sale hearing to consider approval of the proposed Transaction, (d) approving procedures for the assumption and assignment of Contracts, (e) approving the sale of the Debtors' assets free and clear, and (e) granting related relief.

**PLEASE TAKE FURTHER NOTICE** that, on February 24, 2023, the Court entered an order [Docket No.    ] (the "Bidding Procedures Order") approving, among other things, the Stalking Horse Purchase Agreement and the Bidding Procedures, which establish the key dates and times related to the Transaction and the Auction, if necessary, to determine the Successful Bidder.  All Interested Parties should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[3]

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380).  The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures or Bidding Procedures Motion, as applicable.

[3]  To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding

## Contact Information for Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in acting as a Bidder must comply strictly with the Bidding Procedures. The Debtors, in accordance with the Bidding Procedures, will consider only Qualified Bids.

**Any Interested Party should contact, as soon as practicable:**

Portage Point Partners, LLC
1300 Avenue of the Americas, 22nd Floor
New York, New York 10019
Attn: Steven Bremer (sbremer@pppllc.com)
Attn: Geoffrey Schmitz (gschmitz@pppllc.com)

## Obtaining Additional Information

Copies of the Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order, as well as all related exhibits, including all other documents filed with the Court, are available free of charge on the Debtors' restructuring website, https://omniagentsolutions.com/PerformancePowersports.

## Important Dates and Deadlines[4]

1. **Bid Deadline**. The deadline to submit a Qualified Bid is **March 7, 2023 at 5:00 p.m.** (prevailing Eastern Time).

2. **Auction**. If the Debtors receive at least one additional Qualified Bid which includes terms that are higher or otherwise better than those contemplated by the Stalking Horse Purchase Agreement prior to the Bid Deadline, then, subject to the satisfaction of any further conditions set forth in the Bidding Procedures, the Debtors intend to conduct an Auction to determine the Successful Bidder. Only (a) Qualified Bidders and each of their respective legal and financial advisors and (b) the Consultation Parties shall be entitled to attend the Auction and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders are eligible to bid at the Auction. The Auction, if one is held, will commence on **March 9, 2023, at 10:00 a.m. (prevailing Eastern Time)** at the offices of Klehr Harrison Harvey Branzburg LLP, at 919 N. Market Street, Suite 100, Wilmington, Delaware 19801, or such later date and time as selected by the Debtors, who shall notify all Qualified Bidders.

---

Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

[4] The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

3. **Time for Debtors to Provide Notice of Results of Auction**.  As soon as reasonably practicable after the close of the Auction, the Debtors shall (a) file the Notice of Auction Results with the Court (which notice shall identify the Successful Bidder, the amount of the Successful Bid, the Backup Bid, and the amount of the Backup Bid(s) and (b) cause the Notice of Auction Results to be published on the Debtors' restructuring website, https://omniagentsolutions.com/PerformancePowersports.

4. **Transaction Objections Deadline**.  The deadline to file an objection with the Court to the Transaction (if any) (collectively, the "<u>Transaction Objections</u>") is **March 10, 2023 at 4:00 p.m.** (prevailing Eastern Time) (the "<u>Objection Deadline</u>").

5. **Hearing**.  A hearing to consider the proposed Transaction will be held before the Court no later than **March 20, 2023 at 10:00 a.m.**  (prevailing Eastern Time)**,** or such other date as determined by the Court, at 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

## <u>Filing Objections</u>

Transaction Objections, if any, must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof, (c) be filed with the Court and served so as to be ***actually received*** by no later than **March 10, 2023 at 4:00 p.m.** (prevailing Eastern Time) on (i) the Debtors, Attn: Ken Vanden Berg, CFO, 1775 East University Drive, Tempe, Arizona 85281; (ii) counsel to the Debtors, Klehr Harrison Harvey Branzburg LLP, located at 919 N. Market Street, Suite 100, Wilmington, Delaware 19801, Attn: Domenic Pacitti (dpacitti@klehr.com) and Michael Yurkewicz (myurkewicz@klehr.com); (iii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 Attn:  Richard Schepacarter (Richard.Schepacarter@usdoj.gov); (iv) counsel for the Prepetition First Lien Agent, Winston & Strawn, LLP, 200 Park Avenue, New York, NY 10017 Attn: Gregory M. Gartland (ggartland@winston.com) and Emma Fleming (efleming@winston.com) and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street Wilmington, DE 19801 Attn: Andrew Magaziner (amagaziner@ycst.com); (v) proposed counsel to the official committee of unsecured creditors, Cole Schotz, P.C., 1325 Avenue of the Americas, 19th Floor, New York, NY 10019, Attn: Seth Van Aalten (svanaalten@coleschotz.com) and Sarah A. Carnes (scarnes@coleschotz.com) and 500 Delaware Avenue, Suite 1410, Wilmington, DE 19801 Attn: G. David Dean (ddean@coleschotz.com); and (vi) counsel for the DIP Lender, Kirkland & Ellis, LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Brian Schartz, P.C. (brian.schartz@kirkland.com) and Allyson B. Smith (allyson.smith@kirkland.com), and (vii) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Objection Notice Parties</u>").

## <u>CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION</u>

**Except as otherwise ordered by the Court, any party or entity who fails to timely make an objection to the Transaction on or before the Objection Deadline in accordance with the Bidding Procedures Order and this notice shall be forever barred from asserting**

any objection to the Transaction, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances and other interests.

Dated: _____, 2023          /s/ DRAFT
Wilmington, Delaware             Domenic E. Pacitti (DE Bar No. 3989)
                                 Michael W. Yurkewicz (DE Bar No. 4165)
                                 Sally E. Veghte (DE Bar No. 4762)
                                 **KLEHR HARRISON HARVEY BRANZBURG LLP**
                                 919 North Market Street
                                 Suite 1000
                                 Wilmington, Delaware 19801
                                 Telephone:    (302) 426-1189
                                 Facsimile:    (302) 426-9193
                                 Email:        dpacitti@klehr.com
                                               myurkewicz@klehr.com
                                               sveghte@klehr.com

                                 -and-

                                 Morton R. Branzburg (admitted *pro hac vice*)
                                 **KLEHR HARRISON HARVEY BRANZBURG LLP**
                                 1835 Market Street, Suite 1400
                                 Philadelphia, Pennsylvania 19103
                                 Telephone:    (215) 569-3007
                                 Facsimile:    (215) 568-6603
                                 Email:        mbranzburg@klehr.com

                                 *Counsel to the Debtors and Debtors in Possession*