1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2

3   IN RE:                     .  Chapter 11
                                .
4   PERFORMANCE POWERSPORTS     .  Case No. 23-10047 (LSS)
    GROUP INVESTOR, LLC,        .
5   et al.,                     .  (Jointly Administered)
                                .
6                               .
                                .  Courtroom No. 2
7                               .  824 Market Street
                                .  Wilmington, Delaware 19801
8              Debtor.          .
                                .  Thursday, February 23, 2023
9   . . . . . . . . . . . . . . .  10:00 a.m.

10                     TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
11              CHIEF UNITED STATES BANKRUPTCY JUDGE

12  APPEARANCES:

13  For the Debtor:          Domenic Pacitti, Esquire
                             KLEHR HARRISON HARVEY BRANZBURG LLP
14                           919 North Market Street
                             Suite 1000
15                           Wilmington, Delaware 19801

16

17

18
    (APPEARANCES CONTINUED)
19

20  Audio Operator:          Jermaine Cooper

21  Transcription Company:   Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.

APPEARANCES (CONTINUED):

For the Committee:        G. David Dean, Esquire
                          COLE SCHOTZ LLP
                          500 Delaware Avenue
                          Suite 1410
                          Wilmington, Delaware 19801

For Kinderhook:           Brian Schartz, Esquire
                          KIRKLAND & ELLIS LLP
                          601 Lexington Avenue
                          New York, New York 10022

For the U.S. Trustee:     Richard Schepacarter, Esquire
                          OFFICE OF THE UNITED STATES TRUSTEE
                          844 King Street, Suite 2207
                          Lockbox 35
                          Wilmington, Delaware 19801

1                                    INDEX

2  MOTIONS:                                                    PAGE

3  Agenda
   Item 1: Motion of the Debtors for Entry of Interim          10
4          and Final Orders, Pursuant to 11 U.S.C. §§
           105, 361, 362, 363, 364 and 507 (I)
5          Authorizing Debtors to Obtain Senior and
           Junior Secured Superpriority Post-Petition
6          Financing; (II) Granting Liens and
           Superpriority Administrative Expense Claims;
7          (III) Authorizing Use of Cash Collateral; (IV)
           Modifying the Automatic Stay; (V) Scheduling
8          a Final Hearing; and (VI) Granting Related
           Relief [Docket No. 13; Filed 1/16/2023]
9

10 Agenda
   Item 2: Motion of Debtors for Entry of: (I) an Order
11         (A) Approving Bid Procedures in Connection with
           the Sale of Substantially All Assets, (B)
12         Approving the Bid Protections to the Stalking
           Horse Bidder, (C) Scheduling an Auction and Sale
13         Hearing, (D) Approving the Form and Manner of
           Notice Thereof, (E) Authorizing Entry into the
14         Stalking Horse Agreement, (F) Approving Bid
           Protections, (G) Approving Procedures for the
15         Assumption and Assignment of Contracts and
           Leases, and (H) Granting Related Relief; and
16         (II) an Order (A) Approving the Sale of
           Substantially All Assets Free and Clear of
17         Liens, Claims, Encumbrances, and Interests, (B)
           Authorizing the Assumption and Assignment of
18         Contracts and Leases, and (C) Granting Related
           Relief [Docket No. 17; Filed 1/16/2023]
19

20         Court's Ruling:                                      37

21

22

23

24

25

1          (Proceedings commenced at 10:06 a.m.)

2                THE COURTROOM DEPUTY:  Please rise.

3                THE COURT:  Please be seated.

4                Mr. Pacitti.

5                MR. PACITTI:  Good morning, Your Honor.

6                THE COURT:  Good morning.

7                MR. PACITTI:  For the record, Your Honor, Domenic

8  Pacitti, Michael Yurkewicz, Sally Veghte, and Ryan Moore from

9  Klehr Harrison Harvey Branzburg on behalf of the debtors.

10 Your Honor, also in the courtroom today is our disinterested

11 or independent Mr. Peter Kravitz, and Mr. Steven Bremer and

12 Alyssa Loyzinski who are our restructuring advisors and

13 investment bankers from Portage Point Partners.

14                Your Honor, perhaps explaining to the Court, sort

15 of, where we are, how we got to where we are today, and our

16 plan forward for today's hearing would be helpful for

17 certainly the Court and perhaps all of us.

18                THE COURT:  Okay.

19                MR. PACITTI:  Initially, Your Honor, I would like

20 to thank the Court and Mr. Schepacarter, in particular, as

21 well for indulging us over the past few weeks and in

22 particular with respect to the adjournment that we requested

23 of both of these hearings which had originally been scheduled

24 for the 13th of February.

25                Since the committee was appointed and since they

1 selected counsel on February 1st we have engaged in very

2 productive, we thought, discussions with the Cole Schotz

3 Firm.  We thought we were working towards a path towards a

4 value maximizing transaction here.

5          Within minutes of the committee selecting counsel

6 we immediately delivered to counsel thousands upon thousands

7 of documents which formed the basis of both the investigation

8 as well as the due diligence behind these proceedings.  We

9 also made available ourselves to have discussions, our

10 financial advisors to have discussions about sale process,

11 about financial condition and the path forward.  We also made

12 Mr. Kravitz available for an interview, informal interview,

13 of any and all issues which, in fact, took place, I believe,

14 on the 5th of February.

15          During this whole process we want to thank, first

16 of all, the Cole Schotz folks.  They have been a pleasure to

17 deal with.  They have been very open, very helpful throughout

18 the process.  The negotiations with them were cooperative.

19 We thought they were fruitful.  There, obviously, was

20 significant back and forth, but it was always collegial.  The

21 spread between the bid and ask was very small.

