# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Performance Powersports Group Investor, LLC, *et al.*,[1] | Case No. 23-10047 (LSS) (Jointly Administered) |
| Debtors. | **Re: Docket Nos. 13 and 17** |

**LIMITED OMNIBUS OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' (I) MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND (II) MOTION FOR ENTRY OF AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby submits this limited omnibus objection (this "Limited Objection") to the (i) *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 13] (the "DIP Motion"), and (ii) *Debtors' Motion for Entry of: (I) an Order (A) Approving Bid Procedures in Connection With the Sale of Substantially All Assets, (B) Approving the Bid Protections to the Stalking Horse Bidder, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, (E) Authorizing Entry into the Stalking Horse Agreement, (F) Approving Bid Protections, (G) Approving Procedures for the Assumption*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

*and Assignment of Contracts and Leases, and (H) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 17] (the "Sale Motion").[2]  In support of this Limited Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

In their current form, the proposed Sale and DIP financing will strip the estates of valuable litigation claims arising from the October 2021 leveraged buyout (the "LBO"), through which Kinderhook purchased the Company from Richard Godfrey, who received over ▮▮▮▮▮ (including ▮▮▮▮▮▮▮▮▮ for stock that the Committee's investigation has determined was worthless.  Through the Sale, Kinderhook seeks to purchase not just the operating assets of the Debtors, but *all* estate claims, including claims against Kinderhook and its affiliates, Godfrey, and other members of the Debtors' management team and board (the "Litigation Assets").[3]  Through the DIP financing, Kinderhook also seeks a broad release for itself and numerous affiliates from all estate claims, including potential claims arising from the LBO.  Unless the Litigation Assets and insider releases are carved out, the Sale and DIP financing will leave these estates with nothing more than $600,000 in wind-down funding and a mere $500,000 to pay over $63 million in unsecured claims that will not be assumed through the Sale.[4]  The Debtors' majority and

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion and Sale Motion, as applicable.

[3] For the avoidance of doubt, "Litigation Assets" shall mean all estate claims and causes of action excluding claims against non-insider vendors, employees, and contract counterparties that will continue to do business with the post-acquisition company.

[4] Kinderhook seeks to acquire these Litigation Assets – and substantially all other assets of the Company – in exchange for (i) a credit bid of the $10 million in DIP obligations, (ii) the assumption of the $52 million of secured debt from Twin Brook, (iii) the assumption of certain liabilities and contracts as set forth in the Stalking Horse Agreement, (iv)

controlling equity holder should not be permitted to use the bankruptcy process to exonerate itself and others (either through a DIP release or purchase of the claims leading to the same result), while cleansing the Debtors' balance sheet of $63+ million in unsecured liabilities, and stripping the estates of the only assets that could provide a meaningful return to those creditors. If this transaction is to be approved, the Litigation Assets must be preserved for the benefit of unsecured creditors.

The Debtors have not met their heighted burden to demonstrate that the terms of, and process underlying, the proposed insider Sale and DIP financing are fair, and that the estate claims to be purchased or released are ultimately unlikely to succeed on the merits.[5] To the contrary, these Litigation Assets may hold significant value. The Committee's preliminary investigation revealed that the Company was likely insolvent or inadequately capitalized *prior* to the close of the LBO, through which the Company incurred $45 million in secured debt to pay Richard Godfrey. Documents produced to the Committee reflect that the Company's post-LBO opening balance sheet did not properly account for *at least* ▓ million in accrued trade liabilities, and that the Company was in a liquidity crisis by at least September 2021 (one month prior to the LBO closing) when the Company had incurred more than $60 million in trade payables from a single vendor, with nowhere near the liquidity or borrowing availability to pay even a fraction of this amount.

---

$600,000 in wind-down funding, and (v) $500,000 cash available to pay the claims of approximately 26 "Excluded Vendors" whose $63+ million in claims will not be assumed under the Staking Horse Agreement.

