# EXHIBIT A

**Transition Services Agreement**

Case 23-10047-LSS    Doc 221-1    Filed 03/15/23    Page 1 of 13

**EXECUTION VERSION**

**TRANSITION SERVICES AGREEMENT**

THIS TRANSITION SERVICES AGREEMENT (this "**Agreement**"), is dated as of March 15, 2023, by and between Performance Powersports Group Holdings, Inc., a Delaware corporation ("**PPG Holding**"), each of the Subsidiaries set forth on Schedule 1 attached hereto (the "**Seller Subsidiaries**", and together with PPG Holding, the "**Service Provider**"), and CPS USA Acquisition, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "**Service Recipient**"). Service Provider and Service Recipient may each be referred to herein individually as a "**Party**" and together as the "**Parties**." Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

WHEREAS, Service Recipient and Service Provider have entered into that certain Amended and Restated Asset Purchase Agreement, dated as of March 6, 2023 (the "**Purchase Agreement**"), pursuant to which Service Recipient has agreed to acquire and assume from Service Provider the Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth in the Purchase Agreement;

WHEREAS, Service Recipient desires to engage Service Provider to provide the use of certain facilities during the Transition Period on the terms and conditions hereinafter set forth; and

WHEREAS, Service Recipient desires to receive the use of such facilities from Service Provider in support of the operation of the Business, in each case for the time periods and on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants, agreements, representations and warranties hereinafter set forth, and intending to be legally bound hereby, the Parties hereto hereby agree as follows.

1. **Facilities and Associated Fees.**

    (a)   Facilities. Following the Closing, Service Provider will grant the Service Recipient the right to use, occupy, operate, manage and conduct business at the facilities identified on Schedule 2 attached hereto (each, a "**Facility**" and collectively, the "**Facilities**") solely in support of the Business following the Closing. It is understood that the Facilities to be provided to Service Recipient (or its applicable affiliate) under this Agreement shall only be provided for the purpose of conducting the Business substantially as conducted immediately prior to the Closing.

    (b)   Facility Fees. Service Recipient shall pay to Service Provider upon request all out-of-pocket costs incurred by Service Provider in connection with the access granted to the Facilities (the "**Facility Fees**"). Within 15 days following the completion of each calendar month, Service Provider shall provide to Service Recipient an invoice setting forth the amounts due with respect to the Facilities occupied by Service Recipient during the preceding month. All undisputed Facility Fees shall be paid by Service Recipient when due under the applicable underlying lease or agreement governing Service Provider's use and access to the Facilities. Notwithstanding any other provision in this Agreement, Service Recipient shall have the right to deduct and withhold any taxes as required by applicable Law from any payments to be made hereunder.

(c) <u>Vendor Contracts</u>. Service Provider shall (i) maintain in effect and enforce each vendor contract identified on <u>Schedule 3</u> or such portion of each such vendor contract applicable to the conduct of the Business at the applicable Facility following Closing ("**Vendor Contracts**") in order to enable Service Recipient to conduct the Business substantially as conducted immediately prior to Closing; <u>provided</u>, that Service Recipient will bear all out-of-pocket costs incurred by Service Provider in connection with such Vendor Contracts, and (ii) provide to Service Recipient substantially all the benefits under each Vendor Contract to the extent required to enable Service Recipient to conduct the Business substantially as conducted immediately prior to Closing. In the event that any third party that is a party to any Vendor Contract breaches such Vendor Contract during the Transition Period, Service Provider will promptly notify Service Recipient of such breach following the date that Service Provider first becomes aware of such breach; and to the extent such breach adversely affects Service Recipient's ability to conduct the Business substantially as conducted immediately prior to Closing, take all actions reasonably requested by Service Recipient against such third party to enforce Service Provider's rights and privileges under the Vendor Contract and to bring such third party back into compliance with such Vendor Contract as soon as possible; <u>provided</u> that Service Recipient will bear any reasonable out-of-pocket costs incurred by Service Provider in connection with such enforcement. All out-of-pocket costs incurred under the Vendor Contracts shall be paid by Service Recipient when due under the applicable Vendor Contract.

