# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
In re:

PERFORMANCE POWERSPORTS GROUP
INVESTOR LLC, *et al.*,[1]

                    Debtors.
---------------------------------------------------------------x

Chapter 11

Case No. 23-10047 (LSS)

(Jointly Administered)

Hearing Date: 3/20/23 at 10:00 a.m.
Objections Due: N/A

**SUPPLEMENTAL OBJECTION OF THE UNITED STATES TRUSTEE TO THE DEBTORS' MOTION FOR ENTRY OF A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR AND JUNIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) AUTHORIZING USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF [D.I. 13, 88, 151]**

In support of the United States Trustee's Objection to the *Debtors' Motion* (the "Motion") *for Entry of a Final Order* (the "Final Order") *Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "U.S. Trustee DIP Objection") [D.I. 13, 88,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

151],[2] Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his counsel, files this Supplemental Objection[3] and states:

## PRELIMINARY STATEMENT

1. As stated in the U.S. Trustee DIP Objection, the overly broad releases sought by Kinderhook in the context of debtor-in-possession financing are wholly inappropriate at this early stage of the cases and before a chapter 11 plan has been proposed. This conclusion is augmented by the Committee's preliminary investigation that revealed the existence of "colorable" claims against certain insiders and other involved in the management of the Debtors prior to and immediately following the October 8, 2021, transaction[4] that resulted in Kinderhook's acquisition of the Company (the "Litigation Assets"). This situation is made even more dire by the fact that the proposed pre-confirmation insider sale of the Debtors' assets to a Kinderhook subsidiary also includes the sale of the valuable Litigation Assets. The broad releases in favor of Kinderhook and its affiliates, coupled with the sale of estate claims and causes of action, mandate that DIP Financing that includes such broad releases are improper and impermissible. Moreover, it appears that the proposed section 363 sale to Kinderhook's affiliate cannot pass muster under the heightened scrutiny that is conferred upon insider pre-confirmation section 363 sales.[5]

---

[2] Capitalized terms herein are ascribed the same meaning in the U.S. Trustee DIP Objection and any other relevant, referenced, cited pleading or document.

[3] This filing supplements the U.S. Trustee DIP Objection filed on February 16, 2023, at [D.I.151]. The U.S. Trustee maintains and preserves his DIP Objection as supplemented herein.

[4] The "October 2021 Transaction".

[5] *See, e.g., In re Exaeris, Inc.,* 380 B.R. 741 (Bank. D. Del. 2008) (*infra*).

**RECENT RELEVANT FACTS**

2. A hearing on the DIP Financing was scheduled for and held on February 23, 2023 (the "DIP Hearing").[6] At the DIP Hearing, the Court did not approve the DIP Financing on a final basis but did enter a Second Interim DIP Order [D.I. 168].

3. The Second Interim DIP Order slightly revised section 4.14 regarding the Releases as follows:

> 4.14 Releases. Subject to and upon entry of a Final Order, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Debtors, (in their own right and on behalf of their estates and on behalf of each of their past, present, and future predecessors, heirs, subsidiaries, successors, and assigns) and any party acting by, through, or under any of the Debtors, or any of their estates, including any successor trustee or other estate and representative in these Chapter 11 Cases or any Successor Case or party that could act by, through, or under any of the Debtors or their estates (collectively, the "Releasing Parties") hereby unconditionally and irrevocably releases, acquits, absolves, forever discharges and covenants not to sue the DIP Lender, and each such entity's current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "Released Parties") and their respective property and assets from any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts,

---

[6] In addition to the U.S. Trustee DIP Objection [D.I 151], the U.S. Trustee also filed an objection to the *Motion of Debtors for Entry of: (I) An Order (A) Approving Bid Procedures in Connection With the Sale of Substantially All Assets, (B) Approving the Bid Protections to the Stalking Horse Bidder, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, (E) Authorizing Entry Into the Stalking Horse Agreement, (F) Approving Bid Protections, (G) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (H) Granting Related Relief* [D.I.150].

> reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of the Final Order, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section 724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement, recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the Prepetition First Lien Credit Agreement, but excluding obligations of the DIP Lender under the DIP Facility arising after the date of the Final Order (collectively, the "Released Claims"). This paragraph is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties. Notwithstanding the releases and covenants in favor of the Released Parties contained above in this paragraph, such releases and covenants in favor of the Released Parties shall be deemed acknowledged and reaffirmed by the Debtors each time there is an advance of funds, extension of credit, or financial accommodation under this DIP Term Sheet, an Interim DIP Order or the DIP Loan Documents. As of the date hereof, there exist no claims or causes of action against the DIP Lenders with respect to, in connection with, related to, or arising from this DIP Term Sheet, an Interim DIP Order or the DIP Loan Documents that may be asserted by the Debtors or, to the Debtors' knowledge, any other person or entity. For the avoidance of doubt, the Released Claims do not include any claims that the Debtors may have against Richard Godfrey, Todd Gentry, and Christopher Hunter, or any entities affiliated with the same of any nature. As of the entry of the Final Order, the releases granted in this paragraph 4.14 are final and binding and are not subject to a Challenge.

Second Interim DIP Order §4.14.

4. The relevant terms in section 4.14 of the Second Interim DIP Order are defined as follows:

- "Releasing Parties" are each of the Debtors, (in their own right and on behalf of their estates and on behalf of each of their past, present, and future predecessors, heirs, subsidiaries, successors, and assigns) and any party acting by, through, or under any of the Debtors, or any of their estates, including any successor trustee or other estate and representative in these Chapter 11 Cases or any Successor Case or party that could act by, through, or under any of the Debtors or their estates (collectively, the "Releasing Parties").

- "Released Parties are the DIP Lender, and each such entity's current and former affiliates, and each such entity's current and former directors, officers, managers and equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, equityholders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and partners (including both general and limited partners) (the "Released Parties")

- "Released Claims" are defined to be any and all acts and omissions of the Released Parties, and from any and all claims, interests, causes of action, avoidance actions, counterclaims, defenses, setoffs, demands, controversies, suits, judgments, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, objections, legal proceedings, equitable proceedings, executions of any nature, type, or description and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of the Debtors, their estates, or such entities' successors or assigns, whether individually or collectively), which the Releasing Parties now have, may claim to have or may come to have against the Released Parties through the date of the Final Order, at law or in equity, by statute or common law, in contract or in tort, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, suspected or unsuspected, disputed or undisputed, whether arising at law or in equity, including any recharacterization, recoupment, subordination, disallowance, avoidance, challenge, or other claim or cause of action arising under or pursuant to section 105, chapter 5, or section

      724(a) of the Bankruptcy Code or under other similar provisions of applicable state, federal, or foreign laws, including without limitation, any right to assert any disgorgement, recovery, and further waives and releases any defense, right of counterclaim, right of setoff, or deduction on the payment of the Prepetition First Lien Credit Agreement, but excluding obligations of the DIP Lender under the DIP Facility arising after the date of the Final Order (collectively, the "Released Claims").

5.     The term "Releasing Parties" was revised in the Second Interim DIP Order to essentially jettison certain third-party releases, but otherwise maintained the broad debtor-only releases. The defined terms "Released Parties" and "Released Claims" remained intact.[7]

6.     Additionally, and as stated in the U.S. Trustee DIP Objection, in conjunction with the DIP Financing, the Debtors also sought court approval to sell substantially all their assets to CPS USA Acquisition, LLC ("CPS USA"), another Kinderhook affiliate, as a going concern; CPS USA that served as the stalking horse bidder (the "Stalking Horse Bidder").[8] Sale Mot. ¶ 14, Vanden Berg Decl. ¶ 35.

---

[7] It should be noted that added to the Releases provision in the Second Interim DIP Order is (i) an acknowledgement and reaffirmation by the Debtors of the release each time there is an advance of funds, extension of credit, or financial accommodation under this DIP Term Sheet, an Interim DIP Order or the DIP Loan Documents, (ii) an acknowledgement that no claims or causes of action exist against the DIP Lenders with respect to, in connection with, related to, or arising from this DIP Term Sheet, an Interim DIP Order or the DIP Loan Documents that may be asserted by the Debtors or, to the Debtors' knowledge, any other person or entity, (iii) that the Released Claims do not include any claims that the Debtors may have against Richard Godfrey, Todd Gentry, and Christopher Hunter, or any entities affiliated with the same of any nature, and (iv) as of the entry of the Final Order, the Releases are final and binding and are not subject to a Challenge. Second Interim Order at ¶ 4.14.

