# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC, *et al.*,[1] | ) |
| | ) Case No. 23-10047 (LSS) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| | ) Related to Docket Nos. 13, 17, 54, 168, and 169 |

## DEBTORS' REPLY IN FURTHER SUPPORT OF SALE MOTION AND DEBTOR IN POSSESSION FINANCING MOTION

### PRELIMINARY STATEMENT

1. The Committee's limited objection to the Sale and DIP Motions rests on the premise that the "proposed Sale and DIP Financing will strip the estate of valuable estate claims arising from the October 2021 leveraged buyout (the "LBO"). Notably, the "valuable estate claims" the Committee seeks to retain for the benefit of unsecured creditors ***do not include any claims against Kinderhook***. In fact, after its own independent investigation—which include the review of more than 7,000 documents obtained from the Debtors and Kinderhook plus interviews of two Kinderhook principals—the Committee has concluded "[t]o date, the Committee's investigation has not revealed ay colorable claims against Kinderhook and its affiliates." Limited Obj. at note 5. Instead, when the Committee speaks of the valuable claims it has identified, it is referring to "the colorable claims to clawback the $80M+ to Richard

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

Godfrey in connection with the LBO, in addition breach of duty claims [against former management]." Based on these conclusions, the Committee explicitly states that it "would support a proposed Sale and DIP Financing Package that carves out and preserves the Litigation Assets for the benefit of unsecured creditors." *See also* Limited Obj. ¶ 31 ("The Committee submits that carving out the Litigation Assets, particularly the estate claims against Richard Godfrey identified to date, from the Sale would resolve any uncertainty about the fairness of the purchase price and the adequacy of consideration to the estates.")

2.  Based on this commitment, the Debtors and Kinderhook have agreed to do exactly what the Committee has requested they do in order to obtain the Committee's support for the Sale and DIP Financing—they have carved out from the Sale and DIP Financing Package the valuable causes of action the Committee has identified (*i.e.*, the estate claims against Richard Godfrey and other former members of management) and split the proceeds of such causes of action equally between Kinderhook and the Litigation Trust. The Debtors and Kinderhook did not, however, stop there. Kinderhook also agreed to provide a total of $1.25 million in funding to a litigation trust that will pursue these claims, which ensures that the trust has resources to actually pursue these valuable causes of action. With this resolution, the Debtors see little choice for the Committee other then to support the Sale and DIP Financing Package and withdraw its objection If the Committee does not do so, it will jeopardize the only value-maximizing transaction available.

3.  At this point, there can be no dispute that a Sale to the Stalking Horse Purchaser on the amended terms is the best—and only—option. The extensive marketing process conducted by the Debtors confirms as much, as not a single bid has emerged, even after the bid protections and fee reimbursement were removed. As a result, absent the sale to the Stalking

Horse Purchaser, the only other option is liquidation. And, while that may be a result that Hisun, as a competitor to the Debtors, prefers, that would rob the unsecured creditors of any recovery and ensure that the value that remains flows only to the Debtors' secured creditors.

4. When it comes to the recoveries that creditors are likely to receive in the Sale versus a liquidation, the choice is stark:

| Sale | | Liquidation | |
|---|---|---|---|
| 1st Lien Debt | 52,000,000 | Cash Net of Admins | 1,650,000 |
| 2nd Lien DIP | 10,000,000 | A/R (Gross)* | 12,860,000 |
| Wind Down Amount | 600,000 | Deposits (Gross)* | 4,360,000 |
| Litigation Trust Funding Amount | 1,250,000 | Prepaids (Gross)* | 2,590,000 |
| Assumed Liabilities | 9,000,000 | Inventory (Gross)* | 9,670,000 |
| | | Other assets (Gross)* | 1,000,000 |
| **Total** | **72,850,000** | | **32,130,000** |

For the purposes of this comparison, the estimate assumes a 100% recovery for all of the Debtors' assets in a liquidation, including full recovery of deposits, accounts receivable, and prepaids were the counterparties are likely to have significant offsets, full recovery for the inventory without accounting for any storage, transportation, or sales costs or discounts that may be necessary, and no costs to administer the liquidation. In reality, the amount that is likely to be recovered would be substantially less. But, even assuming a 100% recovery the total value received falls well below the first lien debt.

