**EXHIBIT A**

**Revised Proposed Sale Order**

10420831.v1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
|  | ) |
| PERFORMANCE POWERSPORTS GROUP | ) |
| INVESTOR, LLC, *et al.,*[1] | ) Case No. 23-10047 (LSS) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) Re: Docket Nos. 17, 169 |

**ORDER (I) APPROVING ASSET PURCHASE AGREEMENT, (II) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTORS PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO CONSUMMATE THE TRANSACTIONS RELATED TO THE ABOVE; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion"), dated January 16, 2023 of Performance Powersports

Group Investor, LLC ("PPG") and its affiliated debtors and debtors in possession, (collectively,

the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"),

pursuant to sections 105(a), 363, and 365 of Title 11 of the United States Code, 11 U.S.C. §§ 101,

et seq. (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the

"Local Rules"), for entry of an order: (a) approving the sale of substantially all assets of the

Debtors free and clear of all liens, claims, encumbrances, and other interests (except certain

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

assumed liabilities as set forth in the Asset Purchase Agreement (as defined herein)) pursuant to that certain Amended and Restated Asset Purchase Agreement, dated as of February 24, 2023, by and among PPG, Performance Powersports Group Holdings, Inc., and their direct and indirect subsidiaries set forth on Schedule I attached thereto (collectively, the "Sellers" and each, individually, a "Seller") and CPS USA Acquisition, LLC (together with its permitted successor, designees, and assigns, the "Buyer") (as amended, restated, supplemented or otherwise modified from time to time, the "Asset Purchase Agreement"), a fully conformed copy of which is attached hereto as **Exhibit A**, (b) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto, (c) granting related relief; and the Court having entered on February 27, 2023, that certain *Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Approving the Form and Manner of Notice Thereof, (III) Scheduling an Auction and Sale Hearing and (IV) Approving Procedures for the Assumption and Assignment of Contracts, and (V) Granting Related Relief* [Docket No. 169] (the "Bid Procedures Order"); and the Debtors having determined that the highest or otherwise best offer for the Purchased Assets[2] was made by the Buyer pursuant to the Asset Purchase Agreement; and the Court having conducted a hearing on March 20, 2023 at 10:00 a.m. (prevailing Eastern Time) (the "Sale Hearing"), at which time all parties in interest were offered an opportunity to be heard with respect to the proposed sale of the Purchased Assets (the "Sale"), to consider the approval of the Sale pursuant to the terms and conditions of the Asset Purchase Agreement, and the Court having considered: (i) the Motion, all objections thereto, and all replies in support thereof; (ii) the arguments of counsel made, and evidence adduced, related to the Motion; and (iii)

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Asset Purchase Agreement or the Bid Procedures Order (as defined hereinafter), as applicable.

the full record in these Chapter 11 Cases, including the record related to the hearing to consider the Bid Procedures Order (the "Bid Procedures Hearing") and the Sale Hearing held before the Court; all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the Asset Purchase Agreement and sale of the Purchased Assets and the related relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, it is hereby **FOUND, CONCLUDED, AND DETERMINED THAT:**

A.      Findings of Fact and Conclusions of Law. The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these Chapter 11 Cases pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      Jurisdiction. This Court has jurisdiction over the Motion and over the property of the Debtors, including the Purchased Assets to be sold, transferred, and conveyed pursuant to the Asset Purchase Agreement, pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these Chapter 11 Cases and the Motion in this district and Court is proper under 28 U.S.C. §§ 1408 and 1409.

C.      Final Order. This order (this "Sale Order") constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court finds that there is no just

reason for delay in the implementation of this Sale Order, and directs entry of judgment as set forth herein.

D.    <u>Property of the Estate</u>.  The Debtors are the sole and lawful owner of, and have clear and marketable title to, the Purchased Assets to be sold pursuant to the Asset Purchase Agreement.  The Debtors' right, title and interest in and to the Purchased Assets constitute property of the Sellers' estates and title thereto is vested in the Sellers' estates within the meaning of section 541(a) of the Bankruptcy Code.

E.    <u>Statutory Bases for Relief</u>.  The statutory bases for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

F.    <u>Petition Date</u>.  On January 16, 2023 (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

G.    <u>Bid Procedures Order</u>.  This Court entered the Bid Procedures Order on February 27, 2023, (i) approving bidding procedures in connection with the sale of substantially all of the Debtors' assets, (ii) approving the form and manner of notice thereof, (iii) scheduling an auction and Sale Hearing, (iv) approving procedures for the assumption and assignment of contracts, and (v) granting related relief.

H.    <u>Notice</u>.  As evidenced by the affidavits of service and publication previously filed with the Court [Docket Nos. 76, 87, 173, 186, and 196], and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Bid Procedures Order, the Sale Hearing, the Sale, and the assumption, assignment and sale of the

executory contracts and unexpired leases to be assumed and subsequently assigned pursuant to this Sale Order has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and in compliance with the Bid Procedures Order, to each party entitled to such notice, including, as applicable: (a) the United States Trustee for the District of Delaware; (b) holders of the thirty (30) largest, non-insider unsecured claims against the Debtors on a consolidated basis; (c) proposed counsel to the official committee of unsecured creditors (the "Committee"); (d) counsel to the Stalking Horse Bidder; (e) counsel to the DIP Lender; (f) counsel to the Prepetition Secured Parties; (g) any other parties with known secured claims against the Debtors or their counsel, if known; (h) all parties that have executed a Confidentiality Agreement pursuant to the Bidding Procedures; (i) the United States Attorney's Offices for the District of Delaware and the District of Arizona; (j) the Internal Revenue Service; (k) all state and local taxing authorities with an interest in the Purchased Assets; (l) the Attorneys General for the State of Delaware and the State of Arizona; (m) the Securities and Exchange Commission; (n) all other governmental agencies with an interest in the Sale and transactions proposed thereunder; (o) all other parties known or reasonably believed to have asserted an interest in the Purchased Assets; (p) the Assumed Contract Counterparties; (q) the Debtors' insurance carries; and (r) any party that requests service pursuant to Bankruptcy Rule 2002.  With respect to entities whose identities or addresses are not reasonably ascertainable by the Debtors, publication of the Sale Notice in *USA Today* on March 3, 2023, as evidenced by the *Proof of Publication* filed by Omni Agent Solutions, claims, noticing, and administrative agent for the Debtors, on March 6, 2023 [Docket No. 196], was, and is deemed, sufficient, and reasonably calculated under the circumstances to reach such entities.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion,

the Bid Procedures Order, the Sale, and the Sale Hearing is, or shall be, required.  The Sale Notice and the Notice of Successful Bidder provided all interested parties with timely and proper notice of the Sale contemplated by the Asset Purchase Agreement, the Bid Procedures Order, and the Sale Hearing.

I.     Sale Hearing.  The Court conducted the Sale Hearing on March 20, 2023, at which time the Court considered the Motion, the evidence and testimony presented, and the statements and argument of counsel in support of the Motion, the Asset Purchase Agreement, and the Sale.  Other than with respect to cure claim objections that are identified in **Exhibit C** hereto, all objections to the Sale and the relief requested in the Motion, whether timely or untimely and whether written or made orally at the Sale Hearing, were heard and considered by the Court. All such objections were either overruled by this Court, are resolved by the terms hereof or by separate agreement between the objecting party and the Debtors, or were adjourned or withdrawn as a result of an agreement between the objecting party and the Debtors.

J.     Disclosures.  The disclosures made by the Debtors in the Motion, the Sale Notice, the Notice of Successful Bidder, and related documents filed with the Court concerning the Asset Purchase Agreement and at the Bid Procedures Hearing and the Sale Hearing were sufficient under the circumstances.

K.     Sale and Marketing Process.  The Bid Procedures attached as Schedule 1 to the Bid Procedures Order were non-collusive, proposed and executed in good faith as a result of arms'-length negotiations, and substantively and procedurally fair to all parties.  Based on the evidence adduced at the hearing, the Debtors and their professionals have adequately marketed and conducted the sale process in accordance with, and have otherwise complied in all respects with, the Bid Procedures Order and the Bid Procedures.  The sale process established by the Bid

Procedures Order and Bid Procedures afforded a full, fair, and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Purchased Assets. The sale process was conducted in a noncollusive, fair, and good faith manner. All potential purchasers had a full and fair opportunity to participate in the sale process and make higher or better offers.

L.    Successful Bidder. The Debtors determined, in accordance with their business judgment and the Bid Procedures Order and the Bid Procedures, after consultation with the Consultation Parties (as defined in the Bid Procedures), that the Buyer's bid was the sole Qualified Bid and represented the highest or otherwise best offer for the Purchased Assets. As a result, on March 7, 2023 the Debtors filed the *Notice of Cancellation of Auction and Designation of Stalking Horse Purchaser as the Successful Bidder in Connection with the Sale of Substantially All of the Debtors' Assets* [Docket No. 198] (the "Notice of Successful Bidder") which designated the Buyer as the Successful Bidder and cancelled the Auction.

M.    Highest and Best Bid. After a full, fair, and robust sale process, the Sellers' determination, after consultation with the Consultation Parties, that the Asset Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Sellers' business judgment. The total consideration provided by the Buyer for the Purchased Assets as reflected in the Asset Purchase Agreement represents a fair and reasonable offer to purchase the Purchased Assets and the highest and best offer received by the Debtors for the Purchased Assets. No other entity or group of entities has submitted a Qualified Bid or otherwise presented a higher or otherwise better offer to the Sellers to purchase the Purchased Assets for greater economic value to the Sellers' estates than the Buyer. The transactions contemplated under the Asset Purchase Agreement, including the total consideration to be realized by the Debtors thereunder, (i) is the highest and best offer received by the Debtors after extensive

marketing, including through the Bidding Procedures, and (ii) is in the best interests of the Debtors,

their creditors, their estates, and other parties in interest.  The sale of the Purchased Assets under

the Asset Purchase Agreement represents the best available alternative for the Debtors' estates.

Therefore, the Debtors' determination that the Asset Purchase Agreement constitutes the highest

and best offer and the Debtors' selection of the Asset Purchase Agreement as the Successful Bid,

in each case after consultation with the Consultation Parties. each constitute a valid and sound

exercise of the Debtors' business judgment and the Debtors' decision to enter into the Asset

Purchase Agreement and consummate the transactions contemplated thereunder constitutes a

proper exercise of the fiduciary duties of the Debtors and their officers and directors under

applicable law.

        N.     <u>Best Interests of the Estates, Creditors, and Parties in Interest</u>.  Given all of

the circumstances of these Chapter 11 Cases and the adequacy and fair value of the consideration

provided by the Buyer under the Asset Purchase Agreement, the Sale constitutes a reasonable and

sound exercise of the Sellers' business judgment, is in the best interests of the Debtors, their

estates, their creditors, and other parties in interest, and should be approved.

        O.     <u>Sound Business Purpose</u>.  The Debtors have demonstrated compelling

circumstances and a good, sufficient, and sound business purpose and justification for the Sale of

the Purchased Assets outside the ordinary course of business under section 363(b) of the

Bankruptcy Code, whether before and outside of a chapter 11 plan or otherwise.  Given all of the

circumstances of these Chapter 11 Cases, such action is an appropriate exercise of the Debtors'

business judgment and in the best interests of the Debtors, their estates, their creditors, and other

parties in interest.

P.    <u>Good Faith</u>.  The Buyer is purchasing the Purchased Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.  Therefore, the Buyer is entitled to the full protections of section 363(m) of the Bankruptcy Code and otherwise has proceeded in good faith in all respects in connection with these Chapter 11 Cases in that: (i) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets; (ii) the Buyer complied with the provisions of the Bid Procedures Order; (iii) the Buyer's bid was subject to the competitive bid procedures set forth in the Bid Procedures Order; (iv) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (v) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (vi) the negotiation and execution of the Asset Purchase Agreement, including the Sale contemplated thereby, were at arms'-length and in good faith.  There was no evidence of insider influence or improper conduct by the Buyer or any of its Affiliates in connection with the negotiation of the Asset Purchase Agreement with the Debtors.

Q.    <u>No Collusion</u>.  The Asset Purchase Agreement and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code.  None of the Debtors, the Buyer, or any of their respective Affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective representatives, attorneys, successors, or assigns have engaged in any conduct that would cause or permit the Asset Purchase Agreement or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

R.    <u>Consent to Sale Transaction</u>. The First Lien Agent (as directed by the Required Lenders (as defined under the Prepetition First Lien Credit Agreement)) has consented

to the Sale, on the condition that the Buyer assumes all outstanding obligations under the Prepetition First Lien Credit Agreement, per the terms of the Asset Purchase Agreement. The DIP Lender has consented to the Sale, on the condition that the Final DIP Order is entered in a form satisfactory to the DIP Lender in its sole discretion.

S.      <u>Fair Consideration</u>.  The consideration provided by the Buyer pursuant to the Asset Purchase Agreement: (i) is fair and adequate and (ii) constitutes reasonably equivalent value, fair consideration and fair value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia (including the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and similar laws).

T.      <u>Buyer Not a Successor</u>.  By consummating the Sale pursuant to the Asset Purchase Agreement (including operating the Purchased Assets under the Debtors' trade names), the Buyer is not a mere continuation of any Debtor or any Debtor's estate, and there is no continuity, no common identity, and no continuity of enterprise between the Buyer and any Debtor. The Buyer shall not be deemed to be holding itself out as a continuation of the Debtors based on the Sale, the Asset Purchase Agreement, or this Sale Order.  The Buyer is not a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Sale does not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Debtors.  Neither the Buyer nor any of its Affiliates and their respective successors, assigns, members, partners, principals, and shareholders (or equivalent) shall assume or in any way be responsible for any obligation or liability of any Debtor (or any Affiliates thereof) or any Debtor's estate, except to the extent expressly provided in the Asset Purchase Agreement.

U.      No *Sub Rosa* Plan.  The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a chapter 11 plan of the Debtors. The Sale does not constitute a *sub rosa* or *de facto* plan of reorganization or liquidation.

V.      Power and Authority.  The Debtors and the Buyer, each acting by and through their existing agents, representatives, and officers, have full corporate power and authority to execute and deliver the Asset Purchase Agreement and all other documents contemplated thereby.  Upon entry of this Sale Order, the Debtors require no further consents or approvals to consummate the Sale contemplated by the Asset Purchase Agreement, except as otherwise set forth in the Asset Purchase Agreement.

W.      Binding Agreement.  The Asset Purchase Agreement is a valid and binding contract between the Sellers and the Buyer and shall be enforceable pursuant to its terms.  The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession or the District of Columbia.  The Asset Purchase Agreement and the Sale itself, and the consummation thereof, shall be, to the extent provided in the Asset Purchase Agreement, specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed with respect to any of the Debtors, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.  The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors (whether known or unknown), the Buyer, and each of their respective Affiliates, successors, and assigns, and any affected third parties, including, without limitation, all Persons asserting Encumbrances (collectively, the "Bound Parties"), notwithstanding any subsequent appointment

of any trustee, examiner, or receiver under the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary under the Bankruptcy Code or any other law with respect to any of the Bound Parties, and all such terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary, and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner, receiver, party, entity, or other fiduciary.  The provisions of this Sale Order and the terms and provisions of the Asset Purchase Agreement, shall survive the entry of any order that may be entered confirming or consummating any chapter 11 plan of the Debtors, dismissing these chapter 11 cases, or converting these chapter 11 cases to cases under chapter 7.  The rights and interests granted pursuant to this Sale Order and Asset Purchase Agreement shall continue in these or any superseding cases and shall be binding upon the Bound Parties and their respective successors and permitted assigns including, without limitation, any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized and directed to perform under the Asset Purchase Agreement and this Sale Order without the need for further order of the Court.

X.    _Valid Transfer_.  The transfer of each of the Purchased Assets to the Buyer pursuant to the Asset Purchase Agreement will be a legal, valid, and effective transfer of such Purchased Assets, and vests or will vest the Buyer with all right, title, and interest of the Sellers to the Purchased Assets free and clear of all Adverse Interests (as defined below) (except to the extent set forth in the Asset Purchase Agreement) accruing, arising or relating thereto any time prior to

the Closing Date, unless otherwise expressly assumed under, or expressly permitted by, the Asset Purchase Agreement.

Y.      Free and Clear Sale.  Each Seller may sell the Purchased Assets free and clear of all Adverse Interests against such Seller, its estate, or any of the Purchased Assets (except to the extent set forth in the Asset Purchase Agreement) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  If the Sale were not free and clear of all Adverse Interests, or if the Buyer would, or in the future could, be liable for any of the Adverse Interests (except to the extent set forth in the Asset Purchase Agreement), the Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Sale, thus adversely affecting the Debtors and their estates and creditors.  The total consideration to be provided under the Asset Purchase Agreement reflects the Buyer's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all Adverse Interests (except to the extent set forth in the Asset Purchase Agreement).

Z.      Assigned Contracts.  The Sellers seek authority to assume and assign to the Buyer certain executory contracts and unexpired leases as more particularly set forth in the Asset Purchase Agreement (collectively, the "Assigned Contracts").  The Debtors have demonstrated that assumption and assignment of the Assigned Contracts under the Asset Purchase Agreement is an exercise of their sound business judgment and is in the best interests of the Debtors, their estates and creditors, and other parties in interest.  The Assigned Contracts to be assumed and assigned to the Buyer under the Asset Purchase Agreement are an integral part of the Asset Purchase Agreement and the Sale and, accordingly, such assumption and assignment are reasonable and enhance the value of the Debtors' estates.  Subject to paragraph 4.19 hereof, any contract

counterparty to any Assigned Contract that has not actually filed with the Court an objection to such assumption and/or assignment as of the applicable deadline specified in the Bid Procedures Order (as such date may have been modified or extended in accordance with the terms of the Bid Procedures Order or with the consent of the Debtors and the Buyer) is deemed to have consented to such assumption and assignment.

AA.    Cure Notice.  The Sellers filed the *Notice to Counterparties to Potentially Assumed Executory Contracts and Unexpired Leases Regarding Cure Amounts and Possible Assignment to the Stalking Horse Bidder or Such Other Successful Bidder at Auction* [Docket No. 167] (the "Cure Notice") pursuant to which the Sellers identified the dollar amount, if any, that the Sellers assert is necessary to be paid to cure all defaults, if any, under their executory contracts and unexpired leases based on the Sellers' books and records (the "Seller Asserted Cure Amount") and served the Cure Notice on the non-Debtor counterparties to the executory contracts and unexpired leases listed thereon [Docket No. 172] in accordance with the Bid Procedures Order. Except to the extent the Debtors agreed to an extension, pursuant to the Bid Procedures Order and the Cure Notice, contract counterparties to the Sellers' executory contracts and unexpired leases were required to file objections (each, a "Cure Objection"), if any, to the Seller Asserted Cure Amount by no later than March 10, 2023 by 4:00 p.m. (prevailing Eastern Time).  The Cure Notice and the Bid Procedures Order provided that if no objection to the assumption of any contract is timely filed, each contract shall be assumed as of the date of the assumption and assignment of the contract or such other date as the Debtors and the Contract Counterparty agree and the proposed cure amount set forth in the Cure Notice (each, a "Cure Cost" and, collectively, the "Cure Costs") shall be binding on all Contract Counterparties and the Contract Counterparties will be forever barred from asserting any other claims related to the contract against the Debtors.

BB.    <u>Adequate Assurance of Future Performance</u>.  In accordance with the Bid Procedures Order, upon request by any contract counterparty to the Debtors, the Debtors sent such counterparty evidence that the Buyer has the ability to perform under the executory contract or unexpired lease and otherwise complies with the requirements of adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code.  Pursuant to the Bid Procedures Order, contract counterparties to Assigned Contracts whose executory contracts and unexpired leases were listed on the Cure Notice were required to file any objections to the Buyer's ability to provide adequate assurance of future performance as contemplated under sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code (the "<u>Adequate Assurance Objections</u>"), by no later than March 10, 2023 at 4:00 p.m. (prevailing Eastern Time).  Such contract counterparties to Assigned Contracts that failed to file an Adequate Assurance Objection are forever barred from objecting to the assumption, assignment and sale of such Assigned Contract on the grounds of a failure to provide adequate assurance of future performance.  Based on evidence adduced at the hearing and based on the record in these Chapter 11 Cases, to the extent necessary, the Sellers have satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1), 365(b)(3) (to the extent applicable) and 365(f)(2) of the Bankruptcy Code, in connection with the assumption, assignment and sale of the Assigned Contracts to the extent provided under the Asset Purchase Agreement and: (i) conditioned on the assumption and assignment of the applicable Assigned Contract, the Buyer will cure, in accordance with the terms set forth in this Sale Order and the Asset Purchase Agreement, any default existing prior to the date of the assumption and assignment of such Assumed Contract, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, (ii) conditioned on the assumption and assignment of the applicable Assigned Contract, the Buyer has provided or will provide

compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date of assumption and assignment of such Assigned Contract, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and (iii) Buyer has provided adequate assurance of future performance of and under the Assigned Contracts, within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2) of the Bankruptcy Code based on the evidence adduced at the Sale Hearing.

CC.    <u>Assumption and Assignment</u>.    The assumption and assignment of the Assigned Contracts (i) is necessary to sell the Acquired Assets to the Buyer, (ii) allows the Debtors to sell their businesses to the Buyer as a going concern, (iii) limits the losses suffered by counterparties to the Assigned Contracts, and (iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Assigned Contracts.  For these reasons, the Debtors have exercised sound business judgment in assuming and assigning the Assigned Contracts and such assumption and assignment is in the best interests of the Debtors' estates.

DD.    <u>Carve Out</u>.    Sound business justifications also exist for the establishment and funding of an escrow maintained by the Sellers and funded in the amount of the Carve-Out Reserves (as defined in the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* (the "<u>Final DIP Order</u>") in accordance with the DIP Credit Agreement and the Final DIP Order (including section 2.3 thereof); *provided* that the funding of the Carve-Out Reserves shall not increase the total amount of DIP Loans or the Purchase Price.

EE.    <u>Wind Down</u>.  The Excluded Cash, including the Wind-Down Amount, will avoid a freefall shutdown of the Debtors' remaining estates, reserved, among other things and in accordance with the Asset Purchase Agreement, for use in connection with the wind-down of the Seller's Chapter 11 Cases whether via a liquidating chapter 11 plan or otherwise.

FF.    <u>Single, Integrated Transaction</u>.  Entry of this Sale Order approving the Asset Purchase Agreement and the Final DIP Order and all provisions of this Sale Order, the Final DIP Order, and the Asset Purchase Agreement are a necessary condition precedent to the Buyer consummating the Sale.  The provisions of this Sale Order, the Final DIP Order, and the Asset Purchase Agreement and the transactions contemplated by this Sale Order, the Final DIP Order, and the Asset Purchase Agreement and Sale to the Buyer are inextricably linked and technically and collectively constitute a single, integrated transaction.

GG.    <u>Consummation is Legal, Valid and Authorized</u>.  The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with.

HH.    <u>Legal and Factual Bases</u>.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**Section 1.    <u>Approval of the Motion</u>**

1.1.    The relief requested in the Motion is granted as set forth herein; *provided* that the Buyer shall have no obligation to consummate the Sale if the Final DIP Order is not entered in a form satisfactory to the DIP Lender in its sole discretion.

1.2.    Any and all objections and responses to the Motion, the entry of this Sale Order or the relief granted herein (other than cure claim objections that are identified in **<u>Exhibit C</u>**

hereto) that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits. Notwithstanding anything in this Sale Order to the contrary, all timely filed cure claim or adequate assurance objections that are identified in **Exhibit C** are reserved. All persons and entities notified or deemed notified of the relief sought in the Motion and set forth in this Sale Order that failed to timely object thereto are deemed to consent to such relief.

1.3.     Notice of the Motion, the Bid Procedures Order, the Bid Procedures Hearing, the Sale Hearing, and the Sale was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

1.4.     The Court's findings of fact and conclusions of law in the Bid Procedures Order, including the record of the Bid Procedures Hearing, are incorporated herein by reference. No appeal, motion to reconsider, or similar pleading has been filed with respect to the Bid Procedures Order, and the Bid Procedures Order is a final order of the Court, has not been vacated, withdrawn, rescinded, or amended and remains in full force and effect.

**Section 2.     Approval of the Sale of the Purchased Assets**

2.1.     The Asset Purchase Agreement and all other ancillary documents, and all of the terms and conditions thereof, and the Sale and related transactions contemplated thereby, are hereby approved in all respects, except as otherwise expressly set forth herein.

2.2.     Pursuant to sections 363 and 365 of the Bankruptcy Code, entry by the Debtors into the Asset Purchase Agreement is hereby authorized and approved as a valid exercise of the Debtors' business judgment. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized to continue performance under and make all payments required by the Asset Purchase Agreement and all other ancillary documents as and when due thereunder

without further order of this Court.  Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, acting by and through their existing agents, representatives and officers, are authorized, without further order of this Court, to take any and all actions necessary or appropriate to: (a) consummate and close the Sale pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement; (b) transfer and assign all right, title, and interest to all assets, property, licenses, and rights to be conveyed in accordance with the terms and conditions of the Asset Purchase Agreement; and (c) execute and deliver, perform under, consummate, and implement the Asset Purchase Agreement and all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Sale, including any other ancillary documents, deeds, assignments, stock powers, transfers of membership interests and other instruments of transfer, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement and such other ancillary documents.  Neither the Buyer nor the Sellers shall have any obligation to proceed with the Closing under the Asset Purchase Agreement until all conditions precedent to its obligations to do so have been met, satisfied, or waived in accordance with the terms of the Asset Purchase Agreement.

2.3.    The Debtors are authorized to cause to be filed with the secretary of state of any state or other applicable officials of any applicable Governmental Units (as defined in section 101(27) of the Bankruptcy Code), any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Asset Purchase Agreement, any related agreements and this Sale Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the

applicable laws of all applicable Governmental Units or as any of the officers of the Debtors may determine are necessary or appropriate.  The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.

2.4.   This Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in the Debtors, all holders of any Adverse Interests against any Debtor, any holders of Adverse Interests against or on all or any portion of the Purchased Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Buyer, any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in any of the Debtors' Chapter 11 Cases or upon a conversion to chapter 7 of the Bankruptcy Code of any of the Debtors' cases.  The terms and provisions of the Asset Purchase Agreement and this Sale Order shall inure to the benefit of the Debtors, their estates and their creditors, the Buyer and its Affiliates, and any other affected third parties, including all persons asserting any Adverse Interests in the Purchased Assets to be sold pursuant to the Asset Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.  Nothing contained in any chapter 11 plan confirmed in any of these Chapter 11 Cases, any order confirming any such chapter 11 plan or any order approving the wind-down or dismissal of any of these Chapter 11 Cases or any subsequent chapter 7 cases (including any discharge of claims thereunder) or otherwise shall alter, conflict with or derogate from the provisions of this Sale Order or the Asset Purchase Agreement, and to the extent of any conflict or derogation between this Sale Order or the Asset Purchase Agreement and such future plan or order, the terms of this Sale Order and

the Asset Purchase Agreement shall control.  This Sale Order shall survive any dismissal or

conversion of any of these Chapter 11 Cases or any dismissal of any subsequent chapter 7 cases.

