## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PERFORMANCE POWERSPORTS GROUP INVESTOR LLC, *et al.*,[1] | ) | Case No. 23-10047 (LSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) | **Related to Docket Nos. 17 and 18** |

## SUPPLEMENTAL DECLARATION OF STEVEN W. BREMER IN SUPPORT OF BID PROCEDURES AND SALE MOTION

I, Steven W. Bremer hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.  I am a Managing Director at Portage Point Partners, LLC, which is a business advisory and financial services firm with its principal place of business at 300 North LaSalle Drive, Suite 1420, Chicago, Illinois 60654.  Triple P Securities, LLC ("Triple P Securities") and Triple P RTS, LLC ("Triple P RTS" together with Triple P Securities are collectively referred to as, "Portage Point") are each wholly owned by Portage Point Partners, LLC.  Triple P Securities is the investment banker and Triple P RTS is the restructuring advisor for the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 Cases.[2]

2.  I submit this supplemental declaration (the "Declaration") in further support of the *Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380).  The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

[2]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms as set forth in the *Declaration of Ken Vanden Berg in Support of Chapter 11 Petitions and First Day Motions and Applications* (the "First Day Declaration"), the Bid Procedures and Sale Motion, or the Initial Declaration (as defined herein), as applicable, each fully incorporated herein.

*Form and Manner of Notice Thereof, (D) Authorizing Entry Into the Stalking Horse Agreement, (E) Approving Bid Protections, (F) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (G) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 17] (the "<u>Bid Procedures and Sale Motion</u>") and to supplement my previously filed *Declaration of Steven Bremer in Support of Bid Procedures and Sale Motion* [Docket No. 18] (the "<u>Initial Declaration</u>").

3.      The statements in this Supplemental Declaration are, except where specifically noted, based on my personal knowledge or opinions, or on information I obtained from the Debtors' employees or advisors, the Debtors' books and records, and/or from Portage Point employees working under my supervision, direction, or control.

4.      I am not being specifically compensated for this testimony other than through payments received by Portage Point as a professional retained by the Debtors pursuant to an order entered by this Court.  I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.  If called to testify, I could and would competently testify to the facts set forth herein.

**A.      Background and Qualifications and Portage Point Engagement**

5.      My background and qualifications and the background, qualifications, and engagement of Portage Point set forth in the Initial Declaration are incorporated herein by reference as if fully set forth herein.

10425201.v5

B.      **Postpetition Marketing and Sale Efforts.**

6.      Following Portage Point's prepetition marketing of the Debtors' assets, as further described in the Initial Declaration, Portage Point continued to market the Debtors' assets postpetition.  Portage Point team re-approached the 33 parties contacted as part of the pre-petition process with an update on the situation and copy of the bidding procedures and sale motion. In addition, Portage Point was in contact with 10 additional parties, including both strategic and financial buyers, who were not part of the pre-petition process. Of these, 9 signed an NDA and were given dataroom access. Also during this time, the Court entered a bidding procedures order that deleted certain bid protections for the Stalking Horse Agreement.

7.      Although Portage Point had discussions with several parties about submitting a bid and participating in an auction, no bids were received by the Bid Deadline of 4:00 p.m. prevailing Eastern Time on March 7, 2023 (other than the one submitted by CPS USA Acquisition, LLC (the "Stalking Horse Bidder")).  Consequently, the Debtors designated the Stalking Horse Bidder as the successful bidder pursuant to the terms of that certain asset purchase agreement, dated January 16, 2023 as amended and modified (the "Stalking Horse Agreement") and, on March 8, 2023, the Debtors filed the *Notice of Cancellation of Auction and Designation of Stalking Horse Purchaser as the Successful Bidder in Connection With the Sale of Substantially All of the Debtors' Assets* [Docket No. 198] and cancelled the Auction.

8.      The interested parties were informed that  they could discuss the assumption of the first lien debt with Twin Brook Capital as part of their bid if they chose to do so.  However, I understand that no interested party elected to so discuss. Interested parties were also informed that all of the Debtors' assets were included as part of the sale and my team and I marketed all those assets to parties participating in the sale process.

10425201.v5

9.      Further, during the sale process Hisun was specifically asked if it wished to participate and submit a bid on the Debtors' assets.  Like all of the other potentially-interested parties Hisun was unwilling to submit a bid on any of the Debtors' assets.

