IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| PERFORMANCE POWERSPORTS GROUP INVESTOR LLC, *et al.*,[1] | ) ) ) | Case No. 23-10047 (LSS) |
| Debtors. | ) ) ) ) | (Jointly Administered) Related to Docket Nos. 13 and 17 |

**DECLARATION OF PETER KRAVITZ IN SUPPORT OF
DIP MOTION AND SALE MOTION**

Pursuant to 28 U.S.C. § 1746, I, Peter Kravitz hereby declare as follows:

1. I currently serve as the Disinterested Director of the above-captioned debtors (the "Debtors").

2. In addition, I am currently employed as a Principal at Province, Inc. ("Province"). Province is a US-based nationally recognized financial advisory firm.

3. I submit this declaration (the "Declaration") in support of the *Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing Entry Into the Stalking Horse Agreement, (E) Approving Bid Protections, (F) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (G) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests,*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

10425319.v7

*(B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* [Docket No. 17] (the "Bid Procedures and Sale Motion") and the *Motion of the Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Authorizing Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 13] the ("DIP Motion").

4. The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinions, or on information I obtained from the Debtors' employees or advisors, the Debtors' books and records, and/or from Province employees working under my supervision, direction, or control.

5. I am not being specifically compensated for this testimony. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If called to testify, I could and would competently testify to the facts set forth herein.

A. **Background and Qualifications**

6. I am a Principal at Province, which focuses on growth opportunities, corporate restructurings, and fiduciary-related services. Over the past fifteen years, I have held a variety of roles, including (i) Chief Restructuring Officer, (ii) a member of bankruptcy oversight and creditor committees, (iii) the trustee for liquidating and litigation trusts, (iv) a plan administrator, (v) a disbursing agent, and (vi) advisor to and member of various boards of directors.

7. In the last 10 years I have worked on approximately 300 to 400 engagements where I served as a representative for committees of unsecured creditors, ad hoc committees, or litigation trusts, or as a litigation trustee. On those matters where I led litigation recovery efforts—including

10425319.v7

in the context of fraudulent conveyances, D&O litigation, business interruption, and class action claims—I have helped recover more than $1 billion. Such matters include Samson Resources, Maxus Energy, Philadelphia Energy, Circuit City, Core Media, Fleetwood, Radio Shack, Aegean Marine, Rescap, American Apparel, and approximately 35 other post-confirmation trust engagements.

8.  In addition to these roles, I have also served as a disinterested director in cases such as PetSmart, BoardRiders, and Sable Energy. Among other things, my responsibilities as a disinterested director have included reviewing financial covenants and transactions, reviewing the appropriateness of spinoff transactions, chairing special committees for DIP considerations, investigating potential company causes of action, and overseeing financial restructurings.

9.  For one of these companies (BoardRiders), I was involved in an uptier financial transaction that resulted in the recapitalization of $450 million in debt obligations and required hard fought negotiations with lenders for covenant relief and liquidity infusion.

10. For Sable Permian Resources Land, LLC, I served as an independent director where I assisted the company in an in=court restructuring of $2.1 billion of debt obligations. In that case I also served as the chair of the Special Committee, which had responsibility for an investigation into estate causes of action, the negotiation of the DIP, and several other pre-petition agreements.

11. Finally, I was appointed as an independent board member of PetSmart, Inc., the largest pet specialty retailer in the United States and Canada, to address its successful dividend of 20% of the equity of its online retailer, Chewy.com to its equity sponsor. That process allowed for the successful $9 billion IPO of Chewy.

12. I have also overseen litigation in my role as a disinterested director. One such litigations was in PetSmart, which was settled and another, BoardRiders, which is still pending.

10425319.v7

13. I have also been involved in bankruptcy litigation in my roles as a litigation/liquidation trustee and as a committee professional. I have served as a litigation/liquidation trustee over 50 times in the past 12 years. In such roles I have generally served as the plaintiff in litigations and have initiated bankruptcy litigation numerous times, including professional liability claims, avoidance actions, fraudulent conveyances, unlawful dividends, and D&O litigation.

**B.     Engagement as Disinterested Director**

14. In the fall of 2022, I was approached to submit my qualifications to serve as a disinterested director for the Debtors. I submitted my qualifications and was interviewed by several members of the Debtors' Board for the position.

