<pre>
1                      UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3    IN RE:                         .  Chapter 11
                                    .  Case No. 23-10047 (LSS)
4    PERFORMANCE POWERSPORTS        .
     GROUP INVESTOR, LLC,           .  (Jointly Administered)
5    et al.,                        .
                                    .
6                                   .  Courtroom No. 2
                                    .  824 Market Street
7                                   .  Wilmington, Delaware 19801
                  Debtor.           .
8                                   .  Thursday, March 23, 2023
     . . . . . . . . . . . . . . .  .  10:00 a.m.
9
                          TRANSCRIPT OF HEARING
10        BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
              CHIEF UNITED STATES BANKRUPTCY JUDGE
11
     APPEARANCES:
12
     For the Debtor:           Domenic Pacitti, Esquire
13                             KLEHR HARRISON HARVEY BRANZBURG LLP
                               919 North Market Street
14                             Suite 1000
                               Wilmington, Delaware 19801
15
     For the U.S. Trustee:     Richard Schepacarter, Esquire
16                             OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
17                             Lockbox 35
                               Wilmington, Delaware 19801
18
     (APPEARANCES CONTINUED)
19

20   Audio Operator:           Brandon J. McCarthy/Dana L. Moore

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

APPEARANCES (CONTINUED):

For the Committee:          G. David Dean, Esquire
                           COLE SCHOTZ LLP
                           500 Delaware Avenue
                           Suite 1410
                           Wilmington, Delaware 19801

For Kinderhook:            Brian Schartz, Esquire
                           KIRKLAND & ELLIS LLP
                           601 Lexington Avenue
                           New York, New York 10022

For Richard Godfrey:       Donald Detweiler, Esquire
                           WOMBLE BOND DICKINSON (US) LLP
                           1313 North Market Street
                           Suite 1200
                           Wilmington, Delaware 199801

For Tao Motor China:       Christopher Samis, Esquire
                           POTTER ANDERSON & CORROON LLP
                           Hercules Plaza
                           1313 North Market Street
                           6th Floor, P.O. Box 951
                           Wilmington, Delaware 19801

For Chongqing Huansong
(Hisun China):             Katherine Kramer, Esquire
                           DGW KRAMER LLP
                           1 Rockefeller Plaza
                           Floor 10
                           New York, New York 10020

For Twin Brook
Capital Partners:          Laura Krucks, Esquire
                           WINSTON & STRAWN LLP
                           35 West Wacker Drive
                           Chicago, Illinois 60601

1                                INDEX

2    <u>MOTIONS</u>:                                                    <u>PAGE</u>

3    Agenda
     Item 2:  Motion of the Debtors for Entry of Interim        17
4             and Final Orders, Pursuant to 11 U.S.C. §§
              105, 361, 362, 363, 364 and 507 (I)
5             Authorizing Debtors to Obtain Senior and
              Junior Secured Superpriority Post-Petition
6             Financing; (II) Granting Liens and
              Superpriority Administrative Expense Claims;
7             (III) Authorizing Use of Cash Collateral; (IV)
              Modifying the Automatic Stay; (V) Scheduling
8             a Final Hearing; and (VI) Granting Related
              Relief [Docket No. 13; Filed 1/16/2023]
9

10   Agenda
     Item 3:  Motion of Debtors for Entry of: (I) an Order
11            (A) Approving Bid Procedures in Connection with
              the Sale of Substantially All Assets, (B)
12            Approving the Bid Protections to the Stalking
              Horse Bidder, (C) Scheduling an Auction and Sale
13            Hearing, (D) Approving the Form and Manner of
              Notice Thereof, (E) Authorizing Entry into the
14            Stalking Horse Agreement, (F) Approving Bid
              Protections, (G) Approving Procedures for the
15            Assumption and Assignment of Contracts and
              Leases, and (H) Granting Related Relief; and
16            (II) an Order (A) Approving the Sale of
              Substantially All Assets Free and Clear of
17            Liens, Claims, Encumbrances, and Interests, (B)
              Authorizing the Assumption and Assignment of
18            Contracts and Leases, and (C) Granting Related
              Relief [Docket No. 17; Filed 1/16/2023]
19

20            Court's Ruling:                                    110

21

22

23

24

25

1                                INDEX

2 DECLARATIONS:                                         PAGE

3 1)   Ken Vanden Berg                                   16

4 2)   Steven Bremer – Docket No. 14                     16

5 3)   Alyssa Loyzinski                                  16

6 4)   Steven Bremer – Docket No. 18                     16

7 5)   Steven Bremer – Docket No. 252                    16

8 6)   Peter Kravitz                                     16

9

10 Transcriptionist Certification                        71

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 10:02 a.m.)

2                  THE COURT:  Good morning.  This is Judge

3   Silverstein.  We are here in Performance Powersports Group

4   bankruptcy, 23-10047.

5                  Mr. Pacitti, can you hear me okay?

6                  MR. PACITTI:  I can hear you perfectly fine, Your

7   Honor.  Can you hear me?

8                  THE COURT:  Yes.

9                  MR. PACITTI:  Great.

10                  THE COURT:  Fantastic.  First, let me thank you

11   for moving this matter to Thursday.  It was extremely

12   helpful.  So, I very much appreciate it.

13                  Mr. Pacitti.

14                  MR. PACITTI:  Your Honor, thank you.  For the

15   record Domenic Pacitti along with my partners, Ryan Moore and

16   Michael Yurkewicz of Klehr Harrison Harvey Branzburg on

17   behalf of the debtors.

18                  Your Honor, not a problem moving the hearing.

19   It's the least we could do and I can speak for all of us, we

20   all hope that you and your chambers staff are all doing well

21   and are okay.

22                  THE COURT:  Thank you.

23                  MR. PACITTI:  We certainly thank Your Honor and

24   your staff for indulging us over the last several weeks,

25   particularly since there has been a lot of paper flying

1  around.

2          Your Honor, we're here on our, I guess, fourth

3  amended agenda.  I apologize for four agendas.  It was filed

4  at Docket 255.  There are two remaining matters on the

5  agenda, and those are the debtor's sale motion and DIP

6  financing motion.

7          There was a third matter, that actually was listed

8  as number one on the agenda, and that was the committee's

9  motion seeking to seal their response which, after

10  consultation with the parties, has been withdrawn.  An

11  unredacted version of that has actually been filed at Docket

12  256.

13          Your Honor, we have had an eventful couple of

14  weeks since we were last before you.  I wanted to begin by,

15  sort of, highlighting two important developments that

16  occurred that directly bear on the remaining issues that are

17  before Your Honor today.

18          First is that the debtors completed their sale and

19  marketing process for the sale of all of their assets.  After

20  a full, open, fair and inclusive process, a process that

21  afforded any potential bidder with the same opportunity to

22  seek to purchase any and all assets of the debtors including

23  its causes of action and also afforded them the opportunity

24  to seek to achieve an assumption of the first lien debt that

25  would, otherwise, be afforded to any bidder similarly as was

1 afforded to the stalking horse purchaser.

2          Now at the end of this process the only bidder

3 remaining was the stalking horse bidder.  We filed a notice

4 of cancellation of the auction and designation of the

5 stalking horse bidder as the successful bidder.  That was

6 under the stalking horse agreement which, in and of itself,

7 yields a transaction that we believe is fair, that benefits

8 all of the constituents of the estate, and that, quite

9 frankly, far exceeds any rational recovery that, otherwise,

10 was expected or available to creditors here.

11          The second development, Your Honor, over the last

12 several weeks is that the committee has had their opportunity

13 to conduct their own investigation into potential causes of

14 action.  The committee has reached its conclusions and as its

15 stated in its limited objection, they concluded that to date

16 the committee's investigation has not revealed any colorable

17 claim against Kinderhook and its affiliates.

18          Instead, the only valuable colorable claims

19 identified by the committee are those same claims that were

20 identified by the disinterested director, Mr. Kravitz, and

21 those are potential claims against the former owner and

22 certain of the former officers of the debtors.

23          Now, Your Honor, despite still having a pending

24 objection, the debtors approached Kinderhook and discussed

25 trying to further narrow issues.  We did that by agreeing to

1   enhance terms under the stalking horse agreement such that in
2   addition to the $600,000 funded winddown amount that is
3   already part of the transaction, the stalking horse agreement
4   as filed now includes leaving behind for the estate those
5   identified potential valuable claims against the former owner
6   and officers that were both identified by the committee and
7   the disinterested director.

8          It also includes providing for a liquidating trust
9   to be formed under a liquidating plan as the vehicle to
10  pursue those claims that are left behind.  It also includes a
11  funding by Kinderhook of that trust with $1.25 million that
12  has two components; one is a cash component of $750,000, and
13  then another cash component that is funded in the form of a
14  note which would result in a loan payable first out from
15  recoveries by that liquidating trust.

16         The last component of the stalking horse agreement
17  was an inclusion of a 50/50 sharing split of any proceeds
18  achieved by the liquidating trust from those litigations that
19  is split between the estate and Kinderhook.

20         So, Your Honor, I guess what we believe as part of
21  this process and the desire to try to narrow issues and a
22  result of these changes, we feel strongly that the arguments
23  that had previously been raised about the terms of the sale
24  being unfair or the price not being adequate have really been
25  addressed.

1          Now you may hear complaints, perhaps later, about

2    the 50/50 split component, but as Kinderhook and their

3    lawyers have told both myself and Mr. Kravitz on many

4    occasions that, you know, they also were harmed in this

5    transaction.  They feel that they should be able to

6    participate in any recovery by that trust particularly in

7    light of the fact that they are providing the funding

8    mechanism that allows that trust to actually perform its

9    function and hope to monetize those assets for the benefit of

10   the estate.

11         So, Your Honor, I guess where does that leave us

12   and, I guess, more importantly, what are we actually still

13   fighting about.  I think that the really only remaining

14   dispute is how to handle the estate claims against Kinderhook

15   and how to effectuate the release of those claims that the

16   debtors seek approval of today.

17         Your Honor, we have had two independent

18   investigations now.  Kinderhook and its affiliates, from the

19   outset, have said -- and I think its only fair that they

20   should not be subject to estate claims post-transaction when

21   they've given a tremendous amount of benefit to the estates.

22         So, at this point, Your Honor, in the cases, we

23   think that the debtor only releases that are in the DIP are

24   perfectly appropriate because of those investigations.  And

25   because the previously stated concerns of Your Honor and of

1  others that the playing field might have been tilted and

2  perhaps creditors might have been prejudiced because of the

3  timing and it may have been too early in the case.  Those

4  things don't apply any longer.  We can, sort of, have the

5  benefit of hindsight given how we pushed, sort of, everything

6  to the backend here.

7          So, Your Honor, the process has run the ground.

8  We believe the playing field was and is level.  We believe

9  the debtors are presenting a fair and value maximizing

10  transaction where the only other option is a liquidation

11  which, quite frankly, would have provided very minimal, if

12  any, value to the estate.

13          So, Your Honor, we think we addressed a lot of the

14  U.S. Trustee and committee objections.  There were other --

15  and clearly there's still pending objections, they don't like

16  the releases and they still don't like the fact that the sale

17  includes the sale of estate claims against others, not

18  including the former owner and former officers.

19          There still were other objections that we have

20  dealt with and, perhaps, on a housekeeping basis I can let

21  Your Honor know where we are with each of those if that is

22  helpful.

23          THE COURT:  Yes.

24          MR. PACITTI:  I think the first one, Your Honor,

25  is there was a reservation of rights filed by Twin Brook

1  Capital.  We have resolved that reservation of rights filing

2  and have consensual language that was proposed that we will

3  put in the sale order if Your Honor is inclined to approve

4  the sale order later today.

5        The other next objection was that of Oracle.  They

6  filed one at 205, and Docket 208.  In conversations with

7  Oracle, we were able to resolve their objections and include

8  it in Paragraph 4.21 of the sale order, specific language

9  that they wanted, and made sure that the contracts that were

10 being assumed were specifically set out in the assumed

11 contract list.

12       The other objection that was filed was at Dockets

13 211 and 212, and that was by one of the landlords DG Mesquite

14 Airport Property Owner.  It dealt with cure objection and

15 adequate assurance objection.  Your Honor, we reached

16 agreement on a path forward.  We have included specific

17 paragraphs at Paragraph 4.22 through 4.24 of the proposed

18 sale order that addressed the concerns that were raised by

19 that landlord.

20       We have been in ongoing discussions with respect

21 to adequate assurance concerns that the landlord has raised.

22 And we have agreed to a process whereby we have asked your

23 Chambers for a hearing date and was given a March 29th

24 hearing date at 2:30 p.m. to use for a hearing on whether

25 adequate assurance is appropriate or not, if we need that

1  hearing.  We are hopeful that we will be able to reach an

2  accommodation and be able to resolve that like we do in any

3  case where we're dealing with adequate assurance issues, Your

4  Honor.

5         I am hoping this won't be the first adequate

6  assurance matter that I have to go to hearing on.

7         There was also an informal objection, Your Honor,

8  raised by Coleman.  They are a licensor of the Coleman name

9  and brand that we attached to some of our products.  We had

10 lengthy discussions and ongoing discussions with Coleman.  We

11 actually agreed to a consensual assignment agreement with

12 Coleman that is attached as Exhibit D, I think, to the sale

13 order or to the APA.

14        The last matter, outside of the U.S. Trustee and

15 committee objections, was a reservation of rights and limited

16 objection filed by Mr. Godfrey. I am happy to report that

17 that limited objection has been resolved by the parties by

18 insertion of agreed upon language in the sale order that is

19 not in there yet.  We just agreed on that language

20 immediately prior to coming onto the record today, Your

21 Honor.

22        So, if Your Honor is inclined to approve the

23 matters today, that will be included in the sale order.  And

24 that is an agreement as between the debtors, Kinderhook, and

25 the committee, as well as Mr. Godfrey.

1          So, Your Honor, that is the, sort of, state of

2    play of where we are.  We reached out to each of the parties

3    in an effort to, sort of, streamline today which might,

4    otherwise, have been a much longer hearing.  We have got

5    consent from the parties to proceed with the offering of the

6    declarations that have been filed as the direct testimony.

7          So, Your Honor, if Your Honor is okay with

8    proceeding that way we would propose that we just move into

9    the record each of the declarations, several of which were

10   admitted at prior hearings; two of which are new.  I can run

11   through them for you, Your Honor, so you have them.

12          THE COURT:  Yes.  I want to make sure that I have

13   reviewed all of the declarations that were filed.

14          MR. PACITTI:  Yes.  The first one, Your Honor, is,

15   obviously, the first day declaration of Mr. Vanden Berg at

16   Docket 16.  There was then the declaration of Mr. Bremer in

17   support of cash collateral and the DIP motion which was at

18   Docket 14.  There was the declaration of Ms. Alyssa

19   Loyzinski, also from Portage Point, in support of cash

20   collateral and the DIP motion, that was Docket 15.  Then

21   there was the declaration of Mr. Bremer again, but this time

22   in support of both the bid procedures and sale motion and

23   that was at Docket 18.  They were all the matters that had

24   been previously entered in the prior hearings.

25          The two new declarations, Your Honor, is the

1  supplemental declaration of Mr. Bremer that was filed at

2  Docket 252.  That, effectively, brings down from the bid

3  procedures hearing and post-petition forward to today in

4  terms of the marketing process.  The last one was the

5  declaration of our disinterested director, Mr. Peter Kravitz,

6  in support of both the DIP motion and the sale motion.  That

7  was filed at Docket 253.

8              THE COURT:  Okay.  And you're saying there is

9  agreement that all six of these declarations can come into

10 evidence?

11             MR. PACITTI:  Yes, Your Honor.

12             THE COURT:  Okay.  Is there going to be any cross-

13 examination of any of these witnesses?

14             MR. PACITTI:  I don't believe so, Your Honor, but

15 each of the folks can speak for themselves.

16             MR. DETWEILER:  Good morning, Your Honor.  May I

17 please the Court, Donald Detweiler of Womble Bond Dickinson

18 (US) on behalf of Mr. Godfrey.

19             Mr. Godfrey, in light of the language that has

20 been agreed upon by the parties, will not cross-examine any

21 witnesses today.

22             THE COURT:  Thank you.

23             MR. DEAN:  Good morning, Your Honor.  David Dean

24 of Cole Schotz on behalf of the committee.

25             In light of the nature of the newly filed

1  declarations, the committee also does not intend to cross-

2  examine any witnesses and does agree to the admission of

3  those declarations into evidence.