22          Unfortunately, Your Honor, as of Monday of this

23 week, the committee informed us that there was no deal and

24 that all prior deals were going to be pulled.  Informed us

25 that they were not going to negotiate any further.  As a

1  consequence they filed their objection on the extended

2  deadline which was Monday, albeit a holiday, at four o'clock.

3          Now, Your Honor, we really don't have a real

4  explanation for why the committee ceased negotiations when

5  they did.  We think that the composition of the committee is

6  somewhat telling and perhaps tells all that needs to be told.

7          THE COURT:  You get the committee you get.

8          MR. PACITTI:  Understood, Your Honor, but, you

9  know, the committee you get, I'm not suggesting that there

10 was anything wrong with the formation, I'm just trying to

11 give context of why I think we are where we are.

12         Your Honor, clearly the folks that are on the

13 committee are the folks that, you know, we were in litigation

14 with prepetition, (indiscernible) entities clearly.  These

15 entities, you know, commenced that litigation both against

16 the debtors and against Kinderhook prepetition.  They

17 subsequently amended that complaint post-petition.  We are in

18 the process of reviewing that amended complaint now because

19 it purports to, sort of, remove the debtors from that

20 process, but we will deal with that later because there may

21 be stay violations, there may be other issues.  We are just

22 reserving rights with respect to all of that today.

23         Again, Your Honor, these are the same entities

24 that, you know, drove the company into bankruptcy by

25 threatening the involuntary petition.  Now, although these

1  entities are supposed to be fiduciaries for the committee,

2  for all unsecured creditors --

3            THE COURT:  I'm not really interested in hearing

4  the debtors thoughts about the committee.

5            MR. PACITTI:  Okay.

6            THE COURT:  You have the committee you have.

7            MR. PACITTI:  Understood, Your Honor.

8            THE COURT:  It has fiduciary obligations.  I'm

9  sure it's been advised of that.

10           MR. PACITTI:  Absolutely, Your Honor.  I can't

11 imagine they haven't been by the Cole Schotz folks.

12           Your Honor, the context here is really, you know,

13 what we're losing potentially here, and why some people may

14 care and why other people may not clear.  Clearly, go-forward

15 creditors care.  Clearly, folks that are competitors that

16 would rather see the debtor not survive don't care about a

17 deal.  Its just that context that I think is important to,

18 sort of, keep in the back of everyone's mind of why it is

19 that we are here today rather than proceeding with an agreed

20 upon value maximizing transaction.

21           Again, Your Honor, where does that leave us.  So,

22 today we're prepared to move forward.  We have got a case to

23 put on.  We still believe that notwithstanding the inability

24 to reach an accommodation with the committee, which,

25 obviously, would have been economically superior then what's

1  before the Court today, we still think that the path forward

2  is a value maximizing process that benefits creditors.

3          We did file a proposed final DIP order, Your

4  Honor.  As part of that proposed final DIP order it still

5  contains some of the negotiated items that we did with the

6  committee, but certainly not all of them.

7          THE COURT:  What were negotiated items that are in

8  the final order?

9          MR. PACITTI:  It was primarily, Your Honor, in

10  terms of the release as it relates to the removal of all of

11  the non-debtor related parties. So, the released parties

12  definition under the release provision has been substantially

13  modified so that its truly a debtor release.

14          I'm sure Your Honor has read the pleadings, most

15  of Mr. Schepacarter's objection and some of the committee's

16  objection really relates to that issue.  And much of the case

17  law in support of why that was not appropriate, you know,

18  talks about plan releases and other things like that which we

19  think are no longer at issue today as a consequence of the

20  changes that we made.

21          THE COURT:  Not as deferred parties anyway.

22          MR. PACITTI:  Correct, Your Honor.

23          Then the other changes were a preservation of

24  potential claims against other folks that were potential,

25  you know, defendants in the investigation.  They were a part

1  of -- I don't want to get too far into the discussion, but

2  that was one of the other accommodations that was raised, and

3  we agreed to keep that in there, Your Honor.

4           THE COURT:  Okay.

5           MR. PACITTI:  So, Your Honor, for today I think

6  what we really need to do is just move forward with the

7  evidentiary record.  We have the testimony of Mr. Kravitz.

8  We also have three of the declarations to move into evidence;

9  those of Mr. Bremer both in terms of the cash collateral and

10 DIP motion, as well as the bid procedures motion, and that of

11 Ms. Loyzinski with respect to the DIP motion. Those are

12 Dockets 14, 15, and 18 respectively.

13          We propose that all of the evidence in terms of

14 the record today be brought simultaneously.  There's two

15 matters on, there's the DIP and the bid procedures, but they

16 really are intertwined and overlap.  So, the evidentiary

17 record, we think, today really is just one, but relates to

18 both of those matters.

19          So, Your Honor, I think that is the way to proceed

20 if that is okay with Your Honor.  Then, obviously, we will

21 have argument with respect to that evidentiary record and the

22 issues before the Court.

23          THE COURT:  Let me hear any opening remarks the

24 committee wants to make.  You don't have to, but I will

25 welcome it.

1   MR. DEAN:  Thank you.  Good morning, Your Honor.

2 Good to see you.  David Dean of Cole Schotz on behalf of the

3 committee.

4   We had agreed to waive openings this morning.  I,

5 obviously, did not expect all of that commentary from Mr.

6 Pacitti.  So, I will just say, at the onset, I take issue

7 with a lot of what he said, but I'm not going to waste the

8 Court's time in opening to do that.  I will just wait to hear

9 the evidence and respond to these points on closing unless

10 the Court has any preliminary questions for me at this time.

11   THE COURT:  I don't.  I have preliminary

12 observations, but you can sit down, Mr. Dean.

13   MR. DEAN:  Thank you.

14   THE COURT:  I have read the filings.

15   MR. PACITTI:  Do you want me to stand, Your Honor?

16   THE COURT:  I read the filings and I think all the

17 wrong standards are being argued to me.  All the wrong

18 standards.  It starts with the idea that these releases are a

19 settlement.  I don't know what they're a settlement of.