[5] To date, the Committee's investigation has not revealed any colorable claims against Kinderhook and its affiliates. However, the Committee's investigation to date has identified colorable fraudulent transfer and breach of duty claims against Richard Godfrey and other former management personnel of the Debtors in connection with the LBO.

3

Not surprisingly, upon the closing in October 2021, the Company drained nearly all of its cash to pay less than a third of the amounts owed.  And, by December 2021, *less than three months post-closing*, the Company had just ▮ million of cash on hand, had exhausted the ▮ million line of credit provided by Twin Brook in connection with the LBO, and still owed tens of millions of dollars in vendor payables incurred *prior to* the LBO closing.  The evidence plainly contradicts the Debtors' conclusion that "the Company does not appear to have been insolvent or near insolvency at the time of the [LBO.]"[6]  Simultaneously, Godfrey pocketed almost ▮ in cash for worthless stock, granted five of his employees ▮ each in non-contractual bonuses, and settled over ▮ in officer debt to himself.  For its part, the Company received only a $45 million secured debt obligation from Twin Brook that further precipitated the Debtors' cash crisis.  While this case is ordinary in many respects, the rapid pace of the Company's demise following the LBO is extraordinary.

The Committee would support a proposed sale and DIP financing package that carves out and preserves the Litigation Assets for the benefit of unsecured creditors.  Kinderhook should not be permitted to do through the Sale what it could not accomplish through the DIP financing in the first instance: obtain backdoor releases for itself and countless affiliates outside of a Chapter 11 plan, which has not been proposed here.  Further, Kinderhook should not be permitted to purchase *any* estate claims other than those necessary to the operation of the business, such as claims against go-forward vendors, employees, and contract counterparties that will continue to provide goods and services to the new company.  The Committee cannot support a sale and financing package that allows Kinderhook to protect its existing equity investment, cleanse $63+ million in unsecured debt from the Debtors' balance sheet *and* bury potentially valuable estate claims arising from and

---

[6] DIP Supplement ¶ 53.

following the LBO that could otherwise provide distributions to those creditors who will not recover on their claims under the Sale.

## BACKGROUND

**A.     The Chapter 11 Cases**

1. On January 16, 2023, each of the Debtors commenced a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware. These Chapter 11 Cases have been jointly consolidated for administrative purposes only.

2. The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. No request has been made for the appointment of a trustee or examiner in these Chapter 11 Cases.

4. On January 30, 2023, the United States Trustee for Region 3 and 9 appointed the Committee. *See* Docket No. 82.

5. Additional information regarding the Debtors, including their businesses and affairs, their capital and debt structures, and the events leading to the filing of these Chapter 11 Cases is set forth in the *Declaration of Ken Vanden Berg in Support of the Debtors' Chapter 11 Petitions and First Day Motions and Applications* [Docket No. 16] (the "Vanden Berg Declaration").

**B.     The Committee's Investigation**

6. Immediately following its appointment, the Committee commenced its independent investigation of potential estate claims arising from the LBO. In furtherance of that investigation,

the Committee obtained and reviewed over 7,000 documents and emails provided by the Debtors, Kinderhook, and the Disinterested Director. These documents formed the basis of the Disinterested Director's investigation, as detailed in paragraphs 35 and 36 of the DIP Supplement. Because the Disinterested Director's investigation focused almost exclusively on potential claims arising from the LBO against Kinderhook, the documents produced to the Committee pertained primarily to the LBO and the post-closing operations of the Company.

7. On March 9, 2023, the Committee conducted an informal interview of two Kinderhook principals regarding the LBO and their narrative of events leading up to the Petition Date. The next day, on March 10, 2023, the Committee conducted an informal interview of Richard Godfrey regarding the same subject matter. The results of the Committee's preliminary investigation are summarized below:

    a. <u>The 2021 LBO Transaction</u>

8. In March of 2021, Rich Godfrey and Associates Inc., *d/b/a* Coleman Powersports (collectively, with its subsidiaries, "<u>Godfrey & Associates</u>"), then majority-owned by its CEO Richard Godfrey, retained Hudson Capital Advisors BD, LLC to market a potential acquisition of, or investment in, Godfrey & Associates. Vanden Berg Declaration ¶ 15.