(d) <u>Additional Services</u>. If, during the 60-day period immediately following the date hereof of this Agreement, Service Recipient identifies any additional services not included in any <u>schedule hereto</u> in connection with the transition of the Business that were provided by Service Provider to the Business in the ordinary course within the prior 12 months to the date of this Agreement, Service Recipient may request that Service Provider provide such additional services. Service Provider shall consider the request in good faith in its sole and reasonable discretion and the Parties shall work collaboratively and in good faith agree on the scope of any such requested additional services, as well as the pricing and other terms and conditions applicable to such requested additional services that are consistent with the historical cost allocations to the Business. In the event any such additional services are agreed by the Parties, the Parties shall supplement the applicable <u>schedules hereto</u> to reflect such addition, and any such addition will be deemed to be a "service" under this Agreement with effect from the date of the Parties' written agreement on the provision of such additional services (including the pricing, if applicable, and other applicable terms and conditions) or such later date as the Parties may agree in writing.

(e) <u>Third Party Consents</u>. If the use or provision of all or a portion of the Facilities or the maintenance and enforcement of the Vendor Contracts pursuant to this Agreement requires the approval, consent, permission, waiver or agreement (including any Permit) (each a "**Consent**") of a third party, Service Provider shall, at the written request of Service Recipient and at Service Recipient's sole cost and expense, (i) use its commercially reasonable efforts to obtain any necessary Consent from such third party or (ii) modify such existing contract (including, for the avoidance of doubt, any of the Vendor Contracts) to enable the Service Provider to provide such use or benefit of the Facilities and/or Vendor Contracts to the Service Recipient, or if any such Consent or modification cannot be obtained as a result of such efforts, then the Parties shall use commercially reasonable efforts to achieve a reasonable alternative arrangement for the Service Recipient to continue to operate the Business.

2

2.     **Facility Matters.**

(a)     Each Party agrees that upon receipt of written notice from the other Party identifying any outage, interruption or other failure with respect to any Facility provided pursuant to this Agreement, it shall promptly respond to such outage, interruption or other failure in a commercially reasonable manner and in no less than the manner substantially similar to the manner in which such Party responded to any outage, interruption or other failure of the same or similar ancillary service prior to the date hereof.

(b)     Service Recipient shall (i) vacate each Facility at or prior to date on which this Agreement is terminated in accordance with Section 3, and (ii) shall deliver over to Service Provider the portion of the Facilities used and/or accessed by it pursuant hereto in the same repair and condition at that date as on the date hereof, ordinary wear and tear, casualty and condemnation excepted. Each Party agrees to maintain commercially appropriate and customary levels (in no event less than what is required by the landlord under the relevant lease agreement) of property and liability insurance in respect of the Facilities and the activities conducted thereon and to be responsible for, and to indemnify and hold harmless the other Party in accordance with this Agreement in respect of, the acts and omissions of its representatives, contractors, invitees and licensees.

(c)     Service Recipient shall comply in all material respects with all Laws applicable to its use or occupation of the Facilities, including those relating to environmental and workplace safety matters.

(d)     During the later to occur of the expiration of the Term or the entry of an Order of the Bankruptcy Court approving the assumption or rejection of the Vendor Contracts or contract or lease associated with the Facilities, Service Provider shall, at Service Recipient's sole cost and expense, carry any and all insurance coverage required to be maintained by the Service Provider under the Vendor Contracts or contract or lease associated with the Facilities, including, without limitation, general liability insurance in commercially reasonable amounts covering Service Providers' and Service Recipient's potential legal liability in connection with claims for personal injury, death or damage to real or personal property arising from Service Recipient's use of the Facilities and Vendor Contracts. All insurance required under this paragraph shall be effected under valid and enforceable policies issued by insurers licensed to provide insurance in the jurisdiction in which the Facilities are located, and shall name the applicable Service Recipient as an additional insured.