[8] On the Petition Date, the Debtors filed the *Motion for Entry of: (I) An Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All Assets, (B) Approving the Bid Protections to the Stalking Horse Bidder, (C) Scheduling an Auction and a Sale Hearing, (D) Approving the Form and Manner of Notice Thereof, (E) Authorizing Entry Into the Stalking Horse Agreement, (F) Approving Bid Protections, (G) Approving Procedures For The Assumption And Assignment of Contracts And Leases, and (H) Granting Related Relief; And (II) an Order (A) Approving the Sale of Substantially all Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, And (C) Granting Related Relief* (the "Sale Motion") [D.I.17].

7. Through the Sale Motion, the Debtors also sought approval of, among other things, the Debtors' entry into the proposed stalking horse agreement with CPS USA, a Kinderhook affiliate. Sale Mot. ¶¶ 14-19; (D.I. 17-1, as amended D.I. 197] (the "Stalking Horse Agreement").

8. Under the Stalking Horse Agreement, CPS USA (Kinderhook) seeks to acquire substantially all of the Debtors' assets, including "except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent); and (ii) all Avoidance Actions[.]" Stalking Horse Agreement § 2.1(n).

9. Additionally, under the Stalking Horse Agreement, CPS USA will purchase the Debtors' assets for an aggregate purchase price that includes a credit bid of the outstanding obligations under the DIP Credit Agreement in the amount of $10 million. Sale Mot. ¶¶ 15, 19.

10. On February 24, 2023, the U.S. Trustee conducted the section 341 meeting (the "341 Meeting"). The 341 Meeting was continued pending the receipt and review of certain documents related to discretionary bonuses and expenses listed in the Statement of Financial Affairs for Performance Powersports Group, Inc. (f/k/a Rich Godfrey & Associates, Inc.) (Case No. 23-10050-LSS). The date of the continued 341 Meeting has not yet been scheduled.

11. On March 14, 2023, the Committee filed its Limited Objection to both the Final DIP Financing and the Sale Motion (the "Committee Limited Objection") [D.I. 213, 218].[9]

---

[9] *Limited Omnibus Objection of The Official Committee of Unsecured Creditors to the Debtors' (I) Motion for Entry of Interim and Final Orders Authorizing the Debtors to Obtain Postpetition Financing and (II) Motion for Entry of an Order Approving the Sale of Substantially All of the Debtors' Assets* (filed under seal) [D.I.213] (redacted) [D.I. 218].

12. In the Committee Limited Objection, the Committee states that:

- The Committee commenced an independent investigation of potential estate claims arising from the LBO. Committee Limited Objection at ¶ 6.

- The Committee obtained and reviewed over 7,000 documents and emails provided by the Debtors, Kinderhook, and the Disinterested Director which documents formed the basis of the Disinterested Director's investigation, as detailed in paragraphs 35 and 36 of the DIP Supplement. Committee Limited Objection at ¶ 6.

- The Committee conducted an informal interview of two Kinderhook principals regarding the October 2021 Transaction as well as an informal interview of Richard Godfrey regarding the same subject matter. Committee Limited Objection at ¶ 7.

13. The Committee's preliminary investigation revealed that (i) the Company was likely insolvent or inadequately capitalized *prior* to the close of October 2021 Transaction through which the Company incurred a substantial amount of secured debt to pay Richard Godfrey, (ii) the Company's post-October 2021 Transaction opening balance sheet did not properly account for accrued trade liabilities, and (iii) the Company was in a liquidity crisis by at least September 2021 when the Company had incurred a substantial amount in trade payables from a single vendor, with little, if any, liquidity or borrowing availability to pay even a fraction of the amount due. Committee Limited Objection at p. 3.

## LAW, ANALYSIS AND ARGUMENT

**A.    The Broad Release Is Inappropriate in the Context of DIP Financing.**

14. As stated in the U.S. Trustee's DIP Objection, and reiterated here, the broad release sought by Kinderhook, as the DIP Lender, is not proper for inclusion in an order approving debtor-

in-possession financing at this early stage of the cases, before a chapter 11 plan is proposed, and considering the Committee's initial determinations from its preliminary investigation.