5. To be clear, the doomsday scenario of a liquidation is not mere speculation. Kinderhook has made clear to the Debtors that, after funding two independent investigations—each of which concluded that there are no colorable claims against it—it will not close the Sale if the DIP Financing and corresponding Debtor Releases are not approved. Not surprisingly, Kinderhook is unwilling to fund litigation against itself, even if any such claims would be

frivolous. Most importantly, the risk of such litigation is very real as demonstrated by the fact that Hisun continues to prosecute similarly-frivolous claims—***including a fraudulent transfer claim that is property of the estate***—in an action against Kinderhook in the Southern District of New York (even putting to the side that this is yet another example of Hisun breaching its fiduciary duties by pursuing an estate claim for its own benefit rather than the benefit of all creditors).[2]

6. Put simply, with the Committee's investigation is complete, the time has come to move this case forward and approve the Sale and the DIP Financing. Notwithstanding the Committee's half-hearted objection to the timing of the Kinderhook release, those complaints ring hollow when they have affirmatively concluded that there are no colorable claims against Kinderhook. Thus, the Committee's concerns around the DIP Financing "tilt[ing] the conduct of the bankruptcy case" or "prejudice[ing], at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors" are no longer valid. Similarly, the Committee's stated concern that the Kinderhook Release does not serve a "legitimate public interest" ignores reality. Without the Kinderhook Release, there will be no Sale, and without the Sale the Debtors will liquidate and non-insider vendors, employees, and contract counterparties will never be paid or reap the benefits of the go-forward business. Thus, contrary to the Committee's assertions, the Kinderhook Release serves an *essential* business purpose as it alone ensures there will be a business.

7. Accordingly, to the extent that Committee members decide to breach their fiduciary obligations and continue to object to the Sale, the DIP Financing, and the Kinderhook

---

[2] In light of this blatant violation of the automatic stay, the Debtors have filed with this Court the *Debtors' Motion for Entry of an Order Enforcing the Automatic Stay and Granting Related Relief* contemporaneously herewith.

Release, those objections should be overruled.

## REPLY

### A. The Debtors' Capital Structure

8. The Debtors' capital structure is relatively straightforward. To begin, the Debtors' have approximately $52 million of first lien debt to Twin Brook. Twin Brook is not participating in the DIP or the Sale, and is not related to Kinderhook in any way.

9. Kinderhook, for its part, was only the prepetition equity sponsor and, through an affiliate, has provided a second-lien DIP Facility of $10 million. Because Kinderhook does not participate in the prepetition first lien debt, Kinderhook does not have any prepetition liens on the Debtors' assets and thus their liens, which arise solely because of the postpetition DIP Facility, are not subject to challenge. Finally, Kinderhook is also the Stalking Horse Bidder and its credit bid includes only postpetition debt incurred for the new money it advanced (in addition to additional cash payments and the assumption of substantial liabilities). Kinderhook's equity is not included in the consideration for the sale and Kinderhook is getting no credit for its equity in the sale.

### B. After Separate, Independent Investigations, the Debtors and the Committee Conclude that There are No Colorable Claims against Kinderhook

10. In November of 2022, the Independent Director began investigating potential claims held by the Debtors. This investigation included examining the facts and circumstances that gave rise to the Debtors' financial distress, including potential causes and investigating claims that the Debtors could assert against parties including claims arising from the 2021 transaction and claims arising from post-transaction conduct. The Independent Director examined 170 transaction related documents, over 5,000 emails from the Debtors' former CEO (Richard Godfrey) and CFO (Chris Hunter), and over 1,200 emails produced from Kinderhook

in response to document requests. Notably, Richard Godfrey, the former CEO, would not cooperate with the investigation and would not turn over emails on a personal email account relating to company business.[3]

11. The Independent Director also interviewed witnesses from Kinderhook and the current management of the debtors. Notably, Mr. Godfrey refused to sit for an interview with the Independent Director. These interviews covered wide topics including the capital structure and financial condition leading up to the 2021 transaction, the financial condition and capital structure after the 2021 transaction, the development, structuring and negotiation of the 2021 transaction, the first lien financing, the operation of the company after the 2021 transaction, and the relationship with Hisun.