**Section 3.**      **Sale and Transfer of Assets**

      3.1.      Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the

Bankruptcy Code, upon the Closing Date and thereafter pursuant to the Asset Purchase Agreement,

and pursuant to and except to the extent otherwise set forth in the Asset Purchase Agreement, the

Purchased Assets shall be transferred free and clear of all encumbrances, claims, interests, and

liens, including the Excluded Liabilities (other than to the extent set forth in the Asset Purchase

Agreement, including, solely to the extent set forth in the Asset Purchase Agreement, with respect

to Assumed Liabilities, Permitted Liens and the Buyer's obligations with respect to Transferred

Employees) (collectively, the "<u>Adverse Interests</u>"), with all such Adverse Interests to attach to the

proceeds of the Sale in the order of their priority, with the same validity, force, and effect that they

now have as against the Purchased Assets, subject to any claims and defenses the Debtors may

possess with respect thereto.  Those holders of Adverse Interests who did not object (or who

ultimately withdrew their objections, if any) to the Sale are deemed to have consented to the Sale

being free and clear of their Adverse Interests pursuant to section 363(f)(2) of the Bankruptcy

Code.  Those holders of Adverse Interests who did object could be compelled in a legal or equitable

proceeding to accept money satisfaction of such Adverse Interests pursuant to section 363(f)(5) of

the Bankruptcy Code, or fall within one or more of the other subsections of section 363(f) of the

Bankruptcy Code and are therefore adequately protected by having their Adverse Interests that

constitute interests in the Purchased Assets, if any, attach solely to the proceeds of the Sale

ultimately attributable to the property in which they have an interest, in the same order of priority

and with the same validity, force and effect that such holders had prior to the Sale, subject to any

defenses of the Debtors.

3.2.     The sale of the Acquired Claims pursuant to the Asset Purchase Agreement is hereby approved.  To the extent any Acquired Claim is not assignable to the Buyer or any of its Affiliates, the Debtors, and any chapter 11 or chapter 7 trustee (or any other designee) of any of the Debtors and their estates, shall be prohibited from bringing any such Acquired Claim.

3.3.     Conditioned upon the occurrence of the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Purchased Assets or a bill of sale transferring all of the Debtors' right, title, and interest in such Purchased Assets to the Buyer pursuant to the terms and allocations set forth in the Asset Purchase Agreement.  For the avoidance of doubt, the Excluded Assets set forth in the Asset Purchase Agreement are not included in the Purchased Assets, and the Excluded Liabilities set forth in the Asset Purchase Agreement (including, for the avoidance of doubt, any liability of Seller or any claim held by Chongqing Huansong Industries (Group) Co., Ltd., Chongqing Huansong Science and Technology Industrial Co., Ltd., Vietnam New Century Industrial Company Limited, Hisun China, and/or Hisun Motors Corp. U.S.A. and each of their affiliates and subsidiaries) are not Assumed Liabilities.

3.4.     All persons are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Buyer in accordance with the Asset Purchase Agreement and this Sale Order.

3.5.     Subject to the terms and conditions of this Sale Order, the transfer of the Purchased Assets to the Buyer pursuant to the Asset Purchase Agreement and the consummation of the Sale and any related actions contemplated thereby do not require any consents other than as specifically provided for in the Asset Purchase Agreement, constitute a legal, valid, and effective transfer of all of the Debtors' right, title, and interest in the Purchased Assets, notwithstanding any

requirement for approval or consent by any person, and shall vest the Buyer with the right, title, and interest of the Sellers in and to the Purchased Assets as set forth in the Asset Purchase Agreement, as applicable, free and clear of all Adverse Interests of any kind or nature whatsoever (except to the extent set forth in the Asset Purchase Agreement).

3.6. To the maximum extent permitted under applicable law, the Buyer or its Affiliates, to the extent provided by the Asset Purchase Agreement, shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Sellers constituting Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Buyer or its Affiliates as of the Closing Date as provided by the Asset Purchase Agreement. To the extent provided by section 525 of the Bankruptcy Code, no Governmental Unit may revoke or suspend any grant, permit, or license relating to the operation of the Purchased Assets sold, transferred, assigned, or conveyed to the Buyer or its Affiliates on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale.

3.7. All entities that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets to be sold, transferred, or conveyed (wherever located) to the Buyer pursuant to the Asset Purchase Agreement are hereby directed to surrender possession of the Purchased Assets to the Buyer on the Closing Date.

3.8. Effective upon the Closing Date and except to the extent included in Assumed Liabilities or Permitted Liens or as otherwise expressly provided in the Asset Purchase Agreement, all entities, including all lenders, debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to executory contracts and unexpired leases, contract counterparties, customers, licensors, litigation claimants, employees and former

23

employees, dealers and sale representatives, and trade or other creditors holding Adverse Interests against the Debtors or the Purchased Assets, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether imposed by agreement, understanding, law, equity, or otherwise), arising under or out of, in connection with, or in any way relating to, the Purchased Assets or the transfer of the Purchased Assets, hereby are forever barred and estopped from asserting any Adverse Interests relating to the Purchased Assets or the transfer of the Purchased Assets against the Buyer and its Affiliates, assets, or property, or the Purchased Assets transferred to the Buyer, including, without limitation, taking any of the following actions with respect to or based on any Adverse Interest relating to the Purchased Assets or the transfer of the Purchased Assets (other than to the extent set forth in the Asset Purchase Agreement or the Final DIP Order): (a) commencing or continuing in any manner any action or other proceeding against the Buyer, its Affiliates, assets or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Buyer, its Affiliates, assets, or properties; (c) creating, perfecting, or enforcing any Adverse Interest against the Buyer or its Affiliates, assets or properties; (d) asserting an Adverse Interest as a setoff (except for setoffs asserted prior to the Petition Date), or right of subrogation of any kind against any obligation due the Buyer or Affiliates; (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof; or (f) interfering with, preventing, restricting, prohibiting or otherwise enjoining the consummation of the Sale.  No such persons shall assert or pursue against the Buyer or its Affiliates, assets, or property any such Adverse Interest directly or indirectly, in any manner whatsoever.

3.9.    The Buyer and their respective successors, assigns, members, partners, principals and shareholders (or equivalent) are not and shall not be (a) deemed a "successor" in any respect to the Debtors or their estates as a result of the consummation of the transactions contemplated by the Asset Purchase Agreement or any other event occurring in the Debtors' Chapter 11 Cases under any theory of law or equity, (b) deemed to have, *de facto* or otherwise, merged or consolidated with or into the Debtors or their estates, (c) deemed to have a common identity with the Debtors, (d) deemed to have a continuity of enterprise with the Debtors, or (e) deemed to be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.  The Buyer shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability except to the extent otherwise expressly provided in the Asset Purchase Agreement, including, solely to the extent set forth in the Asset Purchase Agreement, with respect to Assumed Liabilities.  Except to the extent otherwise set forth in the Asset Purchase Agreement, including, solely to the extent set forth in the Asset Purchase Agreement, with respect to Assumed Liabilities, the transfer of the Purchased Assets and the Assumed Contracts to the Buyer under the Asset Purchase Agreement shall not result in (a) the Buyer and its Affiliates and their respective successors, assigns, members, partners, principals and shareholders (or equivalent), or the Purchased Assets, having any liability or responsibility for any claim against the Debtors, (b) the Buyer and their respective successors, assigns, members, partners, principals and shareholders (or equivalent), or the Purchased Assets, having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff (except for setoffs asserted prior to the Petition Date) or otherwise,

directly or indirectly, any Adverse Interests or Excluded Liability or (c) the Buyer and their respective successors, assigns, members, partners, principals and shareholders (or equivalent), or the Purchased Assets, having any liability or responsibility to the Debtors, in each case except to the extent expressly set forth in the Asset Purchase Agreement.

3.10.    Without limiting the effect or scope of the foregoing, except to the extent expressly provided in the Asset Purchase Agreement, as of the Closing Date, the Buyer and their respective successors, assigns, members, partners, principals and shareholders (or equivalent) shall have no successor or vicarious liabilities of any kind or character with respect to the applicable Purchased Assets, including, but not limited to: (a) any employment or labor agreements or the termination thereof; (b) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any of the Debtors' Affiliates or predecessors or any current or former employees of any of the foregoing, or the termination of any of the foregoing; (c) the Debtors' business operations or the cessation thereof; (d) any litigation involving one or more of the Debtors; (e) any claims of any former employees of the Debtors; (f) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law; and (g) any claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended; (ii) the Fair Labor Standards Act; (iii) Title VII of the Civil Rights Act of 1964; (iv) the Federal Rehabilitation Act of 1973; (v) the National Labor Relations Act; (vi) the Worker Adjustment and Retraining Notification Act of 1988; (vii) the Age Discrimination in Employee Act of 1967, as amended; (viii) the Americans with Disabilities Act of 1990; (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985; (x) the Multiemployer Pension Plan Amendments Act of 1980; (xi) state and local discrimination laws; (xii) state and

local unemployment compensation laws or any other similar state and local laws; (xiii) state workers' compensation laws; (xiv) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (xv) any antitrust laws; (xvi) any product liability or similar laws, whether state or federal or otherwise; (xvii) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq*., or similar state statutes; (xviii) any bulk sales or similar laws; (xix) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (xx) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to, the Purchased Assets, the Asset Purchase Agreement or the Assumed Contracts except to the extent otherwise set forth in this Sale Order.

3.11.    Except as expressly set forth in the Asset Purchase Agreement, including with respect to Assumed Liabilities, Permitted Liens and the Buyer's obligations with respect to Transferred Employees, it is expressly ordered and directed that the Sale of the Purchased Assets is free and clear of any and all unemployment compensation taxes and any related contribution and reimbursement obligations of the Debtors, and all state tax and labor agencies shall treat the Buyer as a "new employer" in all respects and for any applicable tax rates and contribution and

reimbursement obligations and "experience rates" as of and after the Closing Date (and each state unemployment compensation law agency or department shall be prohibited from treating the Buyer as a successor of the Debtors for any contribution rates, benefit charges, benefit rates, experience rates or similar charges or taxes).

3.12.    Subject to the Asset Purchase Agreement, the Buyer is hereby authorized in connection with the consummation of the Sale to transfer or direct the transfer of any or all of the Purchased Assets and the Assumed Contracts (or any rights to acquire the Purchased Assets and the Assumed Contracts) to its direct and indirect subsidiaries in a manner as it, in its sole and absolute discretion, deems appropriate and to assign, sublease, sublicense, transfer or otherwise dispose of any of the Purchased Assets or the rights under any Assumed Contract to its direct and indirect subsidiaries with all of the rights and protections accorded under this Sale Order and the Asset Purchase Agreement, and the Debtors shall cooperate with and take all actions reasonably requested by the Buyer to effectuate any of the foregoing.

**Section 4.**      <u>**Assumption and Assignment**</u>

4.1.    Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing Date, and subject to paragraphs 4.7 and 4.19 hereof, the Sellers' assumption, assignment and sale to the Buyer, and the Buyer's assumption on the terms set forth in the Asset Purchase Agreement of the Assigned Contracts is hereby approved in its entirety, and the requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Subject to paragraphs 4.7 and 4.19 hereof, the Debtors are hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to assume and assign to the Buyer, effective upon the Closing Date of the Sale of the Purchased Assets or thereafter pursuant to the Asset Purchase Agreement, the Assigned Contracts free and clear of all Adverse Interests of any kind or nature whatsoever (except to the extent set forth in the

Asset Purchase Agreement) and execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Buyer.

4.2.    Upon the date that each Assigned Contract is assumed and assigned, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title, and interest of each Assigned Contract.  The Debtors shall cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing, as further provided in the Asset Purchase Agreement.

4.3.    The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract that is assumed, assigned and sold to the Buyer pursuant to the Asset Purchase Agreement (including those of the type described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer, or requires any counterparty to consent to assignment.

4.4.    Subject to paragraphs 4.7 and 4.19 hereof, the Buyer has provided adequate assurance of future performance for the Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

4.5.    **Exhibit B** attached hereto lists executory contracts and unexpired leases for which either (a) no Cure Objections were timely filed with the Court or (b) informal responses were received by the Debtors and resolved by mutual written agreement between the Buyer, the Debtors, and the applicable contract counterparty.  The Cure Costs for the contracts listed on **Exhibit B** are hereby fixed at the amounts set forth in the Cure Notice or as otherwise agreed in writing by the Buyer, the Debtors, and the applicable contract counterparty, and the contract

counterparties to such executory contracts and unexpired leases are forever bound by such Cure Costs. Unless the Buyer and the applicable contract counterparty subsequently agree to different terms, pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, the Buyer shall pay to the applicable contract counterparty the Cure Costs relating to any Assigned Contracts on **Exhibit B** on the Closing Date or as soon as reasonably practicable thereafter. Upon payment of such Cure Costs as provided for herein, the contract counterparties to such Assigned Contracts are hereby enjoined from taking any action against the Buyer or the Purchased Assets with respect to any claim for cure. For the avoidance of doubt, the inclusion of an executory contract or unexpired lease on **Exhibit B** shall not limit the rights of the Buyer under the Asset Purchase Agreement not to designate such executory contract or unexpired lease for assumption and assignment at Closing.

4.6.    At least one (1) day prior to the Closing Date, the Buyer shall provide the Debtors, and the Debtors shall file schedules of all Assigned Contracts to be assumed and assigned as of the Closing Date.

4.7.    Any executory contract or unexpired lease for which there is an unresolved adequate assurance objection or cure claim objection set forth on **Exhibit C** hereto shall not be assumed, assigned and sold unless (a) all such objections relating to such contract or lease are withdrawn, (b) the contract or lease counterparty consents, or (c) the Court subsequently orders otherwise.

4.8.    The rights of the Buyer to modify the lists of Assigned Contracts after the date of this Sale Order pursuant to the Asset Purchase Agreement are hereby approved. Notwithstanding anything in this Sale Order to the contrary, on the date any such Contract is assumed and assigned to the Buyer, such Assigned Contract shall thereafter be deemed a Purchased Asset for all purposes under this Sale Order and the Asset Purchase Agreement.

4.9.    The payment of the applicable Cure Costs (if any) shall effect a cure of all defaults existing as of the date that the applicable Assigned Contracts are assumed and shall compensate for any actual pecuniary loss to such contract counterparty resulting from such default.

4.10.    Pursuant to section 365(f) of the Bankruptcy Code, the assignment and sale by the Debtors to the Buyer of such Assigned Contracts shall not be a default thereunder.  After the payment of the relevant Cure Costs as provided for herein, the Debtors and the Buyer shall not have any further liabilities to the contract counterparties to the Assigned Contracts, other than the Buyer's obligations under the Assigned Contracts that become due and payable on or after the date that such Assigned Contracts are assumed and assigned, including as set forth in paragraph 4.18 of this Sale Order.

4.11.    Any provisions in any Assigned Contracts that prohibit or condition the assignment and sale of such Assigned Contracts or allow the party to such Assigned Contracts to terminate, recapture, impose any penalty or condition on renewal or extension, purport to require the consent of any counterparty, or modify any term or condition upon the assignment and sale of such Assigned Contracts constitute unenforceable anti-assignment provisions that are void and of no force and effect with respect to the assignment and sale of the Assigned Contracts to the Buyer and all Assigned Contracts shall remain in full force and effect, without existing default(s), subject only to payment by the Buyer of the appropriate cure amount, if any.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment and sale to the Buyer of the Assigned Contracts have been satisfied.

4.12.    Subject to paragraph 4.19 hereof, any party having the right to consent to the assumption and assignment of any Assigned Contract that failed to object to such assumption

and/or assignment is deemed to have consented to such assumption and assignment as required by section 365(c)(1)(B) of the Bankruptcy Code.

4.13.    As of the date of assignment to the Buyer, the Buyer shall be deemed to be substituted for the applicable Debtors as a party to the applicable Assigned Contracts and such Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assigned Contracts arising from and after the assignment and sale.

4.14.    All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, and shall not charge the Buyer for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale.

4.15.    Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Assigned Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors or the Buyer any assignment fee, rent acceleration, rent increase on account of assignment, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts, existing as of the date that such Assigned Contracts are assumed, assigned and sold or arising by reason of the Closing.  For the avoidance of doubt, nothing in this paragraph alters any counterparty's entitlement to the Cure Cost determined with respect to its Assigned Contract.

4.16.    Notwithstanding any term of any Assigned Contract to the contrary, any extension or renewal options or other rights contained in such Assigned Contract that purport to be personal only to, or exercisable only by, the Debtors, a named entity, or an entity operating under a specific trade name, may, in each case, be freely exercised to their full extent by the Buyer

subject to the other applicable terms of the Assigned Contract.  Any extension or renewal options in connection with all Assigned Contracts that the Debtors have sought to exercise prior to the entry of this Sale Order have been timely and validly exercised by the Debtors, and all Assigned Contracts are in full force and effect and have not been previously rejected, and the Debtors' time to assume or reject the Assigned Contracts has not otherwise expired.

4.17.    Neither the Buyer nor any successor of the Buyer shall be responsible for any Adverse Interests or obligations arising out of any of the executory contracts or unexpired leases that are not assumed and assigned to the Buyer, except to the extent specifically provided by the Asset Purchase Agreement.

4.18.    Notwithstanding anything to the contrary in this Sale Order, with respect to each Assigned Contract, from and after the date that such Assigned Contract is assumed and assigned to the Buyer, the Buyer shall be responsible for continuing obligations under such Assigned Contract, *cum onere*, including, without limitation, liabilities for any breach of such Assigned Contract occurring after such assumption, assignment and sale and obligations to pay year-end adjustment and reconciliation amounts that become obligations after the entry of this Sale Order (irrespective of whether such obligations accrued before, on, or after assumption, assignment and sale of the Assigned Contract), including tax reconciliations, common area charges and insurance premiums, in each case subject to the terms and conditions of the Assigned Contracts, and subject to any defenses provided by such Assigned Contracts and applicable non-bankruptcy law and unless otherwise agreed.

4.19.    In the case of any executory contracts and/or unexpired leases that the Debtors seek to assume and assign prior to Closing pursuant to the Asset Purchase Agreement that were not previously included in the Cure Notice, the Debtors shall file with the Court a written

supplemental Cure Notice of the Debtors' intent to assume and assign such executory contract and/or unexpired lease(each, a "<u>Supplemental Cure Notice</u>").    The Debtors shall serve such Supplemental Cure Notice on each of the following parties (the "<u>Supplemental Cure Notice Parties</u>"): (a) by overnight delivery service upon each counterparty to any such executory contract and/or unexpired lease at the address set forth in the notice provision of the applicable contract (and their counsel, if known), (b) by first class mail, email, or fax upon (i) the Office of the U.S. Trustee for the District of Delaware, (ii) counsel to the Committee, (iii) counsel to the agent of the Prepetition First Lien Lenders, and (iv) counsel to the Buyer.    The Debtors shall also serve on affected counterparties and their respective known counsel by electronic mail (if available) or overnight mail adequate assurance information about the Buyer.    The Supplemental Cure Notice shall set forth the following information, to the best of the Debtors' knowledge: (a) the street address of the real property that is the subject of any unexpired lease that the Debtors seek to assume, assign and sell or a description of any executory contract that the Debtors seek to assume, assign and sell, (b) the name and address of the affected counterparties (and their known counsel), (c) a description of the deadlines and procedures for filing objections to the Supplemental Cure Notice, if so permitted as set forth below, and (d) any proposed cure amounts as of that time.    A party in interest may object to a Supplemental Cure Notice solely with respect (a) to the proposed cure amount contained therein but only to the extent such objection could not have been raised prior to the Cure Objection Deadline, or (b) adequate assurance of future performance.    Any such objection must be in writing and filed and served so that such objection is filed with this Court and actually received by the Debtors and the Supplemental Cure Notice Parties no later than 14 calendar days after the date the Debtors served the applicable Supplemental Cure Notice.    If no permitted objection is timely filed and served with respect to the applicable Supplemental Cure

Notice, all non-Debtor parties to such executory contract and/or unexpired lease shall be deemed to have consented to the cure amount set forth in such supplemental Cure Notice.  If a permitted objection to a Supplemental Cure Notice is timely filed and served on the Supplemental Cure Notice Parties in the manner specified above, unless the parties agree otherwise in writing, a hearing will be scheduled by the Court to consider that objection.  The assumption and assignment of any executory contract and/or unexpired lease set forth in a Supplemental Cure Notice shall be deemed to have occurred as of the date of filing of a Supplemental Cure Notice upon payment of the cure amount, unless otherwise agreed by the relevant counterparty.

4.20.   The Coleman Company, Inc.  Notwithstanding anything contained herein or in the Asset Purchase Agreement, the terms of the Consent to Assumption and Assignment of License Agreement between The Coleman Company, Inc. ("Coleman"), the Debtors, and the Purchaser, attached hereto as **Exhibit D**, shall govern the Debtors' assumption of the License Agreement between Coleman and the Debtors and the Debtors' assignment of such License Agreement to the Purchaser.

4.21.   Oracle.  Notwithstanding anything to the contrary in this Order or the Asset Purchase Agreement, no contract between the Debtors and Oracle America, Inc., successor in interest to NetSuite, Inc., ("Oracle") will be assumed and/or assigned, and no shared or concurrent use of Oracle's products and services will be authorized (pursuant to the Transition Services Agreement or otherwise), without (a) further Court order or Oracle's prior written consent and (b) execution by the Debtor or its successor and the assignee of mutually agreeable assignment documentation in a final form to be negotiated after entry of this Order.

4.22.   DG Lease.  Notwithstanding anything to the contrary in the Asset Purchase Agreement or this Order, Buyer agrees to perform all of its obligations under that certain lease

(the "DG Lease") dated October 24, 2022, by and between DG Mesquite Airport Property Owner, L.P. ("DG Landlord") and Performance Powersports Group, Inc., including, but not limited to, performing the maintenance, repair and restoration obligations under the DG Lease as they may arise in the ordinary course of business, ordinary wear and tear excepted, under the terms of the DG Lease without regard as to whether the underlying conditions currently exist, or are known or unknown, contingent or liquidated.

4.23.    Nothing in the Asset Purchase Agreement or this Order shall be construed to release, waive, or enjoin any direct Claims or Litigation, if any, DG Landlord may assert against the Debtors' applicable insurance providers with respect to third-party claims asserted in connection with the Debtors' use and occupancy of the applicable premises prior to the Closing, including with respect to potential liability for property damage or personal injuries related to the premises under the DG Lease as long as such pursuit does not result in any liability to the Debtors or their estates, provided, however, for the avoidance of doubt, nothing herein (a) creates a direct right of action if one does not otherwise exist under applicable law, and (b) shall be deemed to modify, amend, waive, or otherwise prejudice any of the insurance providers' rights or defenses under or with respect to the insurance policies.

4.24.    Notwithstanding anything to the contrary in the Stalking Horse Purchase Agreement or this Order, for the avoidance of doubt and as part of the Assumed Liabilities under the Stalking Horse Purchase Agreement, as of the entry of this Order, so long as the DG Lease is or becomes an Assumed Contract Buyer has assumed all liabilities and obligations under the DG Lease that arise or become due and payable on or after March 31, 2023, including, without limitation, accrued and unbilled common area maintenance, insurance, taxes, or similar charges contained in such DG Lease that will come due on or after the effective date of assumption and

assignment of the DG Lease, regardless of whether such charges relate to a period before or after March 31, 2023.

**Section 5.**     **DIP Matters**

5.1.     Upon the Closing of the Sale, and subject to the entry of the Final DIP Order in a form satisfactory to the DIP Lender in its sole discretion, the DIP Lender shall deliver to the Sellers all remaining amounts outstanding under the DIP Loans.

5.2.     Upon the Closing of the Sale, and subject to the entry of the Final DIP Order in a form satisfactory to the DIP Lender in its sole discretion, the Seller shall fund an escrow account in the amount of the Carve-Out Reserves (as defined in the Final DIP Order); *provided* that such funding shall in no way increase the total amount of the DIP Loans or Purchase Price.

**Section 6.**     **Additional Provisions**

6.1.     Litigation Trust Agreement & Form of Litigation Trust Note. The Litigation Trust Agreement and form of Litigation Trust Note shall be mutually agreed upon by (a) the Debtors and (b) the Buyer, Tankas Funding VI LLC, and their respective affiliates (collectively, "Kinderhook"), in consultation with Committee's counsel, and filed with the Court at least five (5) days prior to the closing of the Sale.

6.2.     Reservation of Rights Regarding Asserted Direct Claims. Kinderhook expressly reserves all rights to defend against any and all claims or litigation brought against Kinderhook or any affiliates of Kinderhook by Chongqing Huansong Industries (Group) Co., Ltd., Chongqing Huansong Science and Technology Industrial Co., Ltd. and Vietnam New Century Industrial Company Limited, or any affiliates of these entities (collectively, "Hisun"), and Kinderhook expressly reserves the right: (a) to bring (i) its own claims against Hisun and (ii) any and all estate claims or causes of actions against Hisun that it purchases from the Debtors under the Asset Purchase Agreement, in each case, in whatever forum it deems appropriate; and

(b) to exercise its rights as a creditor of the Debtors, including its ability to object to any Hisun proof(s) of claim filed in the chapter 11 cases.

6.3.    Hisun expressly reserves any and all direct claims against Kinderhook, or any affiliates of Kinderhook, including Counts I, II, and III in the complaint currently being prosecuted in the United States District Court, Southern District of New York, Case No. 22-cv-10652-JPO (the "SDNY Action").

6.4.    Hisun expressly reserves the right to: (a) bring direct claims against Kinderhook or its affiliates; and (b) object to any Kinderhook proof(s) of claim filed in these chapter 11 cases.

6.5.    Stay Relief.  The automatic stay pursuant to section 362 is hereby lifted to the extent necessary, without further order of this Court, to (a) allow the Buyer to deliver any notice provided for in the Asset Purchase Agreement and any ancillary documents and (b) allow the Buyer to take any and all actions permitted under this Sale Order, the Asset Purchase Agreement, and any ancillary documents in accordance with the terms and conditions thereof.

6.6.    Bulk Transfer Laws.  Each of the Sellers and the Buyer hereby waive, and shall be deemed to waive, any requirement of compliance with, and any claims related to non-compliance with, the provisions of any bulk sales, bulk transfer, or similar law of any jurisdiction that may be applicable.

6.7.    Non-Interference.  Following the Closing Date, no holder of an Adverse Interest in or against the Debtors or the Purchased Assets shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets based on or related to such Adverse Interest or any actions that the Debtors or their successors, including any chapter 11 or chapter 7 trustee, may take in these Chapter 11 Cases or any successor chapter 7 cases.

6.8.    <u>Authorization</u>.  The Debtors, including their respective officers, employees and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the Asset Purchase Agreement and this Sale Order.  The Debtors shall be, and they hereby are, authorized to take all such actions as may be necessary to effectuate the terms of the Asset Purchase Agreement, this Sale Order and the relief granted pursuant to this Sale Order.

6.9.    <u>Good Faith</u>.  The Sale contemplated by the Asset Purchase Agreement is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including, for the avoidance of doubt, the assumption, assignment and sale to the Buyer of the Assumed Contracts and the Sale of the Purchased Assets free and clear of all Adverse Interests (unless otherwise assumed under, or permitted by, the Asset Purchase Agreement)), unless such authorization and consummation of such Sale were stayed pending such appeal.  The Buyer is a good-faith Buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.  The Buyer has not colluded with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets, and therefore the sale of the Purchased Assets may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

6.10.    <u>Cooperation</u>.  From time to time, as and when requested by any party, each party to the Asset Purchase Agreement shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate

the Sale, including such actions as may be necessary to vest, perfect or confirm, of record or otherwise, in the Buyer its right, title and interest in and to the Purchased Assets.

6.11.    <u>Scope of Approval</u>.    The failure specifically to include any particular provisions of the Asset Purchase Agreement, including any of the documents, agreements, or instruments executed in connection therewith, in this Sale Order shall not diminish or impair the efficacy, approval, or effectiveness of such provision, document, agreement, or instrument, it being the intent of this Court that the Asset Purchase Agreement and each such document, agreement or instrument be authorized and approved in its entirety, except as otherwise specifically set forth herein.

6.12.    <u>Post-Closing Claims Administration</u>.    After the Closing Date:  (a) neither the Debtors nor any successor in interest, including any chapter 11 or chapter 7 trustee in these Chapter 11 Cases or any successor chapter 7 cases, shall consent or agree to the allowance of any claim to the extent it would constitute an Assumed Liability or Permitted Liens without the prior written consent of the Buyer; and (b) the Buyer shall have standing to object to any claim against the Debtors and their estates to the extent that, if allowed, it would constitute an Assumed Liability or Permitted Liens, and the Court will retain jurisdiction to hear and determine any such objections.