10.      During the process, none of the interested parties expressed a concern about the marketing process or the sale timeline.  Instead, interested parties expressed concerns with the EBITDA profile of the Debtors.

**C.      The Stalking Horse Agreement Is the Best Offer Available to the Debtors.**

11.      As the Debtors' investment banker, I was involved in the negotiations of the Stalking Horse Agreement with the Stalking Horse Bidder and in the marketing of the Debtors' assets.

12.      Under the terms of the Stalking Horse Agreement, the Stalking Horse Bidder will purchase the Assets for an aggregate purchase price consisting of: (a) a credit bid of the outstanding obligations under the DIP Credit Agreement in the amount of approximately $10 million; (b) payment of an amount in cash equal to $750,000 and a note in the amount of $500,000 to fund a litigation trust to assist in pursuing Excluded Claims; (c) assumption of the outstanding obligations under the Prepetition First Lien Credit Agreement under new terms in the amount of approximately $52 million; (d) assumption of certain other assumed liabilities as provided in the Stalking Horse Agreement; (e) the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder and payment of any cure obligations associated with such Assumed Contracts; and (f) payment of the Wind-Down Amount in the amount of $600,000; provided that the Wind-Down Amount shall only become payable as a portion of the Purchase Price in the event that (i) Debtors have insufficient cash on hand at Closing to fund the Wind-Down Amount from such cash on hand and (ii) the Debtors have otherwise complied in all respects with the Financing Orders, in which

case the Stalking Horse Bidder shall only be required to fund the amount necessary to bring the Debtors' total cash on hand at Closing to equal to the amount of the Wind-Down Amount (each term as defined in the Stalking Horse Agreement).  The Stalking Horse Agreement not only represents a going concern sale of substantially all of the Debtors' assets, but also provides for a recovery to unsecured creditors whose contracts and/or claims the Stalking Horse Bidder is not otherwise assuming under the Stalking Horse Agreement.  As a result, the proposal embodied in the Stalking Horse Agreement contemplates  the assumption of a significant amount of prepetition unsecured claims by the Stalking Horse Purchaser.

13.     Based on my knowledge of the prepetition and postpetition marketing process and the Debtors' present circumstances, I believe that the Stalking Horse Agreement currently represents the highest and best offer for the Debtors' assets.

14.     I believe that the marketing process has been adequate to achieve the greatest possible level of interest and return for the assets.  This is based on the marketing efforts to date, the Debtors' current circumstances, the number of parties that executed NDAs, and the fact that Portage Point had recently marketed the assets to the most likely bidders. .

**D.      The Sale Timeline Reflects an Efficient and Value-Maximizing Sale Process.**

15.     I also believe that the timeline for the sale allowed the Debtors to maximize the prospect of receiving the highest and best offer through a fair, robust, and open sale process, while still ensuring that the Debtors could close the sale in accordance with the Stalking Horse Agreement.  In particular, following a robust prepetition marketing process, the Debtors did not receive any bid other than that of the Stalking Horse Bidder. Despite renewed marketing efforts initiated postpetition, the Debtors similarly did not receive any additional bid from interested

parties. As a result, the Debtors do not believe that additional time to run the sale process would be useful to achieve additional interests in the assets.

16.    Further, the sale timeline is prudent under the circumstances. I understand that the Debtors' business and its assets are at risk of being negatively impacted over time as customers, vendors, and employees become increasingly reluctant to engage with the Debtors under the current period of uncertainty. Moreover, the Debtors do not have the liquidity to support a protracted sale process. Instead, a sale on the requested timeline is reasonable under the present circumstances as it provides a buyer with the best opportunity to retain the Debtor's customers and employees and continue the Debtors' operations as a going concern.

17.    The Stalking Horse Agreement was extensively  negotiated by the Debtors via the Disinterested Director and the Stalking Horse Bidder over several weeks leading up to the filing of these Chapter 11 Cases and following the petition date.  The resulting Stalking Horse Agreement is the culmination of substantial diligence and rigorous arms-length negotiations, all conducted in good faith and without collusion.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  March 22, 2023

/s/ Steven W. Bremer
Steven W. Bremer, Managing Director
Portage Point Partners, LLC

10425201.v5