15. Prior to my engagement as the Disinterested Director, I did not have any involvement with the Debtors, the Debtors' first lien lender (Twin Brook Capital Partners ("Twin Brook")), or the Debtors' equity sponsor (Kinderhook Industries, LLC ("Kinderhook")).

**C.     Scope and Authority As Disinterested Director**

16. I became the Disinterested Director for the Debtors in October 2022. At that time, the Debtors decided that a disinterested director was necessary because the Company was in the midst of financial distress that could require actions that may give rise to a potential conflict of interest among the board members.

17. Initially, my authority included the review and authorization of matters relating to a potential restructuring, a potential financing, the sale of the company, or any other matter in which a conflict existed with another board member. When a bankruptcy filing become a possibility, the Board expanded my authority to include decisions relating to a filing or any related transactions.

4

18.     In my role as disinterested director, I have: (1) evaluated the Debtors' assets, including but not limited to performing an investigation of potential litigation claims that the Company may have against certain parties; (2) assisted in identifying strategic alternatives for the Company, including a prepetition marketing and sale process; (3) led attempts to resolve disputes with the Hisun entities;[2] (4) led the negotiation of the Stalking Horse agreement; and (5) led the negotiation of the DIP Financing.  The Debtors delegated to me the decision-making authority on these topics, and I was the one who ultimately made the decisions.

**D.     The Investigation of Potential Claims.**

19.     Shortly after I was appointed as the disinterested director, it became clear that a sale of the Company's assets was in the best interests of the Debtors, their creditors, and all parties in interest.  I believed this was the best path given the Company's liquidity constraints, the pending and threatened litigation by Hisun and the anticipated difficulties raising additional debt or equity.

20.     Under these circumstances, I believed that an investigation into potential causes of action was necessary.  In particular, I believed that an investigation was necessary to determine whether the Company had any assets in the form of litigation claims, including claims relating to the 2021 Transaction or any conduct after that transaction.  Notably, the investigation's scope was not limited to any one party's conduct.  Instead, the investigation sought to understand how the Company ended up where it was, including the roles played by the Company's former CFO, CEO, and all of the parties to the 2021 Transaction.  Of particular concern was the financial condition after the 2021 Transaction and how the Company's liquidity revolver was exhausted in such a short period of time.

---

[2] The Hisun entities are Chongqing Huansong Industries (Group) Co., Ltd., Chongqing Huansong Science and Technology Industrial Co., Ltd., and Vietnam New Century Industrial Company Limited.

10425319.v7

21. The investigation became even more important when the Company's investment banker, Portage Point Partners LLC ("Portage Point"), advised that the only viable DIP financing partner was the Debtors' equity sponsor, Kinderhook, and there were no viable alternatives in the marketplace. Investigating any potential claims against Kinderhook became crucial, as I know that DIP lenders typically ask for a release of a company's claims against it in exchange for the financing.

22. As part of my investigation, I obtained from the Company a set of 170 documents related to the 2021 transaction, including the transaction documents, governance documents, corporate structure charts, board minutes, and other documents. I also received and reviewed over 5,000 emails from the company, including available emails of Richard Godfrey and Christopher Hunter, the Company's CEO and CFO, respectfully, during the relevant time period. Unfortunately, the emails that I was able to collect included very few emails from Mr. Godfrey. This was due to a few factors: (i) he generally refused to cooperate with me during my investigation; (ii) he appears to have used his personal email address to conduct work business; and (iii) the possibility that he deleted some of his work emails. I also received and reviewed over 1,200 emails from Kinderhook in response to document requests.

23. My investigation also included interviews with a number of people involved in the 2021 Transaction and management of the Company, including Kyle Dawson and Paul Cifelli from Kinderhook, Ken Vanden Berg, the Company's current CFO, and Ron Lackey, the Company's current Executive VP and General Manager. Though we made several requests, Mr. Godfrey refused to sit for an interview for purposes of my investigation.

24. These interviews covered a wide range of topics. For example, these interviews explored the Company's capital structure and financial condition leading up to the 2021

Transaction, the development, structuring, and negotiation of the 2021 Transaction, the Company's capital structure and financial condition after the 2021 Transaction, the Twin Brook financing, the operation of the Company post-2021 Transaction, and the Company's relationship with Hisun.