4            THE COURT:  Thank you.

5            MR. DEAN:  Thank you.

6            MR. SCHEPACARTER:  Good morning, Your Honor.

7  Richard Schepacarter for the United States Trustee.

8            Can Your Honor hear me clearly?

9            THE COURT:  I can.  Thank you.

10            MR. SCHEPACARTER:  Likewise, the U.S. Trustee will

11  have no cross-examination based on either the previously

12  admitted declarations or the newly presented declarations.

13  Thank you.

14            THE COURT:  Thank you.

15            MR. SCHARTZ:  Your Honor, Brian Schartz from

16  Kirkland & Ellis on behalf of the Kinderhook entities.

17            We have no objection to the admission of those

18  declarations into evidence.  We don't plan to cross.

19            THE COURT:  Thank you.

20            Anyone else?

21            MS. KRUCKS:  Good morning, Your Honor.  Laura

22  Krucks, Winston & Strawn, on behalf of Twin Brook, the

23  prepetition first lien agent.

24            We also do not have any objection.

25            THE COURT:  Okay.  That is Ms. Krucks?

1          MS. KRUCKS:  Yes, that's right.

2          THE COURT:  Okay.  Thank you.

3          Anyone else?

4      (No verbal response)

5          THE COURT:  Okay. I take it that no other party,

6   objecting party, has their own evidence to proffer.  I did

7   not see any other declarations and I didn't hear Mr. Pacitti

8   list any declarations from any other party. Is that correct?

9          MR. DETWEILER:  On behalf of Mr. Godfrey, Your

10  Honor, that is correct.

11         MR. DEAN:  On behalf of the committee, Your Honor,

12  that is also correct.

13         THE COURT:  Okay.

14         MR. SCHEPACARTER:  For the United States Trustee

15  that is correct, Your Honor.

16         MR. SCHARTZ:  Same for Kinderhook.

17         THE COURT:  Thank you.

18         That is the evidentiary record.  I will admit each

19  of these declarations.  I have read each of these

20  declarations.  No one is seeking to cross-examine and there

21  is no other evidence.  I don't know if I actually said the

22  declarations are admitted into evidence.  The evidentiary

23  record is closed.

24      (Declarations received into evidence)

25         MR. PACITTI:  Thank you, Your Honor.

1          Your Honor, obviously, the issues are a bit

2   intertwined as between the sale motion and the DIP motion.  I

3   would suggest I just proceed to argue both of them and then

4   turn it over to whoever would like to argue as well on these

5   matters.

6          THE COURT:  I agree.

7          MR. PACITTI:  Okay.  So, Your Honor, I guess I

8   will start with the DIP motion first. Clearly, we are here on

9   a final basis for approval of the debtor-in-possession

10  financing.  Your Honor, at the February 23rd hearing a number

11  of the terms relating to the DIP were discussed and many of

12  those terms related to interest rate, to the fees, both

13  commitment fees, exit fees, and the like that, quite

14  honestly, only become relevant if there was a bidder other

15  than the stalking horse bidder.

16         Since there were no other bidders we really

17  believe that the discussion with respect to those matters are

18  really no longer relevant particularly in light of the fact

19  that the DIP is being assumed by the stalking horse

20  purchaser. If they want to assume more debt then less debt

21  that is their prerogative.

22         THE COURT:  That is a question I had that I would

23  like you to address, Mr. Pacitti, is really -- and I will

24  hear all objections, but what I would like to make sure I

25  understand is if I were to approve the sale agreement, what

1   part of the DIP terms will really remain and be operative

2   given the sale, the purchase price includes satisfaction of

3   the DIP, satisfaction of the prepetition lenders first debt

4   obligations, you know, the credit bid has been accepted. I

5   mean what sort of remaining that would be operative.

6          MR. PACITTI:  Sure.  And, quite honestly, Your

7   Honor, it's a couple of the most important parts of this,

8   right.  The first being that the company needs more money to

9   get from here to closing.  So, a big, big component of it is

10  the authorization to continue to draw down on the balance of

11  that $10 million facility which, obviously, is critical to

12  get us from now to closing.  That is number one.

13         Number two is that a prerequisite of that and a

14  condition to that is the release of the claims against

15  Kinderhook that is memorialized in that DIP facility.  So,

16  those are really the two major components that are left and,

17  quite frankly, are the critical ones.

18         You are right, and that is why I raised it is that

19  all the other components of it, quite honestly, are -- you

20  know, again, we get the benefit of some  hindsight here and

21  the benefit that this is being done, sort of, near the end of

22  the case, but sort of after the fact.  Those things really

23  are not as relevant as they might have been a month or two

24  months ago clearly.

25         THE COURT:  Right.  And for example we're not

1  going to have events of default.  We are not going to have --

2        MR. PACITTI:  We better not between now and

3  closing, Your Honor, that is for sure.

4        THE COURT:  Okay.

5        MR. PACITTI:  So, its really those very important

6  items as I suggested.

7        So, Your Honor, at the last hearing you also noted

8  that the foundational case that we should be referring to

9  here in the context of DIP financing is the In Re Ames

10 Department Store case.  In that case it specifically said

11 that many of the cases involving DIP's consistently reflect

12 the Court's discretion to rule upon DIP motions.  That

13 discretion is to be utilized on grounds that permit

14 reasonable business judgment to be exercised so long as the

15 financing agreements "Does not contain terms that leverage

16 the bankruptcy process, and powers or its purpose is not so

17 much to benefit the estate as it is to benefit a party in

18 interest."

19        So, Your Honor, the transaction in the DIP

20 facility at issue here undoubtedly provides significant,

21 otherwise, unavailable benefits and value to the estate.  The

22 disinterested director here did an independent investigation.

23 He concluded what he concluded as it relates to the value of

24 those claims that are being released under the DIP.  He

25 concluded that they were of little, if any, value.  The

1  committee also conducted their own investigation.

2          The debtors have chosen, as a consequence of those

3  investigations, to trade something  that provides no value to

4  the estate for something that provides significant value and

5  that is a DIP facility, and it's a DIP facility not just that

6  funds a case, but funds a process that gets to a transaction

7  and that transaction results in value that would not,

8  otherwise, be available to these estates.

9          So, Your Honor, there is nothing in the release

10 that can be said to leverage the bankruptcy in favor of just

11 the creditor when you take, as you must, the whole package of

12 what is being sought here.  Look at both the benefits and the

13 burdens of the facility and this process.

14         We believe, and the debtors clearly believe, that

15 that trade-off was not only fair, but made all the sense in

16 the world given the fact that there's very little value, if

17 anything, to these claims.  We are getting tremendous value

18 and a tremendous opportunity to close a transaction that

19 results in value to all constituents.

20         So, Your Honor, we don't think that the playing

21 field has been tilted.  We think, again, with added hindsight

22 that that playing field clearly can be seen as level.  I

23 think much like Your Honor and your other colleagues say, you

24 don't want to have something you do in a case particularly be

25 precedential in every single case going forward.  I think we

1  too don't particularly want to have everything pushed to the

2  backend of the case and everyone wondering for 30 days, 90

3  days, 120 days of where we are.

4         This was a little bit different case the way it

5  ended up being structured, but I think in whole as a result

6  of all of it we got to a fair place and I think that is

7  clearly seen by, sort of, where we are now.

8         The other component of the DIP financing, Your

9  Honor, is clearly that, as the evidence and the declarations

10  set forth, you know, the financing was solicited by Portage

11  Point. It was negotiated by a disinterested director.  The

12  committee's objection suggests that the Court should apply

13  some different heightened standard different then even Ames.

14  And, quite honestly, we don't even think that heightened

15  standard should apply because that heightened standard

16  applies typically where there's evidence that the decision

17  maker is not disinterested.

18         Here, its clear that Mr. Kravitz is disinterested.

19  He made a fully informed decision after investigation, after

20  fully vetting other options, and believed that going forward

21  with this proposal was the best option available.  Now, Your

22  Honor, this heightened standard that the committee suggests,

23  again, it sort of folds into Ames.  I think Ames really

24  allows you to examine the financing, as you said, at the last

25  hearing not only under a business judgement rule, but under

1  heightened scrutiny, under totality of the circumstances;

2  take into account everything.

3          I think the important component is that you need

4  to examine the independence of the decision makers and the

5  fairness of the value that is being achieved by the debtors

6  in seeking approval of the DIP financing.  So, I think, Your

7  Honor, that clearly we have demonstrated that on the record.

8  We have clearly also demonstrated the other prongs that the

9  debtors certainly needed this DIP financing, they continue to

10  need the DIP financing.  The claims that are being released

11  were fully vetted or fully investigated by the disinterested

12  director.  The committee had their shot to review them as

13  well.

14          The debtors are asking the Court for authority to

15  trade, again, those worthless claims, in our view, for

16  exchange for a facility that provides that pathway to a

17  transaction that preserves value, enhances value, and also

18  achieves maximization of any return to creditors here.

19          Your Honor, the -- I mean there's other

20  considerations that the Court takes into account when dealing

21  with debtor-in-possession financings, and that is certainly

22  part of Ames as well.  They are considerations of the

23  liquidity and financial position of the company.  The

24  evidence that is in the record certainly demonstrates that

25  there is a need and requirement for liquidity both to operate

1  during the proceeding and to get to a sale process.  Without

2  that liquidity there would be no sale and there would be

3  minimal recoveries.

4         Also, Your Honor, that there is no other

5  alternative that has been presented.  If you recall, this is

6  a second lien DIP facility.  Don't often see those, right,

7  particularly in a situation where the value of the assets

8  here really turns up a hard asset if you are looking at like

9  an asset based loan transaction when you look at, sort of,

10  what hard assets can you realize if this thing melts down.

11        As our declarations reflect, there is minimal

12  inventory here.  There are minimal accounts receivable here.

13  There is, you know, net cash that is not a lot of money.  So,

14  if this thing -- if this case doesn't go down the path that

15  its currently going down and we have to pivot to an,

16  otherwise, liquidation hearing we are talking about, you

17  know, gross asset values of like $30, $31 million.  That

18  doesn't take into account, you know, costs of sale, discounts

19  of proceeds when you're doing a liquidation sale of inventory

20  and accounts receivable.

21        So, that too should factor in, in your

22  consideration because the alternative that this DIP facility

23  provides is, again, that pathway to a transaction that has

24  tremendous value.  And we will talk about this in the context

25  of the sale motion, but, you know, that provides for the

1  assumption of a $52 million first lien debt, the assumption

2  of a $10 million DIP, the assumption of assumed liabilities

3  of in excess of $9 million, you know, continued employment of

4  close to 100 employes, you know, continuation of employee

5  benefits, the continuation and assumption of consumer

6  warranty claims.  So, again, a package that results in

7  tremendous value for all constituents, Your Honor.

8          Your Honor, I think, in a whole giving together

9  when you look at the DIP facility, when you look at the

10  releases that we're talking about, we think its very fair to

11  approve these in this context.

12          I want to just circle back on, sort of, the

13  initial objection and the initial structure of these releases

14  were broader at the outset, right, and they were scaled back

15  during the case.  They had originally been, and Mr.

16  Schepacarter raised this issue, you know, potential releases

17  by non-debtor parties.  We have revised that to make it clear

18  that these are only debtor releases.  The debtors only are

19  releasing claims.

20          So, we think the way that that this has been

21  structured makes sense given the circumstances here.  We

22  would request that the Court approve the DIP facility on a

23  final basis and including the releases that have been fully

24  vetted by both the committee and the disinterested director.

25          Your Honor, I can move onto the sale motion if you

1  would like me to, if that makes sense.

2          THE COURT:  Yes.

3          MR. PACITTI:  I have to find my page, sorry.  Much

4  like the DIP facility, Your Honor, its pretty clear in our

5  view here.  We look first, just like you look to Ames, you

6  look to Abbotts Diaries in a sale context.  And what we are

7  required to demonstrate is that there is a sound business

8  purpose for the sale of the debtor's assets outside the

9  ordinary course of business.  That sound business purpose can

10 be found where the sale is necessary to preserve value of the

11 assets for the estate's creditors and their interest holders.

12         We believe that the uncontroverted evidence shows

13 that a sale under 363 here is necessary to preserve value.

14 This debtor was facing liquidity constraints prior to the

15 bankruptcy filing.  It was facing mounting litigation. It was

16 facing the threat of an involuntary bankruptcy proceeding.

17 It had conducted a prepetition sale process that yielded no

18 interest.

19         So, rather than filing a freefall bankruptcy or

20 trying to resurrect some proceeding out of an involuntary

21 that might otherwise have been filed, you know, the debtors

22 cobbled together the most rational process that it could do

23 at that point in time.  And rather than file a case with no

24 articulable goal, they approached Kinderhook as the sponsor

25 and suggested that a sale process continuing in bankruptcy

1  made the most sense, was the only way that value could be

2  preserved and maximized.

3         Like many cases that Your Honor sees, going into a

4  363 process blind with no stalking horse is often a recipe

5  for disaster.  So, the debtor, through Mr. Kravitz, initiated

6  discussions with Kinderhook to negotiate a stalking horse

7  agreement so that a rational process could be presented to

8  the Court.  That is what we did.

9         That stalking horse agreement, again, as I said

10 before, sought to assume liabilities in the form of the

11 prepetition first lien debt, assume assumption of the DIP

12 that was critical to run this process and continue to operate

13 in a bankruptcy proceeding.  Assumes almost in excess of $9

14 million of other assumed debt, again, in the litany of other

15 advantages, vis-à-vis employees, warranty claimants and the

16 like.

17        There is much talk in the objections, Your Honor,

18 about, sort of, how to approach approval of all of these

19 matters in the context of a sale and what standard to apply.

20 Clearly, Abbotts Dairies is the seminal case, but cases also

21 talk about, sort of, looking at Delaware corporate law in

22 determining, sort of, what standard should apply when

23 companies and their directors are making decisions about

24 these types of things.

25        Its well established that there is, sort of, three

1  tiers of review under Delaware corporate law when, sort of,

2  analyzing director decision makings.  They clearly are, as

3  everyone knows that's sitting in this case, and I feel like

4  I'm preaching to the choir, but clearly a business judgment

5  rule, the enhanced scrutiny standard, and then the entire

6  fairness standard, Your Honor.

7        The applicability of these standards, though,

8  turns on an analysis of who the corporate fiduciaries are

9  that are making the decisions.  Where there is a

10 disinterested and independent director that is charged with

11 making those decisions cases are clear that it's the business

12 judgement rule that should apply.

13       When you are faced with a potential conflict of

14 interest in the decision makers and the dynamics of those

15 circumstances, otherwise, present a particular situation that

16 might give rise to a conflict then enhanced scrutiny is often

17 used.  When there is an actual conflict where directors that

18 are charged with making the decisions are on both sides of

19 the transactions there is no disinterested person making

20 decisions then the entire fairness doctrine is applied.

21       Here, Your Honor, we believe that, first of all,

22 notwithstanding any of the standards, we meet those

23 standards.  But I think its helpful to recognize that, you

24 know, the decision making authority with respect to the DIP,

25 with respect to the bankruptcy, with respect to the sale

1 process, with respect to the sale rested with Mr. Kravitz

2 who, as the testimony, uncontroverted declarations set out,

3 is clearly independent, clearly knowledgeable about these

4 matters, has no stake in this gain, has no connection with

5 any of the parties in these cases, but rather is a true

6 independent who is looking out for the best interest of the

7 debtors.

8        In that role Mr. Kravitz made the decisions that

9 he made to move down this path because they were, number one,

10 actionable; number two, the best decision possible at the

11 time; number three, were the product of arm's length

12 negotiations by himself as the independent disinterested

13 director on one side of the transaction and Kinderhook as the

14 DIP lender and buyer on the other side of the transaction,

15 both sides represented by separate counsel.

16        So, Your Honor, we believe that under these facts

17 business judgment rule should apply given the

18 disinterestedness of Mr. Kravitz, but nevertheless, if Your

19 Honor chooses to look at this in either heightened scrutiny

20 or entire fairness we think the facts of this case

21 demonstrate that any standard is met.  Why do we think that,

22 well clearly it's because the process, number one, was fair.

23 It was a prepetition process that was run, there was a post-

24 petition process that was run.  There was ample time. There

25 had been no complaint about the timing of the process.

1          There has been no complaint about the information

2   flow, about the opportunity to present potential proposals.

3   Those opportunities were given to folks that are on this

4   call. You know, both Mr. Godrey was given an opportunity,

5   members of the committee were given opportunities to bid on

6   assets, whether its all the assets or part of the assets,

7   whether its causes of action or a forklift.  So, none of

8   those bids materialized.

9          So, when you look at, sort of, all of the

10  circumstances you first look to fairness of the process. I

11  think the uncontroverted evidence demonstrates that the

12  process was fair.