20 Nobody has told me that.  And this isn't a settlement

21 hearing.  This is a DIP financing hearing.

22   It's like when people tell me a plan is a

23 settlement.  No, a plan is not a settlement, okay.  There are

24 standards for confirmation of a plan.  This is a DIP

25 financing hearing.  What is the standard on that, 364; not

1  settlement.

2        I went back and read <u>Ames</u>, which I think was cited

3  in some of the papers, and is clearly the foundational case

4  for DIP financing.  And its interesting even though its,

5  what, 1990. Its super similar.  The question -- what does

6  <u>Ames</u> tell us.  <u>Ames</u> tells us that whether the Court approves

7  DIP financing is within the discretion of the Court.  The

8  Court may authorize financing.  Once availability of less

9  intrusive credit has been shown, unavailability has been

10  shown, and adequate protection found if required, the

11  bankruptcy courts, in applying discretion under 364(b), (c),

12  and (d) have recognized that their discretion is not

13  unbridled.

14        Acknowledging that Congress, in Chapter 11,

15  delicately balanced the hope of debtors to reorganize the

16  expectations of creditors for payment.  The Courts have

17  focused their attention on proposed terms that would tilt the

18  conduct of the bankruptcy case, prejudice at an early stage

19  the powers and rights that the bankruptcy code confers for

20  the benefit of all creditors or leverage the Chapter 11

21  process by preventing motions by parties in interest from

22  being decided on their merits.

23        The cases consistently reflect that the Court's

24  discretion under 364 is to be utilized on grounds that permit

25  reasonable business judgment to be exercised so long as the

1  financing agreement does not contain terms that leverage the

2  bankruptcy process and powers or its purposes not so much to

3  benefit the estate as it is to benefit a party in interest.

4          So, the question is what are the terms and do they

5  unfairly tilt the case in improper ways.  That is the issue

6  that is in front of me, the terms.  The debtor's business

7  judgment is only a piece of it.  I think it's the piece that

8  tells me, well, do we need financing.  Do we -- are there

9  more favorable terms that could be gotten somewhere else.

10  Are these the best terms.

11          When we start looking at what we're looking at

12  here, at the beginning of this case, I have significant

13  concerns about whether there is anything I can approve today.

14  Here is a list of things that I made about what the terms

15  are.  I am sure its just a partial list.

16          The sponsor is the equity, the prepetition lender,

17  the DIP lender, and the stalking horse bidder.  I have got a

18  commitment fee of 6 percent, an exit fee of 10 percent.  I

19  have got 18 percent interest.  The DIP wants a waiver of

20  everything and is liening up everything including claims

21  against it.  Wanted third-party releases and debtor releases

22  of DIP and all affiliated entities.  So, it ends up being

23  everyone gets a release.  And, of course, everyone related to

24  them gets a release.

25          Debtor wants releases that include fraud, willful

1   misconduct and things usually excluded.  Debtor wants a

2   reaffirmation of the release each time it takes an advance.

3   So, the release is forward looking on actions that we don't

4   know about.  The challenge period ends on all debtor claims

5   released.  So, the committee does not have any period to take

6   a look at this.

7          The stalking horse bidder, who is an insider, gets

8   a breakup fee and an expense reimbursement.  The exit fee and

9   the commitment fee are added to the credit bid.  The DIP

10  lender is a consultation party.  The committee is not a

11  consultation party.  The prepetition marketing period was

12  less then a month over the December, January holidays, and

13  they want a 60 day sale period from the petition date.  I

14  think the bid is due March 8th and I haven't approved the bid

15  procedures yet.

16         The debtors argue I should approve the releases as

17  a settlement, and, again, I don't know what that means.  I

18  don't think they have met the release standard for third

19  parties or debtor releases which is the Zenith standard for

20  debtor releases.  I have got a 30 plus page submission

21  evaluating all these potential causes of action that the

22  disinterested director reviewed.  It shows me that this is

23  complicated.

24         This was a -- as I understand it the current

25  sponsor bought the business in a leveraged buyout.  I wonder

1  who represented the debtor in that transaction.  I don't

2  think I have seen this aggressive of a position in a long

3  time.  And I don't see how I can read Ames and say that this,

4  if approved, as submitted, doesn't unfairly tilt this case in

5  favor of the sponsor.

6          I don't see how you can read Ames and say that

7  this would not tilt the conduct of the bankruptcy case,

8  prejudice at an early stage the powers and rights that the

9  bankruptcy code confers for the benefit of all creditors or

10  leveraged a Chapter 11 process by preventing motions by

11  parties in interest from being decided on the merits.

12          You can respond, but I am not inclined to hear

13  evidence today because I'm not inclined to permit the release

14  today.  So, I am not sure what I would be hearing the

15  evidence for.  We have had some -- parties keep getting more

16  and more aggressive and I don't mind pushing the envelope,

17  but when you look at all of this in the totality I don't

18  understand how this just doesn't decide the entire case

19  today.

20          MR. PACITTI:  A lot to swallow.

21          THE COURT:  Mr. Pacitti, you can certainly

22  respond.

23          MR. PACITTI:  First of all, Your Honor, I agree

24  that there is a bit of back and forth about the standard.  If

25  I ever got to my post-evidence argument one of the things I

1   was going to say was that notwithstanding whether its

2   business judgment, notwithstanding whether its entire

3   fairness --

4           THE COURT:  I don't think it's either.

5           MR. PACITTI:  -- notwithstanding whether its

6   anything that we have been in front of Your Honor quite a

7   bit.  We know that we're not saying that you are not allowed

8   to read this DIP, you need to defer to other folks judgement,

9   and as a consequence of the exercise of that judgment you

10  should just approve that.  That is not what we are asking.