9. As a result of that process, on October 8, 2021, Godfrey & Associates, Richard Godfrey, and Performance Powersports Group Purchaser, Inc., an affiliate of Kinderhook Industries, Inc., entered into an agreement to effectuate the LBO, whereby Kinderhook acquired substantially all of the equity in Godfrey & Associates through a leveraged buyout. The LBO closed on October 8, 2021 (the "<u>Closing Date</u>") with a total purchase price of $112 million, which was comprised of:

    i. $47 million in equity contributions: $45 million from Kinderhook and $2 million from Twin Brook Capital Partners ("<u>Twin Brook</u>");

ii. $45 million in debt financing from Twin Brook, less $7.5 million cash to balance sheet, resulting in $37.5 million of net debt on the new Company; and

iii. $20 million rollover amount, whereby Richard Godfrey exchanged a portion of his cash consideration for stock in the new Company and a seat on the new board of directors.

Vanden Berg Declaration ¶ 18.

10. Upon information and belief, the cash consideration from the LBO was allocated as follows:

| Amount | Allocation |
|---|---|
| ■ | Cash payments to Richard Godfrey |
| ■ | Used to satisfy debts owed by Richard Godfrey to the Company |
| ■ | Non-contractual bonuses paid to 5 employees selected by Richard Godfrey |
| ■ | Transaction fees and expenses paid to Kinderhook |
| ■ | Finance fee paid to Twin Brook |
| ■ | Used to pay taxes owed by the Company |
| ■ | |

b. <u>Accounting Misstatements and Post-Closing Liquidity Crisis</u>

11. Following the Closing Date, Richard Godfrey continued in his role as CEO of the new Company until approximately June 2022 when he was terminated. As of the date hereof, Mr. Godfrey is still a member of the Debtors' board of directors.

12. Documents reviewed and information obtained by the Committee to date reflect the following:

- 

- 

7

- ██████████████████████████████████████████████████████████████████████████████████████████████████████████████

- ██████████████████████████████████████████████████████████████████████████████████████████████████████████████

- ██████████████████████████████████████████████████████████████████████████████████████████████████████████████

- On or about March 2, 2022, Twin Brook agreed to provide the Company an additional $5 million in secured financing, which increased the term loan balance from $45 million to $50 million.

- The Company's cash problems remained unsolved in the months leading up to the Petition Date. The Company was significantly over-inventoried, incurred substantial storage costs for inventory it could not sell, ████████████ ████████████████████████████████████████████████

**C.    The DIP Motion**

13.    On the Petition Date, the Debtors filed the DIP Motion, which was approved by the Court on an interim basis on January 18, 2023 [Docket No. 54] (the "Interim DIP Order").

14.    Through the DIP Motion, the Debtors sought approval of a $10 million second lien postpetition DIP financing facility from Tankas Funding IV, LLC, an affiliate of Kinderhook.

15.    On January 31, 2023, the Debtors filed the *Supplement to the Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 88] (the "DIP Supplement"). The DIP Supplement details, among other things, the results of the Disinterested Director's investigation of

8

potential claims against Kinderhook and his conclusions that (i) the Debtors do not have viable claims against Kinderhook and (ii) that the LBO "was based on a supportable EBIDTA multiple" and "the Company does not appear to have been insolvent or near insolvency at the time of the [LBO]." DIP Supplement ¶ 53.

**D.    The Bid Procedures and Sale Motion**

16.    On the Petition Date, the Debtors filed the Sale Motion and the *Declaration of Steven Bremer in Support of Bid Procedures and Sale Motion* [Docket No. 18]. Through the Sale Motion, the Debtors sought approval of, among other things, (i) the sale (the "Sale") of substantially all of the Debtors' assets, (ii) the Debtors' entry into the proposed stalking horse agreement with CPS USA Acquisition, LCC, an affiliate of Kinderhook (as amended at Docket No. 197, the "Stalking Horse Agreement"), and (iii) proposed bid procedures to govern the Sale (the "Bid Procedures").