3.     **Term; Termination.**

(a)     Term of this Agreement. Except as otherwise agreed between the Parties in connection with Section 1(d), access to the Facilities and the maintenance and enforcement of the Vendor Contracts to be provided under this Agreement shall commence as of the date hereof and shall, with respect to each Facility and Vendor Contract, continue until the date of termination for access to such facility as set forth on Schedule 2 (each such period, the "Transition Period"); provided, however, that access to all or any portion of any Facility may be terminated in accordance with Section 4(b).

3

(b) <u>Termination</u>.

(i) Service Recipient shall have the right at any time prior to the expiration of the Transition Period to vacate any one or more Facilities upon written notice to Service Provider, whereupon access to such Facility(ies) and Service Provider's maintenance and enforcement of the applicable Vendor Contract shall terminate and the Facility Fees with respect to such Facility(ies) shall cease to accrue, provided, however, if termination with respect to a Facility occurs on a day other than the last the day of a month, Service Recipient shall pay all Facility Fees through the end of the month during which such termination occurs.

(ii) Service Provider may terminate this Agreement if the Service Recipient fails to pay any undisputed Facility Fees in any invoice within 30 days after such Facility Fees become due and payable in accordance with the terms hereof, upon at least 10 days' advance written notice to the Service Recipient of such termination.

(iii) This Agreement or any rights or obligations hereunder with respect to any Facility or Vendor Contract may be terminated by the mutual written agreement of the Parties.

(c) This <u>Article 3</u>, <u>Article 4</u>, <u>Article 5</u>, and <u>Article 6</u> shall survive the termination or expiration of this Agreement.

**4.    Indemnity; Limited Liability.**

(a) <u>Indemnity</u>. Service Provider hereby agrees to release, discharge, defend, indemnify and hold Service Recipient and its affiliates and each of their respective officers, directors, employees, representatives, agents and invitees harmless from and against any and all claims, actions, suits, losses, demands, damages, costs and expenses (including reasonable attorneys' fees) of every kind, nature, or description brought by a third party directly arising out of or related to the gross negligence or willful misconduct of Service Provider or its affiliates or each of their respective officers, directors, employees, representatives, agents, and invitees.

(b) Service Recipient hereby agrees to release, discharge, defend, indemnify and hold Service Provider and their respective officers, directors, employees, agents, and invitees (the "<u>Indemnified Parties</u>") harmless from and against (i) all allowed administrative claims incurred by Service Provider and (ii) all liabilities, obligations, claims, damages, penalties, liens, causes of action, costs and expenses imposed upon or incurred by or asserted against the Indemnified Parties or the Facilities, in each case referenced in (i) and (ii), on account of any loss or damage to real or personal property or any injury to or death of any person that may be occasioned by Service Recipient's use of the Vendor Contracts or Facilities during the Term. Notwithstanding the foregoing, Service Recipient shall not be required to indemnify an Indemnified Party for any claim or liability resulting out of or related to an Indemnified Party's own gross negligence or willful misconduct.

(c) <u>Limitation on Liability</u>.

(i) IN NO EVENT SHALL SERVICE PROVIDER OR ITS AFFILIATES, OR SERVICE RECIPIENT OR ITS AFFILIATES, OR ANY OF ITS OR THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, OR AGENTS BE LIABLE