15.     Pursuant to this Court's decision in *In re Tribune Company*, 464 B.R. 126 (Bankr. D. Del. 2011) (Carey, J.), and *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) (Walrath, J.), among others, Courts consider the five factors set forth in *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del 1999) and *In re Master Mortgage Inv. Fund, Inc.,* 168 B.R. 930, 937-38 (Bankr. W. D. Mo. 1994) to determine whether, notwithstanding section 524(e) of the Code, a plan may provide for releases by debtors of non-debtor entities. *See Tribune*, 464 B.R. at 186; *Wash. Mut.,* 442 B.R. at 346; *In re Spansion, Inc*., 426 B.R. 114, 142-43, n. 47 (Bankr. D. Del 2010) (Carey, J.); *In re Coram Healthcare Corp.,* 315 B.R. 321, 335 (Bankr. D. Del. 2004) (Walrath, J). Those five factors are as follows:

- a. an identity of interests between debtor and non-debtor releasee, so that a suit against the non-debtor will deplete the estate's resources (e.g., due to a debtor's indemnification of a non-debtor).
- b. a substantial contribution to the plan by non-debtor.
- c. the necessity of release to the reorganization.
- d. the overwhelming acceptance of plan and release by creditors; and
- e. the payment of all or substantially all the claims of the creditors and interest holders under the plan.

*See Tribune*, 464 B.R. at 186 (*citing Wash. Mut.*, 442 B.R. at 346 (*citing Zenith*, 241 B.R. at 110)). "The factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *Id*.

16.     Given the Committee's investigation to date, it is obvious that the overbroad releases proposed are entirely inappropriate in the context of DIP Financing in these cases.

17.     Even if the first factor could be established (which it cannot), the remaining four factors are beyond reach. This Court is not being asked to confirm a plan, but rather to simply approve DIP Financing.  The DIP Financing has none of the procedural safeguards contained in the Bankruptcy Code's provisions governing solicitation of votes on a proposed plan.  Even if the Court were to somehow consider the distributions proposed under the DIP Financing as payments to be evaluated by the *Master Mortgage* factors, it is unclear what distribution, if any, general unsecured creditors might receive under any potential plan.

18.     In fact, based upon the Committee's preliminary investigation, prosecution of the estate causes of action could result in a plan dividend that would be greater than any conceivable distribution contemplated by the DIP Financing.

19.     Additionally the Released Parties in paragraph 4.14 includes not only the DIP Lenders, but such entity's current and former affiliates[10], and their current and former directors, officers, managers and direct and indirect equityholders, predecessors, successors and assigns, and direct and indirect subsidiaries, and each of such entity's current and former officers, members, managers, directors, direct and indirect equityholders, principals, members, employees, agents, independent contractors, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, financial advisors, and general and limited partners.

20.     The Debtors have not addressed any of the *Zenith* or *Master Mortgage* factors for each of these Released Parties.  The reasonableness of the releases (in the context of a plan) must be evaluated separately with respect to each of the released parties to determine if the release is appropriate. *See Wash. Mut.,* 442 B.R. at 346. The Debtors have the burden to establish whether

---

[10] Affiliates of Kinderhook include Debtor Performance Powersports Group Investor, LLC, the DIP Lender, and the Stalking Horse Bidder.

the *Master Mortgage/Zenith* factors have been met as to each of the non-debtor Released Parties. Neither the Debtors nor the DIP Lender can do so in these cases as, among other things, there is no plan for creditors to review or to vote upon.

**B. Under the Present Terms, DIP Financing Should Not Be Approved Under Section 364.**

21. As this Court readily recognized, the case of *In re Ames Dept. Stores*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) set the foundation for DIP financing and is "super similar" to the present case. Feb. 23, 2023, Hr'g Tr. 11:2-5.

22. Here the terms of the DIP Financing, including the Releases, benefit Kinderhook and the vast number of Released Parties and no other parties -- especially the creditors.

23. In *Ames*, the court recognized that its discretion to approve section 364 post-petition financing is not unbridled given Congress's delicate balancing act, in the context of chapter 11 financing, between the hope of debtors to reorganize against the expectations of creditors for payment. *Id.*

24. In this regard, the *Ames* court stated that:

> courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits.

*Ames,* 115 B.R. at 37 (citing *In re Tenny Village Co.,* 104 B.R. 562, 567-70 (Bankr. D.N.H. 1989); *In re St. Mary Hospital,* 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.* 71 B.R. 544, 550-51 (Bankr. E.D. Pa. 1987)).