12. The Independent Director investigated claims for fraudulent transfers relating to the 2021 transaction, including Kinderhook's transaction fee, claims for fraudulent transfers or fiduciary claims relating to post transaction conduct, including Kinderhook's advisor fees (which have not been paid) and the management services agreement (which has not resulted in a payment to Kinderhook), possible avoidance claims, and any other viable claims the Debtors may possess. The Independent Director also investigated claims against Mr. Godfrey and former management, including fraudulent transfers related to the transaction, Mr. Godfrey's cash consideration and bonuses paid to certain executives, breach of fiduciary duty claims for both pre-transaction and post-transaction conduct, and any other relevant claims.

13. Immediately after the Committee retained counsel (in fact, within 30 minutes) the Debtors provided Committee counsel with thousands of pages of documents collected during the

---

[3] The Debtors have been able to locate very few emails from Richard Godfrey on the Debtors' email servers. Mr. Godfrey may have conducted company business on a private email server or emails on the Debtors' email servers may have been deleted.

course of their investigation. This production included, among others, (a) transaction documents related to the 2021 transaction, Twin Brook Credit Agreement, First Amendment to the Twin Brook Credit Agreement, Second Amendment to the Twin Brook Credit Agreement, and UCC searches; (b) company documents collected from the form CEO's and CFO's company email accounts totaling 5,176 documents, (c) documents and email of the Disinterested Director totaling 697 documents, (d) miscellaneous documents including documents surrounding both the 2021 marketing process and the pre-petition marketing process, and (e) 1,270 documents from Kinderhook in response to document requests during the Disinterested Directors investigation. The Debtors also had several meetings with Committee counsel, and Committee counsel conducted a three-hour interview of the Debtors' Disinterested Director. Additionally, the Committee's proposed financial advisor meet with the Portage Pont Partners and received information related to the Debtors' financial condition, forecasts, and a full download of the sales and marketing process. The Committee was able to interview witnesses from Kinderhook and was able to interview Mr. Godfrey.[4]

14. The investigations by both the Independent Director and the Committee were extremely thorough and involved. Although the Committee and the Independent Director may not agree on all aspects of the investigation results and more information may be needed on some aspects, they are in full agreement as to the results as to Kinderhook. Both the Debtors and the Committee agree that there are no viable claims against Kinderhook.

---

[4] Although Mr. Godfrey refused to sit for an interview for the Independent Director, the Debtors were able to participate in the interview conducted by the Committee.

C.  **The Results of the Debtors' Sale Process**

15. After an extensive, thorough, and independent sale process, the Debtors did not receive any Qualified Bids—even after the bid protections were removed. And, while the Committee identifies valuable litigation claims against Godfrey and other former members of management, no Committee member —who presumably were well-informed as to the value of these claims—ever made an offer to purchase them. That left but one bid and one purchaser that would allow the company to continue as a going concern: the bid submitted by Kinderhook.

16. Significantly, even without a competing bid, the Stalking Horse Agreement provides the estates with numerous benefits that would not otherwise be available.

17. The benefit to the estates of the Stalking Horse Agreement are numerous. Under the Stalking Horse Agreement:

- The $52 million first lien debt will be assumed;

- The $10 million second lien DIP will be forgiven;

- If the Debtors do not have enough cash on hand to fund the wind down of the estates, Kinderhook will provide $600,000 for that purpose; and

- The assumption of the Assumed Liabilities, including all Determined Cure Costs and all trade payables (except the Excluded Vendors), which is estimated at approximately $9 million.