6.13.    <u>Notice of Sale Closing</u>.    Within one (1) Business Day of the occurrence of the Closing of the Sale, the Debtors shall file and serve a notice of the closing of the Sale.

6.14.    <u>Computations of Time-Periods</u>.    All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

6.15.    <u>Sale Order Governs in Event of Inconsistencies</u>.    To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Sale Order shall govern.  To the extent there are any inconsistencies

between the terms of this Sale Order and the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

6.16.    <u>Modifications</u>.  The parties to the Asset Purchase Agreement may make any non-material modifications, amendments or supplements to such agreement and to any related agreements, documents or other instruments in accordance with the terms thereof without further order of this Court.

6.17.    <u>Non-Severability</u>.  The provisions of this Sale Order are nonseverable and mutually dependent.

6.18.    <u>No Stay</u>.    Notwithstanding the provisions of the Bankruptcy Rules, including Bankruptcy Rules 6004(h), 6006(d), and 7062, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is waived and shall not apply.

6.19.    <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Asset Purchase Agreement, and all amendments thereto any waivers and consents thereunder, and of each of the agreements executed in connection therewith to which the Debtors are a party or which have been assigned by the Debtors to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

## Exhibit A

**Asset Purchase Agreement**

*Execution Version*

**SECOND AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

**by and among**

**PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC,**

**PERFORMANCE POWERSPORTS GROUP HOLDINGS, INC.,**

**THE SUBSIDIARIES SET FORTH ON SCHEDULE I ATTACHED HERETO,**

**and**

**CPS USA ACQUISITION, LLC**

**March 17, 2023**

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ................................................................................................2

**ARTICLE II PURCHASE AND SALE** ...........................................................................15

Section 2.1    Purchase and Sale of Purchased Assets ....................................................15
Section 2.2    Excluded Assets ........................................................................................17
Section 2.3    Assumption of Assumed Liabilities...........................................................19
Section 2.4    Excluded Liabilities ...................................................................................20
Section 2.5    Consideration .............................................................................................20
Section 2.6    Assumption and Assignment of Contracts.................................................21
Section 2.7    Closing .......................................................................................................22
Section 2.8    Deliveries at Closing ..................................................................................22
Section 2.9    Allocation ...................................................................................................23
Section 2.10   Indemnification ..........................................................................................24
Section 2.11   Withholding ...............................................................................................24

**ARTICLE III SELLERS' REPRESENTATIONS AND WARRANTIES**............................24

Section 3.1    Organization of Sellers; Good Standing. ...................................................24
Section 3.2    Authorization of Transaction .....................................................................25
Section 3.3    Noncontravention; Consents and Approvals .............................................25
Section 3.4    Compliance with Laws ...............................................................................26
Section 3.5    Title to Purchased Assets ...........................................................................26
Section 3.6    Contracts ....................................................................................................26
Section 3.7    Intellectual Property...................................................................................26
Section 3.8    Litigation ....................................................................................................28
Section 3.9    Employees and Employment Matters .........................................................28
Section 3.10   Employee Benefit Plans..............................................................................30
Section 3.11   Real Property. .............................................................................................31
Section 3.12   Permits ........................................................................................................31
Section 3.13   Environmental Matters................................................................................32
Section 3.14   Brokers' Fees ..............................................................................................32
Section 3.15   Tax Matters .................................................................................................32
Section 3.16   No Other Representations or Warranties .....................................................33

**ARTICLE IV BUYER'S REPRESENTATIONS AND WARRANTIES**............................33

Section 4.1    Organization of Buyer................................................................................34
Section 4.2    Authorization of Transaction. ....................................................................34
Section 4.3    Noncontravention........................................................................................34
Section 4.4    Litigation ....................................................................................................35
Section 4.5    Financial Capacity ......................................................................................35
Section 4.6    Good Faith Purchaser..................................................................................35
Section 4.7    Brokers' Fees ..............................................................................................36

Section 4.8     No Outside Reliance .................................................................36

**ARTICLE V PRE CLOSING COVENANTS** ...................................................**37**

Section 5.1     Certain Efforts; Cooperation.............................................37
Section 5.2     Notices and Consents..........................................................37
Section 5.3     Bankruptcy Actions. ...........................................................38
Section 5.4     Conduct of Business ...........................................................39
Section 5.5     Notice of Developments .....................................................41
Section 5.6     Access. ...................................................................................41
Section 5.7     Press Releases and Public Announcements ...................42
Section 5.8     Bulk Transfer Laws..............................................................42
Section 5.9     Establishment of Litigation Trust. ..................................42
Section 5.10    Covenants of Buyer and Seller. ........................................44

**ARTICLE VI OTHER COVENANTS** .................................................................**44**

Section 6.1     Cooperation ..........................................................................44
Section 6.2     Further Assurances..............................................................44
Section 6.3     Availability of Business Records ......................................45
Section 6.4     Employee Matters ...............................................................45
Section 6.5     Reserved. ...............................................................................47
Section 6.6     Transfer Taxes .....................................................................47
Section 6.7     Wage Reporting ...................................................................47
Section 6.8     Acknowledgements .............................................................47
Section 6.9     Insurance Policies ...............................................................49
Section 6.10    Collection of Accounts Receivable..................................49
Section 6.11    Data Privacy Protection .....................................................50
Section 6.12    Alternative Transactions ...................................................50
Section 6.13    Covenant Not to Sue ..........................................................50
Section 6.14    Certain Tax Matters ...........................................................50
Section 6.15    Confidentiality .....................................................................50

**ARTICLE VII CONDITIONS TO CLOSING** ....................................................**51**

Section 7.1     Conditions to Buyer's Obligations..................................51
Section 7.2     Conditions to Sellers' Obligations ..................................52
Section 7.3     No Frustration of Closing Conditions.............................53
Section 7.4     Waiver of Conditions ..........................................................53

**ARTICLE VIII TERMINATION** .........................................................................**53**

Section 8.1     Termination ...........................................................................53
Section 8.2     Procedure upon Termination.............................................55
Section 8.3     Effect of Termination or Breach ......................................55

**ARTICLE IX BANKRUPTCY COURT MATTERS** ........................................**56**

ii

Section 9.1    Competing Bids ...................................................................56
Section 9.2    Bankruptcy Court Filings ....................................................56
Section 9.3    Bankruptcy Court Milestones ..............................................56

**ARTICLE X MISCELLANEOUS** ....................................................................**57**

Section 10.1    Remedies ............................................................................57
Section 10.2    Expenses ............................................................................57
Section 10.3    Entire Agreement ..............................................................57
Section 10.4    Incorporation of Schedules, Exhibits and Disclosure Schedule ...............58
Section 10.5    Amendments and Waivers ..................................................58
Section 10.6    Succession and Assignment ...............................................58
Section 10.7    Notices ...............................................................................58
Section 10.8    Governing Law; Jurisdiction ..............................................60
Section 10.9    Consent to Service of Process ............................................60
Section 10.10   WAIVERS OF JURY TRIAL ..............................................60
Section 10.11   Severability .......................................................................60
Section 10.12   No Third Party Beneficiaries .............................................61
Section 10.13   No Survival of Representations, Warranties and Agreements.................61
Section 10.14   Non-Recourse ....................................................................61
Section 10.15   No Right of Set-Off ...........................................................61
Section 10.16   Construction ......................................................................62
Section 10.17   Computation of Time .........................................................62
Section 10.18   Mutual Drafting .................................................................62
Section 10.19   Disclosure Schedule ..........................................................62
Section 10.20   Headings; Table of Contents ..............................................63
Section 10.21   Counterparts; Facsimile and Email Signatures .........................63
Section 10.22   Time of Essence ................................................................63

Exhibit A            -        Form of Bill of Sale
Exhibit B            -        Form of Assignment and Assumption Agreement
Exhibit C            -        Form of Trademark Assignment Agreement
Exhibit D            -        Bid Procedures Order
Schedule I           -        Schedule of Seller Subsidiaries
Schedule 1.1         -        Excluded Claims
Schedule 1.2         -        Excluded Vendors
Schedule 2.2(n)      -        Excluded Assets
Schedule 2.6(a)      -        Assumed Contract List
Schedule 5.4         -        Conduct of Business
Schedule 3.3(b)      -        Consents and Approvals
Schedule 3.6         -        Contracts
Schedule 3.7         -        Intellectual Property
Schedule 3.8         -        Litigation
Schedule 3.9(b)      -        Employees and Employment Matters
Schedule 3.10(a)     -        Employee Benefit Plans
Schedule 3.11        -        Leased Real Property
Schedule 3.12        -        Permits

Schedule 3.13          -          Environmental Matters

## SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of March 17, 2023, by and among Performance Powersports Group Investor, LLC, a Delaware limited liability company ("PPG Investor"), Performance Powersports Group Holdings, Inc, a Delaware corporation and wholly owned subsidiary of PPG Investor ("PPG Holding"), each of the Subsidiaries set forth on Schedule I attached hereto (the "Seller Subsidiaries", and together with PPG Investor and PPG Holding, "Sellers"), and CPS USA Acquisition, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties." Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article I.

WHEREAS, the Parties entered into that certain Asset Purchase Agreement, by and among the Parties, dated as of January 16, 2023 (the "Original Effective Date") (the "Asset Purchase Agreement");

WHEREAS, the Parties entered into that certain Amended and Restated Asset Purchase Agreement, by and among the Parties, dated as of March 6, 2023 (the "Amended and Restated Asset Purchase Agreement")

WHEREAS, as of the date hereof, the Parties hereto desire to amend and restate in its entirety the Amended and Restated Asset Purchase Agreement.

WHEREAS, on January 16, 2023 (the "Petition Date"), the Sellers commenced voluntary cases (such cases, the "Chapter 11 Cases") under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, each Seller continues in possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor in possession;

WHEREAS, Sellers presently conduct the business of producing and selling light-to-middle-weight powersports equipment, including utility task vehicles, all-terrain vehicles, go-karts, mini bikes and golf carts, to third party retailers throughout the United States (collectively, the "Business");

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, the Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth herein;

WHEREAS, the board of directors of PPG Investor, in its capacity as a Seller and the sole stockholder of PPG Holding and sole indirect equity owner of the Seller Subsidiaries, and the boards of directors of each of the Sellers, acting on behalf of each of the applicable Sellers, has determined that it is advisable and in the best interests of Sellers to consummate the Contemplated Transactions provided for herein;

WHEREAS, the Sellers and Buyer have agreed that the sale, transfer and assignment of the Purchased Assets and the Assumed Liabilities from the Sellers to Buyer shall be effected

pursuant to motion by the Sellers pursuant to sections 105, 363 and 365 and/or, with the prior written consent of Buyer which may be withheld in its sole discretion, pursuant to a plan (a "Chapter 11 Plan") under section 1129 of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code");

WHEREAS, in connection with the Chapter 11 Cases and subject to the terms and conditions contained herein, following entry of the Sale Order finding Buyer as the Successful Bidder at the Auction (if any), the Sellers shall sell and transfer to Buyer, and Buyer shall purchase and acquire from the Sellers, pursuant to sections 105, 363 and 365 and/or, with the prior written consent of Buyer which may be withheld in its sole discretion, 1129 of the Bankruptcy Code, the Purchased Assets, and Buyer shall assume from the Sellers the Assumed Liabilities, all as more specifically provided herein and in the Sale Order; and

WHEREAS, in connection with the Chapter 11 Cases and subject to the terms and conditions contained herein, the Parties shall enter into that certain litigation trust agreement (the "Litigation Trust Agreement") at Closing, pursuant to which, among other things, a litigation trust (the "Litigation Trust") shall be established.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS**

"Accounts Receivable" means (a) all accounts, accounts receivable, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor and supplier rebates of Sellers in connection with the Business as conducted by the Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Accrued PTO" has the meaning set forth in Section 6.4(c).

"Acquired Claims" has the meaning set forth in Section 2.1(n).

"Adequate Assurance Deposit" means all deposits (whether maintained in escrow or otherwise) or other security provided in favor of a utility as adequate assurance of payment pursuant to section 366 of the Bankruptcy Code.

"Administrative Claim" means a Claim arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

2

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Alternative Transaction</u>" means a sale or sales of any of the Purchased Assets to a Person other than Buyer or an Affiliate of Buyer, whether effected pursuant to a merger, consolidation, asset acquisition, share exchange, amalgamation or plan of reorganization, excluding any sales of Inventory in the Ordinary Course of Business.

"<u>Asset Purchase Agreement</u>" has the meaning set forth in the preamble.

"<u>Amended and Restated Asset Purchase Agreement</u>" has the meaning set forth in the preamble.

"<u>Assigned Intellectual Property Assets</u>" has the meaning set forth in <u>Section 2.1(e)</u>.

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in <u>Section 2.8(a)ii</u>.

"<u>Assumed Contract List</u>" has the meaning set forth in <u>Section 2.6(a)</u>.

"<u>Assumed Contracts</u>" means those Leases and Contracts that have been assumed by Sellers and assigned to Buyer pursuant to <u>Section 2.6</u> and section 365 of the Bankruptcy Code. For the avoidance of doubt, "Assumed Contracts" shall not include any Non-Real Property Contract or Lease that is excluded and rejected pursuant to <u>Section 2.6</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Assumed Permits</u>" means all Permits relating to the Business that are transferable, assignable or capable of being reissued in accordance with their terms and under applicable Law, but excluding all Permits to the extent related to any Excluded Asset (including any Lease that is not an Assumed Contract).

"<u>Auction</u>" has the meaning ascribed to such term in the Bid Procedures Order.

"<u>Avoidance Actions</u>" means all causes of action, lawsuits, claims, rights of recovery and other similar rights of any Seller arising under Chapter 5 of the Bankruptcy Code.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court Milestones</u>" has the meaning set forth in <u>Section 9.3</u>.

"<u>Bankruptcy Deposit Accounts</u>" has the meaning set forth in <u>Section 2.2(a)</u>.

"<u>Bid Deadline</u>" has the meaning set forth in <u>Section 9.3(b)</u>.

"<u>Bid Procedures</u>" has the meaning ascribed to such term in the Bid Procedures Order.

"<u>Bid Procedures Order</u>" means an order of the Bankruptcy Court in substantially the form attached hereto as <u>Exhibit D</u>.

"Bill of Sale" has the meaning set forth in Section 2.8(a)i.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Equity Claim" has the meaning set forth in Section 5.9(e).

"Buyer Group" means Buyer, any Affiliate of Buyer and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, advisors, Representatives, successors or permitted assigns.

"Buyer GUC Claim" has the meaning set forth in Section 5.9(e).

"Buyer Litigation Trust Note Claim" has the meaning set forth in Section 5.9(e).

"CAM" has the meaning set forth in Section 2.3(n).

"Cash and Cash Equivalents" means, collectively, all of the Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, net of uncleared checks issued by Sellers that are not yet reflected in the applicable bank account of Sellers.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Chapter 11 Plan" has the meaning set forth in the recitals.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 2.7.

"Closing Date" has the meaning set forth in Section 2.7.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the IRC, and any similar state Law.

"Committee" means the official committee of unsecured creditors appointed in the Seller's Chapter 11 Cases.

"Company IPR Agreements" has the meaning set forth in Section 3.7(c).

"Confidential Information" means, in relation to a Party (the "Discloser"): (a) all information, in whatever form communicated or maintained, whether orally, in writing, electronically, in computer readable form or otherwise, that the Discloser discloses to, or that is

gathered by inspection by a Party (the "Recipient") or any of the Recipient's Representatives in the course of the Recipient's review of the transactions contemplated by this Agreement, whether provided before, on or after the date of this Agreement, including information that contains or otherwise reflects information concerning the Discloser or its businesses, affairs, financial condition, assets, liabilities, operations, prospects or activities, and specifically includes financial information, budgets, business plans, ways of doing business, business results, prospects, customer lists, forecasts, engineering reports, environmental reports, evaluations, legal opinions, names of venture partners and contractual parties, and any information provided to the Discloser by third parties under circumstances in which the Discloser has an obligation to protect the confidentiality of such information; (b) all plans, proposals, reports, analyses, notes, studies, forecasts, compilations or other information, in any form, that are based on, contain or reflect any confidential information regardless of the identity of the Person preparing the same ("Notes"); (c) the existence and terms of this Agreement; and (d) the fact that information has been disclosed or made available to the Recipient or the Recipient's Representatives; but does not include any information that: (x) is at the time of disclosure to the Recipient or thereafter becomes generally available to the public, other than as a result of a disclosure by the Recipient or any of the Recipient's Representatives in breach of this Agreement; (y) is or was received by the Recipient on a non-confidential basis from a source other than the Discloser or its Representatives if such source is not known to the Recipient to be prohibited from disclosing the information to the Recipient by a confidentiality agreement with, or a contractual, fiduciary or other legal confidentiality obligation to, the Discloser; or (z) was known by the Recipient prior to disclosure in connection with the transactions contemplated by this Agreement and was not subject to any contractual, fiduciary or other legal confidentiality obligation on the part of the Recipient.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization.

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"Contract" means any written or oral agreement, contract, Lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally-binding.

"COVID-19 Measures" means any action taken by any Seller directly in response to COVID-19, including any compliance with any quarantine, "shelter in place," "stay at home," social distancing, shut down, closure, sequester, safety or similar applicable Law, directive, guidelines or recommendations promulgated by any Governmental Entity, including the Centers for Disease Control and Prevention and the World Health Organization.

"Cure Amounts" has the meaning set forth in Section 2.6(b).

"Current Employees" means all individuals (including directors, officers, independent contractors or other individual service providers) employed or engaged by Sellers, whether active or not (including those on short-term disability, leave of absence, paid or unpaid, or long-term disability).

"Customer Deposits" has the meaning set forth in Section 2.1(c).

"Data Security Requirements" has the meaning set forth in Section 3.7(f).

"Dataroom" has the meaning set forth in Section 4.8.

"Decree" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order of any Governmental Entity.

"Debtor Release" means the Seller release as provided in the order of the Bankruptcy Court approving the DIP Credit Agreement on a final basis.

"Determined Cure Cost" means, with respect to the Cure Amount of any particular Contract, that such Cure Cost is finally established, by (i) the Bankruptcy Court or by (ii) with the consent of Buyer, agreement by the parties to such Contract.

"DIP Credit Agreement" means that certain Junior Secured, Superpriority Debtor-in-Possession Credit Agreement or Term Sheet, dated as of January 16, 2023, by and among Performance Powersports Group Purchaser, Inc, the Guarantors party thereto, and the DIP Lender thereunder, as amended, supplemented, amended and restated or otherwise modified from time to time.

"DIP Lender" means Tanks Funding VI, LLC.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and any other benefit or compensation plan, program, agreement or arrangement of any kind, in each case, sponsored, maintained or contributed to (or required to be contributed to) by any Seller or in which any Seller participates and that provides benefits to any Current Employee or Former Employee or otherwise with respect to which any Seller has any Liability or obligation.

"Environmental Laws" all applicable Laws concerning public or worker health or safety (regarding exposure to Hazardous Substances), pollution or protection of the environment.

"Equity Commitment Letter" has the meaning set forth in Section 4.5.

"Equity Commitment Source" has the meaning set forth in Section 4.5.

"Equity Financing" has the meaning set forth in Section 4.5.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Benefits and Compensation" has the meaning set forth in Section 6.4(a).

"Excluded Cash" has the meaning set forth in Section 2.2.

"Excluded Claims" means all rights (including rights of set-off and rights of recoupment), refunds, claims, counterclaims, demands, causes of action and rights to collect damages solely with respect to those claims set forth on Schedule 1.1 attached hereto.

"Excluded Employee" has the meaning set forth in Section 6.4(b).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Litigation" means all Liabilities of Sellers, whether existing on or prior to the Closing Date or arising thereafter with respect to those matters set forth on Schedule 3.8 of the Disclosure Schedule.

"Excluded Utility Deposits" means (a) any utility deposits related exclusively to Excluded Assets and (b) any post-Petition Date adequate assurance deposits provided to the provider of any utility services or held by Sellers and excludes any Adequate Assurance Deposit.

"Excluded Vendors" means all Liabilities of Sellers, whether existing on or prior to the Closing Date or arising thereafter with respect to those Persons set forth on Schedule 1.2 attached hereto.

"Express Representations" has the meaning set forth in Section 4.8.

"Final Order" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the bankruptcy rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"Financing Orders" means the interim and final orders approving the DIP Credit Agreement.

"<u>Former Employees</u>" means all individuals (including directors, officers, independent contractors or other individual service providers) who have been employed or engaged previously by the Sellers (or any of their predecessors) who are not Current Employees.

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America as in effect from time to time, applied on a consistent basis.

"<u>Governmental Entity</u>" means any United States federal, state or local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"<u>Hazardous Substance</u>" means any toxic or hazardous material, substance or waste as to which Liability or standards of conduct may be imposed under any applicable Environmental Laws.

"<u>Health and Welfare Plans</u>" means those Employee Benefit Plans set forth on <u>Section 3.10(a) of the Disclosure Schedule</u> providing for medical, dental, life, disability, long-term care or other welfare insurance.

"<u>Information Presentation</u>" has the meaning set forth in <u>Section 2.8(a)iii</u>.

"<u>Insurance Policy</u>" means each primary, excess and umbrella insurance policy, bond and other forms of insurance owned or held by or on behalf, or providing insurance coverage to the Business, Sellers and their operations, properties and assets, including, without limitation, all stop-loss insurance policies with respect to Sellers' self-insured medical and/or dental insurance programs.

"<u>Intellectual Property</u>" means any and all rights, title and interest in or relating to intellectual property or proprietary rights, which may exist or be created under the Laws of any jurisdiction throughout the world, including: (a) patents and patent applications, together with all reissues, continuations, continuations-in-part, divisionals, extensions and reexaminations in connection therewith; (b) trademarks, service marks, trade dress, logos, slogans, trade names, service names, brand names, Internet domain names and all other source or business identifiers and general intangibles of a like nature, along with all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing; (c) rights associated with works of authorship, including exclusive exploitation rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof; (d) rights in software (including object code, source code, systems, tools, firmware, interfaces, and related documentation and materials), data and databases; (e) inventions (whether or not patentable or reduced to practice) and all improvements thereto, processes, methods, designs, technologies, techniques, protocols, methodologies, formulae, formulations, algorithms, layouts, specifications, discoveries, compositions, industrial models, architectures, drawings, plans, ideas, research and development, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, trade secrets, know-how, and other proprietary confidential information (collectively, "<u>Trade Secrets</u>"); and (f) copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"<u>Intellectual Property Assignments</u>" has the meaning set forth in <u>Section 2.8(a)iii</u>.

"<u>Inventory</u>" means all of Sellers' inventory of parts, subassemblies, finished goods, raw materials and work-in-process therefor related to the Business and all of Sellers' tangible property used in connection with the Business, including, materials, supplies, inventories and other related items or that are otherwise included in the Purchased Assets and are permitted to be sold and transferred under applicable Law.

"<u>IRC</u>" means the United States Internal Revenue Code of 1986, as amended.

"<u>Law</u>" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, Decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Entity.

"<u>Leased Real Property</u>" means all of the right, title and interest of the Seller under all written leases, subleases, licenses, concessions and other agreements, pursuant to which Seller holds a leasehold or sub-leasehold estate in, or is granted the right to use or occupy, any land, buildings, improvements, fixtures or other interest in real property which is used in the operation of the Business.

"<u>Leases</u>" means all leases, subleases, licenses, concessions and other agreements (written or oral) pursuant to which the Seller holds any Leased Real Property, together with all amendments, extensions, renewals, guaranties and other agreements with respect thereto, and including the right to all security deposits and other amounts and instruments deposited by or on behalf of the Seller thereunder.

"<u>Liability</u>" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"<u>License Agreement</u>" means that certain License Agreement, dated April 1, 2010, between the Coleman Company, Inc. and certain of the Sellers, as amended or modified from time to time.

"<u>Lien</u>" means any lien, license, encumbrance, claim, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, judgments, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

"<u>Litigation</u>" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity and whether before any Governmental Entity or arbitrator.

"<u>Litigation Trust</u>" has the meaning set forth in the recitals.

"<u>Litigation Trust Agreement</u>" has the meaning set forth in the recitals and shall be in form and substance agreed to by Buyer, Seller and Peter Kravitz.

"<u>Litigation Trust Cash Payment</u>" means a payment in an amount of Seven Hundred Fifty Thousand ($750,000) in cash to fund a portion of the Litigation Trust.

"<u>Litigation Trust Funding Amount</u>" means, collectively, the Litigation Trust Cash Payment and the Litigation Trust Note.

"<u>Litigation Trustee</u>" means Peter Kravitz, effective as of establishment of the Litigation Trust, or such other individual in accordance with the Litigation Trust Agreement.

"<u>Litigation Trust Note</u>" means a loan in an amount equal to Five Hundred Thousand Dollars ($500,000) pursuant to a note to fund a portion of the Litigation Trust, bearing interest at 12% per annum and payable from litigation recoveries first after payment of professional fees and out of pocket expenses of the Litigation Trust.

"<u>Litigation Trust Note Claim</u>" means any claim arising pursuant to the Litigation Trust Note.

"<u>Material Adverse Effect</u>" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is materially adverse to the financial condition or results of operations of the Purchased Assets (taken as a whole); <u>provided, however,</u> that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military, cyber or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) compliance with this Agreement or any Related Agreement, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (iv) any changes attributable to or arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Buyer or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, or (C) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby or the identity, nature or ownership of

Buyer, including the impact thereof on the relationships, contractual or otherwise, of the business of the Sellers with employees, customers, lessors, suppliers, vendors or other commercial partners; (v) arising from or relating to any existing event, occurrence, or circumstance with respect to which Buyer has knowledge as of the date hereof, including any matter set forth in the schedules hereto, (vi) arising from or relating to changes in Laws or other binding directives or determinations issued or made by or agreements with or Consents of any Governmental Entity, (vii) resulting from any act of God or other force majeure event (including natural disasters, disease, epidemics, pandemics (including COVID-19 and COVID-19 Measures) or famine); (viii) in the case of Sellers or the Business, (A) the failure to meet or exceed any Projection or forecast or (B) changes in the business or operations of Sellers or any of their respective Affiliates (including changes in credit terms offered by suppliers or financing sources) resulting from Sellers' and their respective Affiliates' financial condition; (ix) seasonal changes in the results of operations; (x) changes in Law or in GAAP or interpretations thereof; (xi) the commencement or pendency of the Chapter 11 Cases, (xii) any objections in the Bankruptcy Court to (A) this Agreement or any of the transactions contemplated hereby or thereby, (B) the reorganization of Sellers, any plan of reorganization or any disclosure statement, (C) the Bid Procedures Order, or (D) the assumption or rejection of any Assumed Contract; or (xiii) any order of the Bankruptcy Court or any actions or omissions of Sellers or their Subsidiaries in compliance therewith; or (b) would reasonably be expected to prevent, materially delay or materially impair the ability of any Seller to consummate the transactions contemplated by this Agreement or the Related Agreements on the terms set forth herein and therein.

"Non-Real Property Contracts" means the Contracts to which any Seller is a party other than the Leases.

"Offeree" has the meaning set forth in Section 6.4(a).

"Off-the-Shelf Software" means off-the-shelf personal computer software as such term is commonly understood, that is non-exclusively licensed and commercially available under non-discriminatory pricing terms on a retail basis for less than Fifty Thousand Dollars ($50,000) per year per software title.

"Ordinary Course of Business" means the ordinary course of business of Sellers taken as a whole consistent with past custom and practice and taking into account the preparation for and pendency of the Chapter 11 Cases.

"Original Effective Date" has the meaning set forth in the recitals.

"Outside Date" has the meaning set forth in Section 8.1(e).