25. As part of the investigation, I considered any and all claims that the Company could potentially monetize, including, but not limited to, intentional or constructive fraudulent transfer claims, breach of fiduciary duty claims, avoidance claims, equitable subordination claims, and debt re-characterization claims. I considered all potential targets for such claims, including Kinderhook, as the purchaser and equity sponsor, Twin Brook, as lender, Mr. Godfrey, as the net seller and net winner from the deal, and the Company's former management team, including Mr. Godfrey and Mr. Hunter, who oversaw the Company's significant financial decline.

E.  **The Factual Findings From The Investigation.**

26. In March 2021, the Company retained Hudson Capital Properties ("Hudson") to market it for a potential sale. Hudson prepared a confidential information memorandum ("CIM") that was circulated to potential strategic partners. A number of potential buyers expressed interest, including Kinderhook.

27. Kinderhook executed a letter of intent ("LOI") on June 4, 2021 that included a $130 million offering price. Prior to this, the Company had no prior relationship with Kinderhook. After diligence and other negotiations, the 2021 Transaction closed on October 8, 2021 with a final purchase price of $112 million, inclusive of fees, expenses, and cash-to-balance sheet amounts. The purchase price was determined as a multiple (5.9X) of the Company's adjusted EBITDA of $17 million. The purchase price was comprised of $45 million of cash from Kinderhook; $2 million of cash from Twin Brook, $45 million of debt financing from the Twin Brook Facility, and

$20 million of rollover amount from Mr. Godfrey. In this transaction, Kinderhook paid $45 million of cash in return for the equity of the Company.

28. At the closing of the 2021 Transaction, the company made a number of payments that included $69 million to Mr. Godfrey, $8.8 million of transaction expenses (including a $1.5 million transaction fee to Kinderhook), and $6 million in sale bonuses to certain former company executives. The Kinderhook fee was a customary fee that Kinderhook receives in these types of transaction.

29. After the 2021 Transaction, Kinderhook was the Company's equity sponsor and had the right to name several individuals to the board. Kinderhook also entered into a Management Services Agreement ("MSA") with the Company at closing, which Kinderhook typically did with its portfolio companies. Under the MSA, Kinderhook agreed to provide advisory and management services to the Company; and, in return, the Company agreed to pay a $1.725 million fee and $500,000 per year for ten years. The Company also agreed to pay a fee if certain transactions occurred, such as a change in control transaction. The Company has paid **none** of the fees outlined in the Management Services Agreement.

**F.    Conclusions From The Investigation**

30. As a result of the investigation, I concluded that the Company did not have valuable claims against Kinderhook or Twin Brook but could have valuable claims against Mr. Godfrey and some former officers.

31. I concluded that the Company did not have claims against Kinderhook for a number of reasons. First of all, Kinderhook was a net loser from the Transaction. As a result, it is not a rational target for fraudulent-conveyance-type claims. Kinderhook paid $45 million in cash for the shares of the Company it currently owns and has not taken any cash out of the Company after

8

the transaction, including the contractual management fees. The $1.5 million transaction fee the Debtors paid to Kinderhook was in exchange for benefits and value Kinderhook provided and thereby was in return for at least reasonably equivalent value (and given the benefits of the junior DIP package Kinderhook provided value). Specifically, Kinderhook paid $45 million and established a long-term partnership with the Company to drive growth by continuing to provide expertise and advice. Due to the Company's financial difficulties, Kinderhook refrained from taking any cash out of the Company, including the fees it was owed under the MSA. At the end of day, it is clear that Kinderhook was a net loser in the 2021 Transaction and there are no valuable claims against it.

32. In contrast, my investigation revealed that there are potentially valuable causes of action against Mr. Godfrey and some of the former executives of the Company. These individuals were the net winners from the 2021 Transaction.

33. In addition to the investigation I performed, I also participated in the Committee's investigation into potential estate causes of action. For purposes of this investigation, I directed that the Committee be given the relevant documentation that I received, and I also participated in the Committee's interview of witnesses. The Committee interviewed the same two Kinderhook witnesses previously interviewed, Kyle Dawson and Paul Cifelli. The Committee also interviewed Mr. Godfrey.

34. I have also read the Committee's limited objection (the "<u>Limited Objection</u>") to the Bid Procedures and Sale Motion and DIP Motion. Nothing I read in the limited objection has caused me to change my conclusions. Though the Committee has raised certain issues regarding the solvency of the Company as a result of the 2021 Transaction, regardless of the solvency issue, I agree with the Committee that the Debtors do not have valuable claims against Kinderhook.