13         The next component, Your Honor, is fairness of

14  price.  Clearly, there was a market test here.  There was a

15  prepetition process, there was a post-petition process.  As

16  Mr. Bremmer sets out his declaration, there was no complaint

17  by any of the prospective interested parties about timing,

18  about information low.  There was no complaint about the

19  process.  The only complaint was that the EBITDA calculations

20  here just didn't support being able to top a bid that was

21  presented by Kinderhook.

22         So, Your Honor, the price was market tested, but

23  even, Your Honor, just looking at this in a global

24  perspective, right, what are we talking about here.  We are

25  talking about a sale to Kinderhook that creates value that no

1  one could have, otherwise, contemplated and that is not,

2  otherwise, available.  Again, I hate to keep reiterating, but

3  we're talking about the assumption of a tremendous component

4  of the debt of this company that is not, otherwise, supported

5  in any other type of transaction.

6         So, Your Honor, in addition to the fairness of the

7  process we think its patently clear that the price too is

8  fair.  Now as it relates to the other terms of the sale

9  transaction, Your honor, the only term really at issue is the

10  purchase of claims by Kinderhook under the asset purchase

11  agreement.  Again, at the outset the stalking horse agreement

12  contemplated a purchase of all claims, but, again, after

13  hearing the protestations of the parties Mr. Kravitz went to

14  Kinderhook and we effectuated a carve-out of what everyone

15  perceives as the valuable claims here from those claims that

16  are being purchased under the stalking horse agreement. So,

17  those valuable claims are not part of what is being sold,

18  they are being left behind.

19         As I went through in the introduction, there has

20  been even further enhancements to the stalking horse

21  agreement since that time.  They are all on the record and

22  they include the establishment of a liquidation trust under a

23  liquidating plan.  The funding of that trust was $1.25

24  million.  So, there's also a vehicle for the estate to

25  monetize those valuable assets that are being left behind.

1  What is being sold are the other claims that folks already

2  have determined have little, if any, value.

3          So in terms of fairness of price, fairness of

4  process, fairness of other terms, Your Honor, we think that

5  this sale and the uncontroverted evidence demonstrates is

6  appropriate, should be approved, and is really the only path

7  forward that allows the debtors to maximize value and achieve

8  a result that no one else could have ever contemplated when

9  we were faced with the prospects of involuntary being filed

10  within days back in January 1st or 2nd of this year.

11          That is all I have, Your Honor, unless you have

12  any questions.

13          THE COURT:  The only question I have, as I'm

14  hearing your presentation, and as I read through the filings,

15  with respect to the liquidation trust, the funding of the

16  trust, etc., today I am not, and I don't think you are asking

17  me to, but I want to confirm this, I'm not being asked to

18  approve that structure.

19          MR. PACITTI:  No, Your Honor, we're not.

20          THE COURT:  Okay.  That is going to be left.  That

21  may be what the debtor proposes, but the approval of that is

22  left for another day, correct?

23          MR. PACITTI:  Correct, Your Honor.  The

24  contemplation, just so we're very clear, and I already have a

25  draft of the liquidating plan, the hope is that Your Honor

1  approves things today and I sit down with Mr. Dean and Mr.

2  Van Aalten and we hammer out a liquidating plan, and hammer

3  out a litigation trust agreement, and get a disclosure

4  statement and plan on file quickly.

5          THE COURT:  Okay.  Thank you.

6          I guess, let me hear from anyone else in support

7  and then I will hear from the objectors.

8          MR. SCHARTZ:  Hi, Judge, Brian Schartz, Kirkland &

9  Ellis, on behalf of Kinderhook.

10          THE COURT:  Mr. Schartz.

11          MR. SCHARTZ:  Good to see you again, thanks for

12  making the time.

13          I think Mr. Pacitti did a really good job

14  explaining where we are at. I have been reflecting on the

15  back and forth that you and I have had at the last couple of

16  hearings.  You said something at one point where you said

17  this case is not that different, its not unique or

18  interesting.  I tend to agree with you. I think this is not

19  that interesting or unique of a case.

20          I think that when we were faced with the imminent

21  threat of an involuntary bankruptcy, we were trying to figure

22  out what was the best way to push this forward.  You know, we

23  had some things at the outset, the release in the final order

24  which would have been heard before the sale hearing.  The bid

25  protections that we took out, and, you know, those were the

1  things that I saw Your Honor as saying, guys, this is your

2  <u>Ames</u> problem, right, you are trying to tilt it in your favor,

3  this is your <u>Ames</u> problem.  We moved all of that so that now

4  everything is together and you're right when you asked Mr.

5  Pacitti about the DIP, its kind of not that interesting today

6  if the DIP is now going to be done at the end of the case as

7  a final order, and the sale is going to, hopefully, close,

8  and there is no DIP default.

9          So, we really see this as just a sale of

10  substantially all of the assets. I am not going to belabor

11  what Mr. Pacitti said, but, you know, no other bidder showed

12  up.  It was fully marketed even after we dropped our bid

13  protections and our fee reimbursements, so that was nothing

14  there.

15          Really, the only potential wrinkle in this case is

16  the presence of potential claims that are part of the

17  debtor's estates under 541 and that are for sale.  Those

18  really fall into two buckets.  The first was the potential

19  claims against Kinderhook which makes sense that people would

20  ask that question given the very swift demise of this company

21  post-close, right.  We close in 2021, we're in bankruptcy the

22  beginning of 2023, not a happy day from Kinderhook's

23  perspective, as I said at the first day hearing.  But people

24  needed to look at those claims and causes of action and

25  understand, you know, what happened.

1          The second bucket is, you know, potential claims

2   and causes of action against non-Kinderhook parties.  That is

3   where things have gotten a little bit interesting because,

4   you know, as we've heard that there is a view that former

5   management stepped into -- created a transaction that was

6   doomed to fail.  That is Kinderhook's view.  We are not

7   surprised by that.  I said that at the first day hearing.

8          What we are also not talking about is that

9   Kinderhook also thinks that there are potential claims

10  against two of the members of the committee because when this

11  transaction came together in 2021 it was a company that was

12  built on relationships between Mr. Godfrey and Hisun.  So, we

13  think those are potential claims that need to be looked into

14  and Kinderhook wants to and has always anticipated that it

15  would buy those claims.  It is especially important now given

16  that those putative defendants in those causes of action sit

17  on the committee. So, they are kind of non-incentivized to

18  bring that.

19          I don't think any of that changes or makes this

20  any different, right.  The investigations, now Mr. Kravitz's

21  investigation and the committee's, reached similar goals that

22  there are no valuable claims against Kinderhook that are

23  found at this time.  I will let Mr. Dean say it however he

24  wants to say it.  That kind of takes that off the table.

25          I think this would be really interesting if

1  someone was saying, well, Kinderhook wants to buy it, it

2  giving it all its value, but there are potential claims

3  against Kinderhook and their valuable.  That could make this

4  more interesting, but no one is saying that today.  So, I

5  think that issue is, you know, kind of a red herring.

6          As to the claims against non-Kinderhook parties,

7  you know, we, in an ideal world, would have stood here today

8  and had an agreement with the committee on how the claims

9  that they think are valuable would sit.  We would have an

10 agreement on that and we tried our hardest to do it.  I said

11 to you at the first day hearing, you know, we are always open

12 to a conversation.  We were open to a conversation.  In fact,

13 we're still open to a conversation.

14         The goal post kept moving and we could never

15 really nail it down.  So, in a last stitch effort Kravitz,

16 Mr. Kravitz, came to us and said, hey, Brian, we have to

17 change this deal.  You know, I have done the work, I think

18 those claims are valuable.  It just doesn't sit right.  We

19 have to figure out what the right answer is here.  I said

20 you're right, we need to.

21         So, we ended up with the 50/50 split and the

22 structure that is reflected in the documents.  Why a 50/50

23 split, you know, in the absence of a negotiation to reach a

24 deal. It just felt fair.  What could be more fair then 50/50

25 especially if Kinderhook is going to help fund the litigation

1  trust and make it potential.  We also increased the value of

2  the cash component as part of that negotiation as well

3  because Mr. Kravitz insisted that, you know, there needs to

4  be some actual funding of it.  It can't just be a litigation

5  trust that doesn't have any cash components.

6        So, we had that conversation.  We amended the

7  documents. Ideally, that would have been part of the deal,

8  but, you know, we weren't there.  Again, I don't think any of

9  this changes or makes exotic what we're doing because the

10 whole process was marketed. If someone believes that the

11 value of the company that we are paying for is too low they

12 could have beat it.  I mean, the committee says its paper

13 that the claims against Godfrey could be up to $80 million.

14 Our bid is only $73 million.

15        So, someone really wanted to come in and top it

16 they could top it.  That hasn't happened, so I think the

17 marketing process, you know, speaks for itself.  I have been

18 talking to my team about the example, like, if we were

19 selling widgets, Your Honor, and we went to the bankruptcy

20 court and said this has been fully marketed it would be kind

21 of strange for us to say we're paying full price, but,

22 actually we decided to leave some of the widgets behind or

23 the Judge says you have to leave some of the widgets behind.

24 That doesn't really happen in asset sales, but we have agreed

25 to do that here.  Its not widgets, its claims.  We have

1 agreed to do that here, basically, as part of fairness.

2          I do want to underscore one more point, Kinderhook

3 does believe it was harmed here.  Right, we think that,

4 without belaboring the facts of getting into with Mr.

5 Godfrey's lawyer, suffice to say we do think this transaction

6 as structured in a way that was doomed to fail and that hurt

7 Kinderhook. It has caused, you know, a lot of financial pain

8 and time and expense related to these Chapter 11 cases and

9 this company.

10          We want to see this company succeed, but this has

11 not been a cheap or fun frolic and detour for my client.  It

12 has been very unfortunate.

13          I want to talk a little bit about the importance

14 of releases.  You probably don't want to hear too much from a

15 release party, but, you know, from our perspective we had

16 three goals going into this case. I believe three goals we

17 have had throughout the entire case.

18          Number one, we wanted to save the business of

19 operations.  Kinderhook believes that this company has a lot

20 of value embedded in it, that is why they are paying a price

21 that is probably somewhat inflated that the rest of the

22 market doesn't see.  They want to save the business

23 operation.  They believe in it, and they want to stand by it.

24          Number two, Kinderhook wants to get through this

25 process as efficiently as possible and find consensus where

1  possible. So, you know, we haven't really -- I guess every

2  hearing has kind of been contested, but we have done what we

3  can to try to resolve things to keep this efficient.  That

4  also includes the two investigations, right.

5           Mr. Kravitz asked for something; more likely than

6  not we gave it.  Mr. Dean asked for something; more likely

7  then not we gave it.  You know, we kept things back for

8  privilege, but we did this in a way that didn't require

9  filing 2004 motions, or discovery fights, or all the things

10 that you see because we felt that we had nothing to hide and

11 we wanted to move the process along as much as possible.

12          So, it has been a bit of a, not to be crass, but a

13 proctology exam.  We have complied with that because we want

14 to support the first goal of saving the debtor's business

15 operations.

16          Integral to the first goal and second goal is that

17 we don't want to close a transaction and get sued by the

18 debtor's estates.  That is the third rail for us.  From a

19 Kinderhook point of view the company and its stakeholders

20 don't get all of the goodies that we have put on the table in

21 terms of recoveries and process, and everything that we

22 proposed now enhanced by the leaving behind of valuable

23 estate causes of action and then get sued.  That is not going

24 to work for us, Judge.  So, that is why we have the release

25 built into as part of the DIP.

1        Again, the DIP has some features that were unique;

2   not the least of which it was junior to the senior DIP.  A

3   judgment call that, you know, we torture ourselves over, but

4   in the interest of time and the fact that we didn't have much

5   time to get ready for this case that was a decision that we

6   made. It was a risk, right, because we didn't know how the

7   company was to perform in bankruptcy.  The company did the

8   best it could to keep the customers happy, and keep the

9   suppliers going, keep the wheels on the bus.

10        I personally think that they did a phenomenal job

11  keeping this together.  So, that second lien DIP, that junior

12  DIP has, you know, played out.  That was a risk, right.  So,

13  the point is the DIP is linked to the sale, the sale is

14  linked to the DIP and that is how we achieve those three

15  goals all together.

16        The debtor release is in exchange, we think, for

17  valuable consideration; namely, the company continuing as a

18  going concern and providing substantial and meaningful

19  recoveries to the creditors. I won't repeat what Mr. Pacitti

20  said.  It is for valuable consideration.

21        Kinderhook funded the bankruptcy process taking on

22  the risk of a junior lien.  We allowed the debtors to fully

23  market their assets and run this process, including dropping

24  our breakup fee, dropping our expense reimbursement.  Your

25  Honor probably doesn't give us much credit for that because

1  you think it shouldn't have been there in the first place,

2  but we did it, right.  We sat at junior position, and we took

3  this risk.

4        As Mr. Kravitz said in his declaration:

5        "The sale provides the necessary liquidity for the

6  debtors to continue as a going concern.  It assumes all the

7  first lien debt, the DIP debt, a host of liabilities

8  including ordinary course trade payables, 503(b)(9) claims,

9  all purchasers, all payroll, warranties, and tax liabilities.

10  It also provides substantial benefits to employees, vendors,

11  customers, and creditors."

12        So, the value that the debtors "give up" in

13  exchange for the debtor release, you have heard, has been

14  good trade.  I don't think -- I am curious what the

15  committee's position is, is actually objecting to the entire

16  sale, right.  That really wouldn't make a lot of sense for

17  the committee to do that because why would the committee try

18  to blow-up this transaction just to liquidate the company and

19  pursue claims against Kinderhook that it doesn't think are

20  very valuable.

21        So, to me, the trade is logical and the evidence

22  that is in the record strongly supports it.  I think that

23  that is something that is a key component of what is

24  different today, you know, merely a month later from when you

25  last saw us when we were talking about the release is that

1  that process has played out and the committee has, you know,

2  made the conclusions that it made.

3          I will also say, Judge, that the specter of

4  litigation is real here.  Hisun, who is on the committee, has

5  already sued the Kinderhook entities, some Kinderhook

6  entities, in Federal Court.  The debtors believe that, at

7  least, one of those causes of action belong to the debtors.

8  We haven't talked about it, but the debtors did file a motion

9  to enforce the automatic stay with respect to, at least, one

10  count that has been alleged against Kinderhook on the view

11  that that count is a fraudulent conveyance claim against

12  Kinderhook.  It was actually Godfrey that is owned by the

13  estate.

14          The threat of litigation is not just -- you know,

15  this isn't just a made-up risk.  This is a real risk.  While

16  the debtor release is narrowly tailored as to the debtors, we

17  can't do what Mr. Schepacarter would like to do and just say,

18  well, the DIP really should be against the DIP lender.  The

19  reason we can't do that is that the DIP lender is just a box

20  that sits within the Kinderhook infrastructure and the

21  complaint that has already been filed in the federal

22  litigation in the Southern District of New  York against

23  Kinderhook doesn't name just the DIP lender; it names a whole

24  bunch of funds, different Kinderhook entities.

25          So, it can't just be a debtor release of the DIP

1  lender.  It needs to reflect the fact that the DIP lender

2  sits within the Kinderhook infrastructure.  It sits within

3  organization, and it flows between entities.  That risk is

4  real.

5          I do think Your Honor probably has more evidence

6  in front of her on this debtor release then you would in a

7  Chapter 11 plan. I am not going to belabor the evidence here,

8  but I do think that there is a huge amount of evidence that

9  supports this debtor release. Its probably one of the most

10  well-vetted debtor releases I have ever been a part of in the

11  plan or sale context, but I do think there is significant

12  evidence here.

13          Last but not least, I don't know if Your Honor is

14  going to take the position that the Zenith and Master

15  Mortgage factors apply as Mr. Schepacarter raised in his

16  objection, but to the extent they do I think we've met them,

17  right. I think there is very clear evidence that there is a

18  substantial contribution of value by Kinderhook to support

19  this company. I am not going to repeat it, but I do think

20  it's there and its substantial; not just a penny, its real

21  value.

22          The debtor release is necessary to the transaction

23  because we're not going to close the sale and have the

24  debtor's estates later sue us.  So, its very important to

25  this transaction.

1          Zenith and Master Mortgage also look at

2    (indiscernible) by creditors.  We do have objections.  I

3    guess this is, technically, a contested hearing, but I would

4    say its contested light.  And we did not, given the scope of

5    the company, receive a huge amount of objections to this

6    sale.  We have, you know, a limited objection from the

7    committee.  We have a complaint from a landlord and we have a

8    complaint from the U.S. Trustee on a technical release issue.