11          What we are asking is that you look at the context

12  of this DIP, the context of the facts and circumstances of

13  the case --

14          THE COURT:  I understand the context of the DIP.

15  I have got a sponsor whose everywhere, who says unless you do

16  this I am not providing financing.  That is what they say.

17          MR. PACITTI:  Understood, Your Honor.  I think you

18  need to remember that its not by choice.  I don't want to be

19  here.  I think both I and perhaps even Mr. Schartz said it on

20  the first day, we don't want to be here.  We, unfortunately,

21  had to be here; otherwise, we were going to be an

22  involuntary.  What awe tried to do is put together something

23  that was, at least, rational to some degree here.

24          THE COURT:  There could be something rational to

25  some degree here.  There absolutely could be.  Its not the

1  first time I've had a sponsor whose come into the case,

2  whether they filed it and chose to do it themselves or were

3  forced into it, that came forward with something reasonable

4  that I approved or that they were able to get the committee

5  on board with.

6            This is not a novel case.  I know you guys think

7  this is a unique case, it just isn't.  It is an everyday

8  case.  And I have got somebody who -- there could be

9  something reasonable that had been put in front of me.  You

10  had time to get there.

11            MR. PACITTI:  We thought we were there, Your

12  Honor.

13            THE COURT:  No, you are not there.

14            MR. PACITTI:  Understood.

15            THE COURT:  You are just not.  I have to say I

16  have never shut something down like this before, but when I

17  read this stuff last night after it was filed what -- you

18  want this case to end today.  This absolutely forms this case

19  it ends today.

20            MR. PACITTI:  I don't think it necessarily ends

21  today.  I think what it does is it provides a path forward to

22  get to a sale process that we still are unclear about.

23            THE COURT:  What is unclear about the sale

24  process?

25            MR. PACITTI:  Well, we don't know if there is

1   going to be someone that overbids.

2            THE COURT:  Right.

3            MR. PACITTI:  We have a floor set that is very

4   valuable.

5            THE COURT:  You know, I don't get that.  I keep

6   hearing that recently, Judge, you know, in order to file the

7   case we had to have a stalking horse bid.  I don't understand

8   that reasoning.

9            MR. PACITTI:  I mean the rationale, Your Honor, is

10  simply that to set a minimum bid. I mean the minimum bid here

11  assumes the first lien debt, assumes the DIP, assumes a

12  substantial amount of executory contracts, unexpired leases,

13  pays administrative claims, pays 503(b) claims, pays priority

14  claims and assumes normal trade debt on an ongoing basis.

15           THE COURT:  You could have all of that in another

16  scenario.  You could have all of that. Why do they need a

17  breakup fee?  Let's just start with that.  I was really

18  surprised to see that.  I haven't seen a breakup fee on an

19  insider in I can't tell you how long.  Why do they need --

20  they're in, and the sponsor wants to be in, or they want this

21  business or they don't.  Okay.

22           Maybe somebody else will come along and overbid,

23  and give you cash, and cash you out.  Great.  Everything here

24  is defensive, and that's fine, but you can't have everything.

25  This is the, you know, pigs get fact, hogs get slaughtered.

1          MR. PACITTI:  Your Honor, this could be making

2    lemonade out of lemons when we had the alternative being in

3    an involuntary and having a company lose all of its value.

4          THE COURT:  If you had been in an involuntary you

5    would have flipped it to a voluntary and we'd be here --

6          MR. PACITTI:  Yeah.

7          THE COURT:  -- because that would have been the

8    option, right.  You wouldn't have fought it.  Maybe you would

9    have, I don't know, but that would have been your -- you

10   would have been entitled to flip it to a voluntary and we

11   would be here.

12         MR. PACITTI:  As the papers suggested, Your Honor,

13   and not suggested, in fact, said, and as the testimony would

14   have, otherwise, said we needed time.  The involuntary threat

15   came very quickly.

16         THE COURT:  Okay, that's fine.

17         MR. PACITTI:  We were able to cobble together

18   about 10 days and we're going to put something together. So,

19   yes, could we have converted, yes.  During that interim

20   period of time what happens to the business.  You are in an

21   involuntary.  Your customers are going to go away.  Your

22   vendors are not going to --

23         THE COURT:  So, file a voluntary.

24         MR. PACITTI:  But without a DIP, without any path

25   forward, without any small plan of what the case is going to

1   be about that is value destructive, Your Honor.

2             THE COURT:  It may be or it may not be.  This DIP

3   and this bidding procedures are so aggressive that I don't

4   see -- I could not approve it today. I don't think it matters

5   if I believe everything that is in all these papers.  Its so

6   aggressive it cuts off the committee's rights.  It sets in

7   place something that I don't know whether the bid procedures

8   with the extra breakup fee and all of that is possibly very

9   chilling and unnecessary because I don't think that these --

10  don't think that the stalking horse bidder needed incentive

11  to put in a defensive DIP or to bid, credit bid.

12            I have approved credit bids in other cases from

13  lenders and I haven't had a problem with that.  This is too

14  aggressive and it goes back to the very basis in <u>Ames</u>.  So,

15  you guys need to go negotiate or make a lot more concessions

16  and put something in front of me that is approvable, but it

17  is not approvable today.

18            We can take a break.

19            MR. SCHARTZ:  Judge, for the record Brian Schartz,

20  Kirkland & Ellis, on behalf of Kinderhook.

21            I appreciate the statement.  I would hopefully

22  bring the temperature down a little bit.  Every story needs a

23  villain. It's not Kinderhook.

24            THE COURT:  I am not looking for a villain.

25            MR. SCHARTZ:  Let me, please I want to get the

1  whole thing out.  When faced with the opportunity to,

2  basically, buy the company back, after putting in nearly $50

3  million not too long ago, it was a tough choice for

4  Kinderhook, right.  When we talked at the first day hearing I

5  said a few things.