17.    Pursuant to the Stalking Horse Agreement, Kinderhook seeks to acquire substantially all of the Debtors' assets, including "*except for the Excluded Claims*, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent); and (ii) all Avoidance Actions[.]" Stalking Horse Agreement § 2.1(n). There are no claims identified on the "Excluded Claims" schedule. Stalking Horse Agreement, Schedule 1.1.

18.    The Stalking Horse Bid is comprised of the following consideration:

    i.    a credit bid of the outstanding DIP obligations in the approximate amount of $11.7 million (inclusive of DIP fees and interest);

9

  ii. the assumption of the outstanding $52 million in senior secured first lien debt held by Twin Brook;

  iii. $500,000 in cash to be used to, *inter alia*, pay the claims of those 26 "Excluded Vendors" identified on Schedule 1.1 of the Stalking Horse Agreement;[7]

  iv. the assumption of trade payables of creditors other than the Excluded Vendors, and certain other liabilities and contracts as provided in the Stalking Horse Agreement; and

  v. approximately $600,000 in wind-down funding.

Stalking Horse Agreement § 2.5.

**E. The Committee's Objection to the DIP Motion and Bid Procedures**

  19. On February 20, 2023, the Committee filed an omnibus objection to both the DIP Motion and the proposed Bid Procedures [Docket No. 152] (the "UCC Objection"). Central to the UCC Objection was the impropriety of the proposed releases to Kinderhook and various other parties under the proposed Final DIP Order.

  20. On February 21, 2023, the Debtors filed their reply to the UCC Objection [Docket No. 154] (the "DIP Reply") and a revised proposed Final DIP Order [Docket No. 156]. As set forth in the DIP Reply, the Debtors revised the proposed Final DIP Order to provide that only estate claims against Kinderhook and its affiliates would be released, and that no third-party claims or estate claims against Richard Godfrey, Todd Gentry, and Christopher Hunter would be released thereunder. DIP Reply ¶¶ 8-10.

  21. On February 23, 2023, the Court held a hearing on the DIP Motion, the proposed Bid Procedures, and the UCC Objection. Following remarks from the Court sustaining certain of the Committee's objections to the DIP financing, the parties agreed to adjourn the final hearing on

---

[7] Based on the Debtors' schedules of assets and liabilities and proofs of claim filed to date, these 26 "Excluded Vendors" collectively assert approximately $63.9 million in unsecured claims against the Debtors.

65643/0001-44833416

the DIP Motion to March 20, 2023, so that it could be heard in connection with the proposed Sale. On February 27, 2023, the Court entered an order approving the DIP financing on a second interim basis [Docket No. 168].

22. On February 27, 2023, the Bankruptcy Court entered the *Order (I) Approving Bidding Procedures in Connection With the Sale of Substantially All of the Debtors' Assets, (II) Approving the Form and Manner of Notice Thereof, (III) Scheduling an Auction and Sale Hearing, (IV) Approving Procedures for the Assumption and Assignment of Contracts, and (V) Granting Related Relief* [Docket No. 169] (the "Bid Procedures Order") which (i) set the Bid Deadline as March 7, 2023 at 5:00 p.m. (ET) and (ii) authorized the Debtors to enter into the Stalking Horse Agreement in the event no other bids were received.

23. The Debtors did not receive any bids, other than the Stalking Horse Agreement, prior to the March 7 Bid Deadline.

24. On March 8, 2023, the Debtors filed a notice cancelling the auction and designating the Stalking Horse Agreement as the successful bid for their assets [Docket No. 198].