TO THE SERVICE RECIPIENT OR SERVICE PROVIDER, RESPECTIVELY, WITH RESPECT TO ANY CLAIM RELATING TO THIS AGREEMENT OR THE SERVICES TO BE PROVIDED HEREUNDER OR THE PERFORMANCE OF OR FAILURE TO PERFORM SUCH PARTY'S OBLIGATIONS UNDER THIS AGREEMENT FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SIMILAR DAMAGES, OR DAMAGES BASED UPON LOST OR ANTICIPATED REVENUES OR PROFITS OR A MULTIPLE OF EARNINGS (IN EACH CASE, EXCEPT FOR ANY SUCH DAMAGES PAYABLE TO A THIRD PARTY), REGARDLESS OF THE LEGAL BASIS OF LIABILITY OR LEGAL OR EQUITABLE PRINCIPLE INVOLVED (INCLUDING VIOLATION OF LAW, BREACH OF CONTRACT, BREACH OF EXPRESS OR IMPLIED WARRANTY, NEGLIGENCE, STRICT LIABILITY, OR STATUTORY LIABILITY).

(ii)   Neither Service Provider nor any of its affiliates will be liable to Service Recipient or any of its affiliates for any damages arising from any claim relating to this Agreement or any of the Services to be provided hereunder or Service Provider's performance of or failure to perform its obligations under this Agreement unless such damages are a result of the gross negligence or willful breach of this Agreement by Service Provider.

(iii)   Each Party and its affiliates will use commercially reasonable efforts to mitigate any damages for which such Person seeks indemnification under this Agreement.

**5.   Certain Representations**. Each Party represents and warrants that it is duly qualified or licensed to do business and is in good standing in each jurisdiction in which such qualification or licensing is necessary for the conduct of its business, except where the failure to be so qualified or licensed would not reasonably be expected to have a material adverse effect on its ability to fulfill its obligations under this Agreement. Except as provided in this Section 5, the Parties acknowledge and agree that the Facilities are provided as-is, that Service Recipient assumes all risks and liabilities arising from or relating to its use of the Facilities and Service Provider does not make any representation or warranty with respect thereto.

**6.   Miscellaneous.**

(a)   Successors and Assigns; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns. No Party shall assign any of their respective rights and obligations as set forth in this Agreement without the prior written consent of the other Party and any assignment in violation hereof shall be void and of no effect; provided, however, that Service Recipient may assign its rights and obligations set forth in this Agreement to its subsidiaries or commonly-controlled affiliates.

(b)   Entire Agreement. This Agreement (including the Schedules hereto) and the Purchase Agreement (including all ancillary agreements thereto) contain the entire agreement between the Parties hereto concerning the transactions contemplated hereby and supersedes all prior agreements or understandings between the Parties hereto relating to the subject matter hereof. No amendment, modification or waiver of this Agreement shall be binding unless executed in writing by the Parties hereto.

(c) <u>Independent Contractor Status</u>. Service Provider will provide access to the Facilities as an independent contractor and each Party shall have no authority to make binding contracts or commitments on behalf of the other Party in any way without the prior written approval of a duly authorized representative of the other Party. Service Provider shall be solely responsible for the costs and expenses in providing access to the Facilities. Nothing in this Agreement shall create any employer-employee, agency, partnership, joint venture, fiduciary or other relationship between the Parties or between a Party and any Representative of the other Party.

(d) <u>Severability</u>. It is the desire and intent of the Parties that the provisions of this Agreement be enforced to the fullest extent permissible under the Laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. If such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

(e) <u>Amendment</u>. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing signed on behalf of each Party and otherwise as expressly set forth herein.

(f) <u>No Third Party Beneficiaries</u>. This Agreement is intended to benefit the Parties hereto, and except as specifically set forth herein, there shall be no third party beneficiaries of this Agreement including, but not limited to, employees, creditors, customers and suppliers of the Parties.

(g) <u>Notices</u>. All communications to be made under this Agreement shall be made in writing and in accordance with Section 10.7 of the Purchase Agreement.

(h) <u>Incorporation by Reference</u>. The provisions of Section 10.8, 10.9, and 10.10 of the Purchase Agreement are hereby incorporated into this Agreement.