25. In fact, the *Ames* Court analyzed *Tenny Village,* a case where the debtor sought section 364(d) post-petition financing from its principal pre-petition secured lender. The *Tenny Village* court did not approve the financing arrangement because it would "pervert the

11

reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the Debtor's principals who guaranteed its debt." *Ames*, 115 B.R. at 38 (citing *Tenny Village*, 104 B.R. at 568).

26. Not unlike the present case, the *Ames* Court, in analyzing the *Tenny Village* holding, stated:

> The bank was to effectively operate the debtor's business; its pre-petition liens would be immunized from attack by not only the debtor but by a creditors' committee even prior to the appointment of counsel; preference, fraudulent conveyance, lender liability and subordination claims of the estate would be waived; debtor's counsel would not be entitled to payment for any work in a dispute with the bank. Thus, the arrangement would skew the conduct of the bankruptcy case, destroy the adversary process that contemplates representation by counsel and deprive the estate of possible rights and powers before the creditors' committee counsel would have a reasonable time to examine whether the estate had viable claims.

*Ames*, 115 B.R. at 38.

27. The present case is quite similar to the cases where the Court did not approve DIP financing. Here, the DIP lender is an insider of Debtors and is the proposed purchaser of the Debtors' assets, including the Litigation Assets. Coupled with the overbroad Releases, the scales are tipped against the DIP Financing, as the overt and apparent purpose of the proposed DIP Financing is to benefit Kinderhook at the expense of the estates and the Debtors' creditors. *See Ames,* 115 B.R. at 37.

28. Additionally, in the context of this case, both the DIP Financing and the proposed sale are subject to strict scrutiny, as both transactions involve insiders.

29. In the context of DIP Financing, such transactions are generally subject to the business judgment standard provided that the financing agreement does not unduly benefit a party in interest at the estate's expense. *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 768 (Bankr. S.D.N.Y. 2020). However, where the transaction is between and among a debtor and an insider

of the debtor, the business judgment rule is inapplicable. *Id.* As the *LATAM* court recognized, such transactions are ". . . inherently suspect because 'they are rife with the possibility of abuse.'" *Id.* at 769.

30. Similarly, the pre-confirmation sale of substantially all the Debtors' assets, including estate causes of action, are also subject to a higher standard of review. In this case, the proposed sale, as it concerns an insider or an affiliate of an insider, is subject to heightened scrutiny in order to protect the estates, creditors, and other parties-in-interest.

31. Courts in this District have previously noted that pre-plan sales of all or substantially all a debtor's assets "requires a bankruptcy court's careful review." *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008). Where there is a proposed sale or sales in the context of a chapter 11 proceeding of substantially all of a debtor's property without the creditor protections of the disclosure statement and plan process, as is here, the transaction must be closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization. *See In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) *(citing In re Indus. Valley Refrig. & Air Cond. Supp., Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987)); *see also In re CGE Shattuck, LLC,* 254 B.R. 5, 12 (Bankr. D. N.H. 2000); ("The closer a proposed transaction gets to the heart of the reorganization process, the greater scrutiny the Court must give to the matter."); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).

32. Courts have expressed great concern that asset sales, particularly sales of all or a substantial portion of an estate's assets, should not be used to circumvent the protections afforded by chapter 11 and the Bankruptcy Code. For example, in *Abbotts Dairies*, the United States Court of Appeals for the Third Circuit expressed concern that section 363 sales should not be used to

13

circumvent the protections afforded to creditors under the plan confirmation process and section 1129 of the Bankruptcy Code. *See Abbotts Dairies*, 788 F.2d at 150. The Third Circuit held that the "good faith" requirement of a section 363 sale should be used as assurance that a debtor does not, by means of an asset sale, abrogate the protections afforded to creditors and shareholders by section 1129 of the Bankruptcy Code and the plan confirmation process. *See id.* at 150. Even those cases that require only a "good business justification" to approve a sale of substantially all the estate's assets expressed concern that courts not adopt a "construction of § 363(b) [that] swallows up Chapter 11's safeguards." *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983).

33.    The U.S. Trustee reserves any and all rights, remedies, and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

\*\*\*

## CONCLUSION

WHEREFORE, for all the above-stated reasons, the United States Trustee respectfully requests that Court deny the DIP Financing and DIP Motion and grant such other relief as this Court deems fair, appropriate, and just.

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 & 9**

Dated: March 17, 2023

By:/s/ Richard L. Schepacarter
Richard L. Schepacarter
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 fax
Richard.Schepacarter@usdoj.gov