These known fixed amounts are close to a total of $73 million of value. In addition to these substantial benefits, the Stalking Horse Agreement has been modified to provide for an increased recovery through the creation of a funded litigation and sharing of proceeds of any successful claims against Mr. Godfrey and certain of his associates:

| Key Term | Original Sale | Revised Sale |
|---|---|---|
| Cash payment | $500,000, paid to Debtors | $750,000, contributed to litigation trust |
| Wind down amount | $600,000 | Same |
| Funding of litigation trust | - | $500,000 as 12% loan |
| DIP credit bid | $10 million | Same |
| Assumption off first lien debt | $52 million | Same |
| Assumption of liabilities | $9 million | Same |
| Estate claims | Kinderhook purchases all estate claims. Full Debtor release of claims against Kinderhook and affiliates. | Kinderhook purchases all estate claims, other than claims against Richard Godfrey and certain other individuals (the "Godfrey Claims"), with the Godfrey Claims being contributed to a litigation trust split proceeds of Godfrey claims 50%/50%. Full Debtor release of claims against Kinderhook and affiliates |

Furthermore, the sale will allow the employees of the Debtors to keep their jobs, provide the Debtors' vendors with a counterparty to trade (and avoid any rejection damages from the Assumed Contracts), provide for ongoing warranty support for the consumers who have purchased their products, and provide the Debtors' customers with an uninterrupted supply of goods from their preferred vendor.

18.     The DIP has also provided significant value to creditors. Specifically, the DIP has allowed the Debtors to satisfy numerous prepetition claims that would otherwise have gone unpaid (including the wages of their employees), payments to taxing authorities, payments to critical vendors, payments to insurers, and ongoing warranty service claims. Without the DIP

and sale, these claims would not have been paid. The payment of these claims are significant additional benefits that have inured to the creditor body.

19. In contrast, without the DIP and Sale, the Debtors' prospects are dismal as they will not be able to continue as a going concern. They have fully exhausted the marketplace seeking potential buyers and have been unable to obtain interest from any party that exceeds the value of the Stalking Horse Agreement. Not only would further searching be futile, the Debtors do not have funds available to continue the search. The Debtors only option would be to cease operations and liquidate.

20. The Debtors have few assets that would be available to satisfy creditors in a liquidation. The Debtors have inventory with a book value of approximately $8 million, accounts receivable with a gross amount of approximately $13 million, cash, net of administrative claims of approximately $6 million, and causes of action, with an unknown value. The inventory would be subject to significant carry costs, would need to be sold without any warranty support, and would only be sold in the mix and amounts currently on hand. The accounts receivable would also have collection risks and would be subject to setoff and recoupment by customers, impairing their value. Even if these risks are ignored, the gross value of these assets is approximately only half of the first lien debt.

21. In response to the Committee's concerns, the Debtors and Kinderhook have agreed to exclude from the Stalking Horse Agreement the causes of action against Richard Godfrey and other former management of the Debtors. In addition, the Stalking Horse Agreement and DIP will provide a funding mechanism so that the Debtors are able to confirm a plan and establish a litigation trust. Moreover, Kinderhook will fund that trust so that it has the requisite funds to to pursue the causes of action.

22. In exchange for funding the bankruptcy process, providing the DIP Financing that allowed to the Debtors to fully market their assets, funding recoveries to creditors through the Stalking Horse Agreement, and funding recoveries to creditors through the litigation trust mechanism, the liquidation trust funding, as well as leaving certain claims behind for the litigation trust to pursue, Kinderhook is acquiring claims against itself and its affiliates as well as seeking a release in the DIP Facility.

23. The propriety of the releases and acquisition by Kinderhook of any potential causes of action against it or its affiliates requires the evaluation of what the Debtors are giving up for the releases as well as what they are receiving in exchange. What is the estate giving up with the releases? Nothing. The Debtors' Independent Director concluded that there were no viable claims against Kinderhook. The Committee investigated and concluded that there were no colorable claims against Kinderhook. The process has reached conclusion and the value the Debtors give up by granting the release is nothing.

24. What do the estates receive in exchange for the releases? As discussed above, the estates receive a going concern and substantial and meaningful recoveries to all creditors. This contrasts against what the Debtors could achieve without the releases, which is a forced liquidation with value unlikely to exceed the first lien debt.