"Oversight Committee" has the meaning set forth in Section 5.9(c).

"Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance, Consent, exemption or similar right issued, granted, given or otherwise obtained from or by any Governmental Entity, under the authority thereof or pursuant to any applicable Law.

"Permitted Liens" means (a) Liens for utilities and Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established under GAAP; (b) with respect to leased or licensed personal property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assumed Contract; (c) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business for amounts which are not delinquent and which are not material or which are being contested in good faith by appropriate proceedings; (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted; (e) any Liens associated with or arising in connection with any Assumed Liabilities; (f) non-exclusive licenses of Assigned Intellectual Property Assets granted in the Ordinary Course of Business; and (g) any Liens that are not reasonably likely to result in a Material Adverse Effect.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"Petition Date" has the meaning set forth in the recitals.

"PII" has the meaning set forth in Section 6.11.

"Portage" has the meaning set forth in Section 3.14.

"PPG Holding" has the meaning set forth in the preamble.

"PPG Investor" has the meaning set forth in the preamble.

"Priority Claim" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"Projections" has the meaning set forth in Section 6.8(b).

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Representations and Warranties Insurance Policy" means that certain Buyer-Side Representations and Warranties Insurance Policy, dated as of October 8, 2021, by and between Performance Powersports Group Purchaser, Inc. and DUAL Transactional Risk, a division of DUAL Commercial LLC.

"Records" means the books, records, information, ledgers, files (including personnel files), invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists

and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement and the Intellectual Property Assignments and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Sale Hearing" means the hearing seeking entry of the Sale Order, which hearing may, with the prior written consent of Buyer which may be withheld in its sole discretion, take the form of a hearing to consider confirmation of the Sellers' Chapter 11 Plan.

"Sale Motion" means a combined motion filed by the Sellers with the Bankruptcy Court in connection with the Chapter 11 Cases requesting the entry of the Bid Procedures Order and the Sale Order.

"Sale Order" means an order in form and substance satisfactory to the Sellers and Buyer (it being understood and agreed that if the Sale Order requires Buyer to assume, pay or otherwise become responsible for any Liabilities of the Sellers that do not constitute Assumed Liabilities as expressly defined herein, then such Sale Order shall not be satisfactory to Buyer). For the avoidance of doubt, the "Sale Order" may, with the prior written consent of Buyer which may be withheld in its sole discretion, also take the form of an order confirming the Sellers' Chapter 11 Plan.

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Subsidiaries" has the meaning set forth in the preamble.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge of J. Pearson and Ken Vanden Berg.

"Stock Purchase Agreement" means that certain Stock Purchase and Contribution Agreement, dated as of October 8, 2021, by and among PPG Investor, the Seller Subsidiaries, and Richard Godfrey, an individual resident of Arizona.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination

13

thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Successful Bidder" has the meaning ascribed to such term by the Bid Procedures Order.

"Systems" means servers, software, computer firmware, computer hardware, electronic data processing equipment, websites, databases, interfaces, platforms, circuits, networks, network equipment, peripherals, computer systems, and other computer, communications, and telecommunications devices and equipment, and other information technology systems, and data or information contained therein or transmitted thereby, in each case owned, leased, licensed or otherwise used or relied on by the Sellers in connection with the Business.

"Tax" or "Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, sales, use, liquor, cigarette, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" has the meaning set forth in Section 6.6.

"Transferred Employee" has the meaning set forth in Section 6.4(a).

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar Laws.

"Wind-Down Amount" means cash and cash equivalents in the amount of Six Hundred Thousand Dollars ($600,000), reserved for use in connection with the wind-down of the Sellers' Chapter 11 Cases whether via a liquidating chapter 11 plan or otherwise.

"Withholding Amount" has the meaning set forth in Section 2.11.

**ARTICLE II**
**PURCHASE AND SALE**

**Section 2.1**    **Purchase and Sale of Purchased Assets**. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Buyer shall purchase, acquire and accept from Sellers, on an "as is, where is" basis and without any representation or warranty on the part of Sellers as to fitness, merchantability or otherwise, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of the Purchased Assets, free and clear of all Liens (other than Permitted Liens and any Liens relating to or included in the Assumed Liabilities), for the consideration specified in Section 2.5. "Purchased Assets" shall mean all of the direct or indirect right, title and interest of Sellers in and to the tangible and intangible assets, properties, rights, claims and Contracts used, useful, or held for use in, or related to, the Business (but excluding the Excluded Assets) as of the Closing, including:

(a)    all Accounts Receivable of Sellers as of the Closing;

(b)    all Inventory of Sellers as of the Closing, including all rights of Sellers to receive such Inventory, supplies and materials which are on order as of the Closing;

(c)    without duplication of the above, all deposits (including, without limitation, deposits in transit, customer deposits (the "Customer Deposits") and security deposits for rent, electricity, telephone, utilities or otherwise, but excluding deposits that are not transferable to Buyer or deposits that constitute Excluded Utility Deposits) and other prepaid charges and expenses of Sellers that relate to the Purchased Assets;

(d)    all Assumed Contracts that have been assumed by and assigned to Buyer pursuant to Section 2.6;

(e)    all Intellectual Property owned or purported to be owned by Sellers, including the items set forth on Schedule 3.7(a) of the Disclosure Schedule (the "Assigned Intellectual Property Assets"), together with (i) any and all claims, demands, or causes of action, known or unknown, for past, present, or future infringement, misappropriation, or other violation of such Assigned Intellectual Property Assets, (ii) all rights to collect income, royalties, damages, proceeds and payments due or payable at or after the Closing with respect to such Assigned Intellectual Property Assets and (iii) tangible embodiments of any of such Assigned Intellectual Property Assets;

(f)    all industrial and motor vehicles owned by Sellers;

(g)    all items of machinery, equipment, supplies, furniture, fixtures, and leasehold improvements (to the extent of Sellers' rights to any leasehold improvements under the Leases that are Assumed Contracts) owned by Sellers as of the Closing;

(h)    all Records (provided that Sellers are entitled to retain copies of all Records and Buyer will make all such Records available to Sellers upon request and at no charge), but excluding (i) personnel files for Excluded Employees and (ii) any materials exclusively

15

related to any Excluded Assets and copies of all information relating solely to the Taxes and Tax Returns of the Business or the Purchased Assets in the possession of Sellers;

(i)    all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Intellectual Property owned or purported to be owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of the Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(j)    all rights of the Sellers under non-disclosure and confidentiality, non-compete, non-solicitation, and other restrictive covenant agreements with Current Employees, Former Employees, directors, consultants, independent contractors and agents of any of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(k)    all of the Assumed Permits or all of the rights and benefits accruing under any Permits relating to the Business to the extent transferrable or assignable (and such non-transferability or non-assignability is not overridden or canceled by the Sale Order or other order of the Bankruptcy Court) and held by Sellers;

(l)    the amount of, and all rights to any, insurance proceeds received by any of Sellers, including pursuant to the Representations and Warranties Insurance Policy, after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets of a type set forth in Section 2.1(b), Section 2.1(e), Section 2.1(f) or Section 2.1(g), occurring on or after the Closing or (ii) any Assumed Liabilities;

(m)    all other rights, demands, claims, credits, allowances, rebates or other refunds (excluding any vendor or supplier rebates) and rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), other than against Sellers, arising out of or relating to the Business as of the Closing, including all deposits (including Customer Deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances and prepayments;

(n)    (i) except for the Excluded Claims, all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent); and (ii) all Avoidance Actions (collectively, the "Acquired Claims");

(o)    all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided to Sellers or to the extent affecting any Purchased Assets and/or Assumed Liabilities;

16

(p)    subject to section 363(b)(1)(A) of the Bankruptcy Code, all of the Sellers' telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names related to the Business;

(q)    all Cash and Cash Equivalents of Sellers and all Accounts Receivable other than the Excluded Cash;

(r)    sponsorship of the Health and Welfare Plans (and all trusts, rights, insurance policies, administrative services contracts, and other assets set aside and specifically reserved solely to fund benefits payable under the applicable Health and Welfare Plan and/or any other Contracts relating to the funding or administration of an applicable Health and Welfare Plan); and

(s)    all other assets that are related to or used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets).

**Section 2.2    Excluded Assets**. Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Seller is not selling or assigning, any of the following assets, properties and rights of Sellers (the "Excluded Assets"):

(a)    (i) the Litigation Trust Cash Payment funded by Buyer pursuant to Section 2.5(b), (ii) the Wind-Down Amount funded by Buyer pursuant to Section 2.5(e), (iii) the amounts necessary to fund the "Carve Out" as set forth in the DIP Credit Agreement and in the order of the Bankruptcy Court approving the DIP Credit Agreement and (iv) all cash deposits in cash collateral, indemnity or other accounts solely to the extent comprising professional fee retainers, professional fee escrows, and indemnity accounts funded in accordance with the Financing Orders, held by or on behalf of the Sellers' or the bankrupt estates' professionals ("Bankruptcy Deposit Accounts" and collectively with (i), (ii) and (iii), the "Excluded Cash");

(b)    all bank accounts of Sellers;

(c)    all deposits that are not transferable to Buyer, and deposits that constitute Excluded Utility Deposits;

(d)    all of Sellers' certificates of incorporation, and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, unit certificates and other documents relating to the organization, maintenance and existence of any Seller as a corporation or other entity;

(e)    all equity securities of any Seller or securities convertible into, exchangeable, or exercisable for any such equity securities and all net operating losses of any Seller;

(f)    all Leases (and related Leased Real Property) and Contracts, in each case, other than the Assumed Contracts;

17

(g)    the Excluded Claims and all causes of action, lawsuits, judgments, claims, refunds, rights of recovery, rights of set-off, counterclaims, defenses, demands, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights of any Seller (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, now existing or hereafter acquired, contingent or noncontingent) related thereto;

(h)    any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances and other than loans or notes from any Transferred Employees);

(i)    any (1) Records containing confidential personal private information including confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; provided that Buyer shall have the right to make copies of any portions of such retained Records (other than the Records referenced in subsection (3)) to the extent that such portions relate to the Business or any Purchased Asset;

(j)    all Permits other than the Assumed Permits;

(k)    all directors' and officers' liability insurance policies, including any tail insurance policies, and all rights of any nature with respect to any such insurance policies, including any recoveries thereunder and any rights to assess claims seeking any such recoveries;

(l)    all assets, rights and claims arising from or with respect to Taxes of any Seller, including all rights arising from any refunds due from federal, state and/or local Governmental Entities with respect to Taxes paid by Sellers, all deferred tax assets, Tax deposits, Tax prepayments and estimated Tax payments;

(m)    any assets expressly excluded from Purchased Assets pursuant to Section 2.1;

(n)    the assets listed on Schedule 2.2(n) attached hereto;

(o)    all Insurance Policies except for the Representations and Warranties Insurance Policy, and any prepaid premiums with respect thereto;

(p)    other than the Health and Welfare Plans, all Employee Benefit Plans and trusts, rights and other assets set aside and specifically reserved solely to fund benefits payable under the applicable Employee Benefit Plan; and

(q)    the rights of Sellers under this Agreement and the Related Agreements and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement.

**Section 2.3    Assumption of Assumed Liabilities**. On the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing (or, with respect to Assumed Liabilities under Assumed Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Section 2.6), Buyer shall assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably convey, transfer, and assign to Buyer, the following Liabilities, without duplication and only to the extent not paid prior to the Closing and no other Liabilities (collectively, the "Assumed Liabilities"):

(a)    all Cure Amounts under any and all Assumed Contracts, including any Determined Cure Costs;

(b)    all outstanding obligations under the Prepetition First Lien Credit Agreement (as defined in the Financing Orders);

(c)    Liabilities under the Assumed Contracts and the Assumed Permits from and after the Closing Date as well as any Liabilities arising out of the conduct of the Business or the ownership of the Purchased Assets, in each case, by Buyer first arising from and after the Closing Date;

(d)    except for the Excluded Vendors, all current trade payables and accrued expenses of Sellers (including, for the avoidance of doubt, (i) invoiced accounts payable, (ii) accrued but un-invoiced accounts payable and (iii) any open purchase orders), in existence as of the Closing Date, as well as to the extent arising and related to the period following Closing Date;

(e)    all accrued payroll, accrued and unused vacation, and accrued payroll Taxes with respect to Transferred Employees as of the Closing Date (and not paid by Sellers prior thereto);

(f)    to the extent required by applicable law, Liabilities relating to continuation of health care coverage, to the extent required by COBRA, to Current Employees and Former Employees of the Sellers (and their qualified beneficiaries) who left employment or otherwise experienced a COBRA qualifying event on or prior to the Closing Date;

(g)    allowed 503(b)(9) Claims;

(h)    all Liabilities associated with Customer Deposits as of the Closing Date;

(i)    allowed mechanic's lien claims;

(j)    Liabilities expressly assumed by Buyer under this Agreement;

(k)    without duplication of the above, other Liabilities with respect to the Transferred Employees, including for (i) accrued vacation pay, sick pay, holiday pay, paid time off, (ii) accrued wages, salary, bonuses, severance, deferred compensation and other payments, (iii) garnishments, and (iv) workers' compensation obligations with respect to

19

events occurring from and after the Closing (but excluding any Liabilities or obligations with respect to Employee Benefit Plans that are not assumed by Buyer);

(l)     all Taxes incurred for the period from and after the Petition Date through the Closing Date to the extent such Taxes are Administrative Claims;

(m)     sponsorship of, and obligations under, the Health and Welfare Plans; provided, that Sellers pay all Liabilities and obligations described in this item as and when due through the Closing Date consistent with Sellers' past practices;

(n)     Priority Claims incurred prior to the Closing Date to the extent allowed by order of the Bankruptcy Court or agreed to (in writing) by Buyer;

(o)     claims for stub-rent pursuant to section 503(b) of the Bankruptcy Code (it being understood that Buyer shall pay such amounts no later than the later of (i) ten (10) days following Closing and (ii) the last day of the month in which the Closing occurs);

(p)     Liabilities for common area maintenance ("CAM"), CAM reconciliation and percentage rent under any Leases that are Assumed Contracts;

(q)     all Liabilities under or pursuant to all warranties, representations, guarantees and programs provided or offered by Sellers to customers in connection with the products sold or services provided by Sellers with respect to the Business;

(r)     all Liabilities and obligations for sales, use, withholding, trust fund or other employment related taxes for which officers and directors may have personal liability for non-payment under applicable Law;

(s)     all Transfer Taxes in accordance with Section 6.6; and

(t)     any and all personal property Taxes with respect to the Purchased Asset.

**Section 2.4     Excluded Liabilities**. Notwithstanding anything herein to the contrary, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers, whether existing on or prior to the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as the "Excluded Liabilities"). For the avoidance of doubt, any Liability of Sellers or any Claim related to the Excluded Litigation or the Excluded Vendors are Excluded Liabilities.

**Section 2.5     Consideration**. The aggregate consideration payable by the Buyer for the sale and transfer of the Purchased Assets by the Sellers shall be composed of the following (the "Purchase Price"):

(a)     a credit bid of the outstanding obligations under the DIP Credit Agreement pursuant to section 363(k) of the Bankruptcy Code in the amount of Ten Million Dollars ($10,000,000), it being understood that any amounts not drawn thereunder shall be drawn in full prior to, and as a condition to, the Closing;

(b)    the Litigation Trust Funding Amount;

(c)    the assumption by the Buyer of the outstanding obligations under the Prepetition First Lien Credit Agreement (as defined in the Financing Orders);

(d)    the assumption by Buyer of the Assumed Liabilities (including all Determined Cure Costs with respect to any Assumed Contract); and

(e)    the Wind-Down Amount; provided that the Wind-Down Amount shall only become payable as a portion of the Purchase Price in the event that (i) Sellers have insufficient cash on hand at Closing to fund the Wind-Down Amount from such cash on hand and (ii) the Sellers have otherwise complied in all respects with the Financing Orders, in which case the Buyer shall only be required to fund the amount necessary to bring the Sellers' total cash on hand at Closing to equal to the amount of the Wind-Down Amount.

**Section 2.6    <u>Assumption and Assignment of Contracts.</u>**

(a)    <u>Schedule 2.6(a)</u> attached hereto (the "<u>Assumed Contract List</u>") sets forth a list of all Contracts and Leases to which a Seller is a party and which the Parties have agreed to be an Assumed Contract, together with estimated Cure Amounts for each Assumed Contract, if any.  For the avoidance of doubt, the License Agreement will be an Assumed Contract.

(b)    In connection with the assumption and assignment to Buyer of any Assumed Contract pursuant to this <u>Section 2.6</u>, (i) the cure amounts, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts necessary to assign such Assumed Contract to the Buyer pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code (such amounts, the "<u>Cure Amounts</u>"), shall be paid by Buyer at the Closing, and not by Sellers and Sellers shall have no Liability therefor, and neither the Cure Amounts paid by Buyer nor any other expense or obligation set forth in this <u>Section 2.6(b)</u> shall reduce, directly or indirectly, any consideration payable to or received by Sellers hereunder and (ii) Buyer shall provide sufficient adequate assurance of future performance as of the Sale Hearing necessary to satisfy the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to Assumed Contracts.

(c)    Sellers shall use their respective commercially reasonable efforts to assign the Assumed Contracts to Buyer on the terms set forth in this <u>Section 2.6</u>, including taking all reasonable actions required to obtain a Bankruptcy Court order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code. In the event Sellers are unable to assign any such Assumed Contract to Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all Consents from Governmental Entities, contract counterparties, and third parties necessary to assume and assign such Assumed Contracts to Buyer, including, in the case of Buyer, paying any applicable Cure Amounts; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder

(including with respect to the Cure Amounts) and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(d)      Notwithstanding the foregoing, a Contract shall not be an Assumed Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) constitutes an Employee Benefit Plan (that is not a health or welfare plan) or an Insurance Policy, (ii) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption, or (iii) requires a Consent of any Governmental Entity or other third party (except as permitted by the Bankruptcy Code) in order to permit the sale or transfer to Buyer of Sellers' rights under such Contract, and no such Consent has been obtained prior to the Closing. In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a Consent of any Governmental Entity or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Sellers' rights under such Permit, and no such Consent has been obtained prior to the Closing.

Section 2.7      __Closing__. The closing of the transactions contemplated by this Agreement (the "__Closing__") shall take place remotely by electronic exchange of counterpart signature pages commencing at 10:00 a.m. local time on the date (the "__Closing Date__") that is the first Business Day after the date on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in __Article VII__ (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto. The Closing shall be deemed to have occurred at 12:01 p.m. (prevailing Eastern Time) on the Closing Date.

Section 2.8      __Deliveries at Closing__.

(a)      At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

  i.      one or more Bills of Sale substantially in the form of __Exhibit A__ attached hereto ("__Bill of Sale__");

  ii.      one or more Assignment and Assumption Agreements substantially in the form of __Exhibit B__ attached hereto ("__Assignment and Assumption Agreement__");

  iii.      instruments of assignment substantially in the form of __Exhibit C__, attached hereto for the Assigned Intellectual Property Assets (collectively, the "__Intellectual Property Assignments__");

  iv.      any other Related Agreements required to be executed by Sellers to consummate the transactions contemplated hereby; and

v.     to the extent applicable, a properly completed and duly executed IRS Form W-9.

vi.    a duly executed Litigation Trust Note.

vii.   a duly executed Litigation Trust Agreement.

(b)    At the Closing, Buyer shall deliver to Sellers the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

i.     the Bills of Sale;

ii.    the Assignment and Assumption Agreement(s);

iii.   the Intellectual Property Assignments;

iv.    any other Related Agreements required to be executed by Buyer to consummate the transactions contemplated hereby;

v.     the Litigation Trust Funding Amount, by wire transfer of immediately available funds to one or more bank accounts designated by the Litigation Trustee in writing to Buyer;

vi.    duly executed board resolutions and applicable insurer consents relating to the transfer of the Health and Welfare Plans to Buyer; and

vii.   a true and correct copy of the Sale Order, which shall be a Final Order.

viii.  a duly executed Litigation Trust Note.

ix.    a duly executed Litigation Trust Agreement.

**Section 2.9    Allocation**. Within sixty (60) calendar days after the Closing Date or within a reasonable amount of time thereafter as mutually agreed by Sellers and Buyer, Buyer shall in good faith prepare and deliver to the Sellers a proposed allocation of the Purchase Price (and all capitalized costs and other relevant items) among the Purchased Assets in accordance with Section 1060 of the IRC and the Treasury Regulations thereunder (and any similar provision of United States state or local or non-United States Law, as appropriate). Sellers shall have sixty (60) calendar days following receipt of Buyer's proposed allocation to review and comment on such proposed allocation and Buyer shall consider such comments in good faith. Thereafter, Buyer shall provide Sellers with Buyer's final allocation schedule. Sellers shall also retain the right to dispute Buyer's proposed and final allocations, with any unresolved dispute to be determined by the Bankruptcy Court. Buyer and Sellers shall report, act and file Tax Returns (including Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocation. Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise) which is inconsistent with such allocation unless required to do so by applicable Law.

**Section 2.10   <u>Indemnification</u>**. Buyer shall indemnify and hold each Seller and its Representatives harmless from and against all claims, demands, penalties, losses, Liability or damage to the extent arising from or relating to the operation of the Business by Buyer from and after the Closing Date, including, without limitation , reasonable attorneys' fees and expenses, resulting from, or related to: (i) Buyer's breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement and the Related Agreements, any Assumed Contract or applicable Law; (ii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers or Representatives of any Seller by Buyer or any of its Representatives; (iii) any actual or threatened claims, charges or lawsuits by or on behalf of any party engaged, or alleged to be engaged, by Buyer as an employee, intern, agent, consultant or independent contractor arising out of such employment or contractor relationship; (iv) the gross negligence (including omissions) or willful misconduct of Buyer, its officers, directors, employees, agents or Representatives; (v) violations of Law by Buyer, its officers, directors, employees, agents or Representatives; and (vi) any Assumed Liabilities.

**Section 2.11   <u>Withholding</u>**. Buyer and Sellers shall be entitled to withhold and deduct from the amounts otherwise payable to any recipient pursuant to this Agreement such amounts as may be required to be withheld or deducted under the IRC or any other provision of federal, state, local or foreign Tax laws (collectively, the "<u>Withholding Amount</u>"); <u>provided</u>, <u>however</u>, that, Buyer will use commercially reasonable efforts to provide written notice to Sellers at least five (5) Business Days prior to withholding any Withholding Amount, or, if sooner, as soon as reasonably practicable after becoming aware thereof, and will reasonably cooperate with Sellers to eliminate or reduce the Withholding Amount. Any Withholding Amount shall be timely remitted to the appropriate Governmental Entity and treated for all purposes under this Agreement as having been paid to the Person to whom such Withholding Amount otherwise would have been paid.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers hereby represent and warrant to Buyer as of the Original Effective Date, as of the date hereof and as of the Closing Date, except as set forth in the disclosure schedule accompanying this Agreement (the "<u>Disclosure Schedule</u>"), the statements contained in this <u>Article III</u> are true and correct.

**Section 3.1   <u>Organization of Sellers; Good Standing.</u>**

(a)     Each Seller is a corporation duly incorporated, validly existing and in good standing under the Laws of its state of incorporation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its Business is currently being conducted. Each Seller has all requisite corporate power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

(b)     Each Seller is duly authorized to do business and is in good standing as a resident or foreign corporation in each jurisdiction where the ownership or operation of the Purchased Assets or the conduct of the Business requires such qualification, except for

failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)    None of the Sellers has any Subsidiaries (other than other Sellers, if applicable).

**Section 3.2    <u>Authorization of Transaction</u>**. Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)    Each Seller has all requisite corporate power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which a Seller is a party have been duly authorized by such Seller and no other company action on the part of any Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)    This Agreement has been duly and validly executed and delivered by each Seller, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable. Assuming that this Agreement constitutes a valid and legally-binding obligation of Buyer, this Agreement constitutes the valid and legally-binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that it is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against Sellers, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3    <u>Noncontravention; Consents and Approvals</u>**.

(a)    Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (i) conflict with or result in a breach of the certificate of incorporation, bylaws or other organizational documents of any Seller, (ii) violate any Law to which any Seller is, or its respective assets or properties are, subject, or (iii) subject to the entry of the Sale Order, conflict with any Assumed Contract, and, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)     Except as set forth in <u>Schedule 3.3(b) of the Disclosure Schedule</u>, subject to the Sale Order having been entered and still being in effect (and not subject to any stay pending appeal at the time of Closing), no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement. After giving effect to the Sale Order and any applicable order of the Bankruptcy Court authorizing the assignment and assumption of any Contract that is an Assumed Contract hereunder, no Consent, notice or filing is required to be obtained by any Seller from, or to be given by any Seller to, or made by any Seller with, any Person that is not a Governmental Entity in connection with the execution, delivery and performance by any Seller of this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, Consent or approval would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.4     <u>Compliance with Laws</u>**. Sellers are in compliance with all Laws applicable to the Business or the Purchased Assets, except in any such case where the failure to be in compliance would not have a Material Adverse Effect.

**Section 3.5     <u>Title to Purchased Assets</u>**. Sellers, as of immediately prior to the Closing, will have good and valid title to, or, in the case of leased assets, have good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (except for Permitted Liens), subject to entry of the Sale Order. At the Closing or such time as title is conveyed under <u>Section 2.6</u>, Sellers will convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens), to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code.

**Section 3.6     <u>Contracts</u>**. <u>Schedule 3.6 of the Disclosure Schedule</u> sets forth an accurate list, as of the Original Effective Date and the date hereof, of all material Contracts (other than any Employee Benefit Plans), including the Company IPR Agreements, to which a Seller is a party with respect to the Business as of the date hereof (and Sellers have made available to Buyer true and complete copies of all such Contracts).

**Section 3.7     <u>Intellectual Property.</u>**

(a)     <u>Schedule 3.7(a) of the Disclosure Schedule</u> sets forth a true and complete list of all patents, patent applications, trademark registrations and applications for registration, copyright registrations, domain names and material proprietary software included in the Assigned Intellectual Property Assets. Each item listed or required to be listed on <u>Schedule 3.7(a) of the Disclosure Schedule</u>, is valid, subsisting and enforceable and none of the foregoing are subject to any outstanding Decree adversely affecting the Sellers' use thereof or rights thereto.

(b)     The Sellers' exclusively own all right, title and interest in and to each item of Assigned Intellectual Property Assets free and clear of all Liens (except for Permitted

Liens and subject to the Sale Order). The Sellers' own or have a valid and enforceable right or license to use all Intellectual Property used in or necessary for the operation of the Business as currently conducted. Subject to entry of the Sale Order, no Assigned Intellectual Property Assets are subject to any consent or settlement, or any writ, order, judgment, injunction or decree issued, made or rendered by any Governmental Entity, prohibiting or restricting the Sellers' ownership, enforcement or other exploitation or disposition thereof.

(c)     None of the Sellers are in breach in any material respect of any of the terms of any third party license agreement in any way related to or affecting any software owned or used by the Business. Schedule 3.7(c) of the Disclosure Schedule sets forth a true and complete list of the Contracts included in the Purchased Assets: (i) pursuant to which any Seller obtains the right to use any third party Intellectual Property (other than Off-The-Shelf Software), (ii) pursuant to which any Seller grants to any other Person the right to use any Assigned Intellectual Property Assets (other than nonexclusive licenses to customers granted in the Ordinary Course of Business); and (iii) relating to the research, development or assignment of Intellectual Property, or otherwise affecting any of the Sellers or any third party's ability to enforce, own, register, license, use, disclose, transfer or otherwise exploit any Intellectual Property (including any covenant not to sue or co-existence or settlement agreements) (collectively, the "Company IPR Agreements").