Again, Kinderhook was a net loser with respect to that transaction. And, just as the Committee similarly concluded that there are no claims against Kinderhook (Limited Objection at note 5), I also agree with the Committee that the only potentially viable claims of the Company are those that could be asserted against the net-winners of the 2021 Transaction— namely Mr. Godfrey and the other former executives that received cash out of the transaction (Limited Objection at note 5).

35.  As a result of my investigation, and as confirmed by the Committee's investigation, I believe that there are no claims against Kinderhook.  Based on these conclusions, I believe that the Debtors' decision to enter into the DIP Facility with Kinderhook and the Stalking Horse Agreement was the best possible decision for the Debtors and their estates.  Moreover, I believe that the Debtors have given up little when it comes to the release of the litigation claims against Kinderhook and its affiliates and the sale of all claims and causes of action other than Excluded Claims under the Stalking Horse Agreement.

**G.     Prepetition Sale Process**

36.  In the fall of 2022, after considering the reasonably available courses of action, I concluded that a sale of the Debtors' assets was in the best interests of the Company, its creditors, and all other parties in interest.  This conclusion was based on the Debtors' liquidity constraints, pending litigation, vendor threats, and the anticipated difficulties in raising additional debt or equity financing.  At the initial stages, it was contemplated that the sale would occur outside of a bankruptcy proceeding.

37.  Portage Point marketed the Company and created materials intended for distribution to prospective buyers, including a teaser and a confidential information memorandum. Portage Point also populated an online data room with numerous documents available for any parties who decided to engage in additional due diligence.  Portage Point worked with the

Company to create a list of suitable potential buyers, and Portage Point then contacted those parties on a discreet and confidential basis. The outreach to these parties began on December 6, 2022.

38. Portage Point reached out to 33 parties and offered them the opportunity to participate in the sale process. These parties included Mr. Godfrey, Hisun, and Twin Brook. Nine parties executed confidentiality agreements and were provided with the confidential information memorandum and access to the data room. Twin Brook and Hisun indicated that they were not interested in bidding on the assets. Although he initially expressed that he would be interested in participating in the process, Mr. Godfrey ultimately did not participate. The Company did not receive any indications of interest by the January 13, 2023 prepetition bid deadline.

39. During this process, I was leading the negotiations of a Stalking Horse Agreement with CPS USA Acquisition,[3] which was an affiliate of Kinderhook that was created to bid on these assets in the event that no other expressions of interest were received. I believed that a stalking horse was required based on the liquidity constraints of the Company and because Hisun had threatened to file an involuntary bankruptcy against the Company.

40. In negotiating the Stalking Horse Agreement, my goals were twofold. First, I wanted to have a baseline deal in place to sell the Company's assets as a going concern and expose the assets to higher and better offers. Second, I needed the liquidity support of DIP financing to make the process possible. After determining that no unsecured DIP was available, I attempted to negotiate the DIP on a junior lien basis.

41. The accelerated timing of the process was driven partly by litigation and a threatened involuntary bankruptcy. Prior to the filing, Hisun had filed litigation against the Company in Texas and the Southern District of New York. During negotiations designed to

---

[3] An affiliate of Kinderhook owns both (a) the DIP lender (Tankas Funding VI, LLC) and (b) the Buyer (CPS USA Acquisition, LLC). But neither the DIP Lender nor the Buyer have any ownership of PPG.

10425319.v7

resolve those litigations, Hisun threatened to file an involuntary, which was an outcome the Company wanted to avoid, as it would have severely damaged the value of the Company.

42. The Hisun litigation centered around attempts to collect an alleged debt. I led the negotiations with Hisun regarding those litigations. We spoke prior to the Christmas holiday in 2022 and then again in early January after the litigation was filed in the Southern District of New York. As a part of those discussions, I was clear that the Company needed to reach a resolution of Hisun's claims before it would be able to sell the company outside of a bankruptcy proceeding. I believe we made reasonable proposals that were rejected by Hisun. I made it abundantly clear what path the company would take absent a settlement and that such path would include a continued sale process in a chapter 11 proceeding. I also made it abundantly clear that given the potential value of a transaction and the senior debt, it would likely not allow value to flow to Hisun. I asked Hisun for any alternatives to move forward other than a sale in a chapter 11 and Hisun had nothing to offer.