9          I think all told, this does meet those factors. I

10   do think we have a lot of buy-in from creditors because the

11   creditors have a lot to gain here.  Last but not least, I

12   think there is a strong recovery for creditors.  I think that

13   this is very much an opportunity to provide stakeholders for

14   a recovery that is so much greater then what they would get

15   if we didn't have this sale transaction.

16          So, Your Honor, I am going to rest on that.  Thank

17   you for listening to me.  We do believe the sale is fair and

18   appropriate and should be approved.  Kinderhook continues to

19   stand by this company and hopes that it can close a sale and

20   work to maximize value on the transaction that we have

21   proposed and hammered out with Mr. Kravitz and his team.

22          Thank you.

23          THE COURT:  Thank you.

24          Mr. Samis?

25          MR. SAMIS:  Thank you, Your Honor.  May I be heard?

1          THE COURT:  Yes.

2          MR. SAMIS:  Good morning, Your Honor, Chris Samis

3   from Potter Anderson & Carroon here today on behalf of Tao

4   Motor.  Recognizing fully what's been approved today and what

5   is not -- what's being approved today and what is not, I just

6   want to make a statement in support of the sale on behalf of

7   Tao.  Tao is a committee member, along with the two Hisun

8   entities, but it's here today in its individual entity

9   capacity.

10          At bottom, a full, fair, and open sale process led

11   to the stalking horse result.  That result gave rise to

12   discussions that produced the related Kinderhook proposal

13   that Mr. Pacitti outlined.  That proposal gets value to all

14   general unsecured creditors.  Moreover, as Mr. Pacitti also

15   noted, the sale preserves jobs, enterprise value, and leaves

16   a go-forward business partner for many parties.

17          For these reasons, regardless of what you may hear

18   from the committee and recognizing that the proposal is yet

19   to be baked into plan subject to Court approval, Tao supports

20   the sale and the related Kinderhook proposal.

21          THE COURT:  Thank you.

22          Anyone else --

23          MR. SAMIS:  Thank you --

24          THE COURT:  -- in support?  I'm sorry, did I cut

25   you off, Mr. Samis?

1          MR. SAMIS:  No, no, I was just saying thank you,

2   Your Honor.

3          THE COURT:  Okay, thank you.

4          Anyone else in support?

5          MS. KRUCKS:  Your Honor, Laura Krucks on behalf of

6   Twin Brook, the prepetition agent.  For the record, I just

7   want to briefly state our support for the sale, which

8   provides for the assumption of the obligations outstanding

9   under the first day credit agreement.

10          We would largely agree with the comments already

11  made that the marketing process largely speaks for itself and

12  no other bidder has shown up to bid or purchase the assets.

13          As debtors' counsel did mention at the beginning of

14  the hearing, we did provide some minor clarifying comments to

15  the sale order.  So, if Your Honor does approve the sale, we

16  would just request that those be included in the sale order.

17          THE COURT:  Thank you.

18          MS. KRUCKS:  Thank you.

19          THE COURT:  Anyone else?

20      (No verbal response)

21          THE COURT:  Okay, let me hear from the committee,

22  please.  Mr. Dean.

23          MR. DEAN:  Good morning, Your Honor.  Can you hear

24  me okay?

25          THE COURT:  I can.  Thank you.

1        MR. DEAN:  Okay, thank you.  For the record, David

2   Dean of Cole Schotz on behalf of the Official Committee of

3   Unsecured Creditors.

4        As the Court knows, the committee filed its limited

5   objection to both approval of a final DIP and the sale motion

6   and, as reflected in that limited objection, as well as the

7   reply papers filed by both the debtors and Kinderhook and the

8   comments made today, the objection that we filed was

9   following a fairly extensive committee investigation

10  concerning the potential claims against Kinderhook and Mr.

11  Godfrey and others.

12       And, as Mr. Schartz discussed, Kinderhook and

13  Godfrey are both defendants in a prepetition lawsuit filed by

14  one of our committee members, who we refer to as Hisun China.

15  There are three members of our committee, Your Honor, Hisun

16  China is one, and then an affiliate of Hisun China that we

17  refer to as Hisun US is the second member, and then Tao Motor

18  Sports is the third.  And I believe counsel for all three

19  committee members are here today, I know you just heard from

20  Mr. Samis on behalf of Tao, but I just also want the Court to

21  know that counsel for Hisun are also here today and may seek

22  to address the Court in their individual capacity at the

23  appropriate time.

24       Now, with that introduction, Your Honor, I might

25  just give you our perspective on where things stand today.

1   Over the past month and following the second

2   interim DIP and bid procedures hearing on the 23rd of

3   February, the committee took a fairly extensive investigation

4   of potential claims against Kinderhook, Mr. Godfrey, and

5   others relating to the October 2021 LBO transaction and the

6   causes and potential causes behind the debtors' bankruptcy

7   filings.  The debtors and Kinderhook produced all documents

8   and information requested by the committee and, as counsel

9   for the committee, Cole Schotz reviewed those documents, over

10  7,000 in total, that were produced by a combination of the

11  debtors and Kinderhook.

12   Now, Mr. Godfrey for his part produced some emails,

13  but we have not yet received a complete document production

14  from him.

15   Kinderhook also produced two individuals for

16  interviews, both of whom currently serve on the debtors'

17  board of directors and were the principals directly involved

18  in consummating the LBO on behalf of Kinderhook, and of

19  representing Kinderhook's interests thereafter and leading up

20  to today.  I questioned these individuals for approximately

21  four hours and with respect to Mr. Godfrey, as the Court may

22  recall, we were initially denied his cooperation and were

23  forced to file a 2004 motion on an emergency basis, which we

24  do want to thank the Court for promptly granting on short

25  notice, which I think was helpful to resolve the issues at

1  hand.

2          In the interim, Mr. Godfrey ultimately replaced his

3  prior counsel and his new counsel did then agree to produce

4  Mr. Godfrey for an informal interview, which fortunately

5  allowed us to proceed with his interview without the need for

6  the 2004 hearing and allowed us to withdraw that motion

7  without prejudice, at least for now.

8          The interviews of the Kinderhook principals and Mr.

9  Godfrey were conducted on Thursday, March 9th and Friday,

10  March 10th, respectively.  And as we said in our objection,

11  following those interviews and our review of the documents

12  produced, it became our conclusion that while the evidence in

13  our possession suggests that valuable estate claims exist

14  against Mr. Godfrey and perhaps other management personnel,

15  the evidence in our possession does not support the existence

16  of colorable state claims against Kinderhook and its

17  representatives.  Our investigation of both parties, Your

18  Honor, was limited in time and it was of course not the

19  equivalent of traditional litigation discovery.

20          So it is possible, Your Honor, that additional time

21  and further investigation could result in the production of

22  evidence that could support the existence of colorable state

23  claims against Kinderhook, but at the same time it's not lost

24  on us that the circumstances surrounding Chapter 11 cases

25  often compel imperfect investigation timelines and resources.

1          Now, following the conclusion of the Kinderhook and

2   Godfrey interviews on the 10th, the committee reengaged with

3   the debtors and Kinderhook on a potential settlement.

4   Unfortunately, as is obvious by our objection today, we

5   weren't able to get there, Your Honor, which led us to the

6   filing of a limited objection before the Court today.

7          As noted therein, the committee -- and to go to Mr.

8   Schartz comment -- we do not dispute that, from the

9   perspective of unsecured creditors as a whole, a sale

10  transaction providing for the preservation of this business

11  is a far better outcome than liquidation.

12         We also appreciate the fact that Your Honor cannot

13  compel Kinderhook to close on a sale transaction on terms

14  that are inconsistent with its bid.  And we appreciate the

15  fact that Kinderhook revised its bid to provide for the

16  assignment of valuable estate claims against Mr. Godfrey and

17  other non-Kinderhook affiliates to a litigation trust through

18  which the claims could be prosecuted and any recoveries would

19  be shared equally among Kinderhook and unsecured creditors.

20         With that said, Your Honor, the committee does not

21  believe that the modifications proposed by Kinderhook today

22  have gone far enough.  Had Kinderhook proposed to assign a

23  hundred percent of the claims against Mr. Godfrey and other

24  non-Kinderhook affiliates; had Kinderhook agreed to permit

25  the committee to name the litigation trustee; had Kinderhook

1  provided for a trust oversight committee consisting of one

2  member picked by the committee, one by Kinderhook, and a

3  third member by the committee-selected trustee; and had

4  Kinderhook allowed Hisun to provide the necessary litigation

5  funding instead of Kinderhook it would have resolved our

6  limited objection, but that did not happen.  So we are left

7  with having to ask the Court to deny the motions.

8          Now, turning to the motions themselves, Your Honor,

9  and considering their substance, as I noted, we understand

10  that this Court's decision today is binary, grant the DIP and

11  sale motions based on the modified offer made by Kinderhook

12  to permit a 50-50 split of the Godfrey claims or deny the

13  motions entirely.  Because Kinderhook is not willing to

14  assign a hundred percent of the Godfrey claims to a

15  litigation trust for the benefit of unsecured creditors with

16  the adjustments I just addressed, the committee has

17  determined to seek denial of the motions today.  So I'll now

18  briefly address each of these motions in turn, Your Honor.

19          Starting with the sale motion and the request by

20  Kinderhook to acquire its own claims and the Godfrey claims,

21  as detailed in our objection, the insider nature of this

22  transaction requires the application of heightened scrutiny.

23  We do not agree that the existence of an independent director

24  shifts the standard back to business judgment.  Under the

25  cases cited in paragraphs 27 and 28 of our objection, when

1  the buyer is an insider, the debtors have the burden to show

2  the integrity and entire fairness of the transaction, as

3  reflected in the <u>Innkeepers</u> and other cases cited in our

4  objection.  The application as framework to sale shall lead

5  the Court to deny the proposed acquisition of the litigation

6  claims for multiple reasons.

7         First, Your Honor, when coupled with the

8  acquisition of the litigation claims, the transaction is

9  fundamentally unfair when considering that the Kinderhook

10 entities will not agree to keep the Godfrey claims behind for

11 the benefit of the estates with certain related adjustments

12 to the trust and funding structures that would allow the

13 creditors to control the outcome of the litigation.

14        Second, Your Honor, while our current investigation

15 has not revealed viable claims against Kinderhook, the

16 investigation was necessarily limited by the nature of these

17 cases and time.

18        And finally, Your Honor, there is simply no

19 business purpose for Kinderhook to purchase the Godfrey

20 claims.  If the Court is inclined to permit Kinderhook to

21 acquire the business assets free and clear of tens of

22 millions of dollars of unsecured claims, the debtors'

23 controlling shareholder should at least be required to leave

24 behind potentially valuable litigation claims against its co-

25 shareholder, who received over $80 million in consideration,

1  including $70 million in cash, for his shares through the LBO

2  transaction just 15 or 16 months prior to bankruptcy, while

3  leaving behind over $60 million in unpaid priority unsecured

4  claims.

5          With the complete surrender of the Godfrey claims,

6  Your Honor, the committee -- without the complete surrender

7  of the Godfrey claims, pardon me, the committee submits that

8  there is no basis to permit the debtors' controlling non-

9  debtor shareholder to acquire and bury claims against itself

10  and its affiliates.  We do not quibble with the process, our

11  objection is to the overall fairness of the transaction

12  itself and that leaves for general unsecured creditors.

13          THE COURT:  Okay, but let me ask you this because I

14  really kind of expected to see some evidence from the

15  committee to support the objection, because if I deny the

16  sale motion, then I thought you said, I think you argued that

17  the sale transaction as a whole is far better than

18  liquidation.

19          MR. DEAN:  Yes.

20          THE COURT:  And so how does the argument that it's

21  unfair to approve the sale transaction square with that,

22  assuming unfairness is the standard?

23          MR. DEAN:  Well, Your Honor, as I mentioned in the

24  beginning, I recognize that this is a difficult situation

25  that we find ourselves in, that you're left with a binary

1  choice of saying yes or no.

2          THE COURT:  Uh-huh.

3          MR. DEAN:  We would hope that if you said no that

4  Kinderhook would agree to release the Godfrey claims, but

5  that would be a decision that they would have to make if you

6  ultimately found this transaction to be unfair because it

7  provides really for the sharing of a 50-50 split of claims

8  that should go 100 percent to general unsecured creditors to

9  a subordinate shareholder.

10         And that's really the fundamental basis of our

11 argument, but we certainly understand the dynamic that we

12 find ourselves in.

13         Now, Your Honor, as for the release itself and the

14 related parties in the final DIP order, we agree with the

15 Court's comments at the February 23rd hearing that the

16 starting point for evaluating the propriety of the DIP terms

17 is Ames, but we respectfully submit that the construct of

18 Ames is just a starting point.  Unlike this case, Ames

19 involved a non-insider DIP, as did the L.A. Dodgers case

20 cited by the debtors in their replies, which involved a

21 conflict of directors in connection with that non-insider

22 DIP.

23         When evaluating an insider DIP like the one here,

24 Your Honor, in addition to the normal framework of Ames, we

25 submit that the Court should adopt the framework of the

1 Southern District of New York in the <u>LATAM</u> case from 2020, a

2 case also decided -- the same court that decided <u>Ames</u> and the

3 one that involved an independent director.  And as that case

4 confirmed, Your Honor, when dealing with insider DIPs, a

5 heightened degree of scrutiny, whether you call that higher

6 fairness or a similar heightened standard, and the existence

7 of an independent director does not revert the standard back

8 to business judgment, as the debtors' presentation suggests

9 today.

10         And, Your Honor, as applied to the DIP release

11 being proposed, Kinderhook's insistence on getting a release

12 in exchange for funding a DIP to be credit bid against its

13 ultimate free-and-clear purchase should be rejected, again,

14 as unfair, unnecessary, and simply going too far.  We believe

15 that any proposed release of this nature is premature and

16 should be reserved for a plan, and we join in the U.S.

17 Trustee's concern, which Mr. Schepacarter will discuss in

18 detail, that the <u>Zenith</u> factors cannot be satisfied today,

19 but we'll defer to Mr. Schepacarter to elaborate on those

20 factors.

21         And for those reasons, Your Honor, the committee

22 respectfully submits that both motions be denied as proposed

23 to the Court today.  We are very aware of the dynamic that

24 the Court just raised with me.  We certainly understand the

25 difficulty of the decision, but we do think that, had

1  Kinderhook wanted to fully resolve our objection, it would

2  have agreed to release the entirety of the Godfrey claims and

3  they were not willing to do that, so we think they should

4  face the consequences of the motion being denied as a result,

5  Your Honor.

6           Unless the Court has any questions for me, we have

7  nothing further at this time, Your Honor.

8           THE COURT:  Well, one question -- one thing that

9  struck me as I listened to the arguments today is, isn't at

10 this point the release almost beside the point in the sense

11 that the sale provides that the debtor is going to acquire

12 all the claims that the debtor has except for the excluded

13 claims.  That would include claims against Kinderhook.

14          So I'm not saying, put it aside, I'm not going to

15 consider it, I'm just saying isn't it almost an aside?

16          MR. DEAN:  I've always believed -- and I have

17 communicated this to counsel for both Kinderhook and debtor

18 prior to this hearing -- that I thought that continuing to

19 prosecute the release and the DIP was not necessary because,

20 if the sale is approved, then it's going to be a moot point,

21 as far as I'm concerned, but they weren't willing to walk

22 away from it.  So I still needed to address the issues that

23 were raised in the objection, but I agree with Your Honor's

24 thinking on this that it's sort of a sideshow at this point

25 if you approve the sale.

1          THE COURT:  Okay.  Okay, thank you.

2          MR. DEAN:  Thank you, Your Honor.

3          THE COURT:  Mr. Schepacarter?

4          MR. SCHEPACARTER:  Thank you, Your Honor.  What a

5   segue into my argument is the whole point of the releases

6   versus -- the releases in the DIP versus the -- what

7   (indiscernible) acquired.

8          Now, if you look at the language, it doesn't match

9   up, and that's the problem that we have.  If you look at what

10  they have -- and you can go through it back to their

11  relationship, but I'm going to address Your Honor's point

12  right away and then I'll get back into my argument -- if you

13  look at the language that they have with respect to what's

14  being released, the released claims under Section 4.14 is any

15  and all acts and omissions of the released parties, and from

16  any and all claims, interests, causes of action, avoidance

17  actions, counterclaims, defenses, and all those other things

18  that they added in there, which the releasing parties -- and

19  I'll get into that in a second, but may have or may have had

20  prior to this situation that basically took place over the

21  last 18 months.