6         Number one, I said we don't want to fund

7  litigation against ourselves.  We have already been sued out

8  of this situation.  We want to stand by the company.  We want

9  to give it a chance to reorganize.  Third, what we're hearing

10 from the company, and we haven't seen their work, we helped

11 them facilitate their work, we haven't seen their work, that

12 there are no potential claims against Kinderhook.

13        So, I hear you on Ames. I hear you on the standard

14 of we should ask ourselves the question does this unfairly

15 tilt the process towards Kinderhook.  I find it hard to

16 believe that there isn't some story that you could hear about

17 a release as part of a DIP that says there are no potential

18 claims against this party.

19        THE COURT:  Why shouldn't the committee -- if

20 Kinderhook was on the side it would want to do its own

21 investigation. And it would not accept the investigation of

22 somebody else.

23        MR. SCHARTZ:  I think the Court --

24        THE COURT:  30 days into the case.

25        MR. SCHARTZ:  -- in its discretion can hear that

1  evidence from the company if it coming from an independent

2  director.

3          THE COURT:  I could.

4          MR. SCHARTZ:  I think you can hear that.

5          THE COURT:  It might be appropriate at some later

6  point in the case, but why 30 days into the case.

7          MR. SCHARTZ:  We -- this deal --

8          THE COURT:  If Kinderhook is solid --

9          MR. SCHARTZ:  Lets talk a little bit about it.

10 You went through the list of all the things that you think

11 are wrong with the DIP. I would like to talk through those

12 with you.

13         THE COURT:  It's a combination of things, that's

14 what it is.

15         MR. SCHARTZ:  I got it.

16         THE COURT:  It's a combination of it.

17         MR. SCHARTZ:  But we are also missing the things

18 that are right with the DIP.

19         THE COURT:  Its providing money that this debtor

20 needs.

21         MR. SCHARTZ:  On a junior basis.

22         THE COURT:  To who?

23         MR. SCHARTZ:  To the banks, right.  There is no

24 guarantee in this environment with this company when its kind

25 of not doing great.  Are the banks going to agree to a

1  priming DIP. Is anyone else saying that they're going to

2  provide another junior DIP.  You know, we're taking a flyer

3  on being a junior DIP. The DIP order says very clearly we do

4  not get a recovery on prepetition collateral until the banks

5  are paid in full.

6          So, yes, we are providing liquidity to the

7  business.  We are allowing it to give the right message to

8  its customers, to its vendors, to its suppliers.  We are

9  letting Lowes, where a significant amount of business is

10 done, let people know that we're here and we're ready to do

11 business.  We are also doing it on a junior basis.

12         There are some other things in this financing that

13 we designed to be favorable.  There is a wind-down budget of

14 $600,000 to allow this company to wind-down.  There is a pot

15 of $500,000 for unsecured creditors.  We didn't have to do

16 all that, but we did it.

17         THE COURT:  Its not unusual to have that.

18         MR. SCHARTZ:  Right.

19         THE COURT:  This is not a unique case.

20         MR. SCHARTZ:  But its in there, right.  There is

21 nothing in the bankruptcy code that says thou shalt give

22 unsecured creditors a pot of $500,000 if you're buying the

23 company.

24         THE COURT:  Right.

25         MR. SCHARTZ:  But we did it.  So, we are giving

1  PPG, we think, the best opportunity to go and continue to

2  operate, find better financing, if they can find another

3  junior financing then fine.  If they want to find another

4  bidder that's fine.

5          Yes, the sale process was abbreviated, but it was

6  because the company had no choice, as I understand it, given

7  that it was faced with an involuntary filing.  I think we all

8  know that involuntary filings, as opposed to voluntary

9  filings, are much more destructive.  For a voluntary filing

10 you have to issue a press release, you have to give comfort,

11 you let people know you have financing.

12          I see you're reading, so I can give you a chance

13 to --

14          THE COURT:  I'm looking at the first day

15 declaration.

16          MR. SCHARTZ:  Yes.

17          THE COURT:  I want to understand who the

18 prepetition lenders are.

19          MR. SCHARTZ:  The prepetition lender is a bank

20 called Twin Brook.  Even though it ends with a --

21          THE COURT:  Twin Brook is not a bank. I had them

22 in front of me yesterday.  They're not a bank.

23          MR. SCHARTZ:  It's a lender.  It's a fund that

24 does lending.  Even though it ends in O-O-K it's not

25 affiliated with Kinderhook.  It's a completely unaffiliated

 1 │ entity.

 2 │          THE COURT:  Okay.  Go ahead.

 3 │          MR. SCHARTZ:  So, our goal here is to facilitate a

 4 │ sale process. I don't think this case is that interesting.

 5 │ We, frankly, don't believe what we are asking for is overly

 6 │ aggressive.

 7 │          THE COURT:  Well, you are wrong on that.  You are

 8 │ just wrong on that.  It is overly aggressive.

 9 │          MR. SCHARTZ:  A breakup fee that backs a bid,

10 │ whether it comes from an insider or not an insider, a breakup

11 │ fee that backs a bid that is significant value to the company

12 │ that sets the floor.  That is value.

13 │          THE COURT:  I have never approved one and I don't

14 │ think any of my colleagues have.

15 │          MR. SCHARTZ:  Okay.

16 │          THE COURT:  I don't think it's necessary.

17 │          MR. SCHARTZ:  I mean we are committing real

18 │ capital to the company.

19 │          THE COURT:  You're credit bidding.

20 │          MR. SCHARTZ:  Right.  But that is new money coming

21 │ in.  We don't have any prepetition debt.  We are not over the

22 │ capital structure.  We didn't go buy distressed bonds that

23 │ we're then trying to credit bid.  The only credit bid is

24 │ fresh capital that we are putting in on a junior basis.  We

25 │ were not a prepetition lender to this company. It was a true

1  equity ownership structure.