**SALE OBJECTION**

25. One of the primary purposes of the Bankruptcy Code is to maximize the value of the bankruptcy estate for the benefit of all creditors. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 568 (3d Cir. 2003) (a debtor, as a fiduciary to the estate, has a duty to maximize the value of the estate). To further this purpose, sale procedures must seek to "facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards,* 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also In re Food Barn Stores, Inc.,* 107 F.3d 558, 564-66 (8th Cir. 1997) (bankruptcy courts are given

11

discretion and latitude in order to facilitate a fair and open public sale focused on maximizing value).

26. In determining whether to authorize the use, sale, or lease of property of the estate under § 363(b), courts require the debtor to show: (1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith. *See In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991).

27. However, transactions involving insiders are subject to a heightened level of scrutiny. *See Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997), *aff'd*, 160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."); *In re Bidermann Indus. U.S.A.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (sales to insiders "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse") (internal quotations omitted); *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, *26-29 (Bankr. D.N.J. Mar. 26, 2008) (recognizing "the heightened scrutiny required by non-bankruptcy law for insider transactions"); *In re Univ. Heights Ass'n*, 2007 Bankr. LEXIS 1200, at *13 (Bankr. N.D.N.Y. Jan. 22, 2007) ("[B]ecause we are dealing with potential insiders on both sides of the transaction, the proposed sale is subject to heightened scrutiny.").

28. "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010). The Debtors bear the burden of proving that their proposed transaction satisfies the heightened standard applicable to insider transactions. *In re Summit Global Logistics, Inc,* 2008 Bankr. LEXIS 896, at *26-29. Under the "entire fairness" standard, the challenged transaction must be demonstrated to involve fair dealing (which entails an examination of the timing, initiation, structure, negotiation and disclosure of a transaction), and fair price (which entails an examination of the economic and financial considerations of the transaction). *Id*.

A. **The Proposed Insider Sale is Subject to Heightened Scrutiny, and the Debtors Have Not Met Their Burden of Demonstrating that the Sale of the Litigation Assets to Kinderhook Is Fair.**

29. The Debtors cannot meet their heightened burden to demonstrate that the sale of the Litigation Assets to Kinderhook is fair. The proposed sale of the Litigation Assets is not fair or reasonable because (i) the Debtors have not demonstrated that the Stalking Horse Agreement provides adequate value to the Debtors' estates, particularly given the colorable claims against Richard Godfrey to clawback the ████████ in LBO consideration identified by the Committee to date, (ii) through the sale of the Litigation Assets, the Debtors seek to effectuate what amounts to a restructuring transaction without observing the creditor protection provisions of the Chapter 11 plan process, and (iii) the sale allows an insider to retain its equity interest without demonstrating that creditors would not fare better in a liquidation where the estates would retain, among other things, the claims against Richard Godfrey and others involved in the management of the Debtors prior to and immediately following the LBO.

30. Other than the Debtors' conclusion that there are no valuable estate claims against any Kinderhook-related party, the record is bereft of any evidence regarding the value of the Litigation Assets in general. It does not appear that the Disinterested Director reached any conclusion about the existence or value of estate claims against any non-Kinderhook-related party, including Mr. Godfrey and other former members of the Debtors' management team. The Litigation Assets do not appear to have been independently marketed, nor do the Debtors' schedules of assets and liabilities provide detail about these assets. Based on the Committee's preliminary investigation, the estates possess colorable claims to clawback the $80+ million paid to Richard Godfrey in connection with the LBO, in addition to breach of duty claims. The Court should not allow Kinderhook to purchase countless unidentified estate claims before the Committee has had a full opportunity to investigate them. A blanket sale of any and all estate claims to the Debtors' controlling shareholder is inappropriate, particularly where, as here, the Debtors appear to have conducted a limited investigation into claims against Kinderhook arising from the LBO.