(i) <u>Signatures</u>. This Agreement shall be effective upon delivery of original signature pages or .pdf or facsimile copies thereof executed by each of the Parties. This Agreement may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

(j) <u>Headings</u>. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(k) <u>Construction of Agreements</u>. Notwithstanding any other provisions in this Agreement to the contrary, in the event and to the extent that there shall be a conflict between the provisions of this Agreement and the Purchase Agreement, the provisions of the Purchase Agreement shall control.

[Signature page follows.]

[Signature page follows.]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

**SERVICE RECIPIENT**

CPS USA Acquisition, LLC, a Delaware limited liability company

By: *Kyle Dawson* (DocuSigned)
Name: Kyle Dawson
Title: Vice President and Secretary

**SERVICE PROVIDER**

Performance Powersports Group Holdings, Inc., a Delaware corporation

By: _____
Name: Ken Vanden Berg
Title: Chief Financial Officer

Performance Powersports Group Purchaser, Inc., a Delaware corporation

By: _____
Name: Ken Vanden Berg
Title: Chief Financial Officer

Performance Powersports Group, Inc. (f/k/a Rich Godfrey & Associates, Inc.), an Arizona corporation

By: _____
Name: Ken Vanden Berg
Title: Chief Financial Officer

*Signature Page to Transition Services Agreement*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

**SERVICE RECIPIENT**

CPS USA Acquisition, LLC, a Delaware limited liability company

By: _____
Name: Kyle Dawson
Title: Vice President and Secretary

**SERVICE PROVIDER**

Performance Powersports Group Holdings, Inc., a Delaware corporation

By: *(signed)* Kenneth D Vanden Berg
Name: Ken Vanden Berg
Title: Chief Financial Officer

Performance Powersports Group Purchaser, Inc., a Delaware corporation

By: *(signed)* Ken Vanden Berg
Name: Ken Vanden Berg
Title: Chief Financial Officer

Performance Powersports Group, Inc. (f/k/a Rich Godfrey & Associates, Inc.), an Arizona corporation

By: *(signed)* Ken Vanden Berg
Name: Ken Vanden Berg
Title: Chief Financial Officer

*Signature Page to Transition Services Agreement*

## **SCHEDULE 1**

**Schedule of Seller Subsidiaries**

1. Performance Powersports Group Purchaser, Inc., a Delaware corporation
2. Performance Powersports Group, Inc. (f/k/a Rich Godfrey & Associates, Inc.), an Arizona corporation

## SCHEDULE 2
## FACILITIES AND FACILITY FEES

| Facility | Use | Plan | Move Out Date (Final) |
|---|---|---|---|
| Geneva | Utility vehicle assembly and storage | <ul><li>Starting to move product to Dallas</li><li>Once current UTVs are built, fewer workers will be required (10-15 as of today)</li></ul> | 6/30/23 |
| University | Parts storage, warranty support personnel / call center and corporate office | <ul><li>Need to transition parts to Dallas</li><li>Will need to hire and train 5-7 new call center employees (zero retention) for Dallas facility</li></ul> | 7/31/23 |
| Mesa | Storage facility for UTV parts and transition warehouse for Geneva | <ul><li>TSC has committed to taking remaining inventory but has not provided indication of timing for collection</li><li>Continue to move parts to Geneva facility as space becomes available and wait for TSC to collect purchases</li></ul> | 4/30/23 |

## SCHEDULE 3
## VENDOR CONTRACTS

| Facility | Use | Plan | Move Out Date (Final) |
|---|---|---|---|
| IGL | 3PL warehouse for inventory | • Move parts from IGL facility into Mesa and then terminate lease | 3/31/23 |
| Crossdocks | 3PL warehouse for inventory (mainly 1 and 2 seater go karts) | • Dependent on customer orders to clear out facility<br>• Move inventory from this facility into Empire facility and terminate lease | 5/31/23 |
| Empire | 3PL warehouse for inventory | • Consolidating inventory into this facility | 6/30/23 |