25. If the releases are not worth anything, why does Kinderhook care about them and why are they necessary to this process? Kinderhook is currently being sued by members of the Committee based, at least in part, on causes of action that belong to the Debtors. Even though the Debtors and the Committee have determined that the claims against Kinderhook are worthless, and the Committee members have no right or standing to assert these causes of action that belong

to the Debtors, the Committee members are actively pursuing such claims. And, of course, Kinderhook still needs to defend against such claims.

26. This stands in contrast to the situation where a party seeks a release for a claim that may or may not be brought in the future. Here, Kinderhook is currently being sued by Hisun in the Southern District of New York, demonstrating that the threat of additional frivolous actions is real. Moreover, it is important to note that the scope of the releases make it clear that the releases are _solely_ debtor releases and do not release any direct claims held by any other party. Finally, Hisun has asserted certain estate causes of action, even though it has right to do so. The releases may be more akin to a comfort order, since no party other than the Debtor has the right to assert them, but nonetheless, other parties are asserting these causes of action. Without such release, there is Kinderhook will not provide funding into the estate that could then be used by the estate to pursue claims against Kinderhook.

### D. Approval Of Sale

27. Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to § 363 if a "sound business purpose" exists for the proposed transaction. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor-in-possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *In re ICL Holding Co. Inc.*, 802 F.3d 547, 551 (3d Cir. 2015); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (approving a sale pursuant to section 363 where there was a "legitimate business justification").

28. Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale, (ii) whether adequate and reasonable notice of the sale was given to interested parties, (iii) whether the sale will produce a fair and reasonable price for the property, and (iv) whether the parties have acted in good faith. *See Del. & Hudson*, 124 B.R. 167, 176 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987). A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estates, creditors, or interest holders. *See, e.g., In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. Of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

29. Under well-established Delaware corporate law, there are "three tiers of review when evaluating corporate fiduciary decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *In re Ultimate Escapes Holdings, LLC*, No. 10-12915 (BLS), 2015 WL 1590132, at *8 (Bankr. D. Del. Feb. 5, 2015), adopted, 551 B.R. 749 (D. Del. 2016), *aff'd sub nom. In re Ultimate Escapes Holdings LLC*, 682 F. App'x 125 (3d Cir. 2017) (*citing Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011)). "The applicable standard turns on whether the corporate fiduciaries (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual

conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness)." *Id*.

30. The Committee Objection suggests that the sale should be subjected to heightened scrutiny under the entire fairness doctrine because the transaction involves the sale to an insider. But here, notwithstanding the fact that the Stalking Horse Bidder is an insider of the Debtors, the sale process was conducted entirely without the insiders' involvement on the selling side. Moreover, the process was led by the Debtors' Independent Director, who is truly is truly independent of the parties and had a fiduciary duty solely to the Debtors. In that role, the Independent Director had control over the sale process and ultimate authority to negotiate the sale documentation. The insider was not involved in the process of negotiating the sale for the company side. The concern that the insider controls both sides of the transaction and can skew the process for its own benefit is simply not present in this case. The Independent Director fought for the Debtors in an arms-length negotiation with the Stalking Horse Bidder.

31. As shown above, the value of the Stalking Horse Agreement to the estates is very substantial and far outweighs the only other option for the Debtors, which is a forced liquidation with recoveries not exceeding the secured lenders. Accordingly, the sale clearly has a legitimate business interest.

32. <u>Application of Heightened Scrutiny</u>. Even if heightened scrutiny is applied to the sale, overwhelming evidence suggests that the sale should be approved. To begin, there is no prohibition of selling assets to an insider. In fact, courts have approved sales to insiders on the grounds that "nothing within the Bankruptcy Code prohibits insiders from purchasing estate assets." *In re Family Christian, LLC*, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015). Rather, an insider transaction (if truly controlled on both sides by an insider) is merely subject to heightened

scrutiny, and such transactions are routinely approved. *Id.; see also In re Summit Glob. Logistics*, 2008 WL 819934 at *9 (Bankr. D.N.J. March 26, 2008); *In re Tidal Construction Co., Inc.*, 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009) (applying heightened scrutiny and ultimately approving the asset sale to an insider).