(d)     Except as set forth on Schedule 3.7(d)(i) of the Disclosure Schedule, in the past three (3) years, none of the use of the Intellectual Property included in the Purchased Assets, the conduct of the Business as currently conducted, nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith, has infringed, misappropriated or otherwise violated the Intellectual Property of any other Person. Except as set forth on Schedule 3.7(d)(ii) of the Disclosure Schedule, the Sellers have not in the past three (3) years received any written notice, or been subject to any proceeding, (i) with respect to any alleged infringement, misappropriation or other violation by the Sellers with respect to the Business of any Intellectual Property owned by any other Person or (ii) challenging the ownership, use, validity, patentability, registrability or enforceability of any Assigned Intellectual Property Assets. To Sellers' Knowledge, in the past three (3) years, no third party has infringed, misappropriated, or otherwise violated any Assigned Intellectual Property Assets.

(e)     The Sellers have taken commercially reasonable measures to protect and maintain the Assigned Intellectual Property Assets and have taken commercially reasonable steps to protect and maintain the confidentiality of the Trade Secrets and other material confidential information used in the conduct of the Business. No such Trade Secrets have been or authorized to be disclosed to any Person, other than in the Ordinary Course of Business pursuant to a written confidentiality and non-disclosure agreement with such Person with reasonable protections of, and preserving all rights of, the Sellers with respect to the Business or other obligation of confidentiality.

(f)     With respect to the Business, the Sellers maintain commercially reasonable policies and procedures regarding data security, data privacy, collection of data, data transfer, and the use of data, has commercially reasonable written agreements in place, or

otherwise has commercially reasonable safeguards in place, in each case to protect PII and confidential information in the Business' possession or control from unauthorized access by third Persons and to ensure that the operation of the Business (including with respect to employee matters) is in compliance in all material respects with all applicable Laws, with all applicable contractual commitments and privacy policies of the Sellers with respect to PII or privacy, security, or security breach notification requirements, and with any applicable industry standards to which the Business is subject (collectively, "<u>Data Security Requirements</u>"). The Sellers, with respect to the Business, and the conduct of the Business are and have been in compliance with all Data Security Requirements in all material respects. In the last three (3) years, with respect to the Business, there has been no (i) actual, suspected, or alleged (in writing) unauthorized access to or use, acquisition, destruction, damage, loss, corruption, unintended or improper disclosure, or breaches of the security of any PII or confidential information collected, maintained, or stored by or on behalf of the Sellers with respect to the Business or in the Sellers' possession or control, or any System, or (ii) written assertion, claim or other proceeding that has given rise or may give rise to any liability under applicable Laws or industry regulation in relation to data protection, data security, or data privacy for PII or other Data Security Requirement. With respect to the Business, the Sellers have not been subject to any external investigations or audits concerning any Data Security Requirement.

(g)     All Systems are (i) free from any material defect, bug, virus, or programming, design, or documentation error or corruptant or other software routines or hardware components that permit unauthorized access or the unauthorized disablement or erasure of such Systems, (ii) in sufficiently good working condition to effectively perform all information technology operations as currently conducted, and (iii) sufficient for the current needs of the Business. The Sellers own or have valid, enforceable and sufficient rights to use all Systems and have complied in all material respects with the terms and conditions of the agreements corresponding to such Systems. The Sellers have taken commercially reasonable actions to protect the confidentiality, security and integrity of these Systems, has implemented and maintained commercially reasonable back-up, disaster recovery and business continuity procedures for the Systems, and acted in compliance therewith. In the past three (3) years, there have been no failures, breakdowns or continued substandard performance of any Systems that have caused any material disruption or material interruption in or to the use of the Systems or the operation of the Business.

**Section 3.8**     <u>Litigation</u>. Other than the Chapter 11 Cases, <u>Schedule 3.8 of the Disclosure Schedule</u> sets forth all unresolved material Litigation brought by or against any Seller in the past three (3) years with respect to the Business or any of the Purchased Assets, and to Sellers' Knowledge, there is no other material Litigation threatened before any Governmental Entity against any Seller which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Contemplated Transactions.

**Section 3.9**     <u>**Employees and Employment Matters**</u>.

28

(a)    No Seller is a party to or bound by any collective bargaining agreement or other Contract with any labor union, works council, or other labor organization, and no Current Employees are represented by any labor union, works council, or other labor organization with respect to their employment with Seller. There is no strike, walkout, work stoppage, lockout, picketing, handbilling, material labor grievance, labor arbitration, unfair labor practice charge, or other material labor dispute affecting any Seller with respect to the Business, and there has been no such dispute within the past three years. To Sellers' Knowledge, there is, and in the past three years there has been, no organizational effort made or threatened by or on behalf of any labor union with respect to the Current Employees or Former Employees.

(b)    Schedule 3.9(b) of the Disclosure Schedule sets forth an accurate list of all Current Employees.

(c)    Each Seller, with respect to the Business, is in compliance in all material respects with all Laws related to employment, employment practices, and labor, including all laws respecting terms and conditions of employment, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), immigration (including the completion of Forms I-9 for all employees and the proper confirmation of employee visas), discrimination, retaliation, harassment, disability rights and benefits, equal opportunity, plant closures and layoffs (including the WARN Act), employee trainings and notices, workers'' compensation, labor relations, employee leave issues, COVID-19, affirmative action, and unemployment insurance. No Seller, with respect to the Business, has any material Liability for (i) any unpaid wages, salaries, wage premiums, commissions, bonuses, fees, or other compensation to its current or former directors, officers, employees and independent contractors under applicable Law, Contract, or policy; and/or (ii) any fines, Taxes, interest, or other penalties for any failure to pay or delinquency in paying such compensation.

(d)    To the Sellers' Knowledge, no Current Employee, Former Employee, or current or former independent contractor of the Business is in any material respect in violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement, nonsolicitation agreement or other restrictive covenant obligation: (i) owed to any Seller; or (ii) owed to any third party with respect to such person's right to perform duties for or provide services to the Business.

(e)    Each Seller, with respect to the Business, has reasonably investigated all sexual harassment, or other harassment, discrimination or retaliation allegations against any of its officers, directors, employees, contractors and agents of which it is aware. With respect to each such allegation with potential merit, the applicable Seller has taken prompt corrective action that is reasonably calculated to prevent further improper action. No Seller reasonably expects any material Liabilities with respect to any such allegations and is not aware of any allegations relating to its officers, directors, employees, contractors, or agents, that, if known to the public, would bring the Business into material disrepute.

**Section 3.10    Employee Benefit Plans.**

(a)    Schedule 3.10 of the Disclosure Schedule lists each material Employee Benefit Plan. Any Employee Benefit Plan that is a Health and Welfare Plan is identified on Schedule 3.10 with an "*." With respect to each Employee Benefit Plan:

i.    no Employee Benefit Plan is intended to meet the requirements of a "qualified plan" under Section 401(a) of the IRC; and

ii.    Sellers have made available to Buyer copies of the current plan documents for all such Employee Benefit Plans.

(b)    Each Employee Benefit Plan has been established, funded, maintained and administered, in each case, in all material respects, in accordance with its terms and all applicable Laws. As of the Original Effective Date and the date hereof, there is no pending or, to Sellers' Knowledge, threatened, Litigation relating to the Employee Benefit Plans. All contributions, premiums and other payments with respect to any Employee Benefit Plan have been timely paid.

(c)    Neither the execution or delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement could, either alone or in combination with any other event: (i) result in the payment of any material compensation or benefits becoming due to any Current Employees or Former Employees under any Employee Benefit Plan or otherwise, (ii) accelerate the time of payment, vesting, or funding of, or materially increase the amount of, any compensation or benefits under any Employee Benefit Plan or otherwise, or (iii) limit or restrict the ability of Buyer to merge, amend or terminate any Employee Benefit Plan.

(d)    Neither the execution or delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement could, either alone or in combination with any other event, result in any payment that would constitute an "excess parachute payments" (within the meaning of Section 280G of the IRC).

(e)    Each Employee Benefit Plan that is subject to Section 409A of the IRC has been maintained and administered in material compliance in both form and operation with Section 409A of the IRC and the rules and regulations promulgated thereunder.

(f)    Sellers do not have any indemnity or gross-up obligation with respect to any Current Employees or Former Employees for any Taxes imposed under Sections 4999 or 409A of the IRC.

(g)    No Employee Benefit Plan is, and the Sellers do not have any Liability or obligation with respect to (i) any "defined benefit plan" (as defined in Section 3(35) of ERISA) or any other plan that is or was subject to Title IV of ERISA or Sections 412 or 430 of the IRC, (ii) any "multiemployer plan" (as defined in Section 3(37) of ERISA), (iii) "multiple employer plan" (within the meaning of Section 210 of ERISA or Section 413(c) of the IRC), or (iv) a "multiple employer welfare arrangement" (as such term is defined in Section 3(40) of ERISA). No Employee Benefit Plan provides for, and no Seller has

30

promised to provide, post-termination or retiree health or welfare benefits to any Person, other than as required by COBRA.

**Section 3.11    Real Property.**

(a)    Sellers do not own any real property, has never owned any real property, and is not party to any agreement or option to purchase any real property or interest therein.

(b)    Schedule 3.11(b) of the Disclosure Schedule sets forth the address of each Leased Real Property, and a true and complete list of all Leases (including dates and names of parties thereto) for such Leased Real Property. Sellers have made available to Buyer true and complete copies of such Leases, as amended through the date hereof.

(c)    Except as described on the Schedule 3.11(c): (a) Sellers have a valid leasehold or sub-leasehold (as applicable) interest in all Leased Real Property, free and clear of all Liens, other than Permitted Liens, (b) Seller is not in breach of, or default under, any Lease governing the Leased Real Property beyond the applicable cure period, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a breach or permit the termination, modification or acceleration of rent under such Lease, (c) Seller has not subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Property (or any portion thereof), (d) Seller has not collaterally assigned or granted any other security interest in such Leased Real Property or any interest therein, and (e) Seller's possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed, and there are no disputes with respect to any Lease.

(d)    The Leased Real property comprises all of the real property owned, leased, occupied or otherwise used in the operation of the Business, and all buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the Leased Real Property are in good condition and repair, free of any structural deficiencies or latent defects, and sufficient for the operation of the Business.

**Section 3.12    Permits**. Schedule 3.12 of the Disclosure Schedule contains a list of all material Permits that Sellers hold as of the Original Effective Date and as of the date hereof in connection with the operations of the Business. As of the Original Effective Date and as of the date hereof, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, except where a failure of this representation and warranty to be so true and correct could not reasonably be expected to have a Material Adverse Effect. To Sellers' Knowledge, all required filings with respect to the Assumed Permits have been made and all required applications for renewal thereof have been filed, except where a failure of this

representation and warranty to be so true and correct could not reasonably be expected to have a Material Adverse Effect.

**Section 3.13    <u>Environmental Matters</u>**. Except as set forth in <u>Schedule 3.13 of the Disclosure Schedule</u>:

(a)    Each Seller is, and has been during the prior two (2) years, in compliance in all material respects with all applicable Environmental Laws, which compliance has included obtaining, maintaining and complying in all material respects with all Permits required under applicable Environmental Laws that are material to the operations of the Business taken as a whole;

(b)    No Seller has received during the prior two (2) years written notice from any Governmental Entity or is currently subject to any Litigation regarding any actual or alleged violation of or Liability under Environmental Laws that is material to the Business taken as a whole;

(c)    No Seller has released, disposed of or arranged for the disposal of any Hazardous Substance, in each case so as has given or would reasonably be expected to give rise to Liability to any Seller or the Business under any Environmental Law, except for such release, disposal, arrangement or Liability that is not material to the Business taken as a whole; and

(d)    Sellers have made available to Buyer copies of all material environmental audits, assessments and reports in their possession relating to the Business and prepared during the prior two (2) years.

(e)    <u>Section 3.12</u> and this <u>Section 3.13</u> contain the sole and exclusive representations and warranties of Sellers with respect to any environmental, health or safety matters, including any arising under any Environmental Law or with respect to any Hazardous Substance.

**Section 3.14    <u>Brokers' Fees</u>**. Except for amounts due to Portage Point Partners LLC ("<u>Portage</u>"), no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated to pay.

**Section 3.15    <u>Tax Matters</u>**.

(a)    All Tax Returns required to be filed under applicable Law by Sellers with respect to the Purchased Assets have been filed and such Tax Returns are true, complete and correct, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    All Taxes shown as due from Sellers with respect to the Purchased Assets have been paid, except (i) to the extent nonpayment of which is permitted or required by the Bankruptcy Code or (ii) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 3.16** <u>**No Other Representations or Warranties**</u>. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>ARTICLE III</u> (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), NEITHER A SELLER NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY PURCHASED ASSET), THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>ARTICLE III</u> (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), EACH SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE PURCHASED ASSETS BY BUYER AFTER THE CLOSING), AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF ANY SELLER OR ANY OF THEIR AFFILIATES). THE DISCLOSURE OF ANY MATTER OR ITEM IN THE DISCLOSURE SCHEDULE SHALL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED OR IS MATERIAL OR THAT SUCH MATTER WOULD RESULT IN A MATERIAL ADVERSE EFFECT.

BUYER HAS PERFORMED AN INDEPENDENT INVESTIGATION, ANALYSIS, AND EVALUATION OF THE PURCHASED ASSETS.

THE PROVISIONS OF THIS <u>SECTION 3.15</u> SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows as of the Original Effective Date, as of the date hereof and as of the Closing Date:

**Section 4.1    Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2    Authorization of Transaction.**

(a)    Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)    The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)    This Agreement has been duly and validly executed and delivered by Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally-binding obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3    Noncontravention**. Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the assignments and assumptions referred to in Section 2.6) will (i) conflict with or result in a breach of the certificate of formation, operating agreement, or other organizational documents of Buyer, (ii) violate any Law to which Buyer is, or its assets or properties are subject, or (iii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (ii) or (iii), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements. Except in relation to the Chapter 11 Cases, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, Consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement or any of the Related Agreement, except where the failure to give notice, file or obtain such

34

authorization, Consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair to the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Related Agreements.

      **Section 4.4**   <u>**Litigation**</u>. There are no Litigation pending or, to Buyer's knowledge, threatened against or affecting Buyer that will adversely affect Buyer's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

      **Section 4.5**   <u>**Financial Capacity**</u>. Buyer is capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code in connection with the assignment of the Assumed Contracts and has delivered to Sellers a true, complete and correct copies, including all exhibits, schedules or amendments thereto, of the fully executed commitment letter, dated as of January 16, 2023, between Buyer and Kinderhook Capital Fund VI, L.P. (the "<u>Equity Commitment Source</u>") (as may be amended, modified, waived or replaced in accordance with the terms hereof, the "<u>Equity Commitment Letter</u>"), pursuant to which the Equity Commitment Source has committed, upon the terms and subject to the conditions set forth therein, to invest in Buyer the cash amounts set forth therein (the "<u>Equity Financing</u>"). As of the Original Effective Date and as of the date of this Agreement, the commitments contained in the Equity Commitment Letter have not been withdrawn, terminated or rescinded in any respect. The Equity Commitment Letter is in full force and effect against Buyer and, to the knowledge of Buyer, each of the other parties thereto as of the Original Effective Date and as of the date of this Agreement, and is a legal, valid and binding obligation of Buyer and, to the knowledge of Buyer, each of the other parties thereto. There are no conditions precedent or other contractual contingencies between Buyer and the Equity Commitment Source related to the funding of the full amount of the Equity Financing, other than as expressly set forth in the Equity Commitment Letter. The proceeds to be disbursed pursuant to the agreements contemplated by the Equity Commitment Letter will be sufficient to fund all of the amounts required to be provided by Buyer for the consummation of the transactions contemplated hereby at or prior to Closing. As of the Original Effective Date and as of the date hereof, assuming the satisfaction of the conditions set forth in Article VII, (i) no event has occurred that would result in any breach or violation of or constitute a default (or an event that with notice or lapse of time or both would become a default) by Buyer under the Equity Commitment Letter, and (ii) Buyer does not have any reason to believe that any of the conditions of the Equity Financing will not be satisfied or that the Equity Financing will not be available to Buyer on the Closing Date. Buyer acknowledges that its obligations hereunder are not subject to any conditions regarding Buyer's or any other Person's ability to obtain financing for the consummation of this Agreement and the other transactions contemplated by this Agreement. As of the Closing and immediately after consummating the transactions contemplated by this Agreement (including the Equity Financing), Buyer will not, assuming the accuracy of the Sellers' representations and warranties under this Agreement, (a) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the present fair value of its assets will be less than the amount required to pay its Liability on its debts as they become absolute and matured), (b) have unreasonably small capital with which to engage in its business, or (c) have incurred or plan to incur debts beyond its ability to repay such debts as they become absolute and matured.

      **Section 4.6**   <u>**Good Faith Purchaser**</u>. Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder. Buyer is entitled to the protections

of section 363(m) of the Bankruptcy Code with respect to all of the Purchased Assets. Buyer has negotiated and entered into this Agreement in good faith and without any improper conduct, including collusion or fraud of any kind.

       **Section 4.7**   **Brokers' Fees**. Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated to pay.

       **Section 4.8**   **No Outside Reliance**. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Buyer acknowledges and agrees, on its own behalf and on behalf of Buyer Group, that the representations and warranties made by the Sellers to Buyer in Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive representations, warranties, and statements of any kind made to Buyer or any member of Buyer Group and on which Buyer and Buyer Group may rely in connection with the transactions contemplated by this Agreement. Buyer acknowledges and agrees, on its own behalf and on behalf of Buyer Group, that all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations), including in the Confidential Information Memorandum prepared by Portage (the "Information Presentation"), that certain datasite established by the Sellers (the "Dataroom"), or any Projections, meetings, calls or correspondence with management of Sellers and their Representatives, or any other Person on behalf of Sellers or any of their respective Affiliates or Representatives, and (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, and prospects of Sellers, or the quality, quantity or condition of Sellers' assets, are, in each case, specifically disclaimed by Sellers and that neither Buyer nor any member of Buyer Group has relied on any such representations, warranties or statements. Buyer acknowledges, on its own behalf and on behalf of Buyer Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, Liabilities, properties, Contracts and prospects of Sellers, and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the results of Buyer Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any Seller, the Information Presentation, any information, statements, disclosures, documents, Projections, forecasts or other material made available to Buyer or any of its Affiliates or Representatives in the Dataroom or otherwise, Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or Sellers or any of their respective Affiliates or Representatives, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Buyer and Buyer Group have relied only on the Express Representations). Buyer will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS."

## ARTICLE V
## PRE CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Original Effective Date and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1    Certain Efforts; Cooperation.**

(a)    Subject to the terms and conditions of this Agreement, each of the Parties shall use its commercially reasonable efforts, subject to the orders of the Bankruptcy Court, to make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in Article VII), except as otherwise provided in Section 5.2; provided, however, Sellers shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Chapter 11 Cases (including, soliciting higher or better offers for the Purchased Assets in any Auction).

(b)    On and after the Closing, Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Sellers and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to more effectively vest in Buyer all of Sellers' right, title and interest to the Purchased Assets, free and clear of all Liens (other than Permitted Liens expressly contemplated by the Sale Order); provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

**Section 5.2    Notices and Consents.**

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

(b)    Sellers and Buyer shall cooperate with one another (i) in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and (ii) in promptly making any such filings, furnishing information required in connection therewith and seeking to timely obtain any such consents, permits, authorizations, approvals or waivers; provided, however, that (A) Sellers shall not incur any costs associated with the obligations hereunder and (B) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed.

**Section 5.3    Bankruptcy Actions.**

(a)      Sellers have commenced the Chapter 11 Cases.

(b)      The Sellers shall have filed the Sale Motion, which motion shall seek the Bankruptcy Court's: (i) entry of the Bid Procedures Order, and (ii) the Sale Hearing to be held no later than March 20, 2023 that provides the parties, inter alia, consummate the Closing as soon as practicable after the entry of the Sale Order and no later than three (3) days following the entry of the Sale Order, subject to the satisfaction of all conditions to the obligations of Sellers and Buyer as set forth in Article VII (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions).

(c)      Sellers, to the extent practicable, will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the transactions contemplated by this Agreement prepared by Sellers or any Affiliates (including forms of orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Cases. All motions, applications, and supporting papers prepared by Sellers and relating to the transactions contemplated by this Agreement to be filed on behalf of Sellers after the Original Effective Date must be reasonably satisfactory in form and substance to Buyer.

(d)      Buyer shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(e)      Each of Buyer and Sellers will promptly take such actions as are reasonably requested by the other party to assist in obtaining entry of the Sale Order and the Bid Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Sellers of their obligations under this Agreement and the Related Agreements and demonstrating that Buyer is a good faith buyer under section 363(m) of the Bankruptcy Code.

(f)      Pursuant to the terms of the proposed Bid Procedures Order, Buyer shall provide information to the Sellers to be disseminated to counterparties to Assumed Contracts, sufficient to satisfy a finding of adequate assurance of future performance as required in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

(g)      Pursuant to the terms of the proposed Bid Procedures Order, Sellers will solicit bids from other prospective purchasers for the sale of all or substantially all of the Purchased Assets on terms and conditions substantially the same in all respects to this Agreement (or more favorable terms to Sellers) in accordance with the procedures set forth in the proposed Bid Procedures Order.

(h)      Sellers shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens in the Purchased Assets, all parties to

the Assumed Contracts and all Taxing authorities in jurisdictions applicable to Sellers and as otherwise required by the Bankruptcy Code and bankruptcy rules.

(i)      Sellers shall file with the Bankruptcy Court and serve a cure notice (the "Cure Notice") by first class mail on all non-debtor counterparties to all Non-Real Property Contracts and Leases as required by the Bid Procedures Order and provide a copy of the same to Buyer.

**Section 5.4    Conduct of Business**. Until the earlier of the termination of this Agreement and the Closing, subject to the terms and conditions of the DIP Credit Agreement or use of cash collateral and any DIP Budget (as defined in the Financing Orders), and except as expressly contemplated by this Agreement or as set forth on Section 5.4 attached hereto, or required under the Bankruptcy Code or other applicable Law and except to the extent waived by Buyer's prior written consent (such consent not to be unreasonably withheld, conditioned, delayed or denied) and except with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed):

(a)      Sellers shall use commercially reasonable efforts to maintain, preserve and protect all of the Purchased Assets in the condition in which they existed on the Original Effective Date, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business;

(b)      Sellers shall use commercially reasonable efforts not to take, or agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(c)      Except as permitted by this Agreement, no Seller shall, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Purchased Assets other than in the Ordinary Course of Business;

(d)      No Seller shall, directly or indirectly, permit, offer, agree or commit to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien or Claim except for Permitted Liens;

(e)      No Seller shall assume, reject or assign any Contract that may become an Assumed Contract other than through the assumption and assignment of the Assumed Contracts, as contemplated by this Agreement, to Buyer (or to a third party in connection with an Alternative Transaction);

(f)      No Seller shall enter into new Contracts other than in the Ordinary Course of Business or amend in a way that is materially adverse to the Business, voluntarily terminate or cancel any Contracts (other than any non-renewal expiration of such Contract according to such Contract's terms);

(g)     Sellers shall make all post-petition payments related to Assumed Contracts (other than Cure Amounts) that become or became due or payable pursuant to the terms thereof to the extent provided in the budget contained in any cash collateral or debtor-in-possession financing orders of the Bankruptcy Court;

(h)     Sellers shall comply in all material respects with all material Laws applicable to them or having jurisdiction over the Business or any Purchased Asset;

(i)     No Seller shall, directly or indirectly, cancel, forgive or compromise any material debt or claim or waive or release any material right of any Seller, in each case that constitutes a Purchased Asset;

(j)     No Seller shall (i) establish, adopt, amend or terminate any Employee Benefit Plan or any other plan, program, policy, agreement or arrangement that would be an Employee Benefit Plan if it were in existence as of the date hereof, (ii) increase or decrease the compensation or benefits payable or provided to, or to become payable or be provided to, any Current Employees or Former Employees, (iii) grant, promise or announce any severance, equity or equity-based incentive compensation or bonus (including any retention, transaction or change in control bonus) or (iv) accelerate the time of vesting, funding or payment of any compensation or benefit under any Employee Benefit Plan or otherwise;

(k)     No Seller shall negotiate, modify, extend or enter into any collective bargaining agreement or other Contract with any labor union, works council, or other labor organization or recognize or certify any labor union, labor organization, works council or group of employees as the bargaining representative for any employees of the Sellers;

(l)     No Seller shall implement or announce any employee layoffs, plant closings, reductions in force, furloughs, temporary layoffs or other such actions that could implicate the WARN Act;

(m)     No Seller shall hire, engage, terminate (without cause), furlough or temporarily lay off any employee or independent contractor;

(n)     No Seller shall waive or release, in writing, any non-competition, non-solicitation, non-disclosure, non-interference, non-disparagement or other restrictive covenant obligation of any Current Employee or Former Employee;

(o)     No Seller shall (i) sell, assign, transfer, abandon, license, allow to lapse or expire or dispose of any Assigned Intellectual Property Asset in any material respect and (ii) disclose any confidential information to any Person other than in the Ordinary Course of Business in circumstances involving reasonable and customary confidentiality restrictions;

(p)     Sellers shall maintain in full force and effect each Assumed Permit held by any Seller as of the Original Effective Date or otherwise obtained by any Seller prior to the Closing (to the extent that such maintenance does not require the Sellers to incur any costs or make any payments), and shall comply with the terms of each such Permit and no Seller

40

shall permit any such Permit to terminate, expire or lapse other than in the Ordinary Course of Business;

(q)    Sellers shall (i) conduct the Business in the Ordinary Course of Business, (ii) use commercially reasonable efforts to preserve the existing business organization and keep management of the Business intact, (iii) use commercially reasonable efforts to keep available the services of the Current Employees, and use commercially reasonable efforts to maintain the existing relations with customers, carriers, suppliers, creditors, business partners, Current Employees and others having business dealings with the Business, to the extent reasonably feasible; and

(r)    Sellers shall not extend the Bid Deadline without prior consent of Buyer.

Nothing contained in this Agreement is intended to give Buyer or its Affiliates, directly or indirectly, the right to control or direct the business of Sellers prior to the Closing.

**Section 5.5    Notice of Developments**. From the Original Effective Date until the Closing Date, each of the Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any material failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.5 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement if such party objects to the disclosures contained in such notice within five (5) days of receipt of such notice.

**Section 5.6    Access.**

(a)    Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access during normal business hours, subject to the terms of Leases and in a manner so as not to interfere unreasonably with the normal business operations of Sellers, to all premises, properties, personnel, Records and Contracts related to the Business, in each case, for the sole purpose of evaluating the Business; provided, however, that, for avoidance of doubt, (i) the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law, and (ii) Buyer shall not be permitted to conduct any sampling, monitoring or other surface, subsurface or invasive investigation, assessment or analysis of soil, groundwater, indoor or ambient air, building materials or other environmental media of the sort generally referred to as a Phase II environmental investigation.

(b)    Buyer will not, and will not permit any member of Buyer Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, noteholder or other material business relation of Sellers prior to the Closing with respect

41

to Sellers, the Business or the transactions contemplated by this Agreement without the prior consent of Sellers for each such contact.

(c)     All information obtained pursuant to this <u>Section 5.6</u> shall be subject to the terms and conditions of the confidentiality obligations contained herein.

**Section 5.7     Press Releases and Public Announcements**. After notice to and consultation with Buyer, Sellers shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, parties in interest in the Chapter 11 Cases and other Persons bidding on assets of Sellers. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), no Party shall issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior written consent of the other Parties, which shall not be unreasonably withheld or delayed; provided, however, (i) Sellers, without the prior consent of Buyer, may (A) issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law or any Governmental Entity with competent jurisdiction and (B) communicate with its and its Affiliates' investors and potential investors relating to the transactions contemplated by this Agreement and (ii) Buyer and its Affiliates, without the prior consent of Sellers, are permitted to report and disclose the status of this Agreement and the transactions contemplated hereby and the financial return and other financial performance or statistical information regarding Buyer's investment to their direct and indirect limited partners and prospective limited partners in connection with fundraising, marketing, information or reporting activities of the kind customarily provided with respect to investments of this kind, in each case, only to Persons who are subject to customary confidentiality restrictions with respect to such information.