43. During these negotiations, Hisun threated an almost immediate involuntary bankruptcy proceeding. I believed this threat to be credible, as they controlled three entities—Hisun China, Hisun Vietnam, and Hisun USA—each of which would have an unsecured claim against the Company. We requested time to put together a more rational process in a voluntary proceeding and Hisun agreed to give the Company approximately two weeks to file a bankruptcy before it would initiate its own involuntary proceeding.

44. During this period, the Company asked Kinderhook to be a stalking horse for the sale. The terms of the Stalking Horse Agreement I negotiated generally included an assumption of the first lien secured debt, the assumption of the junior lien DIP, the assumption of many contracts and leases, the assumption of the ordinary course trade payables from the vendors to be

used going forward, the retention of employees and the satisfaction of their benefits, the assumption of warranty claims, a $600,000 fund to wind down the estates, and an additional $500,000 payment to the estates.

45.     I believe the Stalking Horse Agreement is very fair to the Debtors in that it not only preserves the going concern value of the Company, but also provides for a recovery to unsecured creditors that have contracts and claims relating to the go-forward business, as well as those unsecured creditors with contracts and claims that will not be assumed.

46.     During the negotiation of the Stalking Horse Agreement, I, along with Debtors' counsel, Klehr Harrison Harvey Branzburg LLP ("Klehr Harrison"), and Portage Point, negotiated the junior DIP Facility.  Portage Point had sought other potential DIP lenders and no parties were interested.  Kirkland & Ellis LLP ("Kirkland & Ellis"), Kinderhook's counsel, negotiated the DIP Facility on behalf of Kinderhook.  Due to the speed at which the Company needed to reach resolution and the lack of interest from other lenders, the Company's only option was to reach a consensual resolution with Kinderhook on the DIP Facility.  As a result, we crafted the best possible outcome that we could for the Company.

47.     The DIP Facility included a release of claims against Kinderhook and its affiliates. Kinderhook required this release as a condition to the DIP Facility.  Kinderhook repeatedly advised that they would not have provided the DIP facility without this release.  The DIP Facility is also interconnected with the Sale, as the Stalking Horse Bid includes a credit bid of the outstanding DIP Obligations.  Accordingly, without the DIP Release, I believe that Kinderhook also would not have proceeded with the Stalking Horse Agreement, if they were to proceed at all.

48.     To this day, Kinderhook continues to insist that it receive a release in connection with the Sale and the DIP, and that the release include the entity involved in the DIP and the Sale

and any other Kinderhook affiliates. Kinderhook has stated that the necessity of such a release is exemplified by the litigation Hisun has subjected it to in the Southern District of New York. As part of that litigation Hisun initially sued certain debtor entities and Kinderhook for breach of contract, unjust enrichment, intentional misrepresentation, and fraudulent transfer.

49. After the Debtors filed for bankruptcy, Hisun amended its complaint to dismiss the Debtor entities, but then subsequently filed an amended complaint that added two Kinderhook funds as defendants. In that amended complaint, Hisun again asserted claims of breach of contract, intentional misrepresentation, negligent misrepresentation, and fraudulent transfer. The fraudulent transfer claims that Hisun has asserted against several Kinderhook entities (plus Rich Godfrey) are estate causes of action and Hisun should not be permitted to prosecute them. Nevertheless, Kinderhook has been forced to defend against such claims—and, based on Hisun's actions to date, Kinderhook may be forced to defend against such claims in the future if it does not obtain the requested release.

**H.    Committee Engagement**

50. I instructed counsel for the Company to be in a position to share with the Committee information relevant to the investigation or any other documentation that the Committee might require as soon as the Committee selected counsel. On February 1, 2023, within thirty minutes of being informed that the Committee had selected counsel, information was shared with them. This information included the documents surrounding the 2021 Transaction, including the closing binder, the closing binder for the Twin Brook Debt, the amendments to the Twin Brook debt, and updated UCC searches. The Committee also received (i) 698 emails constituting all of my non-privileged emails involving my work as the Disinterested Director, (ii) the 1,279 documents the Company received from Kinderhook in response to the investigation requests, and (iii) 5,176

documents consisting of documents and emails reviewed pursuant to the course of the investigation from the Company's former CFO (Mr. Hunter) and CEO (Mr. Godfrey) email accounts. Additionally, other documents were shared including the confidential information memorandum, the teaser, and the confidential information memorandum utilized in connection with the 2021 Transaction. I believed it was important for the Committee to have the benefit of time, so I instructed that this process be put in place as soon as possible.