22          So if you hold that, sort of put a pin in that, and

23  then if you go over to the stalking horse agreement, which is

24  amended, but Section 2.1 pretty much stayed the same except

25  I'm going to point out what they added.  They have now there

1  the acquired claims, which it has all causes of action,

2  lawsuits, judgment claims, and they put that laundry list in

3  there -- it's a little different, but it's, I think, supposed

4  to be sort of the same -- and all avoidance actions.  So they

5  include those as the acquired claims, they're getting all of

6  the avoidance actions.

7      (Pause)

8          THE COURT:  Mr. Schepacarter?  Ah, Brandon.

9          MR. SCHEPACARTER:  No internet in the Yankees man

10  cave.

11          THE COURT:  Ah, Mr. Schepacarter.  You were frozen

12  for us for a minute.  You need to go back, you had just ended

13  with the 2.4, I think.

14          MR. SCHEPACARTER:  Two point one (n).  I think I

15  was at the stalking horse agreement that says where the

16  acquired claims are?

17          THE COURT:  Yes.

18          MR. SCHEPACARTER:  Okay.  Yeah, I had a message on

19  my screen that said my internet was unstable for whatever

20  reason, but be that as it may.

21          So if you look at what they have as to the released

22  claims, it doesn't match, it doesn't match what the acquired

23  claims are.  So they're asking for more than just what

24  they're acquiring through the release.  The acquired claims

25  has all of those laundry list of things plus the avoidance

1  actions.  And then they added to the sale order -- and I

2  think this is very important -- they added to the sale order

3  language that says, "For the avoidance of doubt, no estate-

4  owned claims or causes of the debtors, other than the

5  excluded claims, shall be owned by the debtors as of the

6  closing date such that the buyer" -- Kinderhook -- "shall be

7  free and clear of any and all such claims and causes of

8  action, whether known or unknown.  For the further avoidance

9  of doubt, as of the closing date, the debtors will not own

10  any estate claims or causes of action against Kinderhook and

11  its affiliates, and the buyer shall own free and clear any

12  and all claims and causes of action, whether known or

13  unknown, against Kinderhook and its affiliates."

14          So they're buying everything.  Everything that

15  they're worried about, that they're concerned with that could

16  possibly be brought by this debtor -- and it's a debtor

17  release, they did take the third party out, but it's a debtor

18  release -- so that everything that they are worried about

19  that the committee or the debtor or somebody acted under the

20  committee, because they put that as the releasing party is

21  anybody acting, you know, in -- basically, in stepping into

22  the shoes of the debtor -- all of that that they have

23  together, added up, they have.  Kinderhook has it;

24  indefeasibly, unquestionably, if the sale is approved, they

25  have it, but what they're asking for in the release is more

1  than that.

2         They're asking for not only just avoidance actions

3  and some of those causes of action, but it says any and all

4  acts and omissions of the released parties, and the released

5  parties are each of the debtors and any party acting under --

6  or, I'm sorry, that's the releasing parties -- the released

7  parties are the DIP lender, and then it has a whole laundry

8  list of other parties, current and former affiliates, and

9  then such other entities, current and former directors,

10  officers, managers.  And it has equity holders and it has a

11  whole laundry list of basically everybody else that could be

12  related to the DIP lender, every entity, funds and

13  everything, parties that have nothing to do with this case.

14         Now, that would be something for confirmation, like

15  we could consider that under confirmation whether they met

16  the Master Mortgage factors, and if they think they met them

17  -- I'm not frozen, am I?

18         THE COURT:  No, no.

19         MR. SCHEPACARTER:  When people stop moving, then I

20  get nervous.

21         If you look at what the Master -- that's one point

22  and, like I said, my points are a little bit more nuanced.

23  And if you look at what they're asking for to be released and

24  all these other claims that go past -- go further than what's

25  being acquired, although everything that they've acquired

1   should give them peace of mind, but then if you go into the

2   Master Mortgage factors, they really can't meet any of them

3   because those are factors that would be with respect to a

4   plan.

5          So there's no way of knowing and it's not been

6   vetted by a plan -- and this will get to the end of my

7   objection -- not been vetted by a plan or vetted by creditors

8   to vote on.  A substantial contribution to the plan by the

9   non-debtor?  Those parties haven't done that.  Necessity of

10  the release to the reorganization?  Well, we don't know that.

11  We don't know, I mean, we just don't know.  It has the DIP

12  and the sale, maybe it's part of that, but I don't think they

13  need this broad release.

14         The identity of the releasees?  They haven't shown

15  who -- you know, that this shoots against these other

16  parties, if they think that they still exist.

17         Will deplete the estate resources?  Maybe their

18  individual resources or Kinderhook's, but it has nothing to

19  do with the bankruptcy estate.

20         And then, if you turn to the other ones,

21  overwhelming acceptance of the plan and release by creditors.

22  Well, that hasn't happened.  And the payment of substantially

23  all of the claims of creditors and interest holders under the

24  plan.  Well, that, again, hasn't happened.

25         So there's really no way to say that they've met

1  the <u>Master Mortgage</u> or the <u>Zenith</u> factors.

2          So those are pretty much the problems with the DIP,

3  just that -- the fact that the release just doesn't -- it

4  just goes way too far.

5          THE COURT:  Well, I want to make sure I understand

6  that because --

7          MR. SCHEPACARTER:  Okay, go ahead.

8          THE COURT:  -- all of the claims that are being

9  released are debtor claims --

10         MR. SCHEPACARTER:  Correct.

11         THE COURT:  -- no third party claims, we've

12 established that.

13         MR. SCHEPACARTER:  No third party, all debtor

14 claims, correct.

15         THE COURT:  And so now we're talking about who the

16 released parties are and that issue often comes up in plan

17 confirmation --

18         MR. SCHEPACARTER:  Right.

19         THE COURT:  -- context; who are the released

20 parties.  They're not only the person in front of me, but

21 every person they've ever known in their entire life.  Okay?

22         MR. SCHEPACARTER:  Correct.

23         THE COURT:  So I get that, but it's still only with

24 respect to the debtors' claims.

25         So even if released parties includes every person

1   Kinderhook ever knew in its entire life, it would still be

2   only a release as to any claims the debtor has against that

3   person, not anybody else --

4            MR. SCHEPACARTER:  Right, and those should --

5            THE COURT:  -- (indiscernible) --

6            MR. SCHEPACARTER:  -- and those should match up to

7   the acquired claims.  What they're asking for under released

8   claims, and it's the first portion of it, it says any and all

9   acts and omissions of the released parties.  That's pretty

10  broad.  I mean, that's as broad as you can get, like anything

11  that ever happened with respect to the released party.

12           THE COURT:  So do you think that the definition of

13  acquired claims doesn't include all those things?

14           MR. SCHEPACARTER:  No, I think it's limited to what

15  it says for acquired claims.  And they've acquired all the

16  debtor claims that they could have, but I think that this

17  goes even further.  I don't know what any and all -- released

18  from any and all acts and omissions of the released party

19  means.  To me, that goes too far.

20           Frankly, if -- and think about it in the context of

21  the regular, garden variety DIP that's approved, right?  We

22  have the prepetition lending situation, that's the

23  relationship between the parties, and they get a release from

24  all of that, all of that prepetition stuff.  So we have that

25  situation, not here, it's a little different.  So the

1   prepetition lending situation is get a release from all the

2   DIP documents and anything that happened, and maybe there

3   might be some stuff with the sale and some other stuff, but

4   the relationship here is the transaction that took place.

5          So all of the debtors' -- and that's the

6   relationship between Kinderhook and the debtors -- so all of

7   those debtors' claims can be released, right?  They're buying

8   them anyway, so they've squared them away.  They've put them

9   in their pocket, never to be seen again in the light of day.

10  They're done, nobody is going to catch them; they put extra

11  super-shielding language into the sale order so that they

12  will never be seen again.  But then you have this lead

13  portion and it's "and," it's not "including."  It says any

14  and all acts and omissions of the released parties, so it's a

15  broad umbrella.  And then we have sub-umbrella under that

16  that says from any and all -- and from any and all claims,

17  interests, causes of action, avoidance actions, all those

18  debtor claims.

19         So if it was limited to just that, it probably

20  would be okay because we've got to get a plan and they can't

21  have what they -- they can't have now their plan release here

22  later on that they will probably need to seek and that will

23  be vetted as part of a plan and disclosure statement.  And

24  even Abbotts -- and we put this in the back part of our

25  objection -- even under Abbotts, when you look at a

1  transaction, especially with an insider -- and I do agree

2  that this is an insider transaction -- so I don't they can

3  avoid that.  And even to the extent that Mr. Kravitz,

4  although I know he'll -- he can do a very good job, he's an

5  independent director, he's not a disinterested.  They keep

6  misnomering him.  He's not disinterested under the Code, he

7  wouldn't be, and if he were to hire a firm, he couldn't do

8  that.

9         So you have to look at that and you have to look at

10  that sale and you can't have -- and I think somebody

11  mentioned, maybe it was Mr. Schartz, said there's like a link

12  between the sale and the DIP, and I agree with that.  This is

13  -- these are linked together, that's why we're arguing them

14  at the same point.  But if you link them together, you still

15  need to at the end of the day have a plan and disclosure

16  statement hearing and you can't foreclose what the parties

17  later on will vet through the plan and disclosure statement

18  process, we can't do that now.  We can't -- just like you

19  can't have a plan as a settlement, you can't decide all those

20  things today in the context of the DIP.  And I know

21  Kinderhook would like to do that because this deal, I've

22  never seen one that went sideways so fast, but it went pear-

23  shaped real quick and that has led to all of the litigation

24  that's taken place.

25         So that's really our point is that the release -- I

1  understand what they're seeking, but I think what they're

2  seeking is more than what they are buying under the DIP and

3  the sale --

4        THE COURT:  Interesting.  And that's based on this

5  language "any and all acts and omissions of the released

6  parties"?

7        MR. SCHEPACARTER:  Correct.

8        THE COURT:  Okay.  At an appropriate time, I'd like

9  to hear a response to that, but let's continue, Mr.

10  Schepacarter.

11        MR. SCHEPACARTER:  Well, I think I've covered

12  pretty much everything that I said, that -- you know, we put

13  a lot in our objection, I tried to be as succinct as

14  possible.  You know, with respect to Ames, I think that Ames

15  is the starting point.  I think that if you look at -- and we

16  analyzed that Tenney Village case where they went into --

17  Ames analyzed Tenney Village and that was one where it was

18  kind of -- the bank had basically operated the debtor's

19  business.  So they said that that wasn't this case, that

20  case, Tenney Village wasn't Ames, but LATAM is closer to this

21  case -- or LATAM -- I'm not sure I used that acronym, but --

22  how you pronounce it, but to the extent that, you know, you

23  have a situation where you have an inside transaction, I

24  think it does need that heightened scrutiny, just as the

25  papers say.

1       And, again, that gets back into the fact that you

2  can't do things like having this release, you can't do things

3  in the context of a sale or a DIP that are plan-esque type of

4  activities.  You can't have through the asset -- like we

5  said, in the asset sale abrogate the protections afforded to

6  the creditors and shareholders by the Bankruptcy Code 1129

7  and the confirmation process.

8       So that's basically all I have to say, Your Honor.

9  Unless Your Honor has any questions, I will rest.  Thank you.

10       THE COURT:  No.  Thank you.

11       Is there anyone else, any other objector who would

12  like to be heard?

13       MS. KRAMER:  Yes, Your Honor, this is Katherine

14  Kramer of DGW Kramer on behalf of Hisun China, which is --

15       MR. PACITTI:  Your Honor, if I could interject for

16  a moment?  I apologize for speaking over Ms. Kramer, but Ms.

17  Kramer and her client are not objectors, they've filed no

18  pleadings in this case as it relates to any of the matters

19  before the Court today, and I don't think it's appropriate

20  for her to raise objections at a hearing when she had ample

21  time to file objections on her own, Your Honor, and she chose

22  not to do that.  So I don't think it's appropriate for her to

23  argue any of the matters before the Court, Your Honor, she's

24  not filed anything.

25       THE COURT:  Ms. Kramer, I guess the first question

1  then would be, why should I hear from you on behalf of your

2  client?

3           MS. KRAMER:  Sure, Your Honor.  So I'm here to

4  speak on behalf of Hisun China as an individual creditor in

5  this matter.  When Your Honor was hearing the arguments in

6  support of the motions, there was a statement from counsel

7  for Tao Motors, which is also a member of the committee; I

8  see that we have the same equivalent standing here.

9           I wish to speak in favor of the limited objection

10 that was put in by the committee, support the points that

11 were made by Mr. Dean, and emphasize a few of the points that

12 he made for the reasons why we think that a hundred percent

13 of the litigation claims should be allocated to the unsecured

14 creditors committee, and also emphasize some of the points

15 that he made about the terms that we view would resolve the

16 committee's objection.  I think that it's important for the

17 Court and also for Kinderhook to hear the specific terms of

18 what we would be looking at and some of the specific reasons

19 why we believe that the proposal that has been put in is not

20 fair to the unsecured creditors in this case.

21           And I think given the fact that Mr. Samis was

22 afforded an opportunity to speak on behalf of Tao, I would

23 ask for the same -- the same treatment here.  I don't wish to

24 take a lot of the Court's time, but I do wish to emphasize

25 those points and would ask for just a couple more minutes to

1    address those points.

2          THE COURT:  I will give you a few minutes in light

3    of the fact that Mr. Samis had some time to speak, but you

4    should recognize that this is not a negotiation, this is a

5    hearing.

6          MS. KRAMER:  Understood.

7          MR. PACITTI:  Thank you, Your Honor.

8          MS. KRAMER:  Yes, I completely understand that,

9    Your Honor, and I am cognizant of the fact that there is a

10   binary choice that is being presented to the Court here

11   today, but at the same time we do wish to emphasize the

12   points of what we would be seeking and what was raised by Mr.

13   Dean in his explanation of the limited objection by the

14   committee.

15         Our position is that a hundred percent of the

16   litigation claims should be allocated to the unsecured

17   creditors and that this is fair in light of the role of

18   Kinderhook after the 2021 transaction.  As the debtors very

19   quickly went into bankruptcy, there's only been a very

20   limited investigation to date of what occurred during that

21   time period.  And Kinderhook is also the -- they can come in

22   an equity position here as opposed to the unsecured creditors

23   and, by allocating a hundred percent of the litigation claims

24   to the unsecured creditors, there would be what we view as

25   fair value then to the unsecured creditors as a result of the

1 sale process and the outcome of this bankruptcy.

2         I would also emphasize what Mr. Dean mentioned, but

3 only briefly in passing, that we would propose that Hisun

4 China is willing to provide the litigation funding.  That was

5 a point that Mr. Pacitti mentioned in terms of the analysis

6 for why a 50-50 split was fair because Kinderhook would be

7 providing the litigation funding.  Our alternative proposal

8 is that Hisun China would be providing the full amount of the

9 litigation financing on better terms, Your Honor, than what

10 had been put forth by Kinderhook.

11         In addition, there's a willingness to include

12 Kinderhook in the litigation oversight process, so that they

13 would not be excluded from that.

14         We do think that it's very important that

15 Kinderhook is not given complete control over the litigation

16 process here.  One of the concerns that we have is that we do

17 have this separate civil action between Hisun China,

18 Kinderhook, and Mr. Godfrey.  I see that there is a potential

19 for risk that if Kinderhook is given control over the

20 litigation process in the liquidation of this bankruptcy,

21 there's a risk of the use of that process to support

22 Kinderhook in the dispute against Hisun China in a separate

23 action.  So we think that it's important that the litigation

24 process is overseen by somebody who's neutral who comes in,

25 who is not there either on behalf of Kinderhook or any of the

1  individual creditors such as Hisun China, but somebody who

2  would be there as a neutral person who could act on behalf of

3  all of the potential beneficiaries of those litigation

4  claims.

5       And, with that, I will thank the Court for the

6  indulgence of some time to speak on behalf of Hisun China.

7  So thank you, Your Honor.

8       THE COURT:  Thank you.

9       Okay, Mr. Pacitti.

10      MR. PACITTI:  Yes, Your Honor, thank you.  I

11 apologize for all the squirming I was doing during that, but

12 I just still want to reiterate that I thought that that was

13 wholly inappropriate given the fact that Ms. Kramer was

14 raising issues specific to her client, the desires of her

15 client to participate in a sale transaction without filing a

16 pleading and making a proposal, and I didn't think we were

17 going to have a quasi-negotiation of potential terms that the

18 parties are hearing, I suspect, for the first time, all these

19 folks on the phone.

20      But, Your Honor, as it relates to the real issues

21 raised and they were, I think, by Mr. Schepacarter, I think

22 he may have the scope of things a little bit backwards, at

23 least that's how I read it.  The release under the DIP is a

24 release solely by the debtors and the debtors' estates

25 against specific Kinderhook-related parties, that's it.