2          The only creditor relationship that Kinderhook

3  has, Judge, is there were management fees like every private

4  equity sponsor charges to its portfolio companies that were

5  never paid.  It's about a million bucks. It's the only

6  creditor relationship that Kinderhook has.

7          THE COURT:  Kinderhook is the equity.

8          MR. SCHARTZ:  What's that?

9          THE COURT:  Kinderhook is the equity.

10          MR. SCHARTZ:  Correct.  You said all over the

11  capital structure we're only in the capital structure because

12  we did the DIP on an interim basis, on a junior basis for

13  this case.

14          THE COURT:  Okay.  And you're equity.

15          MR. SCHARTZ:  And we're equity, right.

16          THE COURT:  And you put the debt on the company.

17          MR. SCHARTZ:  The debt came in as part of the LBO.

18          THE COURT:  In connection with the original

19  buyout.

20          MR. SCHARTZ:  Right.  From a Kinderhook

21  perspective you do a deal in 2021, it has to file in 2023

22  Kinderhoook is not in the business, like all private equity

23  firms, investing in companies where they don't think there is

24  equity value.  This thing went very south very fast.  It went

25  south very fast because old management made a series of

1  calamitous decisions that Kinderhook was not involved in.

2         THE COURT:  Then Kinderhook should not be

3  concerned that there is any causes of action against it.

4         MR. SCHARTZ:  We don't think there are any causes

5  of action against Kinderhook.

6         THE COURT:  Then the committee needs an

7  opportunity to come to that conclusion itself.

8         MR. SCHARTZ:  We are not agreeing to pay a

9  bottomless pit for the committee to go do months and months

10 of work to investigate us.  That is -- this bankruptcy

11 process is --

12        THE COURT:  Why do you think there's a bottomless

13 pit.  Isn't there an amount that is set aside for an

14 investigation.

15        MR. SCHARTZ:  Sure.  There is a committee budget.

16 They think it's too low.

17        THE COURT:  That is a whole different issue.

18 Where did you agree to fund your litigation against you.

19 That is reasonable.  This is not what you are talking about

20 here.

21        MR. SCHARTZ:  Maybe I misunderstood your statement

22 earlier.  I want to make sure that I'm really clear on it.

23 When you talked about Ames, and I tried to write it down as

24 much as possible, but I am going to paraphrase it. I am

25 probably going to get it wrong, but you said, you know, what

1  are terms and do they unfairly tilt the case in improper ways

2  and prevent other motions from being heard.  I am

3  paraphrasing.

4           In my mind, when I hear that, I hear that you are

5  requiring the committee to go do its work and file an STN

6  motion, standing motion in this Court, and we're going to

7  fight it out.  That to me is a colossal waste of time and

8  money.

9           THE COURT:  Well, that might be a waste of their

10 time, I don't know.

11          MR. SCHARTZ:  Right.

12          THE COURT:  That doesn't say whose paying for it.

13          MR. SCHARTZ:  Then when you look at how we got

14 here, right, it was February -- the first hearing was

15 supposed to be February 13th, its now February 23rd, right.

16 Ten days is a long time.  We put the whole case together in

17 10 days.  There is no deposition notices for Kinderhook.

18 There is no discovery on Kinderhook.  There is no 2004 motion

19 filed.

20          The debtor turned over mountains of paper.  What

21 is going on here.  Why the delay.  You can't sit on your

22 hands and then say, oh, well now we need more time.

23          THE COURT:  This is the 23rd of February.  This

24 case was filed on January 16th.

25          MR. SCHARTZ:  Correct.  Right.  And if you heard

1   evidence today about the work that Mr. Kravitz did you would

2   hear that in order tog et ahead of whatever the company may

3   have to deal with in terms of the committee was I didn't see

4   it.  We're the putative defendants, so, of course, we haven't

5   seen all this.  Emails, documents, production, immediately,

6   within 30 minutes, hey, Cole Schotz, welcome to the group.

7   Here is all the information.

8          THE COURT:  Here is the dump and you're hearing is

9   in two weeks.

10         MR. SCHARTZ:  Right.  Then they said we need more

11  time.  We said, great, here is more time.  We thought we were

12  going to negotiate a resolution, nothing.  I didn't read the

13  committee's -- you read the statement, the supplement to the

14  DIP motion that the debtor filed that goes through all the

15  things it did, all the specific claims they talked about,

16  fraudulent conveyance claims, litigation, all the stuff that

17  is in there.  You read the committee objection, just as a

18  morphis we think there could be claims against Kinderhook.

19  Why?  Based on what? They have the information.

20         THE COURT:  If there aren't any then Kinderhook

21  should not be concerned, and it should be prepared to go

22  forward.  And if it's not I don't know what to say to you.

23  You want me to decide releases in a case that's just slightly

24  more than 30 days old and when I put it together with all the

25  other aggressive provisions that you're requiring --

1    MR. SCHARTZ:  Well, let's go down the list if we

2  may.  Let's put the release in.  What I would like to have

3  happen, if I have a choice, and I'm not the Judge, what I

4  would like to have happen is, at least, have you hear the

5  evidence because I think it's important.

6    THE COURT:  I have limited time today.  What is it

7  going to do if I just think its inappropriate at this point

8  in the case to grant a release.  I just think it's

9  inappropriate.

10    MR. SCHARTZ:  Okay.

11    THE COURT:  It leverages the case in a way that

12  cannot be undone.

13    MR. SCHARTZ:  Okay. So, then, if I may, can we run

14  down your list that you went through earlier.

15    THE COURT:  Yeah, which was just off the top. It

16  wasn't after a detailed look at everything.  That was just

17  off the top.  And it is the cumulation of all of this --

18  maybe anyone in particular might not be a problem in a given

19  situation.  It is the accumulated effect of all of this.