31. Analysis of whether the Debtors' claims and causes of action can or should be sold is inherently fact-intensive and approval should be denied where there are insufficient facts to support such sale. For example, in *In re Exaeris, Inc.*, a Chapter 11 debtor filed a motion for authority to sell substantially all of the debtor's assets to an insider on terms that included a marginal credit bid and a release of estate claims against that insider. There, the bankruptcy court declined to approve the sale based on, *inter alia,* a dearth of evidence of efforts to market the assets and lack of evidence of the value of the assets to be sold. *In re Exaeris, Inc.,* 380 B.R. 741, 744 (Bankr. D. Del. 2008). Given the lack of evidence of the value of the Litigation Assets, the Debtors cannot demonstrate that the purchase price – comprised of a $10 million credit bid, $1.1 million

cash, and the assumption of certain liabilities – is fair or that creditors would not do better in a liquidation where such claims would be preserved. The Committee submits that carving out the Litigation Assets, particularly the estate claims against Richard Godfrey identified to date, from the Sale would resolve any uncertainty about the fairness of the purchase price and the adequacy of consideration to the estates.

B. **The Proposed Sale of the Litigation Assets Should Not Be Used to Circumvent the Protections for Unsecured Creditors Mandated by the Bankruptcy Code.**

32. Section 363 asset sales should not be used to circumvent the protections for unsecured creditors mandated by the Bankruptcy Code. *In re WestPoint Stevens, Inc.,* 333 B.R. 30, 52 (S.D.N.Y. 2005), *aff'd in part, rev'd in part on other grounds*, 600 F.3d 231 (2d Cir. 2010) (stating that "it is well established that section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan confirmation procedures"). Pre-plan sales are sometimes approved if there is sound business justification supported by a multitude of factors, with often the most important factor being whether the debtor's assets are rapidly decreasing in value such that an expeditious sale is necessary to maximize the value of the assets. *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (noting that relevant factors may include the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and whether the asset is increasing or decreasing in value); *see also In re Chrysler LLC*, 576 F.3d 108, 126 (2d Cir. 2009) ("Typically, courts have approved § 363(b) sales to preserve wasting asset[s].") (internal quotations omitted), *vacated as moot sub. nom. Ind. State Police Pension Tr. v. Chrysler LLC*, 558 U.S. 1087 (2009).

33. The sale of the Litigation Assets to Kinderhook essentially amounts to a restructuring without observing the creditor protections mandated in the Chapter 11 plan process. If the Court approves the sale of the Litigation Assets, it will essentially be granting Kinderhook, and potentially Richard Godfrey and countless other parties, a blanket release outside of a Chapter 11 plan, which has not been proposed here. Moreover, with the inclusion of the Litigation Assets, the Stalking Horse Agreement may run afoul of the absolute priority rule by effectively allowing Kinderhook to retain its equity interests without contributing sufficient new value, while many unsecured creditors receive nothing, much less payment in full. *See, e.g.*, *In re Dewey Ranch Hockey, LLC,* 414 B.R. 577, 592 (Bankr. D. Ariz. 2009) ("Because there is a real danger that a section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process, sales of substantial portions of a debtor's assets under Section 363 must be scrutinized closely by the court."). The Court should not approve the Sale unless and until the Litigation Assets are carved out and preserved for the benefit of unsecured creditors.

C.  **The Sale of the Litigation Assets Serves No Legitimate Business Purpose and Should Not Be Permitted.**

34. Even under the more lenient business justification standard, courts must consider whether the purchase price is fair and whether there is a sound business purpose for the sale. *See In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that when a debtor sells substantially all of its assets outside of the ordinary course of business it must prove that: "(1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith").

35. The sale of the Litigation Assets to Kinderhook has no legitimate business purpose. Unlike claims against non-insider vendors, employees, and contract counterparties that will continue to provide goods and services to the new company, the Litigation Assets are not necessary

to the operation of the new business. Such assets can easily be carved out from the Sale, and litigation against these parties would not interfere with the go-forward operations of the new business. Kinderhook's desire for a broad Plan release is not a "sound business purpose" sufficient to justify a sale of those claims under section 363(b) of the Bankruptcy Code. Likewise, the sale of estate claims against Richard Godfrey and other former members of the Debtors' management team serves no legitimate business purpose: these individuals will not be involved with the new company. Such assets should be preserved for the benefit of those unsecured creditors expected to receive nothing under the Sale.