33. "Heightened scrutiny" only means that courts focus on the "integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010). As courts have made clear, that standard is satisfied when, as here, the Debtors utilize an independent director to conduct an investigation and assist in running a fulsome marketing process. *See, e.g., Summit Glob. Logistics*, 2008 WL 819934 at *12-13.

34. An "entire fairness" analysis requires examination of both (i) fair dealing and (ii) fair price, examined together as a whole. *Id*. "Fair dealing" involves elements such as (i) when the transaction was timed, (ii) how it was initiated, (iii) how it was structured, (iv) how it was negotiated, (v) how it was disclosed to the directors, and (vi) how the approvals of the directors and the stockholders were obtained. *Id*. The evidence needed to support a 363 sale to a disinterested insider is not uniformly articulated in the case law and naturally will vary based on the specific facts of the case, but given that bankruptcy courts often reference or adopt the rules of conduct generally applicable to corporate fiduciaries, the state law entire fairness standard provides a useful measuring stick. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995). ("Where ... the presumption of the business judgment rule has been rebutted, the [fiduciary's] action is examined under the entire fairness standard.").

35. <u>Fair Process</u>. The process that the Debtors conducted was entirely fair. Noting the potential conflicts of interest that could be involved, the Debtors appointed the Independent Director. The Independent Director was delegated the sole responsibility for the marketing and sale process. The Independent Director negotiated the sale and the DIP. No party with any actual or potential conflict was involved in designing or effectuating the marketing process, the negotiations, the evaluation of potential bidders or bids, or the decision to enter into the Stalking Horse Agreement. The entire process was conducted by a disinterested person. There have been no allegations or evidence that the Independent Director was anything other than fully disinterested. Therefore, the process conducted by the Debtors was unquestionably fair.

36. <u>Fair Price</u>. In evaluating application of fair price in the context of the entire fairness standard, should it apply, "fair price" is measured by the economic and financial considerations of the sale, including relevant factors such as market value and any other elements that potentially affect the intrinsic or inherent value of an asset. *In re Broadstripe, LLC*, 444 B.R. 51, 106 (Bankr. D. Del. 2010). A market test is utilized because the best measure of a company's value is through a market test. *See In re SubMicron Sys. Corp.*, 432 F.3d 448, 461 (3d Cir. 2006) (Section 363 attempts to avoid complexities and inefficiencies of valuing collateral). It is well settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999). In this case, the Debtors conducted a sale process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order. The sale process afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase all or part of the Debtors' assets. This included a robust and extensive marketing and

sale process by the Debtors and their professionals in accordance with the Bidding Procedures Order.

37. The Committee raises the issue that the Debtors did not separately market the litigation assets. This issue is no longer pertinent now that the only potentially valuable litigation claims will remain in the estate for the benefit of creditors. However, the Debtors' marketing process with respect to the potential causes of action is no different than any other sale of causes of action. The Debtors have not and could not fully conduct discovery on the potential causes of action and assess the actions prior to marketing all of the assets for sale. The existence of the causes of action was disclosed and no party, including members of the Committee with specialized knowledge of these claims, was interested enough in the claims to express a willingness to bid on them.

38. While entities expressed an interest in acquiring the assets generally, ultimately no Qualifying Bids were received. The feedback the Debtors received during the process indicated that the reason for the lack of interest was that parties were unwilling to come close to the value delivered by the Stalking Horse Agreement. As a result, the process conducted by the Debtors tested the market and resulted in the highest or best value for the assets for the Debtors and their estates. The Stalking Horse Agreement with the Stalking Horse Bidder ensured the Debtors obtained at least fair market value by setting a minimum purchase price for the assets that was tested by the marketplace. As such, potential purchasers and creditors could be assured that the consideration obtained would be fair and reasonable and at or above the market.

39. As an alternative to the highest and best offer for the assets - one that provides recovery to others and a path forward for the Debtors' estates - the Debtors are faced only with liquidation. The Debtors have demonstrated compelling circumstances and a good, sufficient, and

sound business purpose and justification for the Sale of the assets prior to, and outside of, a plan of reorganization. The market test performed by the Debtors and testimony from the Debtors' professionals will show that the value placed on the Debtors' assets by the Stalking Horse Bidder exceeds otherwise reasonable expectations, creates value, and sets a fair price that is in the best interest of the Debtors' estates.