**Section 5.8     Bulk Transfer Laws**. Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and hereby waives all claims related to the noncompliance therewith. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens on the Purchased Assets (other than Permitted Liens), including any Liens arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**Section 5.9     Establishment of Litigation Trust**.

(a)     Upon Closing, Sellers shall establish the Litigation Trust, pursuant to the Litigation Trust Agreement, which shall be funded with the Litigation Trust Funding Amount. The Litigation Trust Agreement may not be amended, changed, or altered without prior written consent of Buyer. The Litigation Trust Agreement and form of Litigation Trust Note are to be mutually agreed upon by Sellers and Buyer, in consultation with counsel to the Committee, and filed with the Bankruptcy Court at least five (5) days prior to the Closing.

(b)     The Litigation Trustee shall retain professionals for the Litigation Trust in his sole discretion. The Litigation Trust Agreement shall establish an oversight committee (the "<u>Oversight Committee</u>") that shall initially be comprised of three (3) members: one

(1) selected by the Committee, one (1) selected by the Sellers, and one (1) independent member selected by Buyer and such members shall be designated prior to the Closing. If Sellers and the Committee cannot agree on the independent member to be appointed to the Oversight Committee prior to the Closing, such member shall be selected by the Litigation Trustee in his sole discretion. The Oversight Committee members shall be disclosed concurrently with the filing of the Litigation Trust Agreement and Litigation Trust Note with the Bankruptcy Court at least (5) days prior to the Closing.

(c)    The Litigation Trust shall be assigned only the Excluded Claims. For the avoidance of doubt, (i) the Litigation Trust shall not be assigned (and will not in the future be assigned), and shall not be authorized to bring, any claims or causes of action of any nature other than the Excluded Claims and (ii) the Excluded Claims shall not include (A) any claims or causes of action against Buyer, any Buyer Affiliate, or any Buyer-related party other than as assigned to the Litigation Trust in Buyer's sole discretion, (B) any claims or causes of action of any nature against Rick Canas, Paul Gift and Ron Lackey, or (C) any direct claims of Buyer.  Richard Godfrey, Todd Gentry and Christopher Harris shall not be construed as Buyer Affiliates or Buyer-related parties.

(d)    The following claims shall be allowed against the Litigation Trust or Sellers, as applicable: (i) Buyer's allowed secured claim arising under the Litigation Trust Note, which shall be paid from litigation recoveries first after payment of professional fees and reasonable and documented out of pocket expenses of the Litigation Trust ("Buyer Litigation Trust Note Claim"); provided, for the avoidance of doubt, no general unsecured claims shall be paid unless and until the Buyer Litigation Trust Note Claim is paid in full; (ii) the allowed One Million Dollars ($1,000,000) general unsecured claim of Buyer to be paid pro rata with other general unsecured claims ("Buyer GUC Claim"), provided, the Buyer GUC Claim shall be deemed allowed against the Sellers or the Litigation Trust, as applicable; and (iii) the allowed Forty Five Million Dollars ($45,000,000) claim on account of any common stock, preferred stock, warrants, or other ownership interest of or in PPG Investor that are issued and outstanding as of the Petition Date, which shall be deemed allowed and shall be paid in full  (including any and all interest required by law to be paid on such claim) following payment in full of allowed general unsecured claims (including any and all interest required by law to be paid on account of such claims) ("Buyer Equity Claim").

(e)    For the avoidance of doubt, the Sellers do not waive and shall assign to the Litigation Trust, the Excluded Claims. In no event shall the Litigation Trust be assigned or authorized to bring any claim or cause of action that is released pursuant to the Debtor Release, and the Sellers stipulate and agree that no party has been, or will be, granted standing to prosecute claims or causes of action that are subject to the Debtor Release.

(f)    The Sale Order shall provide for the assignment of all insurance policies of the Sellers that are relevant to the Litigation Trust's prosecution of retained causes of action, including the Sellers' director & officer liability policies, but excluding the representation and warranty coverage under the Representations and Warranties Insurance Policy, which is a Purchased Asset.

(g)     Sellers and Buyer acknowledge that no general unsecured claims shall be paid unless and until the Litigation Trust Note Claim is paid in full.  Following payment in full of the Litigation Trust Note Claim, the Litigation Recovery Proceeds shall be split equally, with 50% payable to Buyer and 50% payable to the Litigation Trust.

**Section 5.10    Covenants of Buyer and Seller.**

(a)     For so long as the Litigation Trust is in place and in effect, Sellers shall preserve all records relevant to potential causes of action assigned to the Litigation Trust and reasonably cooperate with the Committee and/or the Litigation Trustee, as applicable, to produce relevant documents and information as requested.

(b)     For so long as the Litigation Trust is in place and in effect, Buyer shall preserve all records relevant to potential causes of action assigned to the Litigation Trust and reasonably cooperate with the Litigation Trustee to produce relevant documents and information as requested. Buyer shall not affirmatively pursue any direct claims of Buyer against Richard Godfrey, Todd Gentry, and Christopher Hunter and Affiliated entities.

**ARTICLE VI**
**OTHER COVENANTS**

The Parties agree as follows with respect to the period from and after the Closing, provided that (i) Sellers shall not incur any costs associated with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed or dismissed:

**Section 6.1    Cooperation**. Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions, including regarding the transfer, assignment or revocation and reissuance of the Assumed Permits.

**Section 6.2    Further Assurances**. In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the Sale Order, at any Party's request and sole cost and expense, each Party shall take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discovers any additional assets or properties which the Parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discovers any assets or properties which the Parties mutually agree should

have been retained by Sellers as Excluded Assets, Buyer and Sellers shall cooperate and execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Sellers. If any Seller, Buyer or any of their respective Subsidiaries, from time to time, identifies any Assumed Liability that was not transferred to Buyer, or any Excluded Liability that was transferred to Buyer, Sellers and Buyer shall use their commercially reasonable efforts to transfer those Liabilities to the correct Party as promptly as reasonably practicable after Closing.

**Section 6.3** <u>**Availability of Business Records**</u>. From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Purchased Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for any Seller (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) five (5) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases, or (iv) in the case of Records related to Taxes, the expiration of the statute of limitation applicable to such Taxes. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain originals or copies of all Records included in the Purchased Assets for periods prior to the Closing.  With respect to any Litigation and claims that are Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending or prosecuting such Litigation or claim and shall make available to Sellers such personnel as are most knowledgeable about the matter in question, at Sellers' cost and expense. Without limitation of any of the foregoing, such assistance by Buyer to Sellers shall include reasonable assistance to Sellers by the Transferred Employees after the Closing with respect to the wind down of the Chapter 11 Cases, which shall include during the pendency of the Chapter 11 Cases, maintaining the accounting infrastructure and reporting and filings that are required to be filed with the Bankruptcy Court.

**Section 6.4** <u>**Employee Matters**</u>.

(a)    Effective as of (and contingent upon the occurrence of) the Closing Date, Buyer shall offer (or cause a designee of Buyer to offer) employment to each Current Employee that Buyer, in its sole discretion, desires to employ, with employment commencing as of the Closing Date. For purposes of this Agreement, each Current Employee who receives such an offer of employment shall be collectively referred to as an "<u>Offeree</u>." Sellers shall, regardless of whether such an offer is accepted, terminate the employment of each Offeree. On the Closing Date, Buyer will provide Sellers with a schedule setting forth a list of the names of all Offerees. Each Offeree who (A) is an employee of Sellers immediately prior to the Closing, (B) accepts such offer of employment, and (C) actually commences employment with Buyer or one of its Affiliates immediately following the Closing shall be referred to herein as a "<u>Transferred Employee</u>." Except to the extent Sellers fail to comply in any material respects with <u>Section 6.4(d)ii</u>, Buyer hereby agrees that the written offer to an Offeree shall include a level of base salary, wages, annual bonus opportunities and benefits (excluding any defined benefit pension, equity or equity-based, nonqualified deferred compensation, or post-termination or retiree

health or welfare benefits or compensation (together, the "<u>Excluded Benefits and Compensation</u>") that are substantially comparable in the aggregate to the base salary, wages, annual bonus opportunities and benefits (excluding any Excluded Benefits and Compensation) provided to such Offeree by Sellers immediately prior to the Closing Date.

(b)    Each Current Employee of Sellers who is not a Transferred Employee shall be referred to herein as an "<u>Excluded Employee</u>."  For the avoidance of doubt, Sellers shall be solely responsible for all Liabilities related to any Former Employee and Excluded Employee (whether accruing prior to, on, or following the Closing Date).

(c)    To the extent required by applicable Law, and in the time frame required by applicable Law, Seller shall pay out all paid time off accrued but not used by Transferred Employees and Excluded Employees through the Closing Date ("<u>Accrued PTO</u>"). In the event that such Accrued PTO is not required by applicable Law to be paid out by Seller to a Transferred Employee upon termination of employment with Sellers, such Accrued PTO shall be rolled over to Buyer (or one of its Affiliates) as of the Closing Date.

(d)    Buyer shall indemnify and hold each Seller and its Representatives harmless from and against all claims, demands, penalties, losses, Liability or damage arising from or relating to the Buyer's discriminatory or otherwise unlawful decision not to hire any Current Employee (but for the avoidance of doubt, not for any Seller's severance, notice or WARN Act obligations, or other Liabilities with respect to Excluded Employees).

(e)    Following the Closing:

i.    Sellers shall not, nor shall any Seller authorize or direct or give express permission to any Affiliate, officer, director or employee of any Seller or any Affiliate, to (A) interfere with Buyer's or its Representatives' rights under <u>Section 6.4(a)</u> to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment;

ii.    Sellers shall provide reasonable cooperation and information to Buyer or the relevant Representative as reasonably requested by Buyer or such Representative with respect to its determination of terms and conditions of employment for any Offeree;

iii.    Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits that are due and payable on or prior to the Closing Date with respect to all Current Employees and Former Employees of Sellers. Seller shall withhold and remit all applicable payroll taxes as required by Law on the Closing Date with respect to all Current Employees and Former Employees of Sellers as of such date; and this Section shall be binding upon and inure solely to the benefit of each of the Parties to this Agreement, and nothing in this Section, express or implied, shall confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Section; and

iv.    Buyer shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that accrue after the Closing Date with respect

to all Transferred Employees. Buyer shall withhold and remit all applicable payroll taxes as required by Law after the Closing Date with respect to Transferred Employees. In addition, Buyer shall (or shall cause its designee to) process all employee and Tax reporting covering the Closing Date in connection with the Excluded Employees and the Transferred Employees that will be required to be prepared and delivered after the Closing; provided, that the foregoing shall not be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring, Buyer to continue any specific employee benefit plan or to continue the employment (or any particular term or condition of employment) of any specific Person. Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Buyer, any of its Affiliates or any of Sellers' Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the Parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

v.    Notwithstanding the terms of any noncompetition, non-solicit or other restrictive covenant obligation between the Seller and an Offeree, such Offeree shall be permitted to provide services to Buyer and its Affiliates following the Closing, and Sellers will not seek to enforce the terms of any such restrictive covenant following the Closing with respect to such Offeree's services to Buyer and its Affiliates.

**Section 6.5    Reserved**.

**Section 6.6    Transfer Taxes**. To the extent not exempt under section 1146 of the Bankruptcy Code, Buyer shall pay any and all sales, use, stamp, documentary, registration, transfer (including real estate transfer tax), stock transfer, registration, gross receipts, duty, securities transactions, stamp, documentary, registration, transfer, added value or similar Tax (each, a "Transfer Tax") imposed under any applicable Law in connection with the transactions contemplated by this Agreement, regardless of the Person liable for such Transfer Taxes under applicable Law. Sellers and Buyer shall cooperate to prepare any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence. The Party that is responsible under applicable law to file such Tax Returns shall timely file such returns.

**Section 6.7    Wage Reporting**. Buyer and Sellers agree to utilize, or cause their respective Affiliates to utilize, the standard procedure set forth in Internal Revenue Service Revenue Procedure 2004-53 with respect to wage reporting.

**Section 6.8    Acknowledgements**.

(a)    Buyer acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, financial condition, results of operations, assets, Liabilities,

properties, Contracts and prospects of Sellers and the Purchased Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer and Buyer Group have relied solely on the results of Buyer Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any Sellers, the Information Presentation, any information, statements, disclosures, documents, Projections, forecasts or other material made available to Buyer or any of its Affiliates or Representatives in the Dataroom, Projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Buyer and Buyer Group have relied only on the Express Representations). Buyer acknowledges and agrees, on its own behalf and on behalf of Buyer Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Buyer or any member of Buyer Group and on which Buyer or any member of Buyer Group may rely in connection with the transactions contemplated by this Agreement; and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (1) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Information Presentation, the Dataroom, Projections, meetings, calls or correspondence with management of Sellers or any other Person on behalf of Sellers or any of their respective Affiliates or Representatives and (2) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, and prospects of Sellers, or the quality, quantity or condition of Sellers' assets, are, in each case, specifically disclaimed by Sellers. Buyer, on its own behalf and on behalf of Buyer Group: (x) disclaims reliance on the items in clause (ii) in the immediately preceding sentence and (y) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in clause (i) in the immediately preceding sentence. Without limiting the generality of the foregoing, Buyer acknowledges and agrees, on its own behalf and on behalf of Buyer Group, that neither Sellers nor any other Person, has made, is making or is authorized to make, and Buyer, on its own behalf and on behalf of Buyer Group, hereby waive, all rights and claims it or they may have against any Seller with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (A) any potentially material information regarding the Sellers or any of their respective assets (including the Purchased Assets), Liabilities (including the Assumed Liabilities) or operations and (B) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of Sellers' business, operations, assets, Liabilities, prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by Buyer Group of Sellers, Buyer and the members of Buyer Group, and the Representatives of each of the foregoing, have received or may receive, from or on behalf of Sellers, certain projections, forward-looking statements, and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, the Dataroom, management meetings, etc.) (collectively, "Projections"). Buyer acknowledges

and agrees, on its own behalf and on behalf of Buyer Group, that (i) such Projections are being provided solely for the convenience of Buyer to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Buyer is familiar with such uncertainties, and (iv) Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)     Buyer acknowledges and agrees, on its own behalf and on behalf of Buyer Group, that it will not assert, institute, or maintain, and will cause each member of Buyer Group not to assert, institute or maintain, any Litigation that makes any claim contrary to the agreements and covenants set forth in this Section 6.8, including any such action with respect to the distribution to Buyer or any member of Buyer Group, or Buyer's or any member of Buyer Group's use, of the Information Presentation, the Dataroom, Projections, or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by Sellers or any failure of any of the foregoing to disclose any information.

Section 6.9     **Insurance Policies**. Buyer acknowledges that, upon Closing, all insurance coverage provided in relation to Sellers and the Purchased Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyer and the Purchased Assets and no further coverage shall be available to Buyer or the Purchased Assets under any such policies.

Section 6.10     **Collection of Accounts Receivable**.

(a)     As of the Closing Date, each Seller hereby (i) authorizes Buyer to open any and all mail addressed to any Seller relating to the Business or the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer if received on or after the Closing Date and (ii) appoints Buyer or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or Sellers' order, for Buyer's own account.

(b)     As of the Closing Date, each Seller agrees that any monies, checks or negotiable instruments received by any Seller after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, shall be held in trust by such Seller for Buyer's benefit and account, and promptly upon receipt by a Seller of any such payment (but in any event within five (5) Business Days of such receipt), such Seller shall pay over to Buyer or its designee the amount of such payments. In addition, Buyer agrees that, after the Closing, it shall hold and shall promptly transfer and deliver to Sellers, from time to time as and when received by Buyer or its Affiliates, any cash, checks with appropriate endorsements, or other property that Buyer or its Affiliates may receive on or after the Closing which properly belongs to Sellers hereunder, including any Excluded Assets.

49

(c)     As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by Buyer after the Closing.

**Section 6.11     Data Privacy Protection**. Buyer acknowledges that the Purchased Assets include personally identifiable information ("PII") within the meaning of section 363(b) of the Bankruptcy Code, along with associated personal information about the Sellers' customers. In connection with the same, Buyer agrees to: (i) employ security controls and procedures (technical, operational and managerial) designed to protect PII and personal information, (ii) abide by all applicable Laws and regulations, in all material respects, with respect to PII and (iii) take such further actions with respect to PII as may be agreed between the Parties. Buyer agrees that it shall, absent a customer's express consent received after adequate notice: (a) abide by the Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date, (b) respect prior requests of customers to opt out of receipt of marketing messages (to the extent Sellers make Buyer aware of such requests), and (c) use personal information only for the purposes of continuing Business operations and continuing to provide similar goods and services to customers, including marketing the products and services related to Purchased Assets consistent with the foregoing. Buyer shall require express consent of a customer for any unapproved use of PII or personal information or before making material changes to the privacy policies that weaken a customer's consumer protection.

**Section 6.12     Alternative Transactions**.  Notwithstanding any provision herein to the contrary, nothing in this Agreement shall restrict Sellers' right to pursue one or more Alternative Transactions, including but not limited to marketing the Sellers' assets or providing due diligence materials. In the event of any Alternative Transaction, the obligations under the Prepetition First Lien Credit Agreement (as defined in the Financing Orders) shall be repaid in full in connection therewith.

**Section 6.13     Covenant Not to Sue**. Buyer hereby covenants and agrees that it shall not bring suit or otherwise assert any claims against Sellers' current or former officers and directors or any Excluded Claims. Buyer further covenants and agrees that it shall not assign the Excluded Claims to any third party.

**Section 6.14     Certain Tax Matters**. Buyer and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and, at no cost or expense to the cooperating Party, in any action, audit, litigation, or other proceeding with respect to Taxes.

**Section 6.15     Confidentiality**.

(a)     Each Recipient shall treat confidentially and not disclose, other than as expressly contemplated by this Agreement, any Confidential Information of a Discloser, except that the Recipient shall be at liberty to disclose the Confidential Information of a Discloser (i) to the Recipient's Representatives; provided, that such Representatives acknowledge the existence of these confidentiality obligations and agree to be bound thereby and; provided, further, that the Recipient shall not disclose Confidential Information of a Discloser to its Representatives that are direct or indirect competitors of

such Discloser, and (ii) to any court of competent jurisdiction, to the extent required; provided, that the foregoing obligations of Buyer shall automatically terminate at the Closing and be of no further force or effect; provided, further, that, after the Original Effective Date, Buyer and its Representatives may provide customary information to rating agencies, potential lenders to the extent such rating agencies and potential lenders are made aware of the confidential nature of such information.

(b)    A Recipient may disclose Confidential Information only to those of its Representatives who need to know such Confidential Information for the purpose of implementing the transactions contemplated by this Agreement. No Recipient shall use, nor permit its Representatives to use, Confidential Information for any other purpose nor in any way that is, directly or indirectly, detrimental to the applicable Discloser.

(c)    If a Recipient or any of its Representatives receives a request or is legally required to disclose all or any part of the Confidential Information of a Discloser, such Recipient shall (i) immediately notify the Discloser of the request or requirement, (ii) consult with the Discloser on the advisability of taking legally available steps to resist or narrow the request or lawfully avoid the requirement, and (iii) if requested by the Discloser, take all necessary steps to seek a protective order or other appropriate remedy. If a protective order or other remedy is not available, or if the Discloser waives compliance with the provisions of this Section 6.15(c), (A) the Recipient receiving the request for disclosure or its Representatives, as the case may be, may disclose to the Person requiring disclosure only that portion of the Confidential Information which such Recipient is advised by written opinion of counsel is legally required to be disclosed, and (B) such Recipient shall not be liable for such disclosure unless such disclosure was caused by or resulted from a previous disclosure by such Recipient or its Representatives not permitted by this Agreement.

(d)    Following the termination of this Agreement in accordance with the provisions of this Agreement, each Recipient shall (and shall cause each of its Representatives to) (i) return promptly to the Discloser all physical copies of the Confidential Information of the Discloser, excluding Notes, then in such Recipient's possession or in the possession of its Representatives, (ii) destroy all (A) electronic copies of such Confidential Information, and (B) Notes (including electronic copies thereof) prepared by such Recipient or any of its Representatives, in a manner that ensures the same may not be retrieved or undeleted by such Recipient or any of its Representatives, and (iii) deliver to the Discloser a certificate executed by one of the Recipient's duly authorized officers indicating that the requirements of this Section 6.15(d) have been satisfied in full.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1    Conditions to Buyer's Obligations**.    Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)     as of the Original Effective Date, as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in <u>Section 3.1</u>, <u>Section 3.2</u> or <u>Section 3.3</u> shall be true and correct in all respects other than de minimis exceptions, and (ii) each other representation or warranty set forth in <u>Article III</u> shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; <u>provided, however</u>, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)     Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by <u>Section 2.8(a)</u> to be delivered to Buyer (or tendered subject only to Closing);

(c)     no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)     the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal;

(e)     from the date of this Agreement until the Closing Date, Sellers shall have maintained a supply of Inventory necessary for operation in the Ordinary Course of Business and the Assumed Contracts shall provide for the reasonable continuation of such supply from and after the Closing;

(f)     Buyer shall have consented to all Assumed Contracts and any Non-Real Property Contract or Lease that is excluded and rejected by Seller pursuant to <u>Section 2.6</u>; and

(g)     Sellers shall have delivered a certificate from an authorized officer of Sellers to the effect that each of the conditions specified in <u>Section 7.1(a)</u>, <u>Section 7.1(b)</u> and <u>Section 7.1(e)</u> has been satisfied.

**Section 7.2     <u>Conditions to Sellers' Obligations</u>**. Subject to <u>Section 7.3</u>, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)     as of the Original Effective Date, as of the date hereof and as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in <u>Section 4.1</u>, <u>Section 4.2</u> or <u>Section 4.3</u> shall be true and correct in all respects other than de minimis exceptions, and (ii) each other representation or warranty set forth in <u>Article IV</u> shall be true and correct in all material respects, except where the failure of

such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or by any Related Agreement; <u>provided, however</u>, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

    (b)    Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by <u>Section 2.8(b)</u> to be delivered to Sellers (or tendered subject only to Closing);

    (c)    no Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Decree that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

    (d)    the Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay pending appeal; and

    (e)    Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> has been satisfied.

**Section 7.3**    <u>**No Frustration of Closing Conditions**</u>. Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in <u>Section 7.1</u> or <u>Section 7.2</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

**Section 7.4**    <u>**Waiver of Conditions**</u>.  Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.

**ARTICLE VIII**
**TERMINATION**

**Section 8.1**    <u>**Termination**</u>.  This Agreement may be terminated in accordance with this <u>Article VIII</u> and the Contemplated Transactions abandoned at any time prior to the Closing:

    (a)    by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

    (b)    by written notice of either Buyer or Sellers, upon the issuance of a Final Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions

53

contemplated hereby; provided that no termination may be made by a Party under this Section 8.1(b) if the issuance of such Final Order was caused by the breach or action or inaction of such Party;

(c)    by Buyer by giving written notice to Sellers at any time prior to Closing  in the event Sellers have breached any material covenant contained in this Agreement in any material respect, Buyer has notified Sellers of the breach, and the breach has continued without cure for a period of thirty (30) days after the notice of the breach;

(d)    by Sellers by giving written notice to Buyer at any time prior to Closing in the event Buyer has breached any material covenant contained in this Agreement in any material respect, Sellers have notified Buyer of the breach, and the breach has continued without cure for a period of thirty (30) days after the notice of the breach;

(e)    by written notice of either Buyer or Sellers, if the Closing shall not have occurred on or before March 31, 2023 (the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(e) if the failure of the Closing to have occurred by the Outside Date was caused by the breach or action or inaction of such Party;

(f)    by Buyer if Sellers withdraw or seek authority to withdraw the Bid Procedures Order or the Sale Order, or announce any stand-alone plan of reorganization or liquidation (or support any such plan filed by any other party), other than a wind-down plan of Sellers' estates post-Closing;

(g)    by Buyer if the Bankruptcy Court has not held the Sale Hearing by March 20, 2023;

(h)    by written notice of either Buyer or Sellers, if the Chapter 11 Cases is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Chapter 11 Cases; provided that Sellers shall not be permitted to terminate this Agreement pursuant to this Section 8.1(h) if Sellers sought such dismissal of the Chapter 11 Cases, conversion to a case or cases under Chapter 7 of the Bankruptcy Code, or appointment of a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers in the Chapter 11 Cases;

(i)    by Buyer if there is a termination of any Financing Order or a material change to the "Approved Budget" thereunder without the express written approval of Buyer;

(j)    automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon:

i.    the consummation of an Alternative Transaction; or

ii.      if Buyer is not selected as the Successful Bidder at the conclusion of the Auction, unless Buyer is designated a "back-up bidder" under the Sale Order;

(k)      by Buyer if any of the Bankruptcy Court Milestones are not met;

(l)      by written notice from Sellers to Buyer, if all of the conditions set forth in Section 7.1 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Buyer fails to complete the Closing at the time required by Section 2.7; or

(m)      by written notice from Sellers or Buyer to Buyer or Sellers, respectively, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties.

Notwithstanding anything to the contrary contained herein, in no event may Buyer terminate this Agreement under Section 8.1(c) on account of Buyer's failure to satisfy the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to any proposed Assumed Contract.

**Section 8.2    Procedure upon Termination**. In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3    Effect of Termination or Breach**.

(a)      Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(b)      Except as set forth in Section 8.1(j), no termination of this Agreement pursuant to Section 8.1 shall be effective until written notice thereof is given to the non-terminating party specifying the provision hereof pursuant to which such termination is made.  If the transactions contemplated hereby are not consummated: (i) this Agreement shall become null and void and of no further force and effect (except that Article I, Section 2.12, this Section 8.3, Article IX and Article X, shall survive any such termination); and (ii) if this Agreement is terminated by Buyer pursuant to a termination right set forth in this Article VIII or by Sellers for any reason other than under Sections 8.1(d) or (l), Sellers shall not be entitled to any damages, losses, or payment from Buyer, and Buyer shall have no further Liability of any kind to Sellers, any of their Affiliates, or any third party on account of this Agreement.

(c)      Nothing herein shall preclude the Sellers from exercising their remedies under Section 10.1.

## ARTICLE IX
## BANKRUPTCY COURT MATTERS

**Section 9.1    Competing Bids**. This Agreement and the transactions contemplated hereby are subject to the Sellers' rights and ability to consider higher or better competing bids with respect to the Business and the Purchased Assets pursuant to the Bid Procedures, as approved by the Bid Procedures Order. In accordance with the Bid Procedures, until the conclusion of the Auction, the Sellers shall have the right to, and may cause their Representatives and Affiliates to, (a) initiate contact with, solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate with, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with any sale or other disposition of the Purchased Assets or any Alternative Transaction; (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person; and (c) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing.