51. In addition to sharing these documents, from February 1, 2023 to February 3, 2023, there were ongoing conference calls and meetings with Committee's counsel and Debtor's counsel. On February 5, 2023, I sat for an approximately three-hour interview by the Committee and offered to make myself available for more time should the Committee desire that. From February 6, 2023 to February 9, 2023, there were discussions between counsel with respect to reaching a possible resolution of issues between the Committee and the Debtors, including issues related to the DIP release. On February 9, 2023, the Committee made a formalized request to continue the February 13, 2023 hearing to February 23, 2023 and go "pencils down" to focus on finalizing a path forward. This was agreed to by the Debtors and Kinderhook. On February 16, 2023, after an exchange of proposals, the Committee, the Debtors, and Kinderhook all reached an agreement in principle on the structure of a resolution, with certain changes on numbers needed for further tweaking or negotiation. On February 20, 2023, the Committee informed the Debtors and Kinderhook that the deal was off.

52. I, along with the Debtors and Kinderhook, was involved in efforts to resolve the Committee's objections to the Bid Procedures and Sale Motion and the DIP Motion. Although these efforts were unsuccessful, the terms of the DIP Financing and Sale Order were amended to

10425319.v7

address the Committee's concern that the terms of the Sale were not fair, regardless of whether or not an agreement was reached.

53. The revisions to the DIP Facility and Sale order were substantial. The DIP Facility release was amended to carve out claims against (i) Mr. Godfrey, Mr. Hunter, and Todd Gentry, (ii) any direct claims of Hisun against Kinderhook, and (iii) any direct claims of Kinderhook against Hisun.

54. The Stalking Horse Agreement was also amended. Kinderhook increased the cash payment that would be contributed to a litigation trust from $500,000 to $750,000. The wind down amount of $600,000 would remain the same. Kinderhook further agreed to fund the litigation trust with a $500,000 loan in the context of choosing a trustee it believed would best monetize the assets. Kinderhook also agreed to assign any litigation claims against Mr. Godfrey and Mr. Hunter to the litigation trust, with recoveries split 50%/50% between Kinderhook and the litigation trust.

55. I believe the DIP Facility and the Stalking Horse Agreement provide substantial value to the estates. This alternative is the only actionable proposal the Company has received. It provides the necessary liquidity for the Debtors to continue as a going concern. It assumes all the first lien debt, the DIP debt, a host of liabilities including ordinary course trade payables, 503(b)(9) claims, open purchase order, all accrued payroll, warranties, and tax liabilities. It also provides substantial benefits to employees, vendors, customer, and creditors.

56. The only alternative to this proposal is a liquidation. The results of a liquidation compared to the current proposal are summarized as follow:

10425319.v7

| Sale | | Liquidation | |
|---|---|---|---|
| 1st Lien Debt | 52,000,000 | Cash Net of Admins | 1,650,000 |
| 2nd Lien DIP | 10,000,000 | A/R (Gross)* | 12,860,000 |
| Wind Down Amount | 600,000 | Deposits (Gross)* | 4,360,000 |
| Litigation Trust Funding Amount | 1,250,000 | Prepaids (Gross)* | 2,590,000 |
| Assumed Liabilities | 9,000,000 | Inventory (Gross)* | 9,670,000 |
| | | Other assets (Gross)* | 1,000,000 |
| **Total** | **72,850,000** | | **32,130,000** |

Even if all of the Debtors' assets were liquidated at their full value, ignoring any discounts, setoffs, and costs incurred with storage and liquidation, the value would not exceed the Company's first lien debt. Thus, no value would flow to any party other than the first lien lender, Twin Brook. The sale, on the other hand, provides for close to $73 million of value, in addition to the assumption of employee obligations, consumer warranty obligations, the value to trade partners of a continuing business, and the retention of jobs.

57. After examining these potential scenarios, I believe that proceeding with the Stalking Horse Agreement and the DIP Facility in their current form is very beneficial to the Debtors, their estates, all parties in interest, and is the most value-maximizing and only rational path for the company to pursue.

10425319.v7

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 22, 2023

*/s/ Peter Kravitz*
Peter Kravitz
Disinterested Director of the Debtors