1          Now, the need for the Kinderhook-related parties

2    was addressed by Mr. Schartz in his presentation, right?  The

3    fact that these -- you know, the DIP lender entity or the

4    asset-acquirer entity are basically silos of the Kinderhook

5    upstream entities and this is not unusual, Your Honor.  It's

6    effectively, you know, to give full relief for the release

7    that's being granted.  If you just release a nominal DIP

8    lender who is, I suspect, an entity formed shortly before the

9    filing that's funded by the Kinderhook upstream entities,

10   then you're not giving effective relief in the form of a

11   release.  So that's why these are structured, it's not novel,

12   that happens in every case where there's a release.

13         But where I think Mr. Schepacarter has it wrong is

14   that the release is limited to those things, but the acquired

15   claims are larger.  They're all claims of the debtors other

16   than the excluded claims.  So it includes the universe of all

17   claims, not just the claims that were being released, it's

18   larger than what is in the release.  So I don't think his

19   argument about the scope of the DIP release being so large is

20   accurate, number one.

21         And then secondly, Your Honor, as it relates to the

22   claims that are being purchased, there's value being given

23   for those claims, and we went through that in our argument in

24   the presentation.

25         THE COURT:  Yeah, let me --

1           MR. PACITTI:  The backdrop --

2           THE COURT:  -- ask -- but, specifically, are you

3    going to -- the specific language -- and I just want to make

4    sure I understand this -- in the release in the 4.14 of the

5    sale order that Mr. Schepacarter is referring to was right

6    after the defined term "released parties" --

7           MR. PACITTI:  I'm sorry, I'm paging to it, Your

8    Honor.

9           THE COURT:  Yeah, it's on page 44.

10          MR. PACITTI:  It's 44 of the one that I have.

11   Okay, 4 point -- I have it, Your Honor.

12          THE COURT:  Okay.  So right after the definition of

13   the released parties it says "from any and all acts and

14   omissions of the released parties," that's what they're being

15   released from.  You go back.  "The releasing parties hereby

16   unconditionally and irrevocably release the released parties

17   and their respective property and assets from any and all

18   acts and omissions of the released parties, and from any and

19   all claims, interests, causes of action," et cetera.

20          So I understood the language that Mr. Schepacarter

21   was questioning is the "from any and all acts and omissions

22   of the released parties."

23          MR. PACITTI:  Right, it's claims against the

24   released parties and the released parties are the DIP lender

25   and the entities affiliated with the DIP lenders.  That's

1  where the limitation lies, not in the definition of released

2  claim, but rather who the released parties are.

3            THE COURT:  So --

4            MR. PACITTI:  Released parties limits the scope of

5  what released claims apply to.  Released claims only apply to

6  released parties, so the limitation there is as to who the

7  released parties are.  In the asset purchase agreement, the

8  claims that are being acquired are all claims that the

9  debtors have against those -- against all parties, against

10  third parties, other than the excluded claims, which are

11  those claims against the former owner and certain of the

12  former officers.

13            THE COURT:  Yeah, I --

14            MR. PACITTI:  It's actually the reverse of what Mr.

15  Schepacarter was suggesting.

16            THE COURT:  Well, I under -- I thought I understood

17  that and that's what I thought the discussion I had with Mr.

18  Schepacarter was, but then he points to this language to

19  suggest that all acts and omissions is something different

20  than claims because in fact there's different language there.

21  Okay?

22            So the debtors are selling their claims, I guess

23  they're not selling whatever all acts and omissions is, is

24  the argument, maybe.  So that's why I'm just asking for a

25  response.

1          MR. PACITTI:  Yeah, I guess an act or omission,

2   theoretically, could give rise to a claim.  In a vacuum, an

3   act or omission is just a phrase, right?  It's only

4   actionable if it results in a claim.

5          So that's why, if we're selling all claims, an act

6   or omission is really just defining what claims are --

7          MR. SCHARTZ:  And --

8          MR. PACITTI:  -- and it relates to released

9   parties.  And, I'm sorry, Mr. Schartz wants to chime in.

10          MR. SCHARTZ:  I don't really see a difference.

11  That's why we put for-the-avoidance-of-doubt language in the

12  sale order.  And I hate using for-avoidance-of-doubt language

13  because we -- now we have included it and there's still

14  doubt, so something is not right, which points to the fact of

15  why we feel like we need a release.

16          But the idea here is -- and however we define it --

17  when the company filed for bankruptcy, created an estate,

18  that estate included all causes of action that's owned by the

19  debtors' estate under 541.  We had Kinderhook's buying entity

20  as buying all of the estate-owned causes of action except for

21  what it's leaving behind, and what it's leaving behind are

22  the specifically enumerated claims and causes of action that

23  are on the exhibit to the APA, that's it.

24          So the fact that we're focusing on the phrasing,

25  you know, acts or omissions, those are the things that give

1  rise to a claim.  We're just describing in the DIP the

2  various things that could give rise to a claim.  You either

3  act or you fail to act; that's what gives rise to a claim.

4  We're just defining with specificity in order to make that

5  more clear, but the idea is exactly as laid out as between

6  the APA and the release.

7          THE COURT:  Okay.  Well, sometimes more words is

8  not better than less words --

9          MR. SCHARTZ:  Again --

10          THE COURT:  -- so --

11          MR. SCHARTZ:  You know, look, this deal suffers

12  from having come together over the course of six days and

13  there's some things we've had to clean up, and this is part

14  of the problem on that.

15          THE COURT:  Okay.  Well, what I'm telling everyone

16  is that the way I read this release is not broader than the

17  causes of action that the debtors have.

18          MR. SCHARTZ:  We agree with you, Judge --

19          THE COURT:  It's just not going to be read that

20  way.

21          MR. SCHARTZ:  -- we agree with you.  And which begs

22  the question, well, Mr. Schartz, why don't you drop the

23  release, right?  That's going to be your next question to me.

24  And the answer is exactly -- I'm actually glad that Ms.

25  Kramer spoke because I want to talk a little bit about, you

 1  know, the history here now that it's on the table, and I'm

 2  going to come back to answering that question in a second.

 3          So that the record is very clear, we had on the

 4  table 100 percent of the Godfrey claims weeks ago, weeks ago.

 5  We've now spent millions of dollars, hours, wasted time,

 6  wasted money because Hisun can't get out of its own way.  And

 7  now we're now hearing on this call, this hearing, for the

 8  first time, that this is how they want it to work.  We've

 9  never heard from them.  The hearing was moved, I didn't hear

10  back from them for days.

11          So, to the extent that a new offer is being put on

12  the table, I want the record to be very clear, Kinderhook

13  rejects it.  The only offer on the table is what is in the

14  asset purchase agreement, the documents we filed with the

15  Court.  We don't trust Hisun to watch the litigation trust;

16  we don't trust Hisun to make smart decisions.  I don't know

17  how Hisun can stand here and challenge a value-maximizing

18  sale and still discharge its fiduciary duty to unsecured

19  creditors as a member of the committee, I'm baffled by the

20  way that they're acting, and they're jeopardizing the entire

21  transaction.

22          The only deal on the table is what is filed with

23  the Court and that is the case.

24          THE COURT:  Okay.  Mr. Pacitti, any final remarks?

25          MR. PACITTI:  No, Your Honor.  I concur with Mr.

1  Schartz's comments.  But, again, the deal that's before the

2  Court is what's been proposed by the debtors and Kinderhook

3  and we can't be asked in open court during the hearing to

4  change that deal and present something new.

5          So, Your Honor, we believe for all the reasons

6  we've stated previously that it makes sense to achieve the

7  value-maximizing transaction and approve both the DIP

8  facility that facilitates that, as well as the asset purchase

9  agreement to Kinderhook.

10          THE COURT:  Okay.

11          MR. DETWEILER:  Your Honor, may it please the

12  Court, Donald Detweiler on behalf of Mr. Godfrey.

13          THE COURT:  Oh, I'm sorry, Mr. Detweiler, yes.

14          MR. DETWEILER:  Just a very quick statement.  Mr.

15  Godfrey did file a reservation of rights.

16          THE COURT:  Yes.

17          MR. DETWEILER:  Mr. Godfrey, respectfully,

18  disagrees with the various statements and unverified

19  accusations asserted against him in the case to date.  He

20  also disagrees with the characterization of the claims that

21  are allegedly -- that could be brought against him.

22          To the extent Mr. Godfrey is sued, he looks forward

23  to defending himself and the merger transaction.  He also

24  looks forward to exposing the true facts of the debtors'

25  demise.  And we thank the Court for your time.

1        THE COURT:  Thank you.

2        MR. DETWEILER:  Thank you, Your Honor.

3  **?      THE COURT:  Okay.  What I have in front of me today

4  is the final DIP hearing and the hearing on this sale.  I

5  have an uncontested evidentiary record that consists of the

6  six declarations that were admitted into evidence without

7  objection and on which cross-examination was permitted, but

8  was not taken.  And those six declarations provide an

9  evidentiary basis for approval of both the DIP on a final

10  basis and the sale motion.

11        I do have some questions with respect to orders,

12  which we'll get to, but the evidentiary record is abundant

13  that both of these motions should be approved.  And I

14  actually thought that the case that the committee cited in

15  its objection, In re -- I don't know how to say it -- Xeris,

16  Inc. (ph), which is Judge Gross' decision from 2008, was very

17  helpful in showing the clear differences between where we've

18  ended up in this case and the evidentiary record that Judge

19  Gross got and denying a sale motion where he had absolutely

20  no record in front of him on the sale process, on the

21  fairness of the price, on any kind of valuation whatsoever,

22  and where the proponents there did not provide an evidentiary

23  basis for their conclusions.

24        Here, with respect to the final DIP, the

25  declarations in support of the DIP clearly show that the

1 debtor did financing in order to fund this case and to

2 continue its operations; that the debtor looked for financing

3 and it was unavailable from any source other than Kinderhook;

4 that it was negotiated at arm's length by Mr. Kravitz as an

5 independent director with Kinderhook; and, quite frankly,

6 nobody else has come forward either.

7        There's also a junior DIP to $52 million of a first

8 lien facility, prepetition facility.

9        The only issue that remains with respect to the DIP

10 is the release.  And it's not unusual in a DIP for the DIP

11 lender qua DIP lender to ask for a release if it's going to

12 fund a DIP facility, and this is -- goes obviously beyond

13 that in that here the DIP lender is also the sponsor and is

14 asking for a release of claims against it by the debtor.

15 That release has been narrowed; it was a third party release,

16 or could at least have been read to a third party release in

17 the beginning, and that has been eliminated.

18        And as I indicated during the course of the

19 discussion I had with Mr. Schepacarter and again with Mr.

20 Pacitti, I am reading this release as it is a release of

21 debtors' claims and nothing beyond that, and the language

22 from any and all acts and omissions of the released parties,

23 I don't think, expands that beyond the debtors' claims and

24 that's how I read this.

25        Here, the release was a part of the deal.  The

1 parties know I did not approve it at the interim, as

2 requested, and I didn't approve it the second interim

3 requested, but now we're here at the final DIP.  Not only has

4 Mr. Kravitz done his independent investigation into claims

5 against Kinderhook, but the committee has as well.  And the

6 committee has concluded, based on the evidence it had and the

7 time it had, which, as Mr. Dean concedes, is often hurried

8 and less than what parties might otherwise have had if there

9 were more time, the committee has concluded there are no

10 viable causes of action against Kinderhook.

11      So there are two parties that have now concluded

12 that there are no viable causes of action against Kinderhook,

13 both the debtor, through its independent director, and the

14 committee.

15      Given the need for the financing and, as we'll get,

16 the tie-in with the sale, I really have no hesitation on the

17 unique facts of this case -- and I'll say this piece is

18 unique, although the case itself isn't -- hopefully, I didn't

19 say it wasn't interesting, but unique is different -- I think

20 this release, the evidence is there to support the release in

21 this case of what are considered to be not valuable causes of

22 action after an investigation that are necessary to obtain

23 the funding.  The tradeoff, if anything, is minimal, and the

24 debtor has made that decision, there is no evidence to the

25 contrary.

1          With respect to the sale motion, what's been put in

2  front of me was the sale of all, substantially all of the

3  assets of the debtor.  It was -- as the declarations

4  evidence, it was noticed out.  No party, including the

5  committee, objected to the time frame of the sale motion.

6  The post-petition sale was preceded by a prepetition sale

7  effort, which did not -- while, again, hurried and occurring

8  over a holiday, the December-to-January holidays of last

9  year, nonetheless also resulted in no actionable agreements

10 other than the stalking horse agreement.  The process

11 continued post-bankruptcy.

12         And the evidence of the marketing, the number of

13 parties that were reached out to and contacted, permitted, I

14 believe it was nine NDAs, people in the availability of the

15 data room, there is no suggestion and all the evidence is to

16 the effect that this company was marketed.  As Mr. -- I

17 believe it's Mr. Kravitz, but it could have been Mr. Bremer,

18 it could have been Mr. Bremer -- testified the stalking horse

19 agreement represents the highest and best offer, the

20 marketing process has been adequate to achieve the greatest

21 possible level of interest and return for the assets.

22         And, again, no party has suggested that there

23 needed to be additional time for these assets to be marketed.

24 The issue -- and I know I read it, but I don't see it here --

25 was in the EBITDA numbers that did not support a greater

1  number.

2          The purchase price is $10 million in the credit

3  bid, or approximately, for the DIP facility; a $52 million

4  assumption of the first lien debt; a wind-down amount of

5  600,000; a litigation trust funding of a million, 250 -- and

6  I do want to get back to the litigation trust, don't let me

7  forget -- and assumed liabilities of about $9 million.

8          The sale will permit this company to go forward,

9  that means there will be ongoing business operations and

10  vendors who will benefit from ongoing business operations.

11  There is assumption of ordinary course trade payables,

12  503(b)(9) claims, open purchase orders, accrued payroll,

13  warranties on the products, and tax liabilities.  We will

14  have continued employment of approximately a hundred

15  employees and, again, vendors will have an operating business

16  to look to.

17          The only alternative, as Mr. Kravitz testifies, is

18  a liquidation.  He also provides in his declaration for a,

19  I'll say, top-level liquidation analysis, which shows that if

20  all of the debtors' assets other than claims that the debtors

21  had are valued at full value, which we know does not happen

22  in a liquidation scenario.  The value is $32 million, which

23  does not cover the first lien debt and does not come near to

24  the $72,850,000.

25          The debtors' assets were marketed and that included

1   all of their assets, including their claims.  All parties

2   could have bought the claims, could have put in a bid for all

3   or any portion of the assets.

4          As far as claims are concerned, usually the two

5   parties that are interested in buying claims are those that

6   want to prosecute them and those that are going to be the

7   defendants, and there is an opportunity for anybody who wants

8   to prosecute a claim to buy it.

9          And I find that, based on all of this evidence, the

10  sale process was fair, the notice was appropriate, the sale

11  price is a fair price, and I see no collusion, no evidence of

12  insider influencing the sale process.

13         There is no question that Kinderhook is an insider,

14  that the buyer is an insider, but regardless of which

15  standard I look at, whether it's business judgment, the

16  intermediate standard, or in the entirely-fair standard, I

17  find the evidence supports the sale.

18         In terms of the purchase of the claims, originally

19  against Mr. Godfrey -- and I'm not commenting one way or the

20  other from the Court on the value of those claims, which of

21  course Mr. Godfrey disputes -- the debtors and the committee

22  have both indicated that those claims have value, but nobody

23  has really put forward for me anything or any evidence which

24  would suggest to me that permitting this company to liquidate

25  is a better value proposition than this sale and the 50-50

1  splitting of these claims that's embodied in the sale.

2          As the parties have recognized, this is an all-or-

3  nothing proposition and, given the evidence, I'm going with

4  the all, with a caveat that I -- as I've already indicated

5  and as Mr. Pacitti has recognized, I'm not preapproving the

6  plan process, I'm not preapproving who the trustee is, I'm

7  not preapproving whatever the plan trust document -- or the

8  trust document might say.  I view this more as, if you will,

9  akin to a restructuring support agreement.  The debtor has

10 agreed this is what it's going to file, the debtor has

11 committed to file that.  It will get -- if it's filed, then I

12 will look at it, it gets solicited, and we'll see what the

13 votes are.  But I would view it as inappropriate to be viewed

14 as prejudging any of that as I would have if the committee

15 came to me with the agreement.  I can't prejudge it; that has

16 to go out.

17 **?      But with that caveat, to the extent it is a caveat,

18 this agreement fully meets the standards for the Abbotts

19 Dairy for approving a sale outside the ordinary course and

20 under the circumstances of this case where there are really

21 no alternatives other than liquidation.