20  506(c) waiver, sure you can get them sometimes.  Should you

21  be able to get it with all of these other things, why.

22    MR. SCHARTZ:  We're funding a junior DIP; we're

23  paying admin claims.  The company is operating. We don't want

24  this to convert.  What does that have to do -- why does a

25  sponsor get penalized because its providing a junior DIP

1  asking for a 506(c) waiver.

2          THE COURT:  Its not getting penalized.  Again, in

3  isolation anyone of these things might be okay.

4          MR. SCHARTZ:  Right.

5          THE COURT:  When you look at the cumulative effect

6  of it that's the problem.

7          MR. SCHARTZ:  Right, but Kinderhook is not

8  negotiating with itself on all of these points.  Kinderhook

9  is not sitting in a board room standing in front of a mirror

10 saying, hey, do you want to agree to this.  Yes, absolutely.

11          THE COURT:  Its never the case.  It's always the

12 case.

13          MR. SCHARTZ:  We put it together, we presented it

14 to the company, the company pushed back on things, and then

15 the independent director, who is vested with the authority,

16 makes the decision.  He could have come to a different

17 conclusion.

18          THE COURT:  He could have, maybe.

19          MR. SCHARTZ:  And Mr. Kravitz, you know, look from

20 our perspective its not like you put someone like him in and

21 you just sight a gigantic sigh of relief.  No offense, Mr.

22 Kravitz, but, you know, he does this and he litigates people.

23 I know he sued Kirkland clients numerous times.  He could

24 have come to a different result.  He could have said we're

25 not doing this.

1          THE COURT:  Then what would have happened.

2          MR. SCHARTZ:  I don't know, maybe the company

3  would have liquidated because I think, Judge, and I don't

4  mean to belabor this, I think you are assuming Kinderhook

5  would just do this on any terms.

6          THE COURT:  I am not making any assumptions about

7  what Kinderhook would do.  What I am saying is this is an

8  aggressive --

9          MR. SCHARTZ:  I recognize that and hear you on

10 that.

11         THE COURT:  -- set of documents that has been put

12 in front of me.  And when I look at it on this overall basis

13 I don't see how I can approve it today.  I have never been

14 asked to approve releases in this context.  I am not sure any

15 of my other colleagues have.  I appreciate that Mr. Kravitz

16 is an independent director.  I have seen this kind of

17 testimony presented later in a case.  At confirmation its

18 actually very helpful and you don't usually get it for debtor

19 releases.  It supports debtor releases which usually have no

20 evidentiary support at confirmation, quite frankly.  Its nice

21 to have it.

22         It's the combination of things that is being asked

23 today that is aggressive and I think doesn't meet the

24 standard.  It's not the debtor's business judgment that of

25 this standard.  This is not a settlement.  What is it a

1  settlement of.

2          MR. SCHARTZ:  From a Kinderhook perspective we're

3  loaning money to a company.  We're taking a flyer on a junior

4  basis.  The company may or may not have claims against us

5  given the prepetition role that we played.  The settlement is

6  that dispute.

7          THE COURT:  What is the dispute?  You don't think

8  there are any claims against you.

9          MR. SCHARTZ:  Of course.

10          THE COURT:  The company doesn't think there's any

11  claims against you.  What is the dispute you're settling? You

12  are not.  You are choosing to lend money on certain terms.

13          MR. SCHARTZ:  Correct.

14          THE COURT:  There is no dispute.  You are not

15  saying -- the company hasn't said we think there is a claim

16  against you and so pay us some money, and you pay them some

17  money.

18          MR. SCHARTZ:  We don't need Mr. Kravitz or any

19  other independent director to say, actually, we disagree with

20  you, we think you should get sued and, therefore, you have to

21  give a little bit more money.  They can agree that its

22  reasonable.

23          THE COURT:  These are terms under -- yes, they can

24  determine its not a settlement.

25          MR. SCHARTZ:  Correct.

1          THE COURT:  These are terms under which Kinderhook

2   is willing to lend.

3          MR. SCHARTZ:  I am not fighting you on the legal

4   standard.  I hear you; you think Ames is the controlling

5   legal standard.  What I'm saying is I don't think if you

6   heard the evidence, you would necessarily conclude that what

7   we are proposing unfairly tilts this case in any way.

8          THE COURT:  And the committee has not had the

9   opportunity to do its own investigation.  We all know when

10  you come into bankruptcy that is part of it.  That is what

11  happens in every case.

12         MR. SCHARTZ:  Okay.  We will talk to folks.

13         THE COURT:  We'll take a break, 15 minutes.

14      (Recess taken at 10:46 a.m.)

15      (Proceedings resumed at 11:35 a.m.)

16         THE COURT:  Please be seated.

17         MR. SCHARTZ:  Judge, Brian Schartz for the record

18  on behalf of the Kinderhook.

19         First of all, I want to say I'm sorry because when

20  you got up before we adjourned, I actually walked away before

21  you got off the bench and I didn't mean to be rude.

22         THE COURT:  No need to say anything.

23         MR. SCHARTZ:  I was just very energized.

24      (Laughter)

25         THE COURT:  That's a good way.  No apology needed.

1          MR. SCHARTZ:  So, I spoke to Kinderhook.  I spoke

2   to debtor's counsel. I spoke to Mr. Schepacarter.  I have

3   spoken to the attorney for Cole Schotz on behalf of the

4   committee and one other attorney representing one of the

5   members of the committee as well.

6          Here is what we would like to propose, and

7   hopefully cuts through a lot of it.  On the DIP we do a

8   second interim order designed to just keep the status quo.

9   Whatever deadlines we started on the first day we will kind

10  of keep the status quo.

11         I got to do some definitional changes on the

12  original order and the second interim, but that will be the

13  guiding thesis.