## **DIP OBJECTION**

36. The Committee fully restates and incorporates its previously filed objection to the DIP financing. As discussed at length during the February 23 hearing, the Debtors seek to release Kinderhook from any and all estate claims, including any claims arising from the LBO, immediately upon entry of the Final DIP Order.

37. At the February 23, 2023, hearing on the DIP Motion, the Court advised that *In re Ames Dept. Stores*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) is the "foundational case for DIP financing." Feb. 23, 2023 Hr'g Tr. 11:3-4. *Ames* recognizes that the Court's authority to approve postpetition financing under section 364 is discretionary, and held that:

> Once unavailability of less intrusive credit has been shown and adequate protection found if required, the bankruptcy courts, in applying discretion under section 364(b), (c), and (d) have recognized that their discretion is not unbridled. Acknowledging that Congress, in Chapter 11, delicately balanced the hope of debtors to reorganize and the expectations of creditors for payment, the courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits … **a proposed financing will not be approved where it is apparent**

17

> **that the purpose of the financing is to benefit a creditor rather than the estate.**

115 B.R. at 37 (emphasis added).

38.     The Committee does not disagree with the Court that *Ames* sets forth the general standard governing approval of postpetition financing under section 364 of the Bankruptcy Code. However, *Ames* did not involve analysis of postpetition financing provided *by an insider* of the Debtors. The proposed financing at issue in *Ames* appears to have been issued from an unaffiliated lending institution.

39.     Recently, in *In re LATAM Airlines Grp. S.A.*, the Bankruptcy Court for the Southern District of New York clarified the appropriate standard for postpetition financing provided by an insider. 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020). The *LATAM* court properly noted that *Ames* stands for the proposition that "the business judgment standard applies so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest." 620 B.R. at 768. It then held that:

> By definition, the business judgment rule is not applicable to transactions among a debtor and an insider of the debtor. Those kinds of transactions are inherently suspect because 'they are rife with the possibility of abuse.' Instead, courts apply a 'heightened scrutiny' test in assessing the bona fides of a transaction among a debtor and an insider of the debtor. …Thus, an insider's dealings with the debtor are subject to rigorous scrutiny by the court, with the insider bearing the burden of showing the 'entire fairness' of the transaction at issue.

*Id.* at 769 (internal citations omitted).

40.     The Committee submits that the proposed DIP financing does not pass muster under the more lenient standard articulated in *Ames* because it would unfairly "tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code

confers for the benefit of all creditors" by granting Kinderhook a broad Plan release, in addition to the myriad of other protections such fees, interest, section 506(c) and marshaling waivers, and restrictions on the Committee's investigation rights. 115 B.R. at 37. Nor does the proposed financing pass muster under the heightened "entire fairness" standard articulated in *LATAM* for substantially the same reason, as detailed at length in the UCC Objection. The Court should not permit the Debtors to grant their majority equity holder and countless of its affiliates a broad release outside of the protections of a Chapter 11 plan.

*[Remainder of Page Left Intentionally Blank]*

**WHEREFORE**, the Committee respectfully requests that this Court sustain this Limited Objection and grant the Committee such other and further relief as this Court deems just and appropriate under the circumstances.

Dated: March 14, 2023
       Wilmington, Delaware

**COLE SCHOTZ P.C.**

*/s/ G. David Dean*
G. David Dean (No. 6403)
Michael E. Fitzpatrick (No. 6797)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
ddean@coleschotz.com
mfitzpatrick@coleschotz.com

-and-

Seth Van Aalten, Esq. (admitted *pro hac vice*)
Sarah A. Carnes, Esq. (admitted *pro hac vice*)
Bryant P. Churbuck, Esq. (admitted *pro hac vice*)
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
svanaalten@coleschotz.com
scarnes@coleschotz.com
bchurbuck@coleschotz.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*