### E. DIP Releases

40. At the February 23, 2023 hearing a number of terms relating to the DIP were discussed. A number of these terms related to fees or other events that could only become relevant if the Stalking Horse Bidder was not the successful bidder. As no other Qualified Bids were received and the Stalking Horse Bidder was deemed the Successful Bidder, the discussion regarding these items no longer relevant.

41. The Court noted at the February 23, 2023 hearing that the foundational case for DIP financing approval was *In re Ames Dept. Stores*, 115 B.R. 34 (Bankr. S.D. N.Y 1990). The Court in *Ames* noted that:

> These cases consistently reflect the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.

*Id.* at 40. The transaction at issue here undoubtedly provides significant value to the estates. As shown above, the Debtors' independent investigation has concluded that the Debtors' claims to be released are without value. The Committee has also conducted their own investigation into these causes of action and has been unable to identify any colorable causes of action that might be released through the DIP. The Debtors have chosen to trade something that provides no value to them in exchange for a transaction that provides significant value to all creditor classes. They have

made this decision in the context that their only other alternative is a forced liquidation that provides no recovery to any creditors other than a less than full recovery to the first lien secured lender. There is nothing in the release that can be said to leverage the bankruptcy process in favor of a creditor. The trade of claims that do not have value in exchange for a transaction that satisfies a significant amount of the total claims in these cases, benefits the estates far more than it could potentially benefit the released parties.

42.  Despite the fact that the DIP financing was wholly solicited and negotiated by the Independent Director, the Committee Objection suggests that the Court should apply to a heightened scrutiny standard set forth in *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (noting that the business judgment rule does not apply to transactions between a debtor and an insider of the debtor). This heightened standard was only applied to distinguish the test from the business judgment rule. The standard set forth in *Ames* allows the Court to examine the terms of the proposed financing in a way that would not be permitted by the business judgment rule. Therefore, *Ames* applies its own version of heightened scrutiny. Nothing in Ames prevents the Court from exercising its discretion to avoid the abuse of an estate by an insider.

43.  Most importantly, however, the examination of the terms of the DIP Financing, as well as the wholly independent process that resulted in the DIP Financing, indicate that the DIP Financing is wholly reasonable and does not tilt the bankruptcy case in any way. The Debtors fully investigated the claims to be released and deemed them worthless. The Committee investigated the claims to be released and deemed them worthless. The Debtors are asking the Court for the authority to trade the release of their worthless claims in exchange for a transaction

that satisfies a substantial amount of the estate claims, preserves value for all parties in interest and vastly exceeds the value of any other actionable avenue the available to the Debtors.

WHEREFORE, the Debtors respectfully request this Court approve the sale and DIP Financing and grant such other and further relief as is just and proper.

| | |
|---|---|
| Dated: March 17, 2023<br>Wilmington, Delaware | */s/ Michael W. Yurkewicz*<br>Domenic E. Pacitti (DE Bar No. 3989)<br>Michael W. Yurkewicz (DE Bar No. 4165)<br>Sally E. Veghte (DE Bar No. 4762)<br>**KLEHR HARRISON HARVEY BRANZBURG LLP**<br>919 North Market Street, Suite 1000<br>Wilmington, Delaware 19801<br>Telephone:    (302) 426-1189<br>Facsimile:     (302) 426-9193<br>Email:  dpacitti@klehr.com<br>            myurkewicz@klehr.com<br>            sveghte@klehr.com<br><br>-and-<br><br>Morton R. Branzburg (admitted *pro hac vice*)<br>**KLEHR HARRISON HARVEY BRANZBURG LLP**<br>1835 Market Street, Suite 1400<br>Philadelphia, Pennsylvania 19103<br>Telephone:    (215) 569-3007<br>Facsimile:     (215) 568-6603<br>Email: mbranzburg@klehr.com<br><br>*Counsel to Debtors and Debtors in Possession* |