**Section 9.2    Bankruptcy Court Filings**. The Sellers shall use reasonable best efforts to obtain entry of the Bid Procedures Order and the Sale Order in accordance with the Milestones (as defined in the DIP Credit Agreement). Buyer agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Bid Procedures Order and the Sale Order and a finding of adequate assurance of future performance by Buyer of the Assumed Contracts, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Sellers shall consult with Buyer and its representatives concerning any order of the Bankruptcy Court relating to this Agreement or the Chapter 11 Cases and use reasonable best efforts to provide Buyer with copies of all applications, pleadings, proposed orders and other material documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. If any order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such order), Sellers shall diligently defend against such appeal, petition or motion and shall use commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motions; provided, that Sellers shall consult with Buyer regarding the status of any such actions. Any changes to the form of the Bid Procedures Order or the Sale Order must be approved by Buyer. Sellers further covenant and agree that, after the Closing, the terms of any reorganization plan submitted to the Bankruptcy Court or any other court by or with the support of Sellers for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

**Section 9.3    Bankruptcy Court Milestones**. Sellers shall comply with the following timeline ("Bankruptcy Court Milestones"):

(a)    the Bankruptcy Court shall have entered the Bid Procedures Order within thirty-nine (39) calendar days after the Petition Date;

(b)    the final date for submitting a qualified bid, as set forth in the approved Bid Procedures, shall be no later than fifty (50) days following the Petition Date (the "Bid Deadline");

(c)    so long as at least one qualified bid has been received (other than from Buyer) the Auction shall be a date within two (2) Business Days after the Bid Deadline; and

(d)    within two (2) days after consummation of the Auction (or if the Auction is not necessary, within five (5) days after the Bid Deadline), but subject to availability of the Bankruptcy Court, the Sale Hearing shall have occurred and the Bankruptcy Court shall have approved the transaction contemplated by this Agreement; and

(e)    within sixty-three (63) calendar days after the Petition Date  the Bankruptcy Court shall have entered the Sale Order (the "Sale Deadline").

## ARTICLE X
## MISCELLANEOUS

**Section 10.1    Remedies**. Buyer recognizes that if Buyer breaches or refuses to perform any covenant set forth in this Agreement or the Sale Order, monetary damages alone would not be adequate to compensate Sellers for their injuries. Sellers shall therefore be entitled, in addition to any other remedies that may be available at law or in equity, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants. If any Litigation is brought by Sellers to enforce such covenants, Buyer shall waive the defense that there is an adequate remedy at Law. Buyer agrees to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants. Buyer agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

**Section 10.2    Expenses**. Except as otherwise provided in this Agreement or a Related Agreement, Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including, but not limited to, all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.

**Section 10.3    Entire Agreement**. This Agreement and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof.

**Section 10.4    Incorporation of Schedules, Exhibits and Disclosure Schedule**. The schedules, appendices and exhibits to this Agreement, and the documents and other information made available in the Disclosure Schedule are incorporated herein by reference and made a part hereof.

**Section 10.5    Amendments and Waivers**. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 10.5 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 10.6    Succession and Assignment**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer shall be permitted to assign any of its rights hereunder (i) to one or more of its Affiliates, as designated by Buyer in writing to Sellers or (ii) to any lender to Buyer or any of its Affiliates as collateral security in connection with the transactions that are the subject of this Agreement; provided, however, Buyer shall remain liable for all of its obligations under this Agreement after any such assignment; provided, further, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed chapter 11 plan or pursuant to an order of the Bankruptcy Court.

**Section 10.7    Notices**. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient; (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (iii) when sent by email (with written confirmation of transmission); or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Sellers, then to:

> Performance Powersports Group Investor, LLC
> 1775 East University Drive
> Tempe, Arizona 85281
> Attention:  Ken Vanden Berg

Email:    kenv@colepow.com

With a copy to (which shall not constitute notice):

**Klehr Harrison Harvey Branzburg LLP**
919 North Market Street, Suite 1000
Wilmington, DE 19801
Attention: Domenic E. Pacitti, Esquire
Email: dpacitti@klehr.com

If to Buyer, then to:

CPS USA Acquisition, LLC
c/o Kinderhook Industries, LLC
505 Fifth Avenue, 25th Floor
New York, NY 10017
Attention:  Chris Michalik
Paul Cifelli
Email: cmichalik@kinderhook.com
pcifelli@kinderhook.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY 10022
Attention:  Brian Schartz, P.C.
Shawn OHargan, P.C.
Allyson B. Smith
Email:    brian.schartz@kirkland.com
shawn.ohargan@kirkland.com
allyson.smith@kirkland.com

with copies (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801
Attention:  Laura Davis Jones
Email:    ljones@pszjlaw.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this <u>Section 10.7</u>.

**Section 10.8   Governing Law; Jurisdiction**. This Agreement shall in all aspects be governed by and construed in accordance with  the Federal Bankruptcy Law, to the extent applicable, and where state law is implicated, the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws. The Parties agree that any Litigation one Party commences against any other Party pursuant to this Agreement shall be brought exclusively in the Bankruptcy Court and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum; provided that if the Bankruptcy Court is unwilling or unable to hear any such Litigation, then the courts of the State of Delaware, sitting in New Castle County, Delaware, and the federal courts of the United States of America sitting in New Castle County, Delaware, shall have exclusive jurisdiction over such Litigation.

**Section 10.9   Consent to Service of Process**. Each of the Parties hereby Consents to process being served by any Party, respectively, in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 10.7.

**Section 10.10 WAIVERS OF JURY TRIAL**.

(a)     THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF DELAWARE LOCATED IN NEW CASTLE COUNTY, DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE DISTRICT OF DELAWARE WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

**Section 10.11 Severability**. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or

unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 10.12 **No Third Party Beneficiaries**. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

Section 10.13 **No Survival of Representations, Warranties and Agreements**. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such party prior to the Closing) of the Parties set forth in this Agreement, the Sale Order, or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for twenty (20) years following the Closing Date, and nothing in this Section 10.13 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Buyer and Sellers acknowledge and agree, on their own behalf and, with respect to Buyer, Buyer Group, that the agreements contained in this Section 10.13 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for twenty (20) years; and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 10.13, none of the Parties would enter into this Agreement.

Section 10.14 **Non-Recourse**. This Agreement may only be enforced against, and any Litigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as Parties to this Agreement. Except to the extent named as a Party to this Agreement, and then only to the extent of the specific obligations of such Parties set forth in this Agreement or the Sale Order, no past, present or future direct or indirect shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Representative of any Party to this Agreement will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the Parties to this Agreement or for any Litigation based upon, arising out of or related to this Agreement. Each Party to this Agreement hereby waives, from and after the Closing, any and all rights, claims and causes of action it may have at any time under any Environmental Law, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, and any analogous state or local Laws, in each case in respect of the Business and this Agreement.

Section 10.15 **No Right of Set-Off**. Buyer, on its own behalf and on behalf of Buyer Group and its and their respective successors and permitted assigns, hereby waives any rights of

set-off, netting, offset, recoupment, or similar rights that Buyer, any member of Buyer Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Buyer pursuant to this Agreement or any other document or instrument delivered by Buyer in connection herewith.

**Section 10.16** <u>**Construction**</u>. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the date hereof." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

**Section 10.17** <u>**Computation of Time**</u>. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**Section 10.18** <u>**Mutual Drafting**</u>. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 10.19** <u>**Disclosure Schedule**</u>. The Disclosure Schedule has been arranged for purposes of convenience in separately numbered Sections corresponding to the Sections of this Agreement; <u>however</u>, each Section of the Disclosure Schedule will be deemed to incorporate by reference all information disclosed in any other Section of the Schedules, and any disclosure in the Disclosure Schedule will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Disclosure Schedule and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business or consistent with past practice, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in

this Agreement, the Disclosure Schedule or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Disclosure Schedule or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Disclosure Schedule will be deemed to broaden in any way the scope of the parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Disclosure Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Disclosure Schedule and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of contract.

Section 10.20 **Headings; Table of Contents**. The Section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 10.21 **Counterparts; Facsimile and Email Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

Section 10.22 **Time of Essence**. Time is of the essence of this Agreement.

[END OF PAGE]
[SIGNATURE PAGES FOLLOW]

## SIGNATURE PAGE TO
## SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**SELLERS:**

**PERFORMANCE POWERSPORTS GROUP INVESTORS, LLC**

By: *Ken Vanden Berg*
Ken Vanden Berg (Mar 17, 2023 07:23 PDT)

    Name:  Ken Vanden Berg
    Title:   Chief Financial Officer

**PERFORMANCE POWERSPORTS GROUP HOLDINGS, INC.**

By: *Ken Vanden Berg*
Ken Vanden Berg (Mar 17, 2023 07:23 PDT)

    Name:  Ken Vanden Berg
    Title:   Chief Financial Officer

**PERFORMANCE POWERSPORTS GROUP PURCHASER, INC.**

By: *Ken Vanden Berg*
Ken Vanden Berg (Mar 17, 2023 07:23 PDT)

    Name:  Ken Vanden Berg
    Title:   Chief Financial Officer

**PERFORMANCE POWERSPORTS GROUP, INC.**

By: *Ken Vanden Berg*
Ken Vanden Berg (Mar 17, 2023 07:23 PDT)

    Name:  Ken Vanden Berg
    Title:   Chief Financial Officer

**SIGNATURE PAGE TO**
**SECOND AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**BUYER:**

**CPS USA ACQUISITION, LLC**

By _____
Name: Kyle Dawson
Title: Vice President and Secretary

**EXHIBIT A**

**<u>Form of Bill of Sale</u>**

See attached.

## BILL OF SALE

This Bill of Sale, dated as of [_____], 202[__] (this "Bill of Sale"), is made and entered into by and among Performance Powersports Group Investor, LLC, a Delaware limited liability company ("PPG Investor"), Performance Powersports Group Holdings, Inc, a Delaware corporation and wholly owned subsidiary of PPG Investor ("PPG Holding"), each of the Seller Subsidiaries (together with PPG Investor and PPG Holding, "Sellers"), and CPS USA Acquisition, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Second Amended and Restated Asset Purchase Agreement, dated as of March 17, 2023 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens).

2.      From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Bill of Sale.

3.      This Bill of Sale is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Bill of Sale or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Bill of Sale shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

A-2

5.      None of the provisions of this Bill of Sale may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Bill of Sale is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Bill of Sale shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Bill of Sale as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Bill of Sale is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      EXCEPT AS AND TO THE EXTENT PROVIDED IN THE ASSET PURCHASE AGREEMENT, SELLERS EXPRESSLY AND SPECIFICALLY DISCLAIM ANY AND ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, WHETHER ORAL OR WRITTEN, AND WHETHER GIVEN OR MADE OR DEEMED TO HAVE BEEN GIVEN OR MADE AT ANY TIME OR TIMES IN THE PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING THE NATURE OR CONDITION OF THE PURCHASED ASSETS, INCLUDING WITHOUT LIMITATION ANY AND ALL WARRANTIES AS TO THE MERCHANTABILITY OF THE PURCHASED ASSETS OR THE SUITABILITY OR FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR FOR ANY PURPOSE.

8.      This Bill of Sale shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

9.      This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Bill of Sale or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature Page Follows]*

A-3

IN WITNESS WHEREOF, the parties have caused this Bill of Sale to be duly executed by their respective authorized officers as of the date first above written.

**<u>SELLERS</u>:**

**PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC**

By: _____
     Name:
     Title:

**PERFORMANCE POWERSPORTS GROUP HOLDINGS, INC.**

By: _____
     Name:
     Title:

**PERFORMANCE POWERSPORTS GROUP PURCHASER, INC.**

By: _____
     Name:
     Title:

**PERFORMANCE POWERSPORTS GROUP, INC.**

By: _____
     Name:
     Title:

**<u>BUYER</u>:**

**CPS USA ACQUISITION, LLC**

By: _____
     Name:
     Title:

[Signature Page to Bill of Sale]

**EXHIBIT B**

**Form of Assignment and Assumption Agreement**

See attached.

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated as of [_____], 202[__] (this "Agreement"), is made and entered into by and among Performance Powersports Group Investor, LLC, a Delaware limited liability company ("PPG Investor"), Performance Powersports Group Holdings, Inc, a Delaware corporation and wholly owned subsidiary of PPG Investor ("PPG Holding"), each of the Seller Subsidiaries (together with PPG Investor and PPG Holding, "Sellers"), and CPS USA Acquisition, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Second Amended and Restated Asset Purchase Agreement, dated as of March 17, 2023 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, the Assumed Contracts, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, pursuant to Section 2.3 of the Asset Purchase Agreement, Buyer has agreed to assume, effective as of the Closing, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1. Sellers hereby assign and delegate the Assumed Contracts and the Assumed Liabilities to Buyer and Buyer hereby accepts assignment and delegation of and assumes the Assumed Contracts and the Assumed Liabilities as set forth in the Asset Purchase Agreement. Buyer assumes none of the Excluded Liabilities and the parties agree that all such Excluded Liabilities remain the responsibility of Sellers.

2. From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Agreement.

3. This Agreement is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4. No provision of this Agreement, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Agreement

or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

5.    None of the provisions of this Agreement may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.    This Agreement is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Agreement shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Agreement as provided and subject to the limitations set forth in the Asset Purchase Agreement. To the extent any provision of this Agreement is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.    This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

8.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature page follows]*

B-3

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS**:

**PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC**

By: _____
      Name:
      Title:

**PERFORMANCE POWERSPORTS GROUP HOLDINGS, INC.**

By: _____
      Name:
      Title:

**PERFORMANCE POWERSPORTS GROUP PURCHASER, INC.**

By: _____
      Name:
      Title:

**PERFORMANCE POWERSPORTS GROUP, INC.**

By: _____
      Name:
      Title:

**BUYER**:

**CPS USA ACQUISITION, LLC**

By: _____
      Name:
      Title:

[Signature Page to Assignment and Assumption Agreement]

**EXHIBIT C**

**<u>Form of Intellectual Property Assignment Agreement</u>**

See attached.

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This Intellectual Property Assignment Agreement ("Assignment"), dated as of [_____], 202[__], is made and entered into by and among Performance Powersports Group Investor, LLC, a Delaware limited liability company ("PPG Investor"), Performance Powersports Group Holdings, Inc, a Delaware corporation and wholly owned subsidiary of PPG Investor ("PPG Holding"), each of the Seller Subsidiaries (together with PPG Investor and PPG Holding, "Sellers"), and CPS USA Acquisition, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Second Amended and Restated Asset Purchase Agreement, dated as of March 17, 2023 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

WHEREAS, pursuant to the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, the Assigned Intellectual Property Assets, including the registered Intellectual Property set forth on Exhibit A attached hereto, free and clear of all Liens (other than Permitted Liens); and

WHEREAS, Sellers desire to deliver to Buyer such instruments of sale, transfer, assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets, including the Assigned Intellectual Property Assets.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Each Seller hereby irrevocably sells, transfers, assigns, conveys and delivers to Buyer all of its worldwide right, title and interest in and to the Assigned Intellectual Property Assets, together with the goodwill of the business symbolized thereby, the right to sue for past infringement of the foregoing, all rights to collect income, royalties, damages, proceeds, and payments due or payable at or after the Closing relating to the foregoing, and the registrations thereof free and clear of all Liens (other than Permitted Liens), and hereby instructs, authorizes and directs the United States Patent and Trademark Office, and the corresponding entity or agency in any applicable foreign country, to record Buyer as assignee and owner of the applicable items set forth on Exhibit A.

2.      From time to time after the Closing Date, each party shall, upon the reasonable request of the other, execute and deliver or cause to be executed and delivered such further instruments of sale, conveyance, assignment, transfer and assumption, and take such further action, as may reasonably be requested in order to more effectively carry out the purposes and intent of the Asset Purchase Agreement and this Assignment.

3.      This Assignment is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

4.      No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Assignment shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

5.      None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the party(ies) against whom the waiver is to be effective.

6.      This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      This Assignment shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the parties shall be determined in accordance with such Laws.

8.      This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, each of which shall be deemed an original.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS:**

**PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC**

By: _____
     Name:
     Title:

**PERFORMANCE POWERSPORTS GROUP HOLDINGS, INC.**

By: _____
     Name:
     Title:

**PERFORMANCE POWERSPORTS GROUP PURCHASER, INC.**

By: _____
     Name:
     Title:

**PERFORMANCE POWERSPORTS GROUP, INC.**

By: _____
     Name:
     Title:

**BUYER:**

**CPS USA ACQUISITION, LLC**

By: _____
     Name:
     Title:

[Signature Page to Trademark Assignment Agreement]

## **<u>Exhibit A to Intellectual Property Assignment Agreement</u>**

### **To be provided**

**EXHIBIT D**

**Bid Procedures Order**

Attached.

This document is available at Docket Number 169

## INDEX TO SCHEDULES

**Schedules**:

Schedule I          -     Schedule of Seller Subsidiaries
Schedule 1.1        -          Excluded Claims
Schedule 1.2        -          Excluded Vendors
Schedule 2.2(n)     -          Excluded Assets
Schedule 2.6(a)     -          Assumed Contract List
Schedule 5.4        -          Conduct of Business

**Disclosure Schedules**:

Schedule 3.3(b)     -          Consents and Approvals
Schedule 3.6        -          Contracts
Schedule 3.7        -          Intellectual Property
Schedule 3.8        -          Litigation
Schedule 3.9(b)     -          Employees and Employment Matters
Schedule 3.10       -          Employee Benefit Plans
Schedule 3.11       -          Real Property
Schedule 3.12       -          Permits
Schedule 3.13       -          Environmental Matters

10330608.v13

**SCHEDULE I**

**Schedule of Seller Subsidiaries**

1.  Performance Powersports Group Purchaser, Inc., a Delaware corporation

2.  Performance Powersports Group, Inc. (f/k/a Rich Godfrey & Associates, Inc.), an Arizona corporation

**SCHEDULE 1.1**

**EXCLUDED CLAIMS**

1. Any and all Claims against Richard Godfrey, Todd Gentry, and Christopher Hunter and affiliated entities of any nature (excluding, for the avoidance of doubt, any Claims against Rick Canas, Paul Gift, Ron Lackey, and Kinderhook Industries, LLC and any of its affiliates).

**SCHEDULE 1.2**

**EXCLUDED VENDORS**

1. CBIZ, Inc.
2. Pacific Coast Cartage Inc.
3. Nam Dinh Vu Port Joint Stock Company (Gema)
4. Brotherhood Transports
5. Norton Lilly International
6. Mediterranean Shipping Company (MSC)
7. Rich Pacific Usa, Inc.
8. Cosco Shipping Lines
9. Wan Hai Lines LTD
10. Hai-Wind Worldwide Inc
11. Mitsubishi Logistics America Corp
12. Chongqing Huansong Industries (Group) Co, Ltd (Hisun China)
13. Hisun Motors Corp USA
14. Jinhua Funrun Vehicle Technology Co., LTD
15. Sundance GS LLC
16. Snell & Wilmer
17. Kinderhook Industries VI LLP
18. Senfeng Laser Usa Inc.
19. Kuehne + Nagel Inc.
20. Jay Pearson
21. John Larson
22. Mark Hanley
23. Steven S Hill
24. Todd Balan
25. Northern Group
26. Summit Outdoors, LLC

10330608.v13

**SCHEDULE 2.2(n)**

**EXCLUDED ASSETS**

None.

10330608.v13

## SCHEDULE 2.6(a)

## ASSUMED CONTRACT LIST

| No. | Agreement | Cure Amount (if any) |
|-----|-----------|---------------------|
| 1. | Coleman License Agreement. | $232,674 |
| 2. | Tractor Supply Company Vendor Agreement, dated as of September 21, 2016, by and between certain of the Sellers and Tractor Supply, as amended by the Drop Ship Program Addendum to Vendor Agreement, dated as of February 26, 2019, by and between certain of the Sellers and Tractor Supply. | $29,279 |
| 3. | Domestic Business Terms, dated as of March 22, 2022, by and between certain of the Sellers and Lowe's Companies, Inc. | $0 |
| 4. | Ace Hardware Corporation Purchase Order Terms and Conditions, dated as of January 14, 2021, by and between certain of the Sellers and Ace Hardware Corporation (together with that certain Vendor Indemnification Agreement, dated of even date, Electronic Funds Transfer Authorization Agreement, dated of even date, Electronic Data Interchange Agreement, dated of even date, Ace Hardware Corporation Drop Ship Agreement, dated of even date, and Rebate Agreement, dated of even date). | $0 |
| 5. | Sam's Club General Merchandise Agreement, dated as of November 14, 2017 (No. 459682-63-0), by and between certain of the Sellers and Wal-Mart Stores, Inc., and its director and indirect US and Puerto Rico operating subsidiaries (collectively, "Walmart"). | $0 |
| 6. | Walmart General Merchandise Agreement, dated as of September 18, 2018 (No. 459682-63-2), by and between certain of the Sellers and Wal-Mart Stores, Inc. | $0 |
| 7. | Walmart General Merchandise Agreement, dated as of August 16, 2018 (No. 459682-63-1), by and between certain of the Sellers and Wal-Mart Stores, Inc. | $0 |
| 8. | Walmart Supplier Agreement, dated as of June 13, 2017 (No. 459682-09-2), by and between certain of the Sellers and Wal-Mart Stores, Inc. | $0 |
| 9. | Walmart Supplier Agreement, dated as of April 26, 2017 (No. 459682-51-1), by and between certain of the Sellers and Wal-Mart Stores, Inc. | $0 |

| 10. | Walmart General Merchandise Agreement (No. 459682-7-0), dated as of January 5, 2014, by and certain of the Sellers and Walmart. | $0 |
|-----|---|---|
| 11. | Walmart.com Supplier Agreement (No. 459682-07-1), dated as of May 23, 2017, by and between certain of the Sellers and Walmart. | $0 |
| 12. | Walmart General Merchandise Agreement (No. 459682-07-2), dated as of March 26, 2019, by and between certain of the Sellers and Walmart. | $0 |
| 13. | Walmart.com Supplier Agreement (No. 459682-09-4), dated as of November 14, 2017, by and between certain of the Sellers and Walmart. | $0 |
| 14. | Walmart.com Supplier Agreement (No. 459682-53-0), dated as of November 14, 2017, by and between certain of the Sellers and Walmart. | $0 |
| 15. | Walmart.com Supplier Agreement (No. 459682-51-0), dated as of April 26, 2017, by and between certain of the Sellers and Walmart. | $0 |
| 16. | Walmart.com General Merchandise Agreement (No. 459682-09-3), dated as of June 13, 2017, by and between certain of the Sellers and Walmart. | $0 |
| 17. | License Agreement, dated as of January 1, 2019, by and between Jordan Outdoor Enterprises, Ltd. and certain of the Sellers, as amended by that certain Amendment dated as of June 3, 2021. | $397 |
| 18. | Data Processing Agreement for Oracle Services, dated as of April 29, 2021, by and between Oracle America, Inc. and certain of the Sellers. | $20,598 |
| 19. | Lease Agreement, dated as of October 24, 2022, by and between DG Mesquite Airport Property Owner, L.P. and certain of the Sellers for the premises located at 4120 E. Scyene Road, Mesquite, Texas 75181. | $0 |
| 20. | Participation Agreement, dated as of June 18, 2020, by and between certain of the Sellers and CWI, Inc. | $0 |
| 21. | Contract Center Agreement, dated as of December 29, 2022, by and between Calderon & Calderon Business Consulting and certain of the Sellers. | $0 |
| 22. | Pro Group, Inc. Services Allowance, dated as of May 22, 2020, by and between Pro Group, Inc. and certain of the Sellers. | $0 |
| 23. | Pro Group, Inc. Brokerage Commission and Terms Agreement, dated as of May 22, 2020, by and between Pro Group, Inc. and certain of the Sellers. | $0 |

10330608.v13

| 24. | Broker Agreement, dated as of December 1, 2022, by and between Acosta Inc. and certain of the Sellers. | $42,271 |
|---|---|---|
| 25. | Master Agreement, dated November 21, 2022, by and between AT&T Corp. DBA ACC Business and certain of the Sellers. | $0 |
| 26. | Acc Business Multi-Service Agreement, dated November 21, 2022, by and between AT&T Corp. DBA ACC Business and certain of the Sellers. | $0 |
| 27. | Vendor Agreement, dated as of December 14, 2022, by and between Autozone Parts, Inc. and certain of the Sellers. | $0 |
| 28. | Consulting Agreement, dated as of January 11, 2022, by and between Baker Logistics Consulting Services, Inc. and certain of the Sellers. | $0 |
| 29. | Service Agreement, by and between Business Development Services, Inc. DBA Cox Commercial Office Cleaning Services and certain of the Sellers. | $490 |
| 30. | Security Proposal, dated as of January 10, 2023, by and between Fortress Security, LLC and certain of the Sellers. | $0 |
| 31. | Supplier Buying Agreement, dated as of January 15, 2019, by and between Home Depot Product Authority, LLC and certain of the Sellers. | $0 |
| 32. | Product Purchase Memorandum of Understanding, dated as of August 16, 2022, by and between SC Autosports, LLC and certain of the Sellers. | $0 |
| 33. | 2021 ASI Safety Program Participation Agreement, dated as of June 30, 2021, by and between Specialty Vehicle Institute of America, Inc. and certain of the Sellers. | $31,866 |
| 34. | Independent Contractor Agreement, dated as of August 19, 2016, by and between Vendor Horizon and certain of the Sellers. | $0 |
| 35. | Purchase Agreement Terms & Conditions, dated April 23, 2020, by and between Mid-States Distributing, LLC and certain of the Sellers. | $0 |
| 36. | Contract, dated December 29, 2022, by and between Velvet Hammer Branding and certain of the Sellers. | $1,363 |
| 37. | Estimate #898725, dated as of August 19, 2021, by and between certain of the Sellers and Oracle America, Inc. | $0 |
| 38. | Estimate #932812, dated as of November 4, 2021, by and between certain of the Sellers and Oracle America, Inc. | $0 |

8

| 39. | Vendor Trade Terms Program Agreement, dated as of December 1, 2022, by and between certain of the Sellers and Academy Sports and Outdoors Inc. | $0 |

10330608.v13

## SCHEDULE 5.4

## CONDUCT OF BUSINESS

(j)

1. Performance Powersports Group, Inc. (f/k/a Rich Godfrey & Associates, Inc.), intends to adopt a discretionary bonus pool of $600,000 (allocated $50,000/month) payable in December 2023 based on the Company's performance during 2023 calendar year.

10330608.v13

## DISCLOSURE SCHEDULE TO ASSET PURCHASE AGREEMENT

Pursuant to that certain Second Amended and Restated Asset Purchase Agreement (the "Agreement"), dated as of March 17, 2023, by and among Performance Powersports Group Holdings, Inc., a Delaware corporation ("PPG Holding"), each of the Subsidiaries of PPG Holding set forth on Schedule I to the Agreement (the "Seller Subsidiaries", and together with PPG Holding, "Sellers"), and CPS USA Acquisition, LLC, a Delaware limited liability company (together with its permitted successors, designees and assigns, "Buyer"), Sellers hereby deliver to Buyer this Disclosure Schedule. Sellers and Buyer are referred to collectively herein as the "Parties." All capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Agreement.

The section and subsection numbers in this Disclosure Schedule correspond to the section and subsection numbers of the Agreement. Any and all information and disclosures set forth in a specific section or subsection of this Disclosure Schedule shall be deemed to be included in all sections or subsections and to be made with respect to all representations, warranties, covenants and Schedules to which the relevance of such item is readily apparent on its face, regardless of whether a specific cross reference is made thereto. The inclusion of any information in any section or subsection does not constitute an admission or acknowledgement by Seller, in and of itself, that such information is required by the terms of the Agreement to be delivered, is material, has resulted in or would result in a Material Adverse Effect or is outside the ordinary course of the Sellers' business.

The Sellers do not assume any responsibility to any Person that is not a Party to the Agreement for the accuracy of any information herein. The information was not prepared or disclosed with a view to its potential disclosure to others. Subject to applicable law, this information is disclosed in confidence for the purposes contemplated in the Agreement and is subject to the confidentiality provisions of any other agreements entered into by the Parties.

Except as set forth in the Agreement, in no event will the disclosure of matters in this Disclosure Schedule broaden the Sellers' representations and warranties, obligations, covenants, agreements or conditions contained in the Agreement. The headings contained in this Disclosure Schedule are inserted for convenience only and shall not be deemed to modify or influence the interpretation of the information contained in this Disclosure Schedule or the Agreement.

In disclosing information contained in the Disclosure Schedules, the Sellers expressly do not waive any attorney-client privilege associated with any such information or any protection afforded by the "work product doctrine" with respect to any of the matters disclosed or discussed herein.