22          MR. PACITTI:  Thank you, Your Honor.

23          THE COURT:  Yeah, I think that's all I've got.  I

24 was just looking at my notes, a little free flow in there.

25          Okay, we do need to go through the order because I

1   have some questions, but I'd like to take 15 minutes --

2          MR. PACITTI:  Thank you, Your Honor.

3          THE COURT:  -- and then we'll come back.

4          Thank you.  We're in recess.

5       (Recess taken at 12:06 p.m.)

6       (Proceedings resumed at 12:20 p.m.)

7          THE COURT:  This is Judge Silverstein.  We're

8   going to go back on the record.

9          MR. PACITTI:  Thank you, Your Honor.

10         THE COURT:  Okay.  As I indicated, I have some

11  questions on the proposed sale order.  I'm looking at what

12  I'm hoping was the final version -- excuse me --

13         MR. PACITTI:  I think it was 254, Your Honor.

14         THE COURT:  Right.  It's -- okay.  I've only got

15  the blackline page, so hopefully it won't be too far off.

16         MR. PACITTI:  Okay.  Yeah, that's -- we were

17  trying to reduce the amount of paper and since there were

18  only a couple of pages with those last little nits, we didn't

19  attach the full blast.  We're trying to make your life a

20  little bit easier.  I apologize for that.

21         THE COURT:  Okay.  My first questions are

22  paragraph W, which I have on page 11, called "binding

23  agreement."

24         MR. PACITTI:  Yes, Your Honor.

25         THE COURT:  It's a pretty extensive provision,

1  okay.  In seven lines down, I'm not sure about this.  I don't

2  have a problem with "the APA and the sale itself and the

3  consummation thereof stands specifically enforceable."  I

4  guess that's okay.  I don't know about the "without posting

5  any bond."  I just can't think through that -- I don't

6  know -- and I don't think I should prejudge something.

7            Is there a reason why this is necessary?

8            MR. PACITTI:  I'm sorry, Your Honor, I'm trying to

9  read it.

10            THE COURT:  Okay.

11            MR. PACITTI:  Yeah, I think the concept was that

12  it took into account, you know, actions to seek to circumvent

13  the enforceability and that if those actions would be taken

14  that it would only seem appropriate for a bond to be posted,

15  but I see your point.

16            I don't know if Mr. Schartz has an issue with this

17  or not.

18            MR. SCHARTZ:  You're being faster than me, so one

19  second so I can read it very carefully.

20        (Pause)

21            MR. SCHARTZ:  And, Your Honor, just so I

22  understand, you wanted to leave the parenthetical?

23            THE COURT:  Yeah, I don't -- I can't think through

24  that.

25            MR. SCHARTZ:  I think of a strong reason -- I can

1  think of a reason -- I can't think of a strong reason why I

2  want to keep it, so I was thinking delete that parenthetical.

3  It's not a problem.

4          THE COURT:  Okay.  If you go down from there, I

5  don't know, another six or so lines -- well, the last line,

6  you define the bound parties, and as part of that definition,

7  you have "effected third parties."  What does that mean?

8          MR. PACITTI:  I apologize, Your Honor.  I'm also

9  reading it again.

10         THE COURT:  Yep.

11         MR. SCHARTZ:  I think what we're thinking about

12 is, so take -- there probably are a number of effected third

13 parties if that's the question.  I think -- just to come up

14 with a couple of examples, number one is Twin Brook, right,

15 so we're assuming their debt.  There are a number of

16 contracts that are being assumed, so I think this -- the

17 language "any effected third party" is -- parties -- excuse

18 me -- is designed to pick up anyone else other than the

19 sellers and the buyer who have claims that are being assumed

20 or maybe even left behind, right.  I think it's designed --

21 that's what this is designed to do.

22         THE COURT:  So we have their creditors.

23         MR. SCHARTZ:  Yep.

24         THE COURT:  We have creditors included.

25         MR. SCHARTZ:  Yep.

1          THE COURT:  So, I'm trying -- I really think it's

2     sort of like people try to do with a plan, you know, 1141

3     says who's bound.  You know, the parties are bound, creditors

4     whose contracts are assumed and assigned, things like that,

5     but this is sort of amorphous.

6          MR. SCHARTZ:  Okay.  So, we could say if your

7     proposal is to delete "and any effected third parties,"

8     right?

9          THE COURT:  I don't know what it means --

10          MR. SCHARTZ:  Yeah.

11          THE COURT:  -- if somebody is trying to figure out

12     what this means.

13          MR. SCHARTZ:  Yeah, I think what -- if we go that

14     route what I would propose, and, again, not to negotiate with

15     you -- I hear your point -- we would say their creditors,

16     "whether known or unknown," in a parenthetical, you know,

17     "allowed or disallowed, assumed or not assumed," just to kind

18     of expand that a little bit if we could, and I think that

19     would work, right, because at the end of the day there's the

20     debtors that have assets.  They have creditors and

21     stakeholders who have claims that are allowed or not allowed.

22     They're either assumed but this transaction or not.  I can't

23     really think of anyone else that we care about, to be honest.

24          THE COURT:  Okay.

25          MR. SCHARTZ:  Unless anyone on my side -- I'm

1  looking at my team.  Okay.  So, we'll expand that

2  parenthetical after "creditors" to address that point.

3        (Pause)

4        THE COURT:  Okay.  I also don't understand, and

5  it's at the top of the next page for me, the same paragraph,

6  I don't understand the reference to "the other law."  I'll

7  give you a chance to read that.

8        MR. SCHARTZ:  Probably most important where you

9  have -- I've come across this where you have a foreign

10 jurisdiction, so we have another proceeding, but we don't

11 have that issue here, so I think we're covered by "trustee,

12 examiner, receiver part of the bankruptcy or other law."  I

13 guess someone could say they're trying to appoint an S, you

14 know, some sort of trustee under state law, right, I could

15 see that happening.  But where I've seen this come up is --

16        THE COURT:  Oh, I see what you're saying.

17        MR. SCHARTZ:  Yeah.  So if you wanted to say,

18 "other state law," I'd be fine with that.  We don't have a

19 foreign law issue in this case, so you could say, "state

20 law."

21        THE COURT:  Okay.  Let's put that in.

22        MR. SCHARTZ:  I think U.S. Trustee would be weird

23 if someone went and tried to, like, have a state, you know,

24 Delaware law trustee appointed after a bankruptcy proceeding.

25 We'd probably contest that, but --

1          THE COURT:  Yeah.

2          MR. SCHARTZ:  -- or we would contest that, because

3    I think you need leave from the Bankruptcy Court to do that

4    at this point.

5          THE COURT:  Okay.  The next question I have is

6    paragraph DD, like dog, page 16 of what I'm looking at:  the

7    carve-out.  And my question is:  Why is that in this order?

8          MR. SCHARTZ:  We are funding -- let me get this

9    right -- we're funding some portion of professional fees at

10   closing and we're using the carve-out mechanisms and the DIP,

11   the two kind of work together so that, you know, from

12   Mr. Pacitti's perspective, if whatever reason things go

13   sideways, we don't close the transaction or we close the

14   transaction and something -- the DIP defaults, there's at

15   least some proceeds to deal with that mess afterwards.

16          So, because we're going to close the sale and

17   there's going to be no more DIP outstanding given the way we

18   structured this, we're putting some cash (indiscernible) what

19   the exact amount is, into the carve-out reserve and using the

20   mechanism as the DIP to, basically, to pre-fund the carve-

21   out.  I think the likelihood that that happens is very low,

22   but, you know, we wanted to make sure that the debtors'

23   professionals have at least some cash to deal with the

24   situation, even if we think it's unlikely to occur.

25          THE COURT:  Okay.

1           MR. SCHARTZ:  Yes, and one more point on this.

2  It's designed to work in a way -- I don't have the budget in

3  front of me -- but it doesn't increase the amount that's

4  funded from the DIP.  So, you know, it works within the

5  $10 million; that's the *proviso* at the end of that paragraph.

6           THE COURT:  My next (indiscernible) was in

7  paragraph FF.

8           MR. SCHARTZ:  Judge, you (indiscernible).

9           MR. PACITTI:  Your Honor, which paragraph?

10           THE COURT:  I'm sorry, paragraph FF, like Frank --

11           MR. SCHARTZ:  Yep.

12           THE COURT:  -- "single, integrated transaction.

13  While I agree that the sale order and the DIP order are

14  related, what does this provision that they're "inextricably

15  linked and technically and collectively constitute a single,

16  integrated transaction," what does that mean from a legal

17  perspective or an approval perspective or what's that

18  supposed to mean?

19           MR. SCHARTZ:  It's important because there is case

20  law and I haven't seen it come up, really, in the 363

21  context, but you (indiscernible), you know, where folks

22  challenge transactions and they try to pick apart bits and

23  pieces.  And so the thought behind this is, if someone is

24  going to challenge the whole thing, a motion for

25  reconsideration, maybe on appeal, I think it's very important

1 that the finding that, like, we wouldn't do the DIP if we

2 didn't have a sale and we wouldn't do the sale if we didn't

3 have a DIP, is part of that because it's an important part of

4 the record.  I think it's an important part of your ruling.

5 So, that's what this is getting at, obviously, with more

6 language, which maybe isn't always better, but that's the

7 idea.  I do listen.

8              THE COURT:  I'm just trying to think of the legal

9 import of this.

10             MR. SCHARTZ:  My associate makes another point

11 that I didn't make, which is that the DIP is part of the

12 purchase price; that's the other part of this, right, so --

13             THE COURT:  Right.  But if you're just

14 (indiscernible) the DIP, I wouldn't consider that a single,

15 integrated transaction.  It's a fair point, but I wouldn't

16 consider it that way.  Well, nobody else has raised this.  I

17 guess I'm okay with it.  I'm not sure where it leads and I'm

18 not sure if it's favorable for you or not, but whatever.  I'm

19 okay.

20             Okay.  I think your option is if somebody --

21 excuse me -- is appealing something and you don't -- and,

22 yeah, the DIP has to be approved, you don't close.  I mean, I

23 think that's the option.

24             MR. SCHARTZ:  That's part of it, too.  That is

25 definitely part of it.

1          THE COURT:  Paragraph 1.3 --

2          MR. PACITTI:  I'm sorry, Your Honor, which

3   paragraph?

4          THE COURT:  1.3.

5          MR. PACITTI:  1.3, thank you.  Sorry.

6          THE COURT:  It's okay.

7          I'm not comfortable with the words that "notice

8   was fair and equitable under the circumstances."  It either

9   complied and was done or didn't; I think that's the standard.

10  I don't think fair and equitable is the standard for notice.

11         MR. SCHARTZ:  Okay.  We will say "complied in all

12  respects --

13         THE COURT:  Uh-huh.

14         MR. SCHARTZ:  -- "and it was fair and equitable

15  under the circumstances."

16         THE COURT:  Okay.  This is an interesting one,

17  paragraph 1.4.  The bid procedures order is a final order.

18  I've never researched that issue, but that's not my gut

19  reaction.

20         MR. SCHARTZ:  Meaning that if another party had to

21  file an objection, they would have to argue that, basically a

22  leave for appeal for an interlocutory appeal; is that your

23  point?

24         THE COURT:  I think it's interlocutory.  I don't

25  think it finally decided anything.

1    MR. SCHARTZ:  Yeah, I think what we're trying to

2 say here is not subject to an appeal.  It's just like a

3 sloppy language, to be honest.  So, I think we can just

4 delete "as a final order of the Court" because I get your

5 point.  So, no appeal or motion has since been filed with

6 respect to the bid procedures and the bid procedures order

7 has not been (indiscernible), withdrawn, or (indiscernible).

8    I would like to say, if it's okay -- I will delete

9 "is the final order of the Court" -- "is not the subject of

10 an appeal" and the appellate period has run, which is true.

11    THE COURT:  I'm not sure what that gets you,

12 but --

13    MR. SCHARTZ:  Not much, because there's nothing to

14 appeal, so it's not exotic in that bid procedures order at

15 all.

16    THE COURT:  Yeah, and if you want me to

17 incorporate it into this order, then it doesn't really matter

18 what that order says.  And I've thought about that because I

19 don't always do that, but I actually think it's implicit

20 because, again, I don't think it's a final order.

21    MR. SCHARTZ:  All right.  So, we'll just delete

22 "is a final order of the Court" because you're probably

23 right, it's not -- no one could object -- no one could appeal

24 the bid procedures order without filing and meeting the

25 interlocutory standard and getting leave.  I agree with that.

1            THE COURT:  Okay.  Paragraph 2.1, I generally

2    don't approve every provision of every agreement.  What I do

3    is authorize the debtor to enter into the agreements and I

4    think we do that in 2.2.

5            MR. SCHARTZ:  So, let me read 2.2.

6        (Pause)

7            MR. PACITTI:  I think we would need to add, "The

8    debtors are authorized to enter into, perform, and make all

9    payments," because, Your Honor, there's -- I think there are

10   agreements part of the asset purchase agreement, like we did

11   with the TSA and that type of stuff, so there's --

12           THE COURT:  I'll authorize you to enter into all

13   of those agreements that are necessary to effect the asset

14   purchase agreement.

15           MR. PACITTI:  So, Brian, should we change

16   something in 2.1 to just do that authorization, to enter into

17   ancillary agreements?

18           MR. SCHARTZ:  Yes, I agree.  Instead of approving,

19   just enter into and, you know, executing the deal.  I get it.

20           THE COURT:  Yep, okay.

21           MR. SCHARTZ:  I'm being too slow to come up with

22   clever language --

23           THE COURT:  I'm sure you all can do it.  You will

24   circulate it.

25           MR. SCHARTZ:  -- concept.

1          Your Honor, there are a couple of folks that are

2    on the line that are texting me saying they can't hear the

3    hearing.  I don't know if there's a way that we can let

4    people in?  It may be on our end, because it's a --

5          THE COURT:  Brandon, can you check and see if

6    there's anybody in the waiting room?

7          THE CLERK:  Your Honor, this is Dana.  No one is

8    in the waiting room.

9          THE COURT:  Oh, I'm sorry, Dana.  I didn't realize

10   you were with me this morning.  Thank you.

11         THE CLERK:  Thank you, Your Honor.

12         MR. SCHARTZ:  It may be on our end, so let me see

13   what I can do.

14         THE COURT:  I have a question on 2.3 and it's kind

15   of picky, but you guys have gotten so detailed here.  The

16   debtors are authorized to (indiscernible) to be filed with

17   the Secretary of State whatever documents they need to do,

18   okay, including -- this is one, two, three, four, five lines

19   down -- including amended and restated certificates or

20   articles of incorporation and bylaws or certificates or

21   articles of amendment.

22         Why are we doing that and why do you need my

23   permission to do it if you're doing it?  We're not buying

24   stock.

25         MR. SCHARTZ:  Yeah, because we're just -- all we

1  are doing is buying assets.  The entity is already formed,

2  so -- that's the buyer entity -- so you're right.

3           I -- actually, you know, in the interests of

4  having fewer words, I actually think we just cut everything

5  at the comma, including that sentence.  I don't think we need

6  all of that to be honest.

7           THE COURT:  Okay.

8           MR. SCHARTZ:  So, I know I'm negotiating against

9  myself, but that first sentence, if it just stops at "sale

10 order" period, we're good.  That's all we need.

11          THE COURT:  Okay.

12          MR. SCHARTZ:  And then the paragraph will end with

13 the final sentence, unless Your Honor has questions with

14 that.

15          THE COURT:  (Inaudible.)

16          MR. SCHARTZ:  Judge, you are faint again on your

17 mic.

18          THE COURT:  Sorry.  I guess I'm okay with that.

19 I'm looking at that.

20          Okay.  Paragraph 2.4, (indiscernible) we're

21 binding and then about two-thirds of the way down, it starts:

22          "Nothing contained in any Chapter 11 plan or any

23 order confirming the plan or any order of a wind-down

24 dismissal shall alter, conflict with, or derogate with the

25 provisions of the sale order or the asset purchase agreement,

1   and to the extent of any conflict, the asset purchase

2   agreement shall control."

3            I'm not comfortable with that.  I'm comfortable

4   with they're not going to -- there's nothing going to be

5   conflicting with this sale order.  But, for example, as I

6   already said, I'm not prejudging a plan, so I'm not

7   comfortable with whatever is in your asset purchase

8   agreement, which I have not internalized prevailing over a

9   confirmation order I might enter.

10           MR. SCHARTZ:  So that comment would translate

11  into, in that second line where it's "asset purchase

12  agreement" comma, you would just put a period and strike

13  everything from the rest of the sentence?