14         The company will be authorized to draw an

15  incremental $1.8 million which is in the DIP budget for

16  today.  So, that should get us to where we need to go.  The

17  only change to the releases -- we're not going to  use the

18  old form of release that was in the interim order.  We are

19  going to keep our modifications that were in the debtors

20  papers.  So, we are not going back on that.  It's just --

21         THE COURT:  Your going to change the provision

22  actually in the second interim DIP.

23         MR. SCHARTZ:  Correct.  The way the interim works

24  is its not saying its approved, its just saying this is

25  what's up for final hearing.  So, we are kind of resetting

1  what's up for final hearing.

2        On the final hearing -- and then on the bid

3  procedures order, because we do want to get that approved

4  today, we have proposed to just kill the breakup fee and

5  expense reimbursement for Kinderhook.  So, we would strike

6  that from the order.

7        Then we would like to have everything up, so

8  everything is the sale and the final order on the DIP, let's

9  call it March 20th.  I think we were thinking about the 17th,

10  but Mr. Kravitz, I understand, can't make it until the 20th.

11        THE COURT:  Okay.

12        MR. SCHARTZ:  Then last but not least, I believe,

13  committee counsel wanted to have consultation rights on any

14  bidders.  Its not mine to give because I'm not going to be

15  talking to other bidders.

16        Dom, I think that's okay.

17        MR. PACITTI:  Absolutely. Not a problem.

18        MR. SCHARTZ:  So, hopefully that helps cut through

19  it without the really interesting testimony that you would

20  have heard.

21        THE COURT:  It would have been.  Thank you very

22  much.  And thanks to the parties for working together.

23        Let me hear from Mr. Dean.

24        MR. DEAN:  Thank you, Your Honor.

25        The committee doesn't have a problem with that. I

1  mean we, obviously, prefer that then to have a fully

2  contested hearing on all this so that the parties can

3  continue to negotiate between the second interim order and

4  the sale hearing.  So, we think that is the best outcome for

5  today.

6           THE COURT:  What about the bid procedures?

7           MR. DEAN:  With the breakup our objection to the

8  bid procedures would really focus on the break fee and the

9  consultation rights.  We had a general objection to the

10 timeline, but if we had gone through the argument I would

11 have really told you that the focus was on the break fee and

12 the consultation rights just given where the process is.

13          THE COURT:  Okay.  Mr. Schepacarter.

14          Thank you.

15          MR. DEAN:  Thank you.

16          MR. SCHEPACARTER:  Good morning, Your Honor.

17 Richard Schepacarter for the United States Trustee.

18          We are fine with this, sort of, homeostasis on the

19 DIP. They have changed the definition.  We will go back and

20 take a look at that.

21          With respect to the breakup fee and the expense

22 reimbursement being dropped that was the gist, I should say,

23 of our objection.  That is resolved.  So, that has gone away.

24 So, were just focusing now on the DIP and we will see what

25 happens in the next month or so.

1                THE COURT:  Okay.

2                MR. SCHEPACARTER:  We're fine with a hearing on

3     the 20th and go forward on this basis.

4                Thank you, Your Honor.

5                THE COURT:  Thank you.

6                Is there anyone else who would like to be heard?

7                Mr. Pacitti, I'm sure you would like to be heard.

8                MR. PACITTI:  Your Honor, I didn't want to miss

9     out on the most important part of this the time for the 20th.

10               THE COURT:  We have the 20th.  I'm available on

11    the 20th.  So, let's start at 10 on the 20th.

12               MR. PACITTI:  Okay.

13               THE COURT:  We had you penciled in on the 17th.

14    Is that now off?

15               MR. PACITTI:  Correct, Your Honor.

16               THE COURT:  Okay.  So, 10 o'clock on the 20th and

17    we will take you off of the 17th.

18               MR. PACITTI:  Perfect.

19               THE COURT:  Okay.  I just want to check because

20    I've got another bid procedures hearing this afternoon, I

21    think its that one that wants all the cure objections to be

22    under seal.  This doesn't require that, does it?

23               MR. PACITTI:  No, Your Honor.

24               THE COURT:  Also, a new one on me.  Well, again, I

25    thank all the parties for discussing matters during the break

1  and for coming up with a path forward to get to either an

2  agreed upon final DIP or a contested final DIP at that point

3  in time.  We will -- I will look for a form of order on the

4  second interim DIP which I know will be circulated to

5  everybody for review and submit it under certification of

6  counsel.

7           Then given the changes that are now being made to

8  the bid procedures order to resolve the objections raised by

9  the committee and the Office of the United States Trustee I

10 will approve a revised form of bid procedures order

11 consistent with the discussion on the record and there is no

12 longer an objection to the timeline.  So, we will go forward

13 on that timeframe.

14           MR. PACITTI:  I appreciate that, Your Honor.

15           THE COURT:  So, we will look for that as well.

16           MR. PACITTI:  We will submit them under COC

17 hopefully this afternoon.

18           THE COURT:  I will get to them as soon as I can.

19 I have contested hearings this afternoon as well.

20           MR. PACITTI:  Understood, Your Honor.

21           THE COURT:  But we will look for them.  Let

22 Chambers know when they have been filed and they will bring

23 them to my attention.

24           MR. PACITTI:  We will.

25           THE COURT:  Thank you very much then.  We're

1   adjourned.

2          (Proceedings concluded at 11:43 a.m.)

3

4

5

6

7

8                        CERTIFICATION

9          I certify that the foregoing is a correct

10  transcript from the electronic sound recording of the

11  proceedings in the above-entitled matter to the best of my

12  knowledge and ability.

13

14  /s/ Mary Zajaczkowski                    February 23, 2023

15  Mary Zajaczkowski, CET-531

16  Certified Court Transcriptionist

17  For Reliable

18

19

20

21

22

23

24

25