## SCHEDULE 3.3(b)

## CONSENTS AND APPROVALS

1.    License Agreement dated as of April 1, 2010, by and between The Coleman Company, Inc. and Rich Godfrey & Associates Inc., as amended by that certain First Amendment dated November 1, 2010, further amended by that certain Second Amendment dated November 21, 2011, further amended by that certain Third Amendment dated January 1, 2014, further amended by that certain Fourth Amendment dated December 31, 2018 (the "Coleman License Agreement").

## SCHEDULE 3.6

## CONTRACTS

1.    Coleman License Agreement.

2.    Lease Agreement, dated as of March 26, 2020, by and between Alliance Funding Group and certain of the Sellers, and exhibits attached thereto and the Lien against the Company related thereto pursuant to a UCC financing statement filed on March 9, 2020 in favor of Pawnee Leasing Corporation (file no. 202000149511).

3.    Lease Agreement, dated as of July 31, 2020, by and between Alliance Funding Group and certain of the Sellers, and the exhibits and addendum attached thereto and the Lien against the Company related thereto pursuant to a UCC financing statement filed on July 21, 2020 in favor of Financial Pacific Leasing, Inc. (file no. 202000542446) (the "Financial Pacific Equipment Lease").

4.    Tractor Supply Company Vendor Agreement, dated as of September 21, 2016, by and between certain of the Sellers and Tractor Supply, as amended by the Drop Ship Program Addendum to Vendor Agreement, dated as of February 26, 2019, by and between certain of the Sellers and Tractor Supply.

5.    Domestic Business Terms, dated as of March 22, 2022, by and between certain of the Sellers and Lowe's Companies, Inc.

6.    Warehousing Agreement, dated as of January 24, 2022, by and between certain of the Sellers and IGL Logistics.

7.    Ace Hardware Corporation Purchase Order Terms and Conditions, dated as of January 14, 2021, by and between certain of the Sellers and Ace Hardware Corporation (together with that certain Vendor Indemnification Agreement, dated of even date, Electronic Funds Transfer Authorization Agreement, dated of even date, Electronic Data Interchange Agreement, dated of even date, Ace Hardware Corporation Drop Ship Agreement, dated of even date, and Rebate Agreement, dated of even date).

8.    Sam's Club General Merchandise Agreement, dated as of November 14, 2017 (No. 459682-63-0), by and between certain of the Sellers and Wal-Mart Stores, Inc., and its director and indirect US and Puerto Rico operating subsidiaries (collectively, "Walmart").

9.    Walmart General Merchandise Agreement, dated as of September 18, 2018 (No. 459682-63-2), by and between certain of the Sellers and Wal-Mart Stores, Inc.

10.    Walmart General Merchandise Agreement, dated as of August 16, 2018 (No. 459682-63-1), by and between certain of the Sellers and Wal-Mart Stores, Inc.

11.    Walmart Supplier Agreement, dated as of June 13, 2017 (No. 459682-09-2), by and between certain of the Sellers and Wal-Mart Stores, Inc.

12. Walmart Supplier Agreement, dated as of April 26, 2017 (No. 459682-51-1), by and between certain of the Sellers and Wal-Mart Stores, Inc.

13. Walmart General Merchandise Agreement (No. 459682-7-0), dated as of January 5, 2014, by and certain of the Sellers and Walmart.

14. Walmart.com Supplier Agreement (No. 459682-07-1), dated as of May 23, 2017, by and between certain of the Sellers and Walmart.

15. Walmart General Merchandise Agreement (No. 459682-07-2), dated as of March 26, 2019, by and between certain of the Sellers and Walmart.

16. Walmart.com Supplier Agreement (No. 459682-09-4), dated as of November 14, 2017, by and between certain of the Sellers and Walmart.

17. Walmart.com Supplier Agreement (No. 459682-53-0), dated as of November 14, 2017, by and between certain of the Sellers and Walmart.

18. Walmart.com Supplier Agreement (No. 459682-51-0), dated as of April 26, 2017, by and between certain of the Sellers and Walmart.

19. Walmart.com General Merchandise Agreement (No. 459682-09-3), dated as of June 13, 2017, by and between certain of the Sellers and Walmart.

20. License Agreement, dated as of January 1, 2019, by and between Jordan Outdoor Enterprises, Ltd. and certain of the Sellers, as amended by that certain Amendment dated as of June 3, 2021.

21. Data Processing Agreement for Oracle Services, dated as of April 29, 2021, by and between Oracle America, Inc. and certain of the Sellers.

22. Amended and Restated Lease, dated as of October 8, 2021, by and between Cascade Range Investments, LLC, and certain of the Sellers for the premises located at 444 West Geneva Drive Tempe, AZ 85282.

23. Amended and Restated Lease, dated as of October 8, 2021, by and between Cascade Range Investments, LLC and certain of the Sellers for the premises located at 1755 E. University Dr. Tempe, AZ 85251.

24. Lease Agreement, dated as of October 24, 2022, by and between DG Mesquite Airport Property Owner, L.P. and certain of the Sellers for the premises located at 4120 E. Scyene Road, Mesquite, Texas 75181.

25. Multi-Tenancy Industrial Lease (Triple Net), dated as of January 26, 2022, by and between Metro East Valley Holdings Phase Three, LLC and certain of the Sellers for the premises located at 1907 South Hobson Street, Suite 108, Mesa, AZ 85204 (together with that certain Memorandum of Commencement, dated September 28, 2022).

26. Agreement, dated as of January 1, 2021, by and between Empire Logistics, LLC and certain of the Sellers (together with that certain Freight Terms and Conditions, Empire Logistics Group LLC Monthly Storage Proposal, dated November 1, 2022, and General Warehouse Terms & Conditions).

27. Participation Agreement, dated as of June 18, 2020, by and between certain of the Sellers and CWI, Inc.

28. Contract Center Agreement, dated as of December 29, 2022, by and between Calderon & Calderon Business Consulting and certain of the Sellers.

29. Pro Group, Inc. Services Allowance, dated as of May 22, 2020, by and between Pro Group, Inc. and certain of the Sellers.

30. Pro Group, Inc. Brokerage Commission and Terms Agreement, dated as of May 22, 2020, by and between Pro Group, Inc. and certain of the Sellers.

31. Broker Agreement, dated as of December 1, 2022, by and between Acosta Inc. and certain of the Sellers.

32. Master Agreement, dated November 21, 2022, by and between AT&T Corp. DBA ACC Business and certain of the Sellers.

33. Acc Business Multi-Service Agreement, dated November 21, 2022, by and between AT&T Corp. DBA ACC Business and certain of the Sellers.

34. Vendor Agreement, dated as of December 14, 2022, by and between Autozone Parts, Inc. and certain of the Sellers.

35. Consulting Agreement, dated as of January 11, 2022, by and between  Baker Logistics Consulting Services, Inc. and certain of the Sellers.

36. Commercial Insurance Premium Finance and Security Agreement, dated as of June 10, 2022, by and among, Bankdirect Capital Finance, LLC, Lockton Companies Inc.  and certain of the Sellers, as amended by that certain Addendum dated as of June 30, 2022.

37. Service Agreement, by and between Business Development Services, Inc. DBA Cox Commercial Office Cleaning Services and certain of the Sellers.

38. Standard Contract Terms and Conditions, by and between Crossdocks, Storage & Logistics LLC and certain of the Sellers.

39. Security Proposal, dated as of January 10, 2023, by and between Fortress Security, LLC and certain of the Sellers.

40. Supplier Buying Agreement, dated as of January 15, 2019, by and between Home Depot Product Authority, LLC and certain of the Sellers.

41.  Selling Agreement (Walmart), dated as of November 16, 2020, by and between Northern Group Inc. and certain of the Sellers.

42.  Commission Agreement (Lowe's), dated as of April 9, 2022, by and between Northern Group Inc. and certain of the Sellers.

43.  Product Purchase Memorandum of Understanding, dated as of August 16, 2022, by and between SC Autosports, LLC and certain of the Sellers.

44.  2021 ASI Safety Program Participation Agreement, dated as of June 30, 2021, by and between Specialty Vehicle Institute of America, Inc.  and certain of the Sellers.

45.  Independent Contractor Agreement, dated as of August 19, 2016, by and between Vendor Horizon and certain of the Sellers.

46.  Purchase Agreement Terms & Conditions, dated April 23, 2020, by and between Mid-States Distributing, LLC and certain of the Sellers.

47.  Contract, dated December 29, 2022, by and between Velvet Hammer Branding and certain of the Sellers.

48.  Estimate #898725, dated as of August 19, 2021, by and between certain of the Sellers and Oracle America, Inc.

49.  Estimate #932812, dated as of November 4, 2021, by and between certain of the Sellers and Oracle America, Inc.

50.  Vendor Trade Terms Program Agreement, dated as of December 1, 2022, by and between certain of the Sellers and Academy Sports and Outdoors Inc.

10330608.v13

## SCHEDULE 3.7

## INTELLECTUAL PROPERTY

(a)

Patents and Patent Applications: None.

Trademark Registrations and Applications:

| Trademark | U.S. Application No. | Owner of Record |
|---|---|---|
| RACKA | 97390958 (ITU application) | Performance Powersports Group, Inc. |
| PERFORMANCE POWERSPORTS GROUP | 97358207 (ITU application) | Performance Powersports Group, Inc. |
| YERF-DOG | 97358206 (ITU application) | Performance Powersports Group, Inc. |
| YERF-DOG | 97358205 (Application) | Performance Powersports Group, Inc. |

Tradename Registrations:

| Tradename | State | Registration No. | Owner of Record |
|---|---|---|---|
| Jili Scooter Import & Export | AZ | 9158528 | Rich Godfrey & Associates, Inc. |
| Coleman Powersports | AZ | 9013947 | Performance Powersports Group, Inc |
| Coleman Powersports | WY | 2016-000729957 | Rich Godfrey & Associates, Inc. |

Copyright Registrations: None.

Domain Names:

| Domain Name | Status | Expiration Date | Auto-renew |
|---|---|---|---|
| COLEMANATV.COM | Active | 5/23/2023 | On |
| COLEMANATVS.COM | Active | 5/23/2023 | On |
| COLEMANMINIBIKE.COM | Active | 10/24/2024 | On |
| COLEMANMOTOR.COM | Active | 3/28/2023 | On |
| COLEMANOFFROAD.COM | Active | 5/23/2023 | On |
| COLEMANOUTBOARD.COM | Active | 3/28/2023 | On |
| COLEMANOUTBOARDS.COM | Active | 3/28/2023 | On |
| COLEMANPOWERED.COM | Active | 10/17/2023 | On |
| colemanpowersports.co | Active | 5/10/2023 | On |
| coleman-powersports.com | Active | 5/11/2023 | On |
| colemanpowersports.com.mx | Active | 4/6/2023 | On |
| colemanpowersportsparts.com | Active | 12/29/2025 | On |

17

| Domain Name | Status | Expiration Date | Auto-renew |
|---|---|---|---|
| COLEMANPOWERSPORTSUSA.COM | Active | 10/24/2024 | On |
| colemanpowersportsusaparts.com | Active | 12/29/2025 | On |
| COLEPOW.COM | Active | 5/18/2023 | On |
| colepow.com.mx | Active | 4/6/2023 | On |
| colepowparts.com | Active | 12/29/2025 | On |
| realtreemotorsports.com | Active | 12/17/2025 | On |
| realtree-motorsports.com | Active | 12/17/2025 | On |
| realtreeoffroad.com | Active | 12/17/2025 | On |
| realtree-offroad.com | Active | 12/17/2025 | On |
| realtreepowered.com | Active | 12/17/2025 | On |
| realtreepowersports.com | Active | 12/17/2025 | On |
| realtree-powersports.com | Active | 12/17/2025 | On |
| realtreepowersportsusa.com | Active | 12/17/2025 | On |
| rtpow.com | Active | 12/17/2025 | On |
| safe-jump.com | Active | 9/25/2023 | On |
| safejumptrampolines.com | Active | 9/25/2023 | On |
| safe-jumptrampolines.com | Active | 9/25/2023 | On |
| safe-jump-trampolines.com | Active | 9/25/2023 | On |
| yerfdog.co | Active | 8/26/2023 | On |
| yerf-dog.co | Active | 8/26/2023 | On |
| yerfdog.com | Active | 9/18/2023 | On |
| yerfdoggokart.com | Active | 8/26/2023 | On |
| yerfdoggokarts.com | Active | 8/26/2023 | On |
| yerfdogkart.com | Active | 8/26/2023 | On |
| yerfdogkarts.com | Active | 8/26/2023 | On |
| yerfdogmanufacturing.com | Active | 8/21/2025 | On |
| yerf-dogmanufacturing.com | Active | 8/21/2025 | On |
| yerfdogminibike.com | Active | 8/26/2023 | On |
| yerfdogminibikes.com | Active | 8/26/2023 | On |
| yerf-dogs.com | Active | 8/26/2023 | On |
| yerfdogtrampoline.com | Active | 8/26/2023 | On |
| yerf-dogtrampoline.com | Active | 8/26/2023 | On |
| yerf-dog-trampoline.com | Active | 8/26/2023 | On |
| yerfdogtrampolines.com | Active | 8/26/2023 | On |
| yerf-dogtrampolines.com | Active | 8/26/2023 | On |
| yerf-dog-trampolines.com | Active | 8/26/2023 | On |
| yerfdogusa.com | Active | 8/26/2023 | On |
| yerf-dogusa.com | Active | 8/26/2023 | On |

<u>Material Proprietary Software</u>: None.

(c)

    (i)

1. The Coleman License Agreement.

2. License Agreement, dated as of January 1, 2019, by and between Jordan Outdoor Enterprises, Ltd. and certain of the Sellers, as amended by that certain Amendment dated as of June 3, 2021.

3. Data Processing Agreement for Oracle Services, dated as of April 29, 2021, by and between Oracle America, Inc. and certain of the Sellers.

    (ii) None.

    (iii) None.

(d)

(i) None.

(ii) None.

### SCHEDULE 3.8

### LITIGATION

1. Kleinman v. Defendants (including the Company) - Philadelphia Court of Common Pleas C.A. No. 200300398, filed March 4, 2020, accident date April 22, 2018.  This case is a civil action arising out of a traffic accident in Philadelphia, Pennsylvania. This case is at the very early stages of litigation as the criminal proceedings need to be resolved to mount discovery. The plaintiff is the estate of six year old Malik Williams, who on April 22, 2018 at 12:48 AM was a passenger on one of the Company's small single passenger CT100u minibikes that was made for off-road use. The minibike, meant for off-road daylight use, had no head light or tail light and was being operated by Antoine Hardman on 63rd Street in Philadelphia, PA in the dark of night. As Mr. Hardman passed through an intersection on Callowhill Street, the minibike was struck by a Jeep Compass being operated by Warren Garrett. It was later determined that Garrett was driving under the influence. Both were criminally charged. Malik Williams was taken by ambulance to a local hospital where he was pronounced dead.  The Complaint was filed by Martin Kleinman, Esq., as personal representative of the decedent Malik Williams. In addition to the Company, other named defendants include: Warren Garrett, Chongqing Huansong Science and Technology Industrial Co, Ltd ("Hisun China"), Hisun Motors Corp. USA, Antoine Hardman and Serita Hunter. The Company was served with the Complaint in November, 2020. As to the Company, the Complaint alleges counts of strict liability for design defect and for failure to warn; negligent design, negligent failure to warn, wrongful death, and survival action. The Company filed an answer, denying the material allegations of the complaint, and counterclaims. There is ample insurance and the Company expects this matter to be covered by the Company's insurance carrier. The Sheehan Firm is representing the Company.

2. Yonko v. Coleman Powersports - US District Court, Southern District of Texas C.A. No. 4:20-CV-03138: 12/2018.  The plaintiff's family purchased a minibike on December 19, 2018, stopped at a gas station to fuel the minibike and proceeded to ride the minibike in a nearby parking lot in the dark of night. It is alleged that the minibike caught fire and burned an underage member of the family, who required hospitalization with third degree burns. A number of facts are still in dispute, including damage sustained to the minibike that is consistent with front end collision that has yet to be explained, a missing fuel cap, and other witness testimony yet to be obtained. Due to issues with the minor's parents being unreasonable, a *guardian ad litem* was assigned to represent the interests of the minor child. The parties and *guardian ad litem* reached a preliminary settlement agreement, but the minor plaintiff's parents are still causing issues with getting the settlement approved by the court. A magistrate has now been assigned to mediate the settlement between the parties. The Company expects this matter to be covered by the Company's insurance carrier. The Sheehan Firm is representing the Company.

3. Brandie Knott Et Al  vs  Hisun Motors Corporation USA; Performance Powersports Group, Inc; DBA Coleman Powersports USA; Jesus Mora; Heather Mora; and Amanda Jones - 27th Judicial District , St. Landry Parish, Louisiana, Docket# C-2211000 D/ Amanda Jones Et Al vs  Hisun Motors et al, 27th Judicial District , St. Landry Parish, Louisiana, Docket# C-2211005 D - Defendants Jesus and Heather Mora purchased a Coleman Outfitter 550 UTV in

20

July 2020. This UTV was provided by Hisun. It was equipped with a device which would limit the UTV's top speed to five miles per hour if the seat belts were not buckled. On the date of the incident, the Moras' 13-year-old daughter was operating the UTV and three other young girls, including the decedent, 13-year-old Bella Hicks, were riding in the UTV. According to the police report, the Moras' daughter made a sharp turn, causing the UTV to turn over fatally injuring Bella Hicks. Defendant Moras claims the seatbelt speed limiter failed at the time of the subject incident which resulted in the UTV being able to operate in excess of 5 mph with the driver's side seatbelt unfastened. Non-destructive testing of the UTV was unable to determine if the seatbelt speed limiter had been tampered with either prior or subsequent to the incident. This matter is in the very early stages of discovery. We will know more about the specifics of this claim as discovery continues. An additional suit was filed by one of the passengers claiming both mental and physical pain and suffering. Insurance is engaged and the Company's counsel expects these suits to be combined. The Sheehan Firm is representing the Company in this matter. The Company expects this to be covered by insurance; however, the Company evaluates claims on a case-by-case basis and may consider paying smaller claims out-of-pocket in lieu of submitting to insurance for payment.

4.    Chongqing Huansong Industries (Group) Co., Ltd., et al. v. Performance Powersports Group, Inc., et al. – United States District Court for the Southern District of New York, No. 1:22-cv-10652, filed December 16, 2022. This case was filed by Chongqing Huansong Industries (Group) Co., Ltd., Chongqing Huansong Science and Technology Industrial Co., Ltd., and Vietnam New Century Industrial Company Limited (collectively, "Hisun") against Performance Powersports Group, Inc. ("the Company") and Kinderhook Industries, LLC ("Kinderhook") asserting claims for breach of contract, account stated (against the Company only), unjust enrichment (against Kinderhook only), intentional misrepresentation (against Kinderhook only), fraudulent transfer, and for a declaratory judgment that the Company is merely an alter ego of Kinderhook. The dispute arises out of the Company's alleged purchase orders with Hisun, one of the Company's primary vendors. Specifically, as to the Company, Hisun alleges that between April 6, 2021 and February 9, 2022 the Company entered into purchase order contracts with Hisun for approximately $87 million worth of product that was delivered to and accepted by the Company. The complaint alleges that, by the time of its filing, the Company still owed no less than $60 million on those purchase orders. The Company does not expect this matter to be covered by insurance.

5.    Hisun Motors Corp. U.S.A. v. Performance Powersports Group, Inc. – United States District Court for the Eastern District of Texas, No. 4:22-cv-958, filed November 11, 2022. This case was filed by Hisun Motors Corp., U.S.A. ("Hisun USA") against Performance Powersports Group, Inc. ("the Company") asserting claims for breach of contract, sworn account, unjust enrichment and constructive trust, promissory estoppel, and attorneys' fees. The dispute arises out of the Company's alleged purchase orders with Hisun USA, one of the Company's vendors. Specifically, Hisun USA alleges that the Company has failed to pay for goods and services provided by Hisun USA to the Company in the amount of $3,514,546.01 as of November 11, 2022. The Company was served on November 16, 2022. Quilling Selander Lownds Winslett & Moser PC is defending the Company in this matter. The Company does not expect this matter to be covered by insurance.

6.     Robinson v. Performance Powersports Group, Inc. – Circuit Court of Hinds County, Mississippi Case No.: 25CI1:23-cv-00037-WLK. Plaintiff purchased a fully-assembled Coleman AT200-B ATV from a Camping World retail location in Jackson, Mississippi. At the time of the incident, the plaintiff alleges she was operating the ATV when one of the front wheels came off. As a result, the plaintiff was thrown off the vehicle and the vehicle landed on top of her, resulting in musculoskeletal pain and a left arm contusion. Inspection of the vehicle revealed the vehicles A-Arm was disconnected from the tie rode. There was also damage on the vehicle consistent with a frontal impact. It is therefore likely the incident was not the result of a product defect, but caused by the plaintiff striking an object with the vehicle. Plaintiffs filed their lawsuit on February 2, 2023.  The Company expects this to be covered by insurance; however, the Company evaluates claims on a case-by-case basis and may consider paying smaller claims out-of-pocket in lieu of submitting to insurance for payment.

7.     Devin Martin Claim - The minor claimant suffered a laceration to his groin when the chain on the Coleman RT100 minibike he was operating broke and struck him. Inspection of the mini-bike disclosed the chain sprocket and hub were misaligned, which may have resulted in increased tension on the chain. The Company is unable to determine if this condition was the result of a manufacturing issue or due to damage to or improper maintenance of the vehicle by the vehicle owners. The Company is currently in settlement negotiations and it is unlikely this matter will result in litigation.  The Company expects this to be covered by insurance; however, the Company evaluates claims on a case-by-case basis and may consider paying smaller claims out-of-pocket in lieu of submitting to insurance for payment.

8.     Aaron Bennett Claim - The claimant was riding the ATV down a hill when the brakes allegedly "gave out", resulting in the claimant being thrown from the vehicle. The claimant allegedly suffered multiple upper body fractures which did not require surgery. An inspection was held, which indicated that the front wheel of the vehicle was not properly assembled and may have caused the incident. At this time no lawsuit has been filed.

9.     Christian Hill vs. The Coleman Company, Inc. - San Bernardino County Superior Court CIV SB 2204223, filed February 23, 2022. The plaintiff alleges she was injured while riding a Coleman go-kart when it malfunctioned and caused her "to be propelled off the go-kart and fall onto the pavement and/or road, thereby causing plaintiff to endure severe injury and pain." The plaintiff has sued The Coleman Company, Inc., which, in turn, has demanded defense and indemnity from Performance Powersports Group, Inc. pursuant to the Coleman License Agreement.

## **SCHEDULE 3.9(b)**

## **EMPLOYEES AND EMPLOYMENT MATTERS**

List provided by Klehr Harrison Harvey Branzburg LLP, as counsel to Sellers, to Kirkland & Ellis LLP, as counsel to Buyer, prior to the effective date hereof.

## SCHEDULE 3.10(a)

## EMPLOYEE BENEFIT PLANS

1.    Medical insurance through BlueCross BlueShield of Arizona (BluePreferred PPO 4000 Plan Option).

2.    Dental insurance through Metropolitan Life Insurance Company.

3.    Basic Term Life/AD&D insurance through Metropolitan Life Insurance Company.

4.    Long Term Disability insurance through Metropolitan Life Insurance Company.

5.    Short Term Disability insurance through Metropolitan Life Insurance Company.

6.    Vision insurance through Metropolitan Life Insurance Company.

7.    Supplemental Term Life insurance through Metropolitan Life Insurance Company.

8.    In connection with its relocation plan, Performance Powersports Group, Inc. (f/k/a Rich Godfrey & Associates, Inc.) adopted the severance and retention payout schedule provided by Klehr Harrison Harvey Branzburg LLP, as counsel to Sellers, to Kirkland & Ellis LLP, as counsel to Buyer, prior to the effective date hereof.

10330608.v13

## SCHEDULE 3.11

## LEASED REAL PROPERTY

(b)

1. Amended and Restated Lease, dated as of October 8, 2021, by and between Cascade Range Investments, LLC, and certain of the Sellers for the premises located at 444 West Geneva Drive Tempe AZ 85282.

2. Amended and Restated Lease, dated as of October 8, 2021, by and between Cascade Range Investments, LLC and certain of the Sellers for the premises located at 1755 E. University Dr. Tempe AZ 85251.

3. Lease Agreement, dated as of October 24, 2022, by and between DG Mesquite Airport Property Owner, L.P. and certain of the Sellers for the premises located at 4120 E. Scyene Road, Mesquite, Texas 75181.

4. Multi-Tenancy Industrial Lease (Triple Net), dated as of January 26, 2022, by and between Metro East Valley Holdings Phase Three, LLC and certain of the Sellers for the premises located at 1907 South Hobson Street, Suite 108, Mesa, AZ 85204 (together with that certain Memorandum of Commencement, dated September 28, 2022).

(c)    None

10330608.v13

## SCHEDULE 3.12

## PERMITS

1.    Certificate of Occupancy, issued by City of Mesquite Building Inspection Division.

2.    The following state licensing registrations:

| States | Off Road. Man. / Dist. License # | 49cc Scooter / Moped On Road. Man. / Dist. License # | Rep. | Man. / Dist. Representative  License # | SoS / DoR Entity Filing # |
|---|---|---|---|---|---|
| Alabama | Not Required | Not Required | Not Required | Not Required | 398-550 |
| Arkansas | 10176D | Not Required | Ron Lackey | 22406 | Not Required |
| Arizona | Not Required | Not Required | Not Required | Not Required | 16009092 |
| California | 93462 | Not Required | Not Required | Not Required | ACC file # 16009092 |
| Colorado | 43882 | Not Required | Not Required | Not Required | 20171188122 |
| Florida | Not required | MD/1127386/1 | Not Required | Not Required | F18000001543 |
| Idaho | 9294-0 | Not Required | Ron Lackey | LACO46874 | Not Required |
| Iowa | ZZ 868316 | M327 | Not Required | Not Required | Not Required |
| Indiana | Not Required | Not Required | Not Required | Not Required | Business ID #201609201159426 |
| Louisiana | RD-2020-00190 | Not Required | Ron Lackey | RD-2020-00186 | 40565864F |
| Mississippi | Not Required | 592 | Ron Lackey | Lic # 592 | Not Required |
| Montana | # 501 | Not Required | Not Required | Not Required | Not Required |
| New Hampshire | Not Required | Not Required | Not Required | Not Required | Business ID:          806189 |
| North Carolina | Not Required | Not Required | Not Required | Not Required | C202028900765 |
| Ohio | DI000178 | Not Required | Not Required | Not Required | Not Required |
| Oklahoma | 586 | Not Required | Ron Lackey | 2630 | Not Required |
| Pennsylvania | VM008694 | Not Required | Ron Lackey | VR457361 | 6464041 |
| Rhode Island | NA | 210-D | Ron Lackey | 620R-1 | 18060060360     ID# 001684888 |
| Texas | 125889 | 125889 | Ron Lackey | 125890 | Not Required |
| Utah | 062P & 10087833-1052 | Not Required | Ron Lackey | 109301 | 10087833-0143 & 10098433-0151 |
| Virginia | 48408 | Not Required | Ron Lackey | NA | Not Required |
| Washington | 10750 | Not Required | Not Required | Not Required | UBI # 604 152 825 |
| Wisconsin | NA | DC-7956 | Not Required | Not Required | Not Required |
| Wyoming | ML-098 | Not Required | Ron Lackey | NA | Rich Godfrey...2016-000729926 DBA Coleman...2016-000729957 |

10330608.v13

## **SCHEDULE 3.13**

## **ENVIRONMENTAL MATTERS**

None.

## Exhibit B

**Assigned Executory Contracts and Unexpired Leases**

**<u>Exhibit C</u>**

**Cure Claim Objections**

## **Exhibit D**

**Consent to Assumption and Assignment of License Agreement**