14           THE COURT:  Yeah, I think that's okay.

15           MR. SCHARTZ:  We think that's acceptable.

16           THE COURT:  And then if you think there's an

17  issue, you need to bring it up at plan confirmation time.

18           MR. SCHARTZ:  Right.  Yep, understanding that we

19  can have our rights to participate in the plan process, as I

20  understand it.

21           THE COURT:  Okay.  Paragraph 3.11, my question is:

22  Can I order this?

23           MR. SCHARTZ:  I have 3.1 -- I just want to make

24  sure I'm looking at the right paragraph -- pursuant to

25  Sections 105, 363 --

1            THE COURT:  Oh, no.  3.11 --

2            MR. PACITTI:  3.11.

3            THE COURT:  3.11.

4            MR. SCHARTZ:  (Indiscernible.)  Okay, because I

5    was like, I hope (indiscernible).

6        (Pause)

7            THE COURT:  I -- I don't even know what it really

8    means or what I would be ordering them to do because I don't

9    have an understanding of the applicable tax rates,

10   contribution reimbursement obligations, experience rates.  I

11   have no idea what I would be ordering them to do and I've

12   never entered an order that's had this in it.

13           So, I guess the question is:  What authority do I

14   have to do this?

15           MR. SCHARTZ:  Well, the idea is -- it's been

16   awhile since I've looked at this issue -- the idea is, if I

17   understand it correctly, is that because this is just an

18   asset sale and we're leaving the debtor boxes behind, we're

19   selling free and clear whatever claims, unemployment,

20   compensation, taxes, whatever's listed here is staying behind

21   with the debtors and it's being sold to the Kinderhook buyer,

22   free and clear of those obligations.  The reason we have it

23   in here is that if one of the taxing authorities ever comes

24   and talks to us, then we've got specific language that we can

25   point to that's not just general, but more specific, because

1  we've had this issue come up in the 363 context of -- I'm

2  struggling to remember the example -- but that's why this is

3  in here, Judge.

4        THE COURT:  Yeah, and, again, I don't know why I

5  would have the authority to do this.  I can make this a free-

6  and-clear sale; that, I can do.

7        MR. SCHARTZ:  Yep.

8        THE COURT:  I can't issue a mandatory injunction

9  that tells the taxing and labor agencies and authorities in

10 certain states that they have to treat you under certain

11 words and certain terms that I don't even know what they mean

12 or what the import of it is.  I think you've got your

13 argument and if there becomes an issue, you know, there's any

14 number of paragraphs in here that says it's free and clear of

15 a thousand different things, but I have no -- where in the

16 Code do I have some authority to do this?

17       MR. SCHARTZ:  So, in that line, one, two, three,

18 four, five down, if we just stop at "reimbursement

19 obligations of the debtor," period, and cut the rest of that,

20 would that satisfy Your Honor's concern?  Because then you're

21 not ordering -- I get your point about the new employer and

22 what does that mean, experience (indiscernible) I get all

23 that -- but it would be helpful, I think, to be able to have

24 something that says we are free and -- we are buying free and

25 clear -- upon employment compensation, taxes, and related

1 contribution, and reimbursement obligations.

2          And I'm not aware of any law that would suggest

3 that those obligations have to go with the buyer.  I don't

4 think that's the case.

5          THE COURT:  Yes, I'm okay with that.  That's a

6 debtor obligation as I'm reading this and I'm permitting the

7 sale, free and clear of claims.

8          MR. SCHARTZ:  Okay.

9          THE COURT:  Okay.  Question 3 point -- I'm

10 sorry -- all right.  Paragraph 3.12, well, two questions.

11 Does the asset purchase agreement provide that the buyer can

12 make these assignments so that parties to assumed and

13 assigned contracts are aware of it and how does this fit in,

14 for example, with adequate assurance of future performance?

15          MR. SCHARTZ:  Let me turn to the asset purchase

16 agreement.  It's Section 10.6, page 58.  But it seems to me

17 that you're looking at a different docket entry.  Let me just

18 see real fast where that is (indiscernible) your version up

19 or I thought I had your version up.

20      (Pause)

21          MR. SCHARTZ:  And I believe the answer to your

22 question is, yes, there's no funny business on this

23 assignment provision.

24          MR. PACITTI:  10.6 of the APA, I believe.

25          MR. SCHARTZ:  Yes, because we can do it to

1  affiliated or to any lender or buyer and its affiliates.

2          I think what we should say in the sale order, just

3  to make this crystal clear, is that subject to the purchase

4  agreement, and we'll add some language that essentially says

5  modifying any right that a contract counterparty has for

6  assurance, something along those lines --

7          THE COURT:  Yeah.

8          MR. SCHARTZ:  -- (indiscernible) assignment.  In

9  other words, we can't change the deal.  We can't do something

10 in the dark.  We wouldn't do that anyway, but I think we can

11 clarify that point.

12         THE COURT:  Okay.  That's fine, because I did have

13 evidence that adequate assurance information was provided to

14 counter-contract parties, so I want to make sure that's still

15 solid evidence there, okay.

16         MR. SCHARTZ:  And we're not going to change that.

17         THE COURT:  Okay.  My next question is -- it's

18 paragraph 4.6 and 4.8.  I assumed 4.6 was there so that we

19 had a definitive list of the assumed and assigned contracts

20 one day before closing, but then 4.8 talks more broadly about

21 the rights of the buyer to modify the list of assigned

22 contracts.

23         So, what's the -- how does it work?

24         MR. SCHARTZ:  This is a good question.  Let me

25 look at the asset purchase agreement real fast.

1        (Pause)

2              MR. SCHARTZ:  Assumed contracts is 2.3.

3              Hold on a second.  I want to talk to my team for

4    just a second.

5              THE COURT:  Okay.

6        (Pause)

7              MR. SCHARTZ:  All right.  Judge, here's what -- we

8    don't anticipate changing the list after we close, so the

9    idea here is we can modify the list after the date the sale

10   order is entered.  Obviously, we need to comply with 4.16,

11   right, so it's a little bit confusing.

12             So, I would say, Subject to 4.16, the right of the

13   buyer to modify the list, blah, blah, blah is hereby

14   approved.

15             THE COURT:  Yeah, 4.6.

16             MR. SCHARTZ:  Yeah, subject to 4.6, yes.  In other

17   words, that's got to be the definitive list for the world to

18   know of what we're assuming.

19             THE COURT:  Okay.  That's fine.

20             MR. SCHARTZ:  I guess if we want to change it, we

21   can move the closing date back and file another list, that's

22   what we'll do.  Hopefully it's not that messy.

23             THE COURT:  Okay.  Paragraph 4.10, it's not

24   pulling up -- well, I'd have to pull it up online because I

25   don't have my Code -- but does Section 365(f) of the Code say

1  that the assignment and sale shall not be a default

2  thereunder?  I don't recall that -- I could be wrong -- and

3  I'm not sure why it's necessary or exactly what it means, but

4  I'm not sure it says that.

5         MR. SCHARTZ:  Well, there's a history here.

6         THE COURT:  It looks like to me like 4.10 and 4.11

7  are duplicative.  I don't know what 4.10 does that 4.11

8  doesn't do, but I also don't think the Code says that as I'm

9  looking at it.

10         MR. SCHARTZ:  So, 4.11 is an expansion on the

11  prohibition on *ipso facto* clauses that's built into 365(f).

12  It is an expansion of the concept using, again, more words,

13  but I don't think it's substantively changing it.  By the

14  way, I'm not arguing for this.  I think there's a way that we

15  can just make it easier.

16         What if we just said -- this is the type of stuff

17  that makes me hate lawyers, I'm not going to lie -- okay,

18  what if we do this and we draft it?  So, here's what we do.

19  Let's cut 11 completely because I don't think we need it and

20  we say, and we cut the rest of 4.10 and all we say is that

21  the assignment and sale by the debtors to the buyer of the

22  assigned contracts shall be -- is approved to the fullest

23  extent possible under 365(f).

24         How's that?

25         THE COURT:  That's fine.

1        MR. SCHARTZ:  That's all we need.

2  (Indiscernible.)

3        UNIDENTIFIED SPEAKER:  Yeah.

4        MR. SCHARTZ:  Yeah, we don't need 11.

5        THE COURT:  Okay.  Paragraph 4.14, I'm okay with

6  all counterparties to the assigned contracts shall cooperate

7  and expeditiously execute and deliver upon the reasonable

8  requests of the buyer.  I guess any instruments of any

9  consents or others, but this "and shall not charge the buyer

10 for," I -- how can I say that they have to spend money to

11 give you something they're requesting that may or may not be

12 necessary in their point of view.

13        MR. SCHARTZ:  Okay.

14        THE COURT:  Okay.  Paragraph 4.16, why is this

15 necessary?  If you're taking over the contract and stepping

16 in, you're stepping in.

17        MR. SCHARTZ:  Yeah, I think we're covered by the

18 language we're going to add to 4.10, so we can cut that.

19 We'll just delete it and say reserved.

20        THE COURT:  Okay.

21    (Pause)

22        THE COURT:  Okay.  Paragraph 6.7:

23 Noninterference, I don't understand.

24        MR. SCHARTZ:  I'm just taking this out.

25    (Pause)

1    MR. SCHARTZ:  Is the question, Your Honor, How

2 does this work?

3    THE COURT:  Yep.  What's it mean?

4    MR. SCHARTZ:  Yeah, so the idea is -- and you've

5 got to go back to 3.1 to look at the definition of adverse

6 interests --

7    THE COURT:  Right.

8    MR. SCHARTZ:  -- paraphrasing the block of text in

9 3.1 is, basically, adverse interest is anything that's left

10 behind that now has -- once the sale closes, has a claim

11 against the proceeds, right, that's left.

12    And what this is saying is that someone who has an

13 adverse interest with a claim against the debtor can't, post-

14 closing date, assert of lien or claim against the buyer,

15 right.  It's a clarifying, but I think important provision

16 that helps supplement 363(f).

17    THE COURT:  Okay.  Maybe I'm not getting it, but

18 what is this "or any actions that the debtors or their

19 successors may take"?

20    What's, "The holder of an adverse interest shall

21 interfere with the buyer's title or interfere with any

22 actions that debtors or their successors may take in the

23 Chapter 11 cases"?

24    Maybe I'm just misreading it, but I -- maybe

25 there's some words missing.  I don't know what it means.

1           MR. SCHARTZ:  Oh, I see your point, okay.

2      (Pause)

3           MR. SCHARTZ:  Frankly, I think that we could just

4  say, Enjoyment of the purchased assets, period, and just

5  delete the rest, the "based on," right?  That's the point.

6           THE COURT:  Yeah, that's fine, then.  Okay.

7           MR. SCHARTZ:  Do you agree with it?

8           MR. PACITTI:  Yeah.

9           MR. SCHARTZ:  The next time I put a 363 order in

10  front of you, it's going to be, like, half as long.  I

11  promising.

12           THE COURT:  It's usually helpful.

13           MR. SCHARTZ:  I promise.

14           THE COURT:  Okay.  6.11 --

15           MR. SCHARTZ:  Uh-huh.

16           THE COURT:  -- scope of approval.

17           MR. SCHARTZ:  I think given your prior comments --

18           THE COURT:  Yeah.

19           MR. SCHARTZ:  -- we just mark this as reserved and

20  we'll address it with how we are revising (indiscernible) as

21  2.1.

22           THE COURT:  Okay.  And, finally, 6.15, I don't

23  like orders that broadly say that anything that deal with

24  prior orders I've entered.  Is there anything inconsistent

25  with any prior order I've entered that we need to worry

1   about?  I can't think of anything.

2            MR. SCHARTZ:  For this case, no, because it's been

3   a pretty short process --

4            THE COURT:  (Indiscernible.)

5            MR. SCHARTZ:  -- without many orders, so we can

6   cut that sentence.  I agree.

7            THE COURT:  Okay.  So, those are my comments and

8   questions.  You all have some work to do.

9            MR. PACITTI:  And, Your Honor, we will be adding

10  the two provisions, one for Godfrey that we agreed on

11  earlier, and then the one for Twin Brook that we agreed on

12  earlier that --

13           THE COURT:  Yes.

14           MR. PACITTI:  -- happened this morning, so they

15  make their way into the pleadings.

16           THE COURT:  I'm sure they're fine if they're

17  agreeing to provisions.

18           MR. DETWEILER:  And may I please the Court?  Your

19  Honor, I'm Donald Detweiler on behalf of Mr. Godfrey.

20           And to the extent the Court has any questions on

21  the paragraph that all the parties have agreed to, we are

22  available to address any concerns Your Honor may have.

23           THE COURT:  Thank you.

24           MR. DETWEILER:  Thank you, Your Honor.

25           THE COURT:  Mr. Dean?

1           MR. DEAN:  Yes, thank you, Your Honor.

2           I just wanted to raise one, I think, very

3   important ambiguity in the order for us to discuss on the

4   record.

5           THE COURT:  Uh-huh.

6           MR. DEAN:  So 5.9(b) starts on page 482 and

7   continues to 483 of the clean.  It talks about the membership

8   of the oversight committee.

9           THE COURT:  5 point -- wait a second -- 5.9?

10          MR. DEAN:  Correct, 5.9.

11          MR. PACITTI:  I think he must be looking at an

12  old -- a prior --

13          THE COURT:  I don't have a 5.9(b).

14          MR. SCHARTZ:  Oh, he -- Mr. Dean is looking at

15  the --

16          MR. DEAN:  Oh, I'm looking at the APA, Your

17  Honor -- I'm sorry -- attached to the order.

18          MR. SCHARTZ:  And I think what you're going to say

19  is in 5.(b)  [sic], third sentence, we have something that's

20  screwed up?

21          MR. DEAN:  Well, yes.  So, it talks about the

22  three members of the oversight committee, one being selected

23  by the seller, one independent member being selected by the

24  buyer, and then another one being selected by the committee,

25  which, if it stopped there, I wouldn't have any questions.

1  But then the next sentence, If the sellers and the Committee

2  cannot agree on an independent member to be appointed to the

3  oversight committee prior to closing, such member shall be

4  selected by a litigation trustee in his sole discretion.

5          And I'm not sure I'm following why that last

6  sentence is there, but I would ask for clarification on that.

7          MR. SCHARTZ:  We screwed up.  It's a holdover from

8  the term sheet that we were negotiating on a different

9  structure, so we will delete that sentence in the final

10  version of the APA.  It's not correct.

11          MR. DEAN:  Thank you.  That clears our issue up,

12  Your Honor.  Thank you.

13          THE COURT:  Okay.  Anything else?

14          (No verbal response)

15          THE COURT:  Okay.  Then I believe we've concluded

16  everything on the agenda today, correct, Mr. Pacitti?

17          MR. PACITTI:  That's correct, Your Honor.

18          And I don't believe, unless Your Honor had changes

19  to the DIP order that was presented, it was really just

20  changing "interim" to "final" and all that kind of stuff.  I

21  don't think there was much there, but –

22          THE COURT:  Yeah, I will confess, I didn't focus

23  on this and nobody has brought any particular issues to me.

24  I've ruled on the one open issue, so I will approve that in

25  this form, especially in this case, where again, much of it

1  is sort of overtaken by the sale.

2          MR. PACITTI:  Your Honor, we'll submit one -- the

3  clean version just under further notice or certification, I

4  guess, and upload it.  We did not upload orders because we

5  suspected there would be changes.

6          THE COURT:  Okay.  Yes, work with my chambers on

7  that.

8          MR. PACITTI:  We will, Your Honor.

9          THE COURT:  And I believe I've got some matters

10  under COC, perhaps, and I'll look at those when I'm back in

11  the office, which should be Monday.

12          UNIDENTIFIED SPEAKER:  Yes, thank you, Your Honor.

13  It was -- it related to our retention applications.  They

14  were scheduled for the next hearing, so we couldn't get them

15  filed within 21 days of today, so we're just getting those

16  delivered to you.

17          THE COURT:  Okay.

18          UNIDENTIFIED SPEAKER:  Thank you very much.

19          THE COURT:  Okay.  Well, I believe that's

20  concludes our hearing, so we're adjourned.  Thank you,

21  counsel.

22          COUNSEL:  Thank you, Your Honor.

23      (Proceedings concluded at 1:16 p.m.)

24

25

<u>CERTIFICATION</u>

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

<u>/s/ William J. Garling</u>                    <u>March 24, 2023</u>

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable

<u>/s/ Tracey J. Williams</u>                    <u>March 24, 2023</u>

Tracey J. Williams, CET-914

Certified Court Transcriptionist

For Reliable

<u>/s/ Mary Zajaczkowski</u>                    <u>March 24, 2023</u>

Mary Zajaczkowski, CET-531

Certified Court Transcriptionist

For Reliable